UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
INVENSYS SYSTEMS, INC.,                    )
        Plaintiff,                   )
                                     )
    v.                               )      Civ. No. 1:05-CV-11589-WGY
                                     )
CENTENNIAL INSURANCE  COMPANY,  )
        Defendant.                   )      **HEARING REQUESTED**
_____)

### SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION OF FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Plaintiff Invensys Systems, Inc. respectfully submits the following Separate Statement of Undisputed Material Facts in support of his motion for summary judgment.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

#### Facts Concerning Underlying Claim

**1.** Plaintiff Invensys Systems, Inc. has filed this action to recover insurance proceeds under an excess/umbrella insurance policy issued by Defendant Centennial Insurance Company. See Complaint.

**2.** This insurance claim involves liability imposed upon Invensys pursuant to Findings of Fact and Rulings of Law issued on December 13, 1995, by Judge Stearns following a bench trial conducted in One Wheeler Road Associates, Inc. v. The Foxboro Company, Civ. No. 90-12873-K (D. Mass.). See Exh. 1.

**3.** Plaintiff Invensys Systems, Inc. is the corporate successor to a company known as Trans-Sonics, Inc.  In December 1974, Trans-Sonics was acquired by The Foxboro Company (now known as Invensys Systems, Inc.) and merged into an entity called Foxboro/Trans-Sonics,

1

Inc. In 1978, Foxoro/Trans-Sonics, Inc. was merged into The Foxboro Company. In 2001, The Foxboro Company changed its name to Invensys Systems, Inc. See Exh. 1 at 1 and n.2; Exh. 2.[1]

4.      The site in question consists of approximately 9.7 acres of semi-wooded land located at 200 Wheeler Road in Burlington, Massachusetts. The property was owned and occupied by the Foxboro Company (Foxboro) or its predecessor corporations (principally Trans-Sonics, Inc.) from August 16, 1954, to December 20, 1978. See Exh. 1 at 1 n.2.

5.      In 1978, Invensys sold the Wheeler Road site and ceased all operations at the site. In 1982, One Wheeler Road Associates purchased the Wheeler Road site. See Exh. 1 at 2.

6.      In 1956, Invensys built a 28,000 square foot factory on the then undeveloped site. Invensys was a manufacturer of precision electronics. Its main customer was the U.S. military. In 1958, the plant was enlarged by a 12,000 square foot addition.

7.      In 1978, Invensys sold the property to Blanton Wiggin and moved its operations to a facility on Blanchard Road in Burlington. See Exh. 1 at 2.

8.      In June of 1982, One Wheeler Road Associates, a Massachusetts limited partnership, purchased 200 Wheeler Road from Wiggin. The Gutierrez Company, a Delaware corporation with its principal place of business in Massachusetts, is the general partner of One Wheeler Road Associates. See Exh. 1 at 2.

9.      Two commercial tenants replaced Invensys at 200 Wheeler Road. From June of 1979 to December of 1988, U.S. Windpower, Inc., designed, built and tested windmill generators at the site. Fiske Med-Science, Inc., a medical equipment supplier owned by Wiggin, had offices

---

[1]      Hereafter, references to "Invensys" are intended to refer to Invensys, The Foxboro Company, Foxboro/Trans-Sonics, Inc., and Trans-Sonics; provided that where more specificity is required, references to "Trans-Sonics" will refer to Trans-Sonics, Inc. with respect to events occurring prior to the 1974 merger.

at the site between 1978 and 1982. Upon purchasing the property, One Wheeler Road Associates assumed U.S. Windpower's lease. (Fiske Med-Science ceased doing business at or about the time of the sale). In 1989-1990, One Wheeler Road Associates and Gutierrez demolished the old Invensys plant and replaced it with a six-story commercial office building. See Exh. 1 at 2.

10.    Invensys engaged in intensive manufacturing activity on the site. By 1959 Invensys employed over 230 workers. See Exh. 1 at 2.

11.    Invensys used commercial solvents to clean and degrease electronic components, and for that purpose purchased substantial quantities of TCE, methylene chloride, cutting oils, and freon, typically in 55 gallon drums and 5 gallon cans. See Exh. 1 at 2.

12.    Invensys was the only occupant of the site to use commercially formulated TCE and acetone in its operations, and the only occupant to use appreciable quantities of freon. See Exh. 1 at 3.

13.    One Wheeler Road Associates did not engage in manufacturing activities at the site or otherwise made use of hazardous materials. There is no evidence that Fiske Med-Science used hazardous materials in its operations. See Exh. 1 at 3.

14.    U.S. Windpower used a solvent called D-SOL 128, which contained PCE and methylene chloride, two of the site contaminants. It also contains petroleum distillate.  U.S. Wind power did not use TCE in its operations, the significant and highly toxic groundwater contaminant. See Exh. 1 at 3.

15.    In 1984, the Town of Burlington Board of Health discovered trichloroethylene (TCE), methylene choloride, freon, 1,1,1, trichloroethylene (TCA), tetrachloroethylene ("PCE"), and traces of petroleum distillates in a leaching basin at the site.  See Exh. 1 at 2.

3

16.     Subsequent investigation by U.S. Windpower and its contractor, Eastern Pipe, found two on-site waste disposal systems, a sanitary sewer leading to a septic leaching field, and a gravitational storm drain feeding the leaching basin. Three internal sinks and the floor drains in the main building, and three roof drains on the east side of the addition, were connected to the storm drain. See Exh. 1 at 2.

17.     When the plant was initially constructed, there were no practical means of connecting either system to the Burlington town sewer. The sanitary system was connected to the town sewer in 1974. See Exh. 1 at 2.

18.     In constructing the system of floor and sink drains, Invensys's primary concern was the possible impact waste solvents might have on the integrity of the plant's septic system. The routing of the internal sinks and floor drains to the leaching basin appears to have been undertaken to avert any such damage. See Exh. 1 at 3.

19.     Judge Stearns found that although employees were verbally admonished against using the sinks to dispose of chemical wastes, Invensys had little appreciation of the environmental risk. See Exh. 1 at 3.

20.     Uncontradicted testimony in the One Wheeler Road Associates lawsuit confirmed that Foxboro and Trans-Sonics employees did not pour solvents into sinks. See Sarapas Affidavit, Exh. 33 at ¶ 4, 5.[2]

---

[2]     See also, e.g., Nicholson Depo., Exh. 28 at 50 ("**Q:** Are you aware of whether any quantities of trichloroethylene . . . were ever poured down the sinks at the Wheeler Road facility? **A:** No. No."); Westcott Depo., Exh. 29 at 14 ("I asked him if we had ever put solvents down the sinks, and he confirmed my impression that that was an absolute no-no.  That was not done."), 68 ("[I]t was our policy not to put solvents down sinks; that is, not into the leaching bed, the septic system, the sewage system"); Manion Depo., Exh. 30 at 62 ("the corporate policy was that no organic solvents could be placed in a sink;" no knowledge of any instance when solvents were poured in sinks).

**21.**     Conditions on the site were inconsistent with continuous or repeated disposal of solvents into the environment. See Sarapas Affidavit, Exh. 33 at ¶ 6.

**22.**     In December of 1984, One Wheeler Road Associates and Gutierrez retained Haley & Aldrich, an environmental consulting firm, to investigate contamination in the area of the leaching basin and to recommend a course of remediation. Haley & Aldrich's samples confirmed the presence of the hazardous substances earlier identified. See Exh. 1 at 4.

**23.**     On April 23, 1985, Haley & Aldrich recommended that removal of the leaching basin "be discussed with the Burlington Board of Health (BOH) and (DEQE) prior to undertaking any work." See Exh. 1 at 4.

**24.**     A copy of the Haley & Aldrich report was forwarded to the Burlington BOH and the Massachusetts Department of Environmental Protection (then the DEQE). In November of 1985, DEQE issued a "Notice of Responsibility" ordering "immediate remedial actions" at the site, including the rerouting of the drainage system and the removal of any liquid residues from the leaching basin.  The Notice of Responsibility named Tilestone Estates (the nominee trust that held title during Trans-Sonics' period of ownership), Foxboro Trans-Sonics, Blanton Wiggin, Fiske Med-Science, One Wheeler Road Associates, and U.S. Windpower as potentially responsible parties. See Exh. 1 at 4.

**25.**     Sometime thereafter One Wheeler Road Associates and Gutierrez authorized Haley & Aldrich to begin work. Thereafter, and continuing for a period of several years, Haley & Aldrich and numerous contractors working at Haley & Aldrich's direction conducted substantial  site investigation and remediation activities, including soil and groundwater cleanup. See Exh. 1 at 4 - 7.

26.    All investigative and remedial work through the date of trial and all projected future remediation measures have been consistent with the requirements of the Massachusetts Contingency Plan and the National Contingency Plan and have been carried out with all necessary DEP approvals, and were reasonable in amount and necessary to restore the enviornrmental integrity of the property. <u>See</u> Exh. 1 at 10.

27.    The site investigation discovered various forms of latent damage to the piping for the drainage system, including broken and loose mortar and partially mortared pipes, three locations where sharp protuberances in the bedrock caused ruptures in the piping, and a hole with weathered edges that was sufficiently large to allow a large rock to fall through. Exh. 1 at 5-6.

28.    The site investigation determined that soil and groundwater contamination was located, *inter alia*, near the former leaching basin, below the areas where the underground piping had been compromised (<u>see</u> <u>supra</u>, Fact 27), near a drainage invert, and near a waste manhole. <u>See</u> Exh. 1 at 5-6.

29.    The remediation at the site includes future expected groundwater treatment and monitoring. <u>See</u> Exh. 1 at 6-7, 11, 12-13.

30.    In 1990, One Wheeler Road Associates and its general partner, The Gutierrez Company, filed suit against Invensys in federal court pursuant to the Comprehensive Environmental Response and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.*, and Mass. Gen. L. c. 21E, to recover response and remediation costs, including "damage to the value of the site and the cost of their investigative and remedial measures." <u>See</u> Complaint in <u>One Wheeler Road Associates, Inc.</u> v. <u>The Foxboro Company</u>, Civ. No. 90-12873-K (D. Mass.), Exh. 37 at ¶¶

16 - 43 and Prayer for Relief; <u>see</u> <u>also</u> Exh. 1 at 1.

**31.**    Following a bench trial, Judge Stearns ruled that Invensys, the owner and operator of the Wheeler Road facility from 1954 to 1978, was responsible for the releases of TCE contaminating the groundwater in the northeastern area of the site. <u>See</u> Exh. 1 at 9 (Finding No. 1) ("I base this conclusion on among other facts: (1) Foxboro stored hazardous materials at the site, including TCE; (2) Foxboro was the only occupant of the site to use TCE in its operations; (3) the monitoring wells downgradient of the leaching basin and the north and west drain lines, as well as samples taken from the surface of the bedrock, show high groundwater concentrations of TCE; (4) Foxboro had no formal policies regulating or monitoring employee use and disposal of hazardous materials; and (5) Foxboro has failed to show by a preponderance of the evidence that some third party was solely responsible for the release of TCE.").

**32.**    Judge Stearns found that Invensys bore some responsibility for soil contamination. <u>See</u> Exh. 1 at 9.  Judge Stearns also found that U.S. Windpower (whose liability was born by One Wheeler Road Associates and Gutierrez by dint of their ownership of the property when U.S. Windpower was a tenant) bore primary responsibility for soil contamination. <u>See</u> Exh. 1 at 9.

**33.**    Judge Stearns also found, based on expert testimony adduced by Invensys, that soil remediation efforts had little impact on groundwater quality and therefore were not properly chargeable to Invensys. <u>See</u> Exh. 1 at 10.

**34.**    Judge Stearns found that Invensys had established at trial, by a preponderance of the evidence, that the damage to soil was divisible from the damage to groundwater. <u>See</u> Exh. 1 at 10.

35.     Judge Stearns assigned responsibility for 100% of soil remediation costs ($231,563.96) to One Wheeler Road and Gutierrez Associates (by dint of their legal liability for contamination caused by their tenant, U.S. Windpower).

36.     Judge Stearns allocated 100% of groundwater remediation past costs ($187,672.00) and 100% of costs associated with the leaching basin and drainage system ($86,826.00), as well as 100% of future costs for these items, to Invensys. See Exh. 1 at 12.

37.     Judge Stearns allocated 54.25% of Phase I and Phase II response costs ($60,916) to Invensys. See Exh. 1 at 12.

38.     In total, Judge Stearns imposed damages of $335,515 upon Invensys, together with liability for reasonable attorney's fees and costs and expert witness fees. See Exh. 1 at 13.

39.     On April 19, 1996, Judge Stearns issued final judgment imposing $335,515 in damages, $217,082.79 in interest, $504,249.00 in attorney's fees and costs, and $87,677.00 in experts' fees and costs -- for a total judgment of $1,144,523.79. See Exh. 2.

40.     Both Invensys and One Wheeler Road/Gutierrez appealed Judge Stearns' ruling.

41.     Both Invensys and One Wheeler Road Associates having partly prevailed and partly lost at trial, the parties to the One Wheeler Road lawsuit agreed in October 1996 to waive their respective rights of appeal and to abide by the terms of the judgment as entered by Judge Stearns. On October 8, 1996, Invensys satisfied the judgment by paying the judgment amount plus accrued interest, for a total payment of $1,187,202.90. See Franciose Affidavit, Exh. 34 at ¶ 13; Exh. 25.

42.     In addition, the post-judgment resolution required the parties to work together to remediate soil and groundwater, with the parties' respective obligations formally set forth in a

8

February 2000 agreement implementing the Court's declaration of rights. See Exh. 26

(Settlement Agreement and Release). Pursuant to the February 4, 2000 agreement, Invensys has

paid a total of $506,286.34 to date, broken down as follows:

| | |
|---|---|
| Remediation costs (10/93 - 2/99) | $235,123.81 |
| Remediation costs through 2/00) | $102,762.59 |
| Additional remediation payments | $168,399.94 |
|    3/1/99 - 3/15/00 ($41,822.88) | |
|    4/1/00 - 10/14/00 ($14,131.86) | |
|    11/1/00 - 5/31/01 ($20,952.02) | |
|    6/1/01 - 5/31/02 ($20,050.55) | |
|    6/1/02 - 2/28/03 ($25,515.72) | |
|    3/1/03 - 4/30/04 ($15,567.74) | |
|    5/1/04 - 8/31/05 ($19,578.79) | |
|    9/1/05 - 3/31/06 ($10,780.38) | |
| **Total Remediation Costs (through 8/31/05)** | **$506,286.34** |

See Exh. 26 (agreement); Exh. 35 (record of post-settlement remediation costs paid through

March 31, 2006); Franciose Affidavit, Exh. 34 at ¶ 15. (Remediation costs are billed by One

Wheeler Road Associates to Invensys every 6 to 12 months. The most recent bill was sent in

April 2006 and accounted for costs through March 31, 2006.)

      43.    In connection with the underlying One Wheeler Road lawsuit, Invensys incurred

the defense costs through the date of the October 8, 1996 payment of the judgment of

$375,908.28. See Franciose Affidavit, Exh. 34 at ¶ 16.

      44.    Thus, the total loss incurred to date by Invensys (not including interest, expected

future remediation costs, or attorney's fees and costs), through March 31, 2006, is as follows:

| | |
|---|---|
| Net Attorneys Fees for Defending<br>Action through 10/8/96 (payment of judgment): | $ 375,908.28 |
| | |
| Satisfaction of Judgment (4/19/96 Judgment<br>plus post-judgment interest and costs<br>through 10/8/96 date of payment); | $1,187,202.90 |

| Response costs (including engineers and consultants, costs incurred under 2/4/00 agreement) | $ 506,286.34 |
|---|---|

**TOTAL AMOUNT OF LOSS (TO DATE)**          **$ 2,069,397.52**


**FACTS CONCERNING PRIMARY AND EXCESS INSURANCE COVERAGE**

**The Excess Policy Issued by Defendant Centennial Insurance Company**

**45.**    Defendant Centennial Insurance Company issued Policy No. 42-00 76 30, a three-year commercial umbrella policy, to Trans-Sonics for the period January 1, 1972-1975.  See Exh. 3.  This policy was issued directly to Trans-Sonics before the December 1974 merger with Invensys.

**46.**    The property damage limits of liability in the Centennial Policy were initially $2,000,000 per occurrence/aggregate per year, excess of primary limits of $100,000 per occurrence/aggregate per year.  On June 16, 1972, these limits increased to $5,000,000 per occurrence/aggregate per year, excess of primary limits of $100,000 per occurrence/aggregate per year.  Id.

**47.**    The Centennial Policy provides two kinds of coverage.  The first kind -- known as "excess" insurance -- becomes operative when a suit against the insured involved a claim covered by both the Centennial Policy and the underlying primary policy.  In such a case, the Centennial Policy provides coverage in excess of the limits of the underlying primary policy (which in each of the three years was provided by Liberty Mutual in the amount of $100,000 per occurrence/aggregate per year).  This "excess" coverage does not require Centennial to defend, but instead obligates Centennial to pay "ultimate net loss" incurred by the insured (including

defense costs and judgments). This obligation to pay ultimate net loss kicks in once the primary insurer had paid the full total of the underlying limits of liability. See Policy, Exh. 4 at 1 (Section IV(a)), at 3 (definition of "ultimate net loss").

**48.** The second type of insurance provided by the Centennial policy is known as "umbrella" insurance. "Umbrella" insurance becomes operative when a claim is covered by the terms of the excess/umbrella policy but is ***not*** covered by the terms of the underlying primary policy. In such case, Centennial is obligated to pay claims that are in excess of a "retained limit" of $25,000. In addition, the "umbrella" coverage obligates Centennial to defend Invensys from the beginning of the claim. See Policy, Exh. 4 at 1 (Section II.a.).

**49.** Because this claim was covered by the primary insurance issued by Liberty Mutual, this claim involves the ***excess*** coverage provided under the Centennial policy, not the umbrella coverage. Id.

**50.** The "excess" portion of the Centennial policy requires Centennial "to indemnify the insured for the ultimate net loss in exces of the retained limit hereinafter defined, which the insured shall become legally obligated to pay as damages by reason of the liability imosed upon the insured by law … on account of … (b) Property Damage Liability … to which this policy appliees, caused by an occurrence anywhere  in the world." See Policy, Exh. 4 at 1 (Section I).

**51.**   The policy defines "ultimate net loss" as follows:

> The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication nor compromise with the written consent of the company, after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses (including attorney's fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred.

> This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

See Exh. 4 at 3.

52.     The Centennial policy defines "occurrence" to mean an "accident, including continuous or repeated exposure to conditions, which results, in … property damage … neither expected nor intended from the standpoint of the insured." See Exh. 4 at 3.

53.     The Centennial policy defines "Property Damage Liability" to include "liability for damages because of (1) physical injury to or destruction of tangible property which occurs during the policy period." See Exh. 4 at 3.

54.     There is no pollution exclusion in the Centennial policy.  The policy jacket for the Centennial policy does not include any form of pollution exclusion, see id., and the numbered endorsements to the policy likewise did not include any pollution exclusion.  See id.  Centennial does not contend that the Policy contains any form of pollution exclusion. See Exh. 31 at 15 (answer to Interrogatory No. 6).

55.     Invensys was unaware of the existence of the Centennial policy until 1999, when it discovered a schedule of insurance prepared in connection with the Trans-Sonics merger in 1974. See Exh. 5; see also Franciose Affidavit, Exh. 34 at ¶ 29.

### The Underlying Liberty Mutual Primary Coverage

56.     Liberty Mutual provided two different categories of primary insurance to Invensys.  The first category of primary insurance involves a series of three one-year policies that Liberty Mutual issued directly to Trans-Sonics during the period s January 1,1972-73, January 1, 1973-74, and January 1, 1974-75, i.e., before the December 1974 merger between Trans-Sonics and Foxboro/Invensys. See Centennial Policy, Exh. 3 (schedule of underlying

insurance shows that Liberty Mutual issued primary coverage to Trans-Sonics).  This coverage shall be known as the "Trans-Sonics Primary Coverage."

57.     Other than a schedule of insurance prepared in connection with the Trans-Sonics merger, see Exh. 4, the Schedule of Underlying Insurance in the primary policy is the only evidence that was ever located to establish the Trans-Sonics Primary Coverage issued by Liberty Mutual. See Franciose Affidavit, Exh. 34 at ¶ 29-34.

58.     In each of the three years that the Trans-Sonics Primary Coverage was in effect, Liberty Mutual provided property damage limits of $100,000 per occurrence/aggregate. See Centennial Policy, Exh. 3 (Schedule of Underlying Insurance).

59.     Because the actual Liberty Mutual policies that were issued to Trans-Sonics could not be located, Liberty Mutual had no direct evidence that the policies contained a pollution exclusion (especially the first policy, which was issued in 1972 before the introduction of the 1973 ISO standard form policy containing a limited pollution exclusion). See Franciose Affidavit, Exh. 35 at ¶ 33, 35. ***Thus, the first category of Liberty Mutual primary policies -- covering the 1972-75 time period -- contained no form of pollution exclusion.***

60.     No other coverage issued to Trans-Sonics, other than the 1972- 75 primary policies from Liberty Mutual and the 1972 - 75 excess policy from Centennial, has ever been located. See Franciose Affidavit, Exh. 35 at ¶ 31.

61.     Invensys was unaware of the existence of the Liberty Mutual primary coverage that was provided to Trans-Sonics until 1999, when it discovered a schedule of insurance prepared in connection with the Trans-Sonics merger in 1974. See Exh. 5; see also Franciose Affidavit, Exh. 35 at ¶ 29, 30.

\* \* \* \*

**62.**    By coincidence, Liberty Mutual also provided primary liability insurance to Invensys at all times from the date of the merger in December 1974 through the date of the <u>One Wheeler Road</u> lawsuit in 1990.  <u>See</u> Franciose Affidavit, Exh. 35 at ¶ 19-21.

**63.**    All primary policies issued by Liberty Mutual to Invensys, from the date of the merger through 1990, contained either limited or absolute pollution exclusions. <u>See</u>, <u>e.g.</u>, 1974 primary policy (Exh. 38).  Liberty Mutual also issued a claims-made Pollution Legal Liability policy that was in effect during the period when the Wheeler Road claim was received, but coverage was excluded because the policy contained a "retroactive date" that prohibited coverage for releases commencing prior to June 1982. <u>See</u> 1990-91 policy (Exh. 39).  During the claims process and subsequently during coverage litigation between Invensys and Liberty Mutual, Liberty Mutual strenuously argued that these pollution exclusion would have barred coverage for the Wheeler Road loss. <u>See</u> Franciose Affidavit, Exh. 35 at ¶ 19-21.

**Settlement of the Primary Insurance Claim Against Liberty Mutual**

**64.**    Promptly after being sued by One Wheeler Road Associates and Gutierrez in 1990, Invensys tendered defense of this case to Liberty Mutual.  The tender was made pursuant to the Liberty Mutual policies that had been issued to Invensys. <u>See</u> Exh. 6; <u>see</u> <u>also</u> Franciose Affidavit, Exh. 35 at ¶ 23.

**65.**    In 1990, Invensys did not tender defense to Liberty Mutual under the primary policies issued by Liberty Mutual to Trans-Sonics, because Invensys was unaware of the existence of those policies. <u>See</u> Franciose Affidavit, Exh. 35 at ¶ 22.

**66.**    Liberty Mutual initially agreed to defend Invensys in the <u>One Wheeler Road</u>

lawsuit, pursuant to a reservation of rights.  Liberty Mutual appointed an experienced defense attorney, Louis Massery of Cooley, Manion, to undertake the defense.  <u>See</u> Exh. 6; <u>see</u> <u>also</u> Franciose Affidavit, Exh. 35 at ¶ 25.

**67.** Liberty Mutual subsequently denied coverage and withdrew from the defense of Invensys in the <u>One Wheeler Road</u> lawsuit.  However, Invensys continued to utilize the services of Mr. Massery and his firm, the defense counsel originally appointed by Liberty Mutual. <u>See</u> Exh. 6; <u>see also</u> Franciose Affidavit, Exh. 35 at ¶ 26. (In addition, Invensys retained an experienced environmental consultant, Leonard Sarapas of the firm of Dames & Moore, to provide expert consulting services in defense of the <u>One Wheeler Road</u> lawsuit.) <u>See</u> Franciose Affidavit, Exh. 35 at ¶ 27.

**68.** After the <u>One Wheeler Road</u> lawsuit resulted in a substantial judgment against Invensys, Invensys filed a coverage lawsuit against Liberty Mutual pursuant to the policies issued to Invensys.  In the course of the coverage lawsuit, Invensys discovered that Liberty Mutual also had issued primary coverage -- probably without any form of pollution exclusion -- to Trans-Sonics prior to the 1974 merger.  Invensys then notified Liberty Mutual that it was also seeking coverage pursuant to the policies issued to Trans-Sonics. <u>See</u> Franciose Affidavit, Exh. 34 at ¶ 33.

**69.** Following several years of litigation activity, Invensys and Liberty Mutual ultimately agreed in March 2000 to settle the coverage lawsuit.  Pursuant to a confidential settlement agreement, Liberty Mutual received a complete release from liability at the Wheeler Road site, in exchange for a payment to Invensys of $1,250,000, allocated as follows: (i) $300,000 for Invensys's attorneys' fees incurred in defending the <u>One Wheeler Road</u> lawsuit,

and (ii) $950,000 to indemnity Invensys  for  a portion of the damages that it had paid and would become obligated to pay. See Franciose Affidavit, Exh. 34 at ¶ 34.

70.    The settlement agreement between Liberty Mutual and Invensys further provided that the first $300,000 of the indemnity payment would be applied to exhaust the $100,000 per policy limits of the three policies that Liberty Mutual had issued to Trans-Sonics (January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75), which could not be shown to contain a pollution exclusion and therefore provided the clearest source of coverage.  The remaining $650,000 was allocated to subsequent Liberty Mutual policies (all containing pollution exclusions) issued to Invensys after the December 1974 merger. See Franciose Affidavit, Exh. 34 at ¶ 35.

71.    The net effect of the settlement with Liberty Mutual was the complete exhaustion of all primary limits for property damage liability in the periods directly below the Centennial policy.

## Notice to Centennial:

72.    On June 24, 1999, Invensys's counsel wrote to Centennial, requesting Centennial to search for evidence of coverage issued to Trans-Sonics. See Exh. 7.

73.    Numerous conversations thereafter ensued between John Yandrasitz (an attorney at Centennial) and Invensys's attorneys. See Exh. 8 (on July 16, 1999, Centennial attorney acknowledges numerous conversations); Exh. 10 (on June 9, 2000, Invensys attorney references numerous conversations over preceding year concerning One Wheeler Road Associates case and coverage dispute with Liberty Mutual); Exh. 12 (on July 12, 2000, Centennial attorney responds to June 9, 2000 letter and does not dispute that numerous conversations took place over

16

preceding year). Thus, as of July 1999, Centennial had received both written and oral notification of the coverage dispute with Liberty Mutual and the underlying One Wheeler Road Associates lawsuit.

74. On June 9, 2000 -- shortly after receiving the settlement check from Liberty Mutual -- Invensys's attorneys tendered a formal claim for coverage to Centennial. The tender was made at this time, because it was only after the payment by Liberty Mutual that the excess coverage in the Centennial had been triggered by exhaustion of the limits of the underlying primary policies in the 1972, 1973 and 1974 policy years. See Exh. 10.

75. Numerous letters were exchanged between the parties, as Invensys responded to Centennial's requests for information. See Exh. 11-22.

76. On July 12, 2001, Centennial denied coverage. See Exh. 23.

77. At no time during the claims process (including its claim denial letter dated July 12, 2001) did Centennial assert that it had been prejudiced by any alleged late notice or any alleged voluntary payment. See Exh. 23; see also, generally, Exh. Nos. 7-22.

78. At no time during the claims process (including its claim denial letter dated July 12, 2001) did Centennial identify any specific facts setting forth ways in which it believed it had been prejudiced by any alleged late notice or any alleged voluntary payment. See id.

79. At no time during discovery (including its responses to Interrogatory Nos. 9, 10, 11, 12 and 13) did Centennial identify any specific facts setting forth ways in which it believed it had been prejudiced by any alleged late notice or any alleged voluntary payment. See Exh. 31 at 16-24 (responses to Interrogatory Nos. 9, 10, 11, 12 and 13).

80. Centennial has refused to state whether there are any instances in which, as an

*excess* insurer, it has associated in the defense of an environmental pollution claim after the underlying primary insurer denied coverage and refused to defend. See Exh. 31 at 24 (response to Interrogatory No. 14.

## DAMAGES SOUGHT ON SUMMARY JUDGMENT

**81.**    Insofar as coverage is sought under the "excess" portion of the Centennial policy (as opposed to the "umbrella" portion), Invensys does not seek damages relating to the duty to defend. See Fact Nos. 47-50, supra.

**82.**    Of the $1,250,000 payment made by Liberty Mutual, $300,000 was allocated to the duty to defend. See Fact No. 69.  $950,000 was allocated to indemnity. See id.

**83.**    The total indemnity obligation incurred to date by Invensys is $1,693,489.24. See Fact No. 44.

**84.**    Accordingly, after giving credit for the portion of the Liberty Mutual settlement that was allocated to indemnity, the remaining indemnity obligation being sought by Invensys pursuant to this motion is $743,489.24.  This amount does not include future remediation costs (after March 31, 2006), interest, attorney's fees or costs.

Respectfully submitted,

PLAINTIFF INVENSYS SYSTEMS, INC.,
By its attorneys,

_____/s Robert J. Gilbert/_____
Robert J. Gilbert, Esq. (BBO # 565466)
GILBERT & RENTON LLC
344 North Main Street
Andover MA 01810
Tel (978) 475-7580
Dated: September 22, 2006          Fax (978) 475-1881


## CERTIFICATE OF SERVICE

I, Robert J. Gilbert, hereby certify that on September 22, 2006, a true and correct copy of the foregoing document was served electronically upon John T. Harding, Esq., counsel of record for Defendant Centennial Insurance Company.

_____/s Robert J. Gilbert/_____
Robert J. Gilbert

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 1

3 of 4 DOCUMENTS

**ONE WHEELER ROAD ASSOCIATES AND THE GUTIERREZ COMPANY v. THE FOXBORO COMPANY**

**CIVIL ACTION NUMBER 90-12873-RGS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHU-SETTS**

*1995 U.S. Dist. LEXIS 20219*

**December 13, 1995, Decided**

**COUNSEL:** [*1] For ONE WHEELER ROAD AS-SOCIATES, GUTIERREZ CO., THE, Plaintiffs: Richard A. Johnston, James W. Prendegrast, David S. Nalven, Hale & Dorr, Boston, MA.

For FOXBORO CO., THE, Defendant: William D. Gillis, Jr., Massery, Gillis & Guiney, Boston, MA.

**JUDGES:** Richard G. Stearns, UNITED STATES DISTRICT COURT

**OPINION BY:** Richard G. Stearns

**OPINION:**

FINDINGS OF FACT AND RULINGS OF LAW AFTER A TRIAL WITHOUT JURY

December 13, 1995

STEARNS, D.J.

The plaintiffs, One Wheeler Road Associates and The Gutierrez Company, brought suit under the Compre-hensive Environmental Response and Liability Act (CERCLA), *42 U.S.C. § 9601,* et seq. and Massachusetts G.L. c. 21E, to recover response and remediation costs for a site at 200 Wheeler Road in Burlington, Massachu-setts. The defendant Foxboro Company is a prior owner and occupant of the site. The plaintiffs also seek a decla-ration pursuant to *28 U.S.C. § 2201* that Foxboro is li-able for future remediation costs. A trial was held without a jury commencing September 13, 1994, and ending September 29, 1994. Extensive briefs were re-ceived by the court before and after the trial. Provisional Findings of Fact and Rulings of Law were issued on June 7, 1995. [*2] The parties were then invited to address any arguable factual or legal errors in the proposed find-ings and rulings. They did so in an especially construc-

tive fashion. On August 24, 1995, the court issued its final findings of fact and rulings of law. This was fol-lowed by a hearing on damages that commenced October 16, 1995. This opinion incorporates the findings and rul-ings of August 24, 1995 (with several minor technical corrections), supplemented by the court's determination of damages.

n1 Common law claims for restitution, neg-ligence, and strict liability were dismissed earlier in the proceedings by the court.

FINDINGS OF FACT

Based on the credible evidence, I find the following material facts.

1. The site in question consists of approximately 9.7 acres of semi-wooded land located at 200 Wheeler Road in Burlington, Massachusetts. The property was owned and occupied by the Foxboro Company (Foxboro) or its predecessor corporations (principally Trans-Sonics, Inc.) from August 16, 1954, to December 20, [*3] 1978. n2

n2 Prior to 1954, the property was owned by the Highland Sand and Gravel Company. High-land's activities at the site do not figure in the liti-gation. From 1954 to 1974 title to the property was held in the name of Tilestone Estates. Tile-stone apparently was a nominee trust. In its An-swer to the Complaint, Foxboro admitted that it was at all times the beneficial owner of the prop-erty. That admission is binding on Foxboro. In 1974, legal title was placed in the name of Fox-boro/Transonics, Inc. Foxboro/Trans-Sonics, Inc., was merged into the Foxboro Company in 1978.

EXHIBIT 1

2. In 1956, Foxboro built a 28,000 square foot factory on the then undeveloped site. Foxboro was a manufacturer of precision electronics. Its main customer was the U.S. military. In 1958, the plant was enlarged by a 12,000 square foot addition. In 1978, Foxboro sold the property to Blanton Wiggin and moved its operations to a facility on Blanchard Road in Burlington. In June of 1982, One Wheeler Road Associates, a Massachusetts limited partnership, [*4] purchased 200 Wheeler Road from Wiggin. n3 The Gutierrez Company, a Delaware corporation with its principal place of business in Massachusetts, is the genera partner of One Wheeler Road Associates.

n3 Wiggin received a forty percent interest in One Wheeler Road Associates as part of the consideration. There is no suggestion in the record that Wiggin has relinquished his stake in the partnership.

3. Two commercial tenants replaced Foxboro at 200 Wheeler Road. From June of 1979 to December of 1988, U.S. Windpower, Inc., designed, built and tested windmill generators at the site. Fiske Med-Science, Inc., a medical equipment supplier owned by Wiggin, had offices at the site between 1978 and 1982. Upon purchasing the property, One Wheeler Road Associates assumed U.S. Windpower's lease. (Fiske Med-Science ceased doing business at or about the time of the sale). In 1989-1990, plaintiffs demolished the old Foxboro plant and replaced it with a six story commercial office building.

4. On July 24, 1984, while reviewing [*5] plans submitted by U.S. Windpower to renovate space in the facility, the Burlington Board of Health took note of an "Industrial Waste Manhole" designated on one of the site plans. On September 22, 1984, with U.S. Windpower's permission, Richard Lombard, Environmental Engineer for the Board of Health, took a sample from a leaching basin capped by the manhole. The leaching basin, made of concrete blocks, was approximately 16' long, 8' wide, and 4 1/2' deep. Lombard observed that the floor of the basin was covered with an oily liquid. The test sample revealed the presence of several hazardous substances, among them trichloroethylene (TCE), methylene chloride, freon, 1, 1, 1 trichloroethane (TCA), tetrachloroethylene (PCE), and traces of petroleum distillates. n4

n4 Freon was the dominant substance detected in the sample, at 20,000 ppb, followed by TCE and PCA, at 10,000 ppb, and then PCE, at 5,000 ppb.

5. U.S. Windpower hired Eastern Pipe to explore the plant's drainage system. Eastern Pipe conducted smoke and [*6] dye tests and ran a miniature television camera through a portion of the drain line leading to the leaching basin. Eastern Pipe's investigation found two on-site waste disposal systems, a sanitary sewer leading to a septic leaching field, and a gravitational storm drain feeding the leaching basin. n5 Three internal sinks and the floor drains in the main building, and three roof drains on the east side of the addition, were connected to the storm drain. The portion of the drain line that Eastern Pipe was able to visually survey, that is, 219' of the west line running under the footprint of the addition between storm water manholes SW-3 and SW-4 were judged structurally sound, although the interior of the pipe was in a poor state of cleanliness. At a distance of 132' from SW-3, Eastern Pipe found an intact service connection serving the three roof drains. The north line leading from SW-4 to the leaching basin was clogged and inaccessible to Eastern Pipe's camera. The basin itself Eastern Pipe observed to contain an oily residue. n6

n5 When the plant was initially constructed, there were no practical means of connecting either system to the Burlington town sewer. The sanitary system was connected to the town sewer in 1974. Foxboro's denial that it "designed, constructed or installed" either drainage system, while literally true, is disingenuous. There is no doubt that both systems date from Foxboro's occupancy and development of the site and were installed at Foxboro's direction.

[*7]

n6 The storm drain was active, as evidenced by the fact that Eastern Pipe was forced to pump water out of the system in order to conduct the television probe. Eastern Pipe's manual survey of the line between storm water manholes SW-1 and SW-2 disclosed no obvious structural defects although it did find that the pipe was in need of cleaning.

6. Foxboro engaged in intensive manufacturing activity on the site. By 1959 Foxboro employed over 230 workers. Foxboro used commercial solvents to clean and degrease electronic components, and for that purpose purchased substantial quantities of TCE, methylene chloride, cutting oils, and freon, typically in 55 gallon drums and 5 gallon cans. n7 Foxboro also used small quantities of acetone. Foxboro had no written policies regarding the handling and disposal of chemical solvents. n8 Employ-

ees of Foxboro routinely drew solvents from drums stationed in a central storeroom to wash electronic parts at individual work benches and stations throughout the plant. Employees in the manufacturing area had access to the internal sinks and floor drains connected to the [*8] storm system. Although employees were verbally admonished against using the sinks to dispose of chemical wastes, Foxboro had little appreciation of the environmental risk. n9 While Foxboro had drums available in the central storeroom to collect spent solvents, Foxboro did not maintain records of the amounts of solvents withdrawn or the amounts of wastes returned, or any records of waste disposal. n10 Foxboro was the only occupant of the site to use commercially formulated TCE and acetone in its operations, and the only occupant to use appreciable quantities of freon.

n7 TCE, as constituted for industrial use in the 1950's and 1960's, occasionally contained trace amounts of PCE. A freon based solvent used by Foxboro (TMC Solvent) contained freon 113 of which PCE is an intermediate constituent, but there is no direct evidence that Foxboro used TMC solvent at the Wheeler Road (as opposed to the Blanchard Road) facility. PCE was found in a "grab" sample (containing soil and water) taken from beneath a concrete slab constructed by Foxboro to support a metal storage shed at the rear of the building. (The sample also revealed the presence of TCE). The hydrological configuration of the property excludes an upgradient source for the PCE or the possibility of any lateral seepage from the area of the leaching basin. The absence of any trace of methylene chloride in the sample, on the other hand, excludes D-SOL 128 as the PCE source. This sample is the only evidence suggesting that Foxboro might have used commercially formulated PCE in its operations at Wheeler Road. There is evidence that U.S. Windpower used the shed to store hazardous materials.

[*9]

n8 A written disposal policy was promulgated by Foxboro when it relocated to the Blanchard Road facility in 1978. Foxboro also contracted with a waste recycler at Blanchard Road, but not until 1980.

n9 Vernon Westcott, a principal of Foxboro, testified in deposition that his concern was the possible impact waste solvents might have on the integrity of the plant's septic system. The routing of the internal sinks and floor drains to the leaching basin appears to have been undertaken to avert any such damage.

n10 Neither Foxboro's facilities manager nor its purchasing agent could account for Foxboro's disposal of waste solvents. There is little if any credible evidence suggesting that Foxboro employed the services of a waste scavenger or recycler while at Wheeler Road.

7. One Wheeler Road Associates has not engaged in manufacturing activities at the site or otherwise made use of hazardous materials. Fiske Med-Science assembled medical devices on the site but did not engage in manufacturing. (Fiske Med-Science employed five or fewer persons). There is no evidence that Fiske Med-Science [*10] used hazardous materials in its operations.

8. U.S. Windpower assembled and tested wind-driven generators during its residency at the site. Although most of the windmill components were manufactured in California, U.S. Windpower used gear oil, a solvent called D-SOL 128, a variant of the same solvent called D-SOL F13, paint thinner, and a rust preventative called ZRC to lubricate, degrease and protect metal parts. D-SOL 128 contains PCE, n11 and methylene chloride, two of the site contaminants identified by Richard Lombard. It also contains petroleum distillate. PCE is a significant contaminant of the site soils, particularly when its high toxicity is considered.

n11 At the relevant time, D-SOL 128 contained 20% PCE by volume.

9. U.S. Wind power did not use TCE in its operations, the significant and highly toxic groundwater contaminant. n12 Employees of U.S. Windpower had access to the internal sinks and floor drains connected to the storm system leading to the leaching basin. The amount of D-SOL 128 used [*11] by U.S. Windpower was relatively modest, on the order of ten gallons a month. n13 Service Chemical, U.S. Windpower's supplier, delivered at least four 55 gallon drums of D-SOL 128 to the site prior to May of 1985 when the sinks and floor drains were apparently disconnected from the storm system. U.S. Windpower's use of gear oil was substantial, on the order of 700-900 gallons a month. U.S. Windpower also disposed of a five gallon can of waste D-SOL F13 (which contains TCA and freon) in 1988 through Northeast Solvents, a recycler. There is evidence that U.S.

Windpower began recycling at least some of its oil and chemical wastes in late 1983. n14

> n12 While Leonard Sarapas, defendant's expert witness testified that TCE can be a degradation byproduct of PCE, there is no evidence that chemical decomposition of PCE explains the presence of TCE in the groundwater at the site.

> n13 Richard Lombard, who visited U.S. Windpower's facility on at least five occasions in 1984, testified that he did not observe any intensive use of solvents.

> n14 U.S. Windpower obtained a RCRA generator number in September of 1983 authorizing the off-site disposal of hazardous wastes.

[*12]

10. In December of 1984, the plaintiffs retained Haley & Aldrich, an environmental consulting firm, to investigate contamination in the area of the leaching basin and to recommend a course of remediation. Haley & Aldrich's samples confirmed the presence of the hazardous substances earlier identified by Richard Lombard. In April or May of 1985, the connections between the internal sinks, floor drains and the three roof drains and the leaching basin were severed, although by whom and in what circumstances is unexplained. It is possible, given the inconclusiveness of the evidence, that the connections were not completely severed until the permanent rerouting of the drainage system to a new leaching field was accomplished in December of 1986 or February of 1987.

11. On April 23, 1985, Haley & Aldrich recommended that removal of the leaching basin "be discussed with the Burlington Board of Health (BOH) and (DEQE) prior to undertaking any work." A copy of the Haley & Aldrich report was forwarded on plaintiffs' behalf to the Burlington BOH and the Massachusetts Department of Environmental Protection (then the DEQE). In November of 1985, DEQE issued a "Notice of Responsibility" ordering [*13] "immediate remedial actions" at the site, including the rerouting of the drainage system and the removal of any liquid residues from the leaching basin. Sometime thereafter plaintiffs authorized Haley & Aldrich to begin work. n15 In December of 1986, Clean Harbors, Inc., working at Haley & Aldrich's direction, pumped approximately 1,000 gallons of liquid out of the leaching basin. The basin was then excavated and filled. n16 One hundred and twenty cubic yards of visibly contaminated soil was removed from the site. Haley & Al-

drich also undertook to have the roof drain system permanently rerouted to a new leaching structure at the front of the property. That work was performed by Bob Griffin & Sons, Inc., also in December of 1986. Griffin & Sons constructed a new leaching field at the front of the building connected to the storm waterhole SW-3 at the northeast corner of the addition. In either December of 1986 or February of 1987, Griffin & Sons plugged the west drain line at SW-3. n17 A 2,000 gallon underground oil storage tank was also dug up and removed at Haley & Aldrich's direction.

> n15 The Notice of Responsibility named Tilestone Estates, Foxboro Trans-Sonics, Blanton Wiggin, Fiske Med-Science, One Wheeler Road Associates, and U.S. Windpower as potentially responsible parties.

[*14]

> n16 Although DEQE had not ordered the leaching basin removed, Zachary Peters, the environmental official with oversight responsibility for Wheeler Road, testified that DEQE approval was not required. In a February 22, 1988 review, DEQE ratified, among other, response actions, Haley & Aldrich's recommendation that the basin be excavated.

> n17 Defendant argues that if the plugging took place in February, the line might have been subject to surcharging (excess hydraulic pressure) caused by the prior plugging of the manhole at SW-4 where the west and north lines conjoined. Plaintiffs argue that, even if SW-3 had not been properly plugged in December, the path of least resistance would have been in the direction of the new leaching field, thus alleviating any surcharging in the west line.

12. Following excavation of the leaching basin, a DEQE site investigation showed "continued 'releases' at the site which may be indicative of additional 'sources' of contamination present or remaining." The DEQE "Site Inspection Letter Report," dated August 25, 1987, observed that the soil that had been [*15] backfilled at the site of the excavated leaching basin had been recontaminated. DEQE recommended further investigation "to evaluate the lateral and vertical extent of the soil and groundwater contamination."

13. In May of 1987, the plaintiffs retained Norwood Engineering, Inc. (Norwood) to undertake further as-

sessment and remediation efforts. Norwood assigned Jeffrey Nangle, its Chief Environmental Engineer, to the project. n18 After completing a "Phase I" investigation, Nangle confirmed that the new fill deposited in the old leaching basin had been recontaminated. Nangle also determined that soil adjacent to the waste manhole was contaminated, as was the local groundwater. On August 25, 1987, DEQE ordered that additional borings be sunk to determine "the lateral and vertical extent of the soil and groundwater contamination." In a December 14, 1987 submission to DEQE, Nangle tentatively identified TCE as the groundwater contaminant and, because of the additional presence of chlorinated compounds like PCE, guessed that its source was a degraded industrial solvent. He recommended initiation of a groundwater monitoring program, the dismantling of the waste manhole structure, and the [*16] pumping out of any residual effluent. On February 29, 1988, DEQE formally approved Nangle's recommendations. DEQE also ordered excavation of the piping system leading to the leaching basin. DEQE requested that two deep wells be installed to the surface of the bedrock, one on-site and the other off, to determine the extent of the groundwater contamination.

n18 Nangle testified that he has visited the site in excess of 200 times to oversee the remediation of the property.

14. In September 1988, Nangle prepared a "Phase III" report, n19 concluding that "the principal focus of site remediation should be placed upon the contaminated overburden in the vicinity of the abandoned drainage inverts, manhole assembly, and former leaching [basin]." Nangle identified these soil areas as "the principal source origin for a further release of on-site contaminants to the underlying groundwater table." Nangle recommended remediation of the soils by a combination of removal and on-site soil gas vapor extraction, undertaken in [*17] conjunction with a long term monitoring program to evaluate the effect of the remediation on groundwater quality. On April 14, 1989, DEQE approved Nangle's "Phase III" recommendations.

n19 DEQE waived the Phase II soil and groundwater assessment otherwise required by the Massachusetts Contingency Plan promulgated on October 1, 1988.

15. In October, 1989, Nangle, now the principal of his own firm, Nangle Consulting Associates, prepared a Heath and Safety Measures Work Plan in anticipation of Phase IV soil activity. Nangle proposed to proceed in

three stages -- the excavation of the drainage invert, manhole and any contaminated sediments, followed by reexcavation of the leaching basin and installation of a vapor recovery system for stockpiled soils, and finally, the setting up of a monitoring program to evaluate the functioning of the system. n20 On October 12, 1989, DEP verbally approved Nangle's Phase IV soil remediation plan. n21

n20 Nangle rejected the alternative of soil incineration because of its prohibitive cost.
[*18]

n21 A written approval was provided on February 5, 1990.

16. Soil excavation began at the waste manhole. No horizontal soil contamination was found above the level where the drain pipes were connected. At the connections Nangle found accumulations of a black viscous sludge. Significant residues of volatile organic compounds (VOCs) n22 were found in the soil at a depth one foot below the bottom of the manhole. No exfiltration appeared to have occurred from the manhole itself, although Nangle found signs of leakage around the partially mortared pipe connections. The manhole was dismantled and the associated sludge and sediments collected for off-site disposal.

n22 VOC concentration, which is determined by headspace screening, is not compound specific.

17. The pipes linking the manhole and leaching basin to the roof drains ran in a northerly direction towards the footprint of the old building addition and then turned [*19] 90 [degrees] west at storm water hole SW-4 running underneath the foundation of the addition to SW-3 at its northeast corner. Nangle excavated first along the north line. Chlorinated solvents were detected in samples taken from beneath the pipe, particularly in the soil adjacent to the partially mortared pipe joints. Below the pipe, Nangle found an undulating surface of bedrock with concentrations of VOCs in its troughs. Exfoliation in the surface of the bedrock Nangle took as evidence that the VOCs had migrated in the relatively distant past from the drainage system, a conclusion fortified by the orientation of pathways Nangle observed in the soil.

18. Nangle then began excavation along the west line. At three points, the pipe had been laid directly on

sharp protuberances in the bedrock. The higher concentrations of VOCs at these points indicated to Nangle that the drainage system had been compromised by the resulting pressure on the pipe. At a point in the west line approximately 132' from SW-3, Nangle found an 18" x 10" hole in the top of pipe section 19 where, according to the site plan, a service connection should have been installed. A fairly large rock had fallen through [*20] the hole into the pipe. The edges of the hole appeared weathered. No pipe shards were found during excavation of the area around the hole. n23 Elevated levels of VOCs, principally PCE, were found in samples of the surrounding soil. At levels approaching the bedrock TCE was found to be a major contaminant. The hole and the compromised pipes were the principal points of contaminant releases identified by Nangle along the west line.

n23 Eastern Pipe conducted a camera survey of the west line in 1984. According to Eastern Pipe's report, it found a service connection installed at the point where Nangle found the hole (132' from the manhole designated as SW-3). Although plaintiffs argue that Eastern Pipe might have been mistaken about the location of the service connection, or that the camera might have slipped by the rock at the bottom of the hole, I conclude that the hole had to have been created after Eastern Pipe's survey, although just how is a mystery. (The most likely explanation involves the undocumented disconnection of the three roof drains served by the service connection in the spring of 1985. The camera, which is 6" in diameter and rides on a sled, simply could not have missed a rock the size of the one unearthed by Nangle. (The drain pipe was 12" in diameter). Eastern Pipe did not survey the north line because of water accumulation and the thickness of the sediment.

[*21]

19. Nangle also observed that the interior of the pipe was clogged with a layer of black pasty sediment nearly 6" thick filling half the diameter of the pipe. The level of sediment tapered off toward SW-4, indicating that the hole had been a major exfiltration point. Although Eastern Pipe had determined the pipe to be "unclean" during the September 1984 survey, no accumulation of sediment of this magnitude had been observed. The sediment contained elevated levels of petroleum distillates.

20. Nangle next excavated the backfill in the area of the former leaching basin. Concentrations of chlorinated solvents (including PCE) were found in the soil begin-

ning three feet below the surface. Excavation proceeded to the surface of the bedrock, at 22 feet below grade.

21. Approximately 850 cubic yards of soil removed during the excavation were placed in on-site treatment cells as called for in Nangle's Phase IV plan. Some 770 soil samples were taken during Phase IV activities. Fifty-one of the samples were submitted for laboratory analysis employing EPA approved methods. (The remaining samples were screened using EPA approved headspace methods). The laboratory tests confirmed PCE as a principal [*22] soil contaminant.

22. Soil removal and vapor cell treatment had been conceived by Nangle as an antidote for the groundwater contamination at the site. As excavation and sampling continued, however, it became increasingly clear that the soil, although contaminated with PCE, was not the source of the TCE infecting the water.

23. Groundwater monitoring at test wells in areas downgradient of the north and west lines disclosed significant fluctuations in levels of TCE which Nangle attributed to the soil disturbance caused by the excavation and the flushing effect on the bedrock of seasonal surges in the groundwater level. n24 PCE levels on the other hand, remained constant, suggesting to Nangle that the relative insolubility of PCE had inhibited its migration from release points along the drain lines into deep soil. Monitoring wells to the south of the building (upgradient) indicated the presence of both PCE and TCE, as opposed to the north wells where only TCE appeared in the groundwater. n25 The two areas are not hydrologically connected.

n24 Since cessation of excavation activities, groundwater quality has stabilized and shown modest seasonal improvement.

[*23]

n25 While PCE can degrade into TCE, the reverse is not true.

24. Once satisfied that the groundwater concentrations of VOCs had been stabilized, Nangle recommended that a closed carbon absorption remediation system be installed to treat groundwater before its discharge in the soil adjacent to the Vine Brook aquifer. n26 In May of 1991, DEP approved installation of a groundwater recovery well for that purpose (NC-35). On May 12, 1993, after inviting public comment (and receiving none) DEP issued plaintiffs a groundwater discharge permit. At the time of trial, plaintiffs were awaiting DEP approval of

the final components of the groundwater remediation plan.

n26 This recommendation represented an evolution in Nangle's thinking. Before completing the groundwater assessment, Nangle had hesitated at the cost and unpredictable efficiencies of a pump and treat solution, expressing hope that his soil remediation efforts might obviate the need for groundwater remediation.

[*24]

25. Through October of 1993, plaintiffs had incurred $ 629,032.03 in costs associated with response actions at the site, Of this amount $ 138,331.02 had been paid to the Gutierrez Construction Company (a subsidiary of the plaintiff general partner) for construction management services performed in connection with response and remediation work at the site. The fees paid to Gutierrez Construction Company consist of a six percent contractor's fee and a ten percent "overhead" charge, to compensate Gutierrez for the costs of "on-site supervision" and support. The balance was paid to third party vendors and contractors ($ 386,323.05 to Norwood Engineering and Nangle Consulting Associates).

RULINGS OF LAW

A. CERCLA

CERCLA imposes liability on "persons" who "own" or "operate" a "facility" from which a release of hazardous substances occurs. *42 U.S.C. § 9607*(a)(2). See also *42 U.S.C. § § 9601*(9)(B) and (20)(A). As defined by § 9601(14), hazardous substances include, among other chemical contaminants, TCE, PCE, methylene chloride, freon, TCA, and acetone. Liability under CERCLA attaches regardless of fault. It need not be shown that an owner or operator in fact "caused" a release, [*25] merely that a release occurred during the time a defendant owned or operated the facility. *United States v. Monsanto Co., 858 F.2d 160, 168 (4th Cir. 1988).* If a release is shown, a defendant may escape liability only by showing by a preponderance of the evidence that a third party, "other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant," was the sole cause of that release. *42 U.S.C. § 9607*(b)(3). A release includes any spilling, leaking, discharging, escaping, leaching, dumping or disposing of hazardous substances into the environment. *42 U.S.C. § 9601*(22).

Under CERCLA, a responsible party may take such actions as are necessary to monitor, assess, and evaluate the release or threatened release of hazardous substances, and to dispose of removed material, or to otherwise minimize or mitigate environmental damage. *42 U.S.C. § 9601*(23). A responsible party may also undertake such remedial actions as are necessary to prevent or minimize any future release of hazardous substances into the environment. *42 U.S.C. § 9601*(24).

A plaintiff who undertakes [*26] removal and response actions to remediate environmental damage resulting from a release by a third party may recover the necessary costs of those actions. *42 U.S.C. § 9607*(a)(4)(B). Such costs are presumptively necessary if the response action conforms with the requirements of the National Contingency Plan. *42 U.S.C. § 9607*(a)(4)(B).

If a plaintiff is an "innocent" party, it may seek to hold a defendant jointly and severally liable for its response costs in a § 9607 action. This is true even though a partially culpable party may end up paying for more than its actual share of the harm. *O'Neil v. Picillo, 883 F.2d 176, 179 (1st Cir. 1989).* The blow is somewhat softened by the statutory cause of action for contribution *(42 U.S.C. § 9613*(f)) that a partially culpable party is authorized to bring against other liable (and hopefully solvent) panties. The policy of CERCLA is to encourage voluntary clean-up actions by shifting the burden of enforcing contribution from the shoulders of innocent parties to those of defendants who share at least some degree of responsibility. If, however, a defendant succeeds in showing that the environmental harm is divisible among or between responsible [*27] parties, a court is authorized to apportion damages. *Picillo, supra, 883 F.2d at 178-179.*

When a party that is not "innocent," but itself liable, "sues another to recover its equitable share of the response costs, the action is one for contribution, which is specifically recognized under CERCLA." *Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 672 (5th Cir. 1992).* n27 Pursuant to § 9613(f), the "non-innocent" party may seek to recoup "that portion of his expenditures which exceeds his pro rata share of the overall liability -- in other words, to seek contribution rather than complete indemnity." *United Technologies Corp. v. Browning Ferris Industries, 33 F.3d 96, 100 (1st Cir. 1994).* Contribution "refers to a claim 'by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make.'" *Id. at 99* (quoting *Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir. 1994)).* Where a plaintiff is a liable party, its claims against other potentially responsible parties are by definition actions for contribution. Id. at 101. n28 CERCLA (unlike M.G.L. c. 21E) does not authorize an award of attorneys' [*28] fees and expert witness fees. *Key Tronic Corp. v. United States, 128 L.*

*Ed. 2d 797,    U.S.    , 114 S. Ct. 1960, 1966-1967 (1994).*

n27 I agree with Foxboro that plaintiffs' argument that any claim of reciprocal contribution has been waived by Foxboro's failure to bring a counterclaim is untenable. Foxboro's effort to portray U.S. Windpower as the primary culprit is more properly labeled as an affirmative defense, see *Fed. R. Civ. P. 8(c)*, and as such it has been consistently prosecuted without surprise or prejudice to the plaintiffs. Cf. *Grant v. Preferred Research Inc., 885 F.2d 795, 797-798 (11th Cir. 1989).* The facts of International Clinical Laboratories v. Stevens 30 FRC (BNA) 2066, 2069 (E.D. N.Y. 1990) (to the extent the case should be regarded as having precedential value) are distinguishable, as Foxboro points out. The absent culprit here is, of course, U.S. Windpower, which plaintiffs, for whatever reason, chose not to join as a defendant in this action (possibly because it is insolvent). Because Foxboro had no connection with U.S. Windpower whatever (having left the property before Wiggin, a partner in Wheeler Road, brought U.S. Windpower on to the site as a tenant), responsibility for pursuing contribution from U.S. Windpower more appropriately lies with plaintiffs. Perhaps more important, I have found that U.S. Windpower is solely responsible for contamination of the site with PCE and, for all cognizable purposes, petroleum distillates, and that the resulting environmental harm is divisible. See *42 U.S.C. § 9607*(b)(3); *M.G.L. c. 21E, § 5(c)(3).*

[*29]

n28 *United States v. S.C.A. Services of Indiana, Inc., 865 F. Supp. 533 (N.D. Ind. 1994),* on which plaintiffs rely, is not to the contrary. As Judge Lee was careful to point out, SCA Services had never admitted liability nor had it ever been adjudicated as a liable party, as no trial on issues of liability had been held, nor had a consent decree been entered. *Id. at 545.* Here the case has been tried, and as is evident from the findings of fact, plaintiffs have been found partially responsible parties.

B. M.G.L. c. 21E

The definitional components of M.G.L. c. 21E are very fact specific and not seriously in dispute. n29 The parties are "persons" as defined by § 2 of Chapter 21E; the property at 200 Wheeler Road is a "site." Foxboro was an "owner" of the site and an "operator" during the time it conducted manufacturing operations there. U.S. Windpower was an "operator" during its occupancy. Plaintiffs are "owners" of the site. A "release" includes any spilling, leaking, or discharging, escaping, leaching or disposing of hazardous materials into the environment. *M.G.L. c. 21E,* [*30] *§ 2.* And finally, the identified contaminants, principally TCE and PCE, are hazardous materials for purposes of the statute. Under § 4 of M.G.L. c. 21E, "any person who undertakes assessment, containment or removal action regarding the release . . . [of] hazardous material shall be entitled to reimbursement from any other person liable for such release . . . for the reasonable costs of such assessment, containment or removal."

n29 *M.G.L. c. 21E*, it should be noted, borrows heavily from the provisions of CERCLA.

*M.G.L. c. 21, § 5(a)* "sets out five categories of persons responsible for response costs incurred as a result of releases that result in contamination. If a person falls into any of these five categories, the statute imposes liability 'without regard to fault.'" *Griffith v. New England Telephone & Telegraph Co., 420 Mass. 365, 366, 649 N.E.2d 766 (1995).*

Under terms of *M.G.L. c. 21E, §§ 5(a)(2) & (5),*

(2) any person who at the time of storage or disposal of any hazardous material owned [*31] or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material . . . and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a . . . site, shall be liable, without regard to fault.

"To impose liability under § 5(a)(5), a plaintiff must establish both that the defendant caused the release and that the release caused the contamination." *Griffith, supra, 420 Mass. at 369.* "Cause," as it is used in the statute means legal or proximate cause with its associated concepts of agency and contemporaneity. "Even if we accept, as we must, that the tanks [previously installed by the defendant] caused the contamination, it is by no

means clear that this occurred during the period of the defendant's lease." *Id. at 369-370).* Like its federal counterpart, M.G.L. c. 21E allows a defense of third party responsibility only if a defendant is able to show by a preponderance of the evidence that a third party was the sole cause of a release. *M.G.L. c. 21E, § 5(c)(3).*

Because an action under *M.G.L.* **[*32]** *c. 21E, § 4* is an action for reimbursement, a plaintiff may only recover those costs actually incurred in any assessment, containment or removal action which are reasonably necessary to prevent, minimize or mitigate damage to the environment. *Oliveira v. Pereira, 414 Mass. 66, 75, 605 N.E.2d 287 (1992).* "We have defined 'reimbursement' as 'repaying or making good the amount paid out.'" Id. Chapter 21E has no provision for an award of future damages. *Mailman's Steam Carpet Cleaning Corp. v. Lizotte. 415 Mass. 865, 874, 616 N.E.2d 85 (1993).* A plaintiff may, however, pursuant to *M.G.L. c. 21E, § 15,* recover attorneys' fees and expert witness fees incurred in initiating and prosecuting a claim for reimbursement. Sanitoy, Inc. v. Ilco Unican Corp.,' 413 Mass. 627, 631, 602 N.E.2d 193 (1992).

CONCLUSIONS OF FACT AND LAW

Based on the subsidiary findings of fact and rulings of law, I conclude that the following has (or has not) been established by a preponderance of the evidence:

1. Foxboro, the owner and operator of the Wheeler Road facility from 1954 to 1978, is responsible for the releases of TCE contaminating the groundwater in the northeastern area of the site. **[*33]** I base this conclusion on among other facts: (1) Foxboro stored hazardous materials at the site, including TCE; (2) Foxboro was the only occupant of the site to use TCE in its operations; (3) the monitoring wells downgradient of the leaching basin and the north and west drain lines, as well as samples taken from the surface of the bedrock, show high groundwater concentrations of TCE; (4) Foxboro had no formal policies regulating or monitoring employee use and disposal of hazardous materials; and (5) Foxboro has failed to show by a preponderance of the evidence that some third party was solely responsible for the release of TCE.

2. The installation during Foxboro's occupancy of a leaching basin connected to the internal sinks and floor drains of the plant provided the agency for disseminating TCE into the groundwater.

3. Foxboro shares some responsibility for the contamination of the soil, specifically for the accumulations of methylene chloride, freon, and acetone found in the earth adjacent to and underlying the leaching basin and the north and west drain lines. I base this conclusion on among other facts that Foxboro used appreciable quanti-

ties of these chemicals in its operations **[*34]** without adequate disposal precautions. I also note that only Foxboro used acetone in operations at the site, or freon in any significant quantities.

4. U.S. Windpower is responsible for the concentrations of PCE in the soil adjacent to and underlying the leaching basin and the north and west drain lines, and particularly for the contamination released through the hole in pipe section 19. U.S. Windpower is also primarily responsible for the concentrations of petroleum distillates in the soil. I base this conclusion on the fact that only U.S. Windpower used significant quantities of PCE and lubricating oils in its site operations as well as on the fact that the hole in pipe section 19 was created after Foxboro had quit the Wheeler Road premises.

5. Foxboro's installation of the leaching basin and drainage system cannot be deemed the legal cause of releases of contaminants by U.S. Windpower. *Griffith v. New England Telephone & Telegraph Co., 420 Mass. 365, 369-370, 649 N.E.2d 766 (1995).*

6. As between U.S. Windpower and Foxboro, there is insufficient evidence in the record to make it possible to allocate responsibility for the release of contaminants into the groundwater percolating **[*35]** to the south of the original building.

7. Plaintiffs One Wheeler Road Associates and The Gutierrez Company are not directly responsible for releases of contaminants at the site, nor is there any evidence to suggest that plaintiffs were involved in or exercised control over U.S. Windpower's operations at the site. However, as owners of the site from June of 1982 until December of 1988, plaintiffs are liable for any environmental damage caused by U.S. Windpower's operations 5(a)(2). n30 *42 U.S.C. § 9607*(a)(2); *M.G.L. c. 21E, § 5(a)(2).* n31

n30 This does not suggest any compromise of plaintiffs' right to seek an appropriate contribution from U.S. Windpower.

n31 Plaintiffs point out that U.S. Windpower began operations at the site in June of 1979 and that One Wheeler Road Associates did not purchase the property until June of 1982. "In fact, U.S. Windpower obtained a RCRA generator number after the first year of its tenancy under the plaintiffs (Findings, footnote 14), suggesting that disposal of hazardous materials from U.S. Windpower, if any, most likely occurred under a different owner." Plaintiffs' Post Trial Submission, at 11 n. 5. As may be evident from the findings, I draw the opposite inference from that fact,

that is, that U.S. Windpower began generating appreciable amounts of hazardous waste in its operations in 1983, after One Wheeler Road assumed ownership of the site. (The inference is buttressed by evidence comparing the condition of the drain pipes as found by Eastern Pipe in 1984 and by Nangle in 1989). Moreover, the "different owner" referenced by the plaintiffs is Blanton Wiggin, who is a forty percent shareholder in the Wheeler Road partnership. Plaintiffs related argument, that as "innocent parties" they are entitled to the remedy of a cost recovery action under § 9607 rather than contribution under § 9613, rests on the premise that they are in fact "innocent." As plaintiffs themselves acknowledge, "they are liable solely because they owned the site at a time when hazardous substances and materials may have been disposed there." Plaintiffs' Post Trial Submission, at 11. Liability under CERCLA may be harsh, but it is strict. "Congress intended only innocent parties - not parties who were themselves liable - to be permitted to recoup the whole of their expenditures." *United Technologies v. Browning-Ferris Industries, 33 F.3d 96, 100 (1st Cir. 1994).* It may be true, as plaintiffs suggest, that "seemingly no owner of a contaminated site - liable solely on the basis of its status as an owner - could ever bring a § 107 cost recovery action against the parties responsible for disposing hazardous substances at the site . . . . The practical consequences of such an interpretation would be to limit a § 107 cost recovery action to an 'innocent' government agency that had undertaken a response action." Plaintiffs' Post Trial Submission, at 11 - 12 & n. 6. Cf. *United Technologies, supra, 33 F.3d at 99 & n. 8.* Plaintiffs finally argue that "Foxboro has failed to prove that the contamination at the site was solely the responsibility of some third party or that the environmental harm at the site is divisible." Plaintiffs' Post Trial Submission, at 12. To the contrary, I have found that Foxboro has shown that it was not responsible for U.S. Windpower's operations at the site and that U.S. Windpower is solely responsible for the contamination of the soil with PCE, and for all practical purposes, with petroleum distillates.

**[*36]**

8. There is no evidence that Fiske Med-Science caused or was otherwise responsible for the release of hazardous materials at the site.

9. Foxboro has shown by a preponderance of the evidence that the environmental harms done to the site by Foxboro and U.S. Windpower are divisible, particularly in the northeastern area of the parcel where the remediation effort is concentrated. This is because of the mutually exclusive use of TCE and PCE by Foxboro and U.S. Windpower and the disparate impacts these two contaminants have had on the groundwater and soil respectively. The responsibility for the presence of lesser contaminants, is also capable of apportionment, if perhaps not with the exactitude that would satisfy a scientist, with sufficient precision to satisfy the law. Acetone, for example, was unique to Foxboro's operations, while U.S. Windpower used substantial quantities of gear oil.

10. Remedial measures taken have been consistent with the requirements of the Massachusetts Contingency Plan and the National Contingency Plan and have been carried out with all necessary DEP approvals. I base this conclusion on the testimony of DEP's representative, Zachary Peters, and on a determination **[*37]** of law.

11. Response costs to date, and those projected for the full remediation of the site are for the most part reasonable in amount and necessary to restore the environmental integrity of the property. I base this conclusion on the testimony of Jeffrey Nangle and Zachary Peters.

12. The Phase IV soil remediation effort, while reasonable in its conception, has had little impact on groundwater quality. I base this conclusion on the testimony of Leonard Sarapas and the analyses of groundwater quality performed over the course of the remediation effort.

13. The ten percent general contractor's overhead fee paid to Gutierrez Construction Company was a reasonable and necessary expense incurred as part of the response and remediation effort. The six percent surcharge ($ 10,337) assessed by Gutierrez as a profit for its work at the site was not a necessary or reasonable expense. The costs of the work done by Bob Griffin & Sons to install a new leaching field were reasonable and necessary, as were the costs incurred by plaintiffs in removing the underground storage tanks and the leaching basin. The costs of the environmental investigation of the site I also conclude were reasonable and **[*38]** necessary.

14. As a Massachusetts limited partnership and a Delaware corporation with a principal place of business in Massachusetts, plaintiffs are within the class of "citizens" defined by *M.G.L. c. 21E, § 15,* entitled to recover attorneys' fees and expert witness fees reasonably incurred in initiating and prosecuting this action. *Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 633, 602 N.E.2d 193 (1992).* Because the action was commenced prior to the enactment of § 4A(d) of M.G.L. c. 21E in 1992, plaintiffs are not required to show that Foxboro acted unreasonably in settlement discussions. n32

n32 I disagree with Judge Stagg's conclusion in *Joslyn Mfg. Co. v. Liberty Mut. Ins. Co., 836 F. Supp. 1273 (W. D. LA. 1993),* that a recovery under CERCLA, in addition to precluding a double recovery of response costs under state law, also precludes a state-authorized recovery of attorneys' fees. *42 U.S.C. § 9614*(b) bars excess compensation for "removal costs or damages or claims as provided in this chapter." It makes no mention of attorneys' fees as does not CERCLA generally. See *Key Tronic Corp. v. United States, supra. 42 U.S.C. § 9614*(a), on the other hand, permits a state to impose "any additional liability or requirements with respect to the release of hazardous substances within such state." This bar to preemption by CERCLA seems broad enough to permit a state to tax a responsible party with the transaction costs of an enforcement or recovery action where state and federal claims are brought in tandem in a federal lawsuit.

[*39]

15. There is a substantial controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment holding Foxboro liable for such reasonable and necessary costs as are incurred in the future remediation of the groundwater percolating in the soil to the north of the original plant. See *Wellesley Hills Realty Trust v. Mobil Oil Corp., 747 F. Supp. 93, 102 (D. Mass. 1990).*

DAMAGES

A hearing on damages was held commencing October 16, 1995, to determine the apportionment of response and remediation costs between One Wheeler Road Associates and Foxboro. The panties were necessarily constrained by the courts prior findings and rulings, particularly the determination that One Wheeler Road Associates is the party with primary responsibility for the remediation of the site soils and that Foxboro is the party responsible for the contamination of the groundwater. The parties agree that as of the end of October of 1993 (the stipulated cut-off date for present purposes), One Wheeler Road had expended $ 618,448.60 in response and remediation deemed reasonable and necessary by the court.

The apportionment of remediation costs is typically [*40] an inexact science. CERCLA recognizes as much, permitting a court to establish a party's liability in a contribution case by "using [among other measures] such equitable factors as the court determines are appropriate." *42 U.S.C. § 9613*(f)(1). See *Picillo, supra, 883 F.2d at 179.* Inexactitude, however, is not a reason to

abdicate the duty to decide. Cf. *United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1088 (1st Cir. 1994).*

In fashioning an allocation of costs in this case, I have given significant weight to the so-called "Gore factors." These have been described as "a nonexhaustive but valuable roster of equitable apportionment considerations." *In re Hemingway Transport, Inc., 993 F.2d 915, 921-922 n.4 (1st Cir. 1993).* They include the following:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
> (ii) the amount of the hazardous waste involved;
> (iii) the degree of toxicity of the hazardous waste involved;
> (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
> (v) the [*41] degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
> (vi) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

*United States v. R.W. Meyer, Inc., 932 F.2d 568, 571 (6th Cir. 1991).*

For reasons of historical discontinuity, the contributions of Foxboro and U.S. Windpower to the contamination of the Wheeler Road site are for the most part distinguishable, particularly as between TCE, the main groundwater contaminant, and PCE, the principal soil contaminant. There is little difference insofar as the toxicity of the two substances is concerned. Both are carcinogens and believed to pose a threat to human health. While Foxboro's gross contribution to the degradation of the site exceeds that of U.S. Windpower, Foxboro's role is mitigated in some degree by the fact that it polluted the site during an era in which the latent environmental threat of toxic substances was not as well understood as it is today, and when such substances were subject to far less regulation. Options open to U.S. Windpower [*42] in the 1970's, like recycling and scavenging, were not as readily available to Foxboro in the 1950's. Weighing against Foxboro, on the other hand, is the decision to

install a wastewater disposal system, the design of which, even by the more casual standards of the time, should have been recognized as irresponsible. Finally, to One Wheeler Road's credit, has been its energetic effort to remediate the site. While it is true that One Wheeler Road had little choice in the matter, it could have responded badly, instead of responsibly, as it has.

The parties submitted through the testimony of their expert witnesses, Jeffrey Nangle and Leonard Sarapas, proposals for the allocation of costs. While these are not dissimilar in structure, I have adopted the framework of the plaintiffs' proposal as the more conceptually clear of the two. I have also adopted the plaintiffs' assignment of costs by category. n33 Plaintiffs allocate these as follows:

| CATEGORY | AMOUNT |
|---|---|
| (1) Phase I and Phase II Response Costs | $ 112,286.58 |
| (2) Soil Response Costs | 213,563.96 |
| (3) Leaching Basin and Drainage System Response Costs | 86,826.00 |
| (4) Groundwater Response Costs | 187,672.06 |

[*43]

n33 The major conceptual difference in approach is that defendant lumps a number of costs incurred during investigation activities at the site into a general category it labels as "site characterization." Plaintiffs demarcate these expenses as directly related to either soil or groundwater remediation. While defendant's approach is not lacking in integrity, I believe that plaintiffs, who have borne the responsibility for the day-to-day remediation effort, have presented the more accurate accounting.

I will address each category in turn.

(1) Phase I and II Response Costs

Consistent with the proportionate allocation of costs between soil and groundwater remediation achieved below, I conclude that Foxboro should bear 54.25 percent of these costs, for a total of $ 60,916.

(2) Soil Response Costs

While I accept plaintiffs' attribution of costs to this category, I do not agree with the distinction they attempt to draw between remediation of "deep" and "shallow" soils. This distinction I do not believe [*44] to be supported by sufficient record evidence. I have previously concluded, that while the dominant share of responsibility for soil and groundwater pollution can be allocated between the parties, each is also to a lesser degree responsible for some cross-contamination. n34 Because I would assign roughly equivalent values to each party for their respective cross-contributions, I think the most manageable result is achieved by drawing a bright line

between soil and groundwater remediation. Consequently I assign the full costs of soil remediation, $ 231,563.96, to One Wheeler Road Associates.

n34 Foxboro, for example, is responsible for traces of methylene chloride, freon and acetone in the soil. As both plaintiffs' and defendant's expert acknowledged, traces of PCE (attributable to U.S. Windpower) have been detected in the groundwater, while no significant trace of TCE (attributable to Foxboro) has been detected in the soil.

(3) Leaching Basin and Drainage System

I attribute 100 percent of the responsibility [*45] for these costs, $ 86,926.00, to Foxboro, as the party responsible for the design and installation of the leaching basin and drainage system.

(4) Groundwater Response Costs

Consistent with my ruling with respect to soil remediation costs, I allocate 100 percent of these costs, $ 187,672.06, to Foxboro. n35

n35 This figure represents the costs of the remediation effort involving the north side of the Foxboro plant. I have ruled that there is insufficient evidence to assign responsibility for the contamination, if any, of the soil and groundwater to the south of the original building.

ORDER

1995 U.S. Dist. LEXIS 20219, *

For the foregoing reasons, judgment shall enter for plaintiffs against the defendant Foxboro Company in the amount of $ 335,515. It is further ADJUDGED and DE-CLARED that defendant is liable for such reasonable and necessary costs as have been, and will be incurred after October, 1993, in the groundwater remediation effort. The court will retain jurisdiction of the case for purposes of monitoring this decree. **[*46]** Plaintiffs are further entitled to such reasonable attorneys' fees and expert witness' fees as have been expended in initiating and maintaining this action. Plaintiffs shall, within fourteen days of this order, file an itemized bill for such attorneys' fees and expert witness' fees. Defendant shall have fourteen days to respond with objections, if any.

SO ORDERED.

Richard G. Stearns

UNITED STATES DISTRICT COURT

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBITS 2 THROUGH 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 9012873-RGS

ONE WHEELER ROAD ASSOCIATES AND
THE GUTIERREZ COMPANY

v.

THE FOXBORO COMPANY

FINAL JUDGMENT

APRIL 19, 1996

STEARNS, D.J.

This action came on for trial before the court, the Honorable Richard G. Stearns, District Judge, presiding, and the issues having been duly heard and tried, and orders and memoranda of decision having been issued on February 7, 1994, December 13, 1995, and April 3, 1996, it is hereby

ORDERED, ADJUDGED, AND DECLARED THAT

1.  Under Counts I and II of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, the plaintiffs, One Wheeler Road Associates and The Gutierrez Company, recover from the defendant, The Foxboro Company, the sum of $335,515.00 in environmental response costs, with interest thereon in the sum of $217082.79 calculated at the rate of 12% per annum from November 28, 1990 to the date of this Final Judgment, as provided by law;

EXHIBIT 2

CBN00288

PLAINTIFF'S EXHIBIT
53

2. Under Count II of the Complaint, the plaintiffs recover nothing of the defendant to the extent said Count is based upon a claim of property damage pursuant to M.G.L. c. 21E, § 5(a)(iii), which claim was dismissed by Order of the Court (Young, J.), dated February 7, 1994;

3. Under Counts III, IV, and V of the Complaint, having been dismissed by Order of the Court (Young, J.), dated February 7, 1994, the plaintiffs recover nothing of the defendant;

4. Under Count VI of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, as a substantial controversy between the parties of sufficient immediacy exists under 28 U.S.C. § 2201, a declaratory judgment based upon 42 U.S.C. § 9601, et seq. and M.G.L. c. 21E is hereby entered, over which this Court shall retain jurisdiction, holding the defendant liable to the plaintiffs for such reasonable d necessary response costs as have been and will be incurred after October 1993 in the remediation of the groundwater percolating in the soil to the north of the original plant located at the site owned by One Wheeler Road Associates in Burlington, Massachusetts; and

5. Under to M.G.L. c. 21E, § 15, pursuant to the Order of the Court (Stearns, J.), dated April 3, 1996, the plaintiffs recover from the defendant $504,249.00 in attorneys' fees and costs and $87,677.00 in experts' fees and costs.

Dated at Boston, Massachusetts, this 24 day of April, 1996.

Deputy Clerk of Court

Post-Judgment interest to date 2
at the rate of 5.46%.

- - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

(3) Leaching Basin and Drainage System

I attribute 100 percent of the responsibility [*45]  for these costs, $ 86,926.00, to Foxboro, as the party responsible for the design and installation of the leaching basin and drainage system.

(4) Groundwater Response Costs

Consistent with my ruling with respect to soil remediation costs, I allocate 100 percent of these costs, $ 187,672.06, to Foxboro. n35

- - - - - - - - - - - - - - - -Footnotes- - - - - - - - - - - - - - - - - -

n35 This figure represents the costs of the remediation effort involving the north side of the Foxboro plant. I have ruled that there is insufficient evidence to assign responsibility for the contamination, if any, of the soil and groundwater to the south of the original building.

- - - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - - -

ORDER

For the foregoing reasons, judgment shall enter for plaintiffs against the defendant Foxboro Company in the amount of $ 335,515. It is further ADJUDGED and DECLARED that defendant is liable for such reasonable and necessary costs as have been, and will be incurred after October, 1993, in the groundwater remediation effort. The court will retain jurisdiction of the case for purposes of monitoring this decree.  [*46]   Plaintiffs are further entitled to such reasonable attorneys' fees and expert witness' fees as have been expended in initiating and maintaining this action. Plaintiffs shall, within fourteen days of this order, file an itemized bill for such attorneys' fees and expert witness' fees. Defendant shall have fourteen days to respond with objections, if any.

SO ORDERED.

Richard G. Stearns

UNITED STATES DISTRICT COURT

INV00356

# REINS.

R 2269

**AL INSURANCE COMPANY**

**CIAL UMBRELLA DAILY REPORT**

BER 462- 00 76 30

Trans-Sonics, Inc.
P. O. Box 326
Lexington, Massachusetts 02173

INDIVIDUAL
PARTNERSH
CORPORATI
JOINT VENT

2. Policy Period: 12.01 A.M. standard time, at the address shown above  From: **1/1/72**   To: **1/1/75**   RENEWAL OR OF POLICY
   Agent or Broker      **Truman Hayes & Company**   **NEW**
   Office Address        **30 Federal Street**
   Town and State        **Boston, Massachusetts**

CENTRAL FILES

3. Limit of Liability: The limit of the company's liability shall be as stated herein, subject to all the terms of this policy having reference thereto.
   (a)   Policy Limit  $  **2,000,000**   Per Occurrence
   (b)   Aggregate Limit  $  **2,000,000**   Where Applicable
   (c)   Retained Limit  $  **10,000**   Per Occurrence

MAR 13 '72

4. Premium:   Three year term prepaid  $  **1,500.00**
   Three year term installment basis: on inception date  $  **500.00**   on each anniversary  $  **500.00**
   Minimum retained premium  $  **150.00**

5. Form numbers of endorsements attached to policy at inception:   **C1690A; D5303**

## SCHEDULE A OF UNDERLYING INSURANCE

| TYPE OF POLICY | CARRIER, POLICY NUMBER and POLICY PERIOD | | APPLICABLE LIMITS |
|---|---|---|---|
| | | | **Personal** Injury Liabili |
| (a) Comprehensive General Liability | **Liberty Mutual Insurance Company** LG1-112-067402-061 1/1/72 to 1/1/73 | $ **100** $ **300** $ **300** | ,000 each person ,000 each **occurrence** ,000 aggregate products |
| | | -$ **50** $ **50** | Property Damage Liability ,000 each **occurrence** ,000 aggregate operations, pro products and contractual; |
| (b) Comprehensive Automobile Liability Owned, Non-Owned and Hired Vehicles | **Lumbermens Insurance** 2M0443483 1/1/72 to 1/1/73 | $ **100** $ **300** | Bodily Injury Liability ,000 each person ,000 each **accident** |
| | | $ **50** | Property Damage Liability ,000 each **accident** |
| (c) Employers' Liability | **Liberty Mutual Insurance Company** WC1-112-067402-011 1/1/72 to 1/1/73 | $ **100** | ,000 each accident |

EXHIBIT 3

bjn EWL 3/9/72

INV00003

| OFFICE | P / C / CLASS TYPE | LINE | TRANS-AC-TION | STATE | TERR | TAX TOWN | COURT TITLE DEPOSIT DOUBLE CONT | COMM RATE | COMM RATE | IDENTIFICATION 55 56 57 58 59 60 | EXPOSURE ④ |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ② | 1 | ③ | 2 | ② | ③ | 4 | 2 | ③ | ③ | ②③①①①① | |
| | 02 | | | | | | | | | | |

*Effective*  1/1/72                                    , this endorsement forms a part of Policy No. 462 00 76 30
(*At the time stated in the policy*)
*issued to*  Trans-Sonics, Inc.

*by*  Centennial               Insurance Company.                    ENDORSEME
(*The information provided for above is required to be completed only when this*     #1
*endorsement is issued for attachment to the policy subsequent to its effective date.*)

### AIRCRAFT PRODUCTS EXCLUSION ENDORSEMENT

In consideration of the premium charged it is agreed that such coverage as
is afforded by this policy for the "Products Hazard" as defined does not ap;
with respect to "aircraft products".

For the purposes of this endorsement, "Aircraft Products" shall mean aircr;
missiles, and spacecraft and all component products used in aircraft, miss;
and spacecraft manufactured, sold, handled or distributed by the insured a;
shall also include ground support or control equipment and tools, spare pa;
training aids, instruction manuals, blueprints, egineering or other data,
engineering or other advice, and services and labor relating to such aircr;
or articles.

CENTRAL FILES

MAR 13 '72

All other terms and conditions of this insurance remain unchanged.

*Harold A. Eckman*
President                                    *Authorized Representative*

61690A

INV00004

| ⓒ | 1 | CARRIER TYPE 2 | LINE | TRANS- ACTION 2 | STATEMENT ⑦ | VENDOR ⑦ | TAX TOWN 4 | TAX COUNTY 2 | FILER ① | PROCESS CODE 2 | RATE ③ | RATE ③ | IDENTIFICATION 55 56 57 58 59 60 ① ① ① ① ① ① | ⑥ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | C | 02 | 471 | | | | | | | | | | 9 6 4 0 - 1 | |



Effective  4/1/72                    , this endorsement forms a part of Policy No.  462 00 76 30

(At the time stated in the policy)

issued to  Trans-Sonics, Inc.

by  Centennial          Insurance Company.

(The information provided for above is required to be completed only when this
endorsement is issued for attachment to the policy subsequent to its effective date.)

ENDORSEMENT
#2


The Aggregate limit under the underlying property damage policy

is increased from 50,000 to 100,000.


CENTRAL FILES

MAR 30 '72


All other terms and conditions of this insurance remain unchanged.

01690A (12/71)

INV00005

| OFFICE (3) | CARD TYPE C (1) | LINE (3) | TRANS-ACTION 2 | STATE (3) | TERM (3) | TAX TOWN 4 | TAX COIN 7 | TAX REPD (1) | PROC CODE 2 | RATE (4) | RATE (5) | IDENTIFICATION 55 56 57 58 59 60 | (5) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | C | 02 | 471 | | | | | | | | | 9 6 4 0 - 1 | |



*Effective* **June 16, 1972**                    , this endorsement forms a part of Policy No. **462 00 76 30**

*(At the time stated in the policy)*
*issued to* **Trans-Sonics, Inc.**

*by* **Centennial**          Insurance Company.

*(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)*

ENDORSEMENT #3

In consideration of the additional premium of $750.00 it is hereby

understood and agreed that the policy limit is increased to

$5,000,000.

*Effect per below)*

CENTRAL FILES
JUL 17 '72

**Truman Hayes**
bjn RPH 7/13/

All other terms and conditions of this insurance remain unchanged.

G1690A (12/71)                                        President          *Authorized Representative*

INV00006

| | | ② | 1 | 2 | ② | 3 | ① | ② | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 1 | C | 0 2 | 4 7 1 | | | | | | | | 9 6 4 0 | - | 1 | | | | | | | |

Effective **6/16/72**          . this endorsement forms a part of Policy No.   **462 00 76 30**

*(At the time stated in the policy)*

issued to   **Trans-Sonics, Inc.**

by   **Centennial**          Insurance Company.

*(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)*

CORRECTED
ENDORSEMEN
#3

In consideration of the additional premium of $636.00 payable as shown below, it is hereby understood and agreed that the policy limit is increased to $5,000,000.

### Additional Premium Payable:

| | |
|---|---|
| $136.00 | 6/16/72 |
| $250.00 | 1/1/73 |
| $250.00 | 1/1/74 |

CENTRAL FILES

JUL 17 '72

Truman Haye
bjn 2PR 7/1

All other terms and conditions of this insurance remain unchanged.

*Harold A. Eckmann*
President

------------------
*Authorized Representative*

G1690A (12/71)

INV00007

11 C 02 471                9 6 4 0 - 1

Effective    6/16/72            , this endorsement forms a part of Policy No. 462 00 76 30

(At the time stated in the policy)

issued to    Trans-Sonics, Inc.

by    Centennial        Insurance Company.

(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)

CORRECTED ENDORSEMENT #3

In consideration of the additional premium of $1,909.00 payable

as shown below, it is understood and agreed that the policy

limit is increased to $5,000,000.

Additional Premium Payable:

| $409.00 | 6/16/72 |
| $750.00 | 1/1/73 |
| $750.00 | 1/1/74 |

CENTRAL FILES

AUG 07 '72

All other terms and conditions of this insurance remain unchanged.

Truman Hayes &
bjn RFH 8/3/72

Harold A. Eckman
President

Authorized Representative

INV00008

ATLANTIC MUTUAL COMPANIES
Atlantic Mutual Insurance Company
Centennial Insurance Company

John E. Yandrasitz, Assistant Vice President and
Associate Corporate Counsel
john_e_yandrasitz@atlanticmutual.com

April 4, 2000

VIA FACSIMILE:  978-475-1881

TO:  ROB GILBERT

RE:  FOXBORO COMPANY
SUBPOENA - CIVIL ACTION NO. 97-6184

Dear Mr. Gilbert:

Enclosed is what we believe to be a copy of the generic policy wording for the identified Centennial umbrella policy.   We cannot tie them together with certainty but based upon information and belief , we believe that the enclosed specimen wording was utilized in the policy in question.  I trust this is satisfactory.   If not, please contact me.  I will be out of the office from 4/5 to 4/12.

John E. Yandrasitz

EXHIBIT 4

Commercial Umbrella Policy

# CENTENNIAL
# INSURANCE COMPANY

462-

- ABC Manufacturing Co.
- 4444 First Street
- New York, New York

3/1/69    To:   3/1/72

- John Smith Brokerage, Inc.
- 3333 Broad Street
- New York, New York



HOME OFFICE

Atlantic Building • 45 Wall St., New York, N. Y. 10005

ATLANTA • BALTIMORE • BOSTON • CHARLOTTE • CHATHAM, N. J. • CHICAGO • CINCINNATI
CLEVELAND • COLUMBUS • DALLAS • DENVER • DES MOINES • DETROIT • GRAND RAPIDS
HOUSTON • INDIANAPOLIS • JERICHO, N. Y. • KANSAS CITY • LOS ANGELES • MILWAUKEE
MINNEAPOLIS • NEW HAVEN • NEW YORK • ORLANDO • PHILADELPHIA • PITTSBURGH
PORTLAND. ORE. • ROANOKE • SACRAMENTO • ST. LOUIS • SAN ANTONIO • SAN FRANCISCO
SCARSDALE, N. Y. • SEATTLE • SYRACUSE

CEN00311

# CENTENNIAL INSURANCE COMPANY

## 45 WALL STREET, NEW YORK, NEW YORK 10005

(A stock insurance company, herein called the company)

Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the application and declarations and subject to the limits of liability, exclusions and other terms of this policy:

### Insuring Agreements

**I.    Coverage.** To indemnify the insured for the ultimate net loss in excess of the retained limit hereinafter defined, which the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law, or assumed by the insured under contract on account of
(a) Personal Injury Liability,
(b) Property Damage Liability, or
(c) Advertising Liability
to which this policy applies, caused by an occurrence anywhere in the world.

**II.    Defense — Settlement.** With respect to any occurrence not covered by the underlying policy(ies) listed in Schedule A hereof or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item (b) of Insuring Agreement IV, the company shall:
(a) defend any suit brought against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;
(b) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, but without obligation to apply for or furnish any such bonds;
(c) pay all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon;
(d) pay all reasonable expenses incurred by the insured at the company's request in assisting the company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $50 per day; and the amounts so incurred, except settlements of claims and suits are payable by the company in addition to the applicable limit of liability of this policy.
In jurisdictions where the company may be prevented by law or otherwise from carrying out this agreement, the company shall pay any expense incurred with its written consent in accordance with this agreement.
The insured shall promptly reimburse the company for any amount of ultimate net loss paid on behalf of the insured within the retained limit specified in Item (b) of Insuring Agreement IV.
This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

**III.    Definition of "Named Insured" and "Insured".** "Named Insured" includes any subsidiary company (including subsidiaries thereof) of the named insured and any other company coming under the named insured's control of which it assumes active management.
The unqualified word "insured", wherever used, includes the named insured and also:
(a) any person, organization, trustee or estate to whom or to which the named insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or on behalf of the named insured or to facilities of or used by the named insured;
(b) except with respect to the ownership, maintenance or use, including loading or unloading, of any automobile or aircraft, (1) any executive officer, other employee, director, or stockholder thereof while acting within the scope of his duties as such; (2) any organization or proprietor with respect to real estate management for the named insured;
(c) any person while using an automobile owned by or loaned to the named

insured or hired for use in behalf of the named insured and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with the named insured's permission, and any executive officer, director or stockholder of the named insured with respect to the use of an automobile not owned by the named insured in the business of the named insured. The insurance with respect to any person or organization other than the named insured does not apply under paragraph (c) of this Insuring Agreement:
(1) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place, with respect to any occurrence arising out of the operation thereof;
(2) with respect to any automobile hired by or loaned to the named insured, to the owner or a lessee thereof other than the named insured, or to any agent or employee of such owner or lessee, except as provided in paragraph (a) or (e) of this Insuring Agreement;
(d) with respect to any aircraft chartered with crew by or on behalf of the named insured, any person using such aircraft and any person legally responsible for the use thereof, provided the actual use is with the named insured's permission, except: (1) the owner or crew thereof or any other person operating the aircraft, or (2) any manufacturer of aircraft, engines or aviation accessories, or any aviation sales, service or repair organization or airport or hanger operator, or any employee or agent of any of them;
(e) any additional interest, other than the named insured or the insured described in paragraphs (a), (b) or (c) of this Insuring Agreement, included in the underlying policy(ies) listed in Schedule A, but only to the extent that insurance is provided to such additional insured thereunder;
(f) if the named insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such, however, this policy does not apply to personal injury, property damage or advertising offense arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured;
(g) if the named insured is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the named insured with respect to the conduct of such a business.

**IV.    Retained Limit — Limit of Liability.** With respect to Coverage I (a), I (b) or I (c), or any combination thereof, the company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:
(a) the total of the applicable limit(s) of the underlying policy(ies) listed in Schedule A hereof, and the applicable limit(s) of any other underlying insurance collectible by the insured, but in no event less than the amount stated in Insuring Agreement IV (b), or
(b) the amount stated in Item 3(c) of the declarations as the Retained Limit as the result of any one occurrence not covered by the said policy or policies of insurance; and then up to an amount not exceeding the amount stated in Item 3(a) of the declarations.
There is no limit to the number of occurrences during the policy period for which claims may be made, except that the liability of the company arising out of either the products hazard or the completed operations hazard or both combined on account of all occurrences during each policy year shall not exceed the amount stated in Item 3(b) of the declarations.
In the event of the reduction or exhaustion of the aggregate limit(s) of liability of the underlying policy(ies) listed in Schedule A by reason of losses paid thereunder, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limit(s), or (2) in the event of exhaustion, shall continue in force as underlying insurance.

**COMMERCIAL
UMBRELLA
POLICY**

**PROVISIONS
PART ONE**

EXCLUSIONS APPEAR ON REVERSE SIDE OF DECLARATIONS (PART TWO)

CEN00312

## Exclusions

This insurance shall not apply:

(a) to any obligation for which the insured or any company as its insurer may be held liable under any Workmen's Compensation, Unemployment Compensation, Disability Benefits or similar law, provided, however, that this exclusion does not apply to liability of others assumed by the named insured under contract or agreement;

(b) under Coverage I (b) to property damage to (1) property owned by the insured, or (2) the insured's products arising out of such products or any part of such products, or (3) work performed by or on behalf of the insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith, or (4) premises alienated by the named insured arising out of such premises or any part thereof, or (5) property rented to, occupied or used by or in the care, custody or control of the insured to the extent the insured is under contract to provide insurance therefor;

(c) under Coverage I (c) to liability for (1) failure of performance of contract, (2) infringement of registered trade mark, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans, (3) incorrect description of any article or commodity, or (4) mistake in advertised price;

(d) to personal injury liability or property damage liability arising out of the ownership, maintenance, operation, use, loading or unloading of (1) any watercraft over fifty feet in length, if the personal injury or property damage occurs away from premises owned by, rented to or controlled by the named insured, or (2) any aircraft, if such watercraft or aircraft is owned or chartered without crew by or on behalf of the named insured, or if such aircraft is being operated by any person in the course of his employment by the named insured and is owned by such person; but this exclusion does not apply to (i) personal injury to any employee of the named insured arising out of and in the course of his employment by the named insured, or (ii) liability assumed by the insured under any contract or agreement;

(e) under Coverage I (b) to loss of use of tangible property which has not been physically injured or destroyed resulting from (1) a delay in or lack of performance by or on behalf of the insured of any contract or agreement, or (2) the failure of the insured's products or work performed by or on behalf of the insured to meet the level of performance, quality, fitness or durability warranted or represented by the insured; but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the insured's products or work performed by or on behalf of the insured after such products or work have been put to use by any person or organization other than an insured;

(f) to damages claimed for the withdrawal, inspection, repair, replacement or loss of the use of the insured's products or work completed by or for the insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(g) to personal injury liability or property damage liability arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

(h) I.   under any Liability Coverage to injury, sickness, disease, death or destruction

(a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or

would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.   under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

III.   as used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operation;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

Page 2

CEN00313

Insert Declarations page (Part Two) here so that top edge butts against fold of Contract, and permits policy number to appear through window. ENDORSEMENTS, IF ANY, TO BE ATTACHED TO TOP OF PAGE 3.

## Conditions

**A.  Definitions.**

(1) **Advertising Liability** — The term "Advertising Liability" wherever used herein shall mean liability for damages because of:
(a) libel, slander or defamation;
(b) infringement of copyright or of title or of slogan;
(c) piracy or unfair competition or idea misappropriation under an implied contract;
(d) invasion of rights of privacy;
which occur during the policy period, and arising out of the named insured's advertising activities.

(2) **Aircraft** — The term "Aircraft", wherever used herein, shall mean any heavier than air or lighter than air aircraft designed to transport persons or property.

(3) **Automobile** — The term "Automobile", wherever used herein, shall mean a land motor vehicle, trailer or semi-trailer.

(4) **Completed Operations Hazard** — The term "Completed Operations Hazard" includes personal injury and property damages arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
(a) when all operations to be performed by or on behalf of the insured under the contract have been completed,
(b) when all operations to be performed by or on behalf of the insured at the site of the operations have been completed, or
(c) when that portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.
Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete shall be deemed completed.
The completed operations hazard does not include personal injury or property damage arising out of
(1) operations in connection with the transportation of property, unless the personal injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,
(2) the existence of tools, uninstalled equipment or abandoned or unused materials.

(5) **Insured's Products** — The term "Insured's Products" shall mean goods or products manufactured, sold, handled or distributed by the insured or by others trading under his name, including any container thereof (other than a vehicle) but "insured's products" shall not include a vending machine or any property other than such a container, rented to or located for use of others but not sold.

(6) **Occurrence** — The term "Occurrence" wherever used herein shall mean an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.

(7) **Personal Injury Liability** — The term "Personal Injury Liability" shall mean (a) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury, including death at any time resulting therefrom; (b) false arrest, detention or imprisonment, malicious prosecution or humiliation; (c) the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of rights of privacy, except when any of the foregoing of this part (c) arises out of the insured's advertising activities; (d) wrongful entry or eviction, or other invasion of the right of private occupancy; and (e) assault and battery not committed by or at the direction of the insured, unless committed for the purpose of protecting persons or property; which occur during the policy period. In no event shall any of the foregoing be construed to include discrimination, whether actual or alleged.

(8) **Products Hazard** — The term "Products Hazard" includes personal injury and property damage arising out of the insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the insured and after physical possession of such products has been relinquished to others.

(9) **Property Damage Liability** — The term "Property Damage Liability" shall mean liability for damages because of (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

(10) **Ultimate Net Loss** — The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal ex-

penses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred.

This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

**B.  Premium.**  Unless stated elsewhere to the contrary, the premium for this policy is the premium stated in Item 4 of the Declarations except as provided in Condition P.

**C.  Inspection and Audit.**  The company shall be permitted but not obligated to inspect the named insured's property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the named insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

The company may examine and audit the named insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**D.  Severability of Interests.**  The term "insured" is used severally and not collectively except with respect to (a) property owned by any named insured and (b) Insuring Agreement IV (Retained Limit — Limit of Liability) and (c) Condition J (Other Insurance). The inclusion in this policy of more than one insured shall not operate to increase the company's total liability for all insureds covered by this policy beyond the limits set forth in Insuring Agreement IV.

**E.  Insured's Duties in the Event of Occurrence, Claim or Suit.**
(a) In the event of an occurrence, which appears reasonably likely to involve such insurance as is afforded by this policy, written notice containing particulars sufficient to identify the insured and also reasonably attainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.
(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.
(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of personal injury or property damage or advertising offense with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense; however, in the event that the amount of ultimate net loss becomes certain either through trial court judgment or agreement among the insured, the claimant and the company, then, the insured may pay the amount of ultimate net loss to the claimant to effect settlement and, upon submission of due proof thereof, the company shall indemnify the insured for that part of such payment which is in excess of the retained limit, or the company will, upon request of the insured, make such payment to the claimant on behalf of the insured.

**F.  Assistance and Cooperation.**  Except as provided in Insuring Agreement II (Defense, Settlement) or Insuring Agreement IV (Retained Limit — Limit of Liability) with respect to the exhaustion of the aggregate limit(s) of the underlying policy(ies) listed in Schedule A, or in Condition K (Underlying Insurance), the company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured; but the company shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve the company. In such event the insured and the company shall cooperate fully.

**G.  Appeals.**  In the event the insured or the insured's underlying insurer elects not to appeal a judgment in excess of the retained limit, the company may elect to do so at its own expense, and shall be liable for the taxable costs, disbursements and interest incidental thereto, but in no event shall the liability of the company for ultimate net loss exceed the amount set forth in Insuring Agreement IV (Retained Limit — Limit of Liability) for any one occurrence plus the taxable costs, disbursements and interest incidental to such appeal.

**H.  Action Against the Company.**  No action shall lie against the company with respect to any one occurrence unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay an amount of ultimate net loss in excess of the retained limit shall have been finally determined either by judgment against the insured after actual trial or by written agreement of

CEN00514

the insured, the claimant and the company. The insured shall make a definite claim for any loss in which the company may be liable within a reasonable time after such final determination. If any subsequent payments are made by the insured on account of the same occurrence, the insured shall make additional claims from time to time and these claims shall be payable within thirty (30) days after proof in conformity with this policy. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the company as a co-defendant in any action against the insured to determine the insured's liability.

**I.  Bankruptcy or Insolvency.**  Bankruptcy or insolvency of the insured shall not relieve the company of any of its obligations hereunder.

**J.  Other Insurance.**  If other collectible insurance with any other insurer is available to the insured, covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. If collectible insurance under any other policy(ies) of the company is available to the insured, covering a loss also covered hereunder (other than underlying insurance of which the insurance afforded by this policy is in excess), the company's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies).

**K.  Underlying Insurance.**  If underlying insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

**L.  Subrogation.**  The company shall be subrogated to the extent of any payment hereunder to all the insured's rights of recovery therefor; and the insured shall do nothing after loss to prejudice such rights and shall do everything necessary to secure such rights. Any amount so recovered shall be apportioned as follows:

Any interest (including the insured's) having paid an amount in excess of the retained limit plus the limit of liability hereunder shall be reimbursed first to the extent of actual payment. The company shall be reimbursed next to the extent of its actual payment hereunder. If any balance then remains unpaid, it shall be applied to reimburse the insured or any underlying insurer, as their interests may appear. The expenses of all such recovery proceedings shall be apportioned in the ratio of respective recoveries. If there is no recovery in proceedings conducted solely by the company, it shall bear the expenses thereof.

**M.  Changes.**  Notice to or knowledge of any agent or other person shall not effect a waiver or change any part of this policy nor estop the company

from asserting any right under it, nor shall the terms of this policy be waived or changed except by endorsement hereon, signed by a duly authorized representative of the company.

**N.  Assignment.**  Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon. Bankruptcy or insolvency of the insured shall not relieve the company of any of its obligations hereunder. If, however, the insured shall die or be adjudged bankrupt or insolvent within the legal period, this policy, unless cancelled, shall cover the insured's legal representative for the unexpired portion of such period.

**O.  Maintenance of Underlying Insurance.**  It is a condition of this insurance that the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restricted, shall be maintained in force as collectible insurance during the currency of this policy, except for any reduction of the aggregate limit(s) contained therein solely by reason of losses in respect of occurrences happening during this policy period. In the event of failure by the insured so to maintain such policy(ies) or to meet all conditions subsequent to loss under such policy(ies), the insurance afforded by this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force.

Upon notice that any aggregate limit of liability under any policy of underlying insurance has been exhausted, the named insured shall immediately make all reasonable efforts to reinstate such limits. The named insured shall give the company written notice as soon as practicable of any change in the scope of coverage or in the amount of limits of insurance under any underlying insurance, and of the termination of any coverage or exhaustion of aggregate limits of any underlying insurer's liability.

**P.  Cancellation.**  This policy may be cancelled by the named insured by surrender thereof to the company or any of its authorized agents, or by mailing to the company written notice stating when thereafter such cancellation shall be effective. This policy may be cancelled by the company by mailing to the named insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing. If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

If this policy insures more than one named insured, cancellation may be effected by the first of such named insureds for the account of all insureds; and notice of cancellation by the company to such first named insured shall be notice to all insureds. Payment of any unearned premium to such first named insured shall be for the account of all interests therein.

**IN WITNESS WHEREOF** the **Centennial Insurance Company** has caused this policy to be signed by its president and secretary at New York, N. Y., but this policy shall not be valid unless completed by the attachment hereto of a declarations page designated as Commercial Umbrella Policy — Part Two and countersigned on the aforesaid declarations page by a duly authorized representative of the company.

_Joseph P. Discannala_  Secretary

_Harold A. Eckmann_  President

CEN00315

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBITS 5 THROUGH 7

TRANS-SONICS, INC.

SCHEDULE OF INSURANCE

DECEMBER 31, 1973

| Type and Description | Company | Policy No. | Limits of Coverage | | Period | Basis |
|---|---|---|---|---|---|---|
| **Transportation** | | | | | | |
| Goods and merchandise held in Trust, on Commission, Consignment, Outside Processors, Packers, Trade Shows | Centennial (A) | 235-110-657-3 | 2,000<br>40,000<br>7,000<br>4,000 | Outside Processors<br>Special Crating<br>One Exhibition<br>Transcale<br>Transportation &<br>Demonstration | 4-4-74<br>-<br>4-3-75 | Yr. |
| **Real and Personal** | Arkwright-Boston | 670195 | 2,843,000<br>2,870,000<br>25,000<br>42,000<br>200,000 | Property Damage<br>Bus. Interruption<br>Property Damage<br>Away from Premises<br>Rent (Being Canc. 5/6/74)<br>Valuable Papers | 1-1-73<br>-<br>1-1-76 | Dep.<br>Prem.<br>3 Yrs. |
| Premises on Wheeler Rd. Burlington, Mass. | | | | | | |
| **Difference in Condition** | Arkwright-Boston | S-770,044 | 1,000,000 | At any location except not more than 400,000 by earthquake in any 12 consecutive months | 1-1-73<br>-<br>1-1-76 | 3 Yrs. |
| All risks of direct physical loss or damage to insured property | | | | | | |
| **Comprehensive Gen. Liability** | Liberty Mutual | LGI 512-067-03-061 | 1,000,000<br>1,000,000 | Bodily Injury<br>Property Damage each occurance and aggregate | 1-1-73<br>-<br>1-1-74 | Adv.<br>Prem.<br>1 Yr. |
| To pay on behalf of the insured all sums which the insured shall become legally obligated to pay | | | | | | |
| **Umbrella Excess** | Centennial (A) | 462-00 76 30 | 5,000,000 | | 1-1-72<br>-<br>1-1-75 | Per<br>Yr. |
| Covers insured for ultimate loss in excess of retained limits under Comprehensive General, Comprehensive Automobile Workmens Compensation | | | | | | |

(A) = The Hayes

EXHIBIT 5

**The Foxboro Company**

Foxboro, MA  U.S.A.  02035-2099
Telephone  508-543-8750
Telex  927-602 or TRT 174090

December 4, 1990

<u>Sent via DHL Courier</u>

Roy P. Giarrusso, Esq.
Cooley, Manion, Moore & Jones, P.C.
21 Custom House Street
Boston, Massachusetts    02110

Dear Roy:

Enclosed is a Complaint filed in the United States District Court for the District of Massachusetts received at Foxboro on November 29, 1990 and which Mr. Arthur Gravilles of Liberty Mutual instructed us to forward directly to you. The Complaint names Foxboro as the sole defendant with respect to Superfund claims (Federal and State) as well as other tort claims. Also enclosed is a copy of the following material relating to the Complaint:

    a)   Plaintiff's First Set of Interrogatories, and
    b)   Plaintiff's First Request for Production of Documents

As I am sure you know, the Complaint must be answered within twenty days of receipt.

Please confirm with Liberty that your firm is to represent Foxboro in this matter. Please then contact me as soon as possible so that we can get this moving.

Sincerely yours,

THE FOXBORO COMPANY


Anthony R. Franciose
Staff Attorney


cc:    E. A. McIntyre, B52-1K
       B. E. Wilson, B52-1L

EXHIBIT 6





Westwood Executive Center
Suite 2100
200 Lowder Brook Drive
Westwood, Massachusetts 02090
Telephone: (617) 326-7100

March 20, 1991

Anthony Franciose, Esquire
The Foxboro Company
33 Comercial Street
Foxboro, MA  02035

RE: MA (WHEELER ROAD) VS THE FOXBORO COMPANY FILE NO: P101-

Dear Mr. Franciose:

I am writing in follow-up to our previous conversations in regards to this matter.  We are presently investigating this site and within this letter have included an information request to aid us in that area.

POTENTIAL COVERAGE CONSIDERATIONS:

We presently lack sufficient information to comment specifically on how your policies may relate to the particular coverage issues present in environmental claims of this nature.

The questions that this type of case typically generates with respect to insurance coverage are:

1.  Whether all of the relief sought, which may include injunctive orders and recovery of governmental agency response costs incurred under statutory authority, qualifies as "damages because of bodily injury or property damage."

2.  When the property damage for which damages are sought occured.

3.  Whether any such property damage was neither "expected nor intended."

4.  Whether any such property damage arose from the release or escape of of pollutants which was both "sudden and accidental."

PRELIMINARY INFORMATION REQUESTED:

In order for us to continue our evaluation of this matter we are requesting that you provide us with answers to the following questions:

Liberty Mutual Insurance Group / Boston
Equal Opportunity Employer

1. A history of Foxboro's ownership of the site including the date of purchase and the date of sale of the property.

2. A history of operations at the site du   g your ownership - include:

   a. A history of plant operations, including manufacturing methods, and the type of product (s) produced.

   b. A description of the waste (s) effluent by its physical & chemical properties.

   c. The amount of effluent discharge daily, and over what time period. Include any changes in the nature, quality and quantity of discharge due to variations in or cycling of plant operations.

3. A history of regulatory involvement at the site during your ownership. Include any reports or notices received from any federal or state agencies regarding the discharge or release of any pollutants from operations and dates and results of testing that has been done.

We will be in further contact with you once we have received and reviewed your responses to the information requested in this letter. We will review the information as well as our records of your policies and will advise you in more detail of our coverage position once this has been completed. In the interim, please keep us fully informed of any further developements and should you have any further questions, please contact me.

The defense of this matter, as previously discussed, has been referred to Lou Massery and Roy Giarrusso of The Law Firm of Cooley, Manion, Moore & Jones.

Liberty Mutual completely and fully reserves all of our rights under any insurance policy issued by Liberty Mutual. In the event that we determine that coverage does not exist for this claim we will advise you of our position in writing and cease to pay for defense costs from the date of such written notice forward. Once you have had the opportunity to review this letter, please sign where indicated below and return it to my attention.

Sincerely,

Arthur P. Gavrilles
Environmental Claims Specialist

ACKNOWLEDGED FOR_____ BY_____
                                            (Signature)

                                            _____
                                            (Title)

AG:  dw



Suite 200
18 Sentry Park West
P.O. Box 1128
Blue Bell, Pennsylvania 19422-0989
Telephone: (215) 641-0400

LIBERTY
MUTUAL.

December 3, 1991

*Sent to c*
*12|3|9|*

Mr. Anthony Franciose, Esq.
The Foxboro Company
33 Commercial Street
Foxboro, MA 02035

RE:   MA (WHEELER ROAD) v. THE FOXBORO COMPANY
P331-130031-01

Dear Mr. Franciose:

This letter is further to our letter of March 20, 1991.  We
have completed our investigation into this matter and the
following letter will outline our coverage position.

SITE HISTORY:

The Wheeler Road Site (Site) is a 9.5 acre property located
at 160 Wheeler Road  in Burlington, Massachusetts that was
formally owned by The Foxboro Company.  Foxboro used the site
as a manufacturing plant for temperature and pressure
instruments.  The site had a manufacturing plant facility and
a leaching basin.

In August, 1954, the site was purchased by Trans-Sonics, Inc.
The site was subsequently sold to Foxboro-Transonics Inc. in
December, 1974.  Foxboro-Transonic Inc. operated at the site
until 1978 when they were merged into The Foxboro Company.
In July, 1978, Blanton C. Wiggins purchased the property from
The Foxboro Company and in 1979 leased the site to Fiske
Medical Science (manufacturer of medical instruments) and US
Windpower Inc (manufacturer of mechanical wind generators).
On June 11, 1982 the site was acquired by One Wheeler Road
Associates.  One wheeler Road Associates continued to lease
the site to US Windpower from 1982 through 1989 as sole
tenant.  In 1989 the site was converted to office space.

The manufacturing process used by Foxboro Company during
their operation of the plant consisted  of mechanical
assembly, testing and soldering of wiring electrical
contacts.  Foxboro used detergents and wash water to clean
components.  Additionally, Foxboro used alcohol and
trichlorethylene as cleaning agents.  Foxboro drummed all

Liberty Mutual Insurance Group / Boston
Equal Opportunity Employer

*CCHO*

hazardous materials and waste and sent the drums off site for disposal and recycling procedures.

In September 1984, samples . re collected from the leaching basin by Haley & Aldrich. These samples were found to contain various haloginated hydrocarbon compounds, including, industrial solvents, cleaning and degreasing agents. Some of the hazardous substances found were Trichlorethylene and other chemicals. A memo dated October 11, 1984 written by Richard Lombard to Board of Health was the first report to identify contamination on the site. The MADEP issued a notice of responsibility to the Gutierrez Company, the sole general partner of One Wheeler Road Associates, in November, 1985.

Norwood Engineering was retained by the Gutierrez Company to perform a comprehensive site inspection. Phase III of their investigation was based on the MADEP scope. Contaminants were detected in offsite wells in 1988 that can be related back to the site.

NATURE OF CLAIMS:

A civil action was filed by One Wheeler Road Associates and the Gutierrez Company against Foxboro in the U.S.D.C., District of Massachusetts, docket Number 90-12873k, which was served on Foxboro November 29, 1990. The complaint alleges in part, that Foxboro and the Predecessor Corporations released PCE and TCE from interior sinks at the plant which discharged through a roof drainage network into an on-site leaching system, which was later determined to be the source of contamination.

The complaint includes Count I, Federal Superfund Statute; Count II, Massachusetts Superfund Statute; Count III, Restitution; Count IV, Negligence (related to contaminating the site); Count V, Strict Liability (abnormally dangerous activity); and Count VI, Declaratory Judgement. The plaintiff seeks judgement on Counts I through V; damages; Declaratory Judgement determining the parties' rights and responsibilities concerning the contamination; and attorney fees, legal costs and other relief the court finds proper. After receiving notice of the suit, under a reservation of rights, Liberty Mutual referred the matter to the law firm of Cooley, Manion, Moore & Jones to to file an answer on behalf of Foxboro.

COVERAGE:

Liberty Mutual provided Comprehensive General Liability (CGL) Insurance to The Foxboro Company. The applicable policy for this claim is policy number LG1-112-020738-028 effective

January 1, 1984 to January 1, 1985 with a Property Damage
Liability limit of $1,000,000 per occurrence and a $1,000,000
aggregate.

Part I of the CGL Policy States:

> The company will pay on behalf of the insured all sums
> which the insured shall become legally obligated to pay
> as damages because of

>> Coverage A.  bodily injury or
>> Coverage B.  property damage

> to which this policy applies, caused by an occurrence..

Under Part VI, Definitions,

> "occurrence" means an accident, including continuous or
> repeated exposure to conditions, which results in
> bodily injury or property damage neither expected nor
> intended from the standpoint of the insured;

> "property damage" means (1) physical injury to or
> destruction of tangible property which occurs during
> the policy period....

Under Part I, Exclusions, This Policy Does not Apply:

> (k)  to property damage to

>> (1)  property owned or occupied by or rented to
>>       the insured,
>> (2)  property used by the insured, or
>> (3)  property in the care, custody or control of
>>       the insured or as to which the insured is for
>>       any purpose exercising physical control...

> (l)  to property damage to premises alienated by the
>       named insured arising out of such premises or any
>       part thereof;

Under the Broad Form Comprehensive General Liability
Endorsement Number 4, Part VI, Broad Form Property
Damage Liability Coverage (Including Completed
Operations), States:

> The insurance for property damage liability applies,
> subject to the following additional provisions:

> (A)  Exclusions (k) and (o) are replaced by the
>       following:

>> (1)  to property owned or occupied by or rented

to the insured....

Endorsement No. 32, POLLUTION EXCLUSION, replaces exclusion (f), and states:

> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply to bodily injury or property damage included within the product hazard or the completed operations hazard if the discharge, dispersal, release or escape originates away from premises owned by, rented or loaned to a named insured.

## UMBRELLA EXCESS LIABILITY POLICY (UEL):

The Liberty Mutual UEL policy in effect when contamination was confirmed on October 11, 1984, was policy number LEl-112-020738-194 effective January 1, 1984 to January 1, 1985, with a combined single limit of liability of $10,000,000 per occurrence and a $10,000,000 property damage liability aggregate limit.

Part I of the UEL Policy States:

> The company will pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the consent of the company, agrees to pay, as damages, direct or consequential, because of:
>
> ...(b)    property damage...

with respect to which this policy applies and caused by an occurrence.

Under Part V, Definitions:

> "occurrence" means injurious exposure to conditions, which results in personal injury, property damage or advertising injury or damage neither expected nor intended from the standpoint of the insured.
>
> "property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period....

Under Part I, This Policy Does not Apply:

> (d)  to (1) property dam- - to property of any kind
> owned...by the insured o- -y any named insured....

> (e)  with respect to premises alienated by the named
> insured....

Under Part I, Exclusions, Endorsement No. 11 amends
Exclusion (G) to read:

> (g)  to bodily injury or property damage arising out
> of the discharge, dispersal, release or escape of
> smoke, vapors, soot, fumes, acids, alkalis, toxic
> chemicals liquids or gases, waste materials or
> other irritants, contaminants or pollutants into
> or upon land, the atmosphere or any water course
> or body of water; but this exclusion does not
> apply to bodily injury or property damage included
> within the product hazard or the complete
> operations hazard if the discharge, dispersal,
> release or escape originates away from premises
> owned by, rented or loaned to a named insured.

POLLUTION LIABILITY POLICY (LW):

Liberty Mutual has provided Pollution Liability Coverage to
The Foxboro Company from 1982 to January 1, 1991. The
applicable LW policy is policy number LW1-611-004218-090,
effective January 1, 1990 to January 1, 1991 with a
retroactive date of June 29, 1982.  The Property Damage
limits of liability are $1,000,000 each occurrence and
$3,000,000 in aggregate.

Part I, Pollution Liability Coverage of the Pollution
Liability Policy states:

> The company will pay on behalf of the insured all sums
> which the insured shall become legally obligated to pay
> as compensatory damages because of bodily injury or
> property damage to which this insurance applies,
> provided that:

> (1)  such bodily injury or property damage is caused
> by a pollution incident which commences subsequent
> to the retroactive date shown in the declarations
> of this policy; and

> (2)  the claim for such damages is first made against
> the insured during the policy period and reported
> to the company during the policy period or within
> fifteen days after its termination.

A claim shall be deemed to have been made only when suit is brought or writt  notice of such claim is received by the insured.

All claims for damages because of bodily injury or property damage sustained by any one person or organization as a result of any one pollution incident shall be deemed to have been made at the time the first of those claims is made.

Part VI, Definitions of the Pollution Liability Policy, states:

"environmental damage" means the injurious presence in or upon land, the atmosphere, or any watercourse or body of water of solid, liquid, gaseous, or thermal contaminants, irritants, or pollutants;

"property damage" means (1) physical injury to, destruction of, or contamination of tangible property....

"pollution incident" means emission, discharge, release, or escape of

(1) any solid, liquid, gaseous or thermal contaminants, irritants, or pollutants directly from the insured site...

into or upon land, the atmosphere, or any watercourse or body of water, provided that such emission, discharge, release, or escape results in environmental damage.

Under Part I, Exclusions, This Policy does not apply:

(a) to bodily injury, property damage, or environmental damage which is expected or intended from the standpoint of the insured.

(e) to property damage or environmental damage to

(2) property owned or occupied by or rented to the insured, or

(3) property used by the insured, or

(4) property in the care, custody, or control of the insured or as to which the insured is for any purpose exercising physical control;

(f)    to property damage or environmental damage to
premises alienated by the named insured arising
out of such premise or any part thereof.

(i)    to ... property damage, or environmental damage
arising out of a pollution incident emanating from
an insured site, or part thereof used by the named
insured for the storage, disposal, processing or
treatment of waste materials, if such site or part
thereof was:

(1)    sealed off, closed, abandoned, or alienated
prior to the retroactive date shown in the
declarations of this policy....

## APPLICATION OF THE CGL, UEL, and LW POLICIES:

There is no coverage under the CGL or UEL policies.
Actionable contamination was not observed until October 11,
1984, when samples taken confirmed contamination. This
contamination was discovered after your company had sold the
property. There has been no "occurrence" or "property damage"
as defined, which took place within Liberty Mutual's policy
period when Foxboro Company owned the Wheeler Road property.

It is our position that governmental response cost recovery
claims, such as the above, are equitable in nature, seeking
merely restitution under statutory authority for costs
incurred in responding to a threat to the public health,
welfare and the environment. They are not claims for legal
damages because of property damage as covered under the
policy.

Furthermore, even if this matter were to qualify as a claim
for damages because of property damage, it is our position
that endorsement 32 which replaced exclusion (f) of the CGL
policy and endorsement 11 which replaced exclusion (g) of the
UEL policy, apply. The pollution exclusion is a complete bar
to both coverage and to the obligation to defend in this
matter. Additionally, exclusions (k) of the CGL policy, as
replaced by endorsement 4, Part VI, A, (1), and (d) of the
UEL policy exclude coverage for property owned or occupied by
or rented to the insured. Exclusions (l) of the CGL and (e)
of the UEL eliminate coverage for property damage to premises
alienated by the named insured.

There is no coverage under the the LW policy. Foxboro Company
sold the Wheeler Road property prior to the retroactive date
of June 29, 1982. Exclusions (f) and (i),(1), preclude
coverage. Furthermore, exclusion (e) bars coverage to
property damage and environmental damage to property owned or
occupied by the insured.

Additionally, there is no coverage for any of the counts included within the complaint, under any of these policies.

Accordingly, Liberty Mutual will not provide coverage in this matter and pursuant to our reservation of rights, as stated in our letter of March 20, 1991, we are withdrawing from the defense of this case. In order to allow Foxboro the time to make alternative defense arrangements, our withdrawal from defense will become effective thirty days from the date of this letter. We would have no objection should Foxboro want to continue to be defended by Cooley, et al. Under separate correspondence, we are notifying them that we have denied coverage and are withdrawing from defense.

While we have tried to identify all of the coverage considerations that we feel are related to this claim, we do hereby reserve all rights under any policies issued by Liberty Mutual to Foxboro and this letter should in no way be construed as a waiver of any of the terms, conditions, or exclusions included within the policies.

We regret that we cannot advise your more favorably with respect to this matter. We trust you understand our position.

Sincerely,

Thomas V. O'Kane

Thomas V. O'Kane
Environmental Claims Specialist

## GILBERT & RENTON, P.C.

23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Kathryn E. Perrotta, Esq.
Edward J. Denn, Esq.

Telephone: (978) 475-7580
Facsimile: (978) 475-1881

June 24, 1999

Via Telecopy: 1-973-408-6121

Legal Department
Centennial Insurance Company
c/o Atlantic Mutual Insurance Companies
3 Giralda Farms
Madison, NJ 07940

      Re:    Insured: Trans-Sonics, Inc.
            Insurer: Centennial Insurance Company

Dear Sir or Madam:

     I represent The Foxboro Company in a matter scheduled for trial on July 14, 1999 in Middlesex County Superior Court, Cambridge, MA. Per the enclosed Schedule of insurance, it has come to our attention that Centennial Insurance Company, now a part of Atlantic Mutual Insurance Companies, issued policies of excess/umbrella insurance to Trans-Sonics, Inc. in the 1960's and early 1970's. (Trans-Sonics, Inc. was acquired by and merged into The Foxboro Company in 1975. We require all of the documentation available regarding Centennial Insurance Company's relationship with Trans-Sonics, Inc. We have prepared a Subpoena Duces Tecum setting forth the information we are seeking.

     Prior to serving the subpoena, we ask your cooperation in searching for the documents. If a thorough search can be achieved, we may avoid the need for Centennial appearing at trial in this matter. I would like to speak with you regarding these documents. Please call me at your earliest convenience. If I am not available, please ask to speak with my colleague, Bob Gilbert.

     Thank you for your attention to this matter.

Very truly yours,

Kathryn E. Perrotta

EXHIBIT 7

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBITS 8 AND 9

ATLANTIC MUTUAL COMPANIES
Atlantic Mutual Insurance Company
Centennial Insurance Company

John E. Yandrasitz, Assistant Vice President and
Associate Corporate Counsel
john_e_yandrasitz@atlanticmutual.com

**VIA FACSIMILE: 978-475-1881**

July 16, 1999

Gilbert & Renton, P.C.
23 Main Street
Andover, Massachusetts, 01810

**Attn:  Kathryn E. Perrotta, Esq.**

Re:    Insured: Trans-Sonics, Inc.
       Centennial Insurance Company

Dear Ms. Perrotta:

Further to your correspondence of June 24, 1999 and our subsequent conversations, enclosed are copies of documentation located by our processing center in regards to the umbrella policy issued by Centennial to Trans-Sonics, Inc.   Several other documents were uncovered that relate to the reinsurance arrangement in place as respects the umbrella policy but as this does not relate to the insured, we will not  release these without a subpoena.

I'm afraid that this is all I was provided from our business people and must assume that this is all they were able to locate.

Please let me know if I can be of further assistance.

Sincerely yours,

John E. Yandrasitz
Assistant Vice President and
     Associate Corporate Counsel

att.

EXHIBIT 8

| CEDG | OFFICE | PRO-DUCER | | | FAC-TION | | | REIN or CO | | FOREIGN CO | LINE | SAC-TION | TER | TOWN | | | PROD CODE | EZ | UNIT | CLASS | | PREM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | | | | 3 | | | | | | | | | 4 | | 38 | | 62 | | (c) | | |
| 11 | 32 | C | C | 4 | | N | 1 | | | | 471 | 20 | | | | | | 150 | | DILL 9840-1 | | |
| | 5 | | | | | | | | | | | | | | | | | | | 9850- | | |
| | | | | | | | | | | | | | | | | | | | | 9850- | | |

40 PRO-RATA $ ___  GROSS LINE ___  % PML ___

REINS  AUTHORIZED BY ___ DATE 1/1/72  RETENTION ___ %
R 2301

TREATY # 200 536

TREATY #

R 2300

### __AL INSURANCE COMPANY
### __CIAL UMBRELLA DAILY REPORT

**REINS.**

__BER 462-00 76 30

Trans-Sonics, Inc.
P. O. Box 326
Lexington, Massachusetts 02173

INDIVIDUAL
PARTNERSH__
CORPORATI__
JOINT VENT__

2. Policy Period: 12.01 A.M. standard time, at the address shown above: From: **1/1/72** To: **1/1/75**
   Agent or Broker  Truman Hayes & Company  NEW
   Office Address  30 Federal Street
   Town and State  Boston, Massachusetts

CENTRAL FILES

MAR 13 '72

3. Limit of Liability: The limit of the company's liability shall be as stated herein, subject to all the terms of this policy having reference thereto.
   (a) Policy Limit $ **2,000,000** Per Occurrence
   (b) Aggregate Limit $ **2,000,000** Where Applicable
   (c) Retained Limit $ **10,000** Per Occurrence

4. Premium:  Three year term prepaid $ **1,500.00**
   Three year term installment basis: on inception date $ **500.00** on each anniversary $ **500.00**
   Minimum retained premium $ **150.00**

5. Form numbers of endorsements attached to policy at inception: **G1690A; Q5303**

### SCHEDULE A OF UNDERLYING INSURANCE

| TYPE OF POLICY | CARRIER, POLICY NUMBER and POLICY PERIOD | APPLICABLE LIMITS |
|---|---|---|
| | | **Personal** Injury Liabili__ |
| (a) Comprehensive General Liability | Liberty Mutual Insurance Company LG1-112-067402-061 1/1/72 to 1/1/73 | $ **100** ,000 each person $ **300** ,000 each **occurrence** $ **300** ,000 aggregate products |
| | | Property Damage Liability $ **50** ,000 each **occurrence** $ **50** ,000 aggregate operations, pro__ products and contractual, |
| (b) Comprehensive Automobile Liability Owned, Non-Owned and Hired Vehicles | Lumbermans Insurance 2M0443483 1/1/72 to 1/1/73 | Bodily Injury Liability $ **100** ,000 each person $ **300** ,000 each **accident** Property Damage Liability $ **50** ,000 each **accident** |
| (c) Employers' Liability | Liberty Mutual Insurance Company WC1-112-067402-011 1/1/72 to 1/1/73 | $ **100** ,000 each accident |

bjn EWL 3/9/72

| OFFICE | P C C 1 | ADV CASE TYPE 2 | LINE | TRANS AC TION 2 | STATE | TERR | TAX TOWN 4 | TAX COUNT 2 | TAX TYPE REPEA 2 | PREBLE CODE 2 | COMM RATE 3 | COMM RATE 3 | IDENTIFICATION 55 56 57 58 59 60 1 1 1 1 1 | EXPOSURE 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 02 | | | | | | | | | | | | |

Effective **1/1/72**    , this endorsement forms a part of Policy No. **462 00 76 30**

(At the time stated in the policy)
issued to **Trans-Sonics, Inc.**

by **Centennial**    Insurance Company.    **ENDORSEME #1**

(The information provided for above is required to be completed only when this
endorsement is issued for attachment to the policy subsequent to its effective date.)

## AIRCRAFT PRODUCTS EXCLUSION ENDORSEMENT

In consideration of the premium charged it is agreed that such coverage as
is afforded by this policy for the "Products Hazard" as defined does not app
with respect to "aircraft products".

For the purposes of this endorsement, "Aircraft Products" shall mean aircra
missiles, and spacecraft and all component products used in aircraft, miss
and spacecraft manufactured, sold, handled or distributed by the insured a
shall also include ground support or control equipment and tools, spare pa
training aids, instruction manuals, blueprints, egineering or other data,
engineering or other advice, and services and labor relating to such aircr
or articles.

CENTRAL FILES

MAR 13 '72

All other terms and conditions of this insurance remain unchanged.

*Harold A. Eckman*
President

_____
Authorized Representative

016900

| OFFICE | CARD TYPE | LINE | TRANS-AC-TION | STATE | TERM | TAX TOWN | TAX COUN | FIRA/REVD | CODE CODE | RATE | RATE | 55,56,57,58,59,60 | | | | | | 6 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 2 | | 9 | 9 | 4 | 2 | 0 | 2 | 9 | 9 | 1 | 1 | 1 | 1 | 1 | 1 | 6 |
| 11 | C | 02 | 471 | | | | | | | | | 9 | 6 | 4 | 0 | - | 1 | |



Effective **4/1/72**                    , this endorsement forms a part of Policy No.  **462 00 76 30**

*(At the time stated in the policy)*

issued to  **Trans-Sonics, Inc.**

                                              Insurance Company.                              **ENDORSEMEN**
by  **Centennial**                                                                                          **#2**

*(The information provided for above is required to be completed only when this
endorsement is issued for attachment to the policy subsequent to its effective date.)*


The Aggregate limit under the underlying property damage policy

is increased from 50,000 to 100,000.


CENTRAL FILES

MAR 30'72


All other terms and conditions of this insurance remain unchanged.

Q1690A (12/71)

| OFFICE | CARD TYPE | LINE | TRANS-AC-TION | STATE | TERR | TAX TOWN | TAX COUN | TRA RERED PROC | CONTROL CODE | RATE | RATE | IDENTIFICATION 55 56 57 58 59 60 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| (7) | 1 | 3 | 2 | (4) | (5) | 4 | 2 | 2 | (8) | (9) | | | |
| 11 | C | 02 | 471 | | | | | | | | | 9 6 4 0 - 1 | |

Effective **June 16, 1972** _, this endorsement forms a part of Policy No._ **462 00 76 30**

_(At the time stated in the policy)_
issued to **Trans-Sonics, Inc.**

by **Centennial** Insurance Company.

_(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)_

In consideration of the additional premium of $750.00 it is hereby

understood and agreed that the policy limit is increased to

$5,000,000.

_effect
(see below)_

CENTRAL FILES

JUL 17 '72

**Truman Hayes**
bjn RPH 7/13/

All other terms and conditions of this insurance remain unchanged.

_Harold A. Edwards_
_President_

_Authorized Representative_

G1690A (12/71)

| 11 | C | 02 | 471 | | | | | | 9 | 6 | 4 | 0 | - | 1 | | | | | | | |
|----|---|----|----|----|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*Effective* **6/16/72**                    , this endorsement forms a part of Policy No.   **462 00 76 30**

*(At the time stated in the policy)*

*issued to* **Trans-Sonics, Inc.**

Insurance Company.

*by* **Centennial**

*(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)*

**CORRECTED ENDORSEMENT #3**

In consideration of the additional premium of $636.00 payable as shown below, it is hereby understood and agreed that the policy limit is increased to $5,000,000.

**Additional Premium Payable:**

| | |
|---|---|
| $136.00 | 6/16/72 |
| $250.00 | 1/1/73 |
| $250.00 | 1/1/74 |

CENTRAL FILES
JUL 17 '72

**Truman Haye**
bjn RPR 7/1

All other terms and conditions of this insurance remain unchanged.

*Harold A. Eckman* ........................
President

........................
*Authorized Representative*

G1690A (12/71)

11 C 02 471                                          9 6 4 0 - 1

*Effective*  6/16/72          , *this endorsement forms a part of Policy No.* 462 00 76 30
            (*At the time stated in the policy*)
*issued to*  Trans-Sonics, Inc.

    *by*  Centennial          Insurance Company.
            (*The information provided for above is required to be completed only when this*
            *endorsement is issued for attachment to the policy subsequent to its effective date.*)

CORRECTED
ENDORSEMENT
#3

In consideration of the additional premium of $1,909.00 payable

as shown below, it is understood and agreed that the policy

limit is increased to $5,000,000.


            Additional Premium Payable:

            $409.00            6/16/72
            $750.00            1/1/73
            $750.00            1/1/74


CENTRAL FILES

AUG 07 '72


                                                Truman Hayes &
                                                bjn RFH 8/3/72

        All other terms and conditions of this insurance remain unchanged.


        *Harold A. Eckman*
            *President*                    - - - - - - - - - - - - -
                                            *Authorized Representative*

ATLANTIC MUTUAL COMPANIES
Atlantic Mutual Insurance Company
Centennial Insurance Company

John E. Yandrasitz, Assistant Vice President and
Associate Corporate Counsel
john_e_yandrasitz@atlanticmutual.com

April 4, 2000

VIA FACSIMILE:  978-475-1881

TO:  ROB GILBERT

RE:  FOXBORO COMPANY
        SUBPOENA - CIVIL ACTION NO. 97-6184

Dear Mr. Gilbert:

Enclosed is what we believe to be a copy of the generic policy wording for the identified Centennial umbrella policy.   We cannot tie them together with certainty but based upon information and belief , we believe that the enclosed specimen wording was utilized in the policy in question.   I trust this is satisfactory.   If not, please contact me.   I will be out of the office from 4/5 to 4/12.

John E. Yandrasitz

EXHIBIT 9

PAGE   3/6

(A stock insurance company, herein called the company)

WALL STREET, NEW YORK, NEW YORK 10005

Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the application and declarations and subject to the limits of liability, exclusions and other terms of this policy;

## Insuring Agreements

**I.    Coverage.** To indemnify the insured for the ultimate net loss in excess of the retained limit hereinafter defined, which the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law, or assumed by the insured under contract on account of

(a) Personal Injury Liability,
(b) Property Damage Liability, or
(c) Advertising Liability

to which this policy applies, caused by an occurrence anywhere in the world.

**II.    Defense — Settlement.** With respect to any occurrence not covered by the underlying policy(ies) listed in Schedule A hereof or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item (b) of Insuring Agreement IV, the company shall:

(a) defend any suit brought against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

(b) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, but without obligation to apply for or furnish any such bonds;

(c) pay all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon;

(d) pay all reasonable expenses incurred by the insured at the company's request in assisting the company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $50 per day; and the amounts so incurred, except settlements of claims and suits are payable by the company in addition to the applicable limit of liability of this policy.

In jurisdictions where the company may be prevented by law or otherwise from carrying out this agreement, the company shall pay any expense incurred with its written consent in accordance with this agreement.

The insured shall promptly reimburse the company for any amount of ultimate net loss paid on behalf of the insured within the retained limit specified in Item (b) of Insuring Agreement IV.

This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

**III.    Definition of "Named Insured" and "Insured".** "Named Insured" includes any subsidiary company (including subsidiaries thereof) of the named insured and any other company coming under the named insured's control of which it assumes active management.

The unqualified word "insured", wherever used, includes the named insured and also:

(a) any person, organization, trustee or estate to whom or to which the named insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or in behalf of the named insured or to facilities of or used by the named insured;

(b) except with respect to the ownership, maintenance or use, including loading or unloading, of any automobile or aircraft, (1) any executive officer, other employee, director, or stockholder thereof while acting within the scope of his duties as such; (2) any organization or proprietor with respect to real estate management for the named insured;

(c) any person while using an automobile owned by or loaned to the named

insured or hired for use in behalf of the named insured and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with the named insured's permission, and any executive officer, director or stockholder of the named insured with respect to the use of an automobile not owned by the named insured in the business of the named insured. The insurance with respect to any person or organization other than the named insured does not apply under paragraph (c) of this Insuring Agreement:

(1) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place, with respect to any occurrence arising out of the operation thereof;

(2) with respect to any automobile hired by or loaned to the named insured, to the owner or a lessee thereof other than the named insured, or to any agent or employee of such owner or lessee, except as provided in paragraph (a) or (e) of this Insuring Agreement;

(d) with respect to any aircraft chartered with crew by or on behalf of the named insured, any person using such aircraft and any person legally responsible for the use thereof, provided the actual use is with the named insured's permission, (1) the owner or crew thereof or any other person operating the aircraft, or (2) any manufacturer of aircraft, engines or aviation accessories, or any aviation sales, service or repair organization or airport or hangar operator, or any employee or agent of any of them;

(e) any additional interest, other than the named insured or the insured described in paragraphs (a), (b) or (c) of this Insuring Agreement, included in the underlying policy(ies) listed in Schedule A, but only to the extent that insurance is provided to such additional insured thereunder;

(f) if the named insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such, however, this policy does not apply to personal injury, property damage or advertising offense arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured;

(g) if the named insured is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the named insured with respect to the conduct of such a business.

**IV.    Retained Limit — Limit of Liability.** With respect to Coverage I (a), I (b) or I (c), or any combination thereof, the company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:

(a) the total of the applicable limit(s) of the underlying policy(ies) listed in Schedule A hereof, and the applicable limit(s) of any other underlying insurance collectible by the insured, but in no event less than the amount stated in Insuring Agreement IV (b), or

(b) the amount stated in Item 3(c) of the declarations as the Retained Limit as the result of any one occurrence not covered by the said policy or policies of insurance; and then up to an amount not exceeding the amount stated in Item 3(a) of the declarations.

There is no limit to the number of occurrences during the policy period for which claims may be made, except that the liability of the company arising out of either the products hazard or the completed-operations hazard or both combined on account of all occurrences during each policy year shall not exceed the amount stated in Item 3(b) of the declarations.

In the event of the reduction or exhaustion of the aggregate limit(s) of liability of the underlying policy(ies) listed in Schedule A by reason of losses paid thereunder, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limit(s), or (2) in the event of exhaustion, shall continue in force as underlying insurance.

COMMERCIAL
UMBRELLA
POLICY

PROVISIONS
PART ONE

EXCLUSIONS APPEAR ON REVERSE SIDE OF DECLARATIONS (PART TWO)

## Exclusions

This insurance shall not apply:

(a) to any obligation for which the insured or any company as its insurer may be held liable under any Workmen's Compensation, Unemployment Compensation, Disability Benefits or similar law, provided, however, that this exclusion does not apply to liability of others assumed by the named insured under contract or agreement;

(b) under Coverage I (b) to property damage to (1) property owned by the insured, or (2) the insured's products arising out of such products or any part of such products, or (3) work performed by or on behalf of the insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith, or (4) premises alienated by the named insured arising out of such premises or any part thereof, or (5) property rented to, occupied or used by or in the care, custody or control of the insured to the extent the insured is under contract to provide insurance therefor;

(c) under Coverage I (c) to liability for (1) failure of performance of contract, (2) infringement of registered trade mark, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans, (3) incorrect description of any article or commodity, or (4) mistake in advertised price;

(d) to personal injury liability or property damage liability arising out of the ownership, maintenance, operation, use, loading or unloading of (1) any watercraft over fifty feet in length, if the personal injury or property damage occurs away from premises owned by, rented to or controlled by the named insured, or (2) any aircraft, if such watercraft or aircraft is owned or chartered without crew by or on behalf of the named insured, or if such aircraft is being operated by any person in the course of his employment by the named insured and is owned by such person; but this exclusion does not apply to (i) personal injury to any employee of the named insured arising out of and in the course of his employment by the named insured, or (ii) liability assumed by the insured under any contract or agreement;

(e) under Coverage I (b) to loss of use of tangible property which has not been physically injured or destroyed resulting from (1) a delay in or lack of performance by or on behalf of the insured of any contract or agreement, or (2) the failure of the insured's products or work performed by or on behalf of the insured to meet the level of performance, quality, fitness or durability warranted or represented by the insured; but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the insured's products or work performed by or on behalf of the insured after such products or work have been put to use by any person or organization other than an insured;

(f) to damages claimed for the withdrawal, inspection, repair, replacement or loss of the use of the insured's products or work completed by or for the insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(g) to personal injury liability or property damage liability arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

(h) I.  under any Liability Coverage to injury, sickness, disease, death or destruction

(a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

III. as used in this exclusion:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operation;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

Case 1:05-cv-01681-WGY   Document 18-5   Filed 09/22/2006   Page 12 of 20

## Conditions

### A. Definitions.

(1) **Advertising Liability** — The term "Advertising Liability" wherever used herein shall mean liability for damages because of:

(a) libel, slander or defamation;

(b) infringement of copyright or of title or of slogan;

(c) piracy or unfair competition or idea misappropriation under an implied contract;

(d) invasion of privacy;

which occur during the policy period, and arising out of the named insured's advertising activities.

(2) **Aircraft** — The term "Aircraft", wherever used herein, shall mean any heavier than air or lighter than air aircraft designed to transport persons or property.

(3) **Automobile** — The term "Automobile", wherever used herein, shall mean a land motor vehicle, trailer or semi-trailer.

(4) **Completed Operations Hazard** — The term "Completed Operations Hazard" includes personal injury and property damages arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times;

(a) when all operations to be performed by or on behalf of the insured under the contract have been completed,

(b) when all operations to be performed by or on behalf of the insured at the site of the operations have been completed, or

(c) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete shall be deemed completed.

The completed operations hazard does not include personal injury or property damage arising out of

(1) operations in connection with the transportation of property, unless the personal injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(2) the existence of tools, uninstalled equipment or abandoned or unused materials.

(5) **Insured's Products** — The term "Insured's Products" shall mean goods or products manufactured, sold, handled or distributed by the insured or by others trading under his name, including any container thereof (other than a vehicle) but "insured's products" shall not include a vending machine or any property other than such a container, rented to or located for use of others but not sold.

(6) **Occurrence** — The term "Occurrence" wherever used herein shall mean an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.

(7) **Personal Injury Liability** — The term "Personal Injury Liability" shall mean (a) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury, including death at any time resulting therefrom; (b) false arrest, detention or imprisonment, malicious prosecution or humiliation; (c) the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication in violation of rights of privacy, except when any of the foregoing of this part (c) arises out of the insured's advertising activities; (d) wrongful entry or eviction, or other invasion of the right of private occupancy; and (e) assault and battery not committed by or at the direction of the insured, unless committed for the purpose of protecting persons or property; which occur during the policy period. In no event shall any of the foregoing be construed to include discrimination, whether actual or alleged.

(8) **Products Hazard** — The term "Products Hazard" includes personal injury and property damage arising out of the insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the insured and after physical possession of such products has been relinquished to others.

(9) **Property Damage Liability** — The term "Property Damage Liability" shall mean liability for damages because of (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

(10) **Ultimate Net Loss** — The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal ex-

penses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred.

This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

### B. Premium.
Unless stated elsewhere to the contrary, the premium for this policy is the premium stated in Item 4 of the Declarations except as provided in Condition P.

### C. Inspection and Audit.
The company shall be permitted but not obligated to inspect the named insured's property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the named insured or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

The company may examine and audit the named insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

### D. Severability of Interests.
The term "insured" is used severally and not collectively except with respect to (a) property owned by any named insured and (b) Insuring Agreement IV (Retained Limit — Limit of Liability) and (c) Condition J (Other Insurance). The inclusion in this policy of more than one insured shall not operate to increase the company's total liability for all insureds covered by this policy beyond the limits set forth in Insuring Agreement IV.

### E. Insured's Duties in the Event of Occurrence, Claim or Suit.

(a) In the event of an occurrence, which appears reasonably likely to involve such insurance as is afforded by this policy, written notice containing particulars sufficient to identify the insured and also reasonably attainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of personal injury or property damage or advertising offense with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense; however, in the event that the amount of ultimate net loss becomes certain either through trial court judgment or agreement among the insured, the claimant and the company, then, the insured may pay the amount of ultimate net loss to the claimant to effect settlement and, upon submission of due proof thereof, the company shall indemnify the insured for that part of such payment which is in excess of the retained limit, or the company will, upon request of the insured, make such payment to the claimant on behalf of the insured.

### F. Assistance and Cooperation.
Except as provided in Insuring Agreement II (Defense, Settlement) or Insuring Agreement IV (Retained Limit — Limit of Liability) with respect to the exhaustion of the aggregate limit(s) of the underlying policy(ies) listed in Schedule A, or in Condition K (Underlying Insurance), the company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured; but the company shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve the company. In such event the insured and the company shall cooperate fully.

### G. Appeals.
In the event the insured or the insured's underlying insurer elects not to appeal a judgment in excess of the retained limit, the company may elect to do so at its own expense, and shall be liable for the taxable costs, disbursements and interest incidental thereto, but in no event shall the liability of the company for ultimate net loss exceed the amount set forth in Insuring Agreement IV (Retained Limit — Limit of Liability) for any one occurrence plus the taxable costs, disbursements and interest incidental to such appeal.

### H. Action Against the Company.
No action shall lie against the company with respect to any one occurrence unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay an amount of ultimate net loss in excess of the retained limit shall have been finally determined either by judgment against the insured after actual trial or by written agreement of

the insured, the claimant and the company shall in any claim for any loss in which the company may be liable within a reasonable time after such final determination. If any subsequent payments are made by the insured on account of the same occurrence, the insured shall make additional claims from time to time and these claims shall be payable within thirty (30) days after proof is in conformity with this policy. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the company as a co-defendant in any action against the insured to determine the insured's liability.

**I. Bankruptcy or Insolvency.** Bankruptcy or insolvency of the insured shall not relieve the company of any of its obligations hereunder.

**J. Other Insurance.** If other collectible insurance with any other insurer is available to the insured, covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. If collectible insurance under any other policy(ies) of the company is available to the insured, covering a loss also covered hereunder (other than underlying insurance of which the insurance afforded by this policy is in excess), the company's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies).

**K. Underlying Insurance.** If underlying insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

**L. Subrogation.** The company shall be subrogated to the extent of any payment hereunder to all the insured's rights of recovery therefor; and the insured shall do nothing after loss to prejudice such rights and shall do everything necessary to secure such rights. Any amount so recovered shall be apportioned as follows:

Any interest (including the insured's) having paid an amount in excess of the retained limit plus the limit of liability hereunder shall be reimbursed first to the extent of actual payment. The company shall be reimbursed next to the extent of its actual payment hereunder. If any balance then remains unpaid, it shall be applied to reimburse the insured or any underlying insurer, as their interests may appear. The expenses of all such recovery proceedings shall be apportioned in the ratio of respective recoveries. If there is no recovery in proceedings conducted solely by the company, it shall bear the expenses thereof.

**M. Changes.** Notice to or knowledge of any agent or other person shall not effect a waiver or change any part of this policy nor estop the company from asserting any right under it, nor shall the terms of this policy be waived or changed except by endorsement hereon, signed by a duly authorized representative of the company.

**N. Assignment.** Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon. Bankruptcy or insolvency of the insured shall not relieve the company of any of its obligations hereunder. If, however, the insured die or be adjudged bankrupt or insolvent within the legal period, this policy, unless cancelled, shall cover the insured's legal representative for the unexpired portion of such period.

**O. Maintenance of Underlying Insurance.** It is a condition of this insurance that the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restricted, shall be maintained in force as collectible insurance during the currency of this policy, except for any reduction of the aggregate limit(s) contained therein solely by reason of losses in respect of occurrences happening during this policy period. In the event of failure by the insured so to maintain such policy(ies) or to meet all conditions subsequent to loss under such policy(ies), the insurance afforded by this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force.

Upon notice that any aggregate limit of liability under any policy of underlying insurance has been exhausted, the named insured shall immediately make all reasonable efforts to reinstate such limits. The named insured shall give the company written notice as soon as practicable of any change in the scope of coverage or in the amount of limits of insurance under any underlying insurance, and of the termination of any coverage or exhaustion of aggregate limits of any underlying insurer's liability.

**P. Cancellation.** This policy may be cancelled by the named insured by surrender thereof to the company or any of its authorized agents, or by mailing to the company written notice stating when thereafter such cancellation shall be effective. This policy may be cancelled by the company by mailing to the named insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing. If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

If this policy insures more than one named insured, cancellation may be effected by the first of such named insureds for the account of all insureds; and notice of cancellation by the company to such first named insured shall be notice to all insureds. Payment of any unearned premium to such first named insured shall be for the account of all interests therein.

**IN WITNESS WHEREOF** the Centennial Insurance Company has caused this policy to be signed by its president and secretary at New York, N. Y., but this policy shall not be valid unless completed by the attachment hereto of a declarations page designated as Commercial Umbrella Policy — Part Two and countersigned on the aforesaid declarations page by a duly authorized representative of the company.

_(signature)_ _____ Secretary

_(signature)_ _____ President

ATLANTIC MUTUAL COMPANIES
Atlantic Mutual Insurance Company
Centennial Insurance Company

John E. Yandrasitz, Assistant Vice President and
Associate Corporate Counsel
john_e_yandrasitz@atlanticmutual.com

**VIA FACSIMILE: 978-475-1881**

July 16, 1999

Gilbert & Renton, P.C.
23 Main Street
Andover, Massachusetts, 01810

**Attn:**   Kathryn E. Perrotta, Esq.

Re:     Insured: Trans-Sonics, Inc.
          Centennial Insurance Company

Dear Ms. Perrotta:

Further to your correspondence of June 24, 1999 and our subsequent conversations, enclosed are copies of documentation located by our processing center in regards to the umbrella policy issued by Centennial to Trans-Sonics, Inc.    Several other documents were uncovered that relate to the reinsurance arrangement in place as respects the umbrella policy but as this does not relate to the insured, we will not  release these without a subpoena.

I'm afraid that this is all I was provided from our business people and must assume that this is all they were able to locate.

Please let me know if I can be of further assistance.

Sincerely yours,

John E. Yandrasitz
Assistant Vice President and
    Associate Corporate Counsel

att.

JUL 09 1999

| 1 | 2 | | co. | | | | | | | | | | 3 | | | 4 | LINE | SAC-TION | | TIE | TOWN | | 36 | | 62 | | PREM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

PROCESSED

REINS.

R 2209

# AL INSURANCE COMPANY

## CIAL UMBRELLA DAILY REPORT

BER 462- 00 76 30

**Trans-Sonics, Inc.**
**P. O. Box 326**
**Lexington, Massachusetts 02173**

INDIVIDUAL
PARTNERSH
CORPORATI
JOINT VENT

2. Policy Period: 12.01 A.M. standard time, at the address shown above. From: **1/1/72**  To: **1/1/75**  RENEWAL

Agent or Broker **Truman Hayes & Company**  **NEW**
Office Address **30 Federal Street**
Town and State **Boston, Massachusetts**

CENTRAL FILES

MAR 13 '72

3. Limit of Liability: The limit of the company's liability shall be as stated herein, subject to all the terms of this policy having reference thereto.

(a) Policy Limit $ **2,000,000** Per Occurrence
(b) Aggregate Limit $ **2,000,000** Where Applicable
(c) Retained Limit $ **10,000** Per Occurrence

4. Premium: Three year term prepaid $ **1,500.00**
Three year term installment basis: on inception date $ **500.00** on each anniversary $ **500.00**
Minimum retained premium $ **150.00**

5. Form numbers of endorsements attached to policy at inception: **G1690A; Q5303**

### SCHEDULE A OF UNDERLYING INSURANCE

| TYPE OF POLICY | CARRIER, POLICY NUMBER and POLICY PERIOD | APPLICABLE LIMITS |
|---|---|---|
| (a) Comprehensive General Liability | **Liberty Mutual Insurance Company**<br>**LG1-112-067402-061**<br>**1/1/72 to 1/1/73** | Personal Injury Liabili<br>$ **100** ,000 each person<br>$ **300** ,000 each occurrence<br>$ **300** ,000 aggregate products<br><br>Property Damage Liability<br>$ **50** ,000 each occurrence<br>$ **50** ,000 aggregate operations, pro products and contractual, |
| (b) Comprehensive Automobile Liability<br>Owned, Non-Owned and Hired Vehicles | **Lumbermans Insurance**<br>**2M0443483**<br>**1/1/72 to 1/1/73** | Bodily Injury Liability<br>$ **100** ,000 each person<br>$ **300** ,000 each accident<br><br>Property Damage Liability<br>$ **50** ,000 each accident |
| (c) Employers' Liability | **Liberty Mutual Insurance Company**<br>**WC1-112-067402-011**<br>**1/1/72 to 1/1/73** | $ **100** ,000 each accident |

bjn EWL 3/9/72

| (2) | P (2) | TYPE 1 | LINE (3) | TRANS-AC-TION 2 | STATE (2) | TERR (2) | TAX TOWN 4 | TAX COUNT N (2) | TAX TAXABLE CODE 2 | COMM. RATE (3) | COMM RATE (3) | IDENTIFICATION 55 56 57 58 59 60 (1)(1)(1)(1)(1)(1) | EXPOSURES (4) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 02 | | | | | | | | | | | |

Effective **1/1/72**            , this endorsement forms a part of Policy No. **462 00 76 30**

(At the time stated in the policy)

issued to  **Trans-Sonics, Inc.**

by  **Centennial**            Insurance Company.            ENDORSEME
                                                                    #1

(The information provided for above is required to be completed only when this
endorsement is issued for attachment to the policy subsequent to its effective date.)

### AIRCRAFT PRODUCTS EXCLUSION ENDORSEMENT

In consideration of the premium charged it is agreed that such coverage as
is afforded by this policy for the "Products Hazard" as defined does not app
with respect to "aircraft products".

For the purposes of this endorsement, "Aircraft Products" shall mean aircra
missiles, and spacecraft and all component products used in aircraft, miss
and spacecraft manufactured, sold, handled or distributed by the insured a
shall also include ground support or control equipment and tools, spare pa
training aids, instruction manuals, blueprints, egineering or other data,
engineering or other advice, and services and labor relating to such aircr
or articles.

CENTRAL FILES

MAR 13 '72

All other terms and conditions of this insurance remain unchanged.

*Harold A. Eckman*
President                                  Authorized Representative

61690A

| OFFICE | CARD TYPE | LIKE | TRANS-AC-TION | STATE | YEAR | TAX TOWN | TAX COUN | FILM REP'D | FORCE CODE | RATE | RATE | 55 56 57 58 59 60 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | C | 02 | 471 | | | | | | | | | 9 6 4 0 - 1 | |

Effective  4/1/72                                   , this endorsement forms a part of Policy No.   462 00 76 30

(At the time stated in the policy)

issued to   **Trans-Sonics, Inc.**

by   **Centennial**          Insurance Company.                            ENDORSEMENT

(The information provided for above is required to be completed only when this        #2
endorsement is issued for attachment to the policy subsequent to its effective date.)

The Aggregate limit under the underlying property damage policy

is increased from 50,000 to 100,000.

CENTRAL FILES

MAR 30 '72

All other terms and conditions of this insurance remain unchanged.

O1690A (12/71)

| OFFICE | ✓/C | CARD TYPE | LINE | TRANS-AC-TION | STATE | TERM | TAX TOWN | TAX EXEMPT | TERR REHD | FEDL PROCE CODE | CORR RATE | CORR RATE | IDENTIFICATION 55 56 57 58 59 60 | ⑥ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ② | 1 | 7 | ④ | 2 | ② | ③ | 4 | 7 | ⑤ | 2 | ① | ③ |  |  |
| 11 | C | 02 | 471 |  |  |  |  |  |  |  |  |  | 9 6 4 0 - 1 |  |



*Effective* **June 16, 1972** , this endorsement forms a part of Policy No. **462 00 76 30**

*(At the time stated in the policy)*
*issued to* **Trans-Sonics, Inc.**

*by* **Centennial** Insurance Company.

*(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)*

ENDORSEMEN #3

In consideration of the additional premium of $750.00 it is hereby understood and agreed that the policy limit is increased to $5,000,000.

*(effect see below)*

CENTRAL FILES
JUL 17 '72

**Truman Hayes**
bjn KPH 7/13/

All other terms and conditions of this insurance remain unchanged.

*Harold D. Schumm* ................................... *Authorized Representative*
President

G1690A (12/71)

| | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | C | 02 | 471 | | | | | | | 9 | 6 | 4 | 0 | - | 1 | | | | |

*Effective* **6/16/72**    , this endorsement forms a part of Policy No.    462 00 76 30

*(At the time stated in the policy)*

*issued to* **Trans-Sonics, Inc.**

*by* **Centennial**    Insurance Company.

CORRECTED
ENDORSEMEN
#3

*(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)*

In consideration of the additional premium of $636.00 payable as shown below, it is hereby understood and agreed that the policy limit is increased to $5,000,000.

Additional Premium Payable:

| | |
|---|---|
| $136.00 | 6/16/72 |
| $250.00 | 1/1/73 |
| $250.00 | 1/1/74 |

CENTRAL FILES

JUL 17 '72

Truman Haye
bjn 2PH 7/1

All other terms and conditions of this insurance remain unchanged.

_Harold A. Eckmann_
President

_____
*Authorized Representative*

G1690A (12/71)

JUL-14-1999 12:47    ATLANTIC MUTUAL

| 11 | C | 02 | 471 | | | | | | | | | 9 | 6 | 4 | 0 | - | 1 | | | | |

*Effective* 6/16/72 , this endorsement forms a part of Policy No. 462 00 76 30

(*At the time stated in the policy*)

*issued to* Trans-Sonics, Inc.

*by* Centennial    Insurance Company.

(*The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.*)

CORRECTED ENDORSEMENT #3

In consideration of the additional premium of $1,909.00 payable as shown below, it is understood and agreed that the policy limit is increased to $5,000,000.

Additional Premium Payable:

| $409.00 | 6/16/72 |
| $750.00 | 1/1/73 |
| $750.00 | 1/1/74 |

CENTRAL FILES

AUG 07 '72

All other terms and conditions of this insurance remain unchanged.

Truman Hayes & bjn RFH 8/3/72

_Harold A. Eckmann_
President

_____
*Authorized Representative*

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 10

# PART 1

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 10

# GILBERT & RENTON, P.C.

23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Kathryn E. Perrotta, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:  (978) 475-1881

June 9, 2000

<u>VIA CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

John E. Yandrasitz, Esq.
Atlantic Mutual Companies
Three Giralda Farms
Madison, NJ 07940-1004

Re:    Insured: Trans-Sonics, Inc.
       <u>Centennial Insurance Company</u>

Dear Mr. Yandrasitz:

As you know from our discussions over the last year, The Foxboro Company (as successor-in-interest to Centennial Insurance Company's insured, Trans-Sonics, Inc.) was named as a defendant in an underlying environmental action, No. 90-12873-K.  <u>See</u> Complaint attached hereto as Exh. No. 1.  After a bench trial, Foxboro was found liable for groundwater contamination, but was exonerated for soil contamination.  The Court assessed damages of $1,144,523.79.  <u>See</u> Copy of Final Judgment attached hereto as Exh. No. 2.  The parties agreed to waive their respective rights of appeal provided the terms of the judgment were fulfilled, thus requiring Foxboro to pay the outstanding judgment (plus accrued costs and post-judgment interest) to Plaintiffs and also requiring the parties to work together to achieve the necessary remediation of groundwater.

Accordingly, Foxboro's costs and expenses paid to date in connection with the underlying claim are as follows:

### Costs To Date

| | |
|---|---|
| Net Attorneys Fees for Defending Action through 10/8/96 (date of satisfaction of judgment): | $ 375,908.28 |
| Satisfaction of Judgment (4/19/96 Judgment plus post-judgment interest and costs through 10/8/96 date of payment): | $1,187,202.90 |

EXHIBIT 10

## GILBERT & RENTON, P.C.

John E. Yandrasitz, Esq.
June 9, 2000
page 2

| | |
|---|---|
| Response costs (including payments to environmental engineers and costs incurred pursuant to Settlement Agreement entered into between the parties to the underlying action dated February 4, 2000): | $  337,886.42 |
| Accrued interest at Massachusetts statutory rate (12%) through March 28, 2000 primary insurance payment by Liberty Mutual (including interest calculated on attorneys fees through 10/8/96; response costs to date; 4/19/96 judgment): | $ 862,384.17 |
| **Total Costs to Date:** | **$ 2,763,381.77** |

In addition, pursuant to the terms of the Judgment and Settlement Agreement reached between the parties to the underlying action, Foxboro continues to incur engineering, operational and legal fees in connection with the ongoing remediation at the site. On a going-forward basis, these future costs are estimated to be $29,690 per year (not adjusted for inflation) for the life of the remediation operation (estimated at 30 years for a projected cost of $890,700).

### Coverage From Centennial

Centennial issued Policy No. 42-00 76 30, a three-year commercial umbrella policy, to Trans-Sonics for the period January 1, 1972-1975. See Exh. No. 3. The property damage limits of liability were initially $2,000,000 per year excess of $100,000, and on June 16, 1972, these limits increased to $5,000,000. The form policy jacket in use at that time did not include any form of pollution exclusion, see Exh. No. 4,[1] and the numbered endorsements likewise did not include any pollution exclusion. See Exh. No. 3.

### Underlying Primary Coverage

According to the schedule of underlying insurance in Centennial's umbrella policy, Liberty Mutual provided Trans-Sonics with underlying property damage liability coverage of $100,000 beginning January 1, 1972. Following Foxboro's purchase of Trans-Sonics in December 1974,

---

[1]    Our investigation indicates that Centennial did not seek approval of a form policy jacket containing a pollution exclusion until November 6 1972 – more than ten months after the effective date of the Centennial policy issued to Tran-Sonics effective January 1, 1972. See Exh. No. 4.

## GILBERT & RENTON, P.C.

John E. Yandrasitz, Esq.
June 9, 2000
Page 3

Liberty Mutual continued to provide primary coverage to Foxboro/Trans-Sonics for "sudden and accidental" pollution releases until mid-1982. Thereafter, primary pollution coverage was provided to Foxboro/Trans-Sonics only on a claims-made basis (None of the claims-made policies were triggered in this case).

Foxboro and Liberty Mutual have now resolved primary coverage issues, with Liberty Mutual paying on March 28, 2000 a total of $1,250,000 for a complete release of the claim. This amount consisted of (i) $300,000 for Foxboro's attorneys' fees incurred in defending this action and (ii) $950,000 in indemnity coverage, including $300,000 in complete exhaustion of the $100,000 underlying property damage limits in each of the Liberty Mutual primary policies issued for the periods January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75 and $650,000 allocated to subsequent Liberty Mutual policies for damages incurred by Foxboro. Foxboro is now looking to Centennial to bear the remaining damages, as well as future costs that Foxboro will continue to incur in this matter. Please contact me regarding Centennial Insurance Company's position on this claim.

Thank you for your continued cooperation

Very truly yours,

Robert J. Gilbert

cc:    Anthony R. Franciose, Esq.

FILED
IN CLERK'S OFFICE

Nov 29  4 22 PM '90

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

U.S. DIST COURT
MASS.

|  |  |
|---|---|
| ONE WHEELER ROAD ASSOCIATES and THE GUTIERREZ COMPANY, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| THE FOXBORO COMPANY, | ) ) ) |
| Defendant. | ) ) ) |

Civil Action No.

COMPLAINT

90 - 1 3K

90-12873K

One Wheeler Road Associates ("Wheeler Road Associates") and The Gutierrez Company ("Gutierrez"), for their complaint against The Foxboro Company ("Foxboro"), allege as follows:

## THE PARTIES

1.    Plaintiff Wheeler Road Associates is a Massachusetts limited partnership, with a principal place of business at One Wall Street, Burlington, Massachusetts.

2.    Plaintiff Gutierrez is the sole general partner of Wheeler Road Associates.  Gutierrez is a corporation organized and existing under the laws of Delaware, with a principal place of business at One Wall Street, Burlington, Massachusetts.

3.    Upon information and belief, defendant Foxboro is a corporation organized and existing under the laws

PLAINTIFF'S EXHIBIT
1

of Massachusetts, with a principal place of business in Foxboro, Massachusetts.  Foxboro is in the business of manufacturing products for industrial process automation.

### JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction pursuant to 42 U.S.C. §9601, et. seq. and 28 U.S.C. §§1331 and 2201.  The Court has pendent jurisdiction over all claims arising under Massachusetts law.

5.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b).

### ALLEGATIONS COMMON TO ALL COUNTS

6.    From August 1954 through December 1978, Foxboro and/or one or more of Foxboro's predecessor corporations, including Trans-Sonics, Inc. and Foxboro/Trans-Sonics, Inc. (the "Predecessor Corporations"), owned a parcel of land of approximately 9.5 acres located at what is now 160 Wheeler Road, Burlington, Massachusetts.

7.    Upon information and belief, Foxboro and the Predecessor Corporations operated a plant at the Site (the "Plant") which manufactured electronic instruments and systems, and used hazardous substances and materials, including tetrachloroethylene ("PCE") and trichloroethylene ("TCE"), in connection with these manufacturing operations.

2.

8.   Upon information and belief, in operating the Plant, Foxboro and the Predecessor Corporations released hazardous substances and materials at the Site, including PCE and TCE.  Upon information and belief, the hazardous substances and materials were released by Foxboro and the Predecessor Corporations from interior sinks at the Plant which discharged through a roof drainage network into an on-site leaching system.

9.   One Wheeler Road Associates purchased the Site in 1982, and has owned the Site since then.  The Plaintiffs have not released any hazardous substances or materials at the Site.

10.   In approximately September 1984, in connection with a storm drain survey performed at the Site, a health agent from the Burlington, Massachusetts Board of Health ("Board of Health") collected liquid samples from the Site.  A laboratory analysis of the samples revealed the presence at the Site of substantial concentrations of hazardous substances and materials believed to be used in connection with the manufacture of electronic instruments and systems, including PCE and TCE.

11.   In a memo dated October 11, 1984, the Board of Health agent reported this finding to the Board of Health. The memo stated that the contamination emanated from the leaching system.  The memo also suggested that Foxboro and the

3.

Predecessor Corporations could be responsible for the contamination.

12.   In response to the Board of Health's finding, the Plaintiffs retained a hydrogeological consulting firm to investigate Site conditions.  In connection with its investigation, the hydrogeological consulting firm collected and analyzed samples from the Site, and prepared a report for submission to the Department of Environmental Quality Engineering ("DEQE").

13.   In November 1985, the DEQE issued a Notice of Responsibility ("NOR") to the Plaintiffs.  The NOR confirmed that a release of hazardous materials had occurred at the Site and that as owners of the Site, the Plaintiffs were potentially responsible for this release.  Through the NOR and subsequent notification, the DEQE, now the Department of Environmental Protection ("DEP"), required the Plaintiffs to complete an environmental assessment of the Site and to undertake appropriate remedial measures to address the conditions identified.

14.   The Plaintiffs have spent and continue to spend substantial sums for assessment and remedial response costs at the Site as required by the DEP.  The Plaintiffs' assessment and remedial activities have included, among other things, analyzing soil and groundwater, excavating and disposing of contaminated sediments from the area of the

4.

leaching basin, installing a vapor recovery system, excavating drainage inverts, installing components of a groundwater recovery and treatment system, and submitting extensive documentation relating to these activities to the DEP for review and approval.

15.    The Plaintiffs' assessment and remedial activities are ongoing and expected to continue.  A substantial portion of the costs relating to these activities results directly from the PCE and TCE contamination.

<u>COUNT I</u>

(Federal Superfund Statute)

16.    The Plaintiffs incorporate by reference paragraphs 1 through 15 as if fully set forth herein.

17.    Foxboro is a person liable under 42 U.S.C. §9607 for the release of hazardous substances on the Site.

18.    Foxboro's release of hazardous substances has damaged the value of the Site and caused the Plaintiffs to incur, and will continue to cause the Plaintiffs to incur, "necessary costs of response" as defined by 42 U.S.C. §9607.

19.    The Plaintiffs' response actions are consistent with the National Contingency Plan.

20.    By reason of the foregoing, the Plaintiffs are entitled to recover from Foxboro the damage to the value of the Site and their necessary costs of response.

5.

## COUNT II

### (Massachusetts Superfund Statute)

21.    The Plaintiffs incorporate by reference paragraphs 1 through 20 as if fully set forth herein.

22.    Foxboro is a person liable under Mass. G.L. c. 21E, §5 for the release of hazardous materials on the Site.

23.    Foxboro's release of hazardous materials has damaged the value of the Site and caused the Plaintiffs to incur, and will continue to cause the Plaintiffs to incur, "response" costs as defined by Mass. G.L. c. 21E.

24.    The Plaintiffs' response actions are consistent with the Massachusetts Contingency Plan.

25.    By reason of the foregoing, the Plaintiffs are entitled to recover from Foxboro the damage to the value of the Site and their response costs.

## COUNT III

### (Restitution)

26.    The Plaintiffs incorporate by reference paragraphs 1 through 25 as if fully set forth herein.

27.    Foxboro caused the release of hazardous substances and materials at the Site for which it was responsible.

28.    Foxboro owed a duty to the Plaintiffs, the public and the Commonwealth of Massachusetts to investigate and remediate the contamination of the Site.

29.    The Plaintiffs have undertaken investigative and remedial measures with respect to the contamination of the Site, and have incurred substantial costs in connection with these investigative and remedial measures.  By these actions, the Plaintiffs performed duties owed by Foxboro, and as a result, Foxboro has been unjustly enriched.

30.    Foxboro is liable to the Plaintiffs for restitution of the costs they have incurred and may incur in performing Foxboro's duty to investigate and remediate the contamination at the Site.

### COUNT IV

### (Negligence)

31.    The Plaintiffs incorporate by reference paragraphs 1 through 30 as if fully set forth herein.

32.    Foxboro owed a duty to the Plaintiffs, the public and the Commonwealth of Massachusetts to operate the Plant at the Site in a safe manner and avoid contaminating the Site with hazardous substances and materials.

33.    Foxboro breached its duty and caused the Site to become contaminated.

7.

34.   Foxboro's contamination of the Site caused damage to the value of the Site and caused the Plaintiffs to incur costs to undertake investigative and remedial measures with respect to the contamination of the Site.

35.   By reason of the foregoing, the Plaintiffs are entitled to recover from Foxboro the damage to the value of the Site and the cost of their investigative and remedial measures.

### Count V

(Strict Liability)

36.   The Plaintiffs incorporate by reference paragraphs 1 through 35 as if fully set forth herein.

37.   Foxboro's release of hazardous substances and materials at the Site constitutes an abnormally dangerous activity.

38.   Foxboro's release of hazardous substances and materials and subsequent discharge of the substances and materials into a leaching system caused the Site to become contaminated.

39.   Foxboro's contamination of the Site caused damage to the value of the Site and caused the Plaintiffs to incur costs to undertake investigative and remedial measures with respect to the contamination of the Site.

40.   By reason of the foregoing, the Plaintiffs are entitled to recover from Foxboro the damage to the value of

the Site and the cost of their investigative and remedial
measures.

## COUNT VI

### (Declaratory Judgment)

41.    The Plaintiffs incorporate by reference
paragraphs 1 through 40 as if fully set forth herein.

42.    There is an actual controversy between the
Plaintiffs and Foxboro as to their rights and duties concerning
the contamination of the Site.

43.    The Plaintiffs seek a declaratory judgment
pursuant to 28 U.S.C. §2201 as to their rights and duties, and,
in particular, to a determination that Foxboro is liable to the
Plaintiffs:

(a) under 42 U.S.C. §9601, et., seq. and
Mass. G.L. c. 21E for all past, present and future costs of
assessment, containment, response, remediation, and removal
arising from the presence of hazardous substances and materials
on the Site; and

(b) for indemnification for any fine, fee,
damage award or cost (collectively "Costs") incurred by the
Plaintiffs, if said Costs arise from the release of hazardous
substances or materials from the Plant onto the Site.

9.

WHEREFORE, the Plaintiffs ask that the Court:

1.  Enter a judgment in their favor on Counts I, II, III, IV and V;

2.  Award their damages in an amount to be determined at trial;

3.  Issue a declaratory judgment determining the parties' rights and responsibilities, concerning the contamination of the Site, as set forth in Count VI;

4.  Award them attorneys fees, including the attorneys fees and other legal costs incurred in connection with response to the Board of Health finding and DEQE Notice, interest and costs; and

5.  Award them such other relief that the Court finds proper.

                    PLAINTIFFS DEMAND A TRIAL BY
                    JURY ON ALL COUNTS SO TRIABLE.

                         ONE WHEELER ROAD ASSOCIATES and
                         THE GUTIERREZ COMPANY

                         By their attorneys,

                         *Richard A. Johnston*

                         *David Nalven*

                         Richard A. Johnston (BBO #253420)
                         David S. Nalven (BBO #547220)
                         Hale and Dorr
                         60 State Street
                         Boston, Massachusetts 02109
                         (617) 742-9100

Dated:  November 28, 1990

                              10.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 9012873-RGS

ONE WHEELER ROAD ASSOCIATES AND
THE GUTIERREZ COMPANY

v.

THE FOXBORO COMPANY

FINAL JUDGMENT

APRIL 19, 1996

STEARNS, D.J.

This action came on for trial before the court, the Honorable Richard G. Stearns, District Judge, presiding, and the issues having been duly heard and tried, and orders and memoranda of decision having been issued on February 7, 1994, December 13, 1995, and April 3, 1996, it is hereby

ORDERED, ADJUDGED, AND DECLARED THAT

1. Under Counts I and II of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, the plaintiffs, One Wheeler Road Associates and The Gutierrez Company, recover from the defendant, The Foxboro Company, the sum of $335,515.00 in environmental response costs, with interest thereon in the sum of $217082.19 calculated at the rate of 12% per annum from November 28, 1990 to the date of this Final Judgment, as provided by law;

PLAINTIFF'S EXHIBIT
53

2. Under Count II of the Complaint, the plaintiffs recover nothing of the defendant to the extent said Count is based upon a claim of property damage pursuant to M.G.L. c. 21E, § 5(a)(iii), which claim was dismissed by Order of the Court (Young, J.), dated February 7, 1994;

3. Under Counts III, IV, and V of the Complaint, having been dismissed by Order of the Court (Young, J.), dated February 7, 1994, the plaintiffs recover nothing of the defendant;

4. Under Count VI of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, as a substantial controversy between the parties of sufficient immediacy exists under 28 U.S.C. § 2201, a declaratory judgment based upon 42 U.S.C. § 9601, et seq. and M.G.L. c. 21E is hereby entered, over which this Court shall retain jurisdiction, holding the defendant liable to the plaintiffs for such reasonable nd necessary response costs as have been and will be incurred after October 1993 in the remediation of the groundwater percolating in the soil to the north of the original plant located at the site owned by One Wheeler Road Associates in Burlington, Massachusetts; and

5. Under to M.G.L. c. 21E, § 15, pursuant to the Order of the Court (Stearns, J.), dated April 3, 1996, the plaintiffs recover from the defendant $504,249.00 in attorneys' fees and costs and $87,677.00 in experts' fees and costs.

Dated at Boston, Massachusetts, this 24 day of April, 1996.

Deputy Clerk of Court

Post-Judgment interest to date
at the rate of 5.46%.

2

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBITS 11 THROUGH 13

# GILBERT & RENTON, P.C.

23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Kathryn E. Perrotta, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:  (978) 475-1881

June 21, 2000

Ms. Michele Pierro
Senior Vice President
Insurance Archaeology
240 Madison Avenue
New York, NY 10016

Re:   ***Historic Insurance Reconstruction Project***
        Invoice #6260

Dear Ms. Pierro:

Per our phone conversation, I have enclosed a check for $1447.28 in payment of the above-referenced invoice.

Very truly yours,

Patricia M. Cabral
Legal Office Manager

/pc

Encl.

EXHIBIT 11

INSURANCE ARCHAEOLOGY GROUP



**P A S T   D U E**

**P L E A S E   R E M I T**

Gilbert & Retton, PC
23 Main Street
Andover, MA 01810
ATTN: Robert J. Gilbert, Esq.

April 6, 2000

Invoice #    6260

For services rendered on behalf of Gilbert & Retton

Matter No. 4253

Status of account through March 31, 2000

|  |  |  | Hrs/Rate | Amount |
|---|---|---|---|---|
| 3/14/00 | BP | Speak with Robert Gilbert regarding sample form for Centennial policy; determine location of potential policy; find sample in 1976 Umbrella policy book | 0.80 85.00/hr | 68.00 |
| 3/15/00 | BP | Speak with Robert Gilbert about 1976 sample Centennial policy; speak with Michele Pierro about using client sample policy | 0.50 85.00/hr | 42.50 |
| 3/21/00 | MP | Conduct further sample form research for additional forms; review form located | 1.20 200.00/hr | 240.00 |
| 3/23/00 | EP | Draft letter to Robert Gilbert; organize records on sample forms | 0.70 85.00/hr | 59.50 |
|  | MP | Calls with Bob Gilbert; prepare information to send; review internal searches | 1.00 200.00/hr | 200.00 |

240 Madison Avenue
New York, NY 10016
E-MAIL: iag@iagltd.com
TEL: 212 697 2680
FAX: 212 697 4354

Gilbert & Retton, PC

Page    2

| | | | Hrs/Rate | Amount |
|---|---|---|---|---|
| 3/24/00 | EP | Draft letter to Robert Gilbert and organize documents regarding Centennial Insurance Company sample policy form to send accordingly | 0.70 85.00/hr | 59.50 |
| | MP | Continue sample form research for additional forms | 0.50 200.00/hr | 100.00 |
| 3/27/00 | BP | Search for sample Centennial Umbrella policy 1970 - 1975 | 1.00 85.00/hr | 85.00 |
| | MP | Continue sample form research; direct Eric Popiel; review Atlantic Mutual files | 1.30 200.00/hr | 260.00 |
| 3/28/00 | BP | Search for sample Atlantic Mutual excess policy 1970 - 1975 | 1.30 85.00/hr | 110.50 |
| | EP | Prepare duplicate sets of documents regarding sample policy forms | 0.30 85.00/hr | 25.50 |
| 3/30/00 | MP | Review, prepare and send policy forms | 0.50 200.00/hr | 100.00 |

For professional services rendered

| | | | 9.80 | $1,350.50 |
|---|---|---|---|---|

Disbursements

Postage
Pull Records
Telecopier

6.28
60.50
30.00

Total costs

$96.78

Total amount of this bill

$1,447.28

BERT & RENTON, P.C.                                                    4209
VENDOR ID: IAG                  CHECK NO: 00004209         DATE: 06/21/00
PAYEE:    Insurance Archaeology Group    MEMO: Inv#6260-FoxCentennial

ACCOUNT                                                          AMOUNT

550 Other Client-related expenses                              1,447.28


                              CHECK TOTAL:   *****$1,447.28

 **AtlanticMutual Companies**

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Certified Mail, Return Receipt Requested*

July 12, 2000

Robert J. Gilbert, Esq.
Gilbert & Renton, PC
23 Main Street
Andover, Massachusetts 01810

*Re*:  **Insured:**      **Trans-Sonics, Inc.**
       **Claim No.:**     **95-806021**
       **Policy No.:**    **462 007 630, effective January 1, 1972 - January 1, 1975**
       **Site:**          **160 Wheeler Road, Burlington, Massachusetts**

Dear Mr. Gilbert:

Centennial Insurance Company (herein "Centennial") hereby acknowledges receipt of your notice of claim involving the above-referenced matter. Based on the limited information submitted with the claim, I am unable to render a decision as to Centennial's defense and/or indemnity obligations to your client at this time.

Centennial will proceed with an investigation of this matter pursuant to a complete reservation of any and all rights available to it under all policies at issue, including all policy terms, conditions, definitions, exclusions and endorsements contained therein. This reservation includes the right to deny or limit such obligation as may be alleged, and as events may warrant.

At the outset, please be advised that given the nature of this claim and the limited information presented in connection with it, there are a number of coverage defenses or issues which may apply, including:

- Coverage is provided only for a claim arising out of an "occurrence" as defined by the policy. To the extent that the pollution or contamination was either expected or intended, there would be no coverage. If there was no occurrence during the applicable policy period, there is no coverage;

- There is no coverage if the underlying claim does not involve a claim for "damages" within the meaning of our policy. If this claim does not involve "property damage" within the meaning of the policy, there is no coverage;

EXHIBIT 12

2
**Mr. R. Gilbert**
**July 12, 2000**

- Environmental cleanup claims may not be considered claims for legal damages, but rather claims for equitable or injunctive relief which would not be covered. Also, environmental cleanup claims may not be considered claims for property damage, but rather claims for economic loss or a business risk which are not covered;

- There is no coverage if the insured knew or should have know of any "property damage" prior to the inception of the policies, in that coverage cannot be provided for a nonfortuitous event or set of circumstances;

- The applicable pollution exclusion in the policy may bar any coverage for the claim;

- There may be no coverage for "property damage" to property owned, occupied by or rented to the insured, property used by the insured, or property in the care, custody or control of the insured or as to which the insured has for any purpose exercised physical control;

- There may be no coverage for "property damage" to premises alienated by the insured;

- We provide coverage only to the named insured or insureds as set forth or defined in the policy;

- To the extent that your client has paid any amounts or incurred any obligations without obtaining our prior consent, such amounts or liabilities incurred constitute voluntary payments made by you and are not chargeable to us;

- The insured's obligations are subject to the "Other Insurance" and Underlying Insurance" conditions contained in the policy;

- To the extent that any claims made against an insured include fines, penalties or punitive damages, they would not be claims for legal damages on account of bodily injury or property damage, and would not be covered. Claims for such damages may also be in violation of public policy and not covered;

- Environmental cleanup claims generally do not come within a products liability or completed operations hazard.

- To the extent that the insured was aware of the pollution or claim of pollution at or before the time it applied to us for coverage and failed to disclose that information, coverage would be void or voidable as a result of a material misrepresentation(s) under the policy;

3
**Mr. R. Gilbert**
**July 12, 2000**

- In most cases, it is a condition of coverage that timely and adequate notice be given of any loss or claim which may involve a policy. In the event that timely notice was not given, there would be no coverage;

- There may be no coverage if the insured failed to comply with conditions specified in the policies. Coverage provided by the policies, if applicable, is in all events subject to and limited by the exclusions of the policies.

The above-referenced coverage issues are not meant to be exhaustive. Centennial reserves the right to supplement the above with additional grounds for denial of coverage should additional information warrant same.

Finally, please direct your attention to the following list of questions. Please completely answer each question and its subparts. If a particular question or subpart is inapplicable, please respond accordingly but also indicate why the question/subpart does not apply:

1.  Please identify any and all Centennial policy(ies) under which your client seeks coverage.

2.  Please identify other companies which issued insurance to your client which have or may provide coverage for the claim submitted to Centennial, including each such insurer's policy numbers, types and levels of coverage, coverage dates, policy limits and agent. Please include, without limitation, general liability, property, auto liability and pollution liability policies.

3.  Please advise of any and all steps taken by you or your client to preserve insurance records and ensure that all carriers potentially providing coverage received timely notice of this claim.

4.  Please identify all other carriers placed on notice of this claim, including those carriers placed on notice of this claim prior to the entry of judgment against your client in/about April 1996. Please provide copies of your client's notices to Arkwright-Boston and Liberty Mutual. Please also provide a copy of your client's settlement agreement with Liberty Mutual.

5.  Please identify other companies which issued insurance policies in which your client was named as an insured or additional insured which apply or potentially may apply to this claim, including each such insurer's policy numbers, types and levels of coverage, coverage dates, policy limits and agent. Please include, without limitation, general liability, property, auto liability and pollution liability policies.

4
**Mr. R. Gilbert**
**July 12, 2000**

6.  Please state whether any of the insurance companies identified in response to the above questions have advised that:

   a) they will or will not contribute to your client's legal defense and satisfaction of judgment relative to this matter;

   b) their policies cover or do not cover your client's claim;

   c) they have exhausted their limits through the payment of settlements, judgments or defense costs; and/or

   d) they will make payments or disbursements on your client's behalf (including payment of legal defense costs) under a reservation of rights to recoup or recover the payments or disbursements from you.

If any of your responses to the above sections are in the affirmative, please explain in full.

7.  State the nature and duration of your client's association with the site.  Please also detail the nature of your client's relationship with the insured and the transaction(s) causing Foxboro to become an alleged successor-in-interest to Trans-Sonics, Inc.

8.  Describe the nature of all activities conducted at the site and the insured's as well as your client's involvement in same.  Provide the dates your client owned/occupied/conducted operations at the site and describe the nature of your client's operations on site.

9.  Identify the nature and quality of the alleged contaminants associated with the site.

10.  Advise of the method of chemical and waste disposal practices at the site during your client's and its predecessor's operations.

11.  Identify all Potentially Responsible Parties (PRPs) and/or any other entity which may have contributed to contamination at the site.

12.  State whether a claim was made or action commenced (including, but not limited to, the imposition of any fine) against the insured and/or your client by any public or governmental agency, department, council or other regulatory agency arising from or relating to pollution/contamination at the site.  If any such claim or action was made, please explain and provide all documentation relative to same.

5
Mr. R. Gilbert
July 12, 2000

13. Prior to discovering or receiving notice of the circumstances which prompted the submission of this claim, did your client discover or receive notice of any other environmental incident, damage or concern occurring on or arising from the site? If so, please describe.

14. Please give a detailed description of the generic, common and/or trade name and the chemical composition and character (*e.g.* liquid, solid, sludge) of the chemicals or waste material used, generated and/or transported by/on behalf of your client and/or the insured to the site.

15. State when the alleged pollution/contamination effected the groundwater. Please also clarify the nature of the judgment in the underlying action against your client by explaining how and why your client was exonerated for soil contamination.

16. State when your client first suspected a pollution/contamination problem existed at the site and how it was made aware of such a problem; also state what, if anything, your client did in response to its initial suspicion of a possible pollution/contamination problem.

17. Please state:

a) the year any investigation, remediation and/or cleanup began at the site;

b) when the pollution/contamination occurred;

c) who discovered the pollution/contamination and under what circumstances;

d) whether a specific isolated event occurred which your client believes caused pollution/contamination at the property;

e) how the chemicals or hazardous waste were released into the environment; and

f) whether records concerning historical operations at the site exist and, if not, when they were disposed of.

18. State whether there has been any investigation or testing at the site with respect to the alleged pollution/contamination. If so, please state:

a) what person, agency, department, company or individual caused the investigation to be undertaken;

b) in what year and month the investigation and/or testing began;

6
**Mr. R. Gilbert**
**July 12, 2000**

     c) in what year and month the investigation and/or testing was completed;

     d)  what actions were undertaken in the investigation and testing;

     e) how site conditions have changed between the time your client was placed on notice of its potential liability and June 9, 2000.

19.    State whether any reports, analyses, summaries or conclusions of site investigation and/or remediation have been prepared and, if so, please provide copies of all such reports or analyses.

20.    State the total cost of cleanup and remediation at the property.

21.    State whether your client has incurred costs and expenses in defending itself in any formal proceeding or suit arising out of the alleged pollution/contamination and, if so, provide copies of any invoices, receipts or statements.

22.    Please provide a complete description of the defenses utilized at trial for the underlying claim to reduce and/or oppose the allegations against your client.

23.    Please advise of the volume of documents and transcripts available concerning the underlying litigation and trial.

24.    Please describe all of your client's agreements pay moneys in settlement of, or pursuant to a judgment entered against it, any of the claims, suits, administrative actions or similar negotiations or proceedings by public or private departments, entities, agencies and/or individuals arising out of or relating to pollution or contamination of the property.

25.    State whether any claimant, public or private, has provided an estimate of damages, projection of damages or settlement demand which your client has not accepted or has agreed to pay. If so, explain in full.

**In addition to the documents specifically requested above, please provide copies of all leases, pertinent correspondence, records and documents, court pleadings and discovery, orders or directives issued by any governmental entity and all insurance policies, including policies issued by Centennial, which you believe provide coverage for this claim.**

After the above information has been received and reviewed and the subject policy(ies) received and reviewed, I will contact you regarding Centennial's coverage analysis regarding the above-referenced matter. Should you have any questions in the interim, please do not hesitate to contact me. Thank you.

7

**Mr. R. Gilbert**
**July 12, 2000**

Very truly yours,

Nancy Crosta Landale
Specialty Claims

# GILBERT & RENTON, P.C.

23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Kathryn E. Perrotta, Esq.
Edward J. Denn, Esq.

Telephone: (978) 475-7580
Facsimile: (978) 475-1881

September 7, 2000

<u>VIA CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

John E. Yandrasitz, Esq.
Atlantic Mutual Companies
Three Giralda Farms
Madison, NJ 07940-1004

|  |  |  |
|---|---|---|
| Re: | Insured: | Trans-Sonics, Inc. |
|  | Policy: | Centennial Insurance Company Umbrella Policy No. 462-00 76 30 |
|  | Claim: | Notice of Downgradient Property Status from Equity Office <u>Products, Inc.</u> |

Dear Mr. Yandrasitz:

As you know from our recent correspondence and our discussions over the last year, this office represents The Foxboro Company (as successor-in-interest to Centennial Insurance Company's insured, Trans-Sonics, Inc.) in connection with those claims made against Foxboro concerning the property formerly owned by Trans-Sonics located at 160 Wheeler Road, Burlington, MA (the "Site"). On behalf of Foxboro, we are hereby placing Centennial on notice of an apparent claim by Equity Office Products, Inc. ("EOP") arising out of Foxboro/Trans-Sonics' past ownership and use of the Site.

As you are aware from correspondence concerning Foxboro's pending claim with Centennial in connection with <u>One Wheeler Road Associates, Inc.</u> v. <u>The Foxboro Company</u>, Foxboro is an insured of Centennial pursuant to Policy No. 462-00 76 30, a three-year commercial umbrella policy, issued to Trans-Sonics for the period January 1, 1972-1975. <u>See</u> Exh. No. 1.

As a result of the payments by Liberty Mutual Insurance Company (the primary carrier for Foxboro and Trans-Soncis), Liberty Mutual has completely exhausted the $100,000 underlying property damage limits in each of the Liberty Mutual primary policies issued for the periods January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75. Accordingly, the EOP claim is being tendered to Centennial for defense and indemnification.

EXHIBIT 13

## GILBERT & RENTON, P.C.

John E. Yandrasitz, Esq.
September 7, 2000
Page 2

Foxboro has recently received a notice that the site is a suspected source of groundwater contamination for property located at 7 New England Executive Park, Burlington, MA, currently owned by Equity Office Products, Inc. ("EOP"). See Downgradient Property Status opinion attached hereto as Exh. No. 2. The Downgradient Property Status ("DPS") opinion identifies the Site as a suspected source of TCE and PCE present on the EOP property. In defense of this claim and in order to minimize exposure to the allegations of contamination and to determine the extent of possible liability, Foxboro is currently investigating the allegations of groundwater contamination and will prepare a response to the DPS. We will, of course, provide Centennial with a copy of the response upon completion thereof.

As all underlying primary coverage for claims against Foxboro/Trans-Sonics resulting from the Site has been exhausted, Foxboro hereby demands that Centennial defend and indemnify Foxboro in connection with EOP's claim. Please contact me regarding Centennial Insurance Company's position on this claim.

Thank you for your continued cooperation

Very truly yours,

Robert J. Gilbert

cc:    Anthony R. Franciose, Esq.

| | POSTAGE | $3.20 | POSTMARK OR DATE |
| RETURN | SHOW TO WHOM, DATE AND ADDRESS OF DELIVERY / RESTRICTED DELIVERY | $0.00 | |
| RECEIPT | CERTIFIED FEE | $1.40 | |
| SERVICE | RETURN RECEIPT FEES | $1.25 | |
| SENT TO: | TOTAL POSTAGE AND FEES | $5.85 | |

Z 973 828 340

Code: Foxboro while Road
File:

**Mr. John Yandrasitz, Esq.**
**Atlantic Mutual Companies**
**Three Giralda Farms**
**Madison, NJ 07940-1004**

SEP - 7 2000
USPS ANDOVER MA 01810

PS FORM 3800

**UNITED STATES POSTAL SERVICE**

**RECEIPT FOR CERTIFIED MAIL**
NO INSURANCE COVERAGE PROVIDED -
NOT FOR INTERNATIONAL MAIL
(SEE OTHER SIDE)

---

**SENDER:**
• Complete items 1 and/or 2 for additional services.
• Complete items 3, and 4a & b.
• Print your name and address on the reverse of this form so that we can return this card to you.
• Attach this form to the front of the mailpiece, or on the back if space does not permit.
• Write "Return Receipt Requested" on the mailpiece below the article number.
• The Return Receipt Fee will provide you the signature of the person delivered to and the date of delivery.

I also wish to receive the
following services (for an extra fee):
1. ☐ Addressee's Address
2. ☐ Restricted Delivery
Consult postmaster for fee.

3. Article Addressed to:

**Mr. John Yandrasitz, Esq.**
**Atlantic Mutual Companies**
**Three Giralda Farms**
**Madison, NJ 07940-1004**

4a. Article Number
Z 973 828 340

4b. Service Type ☒ CERTIFIED

7. Date of Delivery

5. Received By: (Print Name)

6. Signature: (Addressee or Agent)

8. Addressee's Address
(ONLY if requested and fee paid.)

PS Form 3811
9/7/2000
Code:
File: Foxboro

**DOMESTIC RETURN RECEIPT**

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBITS 14 THROUGH 17


**AtlanticMutual
Companies**

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Certified Mail, Return Receipt Requested*

September 20, 2000

Robert J. Gilbert, Esq.
Gilbert & Renton, PC
23 Main Street
Andover, Massachusetts 01810

| | | |
|---|---|---|
| *Re*: | **Insured:** | **Trans-Sonics, Inc.** |
| | **Claim No.:** | **95-806021** |
| | **Policy No.:** | **462 007 630, effective January 1, 1972 - January 1, 1975** |
| | **Site:** | **160 Wheeler Road, Burlington, Massachusetts** |

Dear Mr. Gilbert:

Centennial Insurance Company (herein "Centennial") hereby acknowledges receipt of your letter and attachments of September 19, 2000 in response to its letter of July 12, 2000. Pursuant to a complete reservation of any and all rights available to it under all policies at issue, including all policy terms, conditions, definitions, exclusions and endorsements contained therein, Centennial will review the information you have provided and respond with its coverage analysis as soon as practicable.

Please also note that we are in receipt of your letter to Mr. Yandrasitz dated September 7, 2000. As previously advised, I will be handling this matter for Centennial and, as such, I will assume that your letter of September 19, 2000 to me supersedes your letter of September 7, 2000 to Mr. Yandrasitz. Please refer all future correspondence and contact to me, and should you have any questions at any time please do not hesitate to contact me.

Thank you.

Very truly yours,

Nancy Crosta Landale
Specialty Claims

EXHIBIT 14

*Cow*
*Fox./Centennial*

# GILBERT & RENTON, P.C.
23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Kathryn E. Perrotta, Esq.
Edward J. Denn, Esq.

Telephone: (978) 475-7580
Facsimile: (978) 475-1881

September 19, 2000

Ms. Nancy Crosta Landale
Atlantic Mutual Insurance Company
Centennial Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ 07940-1004

Re: Insured: Trans-Sonics, Inc.
Claim No.: 95-806021

Dear Ms. Landale:

Below please find the response of The Foxboro Company ("Foxboro"), as successor to Trans-Sonics, Inc., to your recent inquiry concerning Foxboro's claim for coverage under Centennial Insurance Company Policy No. 42-00 76 30.

1.  **Please identify any and all Centennial policy(ies) under which your client seeks coverage.**

Foxboro seeks coverage under Centennial Policy No. 42-00 76 30, a three-year commercial umbrella policy, issued to Trans-Sonics[1] for the period January 1, 1972-1975. See Exh. No. 1. The property damage limits of liability were initially $2,000,000 per year excess of $100,000, and on June 16, 1972, these limits increased to $5,000,000. The form policy jacket in use at that time did not include any form of pollution exclusion, see Exh. No. 2,[2] and the numbered endorsements likewise did not include any pollution exclusion. See Exh. No. 1. Foxboro also seeks coverage under any other policies issued by

---

[1]    As explained in our correspondence of June 9, 2000 Foxboro purchased Trans-Sonics in 1974. The nature of Foxboro's relationship with the Trans-Sonics site is more fully set forth in Foxboro's response to Request No. 7.

[2]    Our investigation indicates that Centennial did not seek approval of a form policy jacket containing a pollution exclusion until November 6, 1972 – more than ten months after the effective date of the Centennial policy issued to Tran-Sonics effective January 1, 1972. See Exh. No. 2.

1

# GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 2

Centennial or Atlantic Mutual Insurance Co. to Trans-Sonics or Foxboro.

2.    **Please identify other companies which issued insurance to your client which have or may provide coverage for the claim submitted to Centennial, including each such insurer's policy numbers, types and levels of coverage, coverage dates, policy limits and agent. Please include, without limitation, general liability, property, auto liability and pollution liability policies.**

As stated more fully in our demand letter dated June 9, 2000, Foxboro sought coverage for the underlying claims from Liberty Mutual Insurance Company pursuant to the Liberty Mutual primary policies Nos. LGI-112-067402-061, LGI 512-067402-064 and LGI 112-020738-024 issued for the periods January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75, respectively. See Centennial Insurance Company Policy No. 462-00 76 30 indicating in the schedule of underlying insurance that Liberty Mutual issued Policy No. LGI-112-067402-061 attached hereto as Exh. No. 1; Trans-Sonics, Inc.'s Schedule of Insurance, December 31, 1973, attached hereto as Exh. No. 3. Foxboro took the position that those Trans-Sonics policies (whose existence was disputed by Liberty Mutual) would not have contained any form of pollution exclusion. In addition, Foxboro sought coverage under Liberty Mutual policies issued to The Foxboro Company and effective after its acquisition of Trans-Sonics in late 1974. See Liberty Mutual Policy No. LGI 112-020738-024 attached hereto as Exh. No. 4.

Foxboro sued Liberty Mutual for coverage under the primary policies. Foxboro and Liberty Mutual resolved primary coverage issues, with Liberty Mutual paying a total of $1,250,000 for a complete release of the claim. This amount consisted of (i) $300,000 for Foxboro's attorneys' fees incurred in defending the underlying action and (ii) $950,000 in indemnity coverage, including $300,000 in complete exhaustion of the $100,000 underlying property damage limits in each of the Liberty Mutual primary comprehensive general liability policies issued to Trans-Sonics for the periods January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75 and $650,000 allocated to subsequent Liberty Mutual primary policies in effect from 1975 through mid-1982.

3.    **Please advise of any and all steps taken by you or your client to preserve insurance records and ensure that all carriers potentially providing coverage received timely notice of this claim.**

Upon notice of the underlying claim(s), Foxboro notified its primary insurer, Liberty Mutual, of the claim(s). See letter from The Foxboro Company to defense counsel dated December 4, 1990 referencing notice to primary insurer attached as Exh. No. 5. Upon settling the underlying claim, Foxboro notified Centennial as its umbrella carrier of the

2

GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 3

damages in excess of the $1,250,000 settlement amount.[3]

In addition, in the course of its coverage action against Liberty Mutual, Foxboro discovered secondary evidence of previously undiscovered general and umbrella liability policies issued to Trans-Sonics prior to Foxboro's purchase of Trans-Sonics. See Exh. 3. At that point, Foxboro apprised Centennial of the coverage action and requested Centennial to provide any information it had concerning the Centennial umbrella policy issued to Trans-Sonics. See Exh. 6.

4.   **Please identify all other carriers placed on notice of this claim, including those carriers placed on notice of this claim prior to the entry of judgment against your client in/about April 1996. Please provide copies of your client's notices to Arkwright-Boston and Liberty Mutual. Please also provide a copy of your client's settlement agreement with Liberty Mutual.**

Please see response to Request No. 3. Arkwright-Boston provided replacement value property insurance to Trans-Sonics and then The Foxboro Company. My understanding is that The Foxboro Company did not notify Arkwright-Boston of the claim.

5.   **Please identify other companies which issued insurance policies in which your client was named as an insured or additional insured which apply or potentially may apply to this claim, including each such insurer's policy numbers, types and levels of coverage, coverage dates, policy limits and agent. Please include, without limitation, general liability, property, auto liability and pollution liability policies.**

Please see response to Request No. 3. Liberty Mutual was the primary liability insurer. See Trans-Sonics, Inc.'s Schedule of Insurance, December 31, 1973, attached hereto as Exh. No. 3.

6.   **Please state whether any of the insurance companies identified in response to the above questions have advised that:**

(a) **they will or will not contribute to your client's legal defense and satisfaction of judgment relative to this matter;**

(b) **their policies cover or do not cover your client's claim;**

---

[3]    The remaining damages are set forth more fully in our demand letter dated June 9, 2000.

GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 4

**(c) they have exhausted their limits through the payment of settlements, judgments or defense costs; and/or**

**(d) they will make payments or disbursements on your client's behalf (including payment of legal defense costs) under a reservation of rights to recoup or recover the payments or disbursements from you.**

**If any of your responses to the above sections are in the affirmative, please explain in full.**

Please see responses to Request Nos. 2 and 3.

7.    **State the nature and duration of your client's association with the site. Please also detail the nature of your client's relationship with the insured and the transaction(s) causing Foxboro to become an alleged successor-in-interest to Trans-Sonics, Inc.**

In 1956, The Foxboro Company's predecessor-in-interest, Trans-Sonics, Inc., constructed a 28,000 square foot factory on undeveloped land at 200 Wheeler Road, Burlington, MA. As part of its manufacturing operations, Foxboro/Transonics used alcohol, trichloroethylene (TCE), freon and methylene chloride and other TCE-based solvents and other chemicals to clean the products which Foxboro/Transonics manufactured and certain other equipment used at the facility. While other entities shared the site or operated on the site prior to the discovery of groundwater contamination, the court in the underlying action held that Foxboro/Transonics was the only occupant of the site to use TCE. Foxboro/Transonics placed drums in a central storeroom to collect spent solvents, and employees were admonished not to pour chemical wastes down the sinks at the facility. The court was not able to reach any findings of fact regarding the manner in which Foxboro disposed of spent TCE, finding no evidence that employees poured TCE into floor or sink drains but also finding little evidence concerning the use of waste scavengers or recyclers.

In 1978, The Foxboro Company sold the property to Blanchard Wiggins and moved its manufacturing operations to another site. In 1984, Mr. Wiggins sold the property to One Wheeler Road Associates. Following Foxboro's departure from the site, U.S. Windpower became a tenant on the property and proceeded to conduct manufacturing operations. The court in the underlying action found that while U.S. Windpower did use certain chemicals in its manufacturing processes, it did not use TCE.

In September 1984, the Town of Burlington discovered environmental contamination at the Wheeler Road site. A series of investigations and remedial efforts were undertaken and on November 29, 1990, One Wheeler Road Associates and the Gutierrez Company

4

GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 5

sued The Foxboro Company. Prior to 1990, Foxboro was not aware of any contamination on the site nor was it aware of any previous environmental testing conducted on the site.

The court found that the site had been contaminated from a number of pathways involving the facility's drainage system. For example, along the west line of the drainage system, the Court found that TCE-contaminated groundwater existed where sections of the drainage pipe were compromised from sharp protuberances in the bedrock. When the court was not able to determine the actual cause of the hole in the pipe or when the hole occurred, the court rejected plaintiffs' argument that the hole occurred while Foxboro/Trans-Sonics owned the site and found that contamination existed along the north line of the drainage system in the vicinity of partially mortared joints as well as near the former leaching basin to which the facility's floor and sink drains were connected.

The Court also found that Foxboro/Trans-Sonics stored hazardous materials at the site, did not have a formal policy monitoring employee use and disposal of hazardous materials and failed to show that a third party was solely responsible for the release of TCE. During Foxboro/Trans-Sonics' occupancy of the site, they installed a leaching basin connected to the internal sinks and floor drains of the plant which, according to the court, provided the agency for disseminating TCE into the groundwater.

The court found liability on Foxboro/Trans-Sonics' part because Foxboro/Trans-Sonics was the only entity to use TCE on the site and because a drainage system was present on the site. The Court did *not* find that Foxboro/Trans-Sonics intentionally poured TCE into the drainage system.

The uncontradicted testimony in the underlying case confirmed that Foxboro/Trans-Sonics employees did not pour solvents into sinks, thus destroying the underlying plaintiffs' speculative theory - alleged "on information and belief" - that solvents might have been released from interior sinks at the Plant. See excerpts from various deposition transcripts eliciting testimony from former Trans-Sonics employees with knowledge of procedures and practices for disposing of TCE based compounds attached hereto as Exh. No. 7.[4]

---

[4]    Nicholson Depo., (Q: Are you aware of whether any quantities of trichloroethylene...were ever poured down the sinks at the Wheeler Road facility? A: No. No."); Westcott Depo., at 14 ("I asked him if we had ever put solvents down the sinks, and he confirmed my impression that that was an absolute no-no. That was not done."), 68 ("[I]t was our policy not to put solvents down sinks; that is, not into the leaching bed, the septic system, the sewage system"); Manion Depo., at 62 ("the corporate policy was that no organic solvents could be placed in

5

GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 6

The court did not state how solvents entered the drainage system and thus did not rule out the possibility of sudden and accidental spills of solvents into sinks or floor drains. See Opinion of Stearns, J. from underlying case attached hereto as Exh. No. 8.

8.    **Describe the nature of all activities conducted at the site and the insured's as well as your client's involvement in same.  Provide the dates your client owned/occupied/conducted operations at the site and describe the nature of your client's operations on site.**

Please see response to Request No. 7.

9.    **Identify the nature and quality of the alleged contaminants associated with the site.**

Please see response to Request No. 7.  In addition to the contaminants alleged in the underlying complaint, C.A. #90- 12873K, a copy of which is attached hereto as Exh. No. 9, please refer to Foxboro's Notice of Claim dated June 9, 2000 attached hereto as Exh. No. 10, setting forth the basis for a recent claim against Foxboro for alleged contamination at the site.

10.    **Advise of the method of chemical and waste disposal practices at the site during your client's and its predecessor's operations.**

Please see response to Request No. 7

11.    **Identify all Potentially Responsible Parties (PRPs) and/or any other entity which may have contributed to contamination at the site.**

Please see response to Request No. 7

12.    **State whether a claim was made or action commenced (including, but not limited to, the imposition of any fine) against the insured and/or your client by any public or governmental agency, department, council or other regulatory agency arising from or relating to pollution/contamination at the site.  If any such claim or action was made, please explain and provide all documentation relative to same.**

Please see response to Request No. 7.

---

a sink...").

6

GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 7

13. **Prior to discovering or receiving notice of the circumstances which prompted the submission of this claim, did your client discover or receive notice of any other environmental incident, damage or concern occurring on or arising from the site?  If so, please describe.**

Please see response to Request No. 7.

14. **Please give a detailed description of the generic, common and/or trade name and chemical composition and character (*e.g.* liquid, solid, sludge) of the chemicals or waste material used, generated and/or transported by/on behalf of your client and/or the insured to the site.**

Please see response to Request No. 7.

15. **State when the alleged pollution/contamination affected the groundwater.  Please also clarify the nature of the judgment in the underlying action against your client by explaining how and why your client was exonerated for soil contamination.**

Please see response to Request No. 7.  In addition, please refer to the Opinion of Judge Stearns, attached as Exhibit 8.

16. **State when your client first suspected a pollution/contamination problem existed at the site and how it was made aware of such a problem; also state what, if anything, your client did in response to its initial suspicion of a possible pollution/contamination problem.**

Please see response to Request No. 7.

17. **Please state:**

    **(a) the year any investigation, remediation and/or cleanup began at the site;**

    **(b) when the pollution/contamination occurred;**

    **(c) who discovered the pollution/contamination and under what circumstances;**

    **(d) whether a specific isolated event occurred which your client believes caused pollution/contamination at the property.**

    **(e) how the chemicals or hazardous waste were released into the environment; and**

## GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 8

**(f) whether records concerning historical operations at the site exist and, if not, when they were disposed of.**

Please see response to Request No. 7.

18.    **State whether there has been any investigation or testing at the site with respect to the alleged pollution/contamination. If so, please state:**

**(a) what person, agency, department, company or individual caused the investigation to be undertaken;**

**(b) in what year and month the investigation and/or testing began;**

**(c) in what year and month the investigation and/or testing was completed;**

**(d) what actions were undertaken in the investigation and testing;**

**(e) how site conditions have changed between the time your client was placed on notice of its potential liability and June 9, 2000.**

The site has been fully investigated and a remediation plan has been implemented. Below please find a list of consultant reports that we maintain. We have included copies of the reports as Exh. Nos. 11 - 20.

1984 "Investigation of Storm Drain System" prepared by Eastern Pipe Service, Inc.

April 1985 "Evaluation of Leaching Basin" prepared by Haley & Aldrich, Inc.

November 1985 Department of Environmental Quality Engineering letter re: assessment of 160 Wheeler Road, Burlington, MA

March 1987 "Report on Phase I Site Assessment" prepared by Haley & Aldrich, Inc.

April 1987 Massachusetts Department of Environmental Quality Engineering Preliminary Assessment Letter Report

September 1988 Phase III Environmental Studies prepared by Norwood Engineering Co., Inc. for the Gutierrez Company

December 1989 "Investigation of Groundwater Contamination in the Southern portion of

GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 9

the Vine Brook Aquifer" prepared by Metcalf & Eddy

March 1993 "Project Overview" prepared by Nangle Consulting Associates, Inc. for The Gutierrez Company

October 1994 "Phase II Risk Characterization" prepared by Nangle Consulting Associates

December 1994 "Supplemental Response Action Plan" prepared by Nangle Consulting Associates

19. **State whether any reports, analyses, summaries or conclusions of site investigation and/or remediation have been prepared and, if so, please provide copies of all such report or analyses.**

Please see response to Request No. 18.

20. **State the total cost of cleanup and remediation at the property.**

Please see response to Request No. 25.

21. **State whether your client has incurred costs and expenses in defending itself in any formal proceeding or suit arising out of the alleged pollution/contamination and, if so, provide copies of any invoices, receipts or statements.**

Please see response to Request No. 25. Copies of invoices are available for inspection.

22. **Please provide a complete description of the defenses utilized at trial for the underlying claim to reduce and/or oppose the allegations against your client.**

Please see response to Request No. 21. In addition, we are providing herewith an index of all proceedings in the underlying case. Exh. No. 21. The documents themselves are voluminous and can be inspected upon request.

23. **Please advise of the volume of documents and transcripts available concerning the underlying litigation and trial.**

Our office maintains copies of Deposition transcripts of employees with knowledge of use of TCE on the property. The transcripts total approximately 500 pages. We have provided copies of all of the environmental consultants' reports as well as an index of all proceedings in the underlying case. Exh. Nos. 11-20 and 21.

9

GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 10

24.   **Please describe all of your client's agreements pay money in settlement of, or pursuant to a judgment entered against it, any of the claims, suits, administrative actions or similar negotiations or proceedings by public or private departments, entities, agencies and/or individuals arising out of or relating to pollution or contamination of the property.**

Please see response to Request No. 25.

25.   **State whether any claimant, public or private, has provided an estimate of damages, projection of damages or settlement demand which your client has not accepted or has agreed to pay. If so, explain in full.**

As previously communicated, Foxboro and Liberty Mutual resolved primary coverage issues, with Liberty Mutual paying on March 28, 2000 a total of $1,250,000 for a complete release of the claim. This amount consisted of (i) $300,000 for Foxboro's attorneys' fees incurred in defending this action and (ii) $950,000 in indemnity coverage, including $300,000 in complete exhaustion of the $100,000 underlying property damage limits in each of the Liberty Mutual primary policies issued for the periods January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75 and $650,000 allocated to subsequent Liberty Mutual policies for damages incurred by Foxboro.

### Costs To Date

| | |
|---|---|
| Net Attorneys Fees for Defending Action through 10/8/96 (date of satisfaction of judgment): | $ 375,908.28 |
| Satisfaction of Judgment (4/19/96 Judgment plus post-judgment interest and costs through 10/8/96 date of payment): | $1,187,202.90 |
| Response costs (including payments to environmental engineers and costs incurred pursuant to Settlement Agreement entered into between the parties to the underlying action dated February 4, 2000): | $ 337,886.42 |
| Accrued interest at Massachusetts statutory rate (12%) through March 28, 2000 primary insurance payment by Liberty Mutual (including interest calculated on attorneys fees through 10/8/96; response costs to date; | |

GILBERT & RENTON, P.C.

Ms. Nancy Crosta Landale
September 19, 2000
Page 11

4/19/96 judgment):                                          $ 862,384.17


**Total Costs to Date:**                                    **$ 2,763,381.77**

In addition, pursuant to the terms of the Judgment and Settlement Agreement reached
between the parties to the underlying action, Foxboro continues to incur engineering,
operational and legal fees in connection with the ongoing remediation at the site. On a
going-forward basis, these future costs are estimated to be $29,690 per year (not adjusted
for inflation) for the life of the remediation operation (estimated at 30 years for a projected
cost of $890,700).

I trust that the above information satisfies your inquiries set forth in your recent
correspondence. Should you have any remaining questions, please feel free to call me directly.
As stated previously, having exhausted the primary coverage afforded by the Liberty Mutual
policies, Foxboro is now looking to Centennial to bear the remaining damages, as well as future
costs that Foxboro will continue to incur in this matter. I look forward to hearing from you
regarding Centennial Insurance Company's anticipated acceptance of this claim.

Thank you for your continued cooperation

Very truly yours,

Robert J. Gilbert

cc:    Anthony R. Franciose, Esq. (w/out encl.)

11


**AtlanticMutual Companies**

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Certified Mail, Return Receipt Requested*

October 24, 2000

Robert J. Gilbert, Esq.
Gilbert & Renton, PC
23 Main Street
Andover, Massachusetts 01810

*Re*:     **Insured:**          **Trans-Sonics, Inc.**
          **Claim No.:**        **95-806021**
          **Policy No.:**       **462 007 630, effective January 1, 1972 - January 1, 1975**
          **Site:**             **Equity Office Products, Inc., 7 New England Park,**
                                **Burlington, MA**

Dear Mr. Gilbert:

Centennial Insurance Company (herein "Centennial") hereby acknowledges receipt of your notice of claim involving the above-referenced matter. Based on the limited information submitted with the claim, I am unable to render a decision as to Centennial's defense and/or indemnity obligations to your client at this time.

Centennial will proceed with an investigation of this matter pursuant to a complete reservation of any and all rights available to it under all policies at issue, including all policy terms, conditions, definitions, exclusions and endorsements contained therein. This reservation includes the right to deny or limit such obligation as may be alleged, and as events may warrant.

At the outset, please be advised that given the nature of this claim and the limited information presented in connection with it, there are a number of coverage defenses or issues which may apply, including:

- Coverage is provided only for a claim arising out of an "occurrence" as defined by the policy. To the extent that the pollution or contamination was either expected or intended, there would be no coverage. If there was no occurrence during the applicable policy period, there is no coverage;

- There is no coverage if the underlying claim does not involve a claim for "damages" within the meaning of our policy. If this claim does not involve "property damage" within the meaning of the policy, there is no coverage;

EXHIBIT 15

2
**Mr. R. Gilbert**
**October 24, 2000**

- Environmental cleanup claims may not be considered claims for legal damages, but rather claims for equitable or injunctive relief which would not be covered. Also, environmental cleanup claims may not be considered claims for property damage, but rather claims for economic loss or a business risk which are not covered;

- There is no coverage if the insured knew or should have know of any "property damage" prior to the inception of the policies, in that coverage cannot be provided for a nonfortuitous event or set of circumstances;

- The applicable pollution exclusion in the policy may bar any coverage for the claim;

- There may be no coverage for "property damage" to property owned, occupied by or rented to the insured, property used by the insured, or property in the care, custody or control of the insured or as to which the insured has for any purpose exercised physical control;

- There may be no coverage for "property damage" to premises alienated by the insured;

- We provide coverage only to the named insured or insureds as set forth or defined in the policy;

- To the extent that your client has paid any amounts or incurred any obligations without obtaining our prior consent, such amounts or liabilities incurred constitute voluntary payments made by you and are not chargeable to us;

- The insured's obligations are subject to the "Other Insurance" and Underlying Insurance" conditions contained in the policy;

- To the extent that any claims made against an insured include fines, penalties or punitive damages, they would not be claims for legal damages on account of bodily injury or property damage, and would not be covered. Claims for such damages may also be in violation of public policy and not covered;

- Environmental cleanup claims generally do not come within a products liability or completed operations hazard.

- To the extent that the insured was aware of the pollution or claim of pollution at or before the time it applied to us for coverage and failed to disclose that information, coverage would be void or voidable as a result of a material misrepresentation(s) under the policy;

3
**Mr. R. Gilbert**
**October 24, 2000**

- In most cases, it is a condition of coverage that timely and adequate notice be given of any loss or claim which may involve a policy. In the event that timely notice was not given, there would be no coverage;

- There may be no coverage if the insured failed to comply with conditions specified in the policies. Coverage provided by the policies, if applicable, is in all events subject to and limited by the exclusions of the policies.

The above-referenced coverage issues are not meant to be exhaustive. Centennial reserves the right to supplement the above with additional grounds for denial of coverage should additional information warrant same.

As you know, Centennial currently is investigating your client's prior claim concerning the Wheeler Road site and will utilize information provided regarding that claim to answer inquiries relative to this claim to the greatest extent possible. Nevertheless, we require the following information specific to the Equity Office Products site claim:

1. Please identify any and all Centennial policy(ies) under which your client seeks coverage.

2. Please identify other companies which issued insurance to your client which have or may provide coverage for the claim submitted to Centennial, including each such insurer's policy numbers, types and levels of coverage, coverage dates, policy limits and agent. Please include, without limitation, general liability, property, auto liability and pollution liability policies.

3. Please advise of any and all steps taken by you or your client to preserve insurance records and ensure that all carriers potentially providing coverage received timely notice of this claim.

4. Please identify all other carriers placed on notice of this claim.

5. Please identify other companies which issued insurance policies in which your client was named as an insured or additional insured which apply or potentially may apply to this claim, including each such insurer's policy numbers, types and levels of coverage, coverage dates, policy limits and agent. Please include, without limitation, general liability, property, auto liability and pollution liability policies.

6. Please state whether any of the insurance companies identified in response to the above questions have advised that:

   a) they will or will not contribute to your client's legal defense and satisfaction of judgment relative to this matter;

4
**Mr. R. Gilbert**
**October 24, 2000**

b) their policies cover or do not cover your client's claim;

c) they have exhausted their limits through the payment of settlements, judgments or defense costs **(and if you contend that your client's settlement with Liberty Mutual relative to the Wheeler Road site exhausted Liberty Mutual's policies relative to this site, or you contend any other basis for exhaustion of underlying insurance, please detail the facts and circumstances supporting such a contention)**; and/or

d) they will make payments or disbursements on your client's behalf (including payment of legal defense costs) under a reservation of rights to recoup or recover the payments or disbursements from you.

If any of your responses to the above sections are in the affirmative, please explain in full.

7.    State the nature and duration of your client's association with the site.

8.    Describe the nature of all activities conducted at the site and the insured's as well as your client's involvement in same.    Provide the dates your client owned/occupied/conducted operations at the site and describe the nature of your client's operations on site.

9.    Identify the nature and quality of the alleged contaminants associated with the site.

10.    Advise of the method of chemical and waste disposal practices at the site during your client's and its predecessor's operations.

11.    Identify all Potentially Responsible Parties (PRPs) and/or any other entity which may have contributed to contamination at the site.

12.    State whether a claim was made or action commenced (including, but not limited to, the imposition of any fine) against the insured and/or your client by any public or governmental agency, department, council or other regulatory agency arising from or relating to pollution/contamination at the site.  If any such claim or action was made, please explain and provide all documentation relative to same.

13.    Prior to discovering or receiving notice of the circumstances which prompted the submission of this claim, did your client discover or receive notice of any other environmental incident, damage or concern occurring on or arising from the site?  If so, please describe.

5
**Mr. R. Gilbert**
**October 24, 2000**

14.     Please give a detailed description of the generic, common and/or trade name and the chemical composition and character (*e.g.* liquid, solid, sludge) of the chemicals or waste material used, generated and/or transported by/on behalf of your client and/or the insured to the site.

15.     State when the alleged pollution/contamination effected the groundwater. Please also clarify the nature of the judgment in the underlying action against your client by explaining how and why your client was exonerated for soil contamination.

16.     State when your client first suspected a pollution/contamination problem existed at the site and how it was made aware of such a problem; also state what, if anything, your client did in response to its initial suspicion of a possible pollution/contamination problem.

17.     Please state:

      a) the year any investigation, remediation and/or cleanup began at the site;

      b) when the pollution/contamination occurred;

      c) who discovered the pollution/contamination and under what circumstances;

      d) whether a specific isolated event occurred which your client believes caused pollution/contamination at the property;

      e) how the chemicals or hazardous waste were released into the environment; and

      f) whether records concerning historical operations at the site exist and, if not, when they were disposed of.

18.     State whether there has been any investigation or testing at the site with respect to the alleged pollution/contamination. If so, please state:

      a) what person, agency, department, company or individual caused the investigation to be undertaken;

      b) in what year and month the investigation and/or testing began;

      c) in what year and month the investigation and/or testing was completed;

      d) what actions were undertaken in the investigation and testing;

      e) how site conditions have changed between the time your client was placed on

6
**Mr. R. Gilbert**
**October 24, 2000**

notice of its potential liability and June 9, 2000.

19. State whether any reports, analyses, summaries or conclusions of site investigation and/or remediation have been prepared and, if so, please provide copies of all such reports or analyses.

20. State the total cost of cleanup and remediation at the property.

21. State whether your client has incurred costs and expenses in defending itself in any formal proceeding or suit arising out of the alleged pollution/contamination and, if so, provide copies of any invoices, receipts or statements.

22. Please provide a complete description of the defenses utilized at trial for the underlying claim to reduce and/or oppose the allegations against your client.

23. Please advise of the volume of documents and transcripts available concerning the underlying litigation and trial.

24. Please describe all of your client's agreements pay moneys in settlement of, or pursuant to a judgment entered against it, any of the claims, suits, administrative actions or similar negotiations or proceedings by public or private departments, entities, agencies and/or individuals arising out of or relating to pollution or contamination of the property.

25. State whether any claimant, public or private, has provided an estimate of damages, projection of damages or settlement demand which your client has not accepted or has agreed to pay. If so, explain in full.

**In addition to the documents specifically requested above, please provide copies of all leases, pertinent correspondence, records and documents, court pleadings and discovery, orders or directives issued by any governmental entity and all insurance policies, including policies issued by Centennial, which you believe provide coverage for this claim.**

After the above information has been received and reviewed and the subject policy(ies) received and reviewed, I will contact you regarding Centennial's coverage analysis regarding the above-referenced matter. Should you have any questions in the interim, please do not hesitate to contact me. Thank you.

7
**Mr. R. Gilbert**
**October 24, 2000**

Very truly yours,

Nancy Crosta Landale
Specialty Claims

*Fax) Centennial COPY*

# GILBERT & RENTON, P.C.
23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:  (978) 475-1881

December 4, 2000

**Via Federal Express**

Nancy Crosta Landale
Specialty Claims
AtlanticMutual Companies
Centennial Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ 07940-1004

Re:    *The Foxboro Company/Wheeler Road*

Dear Ms. Landale:

I am writing in response to your letter of October 24, 2000.  First, you have requested documentation detailing the nature of Foxboro's relationship with Trans-Sonics and the nature of the transaction causing Foxboro to become Trans-Sonics, Inc.'s successor-in-interest.  I have enclosed the following documents establishing that in December 1974, The Foxboro Company acquired substantially all of the assets and liabilities of Trans-Sonics, Inc. by paying one share of Foxboro stock for every four shares of Trans-Sonics stock.  Simultaneous with this transaction, Trans-Sonics was liquidated and all of its business, assets and liabilities were merged into The Foxboro Company.  I trust that this documentation provides the information that you need on the successor-in-interest issue.  However, please do not hesitate to call if you need additional information.

Second, you have requested a copy of the Settlement Agreement between Foxboro and Liberty Mutual.  As set forth in our previous correspondence, a confidentiality requirement prohibits Foxboro from unilaterally providing Centennial with a copy of the Settlement Agreement.  Liberty Mutual insisted upon this provision, because Liberty Mutual believes that their standard settlement agreements contain proprietary information concerning their claims and claims settlement practices.  I have asked Liberty Mutual whether it will waive the confidentiality provision.  I will let you know as soon as I hear back.

In the meantime, we do not believe that Centennial should defer its consideration of Foxboro's claim, since Foxboro has provided complete information concerning the amount of the settlement and Liberty Mutual's allocation of that settlement among its various policies, including exhaustion of the underlying Liberty Mutual primary policies with no pollution exclusion.

EXHIBIT 16

# GILBERT & RENTON, P.C.

Nancy Crosta Landale
December 4, 2000
Page 2

Please do not hesitate to call if you have any questions.

Very truly yours,

Robert J. Gilbert

RJG/pc

cc: Anthony R. Franciose, Esq.

*Centennx/Con*

# GILBERT & RENTON, P.C.

23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:  (978) 475-1881

December 4, 2000

**Via Telecopy**

Carol A. Kelly, Esq.
Liberty Mutual Insurance Company
Martin, Magnuson, McCarthy & Kenney
101 Merrimac Street
Boston, MA 02114-4716

Re:     ***The Foxboro Company/Wheeler Road***

Dear Carol:

I am writing in connection with The Foxboro Company's insurance coverage claim against Centennial Insurance Company for the Wheeler Road site in Burlington, Massachusetts. Centennial has requested that Foxboro provide a copy of the Settlement Agreement between Foxboro and Liberty Mutual in connection with the Wheeler Road site. As you know, the Settlement Agreement contains a confidentiality requirement that prohibits Foxboro from turning over the Settlement Agreement. We have advised Centennial of the confidentiality requirement, but Centennial has again requested a copy of the agreement. Please let me know whether Liberty Mutual objects to The Foxboro Company providing a copy of the Settlement Agreement to Centennial.

Please note that we will not provide a copy of the agreement to Centennial unless and until we receive Liberty Mutual's consent to do so. I look forward to hearing from you.

Very truly yours,

Robert J. Gilbert

RJG/pc

cc: Anthony R. Franciose, Esq.

EXHIBIT 17

```
************************
***   TX REPORT   ***
************************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 1335 |
| CONNECTION TEL | 16172273346 |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 12/04 19:15 |
| USAGE T | 01'02 |
| PGS. | 2 |
| RESULT | OK |

# GILBERT & RENTON, P.C.
## 23 Main Street
## Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Kathryn E. Perrotta, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:   (978) 475-1881

## FACSIMILE TRANSMITTAL

**DATE:**  December 4, 2000

**TO:**   Carol A. Kelly, Esq.

**FIRM:**   Martin, Magnuson, McCarthy & Kenney

**FACSIMILE NUMBER:**   (617) 227-3346

**FROM:**   Robert J. Gilbert, Esq.

**RE:**   *The Foxboro Company/Wheeler Road*

**NUMBER OF PAGES (INCLUDING COVER SHEET)**          2

**MESSAGE:**_____

_____

**************************************************************************************

### CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission, as well as messages contained on this cover sheet, may contain confidential or privileged information from GILBERT & RENTON, P.C.  This

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBITS 18 THROUGH 23

*Fox (Centennial corr =*

# GILBERT & RENTON, P.C.

23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:  (978) 475-1881

December 6, 2000

**Via Telecopy/973-660-3218**

Nancy Crosta Landale
Specialty Claims
AtlanticMutual Companies
Centennial Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ 07940-1004

Re:    ***The Foxboro Company/Wheeler Road***

Dear Ms. Landale:

Enclosed please find a copy of Liberty Mutual's response with respect to your request for a copy of the Settlement Agreement between Liberty Mutual and The Foxboro Company.

Very truly yours,

Robert J. Gilbert

RJG/pc

cc: Anthony R. Franciose, Esq.

EXHIBIT 18

MARTIN, MAGNUSON, McCARTHY & KENNEY

ATTORNEYS AT LAW

101 MERRIMAC STREET

BOSTON, MASSACHUSETTS 02114-4716

TELEPHONE: (617) 227-3240

TELECOPIER: (617) 227-3346

A PROFESSIONAL CORPORATION

RAYMOND J. KENNEY, JR.
CHARLES P. REIDY, III
DANIEL J. GRIFFIN, JR.
PHILIP E. MURRAY, JR.
JOSEPH L. DOHERTY, JR.
PAUL R. KEANE
JOHN P. MULVEY
PAUL M. McTAGUE
CAROL A. KELLY
EDWARD F. MAHONEY
DOUGLAS A. ROBERTSON

JOSEPH B. BERTRAND
KEVIN C. REIDY
STEPHEN M. O'SHEA
CHRISTOPHER J. MALEY
SEAN M. ENNIS
DARLENE DAWSON
PAUL R. THEBAUD
ANN M. COLLINS*
MICHAEL J. KEEFE**

OF COUNSEL
EDWARD F. HENNESSEY

EPHRAIM MARTIN (1927-1988)
HAROLD E. MAGNUSON (1938-1999)
CLEMENT McCARTHY (1951-1982)

*ALSO ADMITTED IN OH
**ALSO ADMITTED IN CT

December 6, 2000

**VIA TELEFAX AND**
**FIRST CLASS MAIL**

Robert J. Gilbert, Esq.
Gilbert & Renton, P.C.
23 Main Street
Andover, Massachusetts  01810

>     Re:   The Foxboro Company/Wheeler Road
>     Vs:   Liberty Mutual Insurance Company

Dear Mr. Gilbert:

In response to your correspondence of December 4, 2000, please be informed that Liberty Mutual Insurance Company objects to The Foxboro Company providing a copy of the Settlement Agreement in the above matter to Centennial Insurance Company.

Please contact me if you wish to discuss this issue.

Very truly yours,

Carol A. Kelly

CAK/jmp

cc:    Christopher G. LeGros, Esq.

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| | |
|---|---|
| TX/RX NO | 1362 |
| CONNECTION TEL | 15085496152 |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 12/06 16:17 |
| USAGE T | 01'45 |
| PGS. | 3 |
| RESULT | OK |

## GILBERT & RENTON, P.C.
### 23 Main Street
### Andover, Massachusetts  01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:  (978) 475-1881

### FASCIMILE TRANSMITTAL

DATE:  December 6, 2000

TO:   Anthony R. Franciose, Esq.

FIRM:   The Foxboro Company

RE:   The Foxboro Company/Centennial Insurance Company

FACSIMILE NUMBER:   (508) 549-6152

FROM:   Robert J. Gilbert, Esq.

NUMBER OF PAGES (INCLUDING COVER SHEET)      3

MESSAGE:_____

_____

****************************************************************

### CONFIDENTIALITY NOTICE

The documents accompanying this telecopy transmission, as well as messages contained on this

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

| TX/RX NO | 1361 |
| CONNECTION TEL | 19736603218 |
| SUBADDRESS | |
| CONNECTION ID | |
| ST. TIME | 12/06 16:14 |
| USAGE T | 01'54 |
| PGS. | 3 |
| RESULT | OK |

## GILBERT & RENTON, P.C.
### 23 Main Street
### Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:   (978) 475-1881

### FASCIMILE TRANSMITTAL

**DATE:  December 6, 2000**

**TO:**   Ms. Nancy Crosta Landale
         Specialty Claims

**FIRM:  AtlanticMutual Companies**
         Centennial Insurance Company

**RE:**   The Foxboro Company/Wheeler Road

**FACSIMILE NUMBER:**   (973) 660-3218

**FROM:**   Robert J. Gilbert, Esq.

**NUMBER OF PAGES (INCLUDING COVER SHEET)**         3

**MESSAGE:** _____

_____

```
***************************************************************
```

### CONFIDENTIALITY NOTICE

# ≡≝ AtlanticMutual Companies

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Certified Mail, Return Receipt Requested*

December 28, 2000

Robert J. Gilbert, Esq.
Gilbert & Renton, PC
23 Main Street
Andover, Massachusetts 01810

Re:  **Insured:**      **Trans-Sonics, Inc.**
    **Claim No.:**    **95-806021**
    **Policy No.:**   **462 007 630, effective January 1, 1972 - January 1, 1975**
    **Site:**          **160 Wheeler Road, Burlington, Massachusetts**

Dear Mr. Gilbert:

Centennial Insurance Company (herein "Centennial") previously acknowledged your notice of claim involving the above-referenced matter. We have carefully reviewed your answers to our investigative questions and found that you have not provided sufficient responses concerning matters vital to our coverage determination. We write this letter to again request specific and complete information so that we can make our coverage determination.

Specifically, we ask that you provide the following information:

1. Please identify the insurer(s) providing general liability insurance to Trans-Sonics prior to January 1, 1972, along with the respective policy numbers. Also, please confirm that each of these insurers has already been put on notice of these claims, the dates(s) of the notice(s) and their respective responses to notice of these claims.

2. Please provide us with information concerning the Liberty Mutual policies issued to Trans-Sonics and Foxboro between 1974 and 1982, including the policy numbers and "occurrence" limits of coverage.

3. Please clarify why Foxboro failed to purchase "occurrence" coverage after 1982, if this is indeed the case.

EXHIBIT 19

We also ask that you clarify certain aspects of the settlement Foxboro recently entered into with Liberty Mutual. Although we understand that Liberty Mutual will not allow you to release a copy of the settlement document itself, we do need clarification with respect to how the sums paid under the Liberty Mutual settlement relate to the claims that you are now presenting to Centennial. Specifically:

1. Did Liberty Mutual pay all of the defense costs that had been incurred in connection with the suit up until the date of its settlement? In this regard, you have advised that $300,000 was paid to Foxboro in reimbursement of defense costs, but provide no explanation for Liberty Mutual's failure to pay the full $375,908.28 you state was expended for defense costs. As you know, even if Centennial is obligated to provide coverage it would not owe defense costs incurred prior to the alleged exhaustion of the limits of Liberty Mutual's policies.

2. Please clarify how the $300,000 that Liberty Mutual paid to exhaust the claimed 1972-75 CGL policies was allocated. It appears from our review of the materials that Liberty Mutual actually issued three CGL policies to Trans-Sonics during this period in addition to a separate policy to Foxboro in 1974 having limits of $500,000 for property damage claims and which would have covered Trans-Sonics after it was acquired by Foxboro. Your responses omit reference to the January 1, 1974 policy issued to Trans-Sonics and seem to suggest that the policy limit for the 1974 Foxboro policy was only $100,000.

3. Your letter states that Liberty Mutual paid an additional $650,000 apparently allocable to policies issued after 1974. Please explain how this sum relates to the actual limits of those policies and how it was allocated among the primary policies issued between 1974 and 1982.

4. Please clarify whether Foxboro believes that these claims are subject to an aggregate limit in the Liberty Mutual policies and, if not, whether Liberty Mutual has been placed on notice of the claim that has been presented against Foxboro by Equity Office Products.

As you are aware, the Centennial umbrella policy is excess to all "collectible" insurance and requires that all collectible policies - - not just those in effect from 1972 to 1975 - - be exhausted before its coverage even is triggered. Accordingly, the information referenced herein and in our prior requests is vital to our coverage determination.

I look forward to hearing from you again soon. Pending the receipt of this information, Centennial continues to fully reserve all of its rights under any and all applicable policies. Thank you.

Very truly yours,

Nancy Crosta Landale
Specialty Claims



**AtlanticMutual Companies**

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Certified Mail, Return Receipt Requested*

April 13, 2001

Robert J. Gilbert, Esq.
Gilbert & Renton, PC
23 Main Street
Andover, Massachusetts 01810

| | | |
|---|---|---|
| *Re*: | Insured: | **Trans-Sonics, Inc.** |
| | Claim No.: | **95-806021** |
| | Policy No.: | **462 007 630, effective January 1, 1972 - January 1, 1975** |
| | Site: | **160 Wheeler Road, Burlington, Massachusetts** |

Dear Mr. Gilbert:

Centennial Insurance Company (herein "Centennial") previously acknowledged your notice of claim involving the above-referenced matter and sent a letter, copy enclosed, to again request specific and complete information so that we can make our coverage determination. To date we have not heard from you.

As you are aware, the Centennial umbrella policy is excess to all "collectible" insurance and requires that all collectible policies - - not just those in effect from 1972 to 1975 - - be exhausted before its coverage even is triggered. Accordingly, the information referenced herein and in our prior requests is vital to our coverage determination.

I look forward to hearing from you again soon. Pending the receipt of this information, Centennial continues to fully reserve all of its rights under any and all applicable policies. Thank you.

Very truly yours,

Nancy Crosta Landale
Specialty Claims

EXHIBIT 20

**AtlanticMutual Companies**

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Certified Mail, Return Receipt Requested*

December 28, 2000

Robert J. Gilbert, Esq.
Gilbert & Renton, PC
23 Main Street
Andover, Massachusetts 01810

Re:     **Insured:**          **Trans-Sonics, Inc.**
        **Claim No.:**        **95-806021**
        **Policy No.:**       **462 007 630, effective January 1, 1972 - January 1, 1975**
        **Site:**             **160 Wheeler Road, Burlington, Massachusetts**

Dear Mr. Gilbert:

Centennial Insurance Company (herein "Centennial") previously acknowledged your notice of claim involving the above-referenced matter. We have carefully reviewed your answers to our investigative questions and found that you have not provided sufficient responses concerning matters vital to our coverage determination. We write this letter to again request specific and complete information so that we can make our coverage determination.

Specifically, we ask that you provide the following information:

1.    Please identify the insurer(s) providing general liability insurance to Trans-Sonics prior to January 1, 1972, along with the respective policy numbers. Also, please confirm that each of these insurers has already been put on notice of these claims, the dates(s) of the notice(s) and their respective responses to notice of these claims.

2.    Please provide us with information concerning the Liberty Mutual policies issued to Trans-Sonics and Foxboro between 1974 and 1982, including the policy numbers and "occurrence" limits of coverage.

3.    Please clarify why Foxboro failed to purchase "occurrence" coverage after 1982, if this is indeed the case.

We also ask that you clarify certain aspects of the settlement Foxboro recently entered into with Liberty Mutual. Although we understand that Liberty Mutual will not allow you to release a copy of the settlement document itself, we do need clarification with respect to how the sums paid under the Liberty Mutual settlement relate to the claims that you are now presenting to Centennial. Specifically:

1. Did Liberty Mutual pay all of the defense costs that had been incurred in connection with the suit up until the date of its settlement? In this regard, you have advised that $300,000 was paid to Foxboro in reimbursement of defense costs, but provide no explanation for Liberty Mutual's failure to pay the full $375,908.28 you state was expended for defense costs. As you know, even if Centennial is obligated to provide coverage it would not owe defense costs incurred prior to the alleged exhaustion of the limits of Liberty Mutual's policies.

2. Please clarify how the $300,000 that Liberty Mutual paid to exhaust the claimed 1972-75 CGL policies was allocated. It appears from our review of the materials that Liberty Mutual actually issued three CGL policies to Trans-Sonics during this period in addition to a separate policy to Foxboro in 1974 having limits of $500,000 for property damage claims and which would have covered Trans-Sonics after it was acquired by Foxboro. Your responses omit reference to the January 1, 1974 policy issued to Trans-Sonics and seem to suggest that the policy limit for the 1974 Foxboro policy was only $100,000.

3. Your letter states that Liberty Mutual paid an additional $650,000 apparently allocable to policies issued after 1974. Please explain how this sum relates to the actual limits of those policies and how it was allocated among the primary policies issued between 1974 and 1982.

4. Please clarify whether Foxboro believes that these claims are subject to an aggregate limit in the Liberty Mutual policies and, if not, whether Liberty Mutual has been placed on notice of the claim that has been presented against Foxboro by Equity Office Products.

As you are aware, the Centennial umbrella policy is excess to all "collectible" insurance and requires that all collectible policies - - not just those in effect from 1972 to 1975 - - be exhausted before its coverage even is triggered. Accordingly, the information referenced herein and in our prior requests is vital to our coverage determination.

I look forward to hearing from you again soon. Pending the receipt of this information, Centennial continues to fully reserve all of its rights under any and all applicable policies. Thank you.

Very truly yours,

Nancy Crosta Landale
Specialty Claims

# GILBERT & RENTON LLC
### 23 Main Street
### Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:  (978) 475-1881

May 1, 2001

<u>Via Certified Mail -- Return Receipt Requested</u>

Ms. Nancy Crosta Landale
Atlantic Mutual Insurance Company
Centennial Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ 07940-1004

Re: Insured: Trans-Sonics, Inc.
Claim No.: 95-806021

Dear Ms. Landale:

I am writing in response to your letters of December 28, 2000 and April 13, 2001, concerning the claim for coverage by The Foxboro Company ("Foxboro"), as successor to Trans-Sonics, Inc., under Centennial Insurance Company Policy No. 42-00 76 30. Your first question on page one requests the identity of those insurers from whom Centennial purchased general liability insurance prior to January 1, 1972. We have investigated this matter exhaustively, but have not been able to identify any primary insurers prior to January 1, 1972.

Your second question on page one requests information concerning the Liberty Mutual policies issued to Trans-Sonics between 1974 and 1982. With respect to the period beginning January 1, 1974, Liberty Mutual provided coverage to Trans-Sonics pursuant to policy no. LGI 112-020738-024. We have not been able to locate a copy of that policy, but have secondary evidence of the policy pursuant to the schedule of underlying insurance in the Centennial umbrella policy.

With respect to the periods beginning January 1, 1975-76 through January 1, 1982-January 1, 1983, Foxboro received coverage under the following Liberty Mutual policies:

| Policy Number | Policy Period | Type of Policy | Limits |
|---|---|---|---|
| LGI-112-020738-025 | 1/1/75 - 1/1/76 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-193 | 1/1/73 - 1/1/76 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-026 | 1/1/76 - 1/1/77 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-196 | 1/1/76 - 1/1/77 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-027 | 1/1/77 - 1/1/78 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-197 | 1/1/77 - 1/1/78 | Umb/Excess | $10 million occ/agg |

EXHIBIT 21

## GILBERT & RENTON LLC

Ms. Nancy Crosta Landale
May 1, 2001
Page 2

| | | | |
|---|---|---|---|
| LGI-112-020738-028 | 1/1/78 - 1/1/79 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-198 | 1/1/78 - 1/1/79 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-029 | 1/1/79 - 1/1/80 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-199 | 1/1/79 - 1/1/80 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-020 | 1/1/80 - 1/1/81 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-190 | 1/1/80 - 1/1/81 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-021 | 1/1/81 - 1/1/82 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-191 | 1/1/81 - 1/1/82 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-022 | 1/1/82 - 1/1/83 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-193 | 1/1/83 - 1/1/84 | Umb/Excess | $10 million occ/agg |

Please note that each of the subject policies was subject to a pollution exclusion that provided coverage only for sudden and accidental releases of contaminants or pollutants.

Beginning on June 29, 1982, The Foxboro Company purchased claims-made pollution coverage from Liberty Mutual. On that same date (and continuing in all subsequent years of coverage), Liberty Mutual endorsed a so-called "absolute" pollution exclusion onto the above-referenced primary and umbrella/excess policies that it issued to Foxboro. Liberty Mutual denied all coverage for the Wheeler Road claim pursuant to the post-June 29, 1982 claims-made pollution liability policies on the basis of an exclusion that barred coverage for claims arising at owned sites that had been disposed of by Foxboro prior to June 29, 1982. (Foxboro sold the Wheeler Road facility in 1978.)

Your third question on page one requests an explanation for Foxboro's decision not to purchase "occurrence" coverage after 1982. Please see Foxboro's response to the preceding question, which I trust will provide the information you are seeking.

Your next series of questions, set forth on page two of your letter, concerns details of the Foxboro/Liberty Mutual settlement. To the extent I can do so without breaching the settlement agreement with Liberty Mutual, I will attempt to provide further information.

–   Question No. 1 on page two of your letter concerns payment of defense costs. Liberty Mutual disputed any obligation to cover either defense or cleanup costs, and pursuant to the settlement it is clear that by paying only $300,000 toward defense costs, Liberty Mutual did not pay all of Foxboro's defense costs.

–   Question No. 2 on page two of your letter concerns the $300,000 paid by Liberty Mutual to exhaust the January 1, 1972-73, January 1, 1973-74 and January 1, 1974-75 policies. After an exhaustive search, the only information we were able to locate indicated that Liberty Mutual provided coverage to Trans-Sonics in each of these three years in the annual amount of $100,000 per occurrence/aggregate. Because the actual policies have never been located, it was unclear whether a pollution exclusion was contained in these policies.

## GILBERT & RENTON LLC

Ms. Nancy Crosta Landale
May 1, 2001
Page 3

Please note that Foxboro did not acquire Trans-Sonics until December 19, 1974, and therefore the 1974-75 policy issued by Liberty Mutual to Foxboro (which would have provided coverage to Trans-Sonics for only 12 days) was not considered to be of material importance in the claim against Liberty Mutual.[1]

You are correct that Foxboro believes the relevant "underlying limit of liability" below the Centennial policy to be only $100,000 for the period from April 1, 1972 through January 1, 1975. However, between January 1, 1972 and April 1, 1972, the underlying limit of liability was only $50,000. These amount are stated in the Centennial umbrella policy, and we are unaware of any endorsement to the Centennial policy (or any return premium having been issued to Trans-Sonics) that would have resulted in the Centennial policy attaching at a different or higher underlying limit of liability.

– The third question on page 2 of your letter asks how the $650,000 allocable by Liberty Mutual relates to the actual limits of liability in the policies between 1975 and 1982 (partial period). We are not privy to Liberty Mutual's internal allocation, but we assume that the settlement amount was been allocated on a pro rata basis (i.e., approximately $100,000 per policy period) to each of those policies, including the half-year policy in effect in 1982 before the absolute pollution exclusion was endorsed onto the policy on June 29, 1982.

– Your final question inquires (i) whether the Liberty Mutual policies contain an aggregate limit of liability and (ii) whether Liberty Mutual has been placed on notice of the Equity Office Properties claim. In response to the first question, the answer is that the policies do contain an aggregate limit of liability, as set forth above on pp. 1-2 of this letter. Liberty Mutual disputed Foxboro's ability to "stack" policy limits, and this issue was compromised by the settlement. With respect to the Equity Office Properties claim, please note that Liberty Mutual received a site release in connection with the compromise settlement of the Wheeler Road claim and believes that the site release applies to the Equity Office Properties claim. Accordingly, Liberty Mutual is not a source of collectible insurance for the Equity Office Properties claim.

---

[1]  Interestingly, the schedule of insurance for the Centennial umbrella policy indicates that in the 1972-73 primary policy issued by Liberty Mutual to Trans-Sonics, the limit of liability for property damage liability was only $50,000 until April 1, 1972. In effect, the lower limit of liability ($50,000) for the first 91 days of 1972 under the policy issued by Liberty Mutual to Trans-Sonics was essentially offset by the higher limit of liability ($500,000) provided by Liberty Mutual to Foxboro for the last 12 days of 1974.

## GILBERT & RENTON LLC

Ms. Nancy Crosta Landale
May 1, 2001
Page 4

Finally, I want to express Foxboro's disagreement with your statement that "the Centennial umbrella policy is excess to all "collectible" insurance and requires that all collectible policies – not just those in effect from 1972 to 1975 – be exhausted before its coverage is even triggered." Without waiving any of its rights, Foxboro has two preliminary observations concerning the "other insurance" issue. First, it is clear under Massachusetts law that Foxboro has the right to allocate the entirety of the Wheeler Road loss to the 1972-75 policy period, pursuant to the Appeals Court's adoption of the Keene "spike" approach to the allocation of long-term environmental damage to a single policy period. See Rubenstein v. Royal Ins. Co. of America, 44 Mass. App. Ct. 842, 694 N.E.2d 381, 388 (1998) (allowing policyholder to assign entire loss to Royal's 1969-72 policy period), citing Keene Corp. v. Insurance Co. of N. America, 667 F.2d 1034, 1047-50 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007 (1982). Thus, as between the policyholder (Foxboro/Trans-Sonics) and the insurer (Centennial), Foxboro may seek recovery in the 1972-75 policy period from the primary carrier (Liberty Mutual) and then pursue excess/umbrella coverage during this same policy period.

Foxboro's second observation is that there is no evidence that any such "other insurance" – whether primary or excess – in fact exists. Centennial's umbrella policy is the only identified policy whose coverage is not subject to a pollution exclusion. To the contrary, a limited and/or absolute pollution exclusion is contained in each of the Liberty Mutual policies issued to Foxboro after its acquisition of Trans-Sonics on December 19, 1974, and therefore there is no post-12/19/74 insurance "covering a loss that is also covered [under the Centennial policy]." Further, the policies issued by Liberty Mutual to Trans-Sonics prior to December 19, 1974 have been exhausted in settlement of this claim. Accordingly, even assuming that a Massachusetts court both (i) would allow Centennial to apply the "other insurance" clause to policies that were issued in other policy periods (which has never been permitted in Massachusetts and has been rejected in many other jurisdictions) and (ii) would allow Centennial to raise the "other insurance" clause as a defense to coverage against its policyholder, rather than in a subsequent contribution action against other insurers (an approach that was emphatically rejected by the Rubenstein court), there is simply no "other insurance" that Centennial can identify.

I trust that this answers your questions. Foxboro looks forward to hearing from Centennial and to an early, amicable resolution of this claim.

Very truly yours,

Robert J. Gilbert

cc:    Anthony R. Franciose, Esq.

**SENDER:**
• Complete items 1,2 and 3.
• Indicate if restricted delivery is desired.
• Print your name and address on the reverse of this form so that we can return this card to you.
• Attach this form to the front of the mailpiece, or on the back if space does not permit.
• Write "Return Receipt Requested" on the mailpiece below the article number.
• The Return receipt Fee will provide you the signature of the person delivered to and the date of delivery.

I also wish to receive the following service (for an extra fee):

☐ **Restricted Delivery**

Consult postmaster for fee.

1. Article Addressed to:

**Ms. Nancy Crosta Landale**
**Atlantic Mutual Insurance Company**
**Centennial Insurance Company, Administrative Center**
**Three Giralda Farms**
**Madison, NJ 07940 - 1004**

2. Article Number

7105 4522 6442 0000 0330

3. Service Type  ☒ **CERTIFIED**

Date of Delivery

Received By: (Print Name)

*Kathleen Clare*

Signature - (Addressee or Agent)

*Kathleen Clare*

Enter delivery address if different than item 1.

PS Form 3811

**DOMESTIC RETURN RECEIPT**

File:



| RETURN RECEIPT SERVICE | POSTAGE | $0.55 |
| | RESTRICTED DELIVERY FEE | $0.00 |
| | CERTIFIED FEE | $1.90 |
| | RETURN RECEIPT FEE | $1.50 |
| **SENT TO:** | TOTAL POSTAGE AND FEE | $3.95 |

POSTMARK OR DATE

File:

**Ms. Nancy Crosta Landale**
**Atlantic Mutual Insurance Company**
**Centennial Insurance Company, Administrative Center**
**Three Giralda Farms**
**Madison, NJ 07940 - 1004**

7105 4522 6442 0000 0330

PS FORM 3800



**RECEIPT FOR CERTIFIED MAIL**
NO INSURANCE COVERAGE PROVIDED
NOT FOR INTERNATIONAL MAIL
(SEE OTHER SIDE)

*cov*
*Wheeler Rd.*

# GILBERT & RENTON LLC
23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Edward J. Denn, Esq.

Telephone:  (978) 475-7580
Facsimile:  (978) 475-1881

June 25, 2001

Ms. Nancy Crosta Landale
Atlantic Mutual Insurance Company
Centennial Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ 07940-1004

Re: Insured: Trans-Sonics, Inc.
Claim No.: 95-806021

Dear Ms. Landale:

I have not heard back from you since my letter to you dated May 1, 2001.  Accordingly, my client, The Foxboro Company, has asked that I follow up to determine when we may expect to hear back from Centennial concerning the Wheeler Road claim.

Thank you for your attention to this matter, and I look forward to hearing from you.

Very truly yours,

Robert J. Gilbert

cc:    Anthony R. Franciose, Esq.

EXHIBIT 22



**AtlanticMutual
Companies**

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Telefax and Certified Mail, Return Receipt Requested*

July 12, 2001

Robert J. Gilbert, Esquire
Gilbert & Renton, LLC
23 Main Street
Andover, MA 01810

*Re*:  **Insured:**     **Trans-Sonics, Inc.**
    **Claim No.:**    **95-806021**
    **Policy No.:**   **462 007 630, effective January 1, 1972 - January 1, 1975**
    **Site:**       **160 Wheeler Road, Burlington, Massachusetts**

Dear Mr. Gilbert:

Thank you for your letter of May 1, 2001 responding to my letters of December 28, 2000 and April 13, 2001. We appreciate your recent supply of the information requested in our earlier letters and, at your request, have again analyzed your client's request for coverage under policy 462 007 630. As expressed more fully herein, Centennial Insurance Company (herein "Centennial") is denying coverage.

From the information provided, I understand that Foxboro, the alleged successor to the insured, alleges $3.66 million in damages stemming from its adjudged pollution liability at a site previously owned by it and Trans-Sonics between August 1954 and December 1978. In your initial June 9, 2000 letter, you advised that Foxboro had resolved the primary coverage issues, with Liberty Mutual paying $1.25 million in exchange for a release of the claim. You also advised that, at a bench trial concerning the underlying pollution claim in April 1996, Foxboro was found liable for groundwater contamination but exonerated for soil contamination; that it was ordered to pay a judgment of $1,144,523.79; and that the parties agreed to waive their respective rights of appeal so long as Foxboro paid the outstanding judgment plus accrued costs and post-judgment interest and achieve the necessary remediation of groundwater. Centennial has no record of ever being placed on notice of the claim underlying this action.

Foxboro claims to have been unable to identify the insurer or insurers providing liability insurance coverage to Trans-Sonics, Inc. prior to January 1, 1972. It remains unclear which insurer or insurers might be responsible for damage attributable to that portion of the *One Wheeler Road* suit alleging that contamination had occurred on or from this property throughout the period of time from 1954 to 1978, when it manufactured electronic instruments and conducted other manufacturing operations at the site.

EXHIBIT 23

As for the period after 1972, you previously indicated that both Trans-Sonics and Foxboro were insured under various liability insurance policies issued by Liberty Mutual. You further indicated that your client released Liberty Mutual from all obligations under those policies in return for partial reimbursement of the defense costs incurred with respect to the *One Wheeler Road* litigation and an indemnity payment of $950,000.

In addition to the four primary liability insurance policies issued to Trans-Sonics and Foxboro between 1972 and 1974 discussed in our earlier exchange of letters, your letter of May 1, 2001 identifies eight Comprehensive General Liability policies issued by Liberty Mutual between January 1, 1975 and January 1, 1983, each of which is stated to contain coverage in the amount of $500,000 each occurrence and in the aggregate. It appears from these materials, coupled with your earlier letter, that the total "occurrence" limits provided under the Liberty Mutual coverage in effect while this pollution is alleged to have occurred is $4.6 million.

The above-referenced policy provides, in pertinent part:

> [Centennial Insurance Company . . . [a]grees with the insured, named in the declarations made part hereof, in consideration of premium and in reliance upon statements in the application and declarations and subject to the limits of liability, exclusions and other terms of this policy:
>
> **I. Coverage.** To indemnify the insured for the ultimate net loss in excess of the retained limit hereinafter defined, which the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law, or assumed by the insured under contract on account of
> > (a) Personal Injury Liability,
> > (b) Property Damage Liability, or
> > (c) Advertising Liability
> to which this insurance applies, caused by an occurrence anywhere in the world.
>
> **II. Defense - Settlement.** With respect to any occurrence not covered by the underlying policy(ies) listed in Schedule A hereof or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this insurance except for the amount of retained limit specified in Item (b) of Insuring Agreement IV, the company shall:
>
> (a) defend any suit brought against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; . . .
>
> This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

The policy contains the following definitions:

> (6) **Occurrence** - The term "occurrence" wherever used herein shall mean an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected not intended from the standpoint of the insured. . . .

> (9) **Property Damage Liability** - The term "Property Damage Liability" shall mean liability for damages because of injury to or destruction of tangible property.

> (10) **Ultimate Net Loss** - The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after taking proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred. This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

The policy also contains the following conditions:

> **J. Other Insurance.** If other collectible insurance with any other insurer is available to the insured, covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and contribute with, such other insurance. If collectible insurance under any other policy(ies) of the company is available to the insured, covering a loss also covered hereunder (other than underlying insurance of which the insurance hereunder is in excess), the company's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies).

> **K. Underlying Insurance.** If underlying insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this insurance applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

As you can see, a condition to coverage under the Centennial umbrella policy is the exhaustion of all other policies with applicable insurance coverage for a loss. Accordingly, Centennial cannot agree that your client's acceptance of $950,000 was a proper "exhaustion" of nearly $5 million in insurance coverage and satisfies this condition of the Centennial policy.

Further, we note from your letter that Liberty Mutual itself provided umbrella liability insurance to Foxboro during the period January 1, 1973 through January 1, 1984 with annual limits of $10 million each occurrence and in the aggregate. Again, we do not agree that any right exists to claim insurance coverage under the Centennial policy insofar

as it does not appear that the availability of insurance coverage under these Liberty Mutual umbrella policies has been pursued, much less exhausted.

Finally, you indicate that Foxboro chose to purchase "claims made" coverage on or after 1982 and therefore has been unable to obtain coverage under such policies. You do not explain, however, why Foxboro failed to purchase "occurrence" coverage during this period of time which may have provided insurance coverage for such claims. As we have no explanation that "occurrence" coverage was not readily available to commercial insureds in Massachusetts in the early 1980's, we must conclude that Foxboro voluntarily chose to purchase a lesser type of insurance coverage and therefore must bear responsibility for that period of time for which conventional "occurrence" policies might have otherwise provided coverage, had they been purchased.

For the reasons set forth above and those outlined in our earlier correspondence, therefore, Centennial disclaims any coverage obligation with respect to these claims. Centennial fully reserves its rights under any and all applicable policies. Centennial does not waive or relinquish the application of any policy term, condition, exclusion or other defense to coverage that it has or may have now or in the future. Centennial expressly reserves the right to supplement the foregoing in the event that additional facts come to our attention.

Please feel free to contact the undersigned with any additional information you feel is relevant to our coverage determination, or with any questions concerning our coverage determination. Thank you.

Very truly yours,

Nancy Crosta Landale
Specialty Claims

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 24



**Sheriff's Dept.**
**County of Plymouth**
**MASS.**

Wayne C. Perkins
Director

# THE COMMONWEALTH OF MASSACHUSETTS

# SHERIFF'S DEPARTMENT
*County of Plymouth*
# DEPUTIES' OFFICE

### PETER FORMAN, SHERIFF

22 COTTAGE STREET • P.O. BOX 1663 • BROCKTON, MA 02401-1663
TELEPHONE: BROCKTON (508) 580-2110 • PLYMOUTH (508) 746-8800

Date: <u>July 11, 1996</u>    Time: <u>9:00 AM</u>

Plaintiff: <u>One Wheeler Road Associates and The Gutierrez Company</u>

Plaintiff's Attorney: <u>Robert F. Fitzpatrick Jr.</u>
Attorney's telephone number: <u>617 526-6000</u>

Defendant: **THE FOXBORO COMPANY**

Certificate of Title #30041

Court of Issue: <u>United States District</u>    Execution #<u>90-12873-RGS</u>

*See Attached*

By virtue of the attached execution, the original of which is in my hands for the purpose of taking the above described real estate, I have this day levied upon, seized and taken all right, title and interest that the within named Judgement Debtor had in such real estate in Plymouth County.

Attached is a true copy of this execution on the above so much of my return as relates to the levying upon, seizure, and taking of this real estate on the execution.

*Deputy Sheriff signature*

Deputy Sheriff

EXHIBIT 24

# Original Certificate of Title.

No. 30203

Entered pursuant to a Decree of the Land Court, dated at Boston, in the County of Suffolk and Commonwealth of Massachusetts, the **twenty-eighth** day of **October** in the year nineteen hundred and **sixty** , and numbered 30203 on the files of said Court.

## Copy of Decree.

COMMONWEALTH OF MASSACHUSETTS.                                          LAND COURT.

In the matter of the Petition of **The Foxboro Company**

numbered ——— 30203 ——— after consideration, the Court doth adjudge and decree that said

**The Foxboro Company**
**a duly existing corporation having an usual**
in Foxborough,                      **place of business**
in the County of    **Norfolk**          and Commonwealth of Massachusetts,    ~~married~~

*[handwritten note: Please note — No further Certificate to issue for Lots 1 & 2. See preliminary plan #30203 D]*

**is** the owner **in fee simple** ,

of that certain parcel of land situate in **East Bridgewater,**

in the County of Plymouth and Commonwealth of Massachusetts, bounded and described as follows:

| | |
|---|---|
| **Northwesterly** | by the southeasterly line of Highland Street seventeen hundred thirty-three and 76/100 (1733.76) feet; |
| **Easterly** | by the westerly line of North Bedford Street four hundred five (405) feet; |
| **Southerly** | by land now or formerly of Charles E. Davenport three hundred (300) feet; |
| **Easterly** | by said Charles E. Davenport land and by land now or formerly of Wilfred F. Duffany three hundred ninety-five (395) feet; |
| **Northerly** | by said Wilfred F. Duffany land three hundred (300) feet; |
| **Easterly** | by the westerly line of said North Bedford Street six hundred sixty-two and 27/100 (662.27) feet; |
| **Southerly** | by land now or formerly of Arthur Cormier et al one hundred eight and 17/100 (108.17) feet; |
| **Easterly** | by lands of sundry adjoining owners as shown on the plan hereinafter mentioned three hundred ninety-four and 10/100 (394.10) feet; |
| **Southerly** | twenty and 77/100 (20.77) feet, |
| **Easterly** | two hundred thirty-five and 08/100 (235.08) feet, and |
| **Northerly** | two hundred sixty-three and 94/100 (263.94) feet by land now or formerly of Mary A. Quill; |
| **Easterly** | by the westerly line of said North Bedford Street two hundred eighty and 50/100 (280.50) feet; |
| **Southerly** | seven hundred fifty-three and 72/100 (753.72) feet, and |
| **Easterly** | three hundred seventy-nine and 50/100 (379.50) feet by land now or formerly of The Foxboro Company; |
| **Southerly** | by land now or formerly of Mary Stankus three hundred eighty-seven and 50/100 (387.50) feet; |
| **Westerly** | by other land now or formerly of The Foxboro Company fifteen hundred twenty-three and 01/100 (1523.01) feet; |
| **Northerly** | by land now or formerly of E. M. Thompson, being the middle line of an Old Road as shown on said plan, seven hundred twenty-three and 97/100 (723.97) feet; and |
| **Westerly** | by said E. M. Thompson land nine hundred thirty-five and 40/100 (935.40) feet. |

All of said boundaries are determined by the Court to be located as shown on a plan drawn by John P. Lienesch, Surveyor, dated February 16, 1960, as modified and approved by the Court, filed in the Land Registration Office, a copy of a portion of which is filed with the original certificate of title issued on this decree, and shown thereon as lots 1 and 2.

So much of said lot 1 as is included within the limits of the Old Road, shown on said plan, is subject to the rights of all persons lawfully entitled thereto in and over the same.



**Wayne C. Parkins**
Director

# THE COMMONWEALTH OF MASSACHUSETTS
# SHERIFF'S DEPARTMENT
## *County of Plymouth*
# DEPUTIES' OFFICE
### PETER FORMAN, SHERIFF

22 COTTAGE STREET • P.O. BOX 1663 • BROCKTON, MA 02401-1663
TELEPHONE: BROCKTON (508) 580-2110 • PLYMOUTH (508) 746-8800

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.

### DISCHARGE OF LEVY

TO THE REGISTER OF DEEDS FOR THE COUNTY OF PLYMOUTH:

The levy of the real estate in said county of Plymouth, THE FOXBORO COMPANY, Defendant, made on the 12th day of July in the year one thousand nine hundred and ninety six in an action commenced in the United States District Court (Execution #90-12873-RGS) by One Wheeler Road Associates and the Gutierrez Company, Plaintiff recorded in the Plymouth County Registry of Deeds, CERTIFICATE OF TITLE #30041 AND DOCUMENT #398251 is hereby released and discharged.

Kerri A. Stimpson
Deputy Sheriff
Plymouth County

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                    Date: July 26, 1996

Then personally appeared the above named Kerri A. Stimpson in her capacity as Deputy Sheriff for Plymouth County and acknowledged the foregoing instrument to be her free act and deed, before me

Patricia J. Callahan
Notary Public
My Commission expires 9/25/1998

COPY

_____ is a duplicate of
Docu___ ___ 398914 **filed**
in P___ ___ Registry District of
the Land C___ on Ju 29, 1996
at 10:50 A.M.
Attest: -

Assistant Recorder

John D. Riordan



**Wayne C. Perkins**
Director

## THE COMMONWEALTH OF MASSACHUSETTS

# SHERIFF'S DEPARTMENT
*County of Plymouth*

# DEPUTIES' OFFICE

### PETER FORMAN, SHERIFF

22 COTTAGE STREET • P.O. BOX 1663 • BROCKTON, MA 02401-1663
TELEPHONE: BROCKTON (508) 580-2110 • PLYMOUTH (508) 746-8800

Date: *July 11, 1996*       Time: *9:00 AM*

Plaintiff: *One Wheeler Road Associates and The Gutierrez Company*

Plaintiff's Attorney: *Robert F. Fitzpatrick Jr.*
Attorney's telephone number: *617 526-6000*

Defendant: *THE FOXBORO COMPANY*

*Certificate of Title #30041*

Court of Issue: *United States District*       Execution *#90-12873-RGS*

Acting on instructions from the Judgement Creditor (plaintiff), I have levied upon, seized and taken the right, title and interest of the Judgement Debtor (defendant) in the real estate described in the above specified certificate of title.

I hereby make demand on the Judgement Debtor that they deliver to me the money due to the Judgement Creditor, the amount appearing below.

Please be advised that unless I have received payment of the monies due the Judgement Creditor or have been notified that satisfactory arrangements have been made, I will be obligated to proceed. Payment or arrangements must be made within TWO WEEKS from the date of this notice. Payment must be made by cash or certified check only.

The costs, fees and interest have already increased the amount due the Judgement Creditor. By prompt attention to this matter you will avoid the additional cost of advertising and fees necessary for a sale.

| | |
|---|---|
| Poundage | $ 11452.24 |
| Judgement & Costs | 1144523.79 |
| Interest to 7/11/96 | 342.42 |
| Service (registry) | 10.00 |
| Travel (to registry) | 11.00 |
| Prepare and Serve | 15.00 |
| Demand | 5.00 |
| Copies | 10.00 |
| Postage and Handling | 2.75 |
| Registry Fee | 30.00 |
| ***T O T A L | $ 1156402.20 |

Respectfully,

*Barbara Stimpson*

Deputy Sheriff

***Interest has been calculated to July 11, 1996. Add $171.21 for each additional day. In addition to the above fees there will also be a $25.00 fee due this office in order to discharge the seizure at the Registry of Deeds.

ABINGTON • BRIDGEWATER • BROCKTON • CARVER • DUXBURY • EAST BRIDGEWATER • HALIFAX • HANOVER • HANSON • HINGHAM • HULL • KINGSTON
LAKEVILLE • MARION • MARSHFIELD • MATTAPOISETT • MIDDLEBOROUGH • NORWELL • PEMBROKE • PLYMOUTH • PLYMPTON
ROCHESTER • ROCKLAND • SCITUATE • WAREHAM • WEST BRIDGEWATER • WHITMAN

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**FIRST EXECUTION**                      CIVIL ACTION NO. 90-12873-RGS

To the United States Marshal for the District of Massachusetts or either of his Deputies ~~and to xxxxxxxxxxxxx xxx xxx xxxx xx xxxx xxx xxx xxxxxxxxxxxxxxxxxx, Special Process Server:~~

WHEREAS One Wheeler Road Associates and The Gutierrez Company ~~xxxx~~ Have recovered judgment against The Foxboro Company _____ on _____ on the 25th day of April _____, 1996, for the sum of $ 927,441.00 _____, debt or damage, pre-judgment interest in the amount of $ 217,082.79 _____, and costs of this suit in the amount of $ ----------------------, as to us appears of record, whereof this First Execution remains to be done,

WE COMMAND YOU, therefore, that of the goods and chattels or lands of the said Judgment Debtor, to cause to be paid and satisfied unto the said Judgment Creditor, at the value thereof in money, the aforesaid sums, being a total of $___ $1,144,523.79 _____, in the whole, with interest thereon at the rate of 5.46% _____ from said day of rendition of said judgment; and thereof also to satisfy yourself for your own fees.

HEREOF FAIL NOT and make due return of this Writ with your doings thereon into the Clerk's Office of our said court, at _____ Boston _____, Massachusetts, within Twenty (20) years after the date of said judgment, or within Ten (10) days after this Writ has been satisfied or discharged.

Dated this 10TH day of July _____, 19 96.

Robert J. Smith, Jr.
Clerk,

By: _____
Deputy Clerk

SEAL

A TRUE COPY, ATTEST
DEPUTY SHERIFF

(1stexecu.wrt - 09/92)                                                    [writexec]

RECEIVED

JUL 2 9 1996

Legal Dept.

# MASSERY, GILLIS & GUINEY

COUNSELLORS AT LAW
101 MERRIMAC STREET
BOSTON, MASSACHUSETTS 02114

WILLIAM D. GILLIS, JR.

TELEPHONE: (617) 523-1125
FACSIMILE: (617) 523-8652
E-MAIL: MGGATTYS@AOL.COM

July 25, 1996

**VIA HAND DELIVERY**

James Prendergast, Esquire
Hale and Dorr
60 State Street
Boston, MA  02109

RE:   One Wheeler Road Associates, et al. v. The Foxboro Company

Dear Jim:

Please be advised that I have received the original Letter of Credit in the amount of $1,187,202.90 and will hold same pending receipt of your instruction to the Plymouth County Sheriff to remove the levy(s) on Foxboro's property. Pursuant to the terms and conditions set forth in yours dated July 18, 1996 enclosed please find an executed version of the Agreement To Satisfy Judgment containing Foxboro's original signature. Please contact me with any questions you may have concerning the above or the enclosed. Thank you for your attention to this matter.

Sincerely,

William D. Gillis, Jr.

WDG:krg
enclosure

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 25

# MASSERY, GILLIS & GUINEY

### COUNSELLORS AT LAW
### 101 MERRIMAC STREET
### BOSTON, MASSACHUSETTS 02114

WILLIAM D. GILLIS, JR.

TELEPHONE: (617) 523-1125
FACSIMILE:  (617) 523-8652
E-MAIL: MGGATTYS@AOL.COM

October 8, 1996

Anthony R. Franciose, Esquire
The Foxboro Company
33 Commercial Street
Foxboro, MA 02035

RE:   One Wheeler Road Associates, et al. v. The Foxboro Company

Dear Tony:

Enclosed concerning the above-referenced matter please find the original, irrevocable standby letter of credit issued on behalf of Foxboro and a copy of Jim Prendergast's October 8, 1996 correspondence acknowledging Foxboro's satisfaction of the judgment in this case.  Please contact me with any questions you may have concerning the above or the enclosed.  Thank you for your attention to this matter.

Sincerely,

William D. Gillis

William D. Gillis, Jr.

WDG:krg
cc:    Louis N. Massery, Esquire (w/enc.)

EXHIBIT 25

# HALE AND DORR
### COUNSELLORS AT LAW

60 STATE STREET, BOSTON, MASSACHUSETTS 02109
617-526-6000 • FAX 617-526-5000

JAMES W. PRENDERGAST
617-526-6181

October 8, 1996

**By Hand Delivery**

William D. Gillis Jr., Esq.
Massery, Gillis & Guiney
101 Merrimac Street
Boston, Massachusetts  02114

Re:  **One Wheeler Road Associates, et al. v.
The Foxboro Company**

Dear Bill:

As we discussed this morning, my client has confirmed receipt by wire transfer of $1,187,202.90 from Foxboro in satisfaction of the judgment in the above-referenced case.  Accordingly, I am returning herewith the original irrevocable stand-by letter of credit issued on behalf of Foxboro to my clients.

I look forward to speaking soon about arranging a meeting with our respective consultants to discuss the status of the One Wheeler Road site and the mechanics for handling the payment of future response costs at the site.

In the meantime, if you have any questions regarding the above, please feel free to call me.

Very truly yours,

James W. Prendergast

JWP/djk

Enclosure

cc:  Richard Johnston, Esq.
     Mr. P. Agustin Rios

WASHINGTON, DC             BOSTON, MA             MANCHESTER, NH
HALE AND DORR IS A PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

DATE: JULY 16,1996

IRREVOCABLE STANDBY LETTER OF CREDIT NO. S420250

BENEFICIARIES:
ONE WHEELER ROAD ASSOCIATES AND
THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MASSACHUSETTS 01803

APPLICANT:
THE FOXBORO COMPANY
33 COMMERCIAL STREET
FOXBORO, MASSACHUSETTS 02035

AMOUNT: USD 1,187,202.90

EXPIRATION DATE: OCTOBER 23, 1996
EXPIRATION PLACE: ABN AMRO BANK N.V. NEW YORK

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. S420250 IN
YOUR FAVOR AS BENEFICIARIES, WHICH IS AVAILABLE WITH US BY PAYMENT FOR
UP TO AN AGGREGATE AMOUNT OF USD 1,187,202.90  (U.S.  DOLLARS ONE
MILLION ONE HUNDRED EIGHTY SEVEN THOUSAND TWO HUNDRED TWO AND 90/100
ONLY) UPON PRESENTATION TO US OF YOUR DRAFT DRAWN AT SIGHT ON ABN AMRO
BANK N.V., BOSTON BRANCH WHEN ACCOMPANIED BY THE FOLLOWING:

1) THE ORIGINAL LETTER OF CREDIT AND ALL AMENDMENTS THERETO, IF ANY.

2) A SIGNED STATEMENT AS FOLLOWS: ''I HEREBY CERTIFY THAT I AM AN
AUTHORIZED REPRESENTATIVE OF ONE WHEELER ROAD ASSOCIATES AND THE
GUTIERREZ COMPANY AND FURTHER CERTIFY THAT THE FUNDS DRAWN HEREUNDER
ARE DUE TO ONE WHEELER ROAD ASSOCIATES AND THE GUTIERREZ COMPANY FROM
THE FOXBORO COMPANY.  I FURTHER CERTIFY THAT THERE HAS BEEN AN EVENT OF
DEFAULT BY THE FOXBORO COMPANY BY ITS FAILURE, ON OCTOBER 7, 1996, TO
SATISFY ITS OBLIGATION PURSUANT TO A JUDGMENT ENTERED IN A CIVIL ACTION
CAPTIONED ONE WHEELER ROAD ASSOCIATES AND THE GUTIERREZ COMPANY V. THE
FOXBORO COMPANY, UNITED STATES DISTRICT COURT, DISTRICT OF
MASSACHUSETTS, CIVIL ACTION NO. 90-12873-RGS AND AN AGREEMENT BETWEEN
THE PARTIES WHEREBY THE FOXBORO COMPANY AGREED TO PAY US$1,187,202.90
ON OCTOBER 7, 1996 IN SATISFACTION OF THE JUDGMENT .  I FURTHER CERTIFY
THAT NO LIENS RELATING TO THE EXECUTION OF THE AFOREMENTIONED JUDGMENT
ARE NOW RECORDED AGAINST ANY PROPERTY OF THE FOXBORO COMPANY WHICH ARE
NOT NOW REMOVED.''

                              ABN AMRO BANK N.V.
                              BOSTON BRANCH

* SEE NEXT PAGE *

CONTINUATION OF L/C REFERENCE S420250

THE AMOUNT OF ANY PAYMENT MADE BY ABN AMRO BANK N.V. TO ONE WHEELER ROAD ASSOCIATES AND THE GUTIERREZ COMPANY QUOTING THIS L/C NO. S420250 SHALL AUTOMATICALLY REDUCE THE AMOUNT AVAILABLE UNDER THE TERMS OF THE LETTER OF CREDIT BY THE AMOUNT OF SUCH PAYMENT.

DRAWINGS MAY NOT BE MADE HEREUNDER BEFORE OCTOBER 8, 1996.  THIS LETTER OF CREDIT SHALL EXPIRE UPON BENEFICIARIES RECEIPT OF FULL PAYMENT FROM ABN AMRO BANK N.V. OR OCTOBER 23, 1996, WHICH EVER IS EARLIER.

DRAFTS AND DOCUMENTS MUST BE PRESENTED TO ABN AMRO BANK N.V., BOSTON BRANCH C/O ABN AMRO BANK N.V., NEW YORK BRANCH, 500 PARK AVENUE NEW YORK, NEW YORK 10022 ATTN: STANDBY LETTER OF CREDIT DEPARTMENT ON OR BEFORE THE CLOSE OF BUSINESS (I.E. 5:00 P.M. NEW YORK CITY TIME) ON OCTOBER 23, 1996.

THIS LETTER OF CREDIT IS ''SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1993 REVISION), INTERNATIONAL CHAMBER OF COMMERCE, PUBLICATION NO.  500''.

ABN AMRO BANK N.V.
BOSTON BRANCH

# HALE AND DORR
COUNSELLORS AT LAW

60 STATE STREET, BOSTON, MASSACHUSETTS 02109
617-526-6000 • FAX 617-526-5000

JAMES W. PRENDERGAST
617-526-6181

October 8, 1996

**By Hand Delivery**

William D. Gillis Jr., Esq.
Massery, Gillis & Guiney
101 Merrimac Street
Boston, Massachusetts  02114

Re:  **One Wheeler Road Associates, et al. v.
The Foxboro Company**

Dear Bill:

As we discussed this morning, my client has confirmed receipt by wire transfer of $1,187,202.90 from Foxboro in satisfaction of the judgment in the above-referenced case. Accordingly, I am returning herewith the original irrevocable stand-by letter of credit issued on behalf of Foxboro to my clients.

I look forward to speaking soon about arranging a meeting with our respective consultants to discuss the status of the One Wheeler Road site and the mechanics for handling the payment of future response costs at the site.

In the meantime, if you have any questions regarding the above, please feel free to call me.

Very truly yours,

James W. Prendergast

JWP/djk

Enclosure

cc:  Richard Johnston, Esq.
     Mr. P. Agustin Rios

DATE: JULY 15, 1996

IRREVOCABLE STANDBY LETTER OF CREDIT NO. S420250

BENEFICIARIES
ONE WHEELER ROAD ASSOCIATES AND
THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE MALL STREET
BURLINGTON, MASSACHUSETTS 01803

APPLICANT:
THE FOXBORO COMPANY
33 COMMERCIAL STREET
FOXBORO, MASSACHUSETTS 02035

AMOUNT: USD 1,187,202.90

EXPIRATION DATE: OCTOBER 8, 1996
EXPIRATION PLACE: ABN AMRO BANK N.V. NEW YORK

WE HEREBY ISSUE OUR IRREVOCABLE STANDBY LETTER OF CREDIT NO. S420250 IN
YOUR FAVOR AS BENEFICIARIES, WHICH IS AVAILABLE WITH US BY PAYMENT FOR
UP TO AN AGGREGATE AMOUNT OF USD 1,187,202.90 (US DOLLARS ONE
MILLION ONE HUNDRED EIGHTY SEVEN THOUSAND TWO HUNDRED TWO AND 90/100
ONLY) UPON PRESENTATION TO US OF YOUR DRAFT DRAWN AT SIGHT ON ABN AMRO
BANK N.V. BOSTON BRANCH WHEN ACCOMPANIED BY THE FOLLOWING:

1) THE ORIGINAL LETTER OF CREDIT AND ALL AMENDMENTS THERETO, IF ANY.

2) A SIGNED STATEMENT AS FOLLOWS: "I HEREBY CERTIFY THAT I AM AN
AUTHORIZED REPRESENTATIVE OF ONE WHEELER ROAD ASSOCIATES AND THE
GUTIERREZ COMPANY AND I FURTHER CERTIFY THAT THE FUNDS DRAWN HEREUNDER
ARE DUE TO ONE WHEELER ROAD ASSOCIATES AND THE GUTIERREZ COMPANY FROM
THE FOXBORO COMPANY. I FURTHER CERTIFY THAT THERE HAS BEEN AN EVENT OF
DEFAULT BY THE FOXBORO COMPANY BY ITS FAILURE, ON OCTOBER 7, 1996, TO
SATISFY ITS OBLIGATION PURSUANT TO A JUDGMENT ENTERED IN A CIVIL ACTION
CAPTIONED ONE WHEELER ROAD ASSOCIATES AND THE GUTIERREZ COMPANY V. THE
FOXBORO COMPANY, UNITED STATES DISTRICT COURT, DISTRICT OF
MASSACHUSETTS, CIVIL ACTION NO. 90-12873-RGS AND AN AGREEMENT BETWEEN
THE PARTIES WHEREBY THE FOXBORO COMPANY AGREED TO PAY US$1,187,202.90
ON OCTOBER 7, 1996 IN SATISFACTION OF THE JUDGMENT. I FURTHER CERTIFY
THAT NO LIENS RELATING TO THE EXECUTION OF THE AFOREMENTIONED JUDGMENT
ARE NOW RECORDED AGAINST ANY PROPERTY OF THE FOXBORO COMPANY WHICH ARE
NOT NOW REMOVED."

ABN AMRO BANK N.V.
BOSTON BRANCH

SEE NEXT PAGE *

CONTINUATION OF L/C REFERENCE S420250

THE AMOUNT OF ANY PAYMENT MADE BY ABN AMRO BANK N.V. TO ONE WHEELER ROAD ASSOCIATES AND THE GUTIERREZ COMPANY QUOTING THIS L/C NO. S420250 SHALL AUTOMATICALLY REDUCE THE AMOUNT AVAILABLE UNDER THE TERMS OF THE LETTER OF CREDIT BY THE AMOUNT OF SUCH PAYMENT.

DRAWINGS MAY NOT BE MADE HEREUNDER BEFORE OCTOBER 8, 1996. THIS LETTER OF CREDIT SHALL EXPIRE UPON BENEFICIARIES RECEIPT OF FULL PAYMENT FROM ABN AMRO BANK N.V. OR OCTOBER 23, 1996, WHICH EVER IS EARLIER.

DRAFTS AND DOCUMENTS MUST BE PRESENTED TO ABN AMRO BANK N.V., BOSTON BRANCH C/O ABN AMRO BANK N.V., NEW YORK BRANCH, 500 PARK AVENUE, NEW YORK, NEW YORK 10022 ATTN: STANDBY LETTER OF CREDIT DEPARTMENT ON OR BEFORE THE CLOSE OF BUSINESS (I.E. 5:00 P.M. NEW YORK CITY TIME) ON OCTOBER 23, 1996.

THIS LETTER OF CREDIT IS SUBJECT TO THE UNIFORM CUSTOMS AND PRACTICE FOR DOCUMENTARY CREDITS (1993 REVISION), INTERNATIONAL CHAMBER OF COMMERCE, PUBLICATION NO. 500.

ABN AMRO BANK N.V.
BOSTON BRANCH

# THE FOXBORO COMPANY
## 33 COMMERCIAL STREET
## FOXBORO, MASSACHUSETTS 02035

# FAX COVER SHEET

## PRIVILEGED & CONFIDENTIAL
## ATTORNEY-CLIENT COMMUNICATION

**TO:** William D. Gillis, Jr., Esquire

**PHONE:** 617-523-1125

**FAX:** 617-523-8652

**DATE:** Wednesday, October 02, 1996

**FROM:** A. R. Franciose
B52-1K

**PHONE:** 508-549-6161
**FAX:** 508-549-6152

**RE:** Payment of One Wheeler Road Judgement

**CC:**

Number of pages including cover sheet **2**

## Message

Bill,

See attached per 10/2/1996 e-mail.

Anthony R. Franciose
*Senior Attorney*
wheel-10/arf

TO: W. Krasinski, ABN AMRO Bank

FROM: W.L. Gibelli, The Foxboro Company

SUBJ: Wire Instructions: L/C# S420250

DATE: October 1, 1996

COPY: A. Zingalli, ABN AMRO, New York
      A. Franciose, The Foxboro Company

As discussed, on Monday, October 7, 1996, The Foxboro Company will wire $1,187,202.90 to ABN AMRO Bank, New York, for the account of ABN AMRO Bank, Boston (ACCT.# 651001027841), in satisfaction of the provisions of L/C# S420250.

ABN AMRO, New York will advise you upon receipt of funds, at which time, you will wire $1,187,202.90 to:

            Fleet Bank of Massachusetts
            ABA # 011000138
            For credit to: One Wheeler Road Associates
            Account # 93725-60341
            Ref: The Foxboro Company (LC # S420250)

As you know, it is critical that the aforementioned funds are wired to Fleet on Monday, October 7. I don't want any attempted draw down of the L/C by Wheeler Road Associates.

Best regards,

Subj: Payment of One Wheeler Road Judgment
Date: 96-10-02 09:21:18 EDT
From: afrancio@foxboro.com (Franciose,Anthony)
To:    mggattys@aol.com ('William D. Gillis, Jr.')

File:  WINMAIL.DAT (1557 bytes)
DL Time (14400 bps): < 1 minute

Bill,

Wire transfer of the One Wheeler Road judgment will be made through ABN-Amro of NYC (the bank that issued the letter of credit.  This will
insure that the LC cannot be presented after the money is wired.  There is a provision in the LC which reduces the amount payable on the LC
by any payments made to One Wheeler Road.

This may result in payment being delayed until 2-3:00PM on October 7, 1996, the payment due date.  Therefore, no additional interest will be
required.   The LC cannot be presented until October 8, 1996.

will send to you by fax a copy of instructions issued to ABN by our treasurer.

f you have any questions please call me at 508-549-6161.


nthony R. Franciose
enior Attorney




------------------ Headers ------------------------------
om afrancio@foxboro.com Wed Oct  2 09:20:43 1996
turn-Path: afrancio@foxboro.com
ceived: from foxboro-bh.foxboro.com (foxboro-bh.foxboro.com [206.32.221.66]) by emin21.mail.aol.com (8.6.12/8.6.12)
h ESMTP id JAA27963 for <mggattys@aol.com>; Wed, 2 Oct 1996 09:20:35 -0400
ceived: (from uucp@localhost) by foxboro-bh.foxboro.com (8.6.12/8.6.11) id JAA01699 for <mggattys@aol.com>; Wed, 2
t 1996 09:22:51 -0400
ceived: from 152.155.16.2 by foxboro-bh.foxboro.com via smap (V1.3)
id sma001681; Wed Oct  2 09:22:43 1996
ceived: from xchange_fox by foxvax13.local (5.65/Ultrix3.0-C)
id AA29483; Wed, 2 Oct 1996 09:25:39 -0400
ceived: by exchange.foxboro.com with Microsoft Exchange (IMC 4.0.838.14)
id <01BBB043.AD535E40@exchange.foxboro.com>; Wed, 2 Oct 1996 09:25:40 -0400
ssage-Id: <c=US%a=_%p=SCD%l=SCD/FOXBORO/0006FDBE@exchange.foxboro.com>
1s-Tnef-Correlator: <c=US%a=_%p=SCD%l=SCD/FOXBORO/0006FDBE@exchange.foxboro.com>
m: "Franciose,Anthony" <afrancio@foxboro.com>
"William D. Gillis, Jr.'" <mggattys@aol.com>
ject: Payment of One Wheeler Road Judgment
e: Wed, 2 Oct 1996 08:28:49 -0400
rn-Receipt-To: <afrancio@foxboro.com>
ailer:  Microsoft Exchange Server Internet Mail Connector Version 4.0.838.14
oding: 22 TEXT, 38 UUENCODE
s-Attachment: WINMAIL.DAT 0 00-00-1980 00:00

Subj: Payment of One Wheeler Road Judgment
Date: 96-10-02 09:21:18 EDT
From: afrancio@foxboro.com (Franciose, Anthony)
To:     mggattys@aol.com ('William D. Gillis, Jr.')

File:  WINMAIL.DAT (1557 bytes)
DL Time (14400 bps): < 1 minute

Bill,

Wire transfer of the One Wheeler Road judgment will be made through ABN-Amro of NYC (the bank that issued the letter of credit. This will
insure that the LC cannot be presented after the money is wired.  There is a provision in the LC which reduces the amount payable on the LC
by any payments made to One Wheeler Road.

This may result in payment being delayed until 2-3:00PM on October 7, 1996, the payment due date. Therefore, no additional interest will be
required.   The LC cannot be presented until October 8, 1996.

I will send to you by fax a copy of instructions issued to ABN by our treasurer.

If you have any questions please call me at 508-549-6161.


Anthony R. Franciose
Senior Attorney


------------------- Headers --------------------
om afrancio@foxboro.com  Wed Oct  2 09:20:43 1996
eturn-Path: afrancio@foxboro.com
eceived: from foxboro-bh.foxboro.com
th ESMTP id JAA27963 for <mggattys@aol.com>; Wed, 2 Oct 1996 09:20:35 -0400
(foxboro-bh.foxboro.com [206.32.221.66]) by emin21.mail.aol.com (8.6.12/8.6.12)
ceived: (from uucp@localhost) by foxboro-bh.foxboro.com (8.6.12/8.6.11) id JAA01699 for <mggattys@aol.com>; Wed, 2
t 1996 09:22:51 -0400
ceived: from 152.155.16.2 by foxboro-bh.foxboro.com via smap (V1.3)
id sma001681; Wed Oct  2 09:22:43 1996
ceived: from xchange_fox by foxvax13.local (5.65/Ultrix3.0-C)
id AA29483; Wed, 2 Oct 1996 09:25:39 -0400
ceived: by exchange.foxboro.com with Microsoft Exchange (IMC 4.0.838.14)
id <01BBB043.AD535E40@exchange.foxboro.com>; Wed, 2 Oct 1996 09:25:40 -0400
ssage-Id: <c=US%a=_%p=SCD%l=SCD/FOXBORO/0006FDBE@exchange.foxboro.com>
Ms-Tnef-Correlator: <c=US%a=_%p=SCD%l=SCD/FOXBORO/0006FDBE@exchange.foxboro.com>
m: "Franciose,Anthony" <afrancio@foxboro.com>
"William D. Gillis, Jr.'" <mggattys@aol.com>
ject: Payment of One Wheeler Road Judgment
e: Wed, 2 Oct 1996 08:28:49 -0400
urn-Receipt-To: <afrancio@foxboro.com>
ailer:  Microsoft Exchange Server Internet Mail Connector Version 4.0.838.14
oding: 22 TEXT, 38 UUENCODE
s-Attachment: WINMAIL.DAT 0 00-00-1980 00:00

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 26

# PART 1

## SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is entered into by and between One Wheeler Road Associates, a Massachusetts Limited Partnership with a principal place of business at Burlington Office Park, One Wall Street, Burlington, Massachusetts (hereinafter referred to as "Wheeler Road Associates"), the Gutierrez Company, a Delaware Corporation and general partner of Wheeler Road Associates, with a principal place of business at Burlington Office Park, One Wall Street, Burlington, Massachusetts (hereinafter referred to as "Gutierrez"), and The Foxboro Company with a principal place of business at 33 Commercial Street, Foxboro, Massachusetts (hereinafter referred to as "Foxboro").   The foregoing shall be collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, the real property and improvements located at 200 Wheeler Road, Burlington, Massachusetts (the "Wheeler Road Property") were owned and occupied by Foxboro or its predecessor corporation from 1954 to 1978;

WHEREAS, in 1978 Foxboro sold the Wheeler Road Property to Blanton Wiggin and moved its operation to a new facility;

WHEREAS, in 1982 Wheeler Road Associates purchased the Wheeler Road Property from Mr. Wiggin;

WHEREAS, One Wheeler Road Associates and Gutierrez Co. (collectively the "Plaintiffs") were the Plaintiffs and Foxboro was the defendant in the litigation captioned <u>One Wheeler Road Associates and The Gutierrez Company v. The Foxboro Company</u>, United States

EXHIBIT 26

INV01615

District Court for the District of Massachusetts Civil Action No. 90-128763-RGS (the "Wheeler Road Action");

WHEREAS, the Plaintiffs in the Wheeler Road Action brought suit under the Comprehensive Environmental Response and Liability Act ("CERCLA") 42 U.S.C. §9601, et seq. and M.G.L. c. 21E to recover response and remediation costs incurred to address the environmental contamination located at One Wheeler Road, Burlington, Massachusetts ( the "Wheeler Road Property");

WHEREAS, the Massachusetts Department of Environmental Protection has assigned Release Tracking Number 3-0267 to this Site;

WHEREAS, Final Judgment was entered in the Wheeler Road Action on or about April 19, 1996, a copy of which Final Judgment is appended hereto at Exhibit A;

WHEREAS, Foxboro has satisfied, in full, the monetary amount of the Final Judgment entered in the Wheeler Road Action;

WHEREAS, the Final Judgment entered in the Wheeler Road Action included certain declarations and findings as to the parties' respective responsibilities for the reasonable and necessary response costs as have been and will be incurred after October 1993 in connection with the remediation of the groundwater and soils at the Wheeler Road Property;

WHEREAS, from October 1993 through February 1999 Plaintiffs have incurred response costs in the amount of $150,439.05 at the Wheeler Road Property, which response costs are more fully detailed in Exhibit B appended hereto;

WHEREAS, Windham Environmental Corporation has submitted a not-to-exceed proposal to design and construct a soil and groundwater remedial system at the Wheeler Road

2

Property (the "Windham Proposal"), a copy of which proposal is appended hereto at Exhibit C; and

WHEREAS, the Parties believe it is in their mutual interest to reach a resolution with respect to Plaintiffs' claims concerning the response costs which they have incurred since October 1993 and will incur in the future with respect to remediation at the Site.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants contained herein, and intending to be legally bound, the Parties agree as follows:

1. **Definitions**

As used herein, the following definitions apply for purposes of this Agreement:

1.1 "**Wheeler Road Associates**" shall mean One Wheeler Road Associates and its respective predecessors, parents, subsidiaries, affiliates, divisions, officers, directors, employees, attorneys, decedents, dependents, heirs, executors, administrators, assigns and successors.

1.2 "**Gutierrez**" shall mean The Gutierrez Company, and its agents, officers, directors, employees, attorneys, representatives, predecessors, successors, subsidiaries, parents, divisions, affiliates, and assigns.

1.3 "**Foxboro**" shall mean The Foxboro Company and its agents, officer, directors, employees, attorneys, representatives, predecessor, successors, subsidiaries, parents, divisions, affiliates, and assigns.

1.4 "**Person**" shall mean any individual, corporation, partnership, association, trust, government, government agency, or other entity or organization.

2. **Cooperative Remediation**

The Parties hereby agree to engage in a joint, cooperative, good faith effort, to manage and direct, in accordance with the Final Judgment entered in the Wheeler Road Action and the provisions set forth in Paragraphs 3, 5, 6, 7, 8 and 9 below, all necessary, reasonable and appropriate response, assessment, containment, removal, and remedial activities ("Response

3

INV01617

Actions") at the Site in a manner consistent with the provisions of M.G. L. c. 21E and the

Massachusetts Contingency Plan ("MCP"), and all other applicable statutes and regulations to

achieve an appropriate Response Action Outcome ("RAO") at this Site which may include an

Activity and Use Limitation ("AUL") consistent with the current and continued use of the

Property as a commercial property. Subject to the provisions of Paragraphs 5, 6, 7, 8 and 9

below, to the extent that M.G.L. c. 21E or the MCP is amended in the future, the parties agree to

consider the application of any other Class A RAO or equivalent statement of completion for the

Site by virtue of such amendment. (An RAO as currently defined under M.G.L. c. 21E and the

MCP or an equivalent statement of completion which would become applicable to the site under

an amendment of M.G.L. c. 21E or the MCP shall hereinafter be referred to as an "RAO

Statement"). The Parties agree that they shall, to the extent required by the MCP or other

applicable law, regulation or order, obtain regulatory approval of, and implement, a remedies for

site soils and site groundwater that are the most cost effective remedies consistent with the

requirements of the Department of Environmental Protection (" DEP") and which are consistent

with the continued use of the Property as a commercial property. The Parties have jointly

prepared and Wheeler Road Associates has or will submit to the DEP the Phase 4 Report for the

Site. Wheeler Road Associates shall, when appropriate, also prepare and submit to the DEP an

RAO Statement and any other document which the MCP requires. The Parties hereby agree and

acknowledge that, upon submittal to the DEP of the RAO Statement for site groundwater and

expiration of the maximum period of time afforded by the then applicable version of the MCP to

conduct an audit of the RAO Statement for Site groundwater, Foxboro's obligations with respect

to the Site under this Agreement and the Final Judgment entered in the Wheeler Road Action

4

shall be fully satisfied; provided, however, that nothing set forth herein shall be deemed to have changed, altered, or otherwise modified, any of the legal or factual findings contained in the Final Judgment.

3.    **Payments by Foxboro of Settlement Amount**

Foxboro hereby agrees to pay the amount of $102,762.59 ("Settlement Amount") to Plaintiffs, as full and complete consideration for the response costs which Plaintiffs have been incurred at the Wheeler Road Property from October 1993 through February 1999. These costs are more fully described in Exhibit B. As more fully set forth in paragraph 4 below, in exchange for Foxboro's payment of the Settlement Amount, Plaintiffs will release and forever discharge Foxboro for any and all claims associated with these past costs.

4.    **Release**

In consideration of Foxboro's payment of the Settlement Amount, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, and expressly subject to the conditions set forth in Paragraphs 5, 6, 7, 8 and 9 below, Wheeler Road Associates and Gutierrez hereby release Foxboro from, and covenant and agree that they will not assert or bring any claim, demand, lawsuit or cause of action (whether by way of original claim, cross claim, third-party claim or fourth-party claim) ("Claim(s)") against The Foxboro Company which arises out of, or relates in any way to, the payment of such reasonable and necessary response costs as have been and will be incurred after October 1993 in the remediation of the groundwater at the Site. The Parties hereby agree and acknowledge that nothing set forth herein shall be deemed to extinguish, release or otherwise affect the Parties' rights to seek recovery from each other, by contribution or otherwise, as to claims that are asserted by persons not a party to this Agreement

5

INV01619

claiming harm of any sort arising from release(s) of oil or hazardous material at or from the Site. This Release shall immediately take effect upon Plaintiffs receipt of the Settlement Amount. The Parties agree that the Release, and its force and effect, shall survive this Agreement.

5.    **Allocation of Remedial System Capital Costs**

The Parties hereby agree and acknowledge that the capital costs incurred to construct the remedial system (as more fully described in Exhibit C hereto) will be allocated as follows:

|  |  |
|---|---|
| Foxboro: | 56% |
| Wheeler Road Associates and Gutierrez: | 44% |

The Parties further agree that Foxboro will pay 15% of the System Start-up and debugging costs as they relate to the delivery of the groundwater component of the remedial system or 50% of the costs incurred on the first day of system delivery. The Parties further agree that the total costs to construct the remedial system shall not exceed the total of $68,607 set forth in the Windham Proposal and $12,988.50 incurred for installation of underground utilities and drainage to the systems, which costs were not included in the Windham Proposal and which are set out more fully in the invoices attached hereto as Exhibit D. The Parties acknowledge and agree that, if the total costs to construct the remedial system exceeds $81,595.50, Foxboro shall be under no obligation to contribute to the payment of these excess costs.

6.    **Operation of Remedial System**

The Parties hereby agree and acknowledge that they will share on an equal basis the costs of the first month's labor and monitoring costs of operating the Site's remedial system and keeping the system in compliance with the applicable regulations including, but not limited to,

6

influent and effluent monitoring and reporting the results of the monitoring. The Parties further agree and acknowledge that for all subsequent months that the Site's remedial system is operational, Foxboro will contribute $600/month towards these costs. Wheeler Road Associates and Gutierrez will be responsible for all other costs incurred to perform these activities. Once the Soil Vapor Extraction ("SVE") component of the remedial system is shut down, Foxboro will pay 100% of these costs. Foxboro understands that repairs to or modification of the groundwater component of the remedial system will be incurred as needed and that these costs have not been included in the $600 per month cost which is discussed above. In the event costs are incurred as result of such repairs or modifications, the parties agree that the costs will be allocated according to whether they were incurred for soil remediation, which will be the Plaintiffs' responsibility, or groundwater remediation, which will be Foxboro's responsibility. For those repairs or modification costs that cannot be so allocated, Foxboro will be responsible for 50% of such costs until the SVE component of the remedial system is shut down, after which time Foxboro shall be responsible for 100% of such costs.

7.    **Operation and Maintenance of Site Remedial System**

The Parties hereby agree and acknowledge that the operation and maintenance costs of the Site's Remedial System will be allocated and paid as follows:

A) Power:

1)   While SVE component of the remedial system is operating:

| | |
|---|---|
| Foxboro: | 30% |
| Wheeler Road Associates and Gutierrez: | 70% |

INV01621

2) After SVE component of the remedial system is shutdown:

      Foxboro:                         100%

B) Parts:   actual costs as incurred

C) Telephone:

1) While SVE component of the remedial system is operating:

      Foxboro:                          50%

      Wheeler Road Associates     50%
      and Gutierrez:

2) After SVE component of the remedial system is shutdown:

      Foxboro:                          100%

D) Deposit Control:  Foxboro 100%

E) Waste Disposal: Allocated as identified and incurred.

8. **Groundwater Monitoring and MCP Compliance**

A) The Parties agree to share equally the cost of preparing and submitting the MCP Phase IV and all other reports for the Site, with the exception of those reports contemplated under paragraph 8(B) below.  Foxboro shall be afforded the opportunity to review and propose edits to all such reports which contain a narrative or otherwise transmit information other than site data prior to their submission to the DEP, including those reports contemplated under paragraph 8(B) below.  The Parties agree that reports which only transmit Site data shall be submitted to Foxboro ten (10) days prior to their submission to the DEP.

8

INV01622

The Parties further agree that Foxboro will be provided with copies of all reports or other written communication submitted to the DEP.

B) The Parties agree that Foxboro will be 100% responsible for the costs of performing ground-water monitoring for 10 on-Site wells on a tri-annual basis. Foxboro will also be responsible for the costs of the preparation and submission of the appropriate reports to DEP concerning this ground-water monitoring work. The Parties also agree that the number of wells to be sampled may decrease if appropriate after the influence of pumping has stabilized and VOC concentrations reach an appropriate level.

C) The Parties agree that Foxboro will have the right to monitor the groundwater sampling activities at the Site. In addition, the Parties may agree, at any time, to replace the then current Licensed Site Professional ("LSP") with a mutually agreed upon replacement ("Replacement LSP"). Until such time as the Parties are able mutually to agree upon a Replacement LSP, Wheeler Road Associates and Gutierrez shall have the right to maintain the then current LSP in his position or to designate an acting LSP for the Site.

9.   **Billing and Dispute Procedure**

On a quarterly basis, the Plaintiffs shall submit an invoice to Foxboro pursuant to the notice procedures set forth in paragraph 21 below. The invoice will set forth in detail (a) the period for which the invoice is being submitted, (b) the total response costs incurred by Wheeler Road Associates and the Gutierrez during the period, (c) by category of response costs, Foxboro's percentage share of those costs, and (d) the total amount to be paid by Foxboro for the period.

9

Foxboro shall pay its total share of the invoice within 60 days of receipt of the invoice. Should any Party to this Agreement object to the payment of any cost or invoice associated with the activities described in Paragraphs 3, 5, 6, 7 or 8 above, the Parties hereby agree that said objection shall be resolved as follows: The Party objecting to the payment of said invoices shall, within twenty (20) days of its receipt of such invoice, notify the other Parties, in writing, of its objection to payment of the invoice(s) and the basis for said objection. The Parties shall attempt to negotiate and resolve, in good faith, this objection within thirty (30) days of the receipt of the notice of objection described above. Any portion of the subject cost or invoice which is not subject to this objection procedure shall be paid within 60 days of receipt.

10. **No Admissions**

This Settlement Agreement and Release shall not be construed as an admission of liability by any party to this agreement.

11. **Application of Agreement Only to the Parties**

This Agreement is intended to confer rights and benefits only on the Parties hereto and the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

12. **Entire Agreement/Amendment to Agreement**

This Agreement represents the entire understanding between the Parties and, without limitation, the Parties expressly agree that any previous communications, correspondence, memoranda of agreement or agreements are excluded from this Agreement and are not to be employed to construe this Agreement. Any other provisions of this Agreement to the contrary

10

INV01624

notwithstanding, this Agreement can only be modified by a writing signed by the Parties, and this provision cannot be orally waived.

**13.    Divisibility**

If any provision of this Agreement, or any portion of any provision of this Agreement, is declared null and void, such provision or such portion of a provision shall be considered separate and apart from the remainder of this Agreement which shall remain in full force and effect.

**14.    Construction of Agreement**

This Agreement is the product of informed negotiations between the parties and their respective representatives, including counsel, and it shall not be construed either in favor of or against any Party by virtue of any rules of contract construction intended to be applicable to insurance policies, nor shall any Party be deemed to be the drafter hereof.

**15.    No Assignment of Rights**

One Wheeler Road Associates and Gutierrez represent and warrant that they are the sole owners and holders of the claims released herein, and that they have not sold, transferred, conveyed, or assigned the same, or any interest therein or portion thereof, to any third party or entity.

**16.    Confidentiality and Disclosure**

All matters relating to the existence, terms and negotiations of this Agreement shall be confidential and Parties, and their respective agents, employees, attorneys, servants, insurers, officers or directors shall not disclose such information to any other person (except insurers, reinsurers, auditors and government regulators) without prior written consent of the other parties to this Agreement or unless such disclosure is required by operation of law or by court order.

INV01625

The Parties shall resist all other disclosure of the terms of this Agreement unless the other Parties to this Agreement consent to such disclosure.

17.    **Representations and Warranties**

To the extent applicable, each Party represents and warrants:

17.1    That it is fully authorized to enter into this Agreement;

17.2    That, in the case of Gutierrez and Foxboro, it is a corporation, and, in the case of Wheeler Road Associates, it is a limited partnership, each duly organized and validly existing in good standing under the laws of one of the states of the United States of America;

17.3    That it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or other internal approval is necessary;

17.4    That the making and performance of this Agreement will not violate any provision of law or of its articles of incorporation, charter or by-laws;

17.5    That, in making this Agreement has obtained the advice of legal counsel of his, her or its choosing;

17.6    That has read this entire Agreement and knows the contents hereof, that the terms hereof are contractual and not merely recitals, and that he, she or it has signed this Agreement of his, her or its own free act;

18.    **Authority to Sign**

Each person signing this Agreement hereby represents and warrants that he/she is a duly authorized representative of the Party for which the signature is provided, and that such person signing is specifically authorized to sign this Agreement, and that said signature will bind said Party.

19.    **Execution**

This Agreement may be executed in multiple counterparts.

INV01626

20.    **Costs**

Except as otherwise expressed in this Agreement, each Party agrees to bear all attorneys'

fees, costs, and expenses arising from the actions of his, her or its own counsel in connection

with this Agreement, and all matters and documents referred to herein, and for all related matters.

21.    **Notices**

Unless another individual is designated, in writing, for receipt of notices hereunder,

notices to the respective Parties shall be sent, via first class mail, to the following individuals:

ONE WHEELER ROAD ASSOCIATES and
THE GUTIERREZ COMPANY:

John A. Cataldo
Trustee of One Wheeler Road
Associates
c/o The Gutierrez Company
One Wall Street
Burlington, MA 01803

     With a copy to:

James W. Prendergast, Esq.
Hale and Dorr LLP
60 State Street
Boston, MA 02109

THE FOXBORO COMPANY:

Anthony R. Franciose, Esq.
The Foxboro Company
33 Commercial Street
Foxboro, MA 02035

     With a copy to:

William D. Gillis, Jr., Esq.
Massery & Gillis, LLP
101 Merrimac Street
Boston, MA  02114

22.    **Contribution Protection**

A.     Nothing in this Agreement shall be construed to create any rights in, or grant any

cause of action to, any person not a party to this Agreement. Each of the Settling Parties

expressly reserves any and all rights (including, but not limited to, any right to contribution or

INV01627

indemnity), defenses, claims, demands, and causes of action which each Settling Party may have against any person who is not a party to this Agreement with respect to any matter, transaction, or occurrence relating in any way to the Site.

B.     For response costs associated with remediation of the Site only, as specifically contemplated by this Agreement, the Settling Parties agree that this Agreement is meant to extinguish their liability for indemnity or contribution to each other pursuant to M.G.L. c. 21E, or any other statute or at common law. The Parties hereby agree and acknowledge that nothing set forth herein shall be deemed to extinguish, release or otherwise effect the Parties' rights to seek recovery from each other, by contribution or otherwise, as to claims that are asserted by persons not a party to this Agreement claiming harm of any sort arising from release(s) of oil or hazardous material at or from the Site.

## 23.   **Effective Date**

This Agreement shall become effective on the date of its execution by all Parties hereto.

## 24.   **Attorney Fees**

The Parties expressly agree that this is a good faith resolution of disputed claims pursuant to the dispute resolution provisions of M.G.L. c. 21E, §4A, and that, to the best of their knowledge and belief, each Party has participated in the negotiations giving rise to this Agreement in good faith. With respect to the matters resolved by this Agreement only, the Parties waive any rights they might otherwise have to seek an award of litigation costs and/or attorneys' fees against the other pursuant to M.G.L. c. 21E, §4A(d)(2) and (f)(1) except for litigation costs and attorneys' fees incurred in enforcement of this Agreement against a

INV01628

defaulting party.  The provisions of this paragraph shall survive the termination of this

Agreement

## 25.    Termination of Agreement

Except as otherwise stated in this Agreement, the provisions of Paragraph Nos. 2, 5, 6, 7,

8 and 9 of this Agreement shall terminate upon submission to the DEP of an appropriate RAO

Statement with respect to the Site and the satisfaction by the Settling Parties of their financial

obligations as set forth in this Agreement.


IN WITNESS WHEREOF, this Agreement has been executed by:

ONE WHEELER ROAD ASSOCIATES

By: _____

Date: _____


THE GUTIERREZ COMPANY

By: _____

Date: _____

THE FOXBORO COMPANY

By: _____

Date: _____

defaulting party. The provisions of this paragraph shall survive the termination of this

Agreement

## 25.   Termination of Agreement

Except as otherwise stated in this Agreement, the provisions of Paragraph Nos. 2, 5, 6, 7,

8 and 9 of this Agreement shall terminate upon submission to the DEP of an appropriate RAO

Statement with respect to the Site and the satisfaction by the Settling Parties of their financial

obligations as set forth in this Agreement.


IN WITNESS WHEREOF, this Agreement has been executed by:

ONE WHEELER ROAD ASSOCIATES

By: _____

Date: _____


THE GUTIERREZ COMPANY

By: _____

Date: _____

THE FOXBORO COMPANY

By: _____

Date: _____

INV01630

defaulting party.  The provisions of this paragraph shall survive the termination of this

Agreement

25.   **Termination of Agreement**

      Except as otherwise stated in this Agreement, the provisions of Paragraph Nos. 2, 5, 6, 7,

8 and 9 of this Agreement shall terminate upon submission to the DEP of an appropriate RAO

Statement with respect to the Site and the satisfaction by the Settling Parties of their financial

obligations as set forth in this Agreement.

      IN WITNESS WHEREOF, this Agreement has been executed by:

ONE WHEELER ROAD ASSOCIATES

By: _____

Date: _____

THE GUTIERREZ COMPANY

By: _____

Date: _____

THE FOXBORO COMPANY

By: _____

Date: _____

INV01631

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 26

# PART 2

# EXHIBIT A

INV01632

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 9012873-RGS

ONE WHEELER ROAD ASSOCIATES AND
THE GUTIERREZ COMPANY

v.

THE FOXBORO COMPANY

FINAL JUDGMENT

APRIL 19, 1996

STEARNS, D.J.

This action came on for trial before the court, the Honorable Richard G. Stearns, District Judge, presiding, and the issues having been duly heard and tried, and orders and memoranda of decision having been issued on February 7, 1994, December 13, 1995, and April 3, 1996, it is hereby

ORDERED, ADJUDGED, AND DECLARED THAT

1. Under Counts I and II of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, the plaintiffs, One Wheeler Road Associates and The Gutierrez Company, recover from the defendant, The Foxboro Company, the sum of $335,515.00 in environmental response costs, with interest thereon in the sum of $217,082.79 calculated at the rate of 12% per annum from November 28, 1990 to the date of this Final Judgment, as provided by law;

2.  Under Count II of the Complaint, the plaintiffs recover nothing of the defendant to the extent said Count is based upon a claim of property damage pursuant to M.G.L. c. 21E, § 5(a)(iii), which claim was dismissed by Order of the Court (Young, J.), dated February 7, 1994;

3.  Under Counts III, IV, and V of the Complaint, having been dismissed by Order of the Court (Young, J.), dated February 7, 1994, the plaintiffs recover nothing of the defendant;

4.  Under Count VI of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, as a substantial controversy between the parties of sufficient immediacy exists under 28 U.S.C. § 2201, a declaratory judgment based upon 42 U.S.C. § 9601, et seq. and M.G.L. c. 21E is hereby entered, over which this Court shall retain jurisdiction, holding the defendant liable to the plaintiffs for such reasonable and necessary response costs as have been and will be incurred after October 1993 in the remediation of the groundwater percolating in the soil to the north of the original plant located at the site owned by One Wheeler Road Associates in Burlington, Massachusetts; and

5.  Under to M.G.L. c. 21E, § 15, pursuant to the Order of the Court (Stearns, J.), dated April 3, 1996, the plaintiffs recover from the defendant $504,249.00 in attorneys' fees and costs and $87,677.00 in experts' fees and costs.

Dated at Boston, Massachusetts, this 24 day of April, 1996.

Mary Johson Roblins
Deputy  Clerk of Court

_____
Post-Judgment interest to date
at the rate of 5.46%.

2

INV01634

# EXHIBIT B

INV01635

REMEDIATION COSTS
AND PROPOSED ALLOCATION
(10/93-2/99)

| Item No. | Windham design Work / NC / Task No. / Invoice No. [2] | Task Description | Total Amount | Proposed Foxboro | Proposed | Allocation Cutierez | Allocation |
|---|---|---|---|---|---|---|---|
| 1. | Windham (1/96-7/98) [2] | System Redesign / Planning | $5,646.50 | 70% | $3,952.55 | 30% | $1,693.95 |
| 2. | Task No. 1 | Groundwater Monitoring | 34,884.13 | 100% | 34,884.13 | 0% | 0.00 |
| 3. | Task No. 2 | Groundwater Monitoring Data Analysis and Documentation | 19,393.71 | 100% | 19,393.71 | 0% | 0.00 |
| 4. | Task No. 3 | Initial Tier Classification Review | 290.00 | 50% | 145.00 | 50% | 145.00 |
| 5. | Task No. 4 | Phase III Submittal | 1,480.00 | 80% | 1,184.00 | 20% | 296.00 |

1    Attachment A

2    Attachment B

INV01636

| No. | Task No. | Description | Amount | % | Amount | % | Amount |
|---|---|---|---|---|---|---|---|
| 6. | Task No. 5 | Supplementary Phase II Submittal – Groundwater | 1,252.00 | 100% | 1,252.00 | 0% | 0.00 |
| 7. | Ta.k No. 6 | Supplemental Risk Characterization – Groundwater | 837.00 | 100% | 837.00 | 0% | 0.00 |
| 8. | Task No. 7 | Downgradient Property Issues | 1,616.25 | 100% | 1,616.25 | 0% | 0.00 |
| 9. | Task No. 8 | Board of Health Issues | 2,520.00 | 0% | 0.00 | 100% | 2,520.00 |
| 10. | Task No. 9 | Review of Windham Treatment and Tier Classification | 3,042.50 | 50% | 1,521.25 | 50% | 1,521.25 |
| 11. | Task No. 10 | Permit Modification | 4,478.75 | 50% | 2,239.37 | 50% | 2,239.38 |
| 12. | Task No. 11 | Drainage Issues | 2,607.50 | 0% | 0.00 | 100% | 2,607.50 |
| 13. | Task No. 12 | Lender Documentation | 6,310.00 | 0% | 0.00 | 100% | 6,310.00 |

-2-

INV01637

| | | | | | | |
|---|---|---|---|---|---|---|
| 14. | Invoice No. 4050 (NCA) | Drainage and Board of Health issues | $1,582.50 | 0% | .00 | 100% | 1,582.50 |
| 15. | Invoice No. 4065 (NCA) | Groundwater Monitoring | $1,358.75 | 100% | 1,358.75 | 0% | .00 |
| 16. | Invoice No. 4084 (NCA) | Litigation | $340.00 | 0% | .00 | 100% | 340.00 |
| | | For environmental services ($2,402.90) | $1,002.90 - Groundwater monitoring | 100% | 1,002.90 | 0% | .00 |
| | | | $1,400 - Phase I studies and litigation issues | 0% | .00 | 100% | 1,400.00 |
| 17. | Invoice No. 4121 (NCA) | Environmental services in conjunction with ongoing studies ($1,148.75) | $700 - Treatment system | 56% | 392.00 | 44% | 308.00 |
| | | | $448.75 - Phase I studies and litigation issues | 0% | .00 | 100% | 448.75 |
| 18. | Invoice No. 4144 (NCA) | Ongoing review of Phase I | $170 - Groundwater monitoring | 100% | 170 | 0% | .00 |
| | | | $247.50 - Phase I | 0% | .00 | 100% | 247.50 |
| | | Litigation issues | $212.50 | 0% | .00 | 100% | 212.50 |

-3-

INV01638

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 19. | Invoice No. 4165 (NCA) | Review of data and information pertaining to proposed treatment system | $527.50 - Treatment system | 56% | $295.40 | 44% | 232.10 |
| | | | $ 127.50 - Phase I | 0% | .00 | 100% | 127.50 |
| | | Litigation issues | $0 | 0% | .00 | 100% | .00 |
| 20. | Invoice No. 4203 (NCA) | Review of treatment system | $860.00 | 56% | 481.60 | 44% | 378.40 |
| 21. | Invoice No. 4219 (NCA) | Review of treatment system data | $895.00 | 56% | 501.20 | 44% | 393.80 |
| 22. | Invoice No. 4237 (NCA) | Review of data and information pertaining to the treatment system | $1,690.00 | 56% | 946.40 | 44% | 743.60 |
| 23. | Invoice No. 4252 (NCA) | Services performed in conjunction with the update of groundwater quality | $949.10 | 100% | 949.10 | 0% | .00 |

-4-

| | | | | | | |
|---|---|---|---|---|---|---|
| 24. | | Review of treatment system | $977.50 | 56% | 547.40 | 44% | 430.10 |
| | Invoice No. 4278 (NCA) | Review of data and information pertinent to treatment system | $1,325.00 | 56% | 742.00 | 44% | 583.00 |
| 25. | Invoice No. 4293 (NCA) | Review of treatment system | $501.25 | 56% | 280.70 | 44% | 220.55 |
| | | Review of downgradient property status submittal | $0 | 100% | .00 | 0% | .00 |
| 26. | 4/10/97 Comm. Of Mass. | Major Permit Modification | $1,200 | 50% | 600.00 | 50% | 600.00 |
| 27. | 11/12/98 Comm. Of Mass. | Tier 1A Annual Compliance Assurance Fee | $4,774.96 | 50% | 2,387.48 | 50% | 2,387.48 |
| 28. | 9/1/98 Windham | Treatment System Design | $2,762.50 | 56% | 1,547.00 | 44% | 1,215.50 |
| 29. | 11/13/98 Windham (Invoice No. 10262) | Treatment System Design | $1,527.50 | 56% | 855.40 | 44% | 672.10 |

-5-

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 30. | 11/25/98 Windham | Treatment System Design | $6,000.00 | 56% | 3,360.00 | 44% | 2,640.00 |
| 31. | 1/6/99 Windham (Invoice No. 10275) | Treatment System construction | $34,500.00 | 56% | 19,320.00 | 44% | 15,180.00 |
| | | TOTALS | $150,449.05 | | $102,762.59 | | $47,676.46 |

-6-

INV01641

WINDHAM ENVIRONMENTAL CORPORATION
ITEMS PAID BY ONE WHEELER ROAD
'1/96-7/7/98

|   |  | DATE PAID | CHECK NUMBER | AMOUNT |
|---|---|---|---|---|
| 1 | WINDHAM ENVIRONMENTAL CORPORATION | 05/16/97 | 1519 | $520.00 |
| 2 | "          "          " | 05/16/97 | 1519 | 2,665.00 |
| 3 | "          "          " | 07/08/97 | 1580 | 199.00 |
| 4 | "          "          " | 07/28/97 | 1606 | 585.00 |
| 5 | "          "          " | 12/03/97 | 1760 | 877.50 |
| 6 | "          "          " | 03/09/98 | 1897 | 800.00 |
|   | TOTAL |  |  | $5,646.50 |

INV01642

Attachment A

| INV# | Hrs | Amount | Total | Subtotal | |
|---|---|---|---|---|---|
| 2338 | | 490.88 | 948.38 | 1777.25 | 1 |
| 2354 | | | 453.75 | | |
| 2371 | | | 408.75 | 1820.88 | 1 |
| 2481 | | | 1136.25 | | |
| 2495 | | | 641.00 | | |
| 2711 | | 561.00 | 1119.75 | | |
| 2721 | | 561.00 | 1877.50 | 2997.25 | 1 |
| 2808 | 12.0 | | 2803.75 | 4165.25 | 1 |
| 2827 | 1.5 | | 1361.50 | | |
| 2912 | 2.0 | | 1005.00 | | |
| 2925 | 2.0 | 1144.00 | 960.50 | | |
| 2997 | 2.0 | 528.00 | 977.50 | | |
| 3005 | | 1232.00 | 1284.50 | 1965.50 | 1 |
| 3103 | 1.0 | 562.40 | 1546.80 | 2262.00 | 1 |
| 3218 | 2.5 | 462.00 | 1587.00 | 1546.80 | 1 |
| 3233 | 4.0 | 462.00 | 478.75 | 2065.75 | 1 |
| 3337 | 3.0 | | 2639.25 | | |
| 3432 | | 1408.00 | 586.25 | 2639.24 | 1 |
| 3456 | | | 550.75 | | |
| 3477 | 4.5 | 462.00 | 571.25 | 2020.75 | 1 |
| 3506 | 2.0 | | 312.50 | | |
| 3526 | 5.5 | | 1053.75 | | |
| 3561 | 5.0 | 990.00 | 1652.50 | | |
| 3578 | 5.0 | 990.00 | 1250.00 | 3956.25 | 1 |
| 3681 | 6.0 | | 2218.15 | | |
| 3718 | 10.5 | | 1826.25 | | |
| 3801 | 10.0 | | 1503.75 | 4044.40 | 1 |
| 3833 | 4.0 | 924.00 | 1546.50 | 3050.25 | 1 |
| 4023 | 3.0 | 118.80 | 582.55 | 582.55 | 1 |

INV01643

Attachment B

| INV | 01 | 04 | 24 | 40 | 45 | 60 | 85 | 66 | 70 | 75 | TOTAL | TASK # |
|------|------|-----|-----|------|-------|------|------|------|-------|-------|---------|--------|
| 2677 | 4.5 | | | | | | | | | | 712.50 | 2 |
| 2685 | | | | 7.0 | 5.5 | 2.5 | | | | | 605.00 | 2 |
| 2745 | 10.0 | | | | 2.5 | | | | | | 3503.75 | 2 |
| 2769 | 1.0 | | | | 2.0 | 2.0 | 0.5 | | | | 205.00 | 2 |
| 2794 | 2.0 | | | | 1.5 | | | | | | 290.00 | 3 |
| 2838 | 8.5 | | 2.0 | | 8.50 | | | | | | 1480.00 | 4 |
| 2859 | 6.5 | | | | | | | | | 1.0 | 552.50 | 2 |
| 2871 | 3.0 | | | | | | | | | | 255.00 | 2 |
| 2939 | 1.5 | | | | | | | | | | 292.50 | 2 |
| 2954 | 5.5 | | 1.0 | | | | 0.5 | | | 2.5 | 555.00 | 7 |
| 3041 | 3.5 | | 1.0 | | 2.5 | | | | | 3.0 | 716.25 | 7 |
| 3185 | 12.0 | | | | 3.5 | | | | 1.75 | 3.0 | 1265.00 | 2 |
| 3204 | 7.0 | | 2.0 | | 6.5 | | | | | 1.0 | 1171.25 | 2 |
| 3254 | 5.0 | | | | 5.0 | | | | | 0.75 | 768.75 | 2 |
| 3277 | 5.0 | | | | 10.0 | | | | | 1.25 | 1252.50 | 5 |
| 3184 | 6.5 | | | | 3.0 | | | | | 6.50 | 837.50 | 7 |
| 3397 | 5.0 | | | | 3.0 | | | | | 3.0 | 485.00 | 2/6 |
| 3415 | 4.0 | | | | 1.0 | | | | 1.0 | | 626.25 | 2 |
| 3543 | 5.0 | | | 6.0 | 2.0 | | | | | 3.75 | 2520.00 | 8 |
| 3601 | 8.0 | | | | 15.0 | | | | 10.50 | 8.00 | 626.25 | 2 |
| 3623 | 18.0 | | | | 0.5 | | | | 0.5 | | 735.00 | 2 |
| 3652 | 10.0 | | | 6.0 | 38.25 | 1.0 | | 2.75 | 8.50 | 10.25 | 4478.75 | 10 |
| 3755 | 1.5 | | | | 6.5 | | | | | 0.75 | 486.25 | 2 |
| 3759 | | | | | 3.0 | | | | | | 180.00 | 2 |
| 3776 | | | | | 0.5 | 2.75 | 0.25 | 0.25 | 1.5 | 1.0 | 365.00 | 2 |
| 3875 | 8.0 | | | | 1.5 | 0.25 | 0.25 | | | 0.5 | 787.50 | 2 |
| 3890 | 11.5 | 3.0 | 3.0 | | 1.0 | | | | | | 1277.50 | 2 |
| 3911 | 3.0 | 4.0 | | 3.5 | 4.5 | 0.5 | | 6.75 | 4.5 | 2.25 | 2607.50 | 11 |
| | | | | | 4.5 | | | | 0.5 | 4.5 | 1620.08 | 2501.33 |

| INV. | 01/04 | 04/24 | 05/0_ | 45/60 | 55/65 | 65/70 | 70/75 | AMT. | TASK |
|------|-------|-------|-------|-------|-------|-------|-------|-------|------|
| 3938 | 5.5 | | 8.25 | | | | 3.0 | 1112.38 | 2 |
| 3951 | 2.0 | | 4.5 | | | | 0.5 | 44.88 | 457.50 | 2 |
| 3962 | 5.0 | | | | | | 5.75 | 425.00 | 2 |
| 3804 | 5.5 | | 5.00 | | | | 8.75 | 968.75 | 2 |
| 3817 | 4.5 | | 33.5 | 1.0 | | | 12.0 | 2918.75 | 12 |
| 3994 | 5.5 | | 9.0 | 3.5 | | 3.0 | 170.00 | 1872.50 | 12 |
| 3998 | 5.0 | | 10.75 | 1.5 | 1.0 | | 2.5 | 5.25 | 1518.75 | 12 |

# EXHIBIT C

INV01646

** TOTAL PAGE.00

# Former Us...ndpower Site - Final Cost Estimate

| item | supplies/comment | unit cost | quantity | cost | eng hours | build hrs | tech hrs | tota hours | total |
|---|---|---|---|---|---|---|---|---|---|
| **Capital Cost** | | | | | | | | | |
| **major equipment** | | | | | | | | | |
| trailer/building | FSI | $5,000.00 | 1 | $5,000.00 | 5 | 0 | 0 | 5 | $7,226.00 |
| degen bag filter | westcoast | $4,000.00 | 1 | $4,000.00 | 5 | 4 | 4 | 13 | $6,285.00 |
| ip adsorption beds | grundfos | $1,000.00 | 2 | $2,000.00 | 2 | 2 | 2 | 6 | $3,400.00 |
| recovery pump | | $1,200.00 | 1 | $1,200.00 | 2 | 2 | 2 | 6 | $1,740.00 |
| pretreatment system | remedx | $1,000.00 | 1 | $1,000.00 | 4 | 1 | 1 | 6 | $1,416.00 |
| extraction blower | spencer or CF | $3,000.00 | 1 | $3,000.00 | 6 | 3 | 4 | 13 | $4,896.00 |
| vp adsorption beds | westpoll | $1,000.00 | 2 | $2,000.00 | 15 | 10 | 10 | 35 | $3,825.00 |
| moisture separator | gast | $1,000.00 | 1 | $1,000.00 | 9 | 2 | 2 | 9 | $1,700.00 |
| | | | | | 38 | 26 | 26 | 88 | $33,236.00 |
| **...c** | | | | | | | | | |
| enclosure | grayber | $2,000.00 | 1 | $2,000.00 | 4 | 4 | 4 | 12 | $3,400.00 |
| panel | grayber | $200.00 | 1 | $200.00 | 8 | 4 | 4 | 16 | $1,140.00 |
| starters | grayber | $100.00 | 4 | $400.00 | 9 | 8 | 8 | 80 | $990.00 |
| pic | grayber | $2,000.00 | 1 | $2,000.00 | 50 | 2 | 2 | 80 | $6,620.00 |
| relays | grayber | $50.00 | 4 | $200.00 | 2 | 2 | 2 | 6 | $680.00 |
| level switches | dwyer | $100.00 | 2 | $200.00 | 2 | 2 | 2 | 6 | $680.00 |
| dp sensors | dwyer | $200.00 | 2 | $400.00 | 2 | 2 | 2 | 6 | $680.00 |
| pressure sensors | dwyer | $200.00 | 1 | $200.00 | 2 | 2 | 2 | 6 | $680.00 |
| temp sensors | omega | $200.00 | 4 | $800.00 | 2 | 2 | 2 | 6 | $580.00 |
| flowmeter | nyerdigital | $800.00 | 1 | $800.00 | 2 | 2 | 2 | 6 | $580.00 |
| transducer | druk | $800.00 | 1 | $800.00 | 6 | 2 | 2 | 6 | $1,420.00 |
| orifice plate | crane | $200.00 | 1 | $200.00 | 2 | 2 | 2 | 6 | $1,140.00 |
| modem | cpi | $200.00 | 1 | $200.00 | 2 | 2 | 2 | 6 | $580.00 |
| buttons | grayber | $50.00 | 2 | $100.00 | 2 | 2 | 2 | 6 | $440.00 |
| switches | grayber | $50.00 | 1 | $50.00 | 2 | 2 | 2 | 6 | $580.00 |
| lights | grayber | $50.00 | 6 | $300.00 | 2 | 2 | 2 | 6 | $720.00 |
| | | | | | 88 | 44 | 36 | 168 | $20,940.00 |
| **pipe & valves** | | | | | | | | | |
| pipe | webb | $0.50 | 200 | $100.00 | 20 | 20 | 20 | 80 | $3,140.00 |
| pipe | webb | $0.30 | 100 | $30.00 | 5 | 5 | 5 | 16 | $3,792.00 |
| fittings | webb | $15.00 | 20 | $300.00 | 10 | 10 | 10 | 30 | $19,920.00 |
| valves | webb | $40.00 | 20 | $800.00 | 10 | 10 | 10 | 30 | $2,820.00 |
| | | | | | 45 | 45 | 45 | 135 | $8,472.00 |
| **electrical** | | | | | | | | | |
| conductor | grayber | $0.20 | 500 | $100.00 | 10 | 10 | 10 | 30 | $1,840.00 |
| conduit | grayber | $0.50 | 200 | $100.00 | 10 | 10 | 10 | 30 | $1,640.00 |
| distribution box | grayber | $100.00 | 2 | $200.00 | 4 | 4 | 4 | 12 | $1,980.00 |
| | | | | | 24 | 24 | 24 | 72 | $4,150.00 |
| start-up & debug | | | | | 32 | 32 | 32 | 96 | $4,500.00 |
| | | | | | 195 | 138 | 130 | 463 | $59,697.00 |
| **Monthly Operating Cost** | | | | | | | | | |
| electrical power | per kilowatt-hour | $0.10 | 4000 | $400.00 | 8 | 32 | 32 | 0 | $480.00 |
| parts | 0.1% of capital cost | $59.61 | 1 | $59.61 | | | | 0 | $59.33 |
| labor | | | | $0.00 | | | | 72 | $3,240.00 |
| phone service | per month estimated | $50.00 | 1 | $50.00 | | | | 0 | $50.00 |
| disposal control chemical | per month estimated | $50.00 | 1 | $50.00 | | | | 0 | $50.00 |
| regen service | per month estimated | $1,000.00 | 1 | $100.00 | | | | 0 | $120.00 |
| waste disposal | per month estimated | $200.00 | 1 | $200.00 | | | | 0 | $240.00 |
| | | | | | | | | | $4,282.00 |

INV01647

# EXHIBIT D

INV01648

1999  2 49PM    FROM NCA 5085865653                    P. D

# WEC

Windham Environmental Corporation

JUL 1 5 1999

Invoice #:      WRA-3-1
Date:           May 26, 1999
Submitted To:   P. Augustin Rios
                The Gutierrez Company
                One Wall Street
                Burlington, MA  01803
Note:           Underground and electrical not w/in scope of contract

## Time Accounting

| Date | Task | Hours | Staff | Hourly Rate | Charges |
|------|------|-------|-------|-------------|---------|
| 03/10/99 | coordinate underground piping work, set-up, schedule, install main hose | 7.00 | Project Manager | $50.00 | $350.00 |
| 03/13/99 | Install subgrade piping from manway #2 to shed | 13.50 | Project Manager | $50.00 | $675.00 |
| 03/18/99 | subgrade piping install, coordinate communications | 10.00 | Project Manager | $50.00 | $500.00 |
| 04/08/99 | subgrade piping installation and electrical coord. | 12.00 | Project Manager | $50.00 | $600.00 |
| 04/12/99 | underground piping/equipment operation | 10.00 | Project Manager | $50.00 | $500.00 |
| | Professional Sevices Total: | 52.50 | | | $2,625.00 |
| | Credit for client pump | | | | ($1,200.00) |
| | **Total Due** | | | | $1,425.00 |

INV01649

**DAY**

CONTRACTORS

NORMAN E. DAY, INC.
116 PERIMETER ROAD
UNIT E
NASHUA, NH 03063

## Invoice

Invoice Number:
6427

Invoice Date:
3/31/99

Page:
1

03-880-4601
03-882-7647

GUTIERREZ COMPANY
PROPERTY MANAGEMENT
WALL STREET
.INGTON, MA   01803

mer ID: GUTPROFMANG

| stomer PO | Payment Terms | Sales Rep ID | Due Date |
|---|---|---|---|
| LACE | Net 30 Days | KNIGHT | 4/30/99 |

| Description | Amount |
|---|---|
| IE AT 200 WHEELER ROAD IN BURLINGTON, MA. | |
| OR ENVIRONMENTAL SHED AS FOLLOWS: | |
| XISTING WIRING AND EQUIPMENT AS NEEDED, AND CLEAN OUT OF | |
| .DERGROUND CONDUITS. | |
| J ONE EXISTING UNDERGROUND CONDUIT FROM WELL #2 TO WELL | |
| WAS BROKEN. | |
| JUNCTION BOXES IN THE BUILDING, WELL #1, AND WELL #2 AS | |
| | |
| ONE 460 VOLT 30 AMP 3 PHASE CIRCUIT FROM THE BUILDING | |
| IEW ENVIRONMENTAL SHED WITH ONE TRANSFORMER AT 15 KVA, | |
| 20 - 208 VOLT, 3 PHASE, TO SUPPLY POWER FOR EXISTING | |
| I THE SHED. | |
| ONE 3 PAIR TELEPHONE CABLE FROM THE BUILDING TO THE | |
| PANEL LOCATED IN THE ENVIRONMENTAL SHED. | |
| WIRING FROM THE ENVIRONMENTAL SHED AS FOLLOWS: | |
| IMP., 3 PHASE CIRCUIT TO WELL #4 FOR THE PUMP. | |
| JAL CABLE FOR THE TRANSDUCER TO WELL #4. | |
| INCH CONDUITS TO WELL #2, FOR WIRING AS DESCRIBED, AND | |
| (E. | |
| 2/24/99 THRU 3/19/99 | 5,487.50 |
| | 4,600.00 |
| | 46.00 |

RECEIVED
APR - 2 1999
MAY 1 7 1999
THE GUTIERREZ COMPANIES

|  | Subtotal | 10,133.50 |
|---|---|---|
|  | Sales Tax | 230.00 |
|  | Total Invoice Amount | 10,363.50 |
| Check No: | Payment Received | 0.00 |
|  | **TOTAL** | 10,363.50 |

INV01650

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBITS 27 THROUGH 30

FEDERAL IDENTIFICATION
NO. _04-1339430_

**Examiner**

# The Commonwealth of Massachusetts

### William Francis Galvin
Secretary of the Commonwealth
One Ashburn    Place, Boston, Massachusetts 02108-1512

**Name**
**Approved**

## ARTICLES OF AMENDMENT
### (General Laws, Chapter 156B, Section 72)

021

We, _____ John H. Spencer _____ , ~~President~~ / *Vice President,

and _____ Edward A. McIntyre _____ , *Clerk / ~~Assistant Clerk~~,

of _____ The Foxboro Company _____ ,
                                    *(Exact name of corporation)*

located at _____ 33 Commercial Street, Foxboro, Massachusetts 02035 _____
                        *(Street address of corporation in Massachusetts)*

certify that these Articles of Amendment affecting articles numbered:

_____ Article 1 _____
        *(Number those articles 1, 2, 3, 4, 5 and/or 6 being amended)*

of the Articles of Organization were duly adopted at a meeting held on _March 30_, 20_01_, by vote of:

_115.1328_ shares of _____ common stock _____ of _115.1328_ shares outstanding,
                        *(type, class & series, if any)*

_____ shares of _____ of _____ shares outstanding, and
                        *(type, class & series, if any)*

_____ shares of _____ of _____ shares outstanding,
                        *(type, class & series, if any)*

1**being at least a majority of each type, class or series outstanding and entitled to vote thereon / or 2**being at least two-thirds of each type, class or series outstanding and entitled to vote thereon and of each type, class or series of stock whose rights are adversely affected thereby:

C
P
M
R.A.

*EXHIBIT 27*

4

*Delete the inapplicable*
*1 for amendments adopted*
*2 for amendments adopted pursuant to*
Note: If the space provided under any article or item on this form is insufficient, additions shall be set forth on one side only of separate 8 1/2 x 11 sheets of paper with a left margin of at least 1 inch. Additions to more than one article may be made on a single sheet so long as each article requiring each addition is clearly indicated.

1/1/14    N C

To change the name of the corporation to "Invensys Systems, Inc."

The foregoing amendment(s) will become effective when these Articles of Amendment are filed in accordance with General Laws, Chapter 156 B, Section 6 unless these articles specify, in accordance with the vote adopting the amendment, a *later* effective date not more than *thirty days* after such filing, in which event the amendment will become effective on such later date.

Later effective date: _____

SIGNED UNDER THE PENALTIES OF PERJURY, this _30th_ day of _March_ , 20_01_ .

_____    _____ / *Vice President,

_____    *Clerk / _____

*Delete the inapplicable words

To *change* the number of shares and the par value (if any) of any type, class or series of stock which the corporation is authorized to issue, fill in the following:    Not Applicable

The total *presently* authorized is:

| WITHOUT PAR VALUE STOCKS | | WITH PAR VALUE STOCKS | | |
|---|---|---|---|---|
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| Common: | | Common: | | |
| | | | | |
| Preferred: | | Preferred: | | |
| | | | | |

*Change* the total authorized to:

| WITHOUT PAR VALUE STOCKS | | WITH PAR VALUE STOCKS | | |
|---|---|---|---|---|
| TYPE | NUMBER OF SHARES | TYPE | NUMBER OF SHARES | PAR VALUE |
| Common: | | Common: | | |
| | | | | |
| Preferred: | | Preferred: | | |
| | | | | |

105134656

748761

# THE COMMONWEALTH OF MASSACHUSETTS

## ARTICLES OF AMENDMENT
### (General Laws, Chapter 156B, Section 72)

I hereby approve the within Articles of Amendment and, the filing fee in the amount of $ *100.00* having been paid, said articles are deemed to have been filed with me this *6th* day of *APRIL* 20 *01* .

Effective date: _____

**WILLIAM FRANCIS GALVIN**
*Secretary of the Commonwealth*

A TRUE COPY ATTEST

WILLIAM FRANCIS GALVIN
SECRETARY OF THE COMMONWEALTH
DATE _____ CLERK _____

## TO BE FILLED IN BY CORPORATION
### Photocopy of document to be sent to:

Patricia J. Turner

Pearl Professional Corporation

Westport, CT 06880

Telephone    203-2229000

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - ]
                              ]
ONE WHEELER ROAD ASSOCIATES   ]
and THE GUTIERREZ COMPANY,    ]
                              ]
            Plaintiff,        ]
                              ]
                              ]    Case No.:  90-12373K
vs.                           ]
                              ]
                              ]
THE FOXBORO COMPANY,          ]
                              ]
            Defendant.        ]
                              ]
- - - - - - - - - - - - - - - ]




            *   *   *   *   *   *




DEPOSITION OF:          FRANK JACOB NICHOLSON

TAKEN:                  Pursuant to Notice by
                        Counsel for Plaintiff

PLACE:                  400 North Ashley Drive
                        23rd Floor
                        Tampa, Florida  33602

DATE:                   March 20, 1992

TIME:                   9:30 a.m. - 12:45 p.m.

REPORTED BY:            Deborah G. Carver
                        Court Reporter, Notary Public
                        State of Florida at Large


                EXHIBIT 28

                                    INV00332

56

1    Q.    Are you aware of whether any quantities of

2    trichlorethylene or methylene chloride were ever poured down

3    the sinks at the Wheeler Road facility?

4    A.    No.  No.

5    Q.    Is it possible that that happened in very small

6    quantities?

7    MR. GIARRUSSO:  I object to the form of the

8    question.  Go ahead and answer.

9    THE DEPONENT:  I think it's always possible it

10   might have happened in small quantities, but not

11   deliberately.  It's part of management policy.

12   BY MR. DELANEY:

13   Q.    Why do you say it's always possible in small

14   quantities?

15   A.    Well, if Mary Smith or Joe Smith doesn't want to

16   walk back to the stockroom to get a new source or new supply,

17   might do that.  I don't think it was very likely.  It wasn't

18   encouraged, I'm sure.

19   Q.    Were employees ever disciplined for that that you

20   recall for permitting solvents to go down the sinks?

21   A.    No.

22   MR. GIARRUSSO:  I object.

23   THE DEPONENT:  No.  I never heard of anything.

24   BY MR. DELANEY:

25   Q.    Mr. Nicholson, I'd like to show you the site plan

1409 Enterprise Plaza
201 East Kennedy Boulevard

*TMT Reporting, Inc.*

Telephone:
(813) 222-8600

Volume:    I
Pages:     1 to 129
Exhibits:  1 to 17

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x
ONE WHEELER ROAD ASSOCIATES and
THE GUTIERREZ COMPANY,
                          Plaintiffs,

     v.                                 Civil Action
                                        No. 90-12373
THE FOXBORO COMPANY,
                          Defendant.
- - - - - - - - - - - - - - - - - x


          DEPOSITION of VERNON C. WESTCOTT, a
witness called by counsel for the Plaintiffs, taken
pursuant to the Federal Rules of Civil Procedure
before Doris M. Jones, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Hale and Dorr, 60 State Street, Boston,
Massachusetts, on Thursday, October 22, 1992,
commencing at 10:00 a.m.


          _____


          DORIS M. JONES & ASSOCIATES, INC.
          Professional Shorthand Reporters
                  59 Temple Place
              Boston, Massachusetts 02111
                  (617) 542-0039

                EXHIBIT 29              INV00325

14

1  ask him, was simply that I wanted to know if we had

2  diverted rainwater from the roof in the course of

3  owning the building.  And yes, we had.  And

4  specifically we directed the rainwater from the roof

5  through a culvert and into a ditch such that it

6  would run down to the Middlesex Turnpike.  The

7  purpose of that was to prevent flooding the septic

8  tanks in the case of heavy rain.

9      Q.   Did you ask Mr. Carvill whether there was

10  a separate catch basin set up for the roof drainage

11  system?

12      A.   No, I did not.  I have no knowledge of

13  that at all.

14      Q.   Did you ask Mr. Carvill any questions

15  about internal plumbing within the building?

16      A.   Yes.

17      Q.   What did you ask him?

18      A.   I asked him specifically if we had

19  modified the connections to any of the sinks or

20  anything of that kind, and the answer was

21  essentially no.  And further I asked him if we had

22  ever put solvents down the sinks, and he confirmed

23  my impression that that was an absolute no-no.  That

24  was not done.

INV00326

DORIS M. JONES & ASSOCIATES, INC.

15

1      Q.    Did you ask Mr. Carvill -- Let me strike

2   that and step back.

3            You said essentially no or he said

4   essentially no in response to modifications.

5      A.    Yes, I modified it in this respect:  That

6   we moved and created a clean room and installed a

7   sink there, and I wanted to cover that event.

8      Q.    Did you discuss the installation of the

9   sink in the clean room with Mr. Carvill?

10     A.    No.  I don't know what you mean by that,

11  but there was a sink there and he confirmed it, and

12  that's what I wanted to know.

13     Q.    Do you recall what year that sink was

14  installed, approximately?

15     A.    No.  I would think that would be very hard

16  for me to do.  It stretched over 30 years.

17     Q.    Did you ask Mr. Carvill any other

18  questions than you've already testified to?

19     A.    No.

20     Q.    Did he volunteer any recollections

21  regarding the plumbing, drainage or sewer systems?

22     A.    No.  Except that he confirmed our

23  practices which I wanted to know for sure and which

24  was that -- See, we were very conscious of the

INV00327

16

1    septic system since we didn't want to poison the

2    bacteria in our system.   And he confirmed my belief

3    that ~~he~~ <sup>we</sup> collected solvents and had them taken away.

4        Q.    Do you recall who took solvents away from

5    the Wheeler Road site?

6        A.    No.   You mean which firm?   The name of the

7    firm?

8        Q.    Right.

9        A.    No, I do not.

10       Q.    Did you ask Mr. Carvill?

11       A.    I did not, no.   I'm afraid the call was

12   mostly a social call, as it turned out; I hadn't

13   talked to him for years.

14       Q.    I want to turn now, and maybe step back a

15   little bit, to the construction of the Wheeler Road

16   facility.   Could you describe how that came about.

17       A.    I think you're asking me how the building

18   was designed.   Is that what you're asking?

19       Q.    Well, I guess that is essentially what I

20   want to know.   How was the Wheeler Road building

21   designed?   What was the process and who assisted in

22   that process?

23       A.    A firm of engineers designed the

24   building.   I couldn't tell you their names at this

INV00328

68

1      Q.    Regarding sinks, plumbing or drainage

2  issues?

3      A.    We discussed it but not in depth.

4      Q.    Do you recall anything he said on that

5  topic?

6      A.    He told me that -- He confirmed, which

7  everybody has told me that I've talked to, that it

8  was our policy not to put solvents down sinks; that

9  is not into the leaching bed, the septic system, the

10  sewage system.  I just modify that because sometimes

11  the definition of what a sink is is obscure a little

12  bit.  You can have something that looks like a sink

13  but goes into a container.  So I thought I'd be a

14  little careful about that.

15      Q.    And the apparatus you just described, what

16  seems to be a sink with a container underneath it,

17  was that type of equipment used at Trans-Sonics?

18      A.    Yes.

19      Q.    And which departments or areas of the

20  facility would use something like that?

21      A.    I believe that was in the model shop or in

22  the welding shop, which is part of the model shop.

23  Solvents for the production areas were generally

24  kept in small containers with caps on them and then

INV00329

69

1    they were emptied periodically into a larger

2    container.

3        Q.    And what size was the larger container?

4        A.    I don't know.  I think five gallons was a

5    common number.  The volume of material we handled

6    was not great.

7        Q.    What would then happen to the larger

8    containers?

9        A.    Eventually they were shipped away.

10       Q.    Who was responsible for that shipping?

11       A.    I think Mr. Maeder arranged for the

12   shipments, and one of the production people was in

13   charge of that.  It might have come under Bill

14   Calori.  You'll have to -- I'll have to check that,

15   however.

16       Q.    Do you know what sort of paperwork would

17   have accompanied those shipments?

18       A.    I do not know.

19       Q.    And as you sit here today you can't recall

20   the name of any specific company that was used?

21       A.    No.  I never was involved in selecting

22   those companies.

23       Q.    Moving forward to the era at Blanchard

24   Road, do you know whether that same practice was in

INV00330

DORIS M. JONES & ASSOCIATES, INC.

70

1    place regarding shipping of used solvents?

2        A.    To my knowledge that was always the

3    practice.

4        Q.    So, from 1956 forward to the mid '70s?

5        A.    I would say it was from 1948.

6        Q.    You mentioned that there was a policy not

7    to put solvents down the sinks.  Was this a written

8    policy?

9        A.    It was not.

10       Q.    How was that policy conveyed to new

11   employees?

12       A.    Well, there was a lot of oral

13   communication.  It was an oral place.  People talked

14   to each other a lot.  And discussions about how

15   things should be done went on all the time.  And I

16   would probably see people in the model shop every

17   day in some respect, one way or another.  The same

18   way with most of the people.  We had a very closely

19   knit organization in that respect.  People talked to

20   each other.  There was no distinction, social

21   distinctions which would serve as a barrier to keep

22   people from talking to each other.  That was a

23   matter of policy.

24       Q.    Were there any safety concerns at

INV00331

1

Volume:  I
Pages:  1 - 85
Exhibits:  Per Index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 90-1237-K

ONE WHEELER ROAD ASSOCIATES       )
and THE GUTIERREZ COMPANY,        )
                        Plaintiffs )
                                  )
vs.                               )
                                  )
                                  )
THE FOXBORO COMPANY,              )
                        Defendant )

        DEPOSITION of RICHARD F. MANNION, a
witness called by and on behalf of the Plaintiff,
taken pursuant to the applicable provisions of the
Federal Rules of Civil Procedure, before Deborah
Meeks Svirtunas, a Registered Professional Reporter
and Notary Public within and for the Commonwealth of
Massachusetts, at the offices of Hale and Dorr, 60
State Street, Boston, Massachusetts, on Monday,
August 16, 1993, commencing at 1:15 p.m.

EXHIBIT 30

DORIS M. JONES & ASSOCIATES, INC.
Professional Shorthand Reporters
59 Temple Place
Boston, Massachusetts 02111
(617) 542-0039

INV00334

DORIS M. JONES & ASSOCIATES, INC.

2

1    APPEARANCES:

2        JAMES W. PRENDERGAST, ESQ.
         Hale and Dorr
3        60 State Street
         Boston, Massachusetts  02109
4        Telephone No. (617) 526-6181
             On behalf of the Plaintiffs;
5
         WILLIAM D. GILLIS, JR., ESQ.
6        Cooley, Manion, Moore & Jones, P.C.
         21 Custom House Street
7        Boston, Massachusetts  02110
         Telephone No. (617) 737-3100
8            On behalf of the Defendant.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

INV00335

DORIS M. JONES & ASSOCIATES, INC.

62

1    minimal volumes of acids and bases which they

2    discharge into the sanitary sewer via the sinks."

3            Were you aware of that practice at

4    Blanchard Road?

5            MR. GILLIS:  Objection.

6        A.   Oh, at Blanchard Road?  Yes.  Okay.

7        Q.   Yes.  This has to do with Blanchard Road,

8    this document.

9        A.   Okay.  I don't have detailed knowledge of

10   that facility.

11       Q.   In establishing your guidelines which we

12   were discussing previously for environmental

13   compliance, which I think you mentioned probably

14   started in 1978 or so ---

15       A.   Um-hum.

16       Q.   --- did you address the disposal of

17   hazardous waste down sinks?

18       A.   Yes.  Okay?  And the corporate policy was

19   that no organic solvents could be placed in a sink.

20       Q.   Okay.  Were you aware of any time that

21   that occurred at any Foxboro facility prior to the

22   establishment of those guidelines?

23       A.   I have no direct knowledge of that.

24       Q.   Do you have any indirect knowledge of

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 31

# PART 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INVENSYS SYSTEMS, INC.     )
            Plaintiff,          )
                             )
                             )
v.                              )
                             )
CENTENNIAL INSURANCE COMPANY,    )
                             )
           Defendant.        )

CIVIL ACTION NO: 1:05-CV-
11589-WGY

## DEFENDANT CENTENNIAL INSURANCE COMPANY'S OBJECTIONS AND ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Pursuant to Fed.R.Civ.P. 26 and 33 and applicable Local District Court Rules, Defendant Centennial Insurance Company ("Centennial") objects to and answers Plaintiff's First Set of Interrogatories ("Invensys Interrogatories") as follows:

### PRELIMINARY STATEMENT

1.      In responding to Invensys' Interrogatories, either by answering an interrogatory or referring Invensys to documents produced by Centennial pursuant to Fed.R.Civ.P. 33(d), Centennial does not waive its right to challenge the relevance, materiality, and admissibility of the information or documents supplied or to object to the use of such information or documents in any subsequent proceeding or trial in this action or any other action on any grounds that may be applicable.

2.      Centennial's answers to Invensys' Interrogatories are based upon the information presently available to Centennial.  The fact that Centennial states in response to certain Interrogatories that the information may be found in non-privileged documents does not mean that Centennial has yet determined that such documents exist or that Centennial has located all

EXHIBIT 31

such documents that may be responsive to the Interrogatory. Centennial fully reserves its right to supplement or amend its answers and/or to produce additional information prior to trial as provided for by applicable law, rules, and Orders of the Court. Centennial specifically limits its obligations to supplement these responses to those imposed upon Centennial by the Federal Rules of Civil Procedure and any Orders of the Court.

3.    To the extent that Centennial has agreed to produce certain documents in response to Invensys' Interrogatories, Centennial will make such documents available to Invensys for inspection and copying within a reasonable time at the place where such documents are maintained by Centennial in the ordinary course of its business or at the offices of Morrison Mahoney LLP, 250 Summer Street, Boston, Massachusetts and in accordance with such other terms and conditions as may be agreed upon by the parties.

4.    Each and every Objection and Answer to an Interrogatory is subject to the General Objections set forth below. These limitations and objections form a part of the Objection and Answer to each and every Interrogatory and are set forth here to avoid the duplication and repetition of restating them for each Objection and Answer. These General Objections may be specifically referred to in an Objection and Answer to certain Interrogatories for the purpose of clarity. However, the failure to specifically incorporate a General Objection shall not be construed as a waiver of the General Objection.

## **GENERAL OBJECTIONS**

1.    Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory seeks information or documents protected from disclosure by the attorney-client privilege, the work product doctrine, a settlement privilege, or any other applicable privilege or discovery immunity.

2.      Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory seeks information or documents that constitute or contain confidential, proprietary or trade secret information belonging to Centennial on the grounds that the disclosure of such information or documents would potentially harm Centennial's business interests and is neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence.

3.      Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory seeks information concerning Centennial's contentions or positions in this matter on the grounds that such Interrogatories are overly broad and unduly burdensome. Centennial further objects to each such Interrogatory insofar as it seeks information concerning Centennial's legal positions or otherwise exceeds the scope of discovery permitted under the Federal Rules of Civil Procedure.

4.      Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory seeks information that is neither relevant, in that there is no logical nexus between the information and the issues in controversy between Centennial and Invensys in this matter, nor reasonably calculated to lead to the discovery of admissible evidence.

5.      Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory is unduly burdensome and oppressive, in that the assembly of information responsive to such Interrogatories would require a search for information that is of little or no benefit with respect to the issues in this matter, such that the value of the requested information would be far outweighed by the burden of locating and producing such information.

6.      Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory is overly broad and seeks information without proper limitation as to subject matter

or time period or purports to impose upon Centennial any obligations which are greater than those provided for by the Federal Rules of Civil Procedure.

7.    Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory is vague and ambiguous, in that Centennial is unable to determine what information is sought, and thus the Interrogatory is likely to lead to a confusing, misleading, inaccurate or incomplete response.

8.    Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory is unduly burdensome and oppressive insofar as it seeks information that is already in Invensys' possession, custody or control or that is equally available to Invensys.

9.    Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory seeks information relating to any transactions involving Centennial and any entity other than Invensys, including any insurance policies issued to such entities or claims involving such entities, on the grounds that such information is neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence and on the grounds that locating and producing such information would be unduly burdensome.  Centennial further objects to the production of any such information on the grounds that such information is confidential, proprietary and cannot be disclosed to Invensys without the prior consent of such entities, who are not parties to this matter.  Centennial further objects that attempting to obtain the consent of such entities to the disclosure of such information would be unduly burdensome.

10.    Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory seeks information that is not within the possession, custody or control of Centennial and/or seeks to require Centennial to obtain information from entities that are not parties to this matter on the grounds that each such Interrogatory seeks to impose obligations

upon Centennial that are greater than those provided for in the applicable Federal Rules of Civil Procedure.    Accordingly, in responding to Invensys' Interrogatories, Centennial will only respond on behalf of itself and not on behalf of any other person or entity.

11.    Centennial objects to Invensys' Interrogatories to the extent that each Interrogatory seeks information that is not related to the alleged insurance contracts that are the subject of this proceeding on the grounds that such information is neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence.

12.    Centennial objects to Invensys' Interrogatories to the extent they fail to identify the relevant time period of each Interrogatory and thus are overly broad, unduly burdensome and seek the production of information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

13.    Centennial objects to Invensys' Interrogatories to the extent that they seek to require Centennial to produce e-mails, electronic or other computer generated or stored data that cannot be reasonably located and retrieved or that would be unduly burdensome to retrieve; where the cost of retrieving such electronic information would far outweigh any potential benefit of producing such materials; to the extent that such information is neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible information and/or is duplicative of other information produced by Centennial; and to the extent that Invensys' Interrogatories seek to impose obligations upon Centennial that are greater than those contained in the Federal Rules of Civil Procedure.

14.    Centennial objects to Invensys' Interrogatories to the extent that they seek information concerning so-called "drafting history" or concerning any alleged insurance policy forms on the grounds that each such Interrogatory is overly broad, vague, unduly burdensome

and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible information.

15.    Centennial objects to Invensys' Interrogatories to the extent that they seek information concerning any documents filed by Centennial with any state, federal or other governmental or regulatory authorities on the grounds that such information is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence and on the grounds that it would be unduly burdensome for Centennial to search for and produce such information. Centennial further objects to each such Interrogatory to the extent that it seeks proprietary or confidential information of Centennial. Further, to the extent that such information is publicly available, it can be obtained directly by Plaintiff.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Centennial objects to Invensys' Definitions and Instructions to the extent that they are inconsistent with or seek to impose obligations upon Centennial that are greater than those set forth in the Federal Rules of Civil Procedure and the Local District Rules. Accordingly, Centennial will respond to Invensys' Interrogatories in accordance with the Federal Rules of Civil Procedure and the Local District Rules and/or the Orders of the Court. Centennial's objections to specific Definitions and Instructions are set forth below.

### DEFINITION A

"Plaintiff" and "Invensys" mean Plaintiff Invensys Systems, Inc., formerly known as The Foxboro Company. "Trans-Sonics" means Trans-Sonics, Inc.

### DEFINITION B

"Defendant," "You," "Your" and "Centennial" means Defendant Centennial Insurance Company.

## DEFINITION C

"Affiliate" means any insurance company, insurance services company, or holding company that is a corporate affiliate, corporate subsidiary (direct or indirect), or corporate parent (direct or indirect) of Centennial.

## OBJECTION TO DEFINITION C

*See* Centennial's General Objections, particularly General Objection No. 10.  Centennial objects to the definition of "Affiliate" to the extent that it is vague, ambiguous, unduly burdensome and overbroad, including insofar as it relates to entities that were not involved with the issuance of the policy or the claim that is the subject of this case.

## DEFINITION D

The "Policy" means Centennial Insurance Company Policy No. 42-00 76 30, effective January 1, 1972-1975.

## DEFINITION E

The "Underlying Action" means One Wheeler Road Associates, et al. v. The Foxboro Company, No. 90-12873k (D. Mass).

## DEFINITION F

"Liberty Mutual" means Liberty Mutual Insurance Company.

## DEFINITION G

The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all documents, information or responses that might otherwise be construed outside the scope.

## DEFINITION H

"Communication" or "Communicated" refers to the transmittal of information in the form of facts, ideas, inquiries or otherwise.

### DEFINITION I

"Concerning" means relating to, referring to, describing, evidencing or constituting.

### DEFINITION J

"Document" and "documents" shall be given the broadest possible interpretation permitted by Rule 34 and shall include, without limitation, all correspondence, records, tables, charts, graphs, pictures, schedules, appointment books and calendars, diaries, reports, memoranda, notes, letters, telegrams, messages (including reports of telephone conversations and conferences), tapes, recordings, transcriptions, studies, analyses, books, magazines, newspapers, booklets, circulars, bulletins, notices, instructions, minutes and other communications (including inter- and intra-office communications), questionnaires, indexes, data sheets and surveys and other written, recorded, printed, typed, transcribed, taped, electronic, mechanical, photographic, filed, graphic, magnetic or digital matter, or other matter of any kind or nature however produced or reproduced and each copy of any of the foregoing (regardless of origin). "Document" shall also include the file jackets, and any labels thereon, in which responsive documents are contained. If the existence of any document is known to you, but the document is no longer in your possession or control, state what disposition was made of the document and when. A draft or non-identical copy is a separate "document" within the meaning of the terms "document" and "documents."

### OBJECTION TO DEFINITION J

*See* Centennial's General Objections, particularly General Objection No. 13. Centennial further objects to Definition J to the extent that it is overly broad, unduly burdensome, seeks documents and categories of documents that are neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence, and seeks to impose obligations upon

Centennial that are greater than those contained in the Federal Rules of Civil Procedure and the Local District Court Rules.

### DEFINITION K

The use of the singular form of any word includes the plural and vice-versa.

### INSTRUCTION L

If you object to any discovery request or a sub-part thereof, state all grounds for the objection. With respect to any objections based on privilege, protection or immunity such as the attorney-client privilege or the attorney-work-product protection, provide a privilege log stating, with respect to which withheld document, (i) the document's author, (ii) all recipients of the document, (iii) all persons who have seen the document, (iv) the date of the document, (v) the type of document, (vi) the subject matter of the document, and (vii) the specific basis for withholding the document.

### OBJECTION TO INSTRUCTION L

*See* Centennial's General Objections. Centennial further objects to Instruction L to the extent that it is overbroad, unduly burdensome, purports to limit Centennial's rights in connection with responding to Invensys' Interrogatories and/or seeks to impose obligations upon Centennial which are greater than those contained in the applicable Federal Rules of Civil Procedure and/or the Local District Court Rules. Subject to and without waiving any objection, Centennial will provide Invensys with a privilege log which identifies any document or portion of a document withheld or redacted by Centennial under a claim of privilege within a reasonable time.

### INSTRUCTION M

The fact that the investigation is continuing or that discovery is incomplete shall not excuse your failure to respond to each request as fully as possible. The failure to produce any

responsive document shall be deemed a representation that the existence of such document is not known to the responding party, its counsel, or other representatives at the time of service of its response and production of documents.

### OBJECTION TO INSTRUCTION M

*See* Centennial's General Objections.  Centennial further objects to Instruction M to the extent that it is unduly burdensome and purports to limit Centennial's rights in connection with responding to Invensys' Interrogatories and/or seeks to impose obligations upon Centennial which are greater than those contained in the applicable Federal Rules of Civil Procedure and/or the Local District Court Rules.

### INSTRUCTION N

Documents shall be produced within thirty (30) days at the law offices of Gilbert & Renton LLC, 23 Main Street, Andover, Massachusetts 01810.

### OBJECTION TO INSTRUCTION N

*See* Centennial's General Objections and Preliminary Statement No. 3.  Centennial further objects to Instruction N to the extent that it is unduly burdensome and purports to limit Centennial's rights in connection with responding to Invensys' Interrogatories and/or seeks to impose obligations upon Centennial which are greater than those contained in the applicable Federal Rules of Civil Procedure and/or the Local District Court Rules.

### OBJECTIONS AND ANSWERS TO INTERROGATORIES

### INTERROGATORY NO. 1

Please identify all insurance policies (or portions thereof) issued by Centennial or any of its affiliates to each of the following entities during any portion of the time period from January 1, 1954 through January 1, 1991:

    a.      Invensys

      b.      The Foxboro Company

      c.      Trans-Sonics, Inc.

      d.      Foxboro/Trans-Sonics. Inc.

## OBJECTION AND ANSWER NO. 1

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence, including insofar as it seeks information pertaining to insurance policies other than Policy No. 42-00-76-30 issued by Centennial to Trans-Sonics for the period from January 1, 1972 to January 1, 1975 (the "Policy").

Subject to and without waiving the foregoing objections, Centennial states that the information sought in this Interrogatory is contained in the Policy and the non-privileged documents relating to the Policy that have previously been produced by Centennial to Invensys. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

## INTERROGATORY NO. 2

Please identify all documents concerning all insurance policies (or portions thereof) issued by Centennial or any of its affiliates to each of the following entities during any portion of the time period from January 1. 1954 through January 1, 1991:

      a.      Invensys

      b.      The Foxboro Company

      c.      Trans-Sonics. Inc.

      d.      Foxboro/Trans-Sonics, Inc.

**OBJECTION AND ANSWER NO. 2**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence, including insofar as it seeks information pertaining to insurance policies other than Policy No. 42-00-76-30 insured by Centennial to Trans-Sonics for the period from January 1, 1972 to January 1, 1975 (the "Policy").

Subject to and without waiving the foregoing objections, Centennial states that the information sought in this Interrogatory is contained in the Policy and the non-privileged documents relating to the Policy that have previously been produced by Centennial to Invensys. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

**INTERROGATORY NO. 3**

Please identify all documents concerning the existence, terms, conditions, provisions, endorsements, exclusions and contents of all insurance policies issued by Centennial or any of its affiliates to each of the following entities during any portion of the time period from January 1, 1954 through January 1, 1991:

     a.     Invensys

     b.     The Foxboro Company

     c.     Trans-Sonics, Inc.

     d     Foxboro/Trans-Sonics, Inc.

**OBJECTION AND ANSWER NO 3**

*See* Centennial's General Objections, particularly Nos. 1-15. Centennial further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the

discovery of admissible evidence, including insofar as it seeks information pertaining to insurance policies other than Policy No. 42-00-76-30 insured by Centennial to Trans-Sonics for the period from January 1, 1972 to January 1, 1975 (the "Policy").

Subject to and without waiving the foregoing objections, Centennial states that the information sought in this Interrogatory is contained in the Policy and the non-privileged documents relating to the Policy that have previously been produced by Centennial to Invensys. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

## INTERROGATORY NO. 4

Please identify all documents concerning (a) any Interrogatories for policies or information by Invensys or Trans-Sonics to Centennial or any of its affiliates, (b) any notices by Invensys or Trans-Sonics to Centennial or any of its affiliates, (c) any communications by Invensys or Trans-Sonics to Centennial or any of its affiliates, (d) any demands for coverage made by Invensys or Trans-Sonics to Centennial or any of its affiliates), and/or (e) Centennial's (or any of Centennial's affiliates) consideration of and response to any requests, notices, communications or demands. This interrogatory is limited to any insurance policy issued to Trans-Sonics or Invensys. It is not limited solely to the *Wheeler Road Lawsuit.*

## OBJECTION AND ANSWER NO. 4

*See* Centennial's General Objections, particularly Nos. 1-15. Centennial further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. This objection includes, but is not limited to, insofar as the Interrogatory seeks information pertaining to insurance policies other than Policy No. 42-00-76-30 issued by Centennial to Trans-Sonics for the period from January 1, 1972 to January 1, 1975 (the "Policy") and to any claims other than the claims pertaining to the *Wheeler Road Lawsuit.*

Subject to and without waiving the foregoing objections, Centennial further answers as follows:

a) Centennial has previously produced the Policy and all non-privileged documents relating to the Policy to Invensys. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

b) Centennial has previously produced all non-privileged documents relating to any notices sent by Invensys to Centennial relating to the *Wheeler Road Lawsuit*. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

c) Centennial has previously produced all non-privileged documents relating to communications by Invensys to Centennial concerning the Policy and/or the *Wheeler Road Lawsuit*. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

d) Centennial has previously produced all non-privileged documents relating to any demands for coverage made by Invensys to Centennial concerning the *Wheeler Road Lawsuit*. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

e) Centennial has previously produced all non-privileged documents relating to its handling of Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

## INTERROGATORY NO. 5

Please identify all documents that reference insurance policies for which Centennial or its affiliates cannot find copies, but that may have provided coverage to Invensys or Trans-Sonics.

## OBJECTION AND ANSWER NO. 5

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks

information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence, including insofar as it seeks information pertaining to insurance policies other than Policy No. 42-00-76-30 issued by Centennial to Trans-Sonics for the period from January 1, 1972 to January 1, 1975 (the "Policy").

Subject to and without waiving the foregoing objections, Centennial states that the information sought in this Interrogatory is contained in the Policy and the non-privileged documents relating to the Policy that have previously been produced by Centennial to Invensys. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

**INTERROGATORY NO. 6**

Does Centennial contend that the coverage in the Policy contains or is otherwise subject to any form of pollution exclusion?

**OBJECTION AND ANSWER NO. 6**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to Interrogatory No. 6 on the grounds that it is overly broad, vague and confusing insofar as it fails to identify the specific "pollution exclusion" to which reference is made. Subject to and without waiving the foregoing objections, Centennial states that based upon the information presently available to it, Centennial does not contend at this time that Policy No. 42-00-76-30 issued to Trans-Sonics for the period from January 1, 1972 to January 1, 1975 contained a specific "pollution exclusion" labeled as such. Centennial reserves it right to supplement this answer in the event that it locates different or additional information concerning the contents of the Policy.

INVENSYS SYSTEMS, INC.

MOTION FOR

SUMMARY JUDGMENT

EXHIBIT 31

PART 2

## INTERROGATORY NO. 7

If the answer to Interrogatory No. 6 is anything other than an unqualified "no," please state all facts, identify all relevant policy provisions, and identify all documents concerning the issue whether the Policy contains or is otherwise subject to any form of pollution exclusion.

## OBJECTION AND ANSWER NO. 7

*See* Centennial's Objection and Answer to Interrogatory No. 6.

## INTERROGATORY NO. 8

Does Centennial contend that it received late or insufficient notice of Invensys' claim for coverage in connection with the Underlying Action or any related proceedings or settlements?

## OBJECTION AND ANSWER NO. 8

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Interrogatory on the grounds that its use of the phrase "any related proceedings or settlements" is vague and ambiguous.

Subject to this and without waiving the foregoing objections, Centennial states that it does contend that Invensys' notice of its claim for coverage under the Policy relating to the *Wheeler Road Lawsuit* was late and did not comply with the terms of the Policy.

## INTERROGATORY NO. 9

Does Centennial contend that it was prejudiced by any late or insufficient notice?

## OBJECTION AND ANSWER NO. 9

*See* Centennial's Objection and Answer to Interrogatory No. 8, which Centennial incorporates here by reference. Further answering, Centennial states that in the event that prejudice is required, Centennial does contend that it was prejudiced by Invensys' late notice of its claim for coverage relating to the *Wheeler Road Lawsuit* that did not comply with the terms of the Policy.

1002784                                16

**INTERROGATORY NO. 10**

Please state all facts, identify all relevant Policy provisions and identify all documents concerning the issue of whether Centennial received and/or was prejudiced by any late or insufficient notice.

**OBJECTION AND ANSWER NO. 10**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to Interrogatory No. 10 on the grounds that it is overly broad, vague, unduly burdensome and exceeds the scope of a proper contention interrogatory, including insofar as it seeks to require Centennial to identify "all" facts and documents relating to Centennial's defense that Plaintiff is not entitled to coverage for the *Wheeler Road Lawsuit* based upon its breach of the provisions of the Centennial policy requiring timely notice of suits.

Subject to and without waiving the foregoing objections, Centennial states that the Policy issued by Centennial to Trans-Sonics requires as a condition precedent to coverage that Centennial be provided with immediate written notice of any suit commenced against Trans-Sonics and that Centennial be provided with a copy of all suits served on Trans-Sonics. The *Wheeler Road Lawsuit* was served on Trans-Sonics in or about 1990. Centennial was not notified of the *Wheeler Road Lawsuit* at that time or at any reasonable time thereafter. Trans-Sonics did not present any claim for coverage to Centennial relating to the *Wheeler Road Lawsuit* until approximately ten (10) years later, in or about 2001. Trans-Sonics' notice of the *Wheeler Road Lawsuit* clearly failed to comply the provisions of the Centennial policy and therefore Centennial does not owe coverage to Trans-Sonics for the *Wheeler Road Lawsuit*. Centennial further states that information concerning the terms of the Centennial policy with respect to the requirements concerning notice; the dates on which Trans-Sonics was served with

1002784                                  17

the *Wheeler Road Lawsuit*; and the dates on which Centennial was notified of Trans-Sonics' claim for coverage with respect to the *Wheeler Road Lawsuit* are contained in the documents that have been produced by Centennial to Invensys and in the documents that have been produced by Trans-Sonics. Accordingly, Centennial refers Trans-Sonics to these documents pursuant to the provisions of Fed.R.Civ.P. 33(d).

Further answering, Centennial states that to the extent the Court may determine that Centennial is required to establish that it was prejudiced by Trans-Sonics' failure to comply with the provisions of the Centennial Policy requiring timely notice of suits, Centennial states that it was prejudiced in a number of respects, including but not limited to the following:

- Centennial was deprived of an opportunity to make a timely investigation of the facts relating to the *Wheeler Road Lawsuit*

- Centennial was deprived of its contractual right to associate in the defense of the *Wheeler Road Lawsuit*

- Centennial was deprived of an opportunity to explore the issue of whether the *Wheeler Road Lawsuit* could be settled or otherwise resolved without trial

- Centennial was prejudiced because Trans-Sonics was aware during the course of the *Wheeler Road Lawsuit* that the damages being sought by the plaintiff could be in the range of several million dollars and that its primary insurer, Liberty Mutual Insurance Company, had denied coverage for the claim

- Centennial had no opportunity to participate in the decision to take the *Wheeler Road Lawsuit* to trial, including after Liberty Mutual had withdrawn from the defense of the case

- Centennial was prejudiced because a Final Judgment was entered against Trans-Sonics several years before notice of the *Wheeler Road Lawsuit* was provided to Centennial

- Centennial was deprived of any opportunity to participate in the decision not to appeal the Final Judgment in the *Wheeler Road Lawsuit*

- Trans-Sonics entered into a binding settlement of the *Wheeler Road Lawsuit* without providing notice of the existence of the suit or the Final Judgment to Centennial

- Trans-Sonics incurred substantial costs pursuant to the terms of the settlement that it entered into with the plaintiffs in the *Wheeler Road Lawsuit* without providing notice of the existence of the suit, the Final Judgment or the settlement to Centennial

- Trans-Sonics did not notify Centennial of the fact that its primary insurer, Liberty Mutual Insurance Company, had denied coverage for the claim

- Trans-Sonics did not notify Centennial that it was involved in litigation with Liberty Mutual relating to coverage for the *Wheeler Road Lawsuit* until the coverage litigation was on the eve of trial, when it was too late for Centennial to seek to intervene in the coverage action in order to protect its rights against Trans-Sonics and Liberty Mutual

- Liberty Mutual issued primary and umbrella insurance policies to Trans-Sonics and/or Invensys that had limits that were more than sufficient to cover all of Trans-Sonics' liabilities (past and future) relating to the *Wheeler Road Lawsuit*. Centennial was prejudiced because Trans-Sonics entered into a settlement

agreement with Liberty Mutual that compromised Trans-Sonics' claim against Liberty Mutual for substantially less than the amount of coverage that Liberty Mutual had provided to Trans-Sonics

Centennial further states that the facts relating to the prejudice to Centennial from Trans-Sonics' failure to notify Centennial of its claim for coverage relating to the *Wheeler Road Lawsuit* until approximately ten (10) years after the suit was commenced are contained in the documents that Centennial has produced to Trans-Sonics in this action and in the documents that Trans-Sonics has produced to Centennial. Accordingly, Centennial refers Trans-Sonics to these documents pursuant to Fed.R.Civ.P. 33(d).

## INTERROGATORY NO. 11

Does Centennial contend that Invensys violated any prohibition or limitation on so-called "voluntary payments" (or any similar concept in the Centennial policy) in connection with the Underlying Action or any related proceedings or settlements.

## OBJECTION AND ANSWER NO. 11

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to Interrogatory No. 11 on the grounds that it is overly broad and vague, including insofar as it refers to a "so-called 'voluntary payments'" provision and to "any similar concept in the Centennial policy" without specifically referring to or quoting the provision of the Policy.

Subject to and without waiving the foregoing objections, Centennial does contend that Trans-Sonics breached the conditions of the Policy issued by Centennial to Trans-Sonics that prohibits the insured, except at its own cost, from entering into any obligations or settlements without the knowledge or consent of Centennial. Further answering, Centennial states that additional information responsive to this Interrogatory is contained in the documents that Centennial has produced to Trans-Sonics in this action and in the documents that Trans-Sonics

has produced to Centennial. Accordingly, Centennial refers Trans-Sonics to these documents pursuant to the provisions of Fed.R.Civ.P. 33(d).

## INTERROGATORY NO. 12

Does Centennial contend that it was prejudiced by any violation of any prohibition or limitation on so-called "voluntary payments" (or any similar concept in the Centennial policy)?

## OBJECTION AND ANSWER NO. 12

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to Interrogatory No. 12 on the grounds that it is overly broad and vague, including insofar as it refers to a "so-called 'voluntary payments'" provision and to "any similar concept in the Centennial policy" without specifically referring to or quoting the provision of the Policy. Centennial further objects to this Interrogatory to the extent that it assumes that Centennial is required to establish that it was prejudiced by Trans-Sonics' breach of the conditions of the Centennial Policy that prohibit the policyholder from incurring obligations or costs or entering into settlements without the knowledge or consent of Centennial.

Subject to and without waiving the foregoing objections, and assuming that the Court ultimately rules that Centennial is required to establish that it was prejudiced by Trans-Sonics' breach of the conditions of the Centennial Policy that prohibit Trans-Sonics from incurring obligations or costs or entering into settlements without the knowledge or consent of Centennial, then Centennial does contend that it was prejudiced by Trans-Sonics' breach of the conditions of the Policy issued by Centennial to Trans-Sonics that prohibits the insured, except at its own cost, from entering into any obligations or settlements without the knowledge or consent of Centennial. Further answering, Centennial states that additional information responsive to this Interrogatory is contained in the documents that Centennial has produced to Trans-Sonics in this action and in the documents that Trans-Sonics has produced to Centennial. Accordingly,

Centennial refers Trans-Sonics to these documents pursuant to the provisions of Fed.R.Civ.P. 33(d).

## INTERROGATORY NO. 13

Please state all facts, identify all relevant policy provisions, and identify all documents concerning the issue whether Invensys violated any prohibition or limitation on so-called "voluntary payments" (or any similar concept in the Centennial policy) and whether Centennial received and/or was prejudiced by any such "voluntary payments."

## OBJECTION AND ANSWER NO. 13

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial further objects to Interrogatory No. 13 on the grounds that it is vague and overly broad, including insofar as it refers to a "so-called 'voluntary payments'" provision and to "any similar concept in the Centennial policy without quoting the specific policy language."  Centennial further objects to Interrogatory No. 13 on the grounds that it is unduly burdensome and exceeds the scope of a proper contention interrogatory, including insofar as it seeks to require Centennial to identify "all" facts and documents relating to Centennial's defense that plaintiff is not entitled to coverage for some or all of its claim for costs associated with the *Wheeler Road Lawsuit* on the grounds that Trans-Sonics breached the condition of the Centennial policy which prohibits the policyholder, except at its own cost, from incurring costs or obligations or entering into settlements without the knowledge and consent of Centennial.  Centennial further incorporates by reference its Objections and Answer to Interrogatory Nos. 11 and 12.

Subject to and without waiving the foregoing objections, Centennial states that the policy issued by Centennial to Trans-Sonics requires as a condition precedent to coverage that the policyholder not incur any costs or obligations, or enter into any settlements, without the knowledge or consent of Centennial.  As set forth in Centennial's Objections and Answer to

Interrogatory No. 10 (which Centennial incorporates here by reference), Centennial was not notified of the *Wheeler Road Lawsuit* or any of the proceedings relating thereto until approximately ten (10) years after the action was commenced. During that time, Trans-Sonics incurred costs for its defense of the *Wheeler Road Lawsuit* that have not been reimbursed by any insurer and for which it now seeks coverage from Centennial. Such costs are not recoverable from Centennial based upon Trans-Sonics' breach of the policy provisions cited above. Further, Trans-Sonics entered into a settlement agreement with the plaintiffs in the *Wheeler Road Lawsuit* which obligated Trans-Sonics to pay for certain ongoing costs of investigating, remediating and/or monitoring the environmental contamination at the site that was the subject of the *Wheeler Road Lawsuit*. This settlement agreement was entered into by Trans-Sonics without the knowledge or consent of Centennial and, accordingly, all costs incurred relating to the settlement agreement between Trans-Sonics and the plaintiffs in the *Wheeler Road Lawsuit* are not recoverable from Centennial based upon Trans-Sonics' breach of the condition cited above. Centennial further states that information concerning the terms of the Centennial policy with respect to the prohibition on incurring costs, obligations or entering into settlements and the actions taken by Trans-Sonics that violate these terms of the policy are contained in the documents that have been produced by Centennial and in the documents that have been produced by Trans-Sonics. Accordingly, Centennial refers Trans-Sonics to these documents pursuant to the provisions of Fed.R.Civ.P. 33(d).

Further answering, Centennial states that it disputes that it is required to establish that it was prejudiced by Trans-Sonics' breach of the conditions of the Policy which prohibit the policyholder from incurring costs or obligations, or entering into settlements, without the knowledge or consent of Centennial. To the extent that the Court may determine that Centennial

is required to establish that it was prejudiced by Trans-Sonics' failure to comply with the provisions of the Centennial Policy prohibiting the policyholder from incurring costs or obligations, or entering into settlements, without Centennial's knowledge or consent, then Centennial incorporates by reference the facts relating to prejudice set forth in its Objections and Answer to Interrogatory No. 10.

Centennial further answers that insofar as Trans-Sonics seeks to recover from Centennial any defense costs relating to the *Wheeler Road Lawsuit*, Centennial was prejudiced because it was deprived of any opportunity to control the defense of the *Wheeler Road Lawsuit* and/or to evaluate the reasonableness of the costs incurred by Trans-Sonics in the defense of that suit. Insofar as Trans-Sonics seeks to recover from Centennial any costs that it has or will incur pursuant to the terms of the settlement that it entered into with the plaintiffs in the *Wheeler Road Lawsuit*, Centennial was prejudiced because it was deprived of any opportunity to evaluate the reasonableness and necessity of the costs incurred or to be incurred by Trans-Sonics pursuant to the terms of the settlement agreement, including whether such costs would otherwise be covered under the terms of the Centennial Policy. Centennial was further prejudiced insofar as it had no opportunity to review the reasonableness and necessity of the costs incurred pursuant to the terms of the settlement agreement between Trans-Sonics and the plaintiffs in the *Wheeler Road Lawsuit* on an ongoing basis.

## INTERROGATORY NO. 14

Is there any instance since 1990 in which Centennial, in its capacity as an excess or umbrella insurer (but not a primary insurer) has exercised any right to associate with the insured in the defense and control of any suit asserting environmental liabilities against one of its policyholders?

**OBJECTION NO. 14**

*See* Centennial's General Objections, particularly Nos. 1-15. Centennial further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and seeks information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible information. Read literally, this Interrogatory would require Centennial to review thousands of files to determine what actions it took in each case. Even if such a review was humanly possible or warranted (which it is not) the information obtained from such a review would be utterly meaningless since each claim is handled on the basis of the specific facts presented. Accordingly, Centennial will not agree to undertake such a review or to provide any of the other information requested in this Interrogatory.

**INTERROGATORY NO. 15**

If the answer to Interrogatory No. 14 is anything other than an unqualified "no," then with respect to each instance since 1991 in which Centennial, in its capacity as an excess or umbrella insurer (but not a primary insurer) associated in the defense and control of the suit asserting environmental liabilities against one of its policyholders, please provide the following information:

- The title, case name, jurisdiction and court of the suit;

- The name. address and telephone number of the defense counsel who associated on Centennial's behalf in the defense or control of the suit;

- All pleadings and correspondence concerning the suit; and

- A copy of the policy(ies) pursuant to which Centennial was asserting its right to associate in the defense and control of the suit.

**OBJECTION NO. 15**

*See* Centennial's Objection to Interrogatory No. 14, which Centennial incorporates here by reference.

**INTERROGATORY NO. 16**

Please state the number of cases since 1991 in which Centennial has declined to exercise the right, in its capacity as an excess or umbrella insurer, has had the right to associate in the defense and control of a suit asserting environmental liabilities against one of its policyholders.

**OBJECTION NO. 16**

*See* Centennial's Objection and Answer to Interrogatory No. 14, which Centennial incorporates here by reference.

**INTERROGATORY NO. 17**

With respect to all defenses or affirmative defenses upon which Centennial intends to or might rely in connection with summary judgment proceedings or trial in this case, please state all facts, identify all relevant policy provisions, and identify all documents concerning each such defense or affirmative defense.

**OBJECTION AND ANSWER NO. 17**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and exceeds the scope of a proper contention Interrogatory under Fed.R.Civ.P. 33, including insofar as it seeks to require Centennial to identify "all" defenses, facts, policy provisions and documents upon which it may rely in connection with its defense of this action.

Subject to and without waiving the forgoing objections, Centennial states that it has provided information concerning certain of its contentions in this case in response to Invensys' Interrogatory Nos. 7-13. Accordingly, Centennial incorporates by reference its Objections and

Answers to Interrogatory Nos. 7-13 here. Centennial further states that it has produced all non-privileged documents relating to the Policy issued by Centennial to Trans-Sonics that is at issue in this case and all non-privileged documents relating to Centennial's handling of Invensys' claim for coverage relating to the *Wheeler Road Lawsuit* and that certain of the information sought by Invensys is contained in these documents. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

## INTERROGATORY NO. 18

With respect to any claim by Centennial that all or part of the amounts sought from Centennial by Invensys instead should be allocated to other insurers or should be retained by Invensys, please identify all facts, identify all relevant provisions in the Centennial Policy, identify all other affected insurers and their respective policies, and identify all documents concerning the allocation issue.

## OBJECTION AND ANSWER NO. 18

*See* Centennial's General Objections, particularly No. 1-13. Centennial further objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome, vague and ambiguous and exceeds the scope of a proper contention Interrogatory, including insofar as it seeks to have Centennial prepare a legal brief on the issue of allocation.

Subject to and without waiving the foregoing objections, Centennial states that in the event that the Court were to find that Invensys is entitled to coverage under the Policy issued by Centennial to Trans-Sonics for any portion of its claims relating to the *Wheeler Road Lawsuit* (a matter which Centennial denies), then any such costs associated with the claim should be allocated on a pro rata by time on the risk basis to all policies that were issued to Invensys (or any of its predecessors) from the first date on which property damage or the operations at the Wheeler Road site occurred through the date on which the *Wheeler Road Lawsuit* was filed. To

the extent that Invensys (or its predecessors) did not purchase insurance, cannot locate copies of any insurance policies that were or may have been in effect or settled with any of its insurers for a sum that is less than the available limits in each year, then Invensys is required to bear the costs allocated to each such period. Further answering, Centennial states that additional information responsive to this Interrogatory is contained in the policy issued by Centennial to Trans-Sonics that is the subject of this action, the non-privileged documents that have been produced by Centennial relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*, and the documents relating to the *Wheeler Road Lawsuit* that have been produced by Invensys. Accordingly, Centennial refers Invensys to these documents pursuant to Fed.R.Civ.P. 33(d).

## INTERROGATORY NO. 19

For each expert upon which Centennial intends to rely at trial or in connection with summary judgment motions, please provide all information and reports required to be provided under the Federal Rules of Civil Procedure and the Local Rules of this Court.

## OBJECTION AND ANSWER NO. 19

*See* Centennial's General Objections. Subject to and without waiving these objections, Centennial states that it has not determined whom, if anyone, it intends to call as an expert witness at the trial of this matter. Accordingly, in the event that Centennial does intend to designate an expert it will do so pursuant to Fed.R.Civ.P. 26, the Local District Court Rules and the Orders of the Court.

## INTERROGATORY NO. 20

Please identify all drafting history (whether consisting of documents created by Centennial, any insurance industry organization or rating bureau, or other third party) and filings with state regulatory officials in New York and in Massachusetts by or on behalf of Centennial or any Affiliate, concerning any forms or endorsements that Centennial contends to be part of the

Policy (including but not limited to any clause concerning any form of pollution exclusion, the sections of the Policy that may be entitled "Assistance and Cooperation," "Ultimate Net Loss)" "Other Insurance," the "Insured's Duties in the Event of Occurrence, Claim or Suit," "Underlying Insurance," "Defense-Settlement," "Retained Limit - Limit of Liability," "Subrogation" and/or "Maintenance of Underlying Insurance."

## OBJECTION NO. 20

*See* Centennial's General Objections, particularly Nos. 1-15. Centennial further objects to this Interrogatory on the grounds that it is overly broad, vague and ambiguous, including in its reference to so-called "drafting history." Centennial further objects to this Interrogatory on the grounds that it is unduly burdensome and seeks the identification of documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence, including insofar as such documents are not a part of the Policy issued by Centennial to Trans-Sonics for the period from January 1, 1972 to January 1, 1975 that is subject of this case. Even attempting to identify and collect documents that are responsive to this Interrogatory (if they exist within Centennial at all) would be a herculean effort that would ultimately have no bearing on the issue of whether Invensys is entitled to coverage under the Policy issued by Centennial to Trans-Sonics for the *Wheeler Road Lawsuit*. Accordingly, Centennial will not respond further to this Interrogatory.

CENTENNIAL INSURANCE COMPANY

As to Objections:

John T. Harding BBO #221270
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

## CERTIFICATE OF SERVICE

I, John T. Harding, counsel for Centennial Insurance Company, hereby certify that on September 18, 2006, I served a copy of the foregoing document by facsimile and first class mail on all counsel of record.

John T. Harding

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 32

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| INVENSYS SYSTEMS, INC. <br> Plaintiff, | ) <br> ) <br> ) | |
| v. | ) <br> ) <br> ) | CIVIL ACTION NO: 1:05-CV- <br> 11589-WGY |
| CENTENNIAL INSURANCE COMPANY, <br> Defendant. | ) <br> ) <br> ) <br> ) | |

## DEFENDANT CENTENNIAL INSURANCE COMPANY'S RESPONSE TO PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Pursuant to Fed.R.Civ.P. 26 and 34 and Local District Court Rule 34.1, Defendant Centennial Insurance Company ("Centennial") responds to Plaintiff Invensys Systems, Inc.'s First Request for Production of Documents (Invensys' Request) as follows.

### PRELIMINARY STATEMENT

1.      In responding to Invensys' Request, either by written response or by the production of documents, Centennial does not waive its right to challenge the relevance, materiality, and admissibility of the documents produced or to object to the use of such documents in any subsequent proceeding or trial in this action or any other action on any grounds that may be applicable.

2.      Centennial's search for documents that may be responsive to Invensys' Request is ongoing.  Accordingly, Centennial's response to Invensys' Request is based upon the documents presently available to Centennial.  The fact that Centennial states in response to certain requests that it will produce non-privileged documents does not mean that Centennial has yet determined that such documents exist or that it has located such documents.  Centennial fully reserves its

EXHIBIT 32

right to supplement or amend its responses and/or to produce additional documents prior to trial as provided for by applicable law, rules and orders of the Court. Centennial limits its obligations to supplement these responses to those imposed upon Centennial by the Federal Rules of Civil Procedure, the Local District Court Rules, and any Orders of the Court.

3.    To the extent that Centennial has agreed to produce certain documents in response to Invensys' Request, Centennial will make such documents available to Invensys for inspection and copying within a reasonable time at the place where such documents are maintained by Centennial in the ordinary course of its business or at the offices of Morrison Mahoney LLP, 250 Summer Street, Boston, Massachusetts and in accordance with such other terms and conditions as may be agreed upon by the parties.

4.    Centennial's General Objections to Invensys' Request are set forth below. To avoid the necessity of restating in full each General Objection throughout the responses that follow, individual General Objections are incorporated by numerical reference within each response to which they are particularly applicable. Centennial's citation to such General Objections is for emphasis only, and Centennial's failure to cite to a particular General Objection in response to a specific Request shall not constitute a waiver of any such objection that may be applicable. Further, Centennial's assertion of additional specific objections to certain Requests shall not constitute a waiver of any otherwise applicable General Objection.

## GENERAL OBJECTIONS

1.    Centennial objects to Invensys' Request to the extent that each Request seeks documents protected from disclosure by the attorney-client privilege, the work product doctrine, a settlement privilege, or any other applicable privilege or discovery immunity.

2

2.    Centennial objects to Invensys' Request to the extent that each Request seeks documents that constitute or contain confidential, proprietary or trade secret information belonging to Centennial on the grounds that the disclosure of such documents would potentially harm Centennial's business interests and is neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence.

3.    Centennial objects to Invensys' Request to the extent that each Request seeks documents concerning Centennial's contentions or positions in this matter on the grounds that such Requests are overly broad, unduly burdensome, and fail to specify with reasonable particularity the documents or category of documents that are requested.  Centennial further objects to each such Request insofar as it seeks documents concerning Centennial's legal positions or otherwise exceeds the scope of discovery permitted under the Federal Rules of Civil Procedure.

4.    Centennial objects to Invensys' Request to the extent that each Request seeks documents that are neither relevant, in that there is no logical nexus between the documents and the issues in controversy between Centennial and Invensys in this matter, nor reasonably calculated to lead to the discovery of admissible evidence.

5.    Centennial objects to Invensys' Request to the extent that each Request is unduly burdensome and oppressive, in that the assembly of documents responsive to such Requests would require a search for documents that are of little or no benefit with respect to the issues in this matter, such that the value of the requested documents would be far outweighed by the burden of locating and producing such documents.

6.    Centennial objects to Invensys' Request to the extent that each Request is overly broad and seeks documents without proper limitation as to subject matter or time period or

3

purports to impose upon Centennial any obligations which are greater than those provided for by the Federal Rules of Civil Procedure.

7.    Centennial objects to Invensys' Request to the extent that each Request is vague and ambiguous, in that Centennial is unable to determine what documents are sought, and thus the Request is likely to lead to a confusing, misleading, inaccurate or incomplete response.

8.    Centennial objects to Invensys' Request to the extent that each Request is unduly burdensome and oppressive insofar as it seeks documents that are already in Invensys' possession, custody or control or that are equally accessible to Invensys.

9.    Centennial objects to Invensys' Request to the extent that each Request seeks documents relating to any transactions involving Centennial and any entity other than Invensys, including any insurance policies issued to such entities or claims involving such entities, on the grounds that such documents are neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence and on the grounds that locating and producing such documents would be unduly burdensome.  Centennial further objects to the production of any such documents on the grounds that such documents are confidential, proprietary and cannot be disclosed to Invensys without the prior consent of such entities, who are not parties to this matter.  Centennial further objects that attempting to obtain the consent of such entities to the disclosure of such information would be unduly burdensome.

10.    Centennial objects to Invensys' Request to the extent that each Request seeks documents that are not within the possession, custody or control of Centennial and/or seeks to require Centennial to obtain documents from entities that are not parties to this matter on the grounds that each such Request seeks to impose obligations upon Centennial that are greater than those provided for in the applicable Federal Rules of Civil Procedure.  Accordingly, in

4

responding to Invensys' First Request, Centennial will only respond on behalf of itself and not on behalf of any other person or entity.

11.    Centennial objects to Invensys' Request to the extent that each Request seeks documents that are not related to the alleged insurance contracts that are the subject of this proceeding on the grounds that such documents are neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence.

12.    Centennial objects to Invensys' Request to the extent that it fails to identify the relevant time period of each Request and thus is overly broad, unduly burdensome and seeks the production of documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

13.    Centennial objects to Invensys' Request to the extent that it seeks to require Centennial to produce e-mails, electronic or other computer generated or stored data that cannot be reasonably located and retrieved or that would be unduly burdensome to retrieve; where the cost of retrieving such electronic information would far outweigh any potential benefit of producing such materials; to the extent that such information is neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible information and/or is duplicative of other information produced by Centennial; and to the extent that Invensys' Request seeks to impose obligations upon Centennial that are greater than those contained in the Federal Rules of Civil Procedure.

14.    Centennial objects to Invensys' Request to the extent that it seeks information concerning so-called "drafting history" or concerning any alleged insurance policy forms on the grounds that each such Request is overly broad, vague, unduly burdensome and seeks

information that is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible information.

15.    Centennial objects to Invensys' Request to the extent that it seeks information concerning any documents filed by Centennial with any state, federal or other governmental or regulatory authorities on the grounds that such information is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence and on the grounds that it would be unduly burdensome for Centennial to search for and produce such information.    Centennial further objects to each such Request to the extent that it seeks proprietary or confidential information of Centennial.    Further, to the extent that such information is publicly available, it can be obtained directly by Plaintiff.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Centennial objects to Invensys' Definitions and Instructions to the extent that they are inconsistent with or seek to impose obligations upon Centennial that are greater than those set forth in the Federal Rules of Civil Procedure and the Local District Rules.    Accordingly, Centennial will respond to Invensys' First Request in accordance with the Federal Rules of Civil Procedure and the Local District Rules and/or the Orders of the Court.    Centennial's objections to specific Definitions and Instructions are set forth below.

### DEFINITION A

"Plaintiff" and "Invensys" mean Plaintiff Invensys Systems, Inc., formerly known as The Foxboro Company.    "Trans-Sonics" means Trans-Sonics, Inc.

### DEFINITION B

"Defendant," "You," "Your" and "Centennial" means Defendant Centennial Insurance Company.

6

### DEFINITION C

"Affiliate" means any insurance company, insurance services company, or holding company that is a corporate affiliate, corporate subsidiary (direct or indirect), or corporate parent (direct or indirect) of Centennial.

### OBJECTION TO DEFINITION C

*See* Centennial's General Objections, particularly General Objection No. 10. Centennial objects to the definition of "Affiliate" to the extent that it is vague, ambiguous, unduly burdensome, and overbroad, including insofar as it relates to entities that were not involved with the issuance of the policy or the claim that is the subject of this case.

### DEFINITION D

The "Policy" means Centennial Insurance Company Policy No. 42-00 76 30, effective January 1, 1972-1975.

### DEFINITION E

The "Underlying Action" means <u>One Wheeler Road Associates, et al. v. The Foxboro Company</u>, No. 90-12873k (D. Mass).

### DEFINITION F

"Liberty Mutual" means Liberty Mutual Insurance Company.

### DEFINITION G

The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all documents, information or responses that might otherwise be construed outside the scope.

7

### DEFINITION H

"Communication" or "Communicated" refers to the transmittal of information in the form of facts, ideas, inquiries or otherwise.

### DEFINITION I

"Concerning" means relating to, referring to, describing, evidencing or constituting.

### DEFINITION J

"Document" and "documents" shall be given the broadest possible interpretation permitted by Rule 34 and shall include, without limitation, all correspondence, records, tables, charts, graphs, pictures, schedules, appointment books and calendars, diaries, reports, memoranda, notes, letters, telegrams, messages (including reports of telephone conversations and conferences), tapes, recordings, transcriptions, studies, analyses, books, magazines, newspapers, booklets, circulars, bulletins, notices, instructions, minutes and other communications (including inter- and intra-office communications), questionnaires, indexes, data sheets and surveys and other written, recorded, printed, typed, transcribed, taped, electronic, mechanical, photographic, filed, graphic, magnetic or digital matter, or other matter of any kind or nature however produced or reproduced and each copy of any of the foregoing (regardless of origin). "Document" shall also include the file jackets, and any labels thereon, in which responsive documents are contained. If the existence of any document is known to you, but the document is no longer in your possession or control, state what disposition was made of the document and when. A draft or non-identical copy is a separate "document" within the meaning of the terms "document" and "documents."

### OBJECTION TO DEFINITION J

*See* Centennial's General Objections. Centennial further objects to Definition J to the extent that it is overly broad, unduly burdensome, seeks documents and categories of documents

8

that are neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence, and seeks to impose obligations upon Centennial that are greater than those contained in the Federal Rules of Civil Procedure and the Local District Court Rules.

## DEFINITION K

The use of the singular form of any word includes the plural and vice-versa.

## INSTRUCTION L

If you object to any discovery request or a sub-part thereof, state all grounds for the objection. With respect to any objections based on privilege, protection or immunity such as the attorney-client privilege or the attorney-work-product protection, provide a privilege log stating, with respect to which withheld document, (i) the document's author, (ii) all recipients of the document, (iii) all persons who have seen the document, (iv) the date of the document, (v) the type of document, (vi) the subject matter of the document, and (vii) the specific basis for withholding the document.

## OBJECTION TO INSTRUCTION L

*See* Centennial's General Objections. Centennial further objects to Instruction L to the extent that it is overbroad, unduly burdensome, purports to limit Centennial's rights in connection with responding to Invensys' Request and/or seeks to impose obligations upon Centennial which are greater than those contained in the applicable Federal Rules of Civil Procedure and/or the Local District Court Rules. Subject to and without waiving any objection, Centennial will provide Invensys with a privilege log which identifies any document or portion of a document withheld or redacted by Centennial under a claim of privilege within a reasonable time.

9

**INSTRUCTION M**

The fact that the investigation is continuing or that discovery is incomplete shall not excuse your failure to respond to each request as fully as possible. The failure to produce any responsive document shall be deemed a representation that the existence of such document is not known to the responding party, its counsel, or other representatives at the time of service of its response and production of documents.

**OBJECTION TO INSTRUCTION M**

*See* Centennial's General Objections. Centennial further objects to Instruction M to the extent that it is unduly burdensome and purports to limit Centennial's rights in connection with responding to Invensys' Request and/or seeks to impose obligations upon Centennial which are greater than those contained in the applicable Federal Rules of Civil Procedure and/or the Local District Court Rules.

**INSTRUCTION N**

Documents shall be produced within thirty (30) days at the law offices of Gilbert & Renton LLC, 23 Main Street, Andover, Massachusetts 01810.

**OBJECTION TO INSTRUCTION N**

*See* Centennial's General Objections and Preliminary Statement No. 3. Centennial further objects to Instruction N to the extent that it is unduly burdensome and purports to limit Centennial's rights in connection with responding to Invensys' Request and/or seeks to impose obligations upon Centennial which are greater than those contained in the applicable Federal Rules of Civil Procedure and/or the Local District Court Rules.

## RESPONSES TO SPECIFIC REQUESTS

### REQUEST NO. 1

Please produce all insurance policies (or portions thereof) issued by Centennial or any of its affiliates to each of the following entities during any portion of the time period from January 1, 1954 through January 1, 1991:

     a.       Invensys

     b.       The Foxboro Company

     c.       Trans-Sonics, Inc.

     d.       Foxboro/Trans-·Sonics, Inc.

### RESPONSE NO. 1

*See* Centennial's General Objections, particularly Nos. 4, 5, 6, 7, 8, 10, 11.  Centennial further objects to this Request on the grounds that it is overly broad and fails to identify with reasonable particularity the documents or category of documents requested. Centennial further objects on the grounds that this request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the forgoing objections, Centennial responds that the only policy at issue in this case is Policy No. 42-00-7-30 that was issued to Trans-Sonics by Centennial for the period from January 1, 1972 to January 1, 1975 (the "Policy").  Centennial has previously produced a copy of the Policy to Invensys.

### REQUEST NO. 2

Please produce all documents relating to all insurance policies (or portions thereof) issued by Centennial or any of its affiliates to each of the following entities during any portion of the time period from January 1, 1954 through January 1, 1991:

     a.       Invensys

      b.       The Foxboro Company

      c..     Trans-Sonics, Inc.

      d.      Foxboro/Trans-Sonics, Inc.

## RESPONSE NO. 2

*See* Centennial's General Objections, particularly Nos. 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested. Centennial further objects on the grounds that this request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the forgoing objections, Centennial responds that it has previously produced all non-privileged documents relating to the Policy to Invensys.

## REQUEST NO. 3

Please produce all documents relating to the existence, terms, conditions, provisions, endorsements, exclusions and contents of all insurance policies issued by Centennial or any of its affiliates to each of the following entities during any portion of the time period from January 1, 1954 through January 1, 1991:

      a.      Invensys

      b.      The Foxboro Company

      c.      Trans-Sonics, Inc.

      d.      Foxboro/Trans-Sonics, Inc.

## RESPONSE NO. 3

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify

with reasonable particularity the documents or category of documents requested. Centennial further objects on the grounds that this request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the forgoing objections, Centennial responds that it has previously produced all non-privileged documents relating to the Policy to Invensys.

## REQUEST NO. 4

Please produce all documents concerning (a) any requests for policies or information by Invensys or Trans-Sonics to Centennial or any of its affiliates, (b) any notices by Invensys or Trans-Sonics to Centennial or any of its affiliates, (c) any communications by Invensys or Trans-Sonics to Centennial or any of its affiliates, (d) any demands for coverage made by Invensys or Trans-Sonics to Centennial or any of its affiliates) and/or (e) Centennial's (or any of Centennial's affiliates') consideration of and response to any requests, notices, communications or demands. This request is limited to any insurance policy issued to Trans-Sonics or Invensys. It is not limited solely to the Wheeler Road Lawsuit.

## RESPONSE NO. 4

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and oppressive and fails to identify with reasonable particularity the documents or category of documents requested. Centennial further objects on the grounds that this request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Centennial specifically objects to this Request to the extent that it seeks documents pertaining to any claim other than the claim relating to the *Wheeler Road Lawsuit* on the grounds that

13

documents pertaining to other claims are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the forgoing objections, Centennial responds as follows:

a)    Centennial has previously produced all non-privileged documents relating to any requests by Invensys or Trans-Sonics for the Policy or information relating to the Policy.

b)    Centennial has previously produced all non-privileged documents relating to any notices of the *Wheeler Road Lawsuit*.

c)    Centennial has previously produced all non-privileged documents relating to any communications by Invensys or Trans-Sonics to Centennial relating to The *Wheeler Road Lawsuit*.

d)    Centennial has previously produced all non-privileged documents relating to any demands for coverage made by Invensys or Trans-Sonics relating to The *Wheeler Lawsuit*.

e)    Centennial has previously produced all non-privileged documents contained in its claim file relating to Invensys' claim for coverage relating to The *Wheeler Road Lawsuit*.

**REQUEST NO. 5**

Please produce all documents that reference insurance policies for which Centennial or its affiliates cannot find copies, but that may have provided coverage to Invensys or Trans-Sonics.

**RESPONSE NO. 5**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested. Centennial specifically objects to this Request as improper to the extent that it seeks to require Centennial to speculate with respect to the terms of policies that have not been located and that "may" provide

14

coverage for Invensys.  Centennial further objects on the grounds that this request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the forgoing objections, Centennial responds that it has previously produced all non-privileged documents relating to the Policy to Invensys.

**REQUEST NO. 6**

To the extent Centennial contends that the coverage in the Policy is subject to any form of pollution exclusion, please produce all documents concerning (whether or not supporting) such contention.

**RESPONSE NO. 6**

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents requested. Centennial further objects on the grounds that this request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the forgoing objections, Centennial responds that it has previously produced all non-privileged documents relating to the Policy to Invensys.

**REQUEST NO. 7**

To the extent Centennial contends that it received late or insufficient notice of Invensys' claim for coverage in connection with the underlying Lawsuit or any settlement of environmental liabilities in connection with the Wheeler Road site, please produce all documents concerning (whether or not supporting) such contention.

15

**RESPONSE NO. 7**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested, including insofar as it purports to require Centennial to determine what documents may "relate to" a particular contention. Centennial further objects on the grounds that this request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Centennial responds that it has previously produced all non-privileged documents contained in its claim file relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*.

**REQUEST NO. 8**

To the extent Centennial contends that it was prejudiced by any late or insufficient notice, please produce all documents concerning (whether or not supporting) such contention.

**RESPONSE NO. 8**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested, including insofar as it purports to require Centennial to determine what documents may "relate to" a particular contention. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Centennial responses that it has previously produced all non-privileged documents contained in its claim file relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*.

16

**REQUEST NO. 9**

To the extent Centennial contends that Invensys violated any prohibition or limitation on so-called "voluntary payments" in connection with the underlying Lawsuit or any settlement of environmental liabilities in connection with the Wheeler Road site, please produce all documents concerning (whether or not supporting) such contention.

**RESPONSE NO. 9**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested, including insofar as it purports to require Centennial to determine what documents may "relate to" a particular contention. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, Centennial responds that it has previously produced all non-privileged documents contained in its claim file relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*.

**REQUEST NO. 10**

To the extent Centennial contends that it was prejudiced by any so-called "voluntary payment," please produce all documents concerning (whether or not supporting) such contention.

**RESPONSE NO. 10**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested, including insofar as it purports to require Centennial to determine what documents may "relate to" a

17

particular contention.  Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections, Centennial responds that it has previously produced all non-privileged documents contained in its claim file relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*.

## REQUEST NO. 11

Please produce all documents identified in response to Plaintiff's First Set of Interrogatories.

## RESPONSE NO. 11

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections, Centennial states that to the extent that it has identified any specific documents in response to Plaintiff's First Set of Interrogatories that have not otherwise been produced, they will be produced.

## REQUEST NO. 12

Please produce all documents concerning (whether or not supporting) any defense or affirmative defense that Centennial has identified in response to Interrogatory No. 17.

## RESPONSE NO. 12

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify

18

with reasonable particularity the documents or category of documents requested, including insofar as it purports to require Centennial to determine what documents may "relate to" a particular contention. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Centennial responds that it has previously produced all non-privileged documents contained in its claim file relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*. Centennial further states that certain documents concerning its defenses in this matter have been produced by Plaintiff.

## REQUEST NO. 13

Please produce all documents that Centennial intends to introduce at trial or in connection with any summary judgment motions.

## RESPONSE NO. 13

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Centennial responds that it has previously produced all non-privileged documents contained in its claim file relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*. Centennial further states that certain documents that it may seek to introduce at trial or rely upon in connection with a motion for summary judgment have been produced by Plaintiff.

19

**REQUEST NO. 14**

Please produce all documents concerning (whether or not supporting) any issues that Centennial intends to raise at trial or in connection with any summary judgment motions.

**RESPONSE NO. 14**

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested, including insofar as it purports to require Centennial to determine what documents may "relate to" a particular contention. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing objections, Centennial responds that it has previously produced all non-privileged documents contained in its claim file relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*. Centennial further states that certain documents concerning issues that it may raise at trial or in connection with a motion for summary judgment have been produced by Plaintiff.

**REQUEST NO. 15**

For each expert upon which Centennial intends to rely at trial or in connection with summary judgment motions, please produce all documents required to be produced by the Federal Rules of Civil Procedure and the Local Rules of this Court.

**RESPONSE NO. 15**

*See* Centennial's General Objections, particularly Nos. 1-13.  Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested. Centennial

20

further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST NO. 16

Please produce all drafting history (whether consisting of documents created by Centennial, any insurance industry organization or rating bureau, or other third party) and filings with state regulatory officials in New York and in Massachusetts by or on behalf of Centennial or any Affiliate, concerning any forms or endorsements that Centennial contends to be part of the Policy (including but not limited to any clause concerning any form of pollution exclusion, the sections of the Policy that may be entitled "Assistance and Cooperation," "Ultimate Net Loss," "Other Insurance," the "Insured's Duties in the Event of Occurrence, Claim or Suit," "Underlying Insurance," Defense-Settlement," "Retained Limit - Limit of Liability," "Subrogation" and/or "Maintenance of Underlying Insurance."

## RESPONSE NO. 16

*See* Centennial's General Objections, particularly Nos. 1-15. Centennial further objects to this Request on the grounds that it is overly broad, vague, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence.

## REQUEST NO. 17

Please produce the entire underwriting file relating to the Policy.

## RESPONSE NO. 17

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested. Centennial

21

further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Centennial states that it has previously produced all non-privileged documents relating to the Policy to Invensys. No additional "underwriting file" exists.

**REQUEST NO. 18**

Please produce the entire claims file relating to the Underlying Actions or related proceedings and settlements.

**RESPONSE NO. 18**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Centennial states that it has previously produced all non-privileged documents relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*.

**REQUEST NO. 19**

Please produce all documents concerning the manner in which Centennial contends that the amounts sought by Invensys in this action should be allocated between or among Centennial and/or other insurers and/or Invensys.

22

**RESPONSE NO. 19**

*See* Centennial's General Objections, particularly Nos. 1-13. Centennial further objects to this Request on the grounds that it is overly broad, unduly burdensome and fails to identify with reasonable particularity the documents or category of documents requested, including insofar as it purports to require Centennial to determine what documents may "relate to" a particular contention or legal theory. Centennial further objects on the grounds that this Request seeks documents that are neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing objections, Centennial states that it has previously produced all non-privileged documents relating to Invensys' claim for coverage relating to the *Wheeler Road Lawsuit*. Centennial further states that documents which may be responsive to this request have been produced by Plaintiff.

**CENTENNIAL INSURANCE COMPANY,**

By its attorneys,

John T. Harding BBO #221270
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

**CERTIFICATE OF SERVICE**

I, John T. Harding, counsel for Centennial Insurance Company, hereby certify that on September 18, 2006 I served a copy of the foregoing document by first class mail on all counsel of record.

John T. Harding

23

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 33

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

INVENSYS SYSTEMS, INC.,　　　　　　　　　)
　　　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　v.　　　　　　　　　　　　　　　　　)　　　Civ. No. 1:05-CV-11589-WGY
　　　　　　　　　　　　　　　　　　　　　)
CENTENNIAL INSURANCE COMPANY,　　　　)
　　　　　　Defendant.　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)

## AFFIDAVIT OF LEONARD SARAPAS IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Leonard Sarapas, hereby testify and affirm as follows:

1.　　　I am of the age of majority and I make this affidavit freely, voluntarily and based on my own firsthand personal knowledge. I am licensed as a Professional Engineer and a Professional Hydrologist. Since June 2003, I have been the Corporate Director, Environment, Health & Safety for Boston Scientific Corporation. In May 1999, I became the Director of Environmental Affairs for Cabot Corporation. Prior to that time, I operated an environmental consulting firm, Balsam Environmental Consultants, Inc., which in 1994 was acquired by and became part of the international consulting firm, Dames & Moore. I remained at Dames & Moore until assuming my current position at Cabot Corporation.

2.　　　In the course of my 30-year career, I have provided investigative and consulting services in connection with hundreds of sites having soil and/or groundwater contamination, including dozens of sites with groundwater contaminated by solvents such as trichloroethylene (TCE) and tetrachloroethylene (PCE). These solvents-contaminated sites have included sites having significant plumes of contaminated groundwater resulting from relatively small releases of TCE or PCE, e.g., releases on the order of five (5) to fifty-five (55) gallons of solvents.

3.　　　In 1993, I was retained to provide expert consulting services for Defendant Invensys Systems, Inc. (then known as The Foxboro Company) in connection with its defense of a lawsuit alleging that releases of TCE and PCE had resulted in soil and groundwater contamination at and in the vicinity of Invnesys's former Wheeler Road facility in Burlington, Massachusetts, including substantial off-site groundwater contamination. See One Wheeler Road Associates, et al. v. The Foxboro Company, No. 90-12873k (D. Mass. 1990) (the "Wheeler Road Lawsuit"). Over the next six years, I worked closely with Invensys and its attorneys, providing consulting services and advice in connection with the investigation and remediation of the Wheeler Road site. Accordingly, I have extensive personal knowledge of the conditions on the site.

1

EXHIBIT 33

4.     I participated actively in Invensys's defense during the federal trial in the Wheeler Road Lawsuit. Following that trial, Judge Stearns found that "[t]he installation during Foxboro's occupancy of a leaching basin connected to the internal sinks and floor drains of the plant provided the agency for disseminating TCE into the groundwater." See One Wheeler Road Associates v. The Foxboro Company, 1995 U.S. Dist. LEXIS 20219, *33 (D. Mass. December 13, 1995), Conclusions of Fact and Law No. 2. However, Judge Stearns's opinion did not contain any finding concerning *how* TCE was released into either the "internal sinks" or "floor drains" that connected to the plant's drainage system. This absence of any finding concerning *how* solvents were released into the drainage system was consistent with the evidence at trial, since during the trial the underlying plaintiffs did not produce evidence that TCE had ever been intentionally poured by any Foxboro employee into the plant's interior drains. Similarly, at trial the underlying plaintiffs did not produce evidence that any solvents had ever been poured onto the ground.

5.     There was also no evidence introduced at trial that Foxboro intentionally contaminated the soil or groundwater at the site. This was reflected in Jude Stearns' factual finding that "[a]lthough employees were verbally admonished against using the sinks to dispose of chemical wastes, Foxboro had little appreciation of the environmental risk." See Opinion, 1995 U.S. Dist. LEXIS 20219, *8. See also id., *41-42 ("Foxboro's role is mitigated in some degree by the fact that it polluted the site during an era in which the latent environmental threat of toxic substances was not as well understood as it is today, and when such substances were subject to far less regulation. ... Weighing against Foxboro, on the other hand, is the decision to install a wastewater disposal system, the design of which, even by the more casual standards of the time, should have been recognized as irresponsible.").

6.     The soil conditions at and in the vicinity of the plant's leaching basin strongly suggest that the TCE contamination did not result from continuous or repeated discharges of TCE solvents into the plant's drainage system. I base this conclusion on two important factors:

a.     While TCE-contaminated *soil* was found in the area of the leaching basin, the amount of such TCE soil contamination was relatively small and concentrated, which is inconsistent with repeated or continuous discharges over a long period of time. Foxboro conducted operations at the Wheeler Road facility for more than 20 years. If Foxboro had regularly disposed of solvents into the plant's drains, then the amount of *soil* contamination in the area of the leaching basin and site piping would have been far greater and more widespread.

b.     A relatively small release of TCE (on the order of five (5) to fifty-five (55) gallons) can result in a very substantial plume of groundwater contamination like that seen at the Wheeler Road site.

7.     In the course of the Wheeler Road Lawsuit, the underlying plaintiffs attempted to

2

hold Foxboro liable for contamination resulting from two different sudden and accidental breaks in the underground piping. Judge Stearns found that soil under these breaks was contaminated by PCE, and that groundwater under these breaks was contaminated by TCE. Judge Stearns held Foxboro liable for the TCE-contaminated groundwater beneath the pipe breaks.

I, Leonard C. Sarapas, testify under the pains and penalties of perjury that the foregoing is true and correct to the best of my knowledge, this _17_ day of September, 2006.

Leonard C. Sarapas

3

# Boston
# Scientific

**FACSIMILE**

| To: Bob GILBENT | From: |
| --- | --- |
| | Department: Corporate EH&S |
| | Location: |
| Date: | |
| Phone: 475 | Phone: |
| Fax: 978-574-1881 | Fax: 508-647-2337 |

**Number of pages including cover sheet:** 1 of 4

**Message:**

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 34

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INVENSYS SYSTEMS, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 1:05-CV-11589-WGY |
| | ) | |
| CENTENNIAL INSURANCE  COMPANY, | ) | |
| Defendant. | ) | |
| | ) | |

**AFFIDAVIT OF ANTHONY R. FRANCIOSE IN SUPPORT OF
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

I, Anthony R. Franciose, hereby testify and affirm as follows:

**1)**     I am of the age of majority and I make this affidavit freely, voluntarily and based

on my own firsthand personal knowledge.  I am currently employed as Senior Counsel for

Invensys Systems, Inc.  I have served as an in-house attorney for Invensys since 1981.  (At the

time, I worked for The Foxboro Company. The Foxboro Company changed its name to Invensys

Systems, Inc. in 2001. See Exh. 27). I submit this affidavit based on my first-hand personal

knowledge obtained in my duties for Invensys.

**THE *ONE WHEELER ROAD* LAWSUIT**

**2)**     In 1990, Invensys was named as a defendant in a lawsuit alleging that releases of

TCE and PCE had resulted in soil and groundwater contamination at and in the vicinity of

Invensys's former Wheeler Road facility in Burlington, Massachusetts, including substantial off-

site groundwater contamination. See One Wheeler Road Associates, et al. v. The Foxboro

Company, No. 90-12873k (D. Mass. 1990) (the "Wheeler Road Lawsuit").  Over the next ten

years, I worked closely with Invensys's outside counsel to defend the lawsuit, and also worked

1

with Invensys's risk manager, Bruce E. Wilson, to pursue insurance coverage.

3)    Following a bench trial, Judge Stearns ruled that Invensys, the owner and operator of the Wheeler Road facility from 1954 to 1978, was responsible for the releases of TCE contaminating the groundwater in the northeastern area of the site.

4)    Judge Stearns found that Invensys bore some responsibility for soil contamination. Judge Stearns also found that U.S. Windpower (whose liability was born by One Wheeler Road Associates and Gutierrez by dint of their ownership of the property when U.S. Windpower was a tenant) bore primary responsibility for soil contamination.

5)    Judge Stearns also found, based on expert testimony adduced by Invensys, that soil remediation efforts had little impact on groundwater quality and therefore were not properly chargeable to Invensys.

6)    Judge Stearns found that Invensys had established at trial, by a preponderance of the evidence, that the damage to soil was divisible from the damage to groundwater.

7)    Judge Stearns assigned responsibility for 100% of soil remediation costs ($231,563.96) to One Wheeler Road and Gutierrez Associates (by dint of their legal liability for contamination caused by their tenant, U.S. Windpower).

8)    Judge Stearns allocated 100% of groundwater remediation past costs ($187,672.00) and 100% of costs associated with the leaching basin and drainage system ($86,826.00), as well as 100% of future costs for these items, to Invensys.

9)    Judge Stearns allocated 54.25% of Phase I and Phase II response costs ($60,916) to Invensys.

10)    In total, Judge Stearns imposed damages of $335,515 upon Invensys, together

with liability for reasonable attorney's fees and costs and expert witness fees.

**11)**    On April 19, 1996, Judge Stearns issued final judgment imposing $335,515 in

damages, $217,082.79 in interest, $504,249.00 in attorney's fees and costs, and $87,677.00 in

experts' fees and costs -- for a total judgment of $1,144,523.79. One Wheeler Road then moved

for, and obtained, a levy on Invensys's real property. See Exh. 24.

**12)**    Both Invensys and One Wheeler Road/Gutierrez appealed Judge Stearns' ruling.

**13)**    Both Invensys and One Wheeler Road Associates having partly prevailed and

partly lost at trial, the parties to the One Wheeler Road lawsuit agreed in October 1996 to waive

their respective rights of appeal and to abide by the terms of the judgment as entered by Judge

Stearns. On October 8, 1996, Invensys satisfied the judgment by paying the judgment amount

plus accrued interest, for a total payment of $1,187,202.90. See Exh. 25.

**14)**    In addition, the post-judgment resolution required the parties to work together to

remediate soil and groundwater, with the parties' respective obligations formally set forth in a

February 2000 agreement implementing the Court's declaration of rights. See Exh. 26.

(Settlement Agreement and Release).  (I have been unable to locate the signed copy of this

agreement.  However, the referenced copy is the final agreement as executed by the parties and

accurately represents the terms of the signed agreement.)

**15)**    Pursuant to the February 4, 2000 agreement, Invensys has paid a total of

$506,286.34 to date, broken down as follows:

| | |
|---|---|
| Remediation costs (10/93 - 2/99) | $235,123.81 |
| Remediation costs through 2/00) | $102,762.59 |
| Additional remediation payments | $168,399.94 |
| 3/1/99 - 3/15/00 ($41,822.88) | |
| 4/1/00 - 10/14/00 ($14,131.86) | |

3

11/1/00 - 5/31/01 ($20,952.02)
6/1/01 - 5/31/02 ($20,050.55)
6/1/02 - 2/28/03 ($25,515.72)
3/1/03 - 4/30/04 ($15,567.74)
5/1/04 - 8/31/05 ($19,578.79)
9/1/05 - 3/31/06 ($10,780.38)

**Total Remediation Costs (through 8/31/05)         $506,286.34**

See Exh. 26 (agreement); Exh. 35 (record of post-settlement remediation costs paid through

March 31, 2006). (Remediation costs are billed by One Wheeler Road Associates to Invensys

every 6 to 12 months.  The most recent bill was sent in April 2006 and accounted for costs

through March 31, 2006.)

16)     In connection with the underlying One Wheeler Road lawsuit, Invensys incurred

the defense costs through the date of the October 8, 1996 payment of the judgment of

$375,908.28.

17)     Thus, the total loss incurred to date by Invensys (not including interest, expected

future remediation costs, or attorney's fees and costs), through March 31, 2006, is as follows:

Net Attorney's Fees for Defending
Action through 10/8/96 (payment of judgment):          $  375,908.28

Satisfaction of Judgment (4/19/96 Judgment
plus post-judgment interest and costs
through 10/8/96 date of payment);                     $1,187,202.90

Response costs (including engineers and
consultants, costs incurred under 2/4/00
agreement)                                            $   506,286.34

**TOTAL AMOUNT OF LOSS (TO DATE)          $ 2,069,397.52**

4

**INSURANCE COVERAGE PROVIDED BY LIBERTY MUTUAL**

18)     My duties as an in-house counsel at Invensys have required me to become personally familiar with the general liability insurance coverages available to the company and to work very closely with Invensys's risk manager, Bruce E. Wilson.

19)     For the entire period between December 1974 (when Invensys acquired Trans-Sonics) and 1990 (when the One Wheeler Road lawsuit was filed), Liberty Mutual Insurance Company provided comprehensive general liability insurance coverage to Invensys.

20)     During this entire period (1974-1990), the primary policies issued by Liberty Mutual all contained either a so-called limited pollution exclusion (excluding coverage except in the event of a sudden and accidental pollution release) or, beginning in 1982, a so-called "absolute" pollution exclusion (excluding coverage for a much greater category of pollution releases).

21)     Beginning in 1982, Liberty Mutual began issuing so-called Pollution Legal Liability policies which provided claims-made coverage for pollution releases.  These policies also contained retroactive dates that barred coverage for releases commencing prior to 1982.

22)     At the time the One Wheeler Road lawsuit was filed, neither the risk management department nor the legal department at Invensys was aware of any coverage that had been provided directly to Trans-Sonics prior to the 1974 acquisition by Invensys, nor were we able to locate any documents indicating what coverage might have been issued to Trans-Sonics.

23)     When the One Wheeler Road lawsuit was served on Invensys in late November 1990, immediate notice of the lawsuit was provided to Liberty Mutual Insurance Company, in Liberty's capacity as the insurer of Invensys (at the time known as The Foxboro Company).

5

24)     Shortly thereafter, I had a series of telephone and written communications with claims personnel from Liberty Mutual. Liberty Mutual instructed me to forward the Complaint to the Boston law firm of Cooley, Manion, Moore & Jones, P.C., which I did on December 4, 1990. See Exh. 6. Attorneys at the firm of Cooley, Manion thereafter defended Invensys's interests throughout the trial and post-trial proceedings.

25)     Within approximately three months after receiving notice, Liberty Mutual issued an initial coverage determination on March 20, 1991, stating that it would defend Invensys under a reservation of rights, and stating again that the Cooley, Manion firm had been assigned to defend Invensys's interests. See Exh. 6.

26)     Approximately nine months later, on December 3, 1991, Liberty Mutual sent a letter to me in which it formally denied coverage and withdrew its defense of Invensys in the One Wheeler Road lawsuit. See Exh. 6.

27)     Thereafter, Invensys continued to utilize the services of Cooley, Manion, primarily Louis Massery and a younger partner, William Gillis. I have worked with many outside counsel. It was my view that Mr. Massery and Mr. Gillis were talented, capable and hard-working trial attorneys with knowledge and experience in the defense of environmental claims. I felt very comfortable continuing to utilize them to defend Invensys's interests, notwithstanding the withdrawal of Liberty Mutual from the suit. At no time did I ever regret utilizing these attorneys, and both I and other in-house attorneys at Invensys believed, and continue to believe, that they did a superb job defending Invensys before, during and after trial. Judge Stearns' decision confirms that these attorneys took a very difficult case and successfully reduced Invensys's exposure, including exoneration for any past or future soil cleanup costs.

6

28)    In addition, Invensys authorized its outside counsel to retain an experienced environmental consultant, Leonard Sarapas of the firm of Dames & Moore, to provide expert consulting services in defense of the <u>One Wheeler Road</u> lawsuit.  Invensys was equally pleased with the excellent work provided by Mr. Sarapas and Dames & Moore.

29)    After the <u>One Wheeler Road</u> lawsuit was resolved, Invensys retained outside counsel, Robert J. Gilbert, to pursue both defense and indemnity coverage from Liberty Mutual, *qua* Invensys's direct insurer.  In the course of this litigation, in or about early 1999, Mr. Gilbert located a corporate binder from the 1974 Trans-Sonics acquisition that included a schedule of insurance that appeared to have been prepared in connection with the Trans-Sonics merger. <u>See</u> Exh. 5.  The insurance schedule indicated that Liberty Mutual, coincidentally, had been Trans-Sonics' primary comprehensive general liability insurer during the period immediately preceding the 1974 merger.  The schedule also indicated that Centennial Insurance Company had provided excess/umbrella liability insurance to Trans-Sonics that sat directly above the primary coverage from Liberty Mutual.

30)    The insurance schedule was the first and only evidence that Invensys ever located within its own files to indicate which companies provided any liability insurance to Trans-Sonics prior to the 1974 acquisition.  Working off information provided in the insurance schedule, Invensys's outside counsel eventually was able to obtain a copy of the excess policy from Centennial Insurance Company.  The Centennial excess policy in turn provided additional evidence, in its Schedule of Underlying Insurance, to establish the existence and terms of the primary coverage issued to Trans-Sonics by Liberty Mutual. <u>See</u> Exh. 3.

31)    Despite extensive searches by Mr. Wilson, myself and outside counsel, Invensys

7

has been unable to locate evidence of any liability insurance coverage issued to Trans-Sonics for the period preceding 1972.

32)    In 1990, Invensys did not tender defense to Liberty Mutual under the primary policies issued by Liberty Mutual to Trans-Sonics, because Invensys was unaware of the existence of those policies.

33)    After the One Wheeler Road lawsuit resulted in a substantial judgment against Invensys, Invensys filed a coverage lawsuit against Liberty Mutual pursuant to the policies issued to Invensys.  In the course of the coverage lawsuit, Invensys discovered that Liberty Mutual also had issued primary coverage -- probably without any form of pollution exclusion -- to Trans-Sonics prior to the 1974 merger.  Invensys then notified Liberty Mutual that it was also seeking coverage pursuant to the policies issued to Trans-Sonics.

34)    Following several years of litigation activity, Invensys and Liberty Mutual ultimately agreed in March 2000 to settle the coverage lawsuit.  Pursuant to a confidential settlement agreement, Liberty Mutual received a complete release from liability at the Wheeler Road site, in exchange for a payment to Invensys of $1,250,000, allocated as follows: (i) $300,000 for Invensys's attorneys' fees incurred in defending the One Wheeler Road lawsuit, and (ii) $950,000 to indemnity Invensys for a portion of the damages that it had paid and would become obligated to pay.

35)    The settlement agreement between Liberty Mutual and Invensys further provided that the first $300,000 of the indemnity payment would be applied to exhaust the $100,000 per policy limits of the three policies that Liberty Mutual had issued to Trans-Sonics (January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75), which could not be shown to contain a

8

pollution exclusion and therefore provided the clearest source of coverage. The remaining $650,000 was allocated to subsequent Liberty Mutual policies (all containing pollution exclusions) issued to Invensys after the December 1974 merger.

36)     The net effect of the settlement with Liberty Mutual was the complete exhaustion of all primary limits for property damage liability in the periods directly below the Centennial policy.

37)     On June 9, 2000 -- shortly after receiving the settlement check from Liberty Mutual -- Invensys's attorneys tendered a formal written claim for coverage to Centennial. The tender was made at this time, because it was only after the payment by Liberty Mutual that the excess coverage in the Centennial had been triggered by exhaustion of the limits of the underlying primary policies in the 1972, 1973 and 1974 policy years. See Exh. 3, 23.

I, Anthony R. Franciose, testify under the pains and penalties of perjury that the foregoing is true and correct to the best of my knowledge, this 22nd day of September, 2006.

_____
Anthony R. Franciose

9

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 35

# memorandum

*19-889479*

**invensys**

| | |
|---|---|
| **To** | Richard Bates |
| **From** | Steve Sacco |
| **Date** | 4/19/05 |
| **cc** | |
| **Subject** | Non Purchase Order Check Request ($10,780.38) |
| | 200 Wheeler Road, Burlington, MA |

Richard,

Attached please find the annual invoice from The Gutierrez Company for
$10,780.38 related to the remediation at 200 Wheeler Road, Burlington, MA.
Such payments are ~~ ...          ~~ nd provisions of the Settlement
                                     Gutierrez and represent the
                                     nt system costs for the period of

*Scott –*
*Please schedule*
*for payment*
*on 6/7.*                             ctivities/costs are consistent with
                                     lished for Dept. 1747
                                     *ɔₚ0000*

*Thanks,*                            by May 2006. I request a non-
                                     forward the check to me so that

                                     nsion 2-4285.

*Dolores,*
*Invoice next page*
*for this agreement.*     RECEIVED-D1612
*Please set up for*        APR 20 2006
*6/7 payment. Thanks*
*Scott*

                                     035  USA
                                     vensys.com    www.invensys.com

                                                    EXHIBIT 35

# memorandum



**19-489479**

**invensys**

| | |
|---|---|
| **To** | Richard Bates |
| **From** | Steve Sacco |
| **Date** | 4/19/05 |
| **cc** | |
| **Subject** | Non Purchase Order Check Request ($10,780.38) |
| | 200 Wheeler Road, Burlington, MA |

Richard,

Attached please find the annual invoice from The Gutierrez Company for $10,780.38 related to the remediation at 200 Wheeler Road, Burlington, MA. Such payments are required under the terms and provisions of the Settlement Agreement and Release between Foxboro and Gutierrez and represent the allocable share for the annual remedial treatment system costs for the period of Sept 1, 2004 through March 31, 2006.

I have reviewed and approved the invoice. The activities/costs are consistent with our expectations and are within the budget established for Dept. 1747 (Charge/Expense Account ~~271100~~).  *71700/-0P0000*

Under the Settlement Agreement, payment is due by May 2006. I request a non-purchase order check for the amount due. Please forward the check to me so that I can make a copy for our files and send it out.

If you have any questions, please contact me at extension 2-4285.

Thanks,
Steve

RECEIVED-D1012

APR 2 0 2006

---

**Invensys Inc.** 33 Commercial Street  B51-2ZFoxboro Massachusetts  02035  USA
Telephone  +1 508 549 4285   Facsimile +1 508 549 6152   steve.sacco@invensys.com   www.invensys.com



THE GUTIERREZ COMPANY
Burlington Office Park
One Wall Street
Burlington, MA 01803
SM

Phone (781) 272-7000 / Fax: (781) 272-3130

April 11, 2006

*SENT VIA CERTIFIED MAIL: RRR*

Mr. Steven P. Sacco, P.G., LSP
Manager Environmental Projects
Invensys, Inc.
f/k/a The Foxboro Company
33 Commercial Street, B52-S1
Foxboro, Massachusetts 02035

<u>Re</u>    Remedial Treatment System Costs
One Wheeler Road Associates /
The Foxboro Company
200 Wheeler Road
<u>Burlington, Massachusetts</u>

Dear Steve:

We hope all is going well with you at Invensys.

In accordance with the terms and provisions of the *"Settlement Agreement and Release"* executed by and between One Wheeler Road Associates and Invensys, Inc. (f/k/a The Foxboro Company), relating to 200 Wheeler Road, please accept this letter as our *invoice* to Invensys for its allocable share of the remedial treatment system costs incurred by One Wheeler Road Associates relating to the property.

Pursuant to the terms and provisions of said agreement, attached, please find a reconciliation of such costs relating to the remedial process underway at 200 Wheeler Road, for the period commencing *September 1, 2005 through March 31, 2006*, along with supporting documentation, for your files. Based upon at enclosed summary reflecting said remedial treatment system costs, the total amount due from Invensys to One Wheeler Road Associates for the period referenced herein, is $10,780.38. Thus, per Section 9 of said agreement, please remit payment in the amount of **$10,780.38**, within sixty (60) days upon receipt of this invoice, made payable and forwarded to:

**"One Wheeler Road Associates"**
c/o The Gutierrez Company, Managing Agent
One Wall Street
Burlington, Massachusetts 01803
<u>Attn:</u>  Property Accountant

Upon your review of this invoice, please do not hesitate to contact me with any questions at (781) 272-7000 ext. 334, or via e-mail at <u>edscioli@gutierrezco.com</u>, which ever you prefer.

Very truly yours,

THE GUTIERREZ COMPANY

Edward M. Scioli
Project Manager

<u>Copies to:</u>    William D. Gillis, Esq., Massery & Gillis, LLP
James W. Prendergast, Esq., Hale & Dorr
Jeffrey A. Nangle, Nangle Consulting Associates

ONE WHEELER ROAD ASSOC. L.P.
21E COSTS  (EXCEPT LEGAL & LITIGATION)

03/31/2006

| | | PERIOD | CHK # | DATE PAID | AMOUNT |
|---|---|---|---|---|---|
| 1 | NANGLE CONSULTING | 08/16/05-08/31/05 | 6034 | 10/05/2005 | $672.50 |
| 2 | " | 09/16/05-09/30/05 | 6096 | 11/04/2005 | 355.00 |
| 3 | " | 10/01/05-10/15/05 | 6123 | 11/17/2005 | 602.40 |
| 4 | " | 10/16/05-10/31/05 | 6149 | 12/08/2005 | 1,161.89 |
| 5 | " | 11/01/05-11/30/05 | 6200 | 01/09/2006 | 542.50 |
| 6 | " | 10/01/05-11/30/05 | 6200 | 01/09/2006 | 578.00 |
| 7 | " | 12/01/05-12/15/05 | 6210 | 01/12/2006 | 251.25 |
| 8 | " | 01/01/06-01/31/06 | 6297 | 03/08/2006 | 383.75 |
| 9 | WINDHAM ENVIRONMENTAL | 08/25/05-03/07/06 | 6341 | 03/31/2006 | 5,139.09 |
| 10 | " | 07/01/05-02/28/06 | 6342 | 03/31/2006 | 1,328.00 |

TOTAL "21E":
(EXCEPT LEGAL &LITIGATION)

$11,014.38
===========

| Item | Period | Check # | Date Paid | Description | Cost Alloc. Category | Total |
|---|---|---|---|---|---|---|
| **NANGLE CONSULTING ASSOC. (NCA)** | | | | | | |
| 1 | 08/16/05-08/31/05 | 6034 | 10/05/2005 | Consulting services: MCP regulatory compliance - Tier 1 Permit | 8a | $672.50 |
| 2 | 09/16/05-09/30/05 | 6096 | 11/04/2005 | Consulting services: update groundwater quality | 8b | 355.00 |
| 3 | 10/01/05-10/15/05 | 6123 | 11/17/2005 | Consulting services: MCP regulatory compliance - Tier 1 Permit | 8a | 602.40 |
| 4 | 10/16/05-10/31/05 | 6149 | 12/08/2005 | Consulting services: update groundwater quality | 8b | 1,161.89 |
| 5 | 11/01/05-11/30/05 | 6200 | 01/09/2006 | Consulting services: MCP regulatory compliance - Tier 1 Permit | 8a | 542.50 |
| 6 | 10/01/05-11/30/05 | 6200 | 01/09/2006 | Consulting services: update groundwater quality | 8b | 578.00 |
| 7 | 12/01/05-12/15/05 | 6210 | 01/12/2006 | Consulting services: update groundwater quality | 8b | 251.25 |
| 8 | 01/01/06-01/31/06 | 6297 | 03/08/2006 | Consulting services: update groundwater quality | 8b | 383.75 |
| | Subtotal | | | | | $4,547.29 |
| **WINDHAM ENVIRONMENTAL** | | | | | | |
| 9 | 08/25/05-03/07/06 | 6341 | 03/31/2006 | Semi-Annual Reporting/Equipment Maint./Repairs | 4 | $5,139.09 |
| 10 | 07/01/05-02/28/06 | 6342 | 03/31/2006 | Remediation Syst. Operations/Maint. (07/05 & 02/06) | 2b | 1,328.00 |
| | Subtotal | | | | | $6,467.09 |
| **OTHER** | | | | | | |
| 11 | 09/01/05-03/31/06 | | | Electric Power (09/01/05 - 03/31/06) | 3a | $2,888.18 |
| | Subtotal | | | | | $2,888.18 |
| **TOTAL** | | | | | | $13,902.56 |

## 200 WHEELER ROAD, BURLINGTON, MASSACHUSETTS
### INVOICES PAID THROUGH MARCH 31, 2006
### MARCH 31, 2006

| Item # | Date Paid | Description | Category | Total | Foxboro Percent | Foxboro Amount | Gutierrez Percent | Gutierrez Amount |
|---|---|---|---|---|---|---|---|---|
| **NANGLE CONSULTING ASSOC. (NCA)** | | | | | | | | |
| 1 | 10/05/2005 | Consulting services: MCP regulatory compliance - Tier 1 Permit | 8a | $672.50 | 50% | $336.25 | 50% | $336.25 |
| 2 | 11/04/2005 | Consulting services: update groundwater quality | 8b | 355.00 | 100% | 355.00 | 0% | 0.00 |
| 3 | 11/17/2005 | Consulting services: MCP regulatory compliance - Tier 1 Permit | 8a | 602.40 | 50% | 301.20 | 50% | 301.20 |
| 4 | 12/08/2005 | Consulting services: update groundwater quality | 8b | 1,161.89 | 100% | 1,161.89 | 0% | 0.00 |
| 5 | 01/09/2006 | Consulting services: MCP regulatory compliance - Tier 1 Permit | 8a | 542.50 | 50% | 271.25 | 50% | 271.25 |
| 6 | 01/09/2006 | Consulting services: update groundwater quality | 8b | 578.00 | 100% | 578.00 | 0% | 0.00 |
| 7 | 01/12/2006 | Consulting services: update groundwater quality | 8b | 251.25 | 100% | 251.25 | 0% | 0.00 |
| 8 | 03/08/2006 | Consulting services: update groundwater quality | 8b | 383.75 | 100% | 383.75 | 0% | 0.00 |
| **WINDHAM ENVIRONMENTAL** | | | | | | | | |
| 9 | 03/31/2006 | Semi-Annual Reporting/Equipment Maint./Repairs | 4 | $5,139.09 | NOTE 2 | 5,075.34 | NOTE 2 | 63.75 |
| 10 | 03/31/2006 | Remediation Syst. Operations/Maint. (07/05 & 02/06) | 2b | 1,328.00 | NOTE 1 | 1,200.00 | NOTE 1 | 128.00 |
| **OTHER** | | | | | | | | |
| 11 | | Electric Power (09/01/05 - 03/31/06) | 3a | $2,888.18 | 30% | 866.45 | 70% | 2,021.73 |
| **TOTAL** | | | | $13,902.56 | | $10,780.38 | | $3,122.18 |

INVOICES ALLOCATED BASED ON:
NOTE 1   GROUNDWATER TREATMENT: "100% FOXBORO" UP TO $600.00/MOS.
NOTE 2   SEE NANGLE SUMMARY AND ALLOCATION ATTACHED HERETO

COST ALLOCATION

|  | | Foxboro | Gutierrez |
|---|---|---|---|
| 1a. | Capital costs | | |
| 1b. | Construction | 56% | 44% |
| 1c. | Startup | 15% | 85% |
| 1d. | Startup-alternate method (Of first day) | 50% | 50% |
| | | | |
| 2a. | Operation labor & monitoring for 1st month | 50% | 50% |
| 2b. | Operation labor and monitoring thereafter | $600/mo | Balance |
| | | | |
| 3a. | Power while SVE component is operating | 30% | 70% |
| 3b. | Power after SVE component is shut down | 0% | 100% |
| | | | |
| 4. | Parts | Allocated as identified & incurred | |
| | | | |
| 5a. | Telephone while SVE component is operating | 50% | 50% |
| 5b. | Telephone after SVE component is shut down | 0% | 100% |
| | | | |
| 6. | Deposit Control | 0% | 100% |
| | | | |
| 7. | Waste Disposal | Allocated as identified & incurred | |
| | | | |
| 8a. | MCP Phase IV and all other reports except ground water monitoring | 50% | 50% |
| 8b. | Ground water monitoring | 100% | 0% |



# NANGLE CONSULTING ASSOCIATES, INC.
### Environmental Engineering and Land Use Planning

9/30

RECEIVED
SEP 1 2 2005
BY:

Invoice Number:                              6835
Invoice Date:              Sep 1, 2005
Due Date:                          10/1/05

THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MA   01803

| Hours | Description | Hourly Rate | Total |
|-------|-------------|-------------|-------|
|       | FOR ENVIRONMENTAL CONSULTING SERVICES PERFORMED 0816/05-08/31/05 IN CONJUNCTION WITH REGULATORY COMPLIANCE REQUIREMENTS, INCLUSIVE OF REMEDY OPERATION STATUS REPORT PERTAINING TO WHEELER ROAD, BURLINGTON, MA | | |
| 7.00 | PROJECT MANAGER GENERAL | 75.00 | 525.00 |
| 1.00 | COMPUTER AIDED DRAFTING | 60.00 | 60.00 |
| 2.50 | TECHNICAL TYPIST/EDITOR | 35.00 | 87.50 |

PAID
OCT 5 2005
By___

OK TO PAY 9/12/01
1900/8215  Hazardous Remediation

Subtotal                672.50
Total Invoice Amount    672.50
Payment Received           0.00
TOTAL                  $672.50

Nangle Consulting Associates, Inc.          960 Turnpike Street          Canton, Massachusetts 02021
Telephone (781) 821-0521          Facsimile (781) 821-4182          email: NCA2@mindspring.com

# NANGLE CONSULTING ASSOCIATES, INC.
**Environmental Engineering and Land Use Planning**

| | |
|---|---|
| Invoice Number: | 6875 |
| Invoice Date: | Oct 1, 2005 |
| Due Date: | 10/31/05 |

THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MA 01803

| Hours | Description | Hourly Rate | Total |
|-------|-------------|-------------|-------|
| | FOR ENVIRONMENTAL CONSULTING SERVICES PERFORMED 09/16/05-09/30/05 IN CONJUNCTION WITH GROUNDWATER RECOVERY SYSTEM, WHEELER ROAD, BURLINGTON, MA | | |
| 4.50 | PROJECT MANAGER GENERAL | 75.00 | 337.50 |
| 0.50 | TECHNICAL TYPIST/EDITOR | 35.00 | 17.50 |

PAID
NOV 4 - 2005
By

|  |  |
|---|---|
| Subtotal | 355.00 |
| Total Invoice Amount | 355.00 |
| Payment Received | 0.00 |
| TOTAL | $355.00 |

Nangle Consulting Associates, Inc.     960 Turnpike Street     Canton, Massachusetts 02021
Telephone (781) 821-0521     Facsimile (781) 821-4182     email: NCA2@mindspring.com

# NANGLE CONSULTING ASSOCIATES, INC.
**Environmental Engineering and Land Use Planning**

| | |
|---|---|
| Invoice Number: | 6900 |
| Invoice Date: | Oct 17, 2005 |
| Due Date: | 11/16/05 |

THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MA  01803

| Hours | Description | Hourly Rate | Total |
|---|---|---|---|
| | FOR ENVIRONMENTAL CONSULTING SERVICES PERFORMED 10/01/05-10/15/05 IN CONJUNCTION WITH MCP REGULATORY COMPLIANCE IN CONJUNCTION WITH TREATMENT SYSTEM SHUT DOWN, PIP NOTIFICATION PERTAINING TO WHEELER ROAD, BURLINGTON, MA | | |
| 6.50 | PROJECT MANAGER GENERAL | 75.00 | 487.50 |
| 2.50 | TECHNICAL TYPIST/EDITOR | 35.00 | 87.50 |
| 1.00 | MISCELLANEOUS EXPENSES | 27.40 | 27.40 |

| | |
|---|---|
| Subtotal | 602.40 |
| Total Invoice Amount | 602.40 |
| Payment Received | 0.00 |
| TOTAL | $602.40 |

NOV 17 2005

PAID

BY:

# NANGLE CONSULTING ASSOCIATES, INC.
**Environmental Engineering and Land Use Planning**

12/5

| | |
|---|---|
| Invoice Number: | 6919 |
| Invoice Date: | Nov 1, 2005 |
| Due Date: | 12/1/05 |

THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MA   01803

| Hours | Description | Hourly Rate | Total |
|-------|-------------|-------------|-------|
| | FOR ENVIRONMENTAL CONSULTING SERVICES PERFORMED 10/16/05-10/31/05 IN CONJUNCTION WITH UPDATE OF GROUNDWATER QUALITY PERTAINING TO WHEELER ROAD, BURLINGTON, MA | | |
| 1.00 | SENIOR PROJECT MANAGER | 85.00 | 85.00 |
| 1.00 | PROJECT MANAGER GENERAL | 75.00 | 75.00 |
| 5.00 | ENVIRONMENTAL ENGINEER FIELD | 65.00 | 325.00 |
| 2.00 | PROJECT ENGINEER  GENERAL | 55.00 | 110.00 |
| 2.00 | TECHNICAL TYPIST/EDITOR | 35.00 | 70.00 |
| 1.00 | LABORATORY SERVICES | 496.89 | 496.89 |

OK TO PAY
11/10/05
1900/8215
HAZARDOUS Remediation
#9716

NOV 10 2005

BY: --------------

PAID
DEC - 8 2005
BY 6149

| | |
|---|---|
| Subtotal | 1,161.89 |
| Total Invoice Amount | 1,161.89 |
| Payment Received | 0.00 |
| TOTAL | $1,161.89 |

Nangle Consulting Associates, Inc.        960 Turnpike Street          Canton, Massachusetts 02021
Telephone (781) 821-0521              Facsimile (781) 821-4182          email: NCA2@mindspring.com

# NANGLE CONSULTING ASSOCIATES, INC.
**Environmental Engineering and Land Use Planning**

DEC 1 5 2005

|                    |              |
|--------------------|--------------|
| Invoice Number:    | 6962         |
| Invoice Date:      | Dec 1, 2005  |
| Due Date:          | 12/31/05     |

THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MA   01803

| Hours | Description | Hourly Rate | Total |
|-------|-------------|-------------|-------|
|       | FOR ENVIRONMENTAL CONSULTING SERVICE PERFORMED 11/01/05-11/30/05 IN CONJUNCTION WITH REGULATORY COMPLIANCE REQUIREMENTS, INCLUSIVE OF UPDATE OF GROUNDWATER QUALITY, PERTAINING TO WHEELER ROAD, BURLINGTON, MA | | |
| 7.00 | PROJECT MANAGER GENERAL | 75.00 | 525.00 |
| 0.50 | TECHNICAL TYPIST/EDITOR | 35.00 | 17.50 |

|                       |          |
|-----------------------|----------|
| Subtotal              | 542.50   |
| Total Invoice Amount  | 542.50   |
| Payment Received      | 0.00     |
| TOTAL                 | $542.50  |

| | | |
|---|---|---|
| Nangle Consulting Associates, Inc. | 960 Turnpike Street | Canton, Massachusetts 02021 |
| Telephone (781) 821-0521 | Facsimile (781) 821-4182 | email: NCA2@mindspring.com |

# NANGLE CONSULTING ASSOCIATES, INC.
**Environmental Engineering and Land Use Planning**



RECEIVED
DEC 1 5 2005
BY: - - - - - - - - - - - - - - -

| | |
|---|---|
| Invoice Number: | 6963 |
| Invoice Date: | Dec 1, 2005 |
| Due Date: | 12/31/05 |

THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MA   01803

| Hours | Description | Hourly Rate | Total |
|---|---|---|---|
| | FOR ENVIRONMENTAL CONSULTING SERVICE PERFORMED 10/01/05-11/30/05 IN CONJUNCTION WITH GROUNDWATER TREATMENT SYSTEM PUMP ISSUES PERTAINING TO WHEELER ROAD, BURLINGTON, MA | | |
| 1.00 | SENIOR PROJECT MANAGER | 95.00 | 95.00 |
| 4.50 | PROJECT MANAGER GENERAL | 75.00 | 337.50 |
| 1.50 | PROJECT ENGINEER   GENERAL | 62.00 | 93.00 |
| 1.50 | TECHNICAL TYPIST/EDITOR | 35.00 | 52.50 |

|  |  |
|---|---|
| Subtotal | 578.00 |
| Total Invoice Amount | 578.00 |
| Payment Received | 0.00 |
| TOTAL | $578.00 |

| | | |
|---|---|---|
| Nangle Consulting Associates, Inc. | 960 Turnpike Street | Canton, Massachusetts 02021 |
| Telephone (781) 821-0521 | Facsimile (781) 821-4182 | email: NCA2@mindspring.com |



## NANGLE CONSULTING ASSOCIATES, INC.
### Environmental Engineering and Land Use Planning

|  |  |
|---|---|
| Invoice Number: | 6988 |
| Invoice Date: | Dec 16, 2005 |
| Due Date: | 1/15/06 |

THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MA   01803

| Hours | Description | Hourly Rate | Total |
|---|---|---|---|
| | FOR ENVIRONMENTAL CONSULTING SERVICES PERFORMED 12/01/05-12/15/05 IN CONJUNCTION WITH TREATMENT SYSTEM PUMP EVALUATION PERTAINING TO WHEELER ROAD, BURLINGTON, MA | | |
| 3.00 | PROJECT MANAGER GENERAL | 75.00 | 225.00 |
| 0.75 | TECHNICAL TYPIST/EDITOR | 35.00 | 26.25 |

JAN 12 2006

|  |  |
|---|---|
| Subtotal | 251.25 |
| Total Invoice Amount | 251.25 |
| Payment Received | 0.00 |
| TOTAL | $251.25 |

Nangle Consulting Associates, Inc.          960 Turnpike Street          Canton, Massachusetts 02021
Telephone (781) 821-0521          Facsimile (781) 821-4182          email: NCA2@mindspring.com



NANGLE CONSULTING ASSOCIATES, INC.
**Environmental Engineering and Land Use Planning**

|  |  |
|---|---|
| Invoice Number: | 7031 |
| Invoice Date: | Feb 1, 2006 |
| Due Date: | 3/3/06 |

THE GUTIERREZ COMPANY
BURLINGTON OFFICE PARK
ONE WALL STREET
BURLINGTON, MA  01803

| Hours | Description | Hourly Rate | Total |
|---|---|---|---|
| | FOR ENVIRONMENTAL CONSULTING SERVICES PERFORMED 01/01/31-01/31/06 IN CONJUNCTION WITH TREATMENT SYSTEM PUMP ISSUE PERTAINING TO WHEELER ROAD, BURLINGTON, MA | | |
| 5.00 | PROJECT MANAGER GENERAL | 75.00 | 375.00 |
| 0.25 | TECHNICAL TYPIST/EDITOR | 35.00 | 8.75 |

PAID
MAR 8 - 2006
By

|  |  |
|---|---|
| Subtotal | 383.75 |
| Total Invoice Amount | 383.75 |
| Payment Received | 0.00 |
| TOTAL | $383.75 |

| Nangle Consulting Associates, Inc. | 960 Turnpike Street | Canton, Massachusetts 02021 |
|---|---|---|
| Telephone (781) 821-0521 | Facsimile (781) 821-4182 | email: NCA2@mindspring.com |



# WEC

**Windham Environmental Corporation**

**Invoice #:**   WRA-3-34

**Date:**   March 22, 2006

**Submitted To:**   Ed Scioli
The Gutierrez Company
One Wall Street
Burlington, MA  01803

RECEIVED
MAR 2 7 2006
BY: ------------------

## Time Accounting

| Date | Task | Hours | Staff | Hourly Rate | Charges |
|------|------|-------|-------|-------------|---------|
| 08/25/05 | emergency site visit - pump failure | 7.50 | Principal Engineer | $85.00 | $637.50 |
| 9/7/2005 | pump troubleshooting | 2.5 | Principal Engineer | $85.00 | $212.50 |
| 9/9/2005 | pump troubleshooting, ship pump to supplier | 1.5 | Principal Engineer | $85.00 | $127.50 |
| 09/16/05 | communications with pump supplier and NCA | 1.25 | Principal Engineer | $85.00 | $106.25 |
| 10/19/05 | research pump replacement alternatives | 1.50 | Principal Engineer | $85.00 | $127.50 |
| 10/25/05 | research pump replacement alternatives | 1.50 | Principal Engineer | $85.00 | $127.50 |
| 11/16/05 | research pump replacement alternatives | 1.00 | Principal Engineer | $85.00 | $85.00 |
| 11/17/05 | research pump replacement alternatives | 2.50 | Principal Engineer | $85.00 | $212.50 |
| 11/18/05 | research pump options, communications w/ NCA | 2.25 | Principal Engineer | $85.00 | $191.25 |
| 12/05/05 | communications w/ NCA re alternatives | 0.75 | Principal Engineer | $85.00 | $63.75 |
| 12/06/05 | research pump options - blackhawk pump | 1.00 | Principal Engineer | $85.00 | $85.00 |
| 12/06/05 | research pump options - blackhawk pump | 1.75 | Principal Engineer | $85.00 | $148.75 |
| 01/18/06 | communications w/ NCA re options | 0.50 | Principal Engineer | $85.00 | $42.50 |
| 01/30/06 | purchase pump, reprogram VFD | 2.75 | Principal Engineer | $85.00 | $233.75 |
| 02/06/06 | reinstall pump, restart, recalibrate | 9.25 | Principal Engineer | $85.00 | $786.25 |
| 02/15/06 | follow-up visit to verify system operations | 5.25 | Principal Engineer | $85.00 | $446.25 |
| 03/07/06 | Prepare semi-annual report | 1.50 | Principal Engineer | $85.00 | $127.50 |

|  | Professional Services Total: | 44.25 | | | $3,761.25 |

## Expense Accounting

| Date | Description | Cost |
|------|-------------|------|
| 01/30/06 | recovery pump & shroud | $1,269.24 |
| 02/06/06 | hotel for reinstall & restart | $108.60 |

|  | Expenses Total (invoiced at cost): | $1,377.84 |

### Total Amount of this Invoice:

$1,377.84

$5,139.09

MAR 3 1 2006
6341

OK TO PAY
3/30/06
1,900/8213
Hazardous Remediation



# WEC

**Windham Environmental Corporation**

RECEIVED
MAR 2 7 2006
BY:------------------

## Invoice

**Invoice Number: WRA-3-33**
**Invoice Date: March 22, 2006**

Submitted to:

Ed Scioli
The Gutierrez Company
One Wall Street
Burlington, MA 01803

**Professional Services:**

**Site Visits – Remediation System Operations and Maintenance:**
July 2005 and February 2006 scheduled site visits
With sampling and analysis ($664/ month)                    $ 1328.00

**Amount  Due:**                                            $1328.00

Please Remit to:

Windham Environmental Corporation
550 Vermont Rte. 30, P.O. Box 331
Newfane, VT  05345

Thank you for your patronage!




PAID
MAR 3 1 2006

550 Vermont Rte 30, P.O. Box 331, Newfane, Vermont  05345  Phone: 802-365-7197 Fax: 802-365-4652

NANGLE CONSULTING ASSOCIATES, INC.
Environmental Engineering and Land Use Planning

# Facsimile

| **To:** | Ed Scioli | **From:** | Jim Parker |
|---|---|---|---|
| **Fax:** | 272-3130 | **Pages:** | 2 (including cover sheet) |
| **Date:** | April 10, 2006 | **CC:** | |
| **Re:** | WEC invoices | | |

Ed,

Attached please find a break down of the WEC invoices.  I included both for the sake of completeness.  Let me know if there are any changes you want to make.


Jim

THIS TRANSMITTAL IS INTENDED ONLY FOR THE USE OF THE DESIGNATED RECIPIENT NAMED ABOVE, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE.  IF THE READER OF THIS TRANSMITTAL IS NOT THE INTENDED RECIPIENT, OR DESIGNATED AGENT, REVIEW, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS FAX IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS LISTED BELOW VIA U.S. MAIL. THANK YOU.

This fax is being transmitted from a Canon 330.  If you do not receive all of the pages, or if any part is illegible, please call us at (781) 821-0521/ Fax (781) 781-4182.

Nangle Consulting Associates, Inc.                 960 Turnpike Street                  Canton, Massachusetts 02021
       Telephone (781) 821-0521              Facsimile (781) 821-4182            email: NCA2@mindspring.com

# Memo

| | |
|---|---|
| **To:** | Ed Scioli |
| **From:** | Dave Potenza |
| **CC:** | |
| **Date:** | April 10, 2006 |
| **Re:** | Wheeler Road Water Treatment Shed |

---

The electric usage for the period of 9/1/05 to 3/31/06 is as follows:

1.  Power for the well pumps and blower (4400 watts)

Assumption : 4,,400 watts( connected load) x  212 days x 24 hours x $.1869/kwh x 50 % run time

= $2,092.08

2.  Power for baseboard heat and heat tape (1,740 watts – winter months )

Assumption: 1,740 watts x 136 days x 24 hours x $.1869/khw x 75 % run time = $796.10

Total = $2,888.18

Table 1.0    WEC Invoice Breakdown July 2005 - March 2006

| Description | Cost allocation Category | Total Amount | Foxboro Percent | Foxboro Amount | Gutierrez Percent | Gutierrez Amount |
|---|---|---|---|---|---|---|
| *Invoice WRA-3-33* | | | | | | |
| Item | | | | | | |
| 1 Monthly O&M (2 months) | 2b x 2 months | $1,328.00 | (1200 cap) | $1,200.00 | (balance) | $128.00 |
| | | | | | | |
| *Invoice WRA-3-32* | | | | | | |
| Item | | | | | | |
| 1 Emergency site visit-pump failure | 4 (groundwater) | $637.50 | 100% | $637.50 | 0% | $0.00 |
| 2-4 Troubleshooting,Ship pump to supplier | 4 (groundwater) | $446.25 | 100% | $446.25 | 0% | $0.00 |
| 5-13 Pump replacement evaluation | 4 (groundwater) | $1,083.75 | 100% | $1,083.75 | 0% | $0.00 |
| 14 Purchase pump, reprogram VFD | 4 (groundwater) | $233.75 | 100% | $233.75 | 0% | $0.00 |
| 15 Re-install new pump, calibrate | 4 (groundwater) | $786.25 | 100% | $786.25 | 0% | $0.00 |
| 16 Follow-up visit to verify system oper. | 4 (groundwater) | $446.25 | 100% | $446.25 | 0% | $0.00 |
| 17 Prepare semi-annual report | 8a | $127.50 | 50% | $63.75 | 50% | $63.75 |
| | | | | | | |
| **Direct expenses** | | | | | | |
| Recovery pump and shroud (part) | 4 (groundwater) | $1,258.64 | 100% | $1,258.64 | 0% | $0.00 |
| Hotel for reinstall and restart | 4 (groundwater) | $108.60 | 100% | $108.60 | 0% | $0.00 |
| | | | | | | |
| **Total allocated amount** | | | | Foxboro $6,264.74 | | Gutierrez $191.75 |

INVENSYS SYSTEMS, INC.

MOTION FOR

SUMMARY JUDGMENT

EXHIBIT 36

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INVENSYS SYSTEMS, INC.,    )
              Plaintiff,    )
                            )
         v.                 )        Civ. No. 1:05-CV-11589-WGY
                            )
CENTENNIAL INSURANCE COMPANY,  )
              Defendant.    )
                            )

## AFFIDAVIT OF GENE WAYMON IN SUPPORT OF
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Gene Waymon, hereby testify and affirm as follows:

1)    I am of the age of majority and I make this affidavit freely, voluntarily and based

on my own firsthand personal knowledge. I have been retained by Plaintiff Invensys Systems,

Inc. to provide expert consulting services with respect to claims-handling issues. The testimony

that I am providing pursuant to this affidavit is based upon (1) my experience, training and

knowledge obtained in the course of my 25-plus year career as a liability claims investigator,

claims handler and claims manager, including more than 15 years handling environmental claims

in Massachusetts; (2) my review of the discovery responses submitted on Monday, September 18,

2006 by Defendant Centennial Insurance Company; and (3) my review of additional materials

that were provided to me, including the following:

- The Complaint and Answer in this case.
- Claims correspondence between Invensys's attorneys and Centennial Insurance Company.
- The Centennial excess policy at issue in this case.
- A letter dated March 13, 2006 from Invensys's attorney to Centennial's attorney, setting forth the damages and defense costs incurred by Invensys in the underlying lawsuit, the settlement paid by Liberty Mutual, and the net amount being sought by Invensys in this lawsuit against Centennial.

1

- The decision by Judge Stearns in the underlying environmental lawsuit (One Wheeler Road Associates v. The Foxboro Company), and the underlying Complaint.
- Claims correspondence involving the Liberty Mutual primary coverage issued to Invensys, consisting of letters dated December 4, 1990, March 20, 1991, and December 3, 1991.

2)      As noted, I have been involved in the handling of liability claims for more than 25 years, and the handling of environmental liability claims for more than 15 years. This experience includes the handling of both primary and excess/umbrella claims.

3)      In addition, throughout my career I have worked closely with claims representatives from dozens of other insurance companies. The nature of the claims that I have specialized in -- long-tail environmental and toxic tort claims -- means that most claims implicate policies that stretch over many years, sometimes over many decades. It is not unusual for a single claim to trigger primary and umbrella/excess policies issued by ten or more different insurance companies. Through the experience of working together with claims representatives from other companies, as well as my frequent participation in industry seminars, I have become knowledgeable about industry practices with respect to the investigation and handling of environmental claims under primary and excess/umbrella policies.

4)      There is a substantial difference between the handling of primary claims and the handling of excess/umbrella claims.

5)      When a primary insurer is placed on notice of an environmental claim, substantial attention must be paid to issues such as (a) whether to provide the policyholder with a defense of the underlying claim, (b) what sorts of information to request the policyholder to provide directly in support of the insurer's claims investigation, (c) what sorts of information to attempt to secure

2

through requests to sources other than the policyholder, (d) whether to retain outside

investigators to conduct additional investigations that go beyond the requests for information

being made by in-house claims personnel, (e) detailed analysis of the costs and risks of litigation

and the likely outcome in pretrial motion practice as well as trial and on appeal, and (f) constant

interaction with defense counsel and, where possible, with the policyholder.

6)     By contrast, the handling of an excess liability claim is much less intensive.  In

theory, excess insurers are concerned with many of the same issues that are listed in the

preceding paragraph as being of concern to primary insurers.  In practice, however, excess

insurers devote far fewer resources and take many fewer steps than primary insurers in handling

environmental claims, for numerous reasons.

- First, where there is underlying primary insurance in place, excess insurers typically do not have a duty to provide a defense. Even in situations where the primary insurer has asserted coverage defenses and is refusing to provide a current defense, it has been the uniform practice across the insurance industry for excess/umbrella insurers to refuse to step in to provide a defense to an environmental claim. Absent the complete exhaustion of underlying insurance (or the rare situation where the primary policy has an absolute pollution exclusion but the excess/umbrella policy clearly does not exclude pollution claims), I cannot recall a single instance in which an excess insurer has voluntarily "dropped down" to defend an environmental claim that the primary insurer has refused to defend.

- Second, there is generally not a strong financial incentive for the excess insurer to conduct a searching claims investigation. Except for the larger and more complicated sites, experience in the environmental field has established that it is relatively unusual for environmental claims to penetrate into the excess layer. Even when the excess layer is reached, the costs typically involve *indemnity* (i.e., cleanup costs), rather than *defense*. Experience in the environmental field has established that the defense costs are often substantially greater than the ultimate cost of remediation. And even where defense costs reach into the excess layer, they typically are subsumed under the definition of "ultimate net loss" and have the effect of eroding policy limits, thus capping the excess insurer's liability. Finally, it is very common for excess insurers to reinsure the policies (and for the reinsurers in turn to retrocede (re-reinsure) their assumed risks). Although the existence of reinsurance in theory should not diminish

3

the extent to which an excess insurer investigates and handles a claim, in practice it is the unfortunate (but not surprising) case that excess insurers who have reinsured a substantial amount of their risk simply do not devote as much time or expense to claims-handling. In sum, even when a large claim potentially could reach into the excess layer, the excess insurer's ultimate exposure is often a small fraction of the nominal limit of liability stated in the policy -- and the excess insurer's incentive to expend any significant time or resources on claims investigation and handling is quite small.

- Third, excess insurers have learned that they can "piggyback" on the claims-handling effort of primary insurers. All insurers typically are interested in knowing as much as possible about a claim; but it is expensive to gain this knowledge. Since primary insurers have an immediate claim that clearly has reached their layer of coverage, they have a financial incentive to conduct a thorough claim, to collect relevant information, and to appoint capable defense counsel to protect their policyholders' interests (as well as to limit the potential size of the claim). Excess insurers are aware of all this, and they understand that it makes economic sense simply to make paper requests to their policyholders and to rely on the primary insurers to do thorough investigations and to ensure that the policyholders are adequately represented.

7)    The bottom line is that the handling of environmental claims under a primary policy is an active, searching exercise; whereas the handling of environmental claims under an excess/umbrella policy is passive, reactive, and much less active and rigorous.

8)    I have reviewed the early claims correspondence between Liberty Mutual and Invensys. From that review, it is clear that Liberty Mutual ensured that Invensys was being defeated by capable, experienced defense counsel. Indeed, the Cooley, Manion firm -- which Liberty Mutual retained, and which Invensys continued to utilize after Liberty Mutual withdrew from the defense -- had a well-deserved reputation as one of the outstanding litigation defense firms in Boston.

9)    I also have scrutinized Judge Stearns's decision in this case. It is clear from that decision that Invensys was very well represented at trial, and that both the attorneys and the environmental expert retained by Invensys (Leonard Sarapas, from the well-regarded

4

environmental consulting firm, Dames & Moore) earned a substantial "win" by persuading Judge Stearns to relieve Invensys of any liability for past or future soil contamination costs even though (as Judge Stearns found) Invensys had contributed to the soil contamination.

10) I have scrutinized Centennial's responses to discovery in this case, particularly its responses to Interrogatory Nos. 9, 10, 11, 12 and 13, in which Centennial asserts that it suffered prejudice as a result of (a) late notice from Invensys and (b) voluntary payments supposedly made by Invensys. For purposes of opining whether Centennial in fact has suffered any prejudice, I have been asked to assume that Invensys did not provide notice to Centennial until June 2000 (i.e., after Invensys had paid the final judgment in the One Wheeler Road lawsuit and after it had entered into a settlement agreement with the plaintiffs regarding allocation of post-trial and future remediation costs).[1]

11) My initial opinion is that in its response to Interrogatory Nos. 9 - 13, Centennial has not identified any "actual" or "substantial" prejudice that it suffered as a result of the alleged late notice or the alleged voluntary payments. Instead, the discovery responses simply identify a series of steps that Centennial *might* have taken, but it does not point to any facts or evidence to suggest any reasonable likelihood that the amount of damages or costs incurred by Invensys would have been any different, or that the amount being sought from Centennial would have been any lower. Centennial is simply speculating that things might have turned out differently, but they don't say why or how or what would have happened differently or more favorably if they

---

[1]    I should add that in my opinion, upon receipt of the June 24, 1999 correspondence from Invensys's counsel informing Centennial of pending coverage litigation against the underlying insurer, any responsible excess insurer would have requested detailed information about the nature of the claim. In my view, if in fact Centennial is correct in its assertion that it was never informed orally of the nature of the coverage dispute and the extent of the underlying claim, then it was irresponsible -- and an example of very passive claims

had received earlier notice.

12)    It is also my opinion that Centennial did not suffer any actual or substantial prejudice as a result of the alleged late notice or the alleged voluntary payments. With respect to the alleged late notice, it is clear from the claims correspondence between Centennial and Invensys's counsel that Centennial received answers to the material requests for information that it made. It is also significant that in all of its claims correspondence, including the July 12, 2001 letter in which it denies coverage, Centennial did not cite late notice as a reason for denying the claim, nor did it ever cite any specific type of prejudice that actually suffered as a result of the alleged late notice. At bottom, it is clear to me that Centennial received complete answers to its claims inquiries; that after conducting their inquiry, Centennial's claims personnel had no problem with the manner in which the underlying lawsuit had been defended and ultimately resolved; and that Centennial in no way felt that its position had been worsened by the timing of the notice. And based on my review of all of the materials, I agree: There is no reason to believe that timely notice to Centennial would have changed a single thing about the outcome of this case.

13)    With particular reference to the specific examples of prejudice identified by Centennial in its discovery responses, I have the following opinions:

a.    Centennial was deprived of an opportunity to make a timely investigation of the facts relating to the *Wheeler Road Lawsuit*

Opinion:    Centennial's claims correspondence makes it clear that it received all of the information that it felt was necessary in order to render a claims determination. Centennial fails to identify any information that it needed but was unable to obtain, let alone how it was prejudiced.

---

administration -- for Centennial to have turned a willful blind eye by not requesting more information about the nature of the claim.

b. Centennial was deprived of its contractual right to associate in the defense of the *Wheeler Road Lawsuit*

**Opinion:** This is an absurd contention, for several reasons. First, I am not aware of a single instance in all my years handling excess environmental insurance claims in which an excess insurer has associated in a claim. Second, it would make no sense in this case for Centennial to do so, not only because capable defense counsel had already been appointed by the primary insurer but also because Centennial was not an "umbrella" insurer with a duty to defend but, instead, was an "excess" insurer with no duty to defend. Simply put, no reasonable excess insurer would pay to associate in the defense of a claim for which counsel was already in place and for which it had no independent obligation to defend. Finally, Centennial does not state any facts to indicate that anything would have changed or turned out more favorably if it had associated in the defense. In other words, it cites no "actual" or "substantial" prejudice.

c. Centennial was deprived of an opportunity to explore the issue of whether the *Wheeler Road Lawsuit* could be settled or otherwise resolved without trial

**Opinion:** Centennial fails to cite any facts to indicate that a settlement was possible on terms that could have been even close to as favorable as the partially successful outcome that Invensys achieved at trial. Moreover, I am not aware of a single instance in all my years handling excess environmental insurance claims in which an excess insurer has stepped in to try to settle an environmental claim in which the underlying primary insurer has denied coverage and is not attempting to settle the claim. This contention simply does not represent the reality of how excess insurers behave.

d. Centennial was prejudiced because Trans-Sonics was aware during the course of the *Wheeler Road Lawsuit* that the damages being sought by the plaintiff could be in the range of several million dollars and that its primary insurer, Liberty Mutual Insurance Company, had denied coverage for the claim

**Opinion:** Centennial does not cite any facts or evidence to suggest that things would have turned out differently if it had been informed earlier of this claim. What, exactly, would it have done differently? And how, exactly, would this have changed the outcome. As noted, the case was very well-defended. Moreover, it is noteworthy that Centennial received quite a windfall -- $650,000, to be exact -- by not being involved in the case earlier. Based on my experience in excess claims-handling, if Centennial had been notified (and sued) along with Liberty Mutual, then Centennial would have been

7

called upon to contribute a much larger portion of the costs incurred by Invensys. The reason is that under the applicable allocation rules in Massachusetts, as well as the strict enforcement given to pollution exclusions in Massachusetts, the focus of the settlement between Invensys and its insurers would have been only on those policies providing coverage without any pollution exclusion. This would mean that Liberty Mutual would have been very unlikely to contributed $650,000 under policies with pollution exclusions; instead, both Invensys and Liberty Mutual would have insisted that this amount be "spiked upward" into the ample policy limits of the Centennial policy.

Thus, it is my firm opinion that Centennial actually benefited, to the tune of $650,000, by not being brought into the case until after Liberty Mutual had already settled.

e.  Centennial had no opportunity to participate in the decision to take the *Wheeler Road Lawsuit* to trial, including after Liberty Mutual had withdrawn from the defense of the case

**Opinion:**  This is an absurd contention, for the same reasons given with respect to Centennial's claim that it was denied an opportunity to associate in the defense. (Those reasons are incorporated into this opinion.)

f.  Centennial was prejudiced because a Final Judgment was entered against Trans-Sonics several years before notice of the *Wheeler Road Lawsuit* was provided to Centennial

**Opinion:**  For the same reasons expressed with respect to "d" above, I do not believe that Centennial was prejudiced by the delay. To the contrary, it received a windfall of $650,000 by not being involved until after Liberty Mutual had paid this amount out under policies which (unlike the Centennial policy) had pollution exclusions.

g.  Centennial was deprived of any opportunity to participate in the decision not to appeal the Final Judgment in the *Wheeler Road Lawsuit*

**Opinion:**  Centennial cites no facts or evidence to suggest that the decision not to appeal was a mistake, or that Centennial was hurt by the decision. To the contrary, as a claims-handler I believe that the decision not to appeal was correct, given the difficulty of overturning detailed fact findings and rulings made pursuant to a bench trial. Indeed, an appeal probably would have simply resulted in much higher costs to Centennial, because interest would have continued to accrue and because Invensys easily could have been ordered to pay for some

8

or all of the soil contamination (which Judge Stearns found Invensys to have partially caused).

Moreover, Centennial's claim is disingenuous, given its consistent position that it had no obligation to participate in this claim because everything should have been handled by the primary insurer. Based on my long experience, no excess insurer would have stepped in to oppose the decision not to appeal, particularly where the primary insurer itself was not participating.

h.  Trans-Sonics entered into a binding settlement of the *Wheeler Road Lawsuit* without providing notice of the existence of the suit or the Final Judgment to Centennial

**Opinion:**  I address this further below, in my discussion of the voluntary payments defense (which I incorporate by reference). Briefly, Centennial fails to cite any *prejudice*, that is, how anything would have been different if it had received earlier notice. In addition, this assertion overlooks the fact that Invensys was already subject to a **binding final judgment, and its property had been levied**, at the time the settlement was entered into. There was nothing voluntary about Invensys's actions, nor was there any way in which Centennial was prejudiced by the settlement agreement, which did no more than effectuate the binding declaration of rights entered by Judge Stearns.

i.  Trans-Sonics incurred substantial costs pursuant to the terms of the settlement that it entered into with the plaintiffs in the *Wheeler Road Lawsuit* without providing notice of the existence of the suit, the Final Judgment or the settlement to Centennial

**Opinion:**  My opinion is the same with respect to item "h" above (which I incorporate by reference).

j.  Trans-Sonics did not notify Centennial of the fact that its primary insurer, Liberty Mutual Insurance Company, had denied coverage for the claim

**Opinion:**  Even if Centennial had known that Liberty Mutual was not defending, there is no evidence that anything would have happened differently. I say this for the same reasons given with respect to Centennial's claim that it was denied an opportunity to associate in the defense. (Those reasons are incorporated into this opinion.) Simply put, I am not aware of any excess insurer that would have stepped into this environmental claim and provided a defense that the primary insurer was refusing to provide. That's just not a realistic statement of how excess carriers, in 1991 or now, respond to such situations. Moreover, it is noteworthy that Centennial refuses to say whether it has ever actually done so.

9

k.    Trans-Sonics did not notify Centennial that it was involved in litigation with Liberty Mutual relating to coverage for the *Wheeler Road Lawsuit* until the coverage litigation was on the eve of trial, when it was too late for Centennial to seek to intervene in the coverage action in order to protect its rights against Trans-Sonics and Liberty Mutual

**Opinion:**    Again, Centennial does not identify how it was prejudiced by the supposed inability to intervene. In fact, for reasons previously discussed, by not participating in the case against Liberty Mutual, Centennial actually received a windfall of $650,000 because of the contribution that Liberty Mutual made under policies containing a pollution exclusion.

It is also my opinion that this assertion of prejudice indicates that Centennial turned a willful blind eye to the insurance claim. Whereas it is now claiming all manner of prejudice resulting from late notice, it is clear from my review of the claims correspondence that Centennial behaved very passively even after being alerted on the "eve of trial" (July 1999) that a coverage action was about to be tried against the underlying insurer. In fact, the settlement with Liberty Mutual did not occur until March 2000, which provided Centennial with ample opportunity to get involved. The fact that Centennial behaved so passively during these several months indicates not only that it was not prejudiced by its supposed inability to intervene, but also that it is unlikely that it would have taken any of the other steps that it now claims that it was deprived from taking.

l.    Liberty Mutual issued primary and umbrella insurance policies to Trans-Sonics and/or Invensys that had limits that were more than sufficient to cover all of Trans-Sonics' liabilities (past and future) relating to the *Wheeler Road Lawsuit*. Centennial was prejudiced because Trans-Sonics entered into a settlement agreement with Liberty Mutual that compromised Trans-Sonics' claim against Liberty Mutual for substantially less than the amount of coverage that Liberty Mutual had provided to Trans-Sonics

**Opinion:**    As I have expressed at length already, the settlement with Liberty Mutual did not prejudice Centennial, but instead provided a substantial windfall of $650,000. Given the strict enforcement that Massachusetts courts give to pollution exclusions, it is my opinion as somebody who has participated in the litigation and settlement of many Massachusetts environmental insurance claims that Centennial (which has no pollution exclusion in its policy) is extremely fortunate that Liberty Mutual agreed to pay any money at all under the policies having pollution exclusions.

In any event, Centennial is simply speculating that the settlement with Liberty Mutual would have been more favorable if Centennial had been on notice

10

earlier. But Centennial provides absolutely no facts or evidence to support
this assertion.

In sum, it is my firm opinion based on years of settling multi-insurer disputes
with policyholders, that if Centennial's $5 million excess policy -- with no
pollution exclusion -- had been involved in the Liberty Mutual case, then
Liberty Mutual would have paid less, not more.

14)     With respect to the alleged "voluntary payment," I disagree with Centennial's
assertion that it has been prejudiced. First, it is absurd, from a claims perspective, to construe
any of Invensys's actions as "voluntary." In this case, the insured was vigorously defended at
trial by capable attorneys and a capable expert. The case went to trial, written findings were
made, and a final judgment was entered. A levy was made on Invensys's property. I do not
know of a single reputable claims person who, under these circumstances, would construe the
policyholder's payment of the judgment amount, with interest, as being even remotely
"voluntary" as that term is used in the insurance industry.  Similarly, it is clear from a simple
comparison of Judge Stearns' opinion and final judgment to the February 2000 settlement
agreement, that Invensys did not "voluntarily" agree to do anything in that settlement agreement.
Instead, Invensys was subject to a court order requiring it to take responsibility for specifically
identified remediation costs. Again, I do not know a single reputable claims manager who would
regard the February 2000 settlement agreement as remotely "voluntary."

15)     It is also my opinion that it would be unreasonable to take the position that
Invensys acted voluntarily by paying a judgment rather than exhausting all possible appeals.
Appeals are expensive and risky, especially where (as here) Invensys's property had been levied,
interest costs were accruing. Invensys would be responsible for plaintiffs' attorney's fees on
appeal, and Invensys faced a risk of being ordered by the appellate court to assume some or all

11

responsibility for soil cleanup. Moreover, the Centennial policy does not contain any requirement that the indemnity obligation is conditioned on the exhaustion of all appeals. Rather, the policy promises to pay ultimate net loss that "the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law." See Centennial Policy, Insuring Agreement I. Judge Stearns' order makes it clear that the judgment had "been imposed upon the insured by law," and no reputable claims handler would construe the payment of this judgment as "voluntary."

## EXPERIENCE AND QUALIFICATIONS

16) I am currently employed as Regional Vice President of Enviro-Tox Loss Services, Inc., an company that assists corporate clients in managing claims and litigation involving environmental, toxic, asbestos and other complex long-tail liabilities. I have been involved in the handling of such claims since 1981, when I joined Aetna Life & Casualty as a claims representative. My responsibilities at Aetna increased steadily during the thirteen years that I spent at the company, including substantial responsibility for adjusting, handling, managing and overseeing environmental and other long-tail claims, under both primary and excess policies. At the time Aetna sold its casualty business to Travelers in 1994, I was serving as a Casualty Claim Manager. In 1994, I began working for Commercial Union as an Environmental Claim Consultant, again with responsibility for substantial responsibility for adjusting, handling, managing and overseeing environmental and other long-tail claims, under both primary and excess policies. I continued at Commercial Union and its successor companies through several mergers and name changes, until joining Enviro-Tox Loss Services in 2006. My experience over the last 25 years has included the management of scores of complex coverage litigation cases,

INVENSYS SYSTEMS, INC.

MOTION FOR

SUMMARY JUDGMENT

EXHIBIT 37

FILED
IN CLERK'S OFFICE

Nov 29  4 22 PH '90

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ONE WHEELER ROAD ASSOCIATES and THE GUTIERREZ COMPANY, | ) ) ) | Civil Action No. |
| Plaintiffs, | ) ) | |
| v. | ) ) | COMPLAINT |
| THE FOXBORO COMPANY, | ) ) | |
| Defendant. | ) ) ) | 90 - ᴵᴼᴼᴼᴼK |

90 - 12873K

One Wheeler Road Associates ("Wheeler Road Associates")
and The Gutierrez Company ("Gutierrez"), for their complaint
against The Foxboro Company ("Foxboro"), allege as follows:

THE PARTIES

1.    Plaintiff Wheeler Road Associates is a
Massachusetts limited partnership, with a principal place of
business at One Wall Street, Burlington, Massachusetts.

2.    Plaintiff Gutierrez is the sole general
partner of Wheeler Road Associates.  Gutierrez is a corporation
organized and existing under the laws of Delaware, with a
principal place of business at One Wall Street, Burlington,
Massachusetts.

3.    Upon information and belief, defendant
Foxboro is a corporation organized and existing under the laws

CEN00280

PLAINTIFF'S EXHIBIT
1

of Massachusetts, with a principal place of business in
Foxboro, Massachusetts.  Foxboro is in the business of
manufacturing products for industrial process automation.

### JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction
pursuant to 42 U.S.C. §9601, et. seq. and 28 U.S.C. §§1331 and
2201.  The Court has pendent jurisdiction over all claims
arising under Massachusetts law.

5.    Venue is proper in this District pursuant to
28 U.S.C. §1391(b).

### ALLEGATIONS COMMON TO ALL COUNTS

6.    From August 1954 through December 1978,
Foxboro and/or one or more of Foxboro's predecessor
corporations, including Trans-Sonics, Inc. and Foxboro/Trans-
Sonics, Inc. (the "Predecessor Corporations"), owned a parcel
of land of approximately 9.5 acres located at what is now 160
Wheeler Road, Burlington, Massachusetts.

7.    Upon information and belief, Foxboro and the
Predecessor Corporations operated a plant at the Site (the
"Plant") which manufactured electronic instruments and systems,
and used hazardous substances and materials, including
tetrachloroethylene ("PCE") and trichloroethylene ("TCE"), in
connection with these manufacturing operations.

2.

8.    Upon information and belief, in operating the Plant, Foxboro and the Predecessor Corporations released hazardous substances and materials at the Site, including PCE and TCE.  Upon information and belief, the hazardous substances and materials were released by Foxboro and the Predecessor Corporations from interior sinks at the Plant which discharged through a roof drainage network into an on-site leaching system.

9.    One Wheeler Road Associates purchased the Site in 1982, and has owned the Site since then.  The Plaintiffs have not released any hazardous substances or materials at the Site.

10.    In approximately September 1984, in connection with a storm drain survey performed at the Site, a health agent from the Burlington, Massachusetts Board of Health ("Board of Health") collected liquid samples from the Site.  A laboratory analysis of the samples revealed the presence at the Site of substantial concentrations of hazardous substances and materials believed to be used in connection with the manufacture of electronic instruments and systems, including PCE and TCE.

11.    In a memo dated October 11, 1984, the Board of Health agent reported this finding to the Board of Health. The memo stated that the contamination emanated from the leaching system.  The memo also suggested that Foxboro and the

3.

CEN00282

Predecessor Corporations could be responsible for the contamination.

12.    In response to the Board of Health's finding, the Plaintiffs retained a hydrogeological consulting firm to investigate Site conditions.  In connection with its investigation, the hydrogeological consulting firm collected and analyzed samples from the Site, and prepared a report for submission to the Department of Environmental Quality Engineering ("DEQE").

13.    In November 1985, the DEQE issued a Notice of Responsibility ("NOR") to the Plaintiffs.  The NOR confirmed that a release of hazardous materials had occurred at the Site and that as owners of the Site, the Plaintiffs were potentially responsible for this release.  Through the NOR and subsequent notification, the DEQE, now the Department of Environmental Protection ("DEP"), required the Plaintiffs to complete an environmental assessment of the Site and to undertake appropriate remedial measures to address the conditions identified.

14.    The Plaintiffs have spent and continue to spend substantial sums for assessment and remedial response costs at the Site as required by the DEP.  The Plaintiffs' assessment and remedial activities have included, among other things, analyzing soil and groundwater, excavating and disposing of contaminated sediments from the area of the

4.

CEN00283

## COUNT II

### (Massachusetts Superfund Statute)

21. The Plaintiffs incorporate by reference paragraphs 1 through 20 as if fully set forth herein.

22. Foxboro is a person liable under Mass. G.L. c. 21E, §5 for the release of hazardous materials on the Site.

23. Foxboro's release of hazardous materials has damaged the value of the Site and caused the Plaintiffs to incur, and will continue to cause the Plaintiffs to incur, "response" costs as defined by Mass. G.L. c. 21E.

24. The Plaintiffs' response actions are consistent with the Massachusetts Contingency Plan.

25. By reason of the foregoing, the Plaintiffs are entitled to recover from Foxboro the damage to the value of the Site and their response costs.

## COUNT III

### (Restitution)

26. The Plaintiffs incorporate by reference paragraphs 1 through 25 as if fully set forth herein.

27. Foxboro caused the release of hazardous substances and materials at the Site for which it was responsible.

6.

CEN00284

28. Foxboro owed a duty to the Plaintiffs, the public and the Commonwealth of Massachusetts to investigate and remediate the contamination of the Site.

29. The Plaintiffs have undertaken investigative and remedial measures with respect to the contamination of the Site, and have incurred substantial costs in connection with these investigative and remedial measures. By these actions, the Plaintiffs performed duties owed by Foxboro, and as a result, Foxboro has been unjustly enriched.

30. Foxboro is liable to the Plaintiffs for restitution of the costs they have incurred and may incur in performing Foxboro's duty to investigate and remediate the contamination at the Site.

## COUNT IV

### (Negligence)

31. The Plaintiffs incorporate by reference paragraphs 1 through 30 as if fully set forth herein.

32. Foxboro owed a duty to the Plaintiffs, the public and the Commonwealth of Massachusetts to operate the Plant at the Site in a safe manner and avoid contaminating the Site with hazardous substances and materials.

33. Foxboro breached its duty and caused the Site to become contaminated.

CEN00285

the Site and the cost of their investigative and remedial measures.

## COUNT VI

### (Declaratory Judgment)

41.    The Plaintiffs incorporate by reference paragraphs 1 through 40 as if fully set forth herein.

42.    There is an actual controversy between the Plaintiffs and Foxboro as to their rights and duties concerning the contamination of the Site.

43.    The Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §2201 as to their rights and duties, and, in particular, to a determination that Foxboro is liable to the Plaintiffs:

(a) under 42 U.S.C. §9601, et., seq. and Mass. G.L. c. 21E for all past, present and future costs of assessment, containment, response, remediation, and removal arising from the presence of hazardous substances and materials on the Site; and

(b) for indemnification for any fine, fee, damage award or cost (collectively "Costs") incurred by the Plaintiffs, if said Costs arise from the release of hazardous substances or materials from the Plant onto the Site.

9.

CEN00286

WHEREFORE, the Plaintiffs ask that the Court:

1. Enter a judgment in their favor on Counts I, II, III, IV and V;

2. Award their damages in an amount to be determined at trial;

3. Issue a declaratory judgment determining the parties' rights and responsibilities, concerning the contamination of the Site, as set forth in Count VI;

4. Award them attorneys fees, including the attorneys fees and other legal costs incurred in connection with response to the Board of Health finding and DEQE Notice, interest and costs; and

5. Award them such other relief that the Court finds proper.

PLAINTIFFS DEMAND A TRIAL BY
JURY ON ALL COUNTS SO TRIABLE.

ONE WHEELER ROAD ASSOCIATES and
THE GUTIERREZ COMPANY

By their attorneys,

_Richard A. Johnston_

_David Nalven_

Richard A. Johnston (BBO #253420)
David S. Nalven (BBO #547220)
Hale and Dorr
60 State Street
Boston, Massachusetts 02109
(617) 742-9100

Dated: November 28, 1990

10.

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 38



**DECLARATIONS**

**LIBERTY MUTUAL INSURANCE COMPANY**
Home Office Boston

**COMPREHENSIVE GENERAL LIABILITY POLICY**

| Policy No. | TD Code | Sales Office | Code | Salesman | Code | N/E | 1st Year |
|---|---|---|---|---|---|---|---|
| LG1-112-020738-024 | 23 | Brockton | 166 | Crosby | 6104 | 2 | 55 |

**Item 1.** Named Insured  The Foxboro Company and as per End. #1

Address  Neponset Ave., Foxboro, MA    02 07 38

The named insured is: Individual ☐, Partnership ☐, Corporation ☒, Other ☐ ————

Business of named insured is: Industrial Instrumentation

**Item 2.** Policy Period: From  Mo. 1  Day 1  Year 74  to  Mo. 1  Day 1  Year 75
12:01 A.M., standard time at the address of the named insured as stated herein.

Audit Basis: At Expiration ☒, Annual ☐, Semi-Annual ☐, Quarterly ☐, Monthly ☐, Flat Charge ☐

**Item 3.** The insurance afforded is only with respect to such of the following Coverages as are indicated by specific premium charge or charges. The limit of the company's liability against each such Coverage shall be as stated herein, subject to all the terms of this policy having reference thereto.

| COVERAGES | LIMITS OF LIABILITY | | ADVANCE PREMIUMS |
|---|---|---|---|
| A — BODILY INJURY LIABILITY | $1,000,000 | each occurrence | 17,184. |
| | $1,000,000 | aggregate | |
| B — PROPERTY DAMAGE LIABILITY | $ 500,000 | each occurrence | $10,071. |
| | $ 500,000 | aggregate | |

MINIMUM PREMIUMS:  Bodily Injury Liability $ 500.  Property Damage Liability $500.   TOTAL ADVANCE PREMIUM   $27,255.

**Item 4.** Computation of Premiums

| Classification and Locations | Code No. | Premium Base Sales | Rates Per $1,000 of Sales | | Advance Premiums | |
|---|---|---|---|---|---|---|
| | | | Bodily Injury Liability | Property Damage Liability | Bodily Injury Liability Code 326 ☐  327 ☐ | Property Damage Liability 328 ☒ |
| All operations of the Named Insured | 20050 | 101,748,400 | .186 | .109 | 18,925 | 11,091 |
| Increased Limits Basic Charge | 99901 | Included in Composite Discount | | | 1,741 | 1,020 |

FOX 001332

The policy, including all endorsements issued therewith, is hereby countersigned by _____ Carl P. Deane _____
Authorized Representative

| Work Units | Typed | Periodic Payment | Rating Basis | Audit Basis | Home State | Pol. H.G. | Renewal of | Accounting Entry |
|---|---|---|---|---|---|---|---|---|
| 1- 2 | dm6-10 s | | K ☐ NR ☒ | 1 | MA | S- ☐ | LG1- 023 | Dividend for Exp. Period |

GPO 2846 R1 (1-1-74)  Printed in U.S.A.

# COMPREHENSIVE GENERAL LIABILITY POLICY



## LIBERTY MUTUAL INSURANCE COMPANY
### Home Office: Boston

FOR PROMPT INSURANCE SERVICE — CALL YOUR SERVICE OFFICE

(A mutual insurance company, herein called the company)

THIS POLICY IS CLASSIFIED IN DIVIDEND CLASS I
GENERAL CLASS

●

The named insured is hereby notified that by virtue of this policy he is a member of Liberty Mutual Insurance Company and is entitled to vote either in person or by proxy at any and all meetings of said company.

●

The annual meetings are held at its home office, Boston, Massachusetts, on the second Wednesday of April in each year, at eleven o'clock in the morning.

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof and subject to all of the terms of this policy, agrees with the **named insured** as follows:

## COVERAGE A—BODILY INJURY LIABILITY
## COVERAGE B—PROPERTY DAMAGE LIABILITY

The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of

### Coverage A. bodily injury or
### Coverage B. property damage

to which this policy applies, caused by an **occurrence**, and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

### Exclusions

This policy does not apply:

(a) to liability assumed by the **insured** under any contract or agreement except an **incidental contract**; but this exclusion does not apply to a warranty of fitness or quality of the **named insured's products** or a warranty that work performed by or on behalf of the **named insured** will be done in a workmanlike manner;

(b) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of

(1) any **automobile** or aircraft owned or operated by or rented or loaned to any **insured**, or

(2) any other **automobile** or aircraft operated by any person in the course of his employment by any **insured**;

but this exclusion does not apply to the parking of an **automobile** on premises owned by, rented to or controlled by the **named insured** or the ways immediately adjoining, if such **automobile** is not owned by or rented or loaned to any **insured**;

(c) to **bodily injury** or **property damage** arising out of (1) the ownership, maintenance, operation, use, loading or unloading of any **mobile equipment** while being used in any prearranged or organized racing, speed or demolition contest or in any stunting activity or in practice or preparation for any such contest or activity or (2) the operation or use of any snowmobile or trailer designed for use therewith;

(d) to **bodily injury** or **property damage** arising out of and in the course of the transportation of **mobile equipment** by an **automobile** owned or operated by or rented or loaned to any **insured**;

(e) to **bodily injury** or **property damage** arising out of the ownership, maintenance, operation, use, loading or unloading of

(1) any watercraft owned or operated by or rented or loaned to any **insured**, or

(2) any other watercraft operated by any person in the course of his employment by any **insured**;

but this exclusion does not apply to watercraft while ashore on premises owned by, rented to or controlled by the **named insured**;

(f) to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental;

(g) to **bodily injury** or **property damage** due to war, whether or not declared, civil war, insurrection, rebellion or revolution or to any act or condition incident to any of the foregoing, with respect to

(1) liability assumed by the **insured** under an **incidental contract**, or

(2) expenses for first aid under the Supplementary Payments provision;

(h) to **bodily injury** or **property damage** for which the **insured** or his indemnitee may be held liable

(1) as a person or organization engaged in the business of manufacturing, distributing, selling or serving alcoholic beverages, or

(2) if not so engaged, as an owner or lessor of premises used for such purposes,

if such liability is imposed

(i) by, or because of the violation of, any statute, ordinance or regulation pertaining to the sale, gift, distribution or use of any alcoholic beverage, or

(ii) by reason of the selling, serving or giving of any alcoholic beverage to a minor or to a person under the influence of alcohol or which causes or contributes to the intoxication of any person;

but part (ii) of this exclusion does not apply with respect to liability of the **insured** or his indemnitee as an owner or lessor described in (2) above;

(i) to any obligation for which the **insured** or any carrier as his insurer may be held liable under any workmen's compensation, unemployment compensation or disability benefits law, or under any similar law;

(j) to **bodily injury** to any employee of the **insured** arising out of and in the course of his employment by the **insured** or to any obligation of the **insured** to indemnify another because of damages arising out of such injury; but this exclusion does not apply to liability assumed by the **insured** under an **incidental contract**;

(k) to **property damage** to

(1) property owned or occupied by or rented to the **insured**,

(2) property used by the **insured**, or

(3) property in the care, custody or control of the **insured** or as to which the **insured** is for any purpose exercising physical control;

but parts (2) and (3) of this exclusion do not apply with respect to liability under a written sidetrack agreement and part (3) of this exclusion does not apply with respect to

FOX 001385

INV00309

property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the named insured;

(l) to property damage to premises alienated by the named insured arising out of such premises or any part thereof;

(m) to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

(2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured;

but this exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured;

(n) to property damage to the named insured's products arising out of such products or any part of such products;

(o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith;

(p) to damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or work completed by or for the named insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

## II  SUPPLEMENTARY PAYMENTS

The company will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;

(b) premiums on appeal bonds required in any such suit, premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, and the cost of bail bonds required of the insured because of accident or traffic law violation arising out of the use of any vehicle to which this policy applies, not to exceed $250 per bail bond, but the company shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the insured for first aid to others at the time of an accident, for bodily injury to which this policy applies;

(d) reasonable expenses incurred by the insured at the company's request in assisting the company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

## III  PERSONS INSURED

Each of the following is an insured under this policy to the extent set forth below:

(a) if the named insured is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the named insured with respect to the conduct of such a business;

(b) if the named insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such;

(c) if the named insured is designated in the declarations as other than an individual, partnership or joint venture, the organization so designated and any executive officer, director or stockholder thereof while acting within the scope of his duties as such;

(d) any person (other than an employee of the named insured) or organization while acting as real estate manager for the named insured; and

(e) with respect to the operation, for the purpose of locomotion upon a public highway, of mobile equipment registered under any motor vehicle registration law,

(i) an employee of the named insured while operating such equipment in the course of his employment, or

(ii) any other person while operating with the permission of the named insured any such equipment registered in the name of the named insured and any person or organization legally responsible for such operation, but only if there is no other valid and collectible insurance available, either on a primary or excess basis, to such person or organization;

provided that no person or organization shall be an insured under this paragraph (e) with respect to:

(1) bodily injury to any fellow employee of such person injured in the course of his employment, or

(2) property damage to property owned by, rented to, in charge of or occupied by the named insured or the employer of any person described in subparagraph (ii).

This insurance does not apply to bodily injury or property damage arising out of the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured.

## LIMITS OF LIABILITY  IV

Regardless of the number of (1) insureds under this policy, (2) persons or organizations who sustain bodily injury or property damage, or (3) claims made or suits brought on account of bodily injury or property damage, the company's liability is limited as follows:

Coverage A—The total liability of the company for all damages, including damages for care and loss of services, because of bodily injury sustained by one or more persons as the result of any one occurrence shall not exceed the limit of bodily injury liability stated in the declarations as applicable to "each occurrence."

Subject to the above provision respecting "each occurrence", the total liability of the company for all damages because of (1) all bodily injury included within the completed operations hazard and (2) all bodily injury included within the products hazard shall not exceed the limit of bodily injury liability stated in the declarations as "aggregate";

Coverage B—The total liability of the company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to "each occurrence".

Subject to the above provision respecting "each occurrence", the total liability of the company for all damages because of all property damage to which this coverage applies and described in any of the numbered subparagraphs below shall not exceed the limit of property damage liability stated in the declarations as "aggregate":

(1) all property damage arising out of premises or operations rated on a remuneration basis or contractor's equipment rated on a receipts basis, including property damage for which liability is assumed under any incidental contract relating to such premises or operations, but excluding property damage included in subparagraph (2) below;

(2) all property damage arising out of and occurring in the course of operations performed for the named insured by independent contractors and general supervision thereof by the named insured, including any such property damage for which liability is assumed under any incidental contract relating to such operations, but this subparagraph (2) does not include property damage arising out of maintenance or repairs at premises owned by or rented to the named insured or structural alterations at such premises which do not involve changing the size of or moving buildings or other structures;

(3) all property damage included within the products hazard and all property damage included within the completed operations hazard.

Such aggregate limit shall apply separately to the property damage described in subparagraphs (1), (2) and (3) above, and under subparagraphs (1) and (2), separately with respect to each project away from premises owned by or rented to the named insured.

INV00310

**Coverages A and B**—For the purpose of determining the limit of the company's liability, all **bodily injury** and **property damage** arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

## V POLICY TERRITORY

This policy applies only to **bodily injury** or **property damage** which occurs within the **policy territory.**

## VI DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

"**automobile**" means a land motor vehicle, trailer or semi-trailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include **mobile equipment**;

"**bodily injury**" means bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

"**completed operations hazard**" includes **bodily injury** and **property damage** arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the **named insured.** "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1) when all operations to be performed by or on behalf of the **named insured** under the contract have been completed,

(2) when all operations to be performed by or on behalf of the **named insured** at the site of the operations have been completed, or

(3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include **bodily injury** or **property damage** arising out of

(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,

(b) the existence of tools, uninstalled equipment or abandoned or unused materials, or

(c) operations for which the classification stated in this policy or in the company's manual specifies "including completed operations";

"**elevator**" means any hoisting or lowering device to connect floors or landings, whether or not in service, and all appliances thereof including any car, platform, shaft, hoistway, stairway, runway, power equipment and machinery; but does not include an **automobile** servicing hoist, or a hoist without a platform outside a building if without mechanical power or if not attached to building walls, or a hod or material hoist used in alteration, construction or demolition operations, or an inclined conveyor used exclusively for carrying property or a dumbwaiter used exclusively for carrying property and having a compartment height not exceeding four feet;

"**incidental contract**" means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) **elevator** maintenance agreement;

"**insured**" means any person or organization qualifying as an insured in the "Persons Insured" provision of the applicable insurance coverage. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

"**mobile equipment**" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self-propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the **named insured**, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers and other road construction or repair equipment; air-compressors, pumps and generators, including spraying, welding and building cleaning equipment; and geophysical exploration and well-servicing equipment;

"**named insured**" means the person or organization named in Item 1 of the declarations of this policy;

"**named insured's products**" means goods or products manufactured, sold, handled or distributed by the **named insured** or by others trading under his name, including any container thereof (other than a vehicle), but "**named insured's products**" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

"**occurrence**" means an accident, including continuous or repeated exposure to conditions, which results in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

"**policy territory**" means:

(1) the United States of America, its territories or possessions, or Canada, or

(2) international waters or air space, provided the **bodily injury** or **property damage** does not occur in the course of travel or transportation to or from any other country, state or nation, or

(3) anywhere in the world with respect to damages because of **bodily injury** or **property damage** arising out of a product which was sold for use or consumption within the territory described in paragraph (1) above, provided the original suit for such damages is brought within such territory;

"**products hazard**" includes **bodily injury** and **property damage** arising out of the **named insured's products** or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs away from premises owned by or rented to the **named insured** and after physical possession of such products has been relinquished to others;

"**property damage**" means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an **occurrence** during the policy period.

## VII CONDITIONS

**1 Premium** All premiums for this policy shall be computed in accordance with the company's rules, rates, rating plans, premiums and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the close of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period the earned premium shall be computed for such period and, upon notice thereof to the **named insured**, shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the company shall return to the **named insured** the unearned portion paid by the **named insured.**

The **named insured** shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the company at the end of the policy period and at such times during the policy period as the company may direct.

**2 Inspection and Audit** The company shall be permitted but not obligated to inspect the **named insured's** property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the **named insured** or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule or regulation.

FOX 001387

INV00311

The company may examine and audit the **named insured's** books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

**3** **Financial Responsibility Laws** When this policy is certified as proof of financial responsibility for the future under the provisions of any motor vehicle financial responsibility law, such insurance as is afforded by this policy for **bodily injury** liability or for **property damage** liability shall comply with the provisions of such law to the extent of the coverage and limits of liability required by such law. The **insured** agrees to reimburse the company for any payment made by the company which it would not have been obligated to make under the terms of this policy except for the agreement contained in this paragraph.

**4** **Insured's Duties in the Event of Occurrence, Claim or Suit**

(a) In the event of an **occurrence**, written notice containing particulars sufficient to identify the **insured** and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the **insured** to the company or any of its authorized agents as soon as practicable.

(b) If claim is made or suit is brought against the **insured**, the **insured** shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.

(c) The **insured** shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of injury or damage with respect to which insurance is afforded under this policy; and the **insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

**5** **Action Against Company** No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured**, the claimant and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the **insured** to determine the **insured's** liability, nor shall the company be impleaded by the **insured** or his legal representative. Bankruptcy or insolvency of the **insured** or of the **insured's** estate shall not relieve the company of any of its obligations hereunder.

**6** **Other Insurance** The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the **insured** has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) **Contribution by Equal Shares** If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes

an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) **Contribution by Limits** If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

**7** **Subrogation** In the event of any payment under this policy, the company shall be subrogated to all the **insured's** rights of recovery therefor against any person or organization and the **insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **insured** shall do nothing after loss to prejudice such rights.

**8** **Changes** Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed by the President or a Vice President, and the Secretary or an Assistant Secretary of the company and, if such signatures are facsimile signatures, countersigned by a duly authorized representative of the company.

**9** **Assignment** Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the **named insured** shall die, such insurance as is afforded by this policy shall apply (1) to the **named insured's** legal representative, as the **named insured**, but only while acting within the scope of his duties as such, and (2) with respect to the property of the **named insured**, to the person having proper temporary custody thereof, as **insured**, but only until the appointment and qualification of the legal representative.

**10** **Three Year Policy** If this policy is issued for a period of three years any limit of the company's liability stated in this policy as "aggregate" shall apply separately to each consecutive annual period thereof.

**11** **Cancellation** This policy may be cancelled by the **named insured** by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the **named insured** at the address shown in this policy, written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the **named insured** or by the company shall be equivalent to mailing.

If the **named insured** cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

**12** **Declarations** By acceptance of this policy, the **named insured** agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations and that this policy embodies all agreements existing between himself and the company and any of its agents relating to this insurance.

**13** **Mutual Policy Conditions** This policy is nonassessable. The policyholder is a member of the company and shall participate, to the extent and upon the conditions fixed and determined by the board of directors in accordance with the provisions of law, in the distribution of dividends so fixed and determined.

In witness whereof, the company has caused this policy to be signed by its President and Secretary at Boston, Massachusetts, and countersigned on the declarations page by a duly authorized representative of the company.

*Bruce E. Boorman*
SECRETARY

*Frank L. Farwell*
PRESIDENT

FOX 001388

INV00312

---

THIS ENDORSEMENT APPLIES TO ALL LIABILITY AND MEDICAL PAYMENTS COVER-
AGES AFFORDED BY THIS POLICY, INCLUDING ANY SUCH COVERAGES ADDED BY
ENDORSEMENT EITHER AT INCEPTION OR DURING THE POLICY PERIOD, EXCEPT
UNDER COMPREHENSIVE PERSONAL AND FARMER'S COMPREHENSIVE PERSONAL
INSURANCE.

---

## NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT
### (Broad Form)

It is agreed that:

I. The policy does not apply:

A. Under any Liability Coverage, to bodily injury or property damage

(1) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by
Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Asso-
ciation of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of
liability; or

(2) resulting from the hazardous properties of nuclear material and with respect to which (a) any person or organization is
required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof,
or (b) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of
America, or any agency thereof, under any agreement entered into by the United States of America, or any agency
thereof, with any person or organization.

B. Under any Medical Payments Coverage, or under any Supplementary Payments provision relating to first aid, to expenses
incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the opera-
tion of a nuclear facility by any person or organization.

C. Under any Liability Coverage, to bodily injury or property damage resulting from the hazardous properties of nuclear
material, if

(1) the nuclear material (a) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (b) has been
discharged or dispersed therefrom;

(2) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, trans-
ported or disposed of by or on behalf of an insured; or

(3) the bodily injury or property damage arises out of the furnishing by an insured of services, materials, parts or equipment
in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility
is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only
to property damage to such nuclear facility and any property thereat.

II. As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties;

"nuclear material" means source material, special nuclear material or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act
of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear
reactor;

"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or
organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;

"nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or
utilizing spent fuel, or (3) handling, processing or packaging waste,

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the
total amount of such material in the custody of the insured at the premises where such equipment or device is located
consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250
grams of uranium 235,

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for
such operations;

"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to con-
tain a critical mass of fissionable material;

"property damage" includes all forms of radioactive contamination of property.

NEW YORK—It is further agreed that the provisions of this endorsement are not applicable to any automobile which is subject to the
New York Motor Vehicle Financial Security Act.

LIBERTY MUTUAL INSURANCE COMPANY

*[signature]* Bruce E. Boorman
SECRETARY

*[signature]* Frank L. Farwell
PRESIDENT

A0009
G320
10/1/66

PAGE 5

FOX 001389





FOX 001390

SHORT RATE CANCELATION TABLE

| Days Policy In Force | Per Cent of One Year Premium | Days Policy In Force | Per Cent of One Year Premium |
|---|---|---|---|
| 1 | 5 | 154–156 | 53 |
| 2 | 6 | 157–160 | 54 |
| 3–4 | 7 | 161–164 | 55 |
| 5–6 | 7 | 165–167 | 56 |
| 7–8 | 8 | 168–171 | 57 |
| 9–10 | 9 | 172–175 | 58 |
| 11–12 | 10 | 176–178 (6 mo.) | 59 |
| 13–14 | 11 | 179–182 | 60 |
| 15–16 | 12 | 183–187 | 61 |
| 17–18 | 13 | 188–191 | 62 |
| 19–20 | 14 | 192–196 | 63 |
| 21–22 | 15 | 197–200 | 64 |
| 23–25 | 16 | 201–205 | 65 |
| 26–29 | 17 | 206–209 | 66 |
| 30–32 (1 mo.) | 18 | 210–214 (7 mo.) | 67 |
| 33–36 | 19 | 215–218 | 68 |
| 37–40 | 20 | 219–223 | 69 |
| 41–43 | 21 | 224–228 | 70 |
| 44–47 | 22 | 229–232 | 71 |
| 48–51 | 23 | 233–237 | 72 |
| 52–54 | 24 | 238–241 (8 mo.) | 73 |
| 55–58 | 25 | 242–246 | 74 |
| 59–62 (2 mo.) | 26 | 247–250 | 75 |
| 63–65 | 27 | 251–255 | 76 |
| 66–69 | 28 | 256–260 | 77 |
| 70–73 | 29 | 261–264 | 78 |
| 74–76 | 30 | 265–269 (9 mo.) | 79 |
| 77–80 | 31 | 270–273 | 80 |
| 81–83 | 32 | 274–278 | 81 |
| 84–87 | 33 | 279–282 | 82 |
| 88–91 (3 mo.) | 34 | 283–287 | 83 |
| 92–94 | 35 | 288–291 | 84 |
| 95–98 | 36 | 292–296 | 85 |
| 99–102 | 37 | 297–305 | 86 |
| 103–105 | 38 | 302–305 (10 mo.) | 87 |
| 106–109 | 39 | 306–310 | 88 |
| 110–113 | 40 | 311–314 | 89 |
| 114–116 | 41 | 315–319 | 90 |
| 117–120 | 42 | 320–323 | 91 |
| 121–124 (4 mo.) | 43 | 324–328 | 92 |
| 125–127 | 44 | 329–332 | 93 |
| 128–131 | 45 | 333–337 (11 mo.) | 94 |
| 132–135 | 46 | 338–342 | 95 |
| 136–138 | 47 | 343–346 | 96 |
| 139–142 | 48 | 347–351 | 97 |
| 143–146 | 49 | 352–355 | 98 |
| 147–149 | 50 | 356–360 | 99 |
| 150–153 (5 mo.) | 52 | 361–365 (12 mo.) | 100 |

If the policy has been in effect for twelve months or less, the above table applies. If the policy has been in effect for more than twelve months, the earned premium shall be determined as follows: (1) Determine full annual premium as for a policy written for a term of one year. (2) Deduct such premium from the full policy premium, and on the remainder calculate the pro rata earned premium on the basis of the ratio of the length of time beyond one year the policy has been in effect to the term of the policy beyond one year for which the policy was originally written. (3) Add premium produced in accordance with provisions (1) and (2) to obtain earned premium during period policy has been in effect.

INV00314

# INVENSYS SYSTEMS, INC.

# MOTION FOR

# SUMMARY JUDGMENT

# EXHIBIT 39

## DECLARATIONS



**LIBERTY MUTUAL**

LIBERTY MUTUAL INSURANCE COMPANY • BOSTON

**POLLUTION LIABILITY POLICY**
(THIS IS A CLAIMS-MADE POLICY. PLEASE READ CAREFULLY.)

| ACCOUNT NO. | SUB-ACCT. NO. |
|---|---|
| 02 07 38 | |

| POLICY NO. | TD/CD | SALES OFFICE | CODE | SALES REPRESENTATIVE | CODE | N/R | 1ST YEAR |
|---|---|---|---|---|---|---|---|
| LW1-611-004218-090 | 93/6 | Weston | 102 | Hershey | 8730 | 2 | 82 |

**Item 1. Named Insured**  The Foxboro Company, Foxboro Controles, S.A. and Octek, Inc.
World Headquarters

**Address**  Bristol Park
Foxboro, MA  02035

The named insured is: ☐ Individual,  ☐ Partnership,  ☒ Corporation,  ☐ Joint Venture.

☐ Other

**Item 2. Policy Period:** From

| | Mo. | Day | Year | | Mo. | Day | Year |
|---|---|---|---|---|---|---|---|
| From | 1 | 1 | 90 | to | 1 | 1 | 91 |

12:01 A.M., standard time at the address of the named insured as stated herein.

**Item 3.** Retroactive Date:

**Item 4.** Address and Description of Insured Site:

See Endorsement No. 1

**Item 5.** EPA Identification Number ( if applicable):

**Item 6.**  Limits of Liability:

$ 3,000,000    aggregate
$ 1,000,000    each pollution incident

**Item 7.** Deductible Amount:  275,000.

This reduces the Limit of Liability shown as applicable to "each pollution incident".

**Item 8.** Computation of Premium Schedule — If no entry appears herein, the declarations are completed on an accompanying schedule

| EXPOSURE BASIS | CODE NO. | ESTIMATED ANNUAL EXPOSURE | RATE | ESTIMATED ANNUAL PREMIUM (301) |
|---|---|---|---|---|
| Flat Charge | 90000 | | | $  92,600. |

| Minimum Premium | Flat Charge | ADVANCE Premium $ | 92,600. |
|---|---|---|---|

Audit Basis: ☐ At Expiration, ☐ Annual, ☐ Semi-Annual, ☐ Quarterly, ☐ Monthly, ☒ Flat Charge

This policy, including all endorsements issued therewith, is hereby countersigned by . . . . . . . . . . . . . . . . . . . . . . . . . .
*N*9N00*                                                                                    "Authorized Representative"

| Loc. Code | Types | Audit Basis | Periodic Payment | Pol. H.G. | Home State | Renewal of |
|---|---|---|---|---|---|---|
| 6 | sh 4/11 | 0 | $ | ☐ s | MA | LW1-099 |

GPO 2989

**POLLUTION LIABILITY POLICY**
**THIS POLICY IS NONASSESSABLE.**



**LIBERTY MUTUAL INSURANCE COMPANY • BOSTON**

FOR PROMPT INSURANCE SERVICE — CALL YOUR SERVICE OFFICE

**THIS POLICY IS CLASSIFIED IN**
**DIVIDEND CLASS I**
**GENERAL CLASS**
•

The named insured is hereby notified that by virtue of this policy he is a member of Liberty Mutual Insurance Company and is entitled to vote either in person or by proxy at any and all meetings of said company.
•

The annual meetings are held at its home office, Boston, Massachusetts, on the third Wednesday of April in each year at ten o'clock in the morning.

(A mutual insurance company, herein called the company)

**THIS IS A CLAIMS MADE POLICY — PLEASE READ CAREFULLY**

In consideration of the payment of the premium, in reliance upon the statements in the declarations made a part hereof, and subject to all terms of this policy, the company agrees with the **named insured** as follows:

**I.    POLLUTION LIABILITY COVERAGE**

A.    The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as compensatory damages because of **bodily injury** or **property damage** to which this insurance applies, provided that:

(1)    such **bodily injury** or **property damage** is caused by a **pollution incident** which commences subsequent to the retroactive date shown in the declarations of this policy; and

(2)    the claim for such damages is first made against the **insured** during the policy period and reported to the company during the policy period or within fifteen days after its termination.

A claim shall be deemed to have been made only when suit is brought or written notice of such claim is received by either the **insured** or the company.

All claims for damages because of **bodily injury** or **property damage** sustained by any one person or organization as a result of any one **pollution incident** shall be deemed to have been made at the time the first of those claims is made.

The company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage**, even if any of the allegations of the suit are groundless, false, or fraudulent. The company may make such investigation and settlement of any claim or suit as it deems expedient. The company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

B.    The company will reimburse the **insured** for reasonable and necessary **clean-up costs** incurred by the **insured** in the discharge of a legal obligation validly imposed through governmental action which is initiated during the policy period, provided that:

(1)    such **clean-up costs** are incurred because of **environmental damage** to which this insurance applies; and

(2)    the **environmental damage** is caused by a **pollution incident** which commences subsequent to the retroactive date shown in the declarations of this policy.

The company shall have the right, but not the duty, to participate at its expense in any proceeding seeking to impose legal obligations because of such **environmental damage**.

The company will also reimburse the **insured** for other **clean-up costs** which the insured incurs, provided that:

(1)    the **clean-up costs** are reasonable and necessary; and

(2)    during the policy period, the company grants the **insured** prior written consent to undertake the clean-up. The company will grant its consent when, in its sole discretion, a **pollution incident** which commences subsequent to the retroactive date shown in the declarations of this policy or the threat of a **pollution incident** presents an imminent and substantial danger of **bodily injury**, **property damage**, or **environmental damage** to which this insurance applies.

**EXCLUSIONS**

This insurance does not apply:

(a)    to **bodily injury**, **property damage**, or environmental **damage** which is expected or intended from the standpoint of the **insured**;

(b)    to liability assumed by the **insured** under any contract or agreement, but this exclusion does not apply to liability that the **insured** would have in the absence of such contract or agreement;

(c)    to any obligation for which the **insured** or any carrier as his insurer may be held liable under any workers' compensation, unemployment compensation, or disability benefits law, or under any similar law;

(d)    to **bodily injury** to any employee of the **insured** arising out of and in the course of his employment by the **insured** or to any obligation of the **insured** to indemnify another because of damages arising out of such injury;

(e)    to **property damage** or **environmental damage** to

(1)    an insured **site**, or

(2)    property owned or occupied by or rented to the **insured**, or

(3)    property used by the **insured**, or

(4)    property in the care, custody, or control of the **insured** or as to which the **insured** is for any purpose exercising physical control;

GPO 2988
LW1 (10-81)

(f) to property damage or environmental damage to premises alienated by the named insured arising out of such premises or any part thereof;

(g) to bodily injury, property damage, or environmental damage included within the completed operations hazard or the products hazard, and arising out of an emission, discharge, release, or escape which takes place away from any insured site owned by, rented or loaned to a named insured;

(h) to bodily injury, property damage, or environmental damage arising out of the ownership or operation of any "offshore facility" as defined in the Outer Continental Shelf Lands Act Amendment of 1978 or the Clean Water Act of 1977 as amended 1978, or any "deepwater port" as defined in the Deepwater Port Act of 1974, as amended or as may be amended;

(i) to bodily injury, property damage, or environmental damage arising out of any pollution incident emanating from a site used for the storage, disposal, processing, or treatment of any waste material, if the pollution incident occurs after the site is no longer in active use because of sealing off, abandonment, alienation, or closure, whether or not in compliance with the requirements of any statute, regulation, ordinance, directive, or order promulgated by any governmental body;

(j) to bodily injury, property damage, or environmental damage arising out of the ownership, maintenance, operation, use, loading, or unloading of

  (1) any aircraft, automobile, rolling stock, or watercraft owned or operated by or rented or loaned to any insured, or

  (2) any other aircraft, automobile, rolling stock, or watercraft operated by any person in the course of employment by any insured;

(k) to bodily injury, property damage, or environmental damage arising out of the emission, discharge, release, or escape of drilling fluid, oil, gas, or other fluids from any oil, gas, mineral, water, or geothermal well;

(l) to bodily injury, property damage, or environmental damage arising out of a pollution incident which results from or is directly or indirectly attributable to failure to comply with any applicable statute, regulation, ordinance, directive, or order relating to the protection of the environment and promulgated by any governmental body, provided that failure to comply is a willful or deliberate act or omission of

  (1) the insured, or

  (2) any named insured, or any member, partner, or executive officer thereof;

(m) to bodily injury, property damage, or environmental damage arising out of acid rain;

(n) to environmental damage outside the United States of America, its territories or possessions, Puerto Rico, or Canada;

(o) 1. to bodily injury, property damage, or environmental damage

  (a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

  (b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protec-

tion pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization;

2. under the Supplementary Payments provision relating to first aid, to expenses incurred with respect to bodily injury resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization;

3. to bodily injury, property damage, or environmental damage resulting from the hazardous properties of nuclear material, if

  (a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

  (b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported, or disposed of by or on behalf of an insured; or

  (c) the bodily injury, property damage, or environmental damage arises out of the furnishing by an insured of services, materials, parts, or equipment in connection with the planning, construction, maintenance, operation, or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions, or Canada, this exclusion (c) applies only to property damage to such nuclear facility and any property thereat.

As used in this exclusion:

"hazardous properties" include radioactive, toxic, or explosive properties;

"nuclear material " means source material, special nuclear material, or byproduct material;

"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;

"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;

"waste" means any waste material (a) containing byproduct material other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content, and (b) resulting from the operation by any person or organization of any nuclear facility included under the first two paragraphs of the definition of nuclear facility;

"nuclear facility" means

(a) any nuclear reactor,

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing, or packaging waste,

(c) any equipment or device used for the processing, fabricating, or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

(d) any structure, basin, excavation, premises, or place prepared or used for the storage or disposal of **waste**,

and includes the site on which any of the foregoing is located, all operations conducted on such site, and all premises used for such operations;

"**nuclear reactor**" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material;

"**property damage**" includes all forms of radioactive contamination of property.

## SUPPLEMENTARY PAYMENTS

The company will pay, in addition to the applicable limit of liability:

(a) all expenses incurred by the company, all costs taxed against the **insured** in any suit defended by the company, and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon;

(b) premiums on appeal bonds required in any such suit and premiums on bonds to release attachments in any such suit for an amount not in excess of the applicable limit of liability of this policy, but the company shall have no obligation to apply for or furnish any such bonds;

(c) expenses incurred by the **insured** for first aid to others at the time of any accident, for **bodily injury** to which this policy applies;

(d) reasonable expenses incurred by the **insured** at the company's request in assisting the company in the investigation or defense of any claim or suit, including actual loss of earnings not to exceed $25 per day.

## II. PERSONS INSURED

Each of the following is an **insured** under this policy to the extent set forth below:

(a) if the **named insured** is designated in the declarations as an individual, the person so designated, but only with respect to the conduct of a business of which he is the sole proprietor, and the spouse of the **named insured** with respect to the conduct of such a business;

(b) if the **named insured** is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof, but only with respect to his liability as such;

(c) if the **named insured** is designated in the declarations as other than an individual, partnership, or joint venture, the organization so designated and any executive officer, director, or stockholder thereof while acting within the scope of his duties as such;

(d) any employee of the **named insured**, other than an executive officer, while acting within the scope of his duties as such, but the insurance afforded to such employee does not apply:

(1) to **bodily injury** to (a) another employee of the **named insured** arising out of or in the course of his employment, or (b) the **named insured**, or, if the **named insured** is a partnership or joint venture, any partner or member thereof;

(2) to **property damage** or **environmental damage** to property owned, occupied or used by, rented to, in the care, custody, or control of, or over which physical control is being exercised for any purpose by (a) another employee of the **named insured** or (b) the **named insured**, or, if the **named insured** is a partnership or joint venture, any partner or member thereof.

This insurance does not apply to **bodily injury, property damage,** or **environmental damage** arising out of the conduct of any partnership or joint venture of which the insured is or was a partner or member and which is not designated in this policy as a **named insured.**

## III. LIMITS OF LIABILITY AND DEDUCTIBLE PROVISIONS

Regardless of the number of **insureds** under this policy, the number of claims made or suits brought, or the amount of **clean-up costs** incurred, the company's liability is limited as follows:

(a) The total liability of the company for all damages because of all **bodily injury** and **property damage** to which this insurance applies and all **clean-up costs** incurred because of all **environmental damage** to which this insurance applies shall not exceed the limit of liability stated in the declarations as "aggregate".

(b) Subject to the above provision with respect to "aggregate", the total liability of the company in any one **pollution incident** for all damages because of all **bodily injury** and **property damage** and all clean-up costs incurred because of all **environmental damage** shall not exceed the lesser of:

(1) the limit of liability stated in the declarations as "each **pollution incident**" reduced by the deductible amount, if any, shown therein, or

(2) the combined amount of such damages and **clean-up costs** in excess of any such deductible amount.

The company may, or will if required by law, pay part or all of the deductible amount to effect settlement of any claim or suit; and upon notification of the action taken, the **named insured** shall promptly reimburse the company for such part of the deductible amount as has been paid by the company.

## IV. POLICY TERRITORY

This insurance applies only to **bodily injury, property damage,** or **environmental damage** caused by a **pollution incident** emanating from an insured **site** in the United States of America, its territories or possessions, Puerto Rico, or Canada, but not to any such **bodily injury** or **property damage** for which original suit for damages is brought elsewhere.

## V. EXTENDED REPORTING PERIOD OPTION

If, for any reason other than non-payment of premium, the company cancels or refuses to renew this policy, the **named insured** may:

(1) by giving written notice to the company on or before the effective date of the cancellation, or no later than ten days after the effective date of non-renewal; and

(2) by paying promptly when due an additional premium of not more than 50% of the annual premium developed under this policy,

have an endorsement issued providing an extended reporting period of one year following the effective date of the cancellation or non-renewal. Any claims for damages because of **bodily**

injury or property damage first made against the insured and reported to the company during that extended reporting period shall be deemed to be so made and reported during the policy period, but only if the bodily injury or property damage occurred prior to the effective date of the cancellation or non-renewal. All other provisions of this policy, including those relating to the company's limit of liability, shall be unchanged by this provision.

For the purpose of this provision, failure of the company to offer to renew this policy at the same rates or with the same form shall not constitute cancellation or non-renewal by the company.

## VI. DEFINITIONS

When used in this policy (including endorsements forming a part hereof):

"automobile" means a land motor vehicle, trailer, or semitrailer designed for travel on public roads (including any machinery or apparatus attached thereto), but does not include mobile equipment;

"bodily injury" means bodily injury, sickness, or disease sustained by any person, including death at any time resulting therefrom;

"clean-up costs" means expenses for the removal or neutralization of contaminants, irritants, or pollutants;

"completed operations hazard" includes bodily injury, property damage, and environmental damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury, property damage, or environmental damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured.

"Operations" include materials, parts, or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:

(1)  when all operations to be performed by or on behalf of the named insured under the contract have been completed, or

(2)  when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or

(3)  when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

Operations which may require further service or maintenance work, or correction, repair, or replacement because of any defect or deficiency, but which are otherwise complete, shall be deemed completed.

The completed operations hazard does not include bodily injury, property damage, or environmental damage arising out of:

(1)  operations in connection with the transportation of property unless the bodily injury, property damage, or environmental damage arises out of a condition in or on a vehicle created by the loading or unloading thereof, or

(2)  the existence of tools, uninstalled equipment, or abandoned or unused materials;

"environmental damage" means the injurious presence in or upon land, the atmosphere, or any watercourse or body of water of solid, liquid, gaseous, or thermal contaminants, irritants, or pollutants;

"insured" means any person or organization qualifying as an insured in the "Persons Insured" provision of this policy. The insurance afforded applies separately to each insured against whom claim is made or suit is brought, except with respect to the limits of the company's liability;

"insured site" means

(1)  the specific location or part thereof specified as such in the declarations of this policy, or

(2)  any site to which waste materials were legally consigned or delivered by a named insured for storage, disposal, processing, or treatment, provided that the site

(a)  is not and was never owned by, operated by, rented or loaned to a named insured; and

(b)  was duly authorized for such storage, disposal, processing, or treatment under a permit issued by state or federal authority and in force at the time of all such consignment or delivery.

The coverage with respect to an "insured site" under part (2) of this definition shall be excess insurance over any other valid and collectible insurance available to the insured;

"mobile equipment" means a land vehicle (including any machinery or apparatus attached thereto), whether or not self propelled, (1) not subject to motor vehicle registration, or (2) maintained for use exclusively on premises owned by or rented to the named insured, including the ways immediately adjoining, or (3) designed for use principally off public roads, or (4) designed or maintained for the sole purpose of affording mobility to equipment of the following types forming an integral part of or permanently attached to such vehicle: power cranes, shovels, loaders, diggers, and drills; concrete mixers (other than the mix-in-transit type); graders, scrapers, rollers, and other road construction or repair equipment; air-compressors, pumps, and generators, including spraying, welding, and building cleaning equipment; and geophysical exploration and well servicing equipment;

"named insured" means the person or organization named in Item 1 of the declarations of this policy;

"named insured's products" means goods or products manufactured, sold, handled, or distributed by the named insured or by others trading under his name, including any container therefor (other than a vehicle); but "named insured's products" shall not include a vending machine or any property other than such container rented to or located for use of others but not sold;

"pollution incident" means emission, discharge, release, or escape of any solid, liquid, gaseous, or thermal contaminants, irritants, or pollutants directly from the insured site into or upon land, the atmosphere, or any watercourse or body of water, provided that such emission, discharge, release, or escape results in environmental damage. The entirety of any sudden or gradual emission, discharge, release, or escape from an insured site shall be deemed to be one "pollution incident";

"products hazard" includes bodily injury, property damage, and environmental damage arising out of the named insured's products or reliance upon representation or warranty made at any time with respect thereto, but only if the bodily injury, property damage, or environmental damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others;

"property damage" means (1) physical injury to, destruction of, or contamination of tangible property, including the loss of use

thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured, destroyed, or contaminated but has been evacuated, withdrawn from use, or rendered inaccessible because of a **pollution incident.**

## VII. CONDITIONS

### 1. PREMIUM

All premiums for this policy shall be computed in accordance with the company's rules, rates, rating plans, premiums, and minimum premiums applicable to the insurance afforded herein.

Premium designated in this policy as "advance premium" is a deposit premium only which shall be credited to the amount of the earned premium due at the end of the policy period. At the end of each period (or part thereof terminating with the end of the policy period) designated in the declarations as the audit period, the earned premium shall be computed for such period and, upon notice thereof to the **named insured,** shall become due and payable. If the total earned premium for the policy period is less than the premium previously paid, the company shall return to the **named insured** the unearned portion paid by the **named insured.**

The **named insured** shall maintain records of such information as is necessary for premium computation, and shall send copies of such records to the company at the end of the policy period and at such times during the policy period as the company may direct.

### 2. INSPECTION AND AUDIT

The company shall be permitted but not obligated to inspect the **named insured's** property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the **named insured** or others, to determine or warrant that such property or operations are safe or healthful, or are in compliance with any law, rule, or regulation.

The company may examine and audit the **named insured's** books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

### 3. ASSISTANCE AND COOPERATION OF INSURED

The **insured** shall give written notice to the company as soon as practicable of:

(1) any claim made against the **insured;** or

(2) any action or proceeding to impose an obligation on the **insured** for **clean-up costs.**

The notice shall identify the **insured** and contain reasonably obtainable information with respect to the time, place, circumstances, and nature of the incident, injury, or damage, including the names and addresses of any persons or organizations sustaining injury or damage and of available witnesses. If a claim is made, a suit is brought, or an action is initiated against the **insured,** the **insured** shall immediately forward to the company every demand, notice, summons, or other process received by the **insured** or the **insured's** representatives.

The **insured** and each of its employees shall cooperate with the company and, upon the company's request, assist in (a) making settlements, (b) the conduct of suits or proceedings, and (c) enforcing any right of contribution or indemnity against any person or organization who may be liable to the **insured** because of injury or damage with respect to which insurance is afforded under this policy; and the **insured,** and any of its members, partners, officers, directors, administrators, stockholders, and employees that the company deems necessary, shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The **insured** shall not, except at the **insured's** own cost, voluntarily make any payment, assume any obligation, or incur any expense.

### 4. ACTION AGAINST COMPANY

No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor until the amount of the **insured's** obligation to pay shall have been finally determined either by judgment against the **insured** after actual trial or by written agreement of the **insured,** the claimant, and the company.

Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. No person or organization shall have any right under this policy to join the company as a party to any action against the **insured** to determine the **insured's** liability, nor shall the company be impleaded by the **insured** or his legal representative. Bankruptcy or insolvency of the **insured** or of the **insured's** estate shall not relieve the company of any of its obligations hereunder.

### 5. OTHER INSURANCE

The insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the **insured** has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess, or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision below:

(a) **Contribution by Equal Shares.** If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid; and, with respect to any amount of loss not so paid, the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

(b) **Contribution by Limits.** If any of such other insurance does not provide for contribution by equal shares, the

GPO 2988
LW1 (10-81)

company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss.

6.  **SUBROGATION**

In the event of any payment under this policy, the company shall be subrogated to all the **insured's** rights of recovery therfor against any person or organization and the **insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **insured** shall do nothing after loss to prejudice such rights.

7.  **CHANGES**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the company from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy.

8.  **ASSIGNMENT**

Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon; if, however, the **named insured** shall die, such insurance as is afforded by this policy shall apply (1) to the **named insured's** legal representative, as the **named insured**, but only while acting within the scope of his duties as such, and (2) with respect to the property of the **named insured**, to the person having proper temporary custody thereof, as **insured**, but only until the appointment and qualification of the legal representative.

9.  **CANCELLATION**

This policy may be cancelled by the **named insured** by mailing to the company written notice stating when thereafter the cancellation shall be effective. This policy may be cancelled by the company by mailing to the **named insured**, at the address shown in this policy, written notice

stating when not less than thirty days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice.

The effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing.

If this policy is issued to comply with any law or regulation which requires notice of cancellation to any governmental body, cancellation may not be effected until the required notice has been provided by the named insured or the company.

If the company cancels, earned premium shall be computed pro rata. If the named insured cancels, the earned premium shall be the pro rata earned premium plus 10% of the pro rata unearned premium. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

10.  **DECLARATIONS**

By acceptance of this policy, the **named insured** agrees that the statements in the declarations are his agreements and representations, that this policy is issued in reliance upon the truth of such representations, and that this policy embodies all agreements existing between himself and the company or any of its agents relating to this insurance.

11.  **SOLE AGENT**

The **insured** first named in Item 1 of the declarations shall act on behalf of all **insureds** with respect to giving and receiving notice of cancellation, accepting any endorsement issued to form a part of this policy, and receiving return premium, if any; and is charged with the responsibility for notifying the company of any changes of members, partners, officers, directors, stockholders, or employees or any other change which might affect the insurance hereunder.

In witness whereof, the company has caused this policy to be signed by its President and its Secretary at Boston, Massachusetts, and countersigned on the declarations page by a duly authorized representative of the company.

_Bruce E. Boorman_
SECRETARY

_Gary L. Countryman_
PRESIDENT