**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| INVENSYS SYSTEMS, INC. )<br>Plaintiff, )<br> )<br>v. )<br> )<br>CENTENNIAL INSURANCE COMPANY, )<br>Defendant. )<br> ) | | CIV. NO: 1:05-CV-11589-WGY |

**DEFENDANT CENTENNIAL INSURANCE COMPANY'S**
**STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1, Defendant Centennial Insurance

Company ("Centennial") hereby submits the following Statement of Undisputed Facts in support

of its Motion for Judgment on all counts and claims of the Complaint.

**STATEMENT OF UNDISPUTED FACTS**

**A.    The *Wheeler Road Lawsuit***

1.      Plaintiff Invensys Systems, Inc., successor-in-interest to Trans-Sonics, Inc.

("Trans-Sonics") operated a manufacturing facility in Burlington, Massachusetts (the "Site")

from approximately 1954 to 1974, at which time the assets of Trans-Sonics were sold to The

Foxboro Company ("Foxboro"). [Ex. 1].

2.      Foxboro continued to operate the facility until 1978, at which time it was sold.

[Ex. 1].

3.      The facility manufactured electronic instruments and systems and used hazardous

materials including PCE and TCE in the process. [Ex. 1].

1

4.    Environmental contamination that allegedly originated from Trans-Sonics' operations was discovered at the Site no later than 1984. [Ex. 1].

5.    The Massachusetts Department of Environmental Quality Engineering (the "DEQE," now the "DEP") issued Notices of Responsibility to Trans-Sonics in 1985. [Ex. 1].

6.    Trans-Sonics and others named were named as potentially responsible parties liable for the contamination at the Site by the DEQE. [Ex. 1].

7.    No notice of the alleged contamination or the fact that the DEQE had issued a Notice of Responsibility to Trans-Sonics was provided to Centennial. [Ex. 1].

8.    In 1990, the current owner of the Trans-Sonics Site brought an action in this Court seeking to recover costs associated with remediating the Site. [Exs. 1, 2].

9.    The complaint sought damages under various federal statutes and for other causes of action. [Exs. 1, 2].

10.    The case was styled as *One Wheeler Road Associates and The Gutierrez Company v. The Foxboro Company*, C.A. No. 90-12873-K, United States District Court (D. Mass.) (the "*Wheeler Road Lawsuit*"). [Ex. 2].

11.    The first notice to Centennial of the *Wheeler Road Lawsuit* was not provided until ***more than nine (9) years later*** in June 2000. [Ex. 3].

12.    By that time, the *Wheeler Road Lawsuit* had proceeded through discovery and trial, resulting in the entry of Findings of Fact, Rulings of Law and a Final Judgment in 1996, some ***four years*** before notice of the claim to Centennial [Exs. 1, 2].

13.    Trans-Sonics was found to be liable for having caused groundwater contamination at the Site, but was not held responsible for soil contamination. [Exs. 1, 2].

2

14.    The Final Judgment against Trans-Sonics was in the amount of $1,144,523.79 and also included a declaration that Trans-Sonics would be responsible for certain ongoing remediation at the Site. [Exs. 1, 2].

15.    The Final Judgment was paid by Trans-Sonics in October 1996, again with absolutely no notice to Centennial or suggestion that Centennial had any liability for the Final Judgment. [Ex. 3].

16.    Trans-Sonics notified its primary insurer, Liberty Mutual Insurance Company ("Liberty Mutual") of the *Wheeler Road Lawsuit* and requested that Liberty Mutual provide a defense. [Ex. 4].

17.    Liberty Mutual issued primary coverage to Trans-Sonics (including Foxboro) for at least the period from 1972 to 1982. [Exs. 6, 7, 8].

18.    The collective limits of liability available to Trans-Sonics for this period were at least $4.8 million. [Exs. 6, 7, 8].

19.    The Liberty Mutual policies required Liberty Mutual to defend suits that were potentially within the scope of coverage and to pay Trans-Sonics' defense costs *in addition to* the limits of liability. [Exs. 6, 7, 9].

20.    The total amount claimed by Invensys is $2,061,250.52. [Ex. 8].

21.    Trans-Sonics purchased separate pollution liability coverage from Liberty Mutual on a "claims made" basis commencing in 1982 and continuing until 1991. [Ex. 7].

22.    The coverage that Trans-Sonics bought for the specific purpose of insuring against liability for pollution had property damage limits of $1 million each year. [Exs. 4, 7].

3

23.    After initially contesting coverage, Liberty Mutual agreed to defend Trans-Sonics (or to reimburse its defense costs) relating to the *Wheeler Road Lawsuit* for some period of time. [Exs. 4, 7, 9].

24.    According to Trans-Sonics, Liberty Mutual subsequently terminated the defense and Trans-Sonics commenced a declaratory judgment action against Liberty Mutual to establish its duty to defend and indemnify Trans-Sonics for the *Wheeler Road Lawsuit*.  [Ex. 4, 7, 9].

25.    After obtaining favorable rulings on Liberty Mutual's defense obligations, Trans-Sonics entered into a settlement with Liberty Mutual under which Liberty Mutual agreed to pay Trans-Sonics the sum of $1,250,000, which was far less than Trans-Sonics' known damages. [Ex. 8].

26.    While Trans-Sonics has refused to produce a copy of the settlement agreement with Liberty Mutual, the settlement agreement apparently allocated $300,000 of the settlement to defense costs and $950,000 to indemnity.  [Ex. 8].

27.    The agreement purported to extinguish Liberty Mutual's obligations under all policies in effect during the period from 1972 to 1982.  [Ex. 8].

28.    Centennial was not advised of the settlement with Liberty Mutual until after it was completed.

29.    While the suit against Liberty Mutual was pending, Trans-Sonics entered into a settlement agreement with the plaintiffs in the *Wheeler Road Lawsuit* in February, 2000. [Ex. 10].

30.    The settlement agreement resolved how ongoing costs of remediation at the Trans-Sonics Site would be allocated.  [Ex. 10].

31.   No notice of this settlement agreement was provided to Centennial until several months after it had been executed. [Ex. 3].

**B.   Notice to Centennial**

32.   Trans-Sonics provided notice of the *Wheeler Road Lawsuit* to Centennial on or about June 9, 2000, when Trans-Sonics forwarded, for the first time, a copy of the Complaint and Final Judgment for the *Wheeler Road Lawsuit*. [Ex. 3].

33.   This notice was some *sixteen years* after the contamination was discovered; *fifteen years* after a Notice of Responsibility was issued to Trans-Sonics; *nine years* after the *Wheeler Road Lawsuit* was commenced; *four years* after the Final Judgment was entered; nearly *four years* after the Final Judgment was paid; and only after Trans-Sonics had entered into settlement agreements with the plaintiffs in the *Wheeler Road Lawsuit* and the primary insurer, Liberty Mutual.

34.   Trans-Sonics demanded that Centennial agree to pay the difference between the amount of the settlement with Liberty Mutual and its claimed past and future costs arising out of the *Wheeler Road Lawsuit*. [Exs. 3, 8].

35.   Centennial issued a reservation of rights with respect to Trans-Sonics' claim on July 12, 2000. [Ex. 11].

36.   After further investigating Trans-Sonics' claim, Centennial denied coverage on July 12, 2001 [Ex. 12].

37.   Trans-Sonics waited nearly another four years to commence this suit.

**C.   The Centennial Policy**

38.   Centennial issued a single excess liability policy to Trans-Sonics that was in effect during the period from January 1, 1972 to January 1, 1975. [Ex. 5].

39.    The Centennial excess policy states that it provides limits of liability in the amount of $5 million per occurrence excess of the underlying Liberty Mutual policy, which had limits of $100,000.[1]  [Ex. 5].

40.    The Centennial policy provides coverage for property damage resulting from an "occurrence." The term "occurrence" is defined as follows:

> The term "Occurrence" wherever used herein shall mean an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.

[Ex. 5].

41.    The definition of "property damage" specifies that the property damage must "occur during the policy period."  [Ex. 5].

42.    The insuring agreement of the Centennial policy states that it only provides coverage for "ultimate net loss," which is defined in the policy as:

> **(10) Ultimate Net Loss** – The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after taking proper deduction for all recoveries and salvages collectible, *but excludes* all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred.  *This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.*

[Ex. 5 (emphases added)].

---

[1] As originally written, the underlying limits were $50,000 and the limits of the excess policy were $2 million.  These limits (including a revised limit of the Liberty Mutual policy) were reflected in an endorsement. [Ex. 5]

6

43.    The Centennial policy also provides certain coverage for defense costs, but only in the limited circumstances where no such coverage is provided by the underlying policy and there is no coverage for defense costs owed by a primary insurer:

> **Defense-Settlement**. With respect to any occurrence not covered by the underlying policy(is) listed in Schedule A hereof or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this insurance except for the amount of retained limit specified in Item (b) of Insuring Agreement IV, the company shall:
>
> (a) defend any suit brought against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; . . .
>
> *This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.*

[Ex. 5 (emphasis added)].

44.    The Centennial policy further provides that it operates as excess insurance to all other "collectible" insurance:

> J. Other Insurance. *If other collectible insurance with any other insurer is available to the insured*, covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. . . .

[Ex. 5 (emphasis added)].

45.    Further, the policy requires immediate notice of a claim or suit and prohibits Trans-Sonics from entering into settlement agreements or making other voluntary payments without Centennial's knowledge or consent:

1022469v1

**Insured's Duties in the Event of Occurrence, Claim or Suit.**

(a)    In the event of an occurrence, which appears reasonably likely to involve such insurance as is afforded by this policy, written notice containing particulars sufficient to identify the insured and also reasonably attainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

**(b)    If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.**

(c)    The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of personal injury or property damage or advertising offense with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. *The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense. . .;*

[Ex. 5 (emphasis added)].

D.    **The Liberty Mutual Policies**

46.    The Liberty Mutual policies that serve as the immediate underlying insurance to the Centennial policy have never been located.  [Exs. 7-9].

47.    Trans-Sonics has represented that Liberty Mutual did not contest in the declaratory judgment action filed by Trans-Sonics that the policies were issued; were standard CGL policies with a duty to defend; and that defense costs were to be paid in addition to limits. [Exs. 7-9].

8

48.    Moreover, Liberty Mutual apparently conceded that it could offer no proof that any of the underlying policies contained a pollution exclusion or that the limits of liability were other than the $100,000 per occurrence referred to in the Centennial policy. [Exs. 7-9].

49.    In addition to these policies, it is not disputed that Liberty Mutual issued a policy to Foxboro that was in effect when Foxboro purchased the assets of Trans-Sonics in 1974. [Exs. 7-9].

50.    This policy provided limits of liability of $500,000 per occurrence. [Exs. 7-9].

51.    Foxboro continued to operate the Trans-Sonics Site through at least 1978 and had policies in effect with Liberty Mutual with annual limits of $500,000 per occurrence. [Exs. 7-9].

52.    Similar policies were purchased by Foxboro from Liberty Mutual for each of the years though 1982. [Exs. 7-9].

53.    Accordingly, the total primary limits available to Trans-Sonics from Liberty Mutual were at least $4.8 million in addition to Liberty Mutual's obligation to pay defense costs.[2] [Ex. 7].

54.    Foxboro purchased separate pollution liability policies from Liberty Mutual commencing in 1982 and continuing through 1991. [Ex. 7].

55.    The Liberty Mutual pollution liability policies had a limit of liability for property damage in the amount of $1 million. [Ex. 7].

---

[2] Foxboro also apparently purchased umbrella excess policies from Liberty Mutual during this period which had annual limits of $10 million.

1022469v1

CENTENNIAL INSURANCE COMPANY,
By its attorneys,


*/s/ John T. Harding*

_____
John T. Harding BBO #221270
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

Dated:  September 22, 2006




## CERTIFICATE OF SERVICE

I hereby certify that this document has been electronically filed, and served upon all counsel of record in compliance with the Fed.R.Civ.P. this 22nd day of September, 2005.



*/s/ John T. Harding*

_____
John T. Harding

10

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INVENSYS SYSTEMS, INC.,   )
      Plaintiff,  )
          )
v.          )  CIV. NO: 1:05-CV-11589-WGY
          )
CENTENNIAL INSURANCE COMPANY, )
      Defendant. )
          )

## DEFENDANT CENTENNIAL INSURANCE COMPANY'S
## LIST OF EXHIBITS TO STATEMENT OF UNDISPUTED FACTS

**Exhibit**  **Document**

1.  Findings of Fact, Rulings of Law and Final Judgment in *One Wheeler Road Assoc. and the Gutierrez Co. v. The Foxboro Co.*, No. 90-12873-RGS, 1995 U.S. Dist. LEXIS 20219 (D. Mass. Dec. 13, 1995) and April 19, 1996

2.  Complaint in *One Wheeler Road Assoc. and the Gutierrez Co. v. The Foxboro Co.*

3.  Letter to Atlantic Mutual dated June 9, 2000

4.  Letters from Liberty Mutual Insurance Co. to The Foxboro Company

5.  Centennial Insurance Policy, No. 462-00-76-30 (1/1/72 to 1/1/75)

6.  Insurance Policy Chart

7.  Letter to Atlantic Mutual dated May 1, 2001

8.  Plaintiff's Response to Defendant's First Set of Interrogatories

9.  Pleadings in *The Foxboro Company v. Liberty Mutual Ins. Co.,* Civil Action No. 97-6184 (Mass. Superior Court)

10.  Settlement Agreement and Release

11.  Letter from Atlantic Mutual Insurance Company dated July 12, 2000

12.  Letter from Atlantic Mutual Insurance Company dated July 12, 2001

**CENTENNIAL INSURANCE COMPANY,**

By its attorneys,

*/s/ John T. Harding*

_____

John T. Harding BBO #221270
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

Dated: September 22, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document has been electronically filed, and served upon all counsel of record in compliance with the Fed. R. Civ. P.. this 22nd day of September, 2006.

*/s/ John T. Harding*

_____

John T. Harding

**EXHIBIT 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 9012873-RGS

ONE WHEELER ROAD ASSOCIATES AND
THE GUTIERREZ COMPANY

v.

THE FOXBORO COMPANY

FINAL JUDGMENT

APRIL 19, 1996

STEARNS, D.J.

This action came on for trial before the court, the Honorable Richard G. Stearns,

District Judge, presiding, and the issues having been duly heard and tried, and orders

and memoranda of decision having been issued on February 7, 1994, December 13,

1995, and April 3, 1996, it is hereby

ORDERED, ADJUDGED, AND DECLARED THAT

1. Under Counts I and II of the Complaint, pursuant to the Order of the Court

(Stearns, J.), dated December 13, 1995, the plaintiffs, One Wheeler Road Associates

and The Gutierrez Company, recover from the defendant, The Foxboro Company, the

sum of $335,515.00 in environmental response costs, with interest thereon in the sum

of $217,082.19 calculated at the rate of 12% per annum from November 28, 1990

to the date of this Final Judgment, as provided by law;

CEN00288

**PLAINTIFF'S EXHIBIT
53**

2. Under Count II of the Complaint, the plaintiffs recover nothing of the defendant to the extent said Count is based upon a claim of property damage pursuant to M.G.L. c. 21E, § 5(a)(iii), which claim was dismissed by Order of the Court (Young, J.), dated February 7, 1994;

3. Under Counts III, IV, and V of the Complaint, having been dismissed by Order of the Court (Young, J.), dated February 7, 1994, the plaintiffs recover nothing of the defendant;

4. Under Count VI of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, as a substantial controversy between the parties of sufficient immediacy exists under 28 U.S.C. § 2201, a declaratory judgment based upon 42 U.S.C. § 9601, et seq. and M.G.L. c. 21E is hereby entered, over which this Court shall retain jurisdiction, holding the defendant liable to the plaintiffs for such reasonable and necessary response costs as have been and will be incurred after October 1993 in the remediation of the groundwater percolating in the soil to the north of the original plant located at the site owned by One Wheeler Road Associates in Burlington, Massachusetts; and

5. Under to M.G.L. c. 21E, § 15, pursuant to the Order of the Court (Stearns, J.), dated April 3, 1996, the plaintiffs recover from the defendant $504,249.00 in attorneys' fees and costs and $87,677.00 in experts' fees and costs.

Dated at Boston, Massachusetts, this 24 day of April, 1996.

Deputy Clerk of Court

---

Post-Judgment interest to date at the rate of 5.46%.

2

1 of 2 DOCUMENTS

**ONE WHEELER ROAD ASSOCIATES AND THE GUTIERREZ COMPANY v. THE FOXBORO COMPANY**

**CIVIL ACTION NUMBER 90-12873-RGS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*1995 U.S. Dist. LEXIS 20219*

**December 13, 1995, Decided**

**COUNSEL:** [*1] For ONE WHEELER ROAD ASSOCIATES, GUTIERREZ CO., THE, Plaintiffs: Richard A. Johnston, James W. Prendegrast, David S. Nalven, Hale & Dorr, Boston, MA.

For FOXBORO CO., THE, Defendant: William D. Gillis, Jr., Massery, Gillis & Guiney, Boston, MA.

**JUDGES:** Richard G. Stearns, UNITED STATES DISTRICT COURT

**OPINIONBY:** Richard G. Stearns

**OPINION:**

FINDINGS OF FACT AND RULINGS OF LAW AFTER A TRIAL WITHOUT JURY

December 13, 1995

STEARNS, D.J.

The plaintiffs, One Wheeler Road Associates and The Gutierrez Company, brought suit under the Comprehensive Environmental Response and Liability Act (CERCLA), *42 U.S.C. § 9601,* et seq. and Massachusetts G.L. c. 21E, to recover response and remediation costs for a site at 200 Wheeler Road in Burlington, Massachusetts. The defendant Foxboro Company is a prior owner and occupant of the site. The plaintiffs also seek a declaration pursuant to *28 U.S.C. § 2201* that Foxboro is liable for future remediation costs. n1 A trial was held without a jury commencing September 13, 1994, and ending September 29, 1994. Extensive briefs were received by the court before and after the trial. Provisional Findings of Fact and Rulings of Law were issued on June 7, 1995. [*2] The parties were then invited to address any arguable factual or legal errors in the proposed findings and rulings. They did so in an especially constructive fashion. On August 24, 1995, the court issued its final findings of fact and rulings of law. This was followed by a hearing on damages that commenced October 16, 1995. This opinion incorporates the findings and rulings of August 24, 1995 (with several minor technical corrections), supplemented by the court's determination of damages.

> n1 Common law claims for restitution, negligence, and strict liability were dismissed earlier in the proceedings by the court.

FINDINGS OF FACT

Based on the credible evidence, I find the following material facts.

1. The site in question consists of approximately 9.7 acres of semi-wooded land located at 200 Wheeler Road in Burlington, Massachusetts. The property was owned and occupied by the Foxboro Company (Foxboro) or its predecessor corporations (principally Trans-Sonics, Inc.) from August 16, 1954, to December 20, [*3] 1978. n2

> n2 Prior to 1954, the property was owned by the Highland Sand and Gravel Company. Highland's activities at the site do not figure in the litigation. From 1954 to 1974 title to the property was held in the name of Tilestone Estates. Tilestone apparently was a nominee trust. In its Answer to the Complaint, Foxboro admitted that it was at all times the beneficial owner of the property. That admission is binding on Foxboro. In 1974, legal title was placed in the name of Foxboro/Transonics, Inc. Foxboro/Trans-Sonics, Inc., was merged into the Foxboro Company in 1978.

2. In 1956, Foxboro built a 28,000 square foot factory on the then undeveloped site. Foxboro was a manufacturer of precision electronics. Its main customer was the U.S. military. In 1958, the plant was enlarged by a 12,000 square foot addition. In 1978, Foxboro sold the property to Blanton Wiggin and moved its operations to a facility on Blanchard Road in Burlington. In June of 1982, One Wheeler Road Associates, a Massachusetts limited partnership, [*4] purchased 200 Wheeler Road from Wiggin. n3 The Gutierrez Company, a Delaware corporation with its principal place of business in Massachusetts, is the genera partner of One Wheeler Road Associates.

n3 Wiggin received a forty percent interest in One Wheeler Road Associates as part of the consideration. There is no suggestion in the record that Wiggin has relinquished his stake in the partnership.

3. Two commercial tenants replaced Foxboro at 200 Wheeler Road. From June of 1979 to December of 1988, U.S. Windpower, Inc., designed, built and tested windmill generators at the site. Fiske Med-Science, Inc., a medical equipment supplier owned by Wiggin, had offices at the site between 1978 and 1982. Upon purchasing the property, One Wheeler Road Associates assumed U.S. Windpower's lease. (Fiske Med-Science ceased doing business at or about the time of the sale). In 1989-1990, plaintiffs demolished the old Foxboro plant and replaced it with a six story commercial office building.

4. On July 24, 1984, while reviewing [*5] plans submitted by U.S. Windpower to renovate space in the facility, the Burlington Board of Health took note of an "Industrial Waste Manhole" designated on one of the site plans. On September 22, 1984, with U.S. Windpower's permission, Richard Lombard, Environmental Engineer for the Board of Health, took a sample from a leaching basin capped by the manhole. The leaching basin, made of concrete blocks, was approximately 16' long, 8' wide, and 4 1/2' deep. Lombard observed that the floor of the basin was covered with an oily liquid. The test sample revealed the presence of several hazardous substances, among them trichloroethylene (TCE), methylene chloride, freon, 1, 1, 1 trichloroethane (TCA), tetrachloroethylene (PCE), and traces of petroleum distillates. n4

n4 Freon was the dominant substance detected in the sample, at 20,000 ppb, followed by TCE and PCA, at 10,000 ppb, and then PCE, at 5,000 ppb.

5. U.S. Windpower hired Eastern Pipe to explore the plant's drainage system. Eastern Pipe conducted smoke and [*6] dye tests and ran a miniature television camera through a portion of the drain line leading to the leaching basin. Eastern Pipe's investigation found two on-site waste disposal systems, a sanitary sewer leading to a septic leaching field, and a gravitational storm drain feeding the leaching basin. n5 Three internal sinks and the floor drains in the main building, and three roof drains on the east side of the addition, were connected to the storm drain. The portion of the drain line that Eastern Pipe was able to visually survey, that is, 219' of the west line running under the footprint of the addition between storm water manholes SW-3 and SW-4 were judged structurally sound, although the interior of the pipe was in a poor state of cleanliness. At a distance of 132' from SW-3, Eastern Pipe found an intact service connection serving the three roof drains. The north line leading from SW-4 to the leaching basin was clogged and inaccessible to Eastern Pipe's camera. The basin itself Eastern Pipe observed to contain an oily residue. n6

n5 When the plant was initially constructed, there were no practical means of connecting either system to the Burlington town sewer. The sanitary system was connected to the town sewer in 1974. Foxboro's denial that it "designed, constructed or installed" either drainage system, while literally true, is disingenuous. There is no doubt that both systems date from Foxboro's occupancy and development of the site and were installed at Foxboro's direction.

[*7]

n6 The storm drain was active, as evidenced by the fact that Eastern Pipe was forced to pump water out of the system in order to conduct the television probe. Eastern Pipe's manual survey of the line between storm water manholes SW-1 and SW-2 disclosed no obvious structural defects although it did find that the pipe was in need of cleaning.

6. Foxboro engaged in intensive manufacturing activity on the site. By 1959 Foxboro employed over 230 workers. Foxboro used commercial solvents to clean and degrease electronic components, and for that purpose purchased substantial quantities of TCE, methylene chloride, cutting oils, and freon, typically in 55 gallon drums and 5 gallon cans. n7 Foxboro also used small quantities of acetone. Foxboro had no written policies regarding the handling and disposal of chemical solvents. n8 Employ-

ees of Foxboro routinely drew solvents from drums stationed in a central storeroom to wash electronic parts at individual work benches and stations throughout the plant. Employees in the manufacturing area had access to the internal sinks and floor drains connected to the [*8] storm system. Although employees were verbally admonished against using the sinks to dispose of chemical wastes, Foxboro had little appreciation of the environmental risk. n9 While Foxboro had drums available in the central storeroom to collect spent solvents, Foxboro did not maintain records of the amounts of solvents withdrawn or the amounts of wastes returned, or any records of waste disposal. n10 Foxboro was the only occupant of the site to use commercially formulated TCE and acetone in its operations, and the only occupant to use appreciable quantities of freon.

n7 TCE, as constituted for industrial use in the 1950's and 1960's, occasionally contained trace amounts of PCE. A freon based solvent used by Foxboro (TMC Solvent) contained freon 113 of which PCE is an intermediate constituent, but there is no direct evidence that Foxboro used TMC solvent at the Wheeler Road (as opposed to the Blanchard Road) facility. PCE was found in a "grab" sample (containing soil and water) taken from beneath a concrete slab constructed by Foxboro to support a metal storage shed at the rear of the building. (The sample also revealed the presence of TCE). The hydrological configuration of the property excludes an upgradient source for the PCE or the possibility of any lateral seepage from the area of the leaching basin. The absence of any trace of methylene chloride in the sample, on the other hand, excludes D-SOL 128 as the PCE source. This sample is the only evidence suggesting that Foxboro might have used commercially formulated PCE in its operations at Wheeler Road. There is evidence that U.S. Windpower used the shed to store hazardous materials.

[*9]

n8 A written disposal policy was promulgated by Foxboro when it relocated to the Blanchard Road facility in 1978. Foxboro also contracted with a waste recycler at Blanchard Road, but not until 1980.

n9 Vernon Westcott, a principal of Foxboro, testified in deposition that his concern was the possible impact waste solvents might have on the

integrity of the plant's septic system. The routing of the internal sinks and floor drains to the leaching basin appears to have been undertaken to avert any such damage.

n10 Neither Foxboro's facilities manager nor its purchasing agent could account for Foxboro's disposal of waste solvents. There is little if any credible evidence suggesting that Foxboro employed the services of a waste scavenger or recycler while at Wheeler Road.

7. One Wheeler Road Associates has not engaged in manufacturing activities at the site or otherwise made use of hazardous materials. Fiske Med-Science assembled medical devices on the site but did not engage in manufacturing. (Fiske Med-Science employed five or fewer persons). There is no evidence that Fiske Med-Science [*10] used hazardous materials in its operations.

8. U.S. Windpower assembled and tested wind-driven generators during its residency at the site. Although most of the windmill components were manufactured in California, U.S. Windpower used gear oil, a solvent called D-SOL 128, a variant of the same solvent called D-SOL F13, paint thinner, and a rust preventative called ZRC to lubricate, degrease and protect metal parts. D-SOL 128 contains PCE, n11 and methylene chloride, two of the site contaminants identified by Richard Lombard. It also contains petroleum distillate. PCE is a significant contaminant of the site soils, particularly when its high toxicity is considered.

n11 At the relevant time, D-SOL 128 contained 20% PCE by volume.

9. U.S. Wind power did not use TCE in its operations, the significant and highly toxic groundwater contaminant. n12 Employees of U.S. Windpower had access to the internal sinks and floor drains connected to the storm system leading to the leaching basin. The amount of D-SOL 128 used [*11] by U.S. Windpower was relatively modest, on the order of ten gallons a month. n13 Service Chemical, U.S. Windpower's supplier, delivered at least four 55 gallon drums of D-SOL 128 to the site prior to May of 1985 when the sinks and floor drains were apparently disconnected from the storm system. U.S. Windpower's use of gear oil was substantial, on the order of 700-900 gallons a month. U.S. Windpower also disposed of a five gallon can of waste D-SOL F13 (which contains TCA and freon) in 1988 through Northeast Solvents, a recycler. There is evidence that U.S.

Windpower began recycling at least some of its oil and chemical wastes in late 1983. n14

> n12 While Leonard Sarapas, defendant's expert witness testified that TCE can be a degradation byproduct of PCE, there is no evidence that chemical decomposition of PCE explains the presence of TCE in the groundwater at the site.

> n13 Richard Lombard, who visited U.S. Windpower's facility on at least five occasions in 1984, testified that he did not observe any intensive use of solvents.

> n14 U.S. Windpower obtained a RCRA generator number in September of 1983 authorizing the off-site disposal of hazardous wastes.

[*12]

10. In December of 1984, the plaintiffs retained Haley & Aldrich, an environmental consulting firm, to investigate contamination in the area of the leaching basin and to recommend a course of remediation. Haley & Aldrich's samples confirmed the presence of the hazardous substances earlier identified by Richard Lombard. In April or May of 1985, the connections between the internal sinks, floor drains and the three roof drains and the leaching basin were severed, although by whom and in what circumstances is unexplained. It is possible, given the inconclusiveness of the evidence, that the connections were not completely severed until the permanent rerouting of the drainage system to a new leaching field was accomplished in December of 1986 or February of 1987.

11. On April 23, 1985, Haley & Aldrich recommended that removal of the leaching basin "be discussed with the Burlington Board of Health (BOH) and (DEQE) prior to undertaking any work." A copy of the Haley & Aldrich report was forwarded on plaintiffs' behalf to the Burlington BOH and the Massachusetts Department of Environmental Protection (then the DEQE). In November of 1985, DEQE issued a "Notice of Responsibility" ordering [*13] "immediate remedial actions" at the site, including the rerouting of the drainage system and the removal of any liquid residues from the leaching basin. Sometime thereafter plaintiffs authorized Haley & Aldrich to begin work. n15 In December of 1986, Clean Harbors, Inc., working at Haley & Aldrich's direction, pumped approximately 1,000 gallons of liquid out of the leaching basin. The basin was then excavated and filled. n16 One hundred and twenty cubic yards of visibly contaminated soil was removed from the site. Haley & Al-

drich also undertook to have the roof drain system permanently rerouted to a new leaching structure at the front of the property. That work was performed by Bob Griffin & Sons, Inc., also in December of 1986. Griffin & Sons constructed a new leaching field at the front of the building connected to the storm waterhole SW-3 at the northeast corner of the addition. In either December of 1986 or February of 1987, Griffin & Sons plugged the west drain line at SW-3. n17 A 2,000 gallon underground oil storage tank was also dug up and removed at Haley & Aldrich's direction.

> n15 The Notice of Responsibility named Tilestone Estates, Foxboro Trans-Sonics, Blanton Wiggin, Fiske Med-Science, One Wheeler Road Associates, and U.S. Windpower as potentially responsible parties.

[*14]

> n16 Although DEQE had not ordered the leaching basin removed, Zachary Peters, the environmental official with oversight responsibility for Wheeler Road, testified that DEQE approval was not required. In a February 22, 1988 review, DEQE ratified, among other, response actions, Haley & Aldrich's recommendation that the basin be excavated.

> n17 Defendant argues that if the plugging took place in February, the line might have been subject to surcharging (excess hydraulic pressure) caused by the prior plugging of the manhole at SW-4 where the west and north lines conjoined. Plaintiffs argue that, even if SW-3 had not been properly plugged in December, the path of least resistance would have been in the direction of the new leaching field, thus alleviating any surcharging in the west line.

12. Following excavation of the leaching basin, a DEQE site investigation showed "continued 'releases' at the site which may be indicative of additional 'sources' of contamination present or remaining." The DEQE "Site Inspection Letter Report," dated August 25, 1987, observed that the soil that had been [*15] backfilled at the site of the excavated leaching basin had been recontaminated. DEQE recommended further investigation "to evaluate the lateral and vertical extent of the soil and groundwater contamination."

13. In May of 1987, the plaintiffs retained Norwood Engineering, Inc. (Norwood) to undertake further as-

sessment and remediation efforts. Norwood assigned Jeffrey Nangle, its Chief Environmental Engineer, to the project. n18 After completing a "Phase I" investigation, Nangle confirmed that the new fill deposited in the old leaching basin had been recontaminated. Nangle also determined that soil adjacent to the waste manhole was contaminated, as was the local groundwater. On August 25, 1987, DEQE ordered that additional borings be sunk to determine "the lateral and vertical extent of the soil and groundwater contamination." In a December 14, 1987 submission to DEQE, Nangle tentatively identified TCE as the groundwater contaminant and, because of the additional presence of chlorinated compounds like PCE, guessed that its source was a degraded industrial solvent. He recommended initiation of a groundwater monitoring program, the dismantling of the waste manhole structure, and the [*16] pumping out of any residual effluent. On February 29, 1988, DEQE formally approved Nangle's recommendations. DEQE also ordered excavation of the piping system leading to the leaching basin. DEQE requested that two deep wells be installed to the surface of the bedrock, one on-site and the other off, to determine the extent of the groundwater contamination.

> n18 Nangle testified that he has visited the site in excess of 200 times to oversee the remediation of the property.

14. In September 1988, Nangle prepared a "Phase III" report, n19 concluding that "the principal focus of site remediation should be placed upon the contaminated overburden in the vicinity of the abandoned drainage inverts, manhole assembly, and former leaching [basin]." Nangle identified these soil areas as "the principal source origin for a further release of on-site contaminants to the underlying groundwater table." Nangle recommended remediation of the soils by a combination of removal and on-site soil gas vapor extraction, undertaken in [*17] conjunction with a long term monitoring program to evaluate the effect of the remediation on groundwater quality. On April 14, 1989, DEQE approved Nangle's "Phase III" recommendations.

> n19 DEQE waived the Phase II soil and groundwater assessment otherwise required by the Massachusetts Contingency Plan promulgated on October 1, 1988.

15. In October, 1989, Nangle, now the principal of his own firm, Nangle Consulting Associates, prepared a Heath and Safety Measures Work Plan in anticipation of Phase IV soil activity. Nangle proposed to proceed in

three stages -- the excavation of the drainage invert, manhole and any contaminated sediments, followed by reexcavation of the leaching basin and installation of a vapor recovery system for stockpiled soils and, finally, the setting up of a monitoring program to evaluate the functioning of the system. n20 On October 12, 1989, DEP verbally approved Nangle's Phase IV soil remediation plan. n21

> n20 Nangle rejected the alternative of soil incineration because of its prohibitive cost.
[*18]

> n21 A written approval was provided on February 5, 1990.

16. Soil excavation began at the waste manhole. No horizontal soil contamination was found above the level where the drain pipes were connected. At the connections Nangle found accumulations of a black viscous sludge. Significant residues of volatile organic compounds (VOCs) n22 were found in the soil at a depth one foot below the bottom of the manhole. No exfiltration appeared to have occurred from the manhole itself, although Nangle found signs of leakage around the partially mortared pipe connections. The manhole was dismantled and the associated sludge and sediments collected for off-site disposal.

> n22 VOC concentration, which is determined by headspace screening, is not compound specific.

17. The pipes linking the manhole and leaching basin to the roof drains ran in a northerly direction towards the footprint of the old building addition and then turned [*19] 90 [degrees] west at storm water hole SW-4 running underneath the foundation of the addition to SW-3 at its northeast corner. Nangle excavated first along the north line. Chlorinated solvents were detected in samples taken from beneath the pipe, particularly in the soil adjacent to the partially mortared pipe joints. Below the pipe, Nangle found an undulating surface of bedrock with concentrations of VOCs in its troughs. Exfoliation in the surface of the bedrock Nangle took as evidence that the VOCs had migrated in the relatively distant past from the drainage system, a conclusion fortified by the orientation of pathways Nangle observed in the soil.

18. Nangle then began excavation along the west line. At three points, the pipe had been laid directly on

sharp protuberances in the bedrock. The higher concentrations of VOCs at these points indicated to Nangle that the drainage system had been compromised by the resulting pressure on the pipe. At a point in the west line approximately 132' from SW-3, Nangle found an 18" x 10" hole in the top of pipe section 19 where, according to the site plan, a service connection should have been installed. A fairly large rock had fallen through [*20] the hole into the pipe. The edges of the hole appeared weathered. No pipe shards were found during excavation of the area around the hole. n23 Elevated levels of VOCs, principally PCE, were found in samples of the surrounding soil. At levels approaching the bedrock TCE was found to be a major contaminant. The hole and the compromised pipes were the principal points of contaminant releases identified by Nangle along the west line.

> n23 Eastern Pipe conducted a camera survey of the west line in 1984. According to Eastern Pipe's report, it found a service connection installed at the point where Nangle found the hole (132' from the manhole designated as SW-3). Although plaintiffs argue that Eastern Pipe might have been mistaken about the location of the service connection, or that the camera might have slipped by the rock at the bottom of the hole, I conclude that the hole had to have been created after Eastern Pipe's survey, although just how is a mystery. (The most likely explanation involves the undocumented disconnection of the three roof drains served by the service connection in the spring of 1985. The camera, which is 6" in diameter and rides on a sled, simply could not have missed a rock the size of the one unearthed by Nangle. (The drain pipe was 12" in diameter). Eastern Pipe did not survey the north line because of water accumulation and the thickness of the sediment.

[*21]

19. Nangle also observed that the interior of the pipe was clogged with a layer of black pasty sediment nearly 6" thick filling half the diameter of the pipe. The level of sediment tapered off toward SW-4, indicating that the hole had been a major exfiltration point. Although Eastern Pipe had determined the pipe to be "unclean" during the September 1984 survey, no accumulation of sediment of this magnitude had been observed. The sediment contained elevated levels of petroleum distillates.

20. Nangle next excavated the backfill in the area of the former leaching basin. Concentrations of chlorinated solvents (including PCE) were found in the soil begin-

ning three feet below the surface. Excavation proceeded to the surface of the bedrock, at 22 feet below grade.

21. Approximately 850 cubic yards of soil removed during the excavation were placed in on-site treatment cells as called for in Nangle's Phase IV plan. Some 770 soil samples were taken during Phase IV activities. Fifty-one of the samples were submitted for laboratory analysis employing EPA approved methods. (The remaining samples were screened using EPA approved headspace methods). The laboratory tests confirmed PCE as a principal [*22] soil contaminant.

22. Soil removal and vapor cell treatment had been conceived by Nangle as an antidote for the groundwater contamination at the site. As excavation and sampling continued, however, it became increasingly clear that the soil, although contaminated with PCE, was not the source of the TCE infecting the water.

23. Groundwater monitoring at test wells in areas downgradient of the north and west lines disclosed significant fluctuations in levels of TCE which Nangle attributed to the soil disturbance caused by the excavation and the flushing effect on the bedrock of seasonal surges in the groundwater level. n24 PCE levels on the other hand, remained constant, suggesting to Nangle that the relative insolubility of PCE had inhibited its migration from release points along the drain lines into deep soil. Monitoring wells to the south of the building (upgradient) indicated the presence of both PCE and TCE, as opposed to the north wells where only TCE appeared in the groundwater. n25 The two areas are not hydrologically connected.

> n24 Since cessation of excavation activities, groundwater quality has stabilized and shown modest seasonal improvement.

[*23]

> n25 While PCE can degrade into TCE, the reverse is not true.

24. Once satisfied that the groundwater concentrations of VOCs had been stabilized, Nangle recommended that a closed carbon absorption remediation system be installed to treat groundwater before its discharge in the soil adjacent to the Vine Brook aquifer. n26 In May of 1991, DEP approved installation of a groundwater recovery well for that purpose (NC-35). On May 12, 1993, after inviting public comment (and receiving none) DEP issued plaintiffs a groundwater discharge permit. At the time of trial, plaintiffs were awaiting DEP approval of

the final components of the groundwater remediation plan.

> n26 This recommendation represented an evolution in Nangle's thinking. Before completing the groundwater assessment, Nangle had hesitated at the cost and unpredictable efficiencies of a pump and treat system, expressing hope that his soil remediation efforts might obviate the need for groundwater remediation.

[*24]

25. Through October of 1993, plaintiffs had incurred $ 629,032.03 in costs associated with response actions at the site, Of this amount $ 138,331.02 had been paid to the Gutierrez Construction Company (a subsidiary of the plaintiff general partner) for construction management services performed in connection with response and remediation work at the site. The fees paid to Gutierrez Construction Company consist of a six percent contractor's fee and a ten percent "overhead" charge, to compensate Gutierrez for the costs of "on-site supervision" and support. The balance was paid to third party vendors and contractors ($ 386,323.05 to Norwood Engineering and Nangle Consulting Associates).

## RULINGS OF LAW

### A. CERCLA

CERCLA imposes liability on "persons" who "own" or "operate" a "facility" from which a release of hazardous substances occurs. *42 U.S.C. § 9607(a)(2). See also 42 U.S.C. §§ 9601(9)(B) and (20)(A).* As defined by § 9601(14), hazardous substances include, among other chemical contaminants, TCE, PCE, methylene chloride, freon, TCA, and acetone. Liability under CERCLA attaches regardless of fault. It need not be shown that an owner or operator in fact "caused" a release, [*25] merely that a release occurred during the time a defendant owned or operated the facility. *United States v. Monsanto Co., 858 F.2d 160, 168 (4th Cir. 1988).* If a release is shown, a defendant may escape liability only by showing by a preponderance of the evidence that a third party, "other than an employee or agent of the defendant, or than one whose act or omission occurs in connection with a contractual relationship, existing directly or indirectly, with the defendant," was the sole cause of that release. *42 U.S.C. § 9607(b)(3).* A release includes any spilling, leaking, discharging, escaping, leaching, dumping or disposing of hazardous substances into the environment. *42 U.S.C. § 9601(22).*

Under CERCLA, a responsible party may take such actions as are necessary to monitor, assess, and evaluate the release or threatened release of hazardous substances, and to dispose of removed material, or to otherwise minimize or mitigate environmental damage. *42 U.S.C. § 9601(23).* A responsible party may also undertake such remedial actions as are necessary to prevent or minimize any future release of hazardous substances into the environment. *42 U.S.C. § 9601(24).*

A plaintiff who undertakes [*26] removal and response actions to remediate environmental damage resulting from a release by a third party may recover the necessary costs of those actions. *42 U.S.C. § 9607(a)(4)(B).* Such costs are presumptively necessary if the response action conforms with the requirements of the National Contingency Plan. *42 U.S.C. § 9607(a)(4)(B).*

If a plaintiff is an "innocent" party, it may seek to hold a defendant jointly and severally liable for its response costs in a § 9607 action. This is true even though a partially culpable party may end up paying for more than its actual share of the harm. *O'Neil v. Picillo, 883 F.2d 176, 179 (1st Cir. 1989).* The blow is somewhat softened by the statutory cause of action for contribution *(42 U.S.C. § 9613(f))* that a partially culpable party is authorized to bring against other liable (and hopefully solvent) parties. The policy of CERCLA is to encourage voluntary clean-up actions by shifting the burden of enforcing contribution from the shoulders of innocent parties to those of defendants who share at least some degree of responsibility. If, however, a defendant succeeds in showing that the environmental harm is divisible among or between responsible [*27] parties, a court is authorized to apportion damages. *Picillo, supra, 883 F.2d at 178-179.*

When a party that is not "innocent," but itself liable, "sues another to recover its equitable share of the response costs, the action is one for contribution, which is specifically recognized under CERCLA." *Amoco Oil Co. v. Borden, Inc., 889 F.2d 664, 672 (5th Cir. 1992).* n27 Pursuant to § 9613(f), the "non-innocent" party may seek to recoup "that portion of his expenditures which exceeds his pro rata share of the overall liability -- in other words, to seek contribution rather than complete indemnity." *United Technologies Corp. v. Browning Ferris Industries, 33 F.3d 96, 100 (1st Cir. 1994).* Contribution "refers to a claim 'by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make.'" *Id. at 99* (quoting *Akzo Coatings, Inc. v. Aigner Corp., 30 F.3d 761, 764 (7th Cir. 1994)).* Where a plaintiff is a liable party, its claims against other potentially responsible parties are by definition actions for contribution. Id. at 101. n28 CERCLA (unlike M.G.L. c. 21E) does not authorize an award of attorneys' [*28] fees and expert witness fees. *Key Tronic Corp. v. United States, 128 L.*

*Ed. 2d 797,    U.S.    , 114 S. Ct. 1960, 1966-1967 (1994).*

n27 I agree with Foxboro that plaintiffs' argument that any claim of reciprocal contribution has been waived if Foxboro's failure to bring a counterclaim is untenable. Foxboro's effort to portray U.S. Windpower as the primary culprit is more properly labeled as an affirmative defense, see *Fed. R. Civ. P. 8(c)*, and as such it has been consistently prosecuted without surprise or prejudice to the plaintiffs. Cf. *Grant v. Preferred Research Inc., 885 F.2d 795, 797-798 (11th Cir. 1989).* The facts of International Clinical Laboratories v. Stevens 30 FRC (BNA) 2066, 2069 (E.D. N.Y. 1990) (to the extent the case should be regarded as having precedential value) are distinguishable, as Foxboro points out. The absent culprit here is, of course, U.S. Windpower, which plaintiffs, for whatever reason, chose not to join as a defendant in this action (possibly because it is insolvent). Because Foxboro had no connection with U.S. Windpower whatever (having left the property before Wiggin, a partner in Wheeler Road, brought U.S. Windpower on to the site as a tenant), responsibility for pursuing contribution from U.S. Windpower more appropriately lies with plaintiffs. Perhaps more important, I have found that U.S. Windpower is solely responsible for contamination of the site with PCE and, for all cognizable purposes, petroleum distillates, and that the resulting environmental harm is divisible. See *42 U.S.C. § 9607(b)(3); M.G.L. c. 21E, § 5(c)(3).*

[*29]

n28 *United States v. S.C.A. Services of Indiana, Inc., 865 F. Supp. 533 (N.D. Ind. 1994),* on which plaintiffs rely, is not to the contrary. As Judge Lee was careful to point out, SCA Services had never admitted liability nor had it ever been adjudicated as a liable party, as no trial on issues of liability had been held, nor had a consent decree been entered. *Id. at 545.* Here the case has been tried, and as is evident from the findings of fact, plaintiffs have been found partially responsible parties.

B. M.G.L. c. 21E

The definitional components of M.G.L. c. 21E are very fact specific and not seriously in dispute. n29 The parties are "persons" as defined by § 2 of Chapter 21E; the property at 200 Wheeler Road is a "site." Foxboro was an "owner" of the site and an "operator" during the time it conducted manufacturing operations there. U.S. Windpower was an "operator" during its occupancy. Plaintiffs are "owners" of the site. A "release" includes any spilling, leaking, or discharging, escaping, leaching or disposing of hazardous materials into the environment. *M.G.L. c. 21E,* [*30] *§ 2.* And finally, the identified contaminants, principally TCE and PCE, are hazardous materials for purposes of the statute. Under § 4 of M.G.L. c. 21E, "any person who undertakes assessment, containment or removal action regarding the release . . . [of] hazardous material shall be entitled to reimbursement from any other person liable for such release . . . for the reasonable costs of such assessment, containment or removal."

n29 M.G.L. c. 21E, it should be noted, borrows heavily from the provisions of CERCLA.

*M.G.L. c. 21, § 5(a)* "sets out five categories of persons responsible for response costs incurred as a result of releases that result in contamination. If a person falls into any of these five categories, the statute imposes liability 'without regard to fault.'" *Griffith v. New England Telephone & Telegraph Co., 420 Mass. 365, 366, 649 N.E.2d 766 (1995).*

Under terms of *M.G.L. c. 21E, §§ 5(a)(2) & (5),*

(2) any person who at the time of storage or disposal of any hazardous material owned [*31] or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material . . . and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a . . . site, shall be liable, without regard to fault.

"To impose liability under § 5(a)(5), a plaintiff must establish both that the defendant caused the release and that the release caused the contamination." *Griffith, supra, 420 Mass. at 369.* "Cause," as it is used in the statute means legal or proximate cause with its associated concepts of agency and contemporaneity. "Even if we accept, as we must, that the tanks [previously installed by the defendant] caused the contamination, it is by no

1995 U.S. Dist. LEXIS 20219, *

means clear that this occurred during the period of the defendant's lease." *Id. at 369-370).* Like its federal counterpart, M.G.L. c. 21E allows a defense of third party responsibility only if a defendant is able to show by a preponderance of the evidence that a third party was the sole cause of a release. *M.G.L. c. 21E, § 5(c)(3).*

Because an action under *M.G.L.* [*32] *c. 21E, § 4* is an action for reimbursement, a plaintiff may only recover those costs actually incurred in any assessment, containment or removal action which are reasonably necessary to prevent, minimize or mitigate damage to the environment. *Oliveira v. Pereira, 414 Mass. 66, 75, 605 N.E.2d 287 (1992).* "We have defined 'reimbursement' as 'repaying or making good the amount paid out.'" Id. Chapter 21E has no provision for an award of future damages. *Mailman's Steam Carpet Cleaning Corp. v. Lizotte. 415 Mass. 865, 874, 616 N.E.2d 85 (1993).* A plaintiff may, however, pursuant to *M.G.L. c. 21E, § 15,* recover attorneys' fees and expert witness fees incurred in initiating and prosecuting a claim for reimbursement. *Sanitoy, Inc. v. Ilco Unican Corp.,' 413 Mass. 627, 631, 602 N.E.2d 193 (1992).*

CONCLUSIONS OF FACT AND LAW

Based on the subsidiary findings of fact and rulings of law, I conclude that the following has (or has not) been established by a preponderance of the evidence:

1. Foxboro, the owner and operator of the Wheeler Road facility from 1954 to 1978, is responsible for the releases of TCE contaminating the groundwater in the northeastern area of the site. [*33] I base this conclusion on among other facts: (1) Foxboro stored hazardous materials at the site, including TCE; (2) Foxboro was the only occupant of the site to use TCE in its operations; (3) the monitoring wells downgradient of the leaching basin and the north and west drain lines, as well as samples taken from the surface of the bedrock, show high groundwater concentrations of TCE; (4) Foxboro had no formal policies regulating or monitoring employee use and disposal of hazardous materials; and (5) Foxboro has failed to show by a preponderance of the evidence that some third party was solely responsible for the release of TCE.

2. The installation during Foxboro's occupancy of a leaching basin connected to the internal sinks and floor drains of the plant provided the agency for disseminating TCE into the groundwater.

3. Foxboro shares some responsibility for the contamination of the soil, specifically for the accumulations of methylene chloride, freon, and acetone found in the earth adjacent to and underlying the leaching basin and the north and west drain lines. I base this conclusion on among other facts that Foxboro used appreciable quanti-

ties of these chemicals in its operations [*34] without adequate disposal precautions. I also note that only Foxboro used acetone in operations at the site, or freon in any significant quantities.

4. U.S. Windpower is responsible for the concentrations of PCE in the soil adjacent to and underlying the leaching basin and the north and west drain lines, and particularly for the contamination released through the hole in pipe section 19. U.S. Windpower is also primarily responsible for the concentrations of petroleum distillates in the soil. I base this conclusion on the fact that only U.S. Windpower used significant quantities of PCE and lubricating oils in its site operations as well as on the fact that the hole in pipe section 19 was created after Foxboro had quit the Wheeler Road premises.

5. Foxboro's installation of the leaching basin and drainage system cannot be deemed the legal cause of releases of contaminants by U.S. Windpower. *Griffith v. New England Telephone & Telegraph Co., 420 Mass. 365, 369-370, 649 N.E.2d 766 (1995).*

6. As between U.S. Windpower and Foxboro, there is insufficient evidence in the record to make it possible to allocate responsibility for the release of contaminants into the groundwater percolating [*35] to the south of the original building.

7. Plaintiffs One Wheeler Road Associates and The Gutierrez Company are not directly responsible for releases of contaminants at the site, nor is there any evidence to suggest that plaintiffs were involved in or exercised control over U.S. Windpower's operations at the site. However, as owners of the site from June of 1982 until December of 1988, plaintiffs are liable for any environmental damage caused by U.S. Windpower's operations 5(a)(2). n30 *42 U.S.C. § 9607(a)(2); M.G.L. c. 21E, § 5(a)(2).* n31

n30 This does not suggest any compromise of plaintiffs' right to seek an appropriate contribution from U.S. Windpower.

n31 Plaintiffs point out that U.S. Windpower began operations at the site in June of 1979 and that One Wheeler Road Associates did not purchase the property until June of 1982. "In fact, U.S. Windpower obtained a RCRA generator number after the first year of its tenancy under the plaintiffs (Findings, footnote 14), suggesting that disposal of hazardous materials from U.S. Windpower, if any, most likely occurred under a different owner." Plaintiffs' Post Trial Submission, at 11 n. 5. As may be evident from the findings, I draw the opposite inference from that fact,

that is, that U.S. Windpower began generating appreciable amounts of hazardous waste in its operations in 1983, after One Wheeler Road assumed ownership of the site. (The inference is buttressed by evidence comparing the condition of the drain pipes as found by Eastern Pipe in 1984 and by Nangle in 1989). Moreover, the "different owner" referenced by the plaintiffs is Blanton Wiggin, who is a forty percent shareholder in the Wheeler Road partnership. Plaintiffs related argument, that as "innocent parties" they are entitled to the remedy of a cost recovery action under § 9607 rather than contribution under § 9613, rests on the premise that they are in fact "innocent." As plaintiffs themselves acknowledge, "they are liable solely because they owned the site at a time when hazardous substances and materials may have been disposed there." Plaintiffs' Post Trial Submission, at 11. Liability under CERCLA may be harsh, but it is strict. "Congress intended only innocent parties - not parties who were themselves liable - to be permitted to recoup the whole of their expenditures." *United Technologies v. Browning-Ferris Industries, 33 F.3d 96, 100 (1st Cir. 1994)*. It may be true, as plaintiffs suggest, that "seemingly no owner of a contaminated site - liable solely on the basis of its status as an owner - could ever bring a § 107 cost recovery action against the parties responsible for disposing hazardous substances at the site . . . . The practical consequences of such an interpretation would be to limit a § 107 cost recovery action to an 'innocent' government agency that had undertaken a response action." Plaintiffs' Post Trial Submission, at 11 - 12 & n. 6. Cf. *United Technologies, supra, 33 F.3d at 99 & n. 8*. Plaintiffs finally argue that "Foxboro has failed to prove that the contamination at the site was solely the responsibility of some third party or that the environmental harm at the site is divisible." Plaintiffs' Post Trial Submission, at 12. To the contrary, I have found that Foxboro has shown that it was not responsible for U.S. Windpower's operations at the site and that U.S. Windpower is solely responsible for the contamination of the soil with PCE, and for all practical purposes, with petroleum distillates.

[*36]

8. There is no evidence that Fiske Med-Science caused or was otherwise responsible for the release of hazardous materials at the site.

9. Foxboro has shown by a preponderance of the evidence that the environmental harms done to the site by Foxboro and U.S. Windpower are divisible, particularly in the northeastern area of the parcel where the remediation effort is concentrated. This is because of the mutually exclusive use of TCE and PCE by Foxboro and U.S. Windpower and the disparate impacts these two contaminants have had on the groundwater and soil respectively. The responsibility for the presence of lesser contaminants, is also capable of apportionment, if perhaps not with the exactitude that would satisfy a scientist, with sufficient precision to satisfy the law. Acetone, for example, was unique to Foxboro's operations, while U.S. Windpower used substantial quantities of gear oil.

10. Remedial measures taken have been consistent with the requirements of the Massachusetts Contingency Plan and the National Contingency Plan and have been carried out with all necessary DEP approvals. I base this conclusion on the testimony of DEP's representative, Zachary Peters, and on a determination [*37] of law.

11. Response costs to date, and those projected for the full remediation of the site are for the most part reasonable in amount and necessary to restore the environmental integrity of the property. I base this conclusion on the testimony of Jeffrey Nangle and Zachary Peters.

12. The Phase IV soil remediation effort, while reasonable in its conception, has had little impact on groundwater quality. I base this conclusion on the testimony of Leonard Sarapas and the analyses of groundwater quality performed over the course of the remediation effort.

13. The ten percent general contractor's overhead fee paid to Gutierrez Construction Company was a reasonable and necessary expense incurred as part of the response and remediation effort. The six percent surcharge ($ 10,337) assessed by Gutierrez as a profit for its work at the site was not a necessary or reasonable expense. The costs of the work done by Bob Griffin & Sons to install a new leaching field were reasonable and necessary, as were the costs incurred by plaintiffs in removing the underground storage tanks and the leaching basin. The costs of the environmental investigation of the site I also conclude were reasonable and [*38] necessary.

14. As a Massachusetts limited partnership and a Delaware corporation with a principal place of business in Massachusetts, plaintiffs are within the class of "citizens" defined by *M.G.L. c. 21E, § 15*, entitled to recover attorneys' fees and expert witness fees reasonably incurred in initiating and prosecuting this action. *Sanitoy, Inc. v. Ilco Unican Corp., 413 Mass. 627, 633, 602 N.E.2d 193 (1992)*. Because the action was commenced prior to the enactment of § 4A(d) of M.G.L. c. 21E in 1992, plaintiffs are not required to show that Foxboro acted unreasonably in settlement discussions. n32

n32 I disagree with Judge Stagg's conclusion in *Joslyn Mfg. Co. v. Liberty Mut. Ins. Co., 836 F. Supp. 1273 (W. D. LA. 1993),* that a recovery under CERCLA, in addition to precluding a double recovery of response costs under state law, also precludes a state-authorized recovery of attorneys' fees. *42 U.S.C. § 9614*(b) bars excess compensation for "removal costs or damages or claims as provided in this chapter." It makes no mention of attorneys' fees as does not CERCLA generally. See *Key Tronic Corp. v. United States, supra. 42 U.S.C. § 9614*(a), on the other hand, permits a state to impose "any additional liability or requirements with respect to the release of hazardous substances within such state." This bar to preemption by CERCLA seems broad enough to permit a state to tax a responsible party with the transaction costs of an enforcement or recovery action where state and federal claims are brought in tandem in a federal lawsuit.

[*39]

15. There is a substantial controversy between the parties of sufficient immediacy and reality to warrant the issuance of a declaratory judgment holding Foxboro liable for such reasonable and necessary costs as are incurred in the future remediation of the groundwater percolating in the soil to the north of the original plant. See *Wellesley Hills Realty Trust v. Mobil Oil Corp., 747 F. Supp. 93, 102 (D. Mass. 1990).*

DAMAGES

A hearing on damages was held commencing October 16, 1995, to determine the apportionment of response and remediation costs between One Wheeler Road Associates and Foxboro. The parties were necessarily constrained by the courts prior findings and rulings, particularly the determination that One Wheeler Road Associates is the party with primary responsibility for the remediation of the site soils and that Foxboro is the party responsible for the contamination of the groundwater. The parties agree that as of the end of October of 1993 (the stipulated cut-off date for present purposes), One Wheeler Road had expended $ 618,448.60 in response and remediation deemed reasonable and necessary by the court.

The apportionment of remediation costs is typically [*40] an inexact science. CERCLA recognizes as much, permitting a court to establish a party's liability in a contribution case by "using [among other measures] such equitable factors as the court determines are appropriate." *42 U.S.C. § 9613*(f)(1). See *Picillo, supra, 883 F.2d at 179.* Inexactitude, however, is not a reason to

abdicate the duty to decide. Cf. *United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1088 (1st Cir. 1994).*

In fashioning an allocation of costs in this case, I have given significant weight to the so-called "Gore factors." These have been described as "a nonexhaustive but valuable roster of equitable apportionment considerations." *In re Hemingway Transport, Inc., 993 F.2d 915, 921-922 n.4 (1st Cir. 1993).* They include the following:

> (i) the ability of the parties to demonstrate that their contribution to a discharge, release or disposal of a hazardous waste can be distinguished;
> (ii) the amount of the hazardous waste involved;
> (iii) the degree of toxicity of the hazardous waste involved;
> (iv) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste;
> (v) the [*41] degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and
> (vi) the degree of cooperation by the parties with Federal, State or local officials to prevent any harm to the public health or the environment.

*United States v. R.W. Meyer, Inc., 932 F.2d 568, 571 (6th Cir. 1991).*

For reasons of historical discontinuity, the contributions of Foxboro and U.S. Windpower to the contamination of the Wheeler Road site are for the most part distinguishable, particularly as between TCE, the main groundwater contaminant, and PCE, the principal soil contaminant. There is little difference insofar as the toxicity of the two substances is concerned. Both are carcinogens and believed to pose a threat to human health. While Foxboro's gross contribution to the degradation of the site exceeds that of U.S. Windpower, Foxboro's role is mitigated in some degree by the fact that it polluted the site during an era in which the latent environmental threat of toxic substances was not as well understood as it is today, and when such substances were subject to far less regulation. Options open to U.S. Windpower [*42] in the 1970's, like recycling and scavenging, were not as readily available to Foxboro in the 1950's. Weighing against Foxboro, on the other hand, is the decision to

install a wastewater disposal system, the design of which, even by the more casual standards of the time, should have been recognized as irresponsible. Finally, to One Wheeler Road's credit, has been its energetic effort to remediate the site. While it is true that One Wheeler Road had little choice in the matter, it could have responded badly, instead of responsibly, as it has.

The parties submitted through the testimony of their expert witnesses, Jeffrey Nangle and Leonard Sarapas, proposals for the allocation of costs. While these are not dissimilar in structure, I have adopted the framework of the plaintiffs' proposal as the more conceptually clear of the two. I have also adopted the plaintiffs' assignment of costs by category. n33 Plaintiffs allocate these as follows:

| | CATEGORY | AMOUNT |
|---|---|---|
| (1) | Phase I and Phase II Response Costs | $ 112,286.58 |
| (2) | Soil Response Costs | 213,563.96 |
| (3) | Leaching Basin and Drainage System Response Costs | 86,826.00 |
| (4) | Groundwater Response Costs | 187,672.06 |

[*43]

n33 The major conceptual difference in approach is that defendant lumps a number of costs incurred during investigation activities at the site into a general category it labels as "site characterization." Plaintiffs demarcate these expenses as directly related to either soil or groundwater remediation. While defendant's approach is not lacking in integrity, I believe that plaintiffs, who have borne the responsibility for the day-to-day remediation effort, have presented the more accurate accounting.

I will address each category in turn.

(1) Phase I and II Response Costs

Consistent with the proportionate allocation of costs between soil and groundwater remediation achieved below, I conclude that Foxboro should bear 54.25 percent of these costs, for a total of $ 60,916.

(2) Soil Response Costs

While I accept plaintiffs' attribution of costs to this category, I do not agree with the distinction they attempt to draw between remediation of "deep" and "shallow" soils. This distinction I do not believe [*44] to be supported by sufficient record evidence. I have previously concluded, that while the dominant share of responsibility for soil and groundwater pollution can be allocated between the parties, each is also to a lesser degree responsible for some cross-contamination. n34 Because I would assign roughly equivalent values to each party for their respective cross-contributions, I think the most manageable result is achieved by drawing a bright line

between soil and groundwater remediation. Consequently I assign the full costs of soil remediation, $ 231,563.96, to One Wheeler Road Associates.

n34 Foxboro, for example, is responsible for traces of methylene chloride, freon and acetone in the soil. As both plaintiffs' and defendant's expert acknowledged, traces of PCE (attributable to U.S. Windpower) have been detected in the groundwater, while no significant trace of TCE (attributable to Foxboro) has been detected in the soil.

(3) Leaching Basin and Drainage System

I attribute 100 percent of the responsibility [*45] for these costs, $ 86,926.00, to Foxboro, as the party responsible for the design and installation of the leaching basin and drainage system.

(4) Groundwater Response Costs

Consistent with my ruling with respect to soil remediation costs, I allocate 100 percent of these costs, $ 187,672.06, to Foxboro. n35

n35 This figure represents the costs of the remediation effort involving the north side of the Foxboro plant. I have ruled that there is insufficient evidence to assign responsibility for the contamination, if any, of the soil and groundwater to the south of the original building.

ORDER

1995 U.S. Dist. LEXIS 20219, *

For the foregoing reasons, judgment shall enter for plaintiffs against the defendant Foxboro Company in the amount of $ 335,515. It is further ADJUDGED and DECLARED that defendant is liable for such reasonable and necessary costs as have been, and will be incurred after October, 1993, in the groundwater remediation effort. The court will retain jurisdiction of the case for purposes of monitoring this decree. [*46] Plaintiffs are further entitled to such reasonable attorneys' fees and expert witness' fees as have been expended in initiating and maintaining this action. Plaintiffs shall, within fourteen days of this order, file an itemized bill for such attorneys' fees and expert witness' fees. Defendant shall have fourteen days to respond with objections, if any.

SO ORDERED.

Richard G. Stearns

UNITED STATES DISTRICT COURT

**EXHIBIT 2**

FILED
IN CLERK'S OFFICE

Nov 29  4  ?? PM '90

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ONE WHEELER ROAD ASSOCIATES and THE GUTIERREZ COMPANY, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| THE FOXBORO COMPANY, | ) ) |
| Defendant. | ) ) ) |

Civil Action No.


COMPLAINT


90 - ____ __3K
90 - 12873K

One Wheeler Road Associates ("Wheeler Road Associates") and The Gutierrez Company ("Gutierrez"), for their complaint against The Foxboro Company ("Foxboro"), allege as follows:

### THE PARTIES

1.    Plaintiff Wheeler Road Associates is a Massachusetts limited partnership, with a principal place of business at One Wall Street, Burlington, Massachusetts.

2.    Plaintiff Gutierrez is the sole general partner of Wheeler Road Associates. Gutierrez is a corporation organized and existing under the laws of Delaware, with a principal place of business at One Wall Street, Burlington, Massachusetts.

3.    Upon information and belief, defendant Foxboro is a corporation organized and existing under the laws

CEN00280

PLAINTIFF'S EXHIBIT
1

of Massachusetts, with a principal place of business in Foxboro, Massachusetts. Foxboro is in the business of manufacturing products for industrial process automation.

## JURISDICTION AND VENUE

4.    The Court has subject matter jurisdiction pursuant to 42 U.S.C. §9601, et. seq. and 28 U.S.C. §§1331 and 2201. The Court has pendent jurisdiction over all claims arising under Massachusetts law.

5.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b).

## ALLEGATIONS COMMON TO ALL COUNTS

6.    From August 1954 through December 1978, Foxboro and/or one or more of Foxboro's predecessor corporations, including Trans-Sonics, Inc. and Foxboro/Trans-Sonics, Inc. (the "Predecessor Corporations"), owned a parcel of land of approximately 9.5 acres located at what is now 160 Wheeler Road, Burlington, Massachusetts.

7.    Upon information and belief, Foxboro and the Predecessor Corporations operated a plant at the Site (the "Plant") which manufactured electronic instruments and systems, and used hazardous substances and materials, including tetrachloroethylene ("PCE") and trichloroethylene ("TCE"), in connection with these manufacturing operations.

2.

8.    Upon information and belief, in operating the Plant, Foxboro and the Predecessor Corporations released hazardous substances and materials at the Site, including PCE and TCE.  Upon information and belief, the hazardous substances and materials were released by Foxboro and the Predecessor Corporations from interior sinks at the Plant which discharged through a roof drainage network into an on-site leaching system.

9.    One Wheeler Road Associates purchased the Site in 1982, and has owned the Site since then.  The Plaintiffs have not released any hazardous substances or materials at the Site.

10.    In approximately September 1984, in connection with a storm drain survey performed at the Site, a health agent from the Burlington, Massachusetts Board of Health ("Board of Health") collected liquid samples from the Site.  A laboratory analysis of the samples revealed the presence at the Site of substantial concentrations of hazardous substances and materials believed to be used in connection with the manufacture of electronic instruments and systems, including PCE and TCE.

11.    In a memo dated October 11, 1984, the Board of Health agent reported this finding to the Board of Health.  The memo stated that the contamination emanated from the leaching system.  The memo also suggested that Foxboro and the

3.

CEN00282

Predecessor Corporations could be responsible for the
contamination.

12.    In response to the Board of Health's finding,
the Plaintiffs retained a hydrogeological consulting firm to
investigate Site conditions.  In connection with its
investigation, the hydrogeological consulting firm collected
and analyzed samples from the Site, and prepared a report for
submission to the Department of Environmental Quality
Engineering ("DEQE").

13.    In November 1985, the DEQE issued a Notice of
Responsibility ("NOR") to the Plaintiffs.  The NOR confirmed
that a release of hazardous materials had occurred at the Site
and that as owners of the Site, the Plaintiffs were potentially
responsible for this release.  Through the NOR and subsequent
notification, the DEQE, now the Department of Environmental
Protection ("DEP"), required the Plaintiffs to complete an
environmental assessment of the Site and to undertake
appropriate remedial measures to address the conditions
identified.

14.    The Plaintiffs have spent and continue to
spend substantial sums for assessment and remedial response
costs at the Site as required by the DEP.  The Plaintiffs'
assessment and remedial activities have included, among other
things, analyzing soil and groundwater, excavating and
disposing of contaminated sediments from the area of the

4.

CEN00283

## COUNT II

### (Massachusetts Superfund Statute)

21.   The Plaintiffs incorporate by reference paragraphs 1 through 20 as if fully set forth herein.

22.   Foxboro is a person liable under Mass. G.L. c. 21E, §5 for the release of hazardous materials on the Site.

23.   Foxboro's release of hazardous materials has damaged the value of the Site and caused the Plaintiffs to incur, and will continue to cause the Plaintiffs to incur, "response" costs as defined by Mass. G.L. c. 21E.

24.   The Plaintiffs' response actions are consistent with the Massachusetts Contingency Plan.

25.   By reason of the foregoing, the Plaintiffs are entitled to recover from Foxboro the damage to the value of the Site and their response costs.

## COUNT III

### (Restitution)

26.   The Plaintiffs incorporate by reference paragraphs 1 through 25 as if fully set forth herein.

27.   Foxboro caused the release of hazardous substances and materials at the Site for which it was responsible.

CEN00284

28.    Foxboro owed a duty to the Plaintiffs, the public and the Commonwealth of Massachusetts to investigate and remediate the contamination of the Site.

29.    The Plaintiffs have undertaken investigative and remedial measures with respect to the contamination of the Site, and have incurred substantial costs in connection with these investigative and remedial measures.  By these actions, the Plaintiffs performed duties owed by Foxboro, and as a result, Foxboro has been unjustly enriched.

30.    Foxboro is liable to the Plaintiffs for restitution of the costs they have incurred and may incur in performing Foxboro's duty to investigate and remediate the contamination at the Site.

## COUNT IV

### (Negligence)

31.    The Plaintiffs incorporate by reference paragraphs 1 through 30 as if fully set forth herein.

32.    Foxboro owed a duty to the Plaintiffs, the public and the Commonwealth of Massachusetts to operate the Plant at the Site in a safe manner and avoid contaminating the Site with hazardous substances and materials.

33.    Foxboro breached its duty and caused the Site to become contaminated.

CEN00285

the Site and the cost of their investigative and remedial measures.

## COUNT VI

### (Declaratory Judgment)

41.   The Plaintiffs incorporate by reference paragraphs 1 through 40 as if fully set forth herein.

42.   There is an actual controversy between the Plaintiffs and Foxboro as to their rights and duties concerning the contamination of the Site.

43.   The Plaintiffs seek a declaratory judgment pursuant to 28 U.S.C. §2201 as to their rights and duties, and, in particular, to a determination that Foxboro is liable to the Plaintiffs:

(a) under 42 U.S.C. §9601, et., seq. and Mass. G.L. c. 21E for all past, present and future costs of assessment, containment, response, remediation, and removal arising from the presence of hazardous substances and materials on the Site; and

(b) for indemnification for any fine, fee, damage award or cost (collectively "Costs") incurred by the Plaintiffs, if said Costs arise from the release of hazardous substances or materials from the Plant onto the Site.

9.

CEN00286

WHEREFORE, the Plaintiffs ask that the Court:

1.   Enter a judgment in their favor on Counts I, II, III, IV and V;

2.   Award their damages in an amount to be determined at trial;

3.   Issue a declaratory judgment determining the parties' rights and responsibilities, concerning the contamination of the Site, as set forth in Count VI;

4.   Award them attorneys fees, including the attorneys fees and other legal costs incurred in connection with response to the Board of Health finding and DEQE Notice, interest and costs; and

5.   Award them such other relief that the Court finds proper.

PLAINTIFFS DEMAND A TRIAL BY
JURY ON ALL COUNTS SO TRIABLE.

ONE WHEELER ROAD ASSOCIATES and
THE GUTIERREZ COMPANY

By their attorneys,

Richard A. Johnston (BBO #253420)
David S. Nalven (BBO #547220)
Hale and Dorr
60 State Street
Boston, Massachusetts 02109
(617) 742-9100

Dated:  November 28, 1990

10.

CEN00287

**EXHIBIT 3**

# GILBERT & RENTON, P.C.

23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Kathryn E. Perrotta, Esq.
Edward J. Denn, Esq.

Telephone: (978) 475-7580
Facsimile: (978) 475-1881

June 9, 2000

<u>VIA CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>

John E. Yandrasitz, Esq.
Atlantic Mutual Companies
Three Giralda Farms
Madison, NJ 07940-1004

Re:    Insured: Trans-Sonics, Inc.
       <u>Centennial Insurance Company</u>

Dear Mr. Yandrasitz:

As you know from our discussions over the last year, The Foxboro Company (as successor-in-interest to Centennial Insurance Company's insured, Trans-Sonics, Inc.) was named as a defendant in an underlying environmental action, No. 90-12873-K. <u>See</u> Complaint attached hereto as Exh. No. 1. After a bench trial, Foxboro was found liable for groundwater contamination, but was exonerated for soil contamination. The Court assessed damages of $1,144,523.79. <u>See</u> Copy of Final Judgment attached hereto as Exh. No. 2. The parties agreed to waive their respective rights of appeal provided the terms of the judgment were fulfilled, thus requiring Foxboro to pay the outstanding judgment (plus accrued costs and post-judgment interest) to Plaintiffs and also requiring the parties to work together to achieve the necessary remediation of groundwater.

Accordingly, Foxboro's costs and expenses paid to date in connection with the underlying claim are as follows:

## <u>Costs To Date</u>

| | |
|---|---|
| Net Attorneys Fees for Defending Action through 10/8/96 (date of satisfaction of judgment): | $ 375,908.28 |
| Satisfaction of Judgment (4/19/96 Judgment plus post-judgment interest and costs through 10/8/96 date of payment): | $1,187,202.90 |

# GILBERT & RENTON, P.C.

John E. Yandrasitz, Esq.
June 9, 2000
page 2

| | |
|---|---|
| Response costs (including payments to environmental engineers and costs incurred pursuant to Settlement Agreement entered into between the parties to the underlying action dated February 4, 2000): | $ 337,886.42 |
| Accrued interest at Massachusetts statutory rate (12%) through March 28, 2000 primary insurance payment by Liberty Mutual (including interest calculated on attorneys fees through 10/8/96; response costs to date; 4/19/96 judgment): | $ 862,384.17 |
| **Total Costs to Date:** | $ 2,763,381.77 |

In addition, pursuant to the terms of the Judgment and Settlement Agreement reached between the parties to the underlying action, Foxboro continues to incur engineering, operational and legal fees in connection with the ongoing remediation at the site. On a going-forward basis, these future costs are estimated to be $29,690 per year (not adjusted for inflation) for the life of the remediation operation (estimated at 30 years for a projected cost of $890,700).

## Coverage From Centennial

Centennial issued Policy No. 42-00 76 30, a three-year commercial umbrella policy, to Trans-Sonics for the period January 1, 1972-1975. See Exh. No. 3. The property damage limits of liability were initially $2,000,000 per year excess of $100,000, and on June 16, 1972, these limits increased to $5,000,000. The form policy jacket in use at that time did not include any form of pollution exclusion, see Exh. No. 4,[1] and the numbered endorsements likewise did not include any pollution exclusion. See Exh. No. 3.

## Underlying Primary Coverage

According to the schedule of underlying insurance in Centennial's umbrella policy, Liberty Mutual provided Trans-Sonics with underlying property damage liability coverage of $100,000 beginning January 1, 1972. Following Foxboro's purchase of Trans-Sonics in December 1974,

---

[1]    Our investigation indicates that Centennial did not seek approval of a form policy jacket containing a pollution exclusion until November 6 1972 – more than ten months after the effective date of the Centennial policy issued to Tran-Sonics effective January 1, 1972. See Exh. No. 4.

## GILBERT & RENTON, P.C.

John E. Yandrasitz, Esq.
June 9, 2000
Page 3

Liberty Mutual continued to provide primary coverage to Foxboro/Trans-Sonics for "sudden and accidental" pollution releases until mid-1982. Thereafter, primary pollution coverage was provided to Foxboro/Trans-Sonics only on a claims-made basis (None of the claims-made policies were triggered in this case).

Foxboro and Liberty Mutual have now resolved primary coverage issues, with Liberty Mutual paying on March 28, 2000 a total of $1,250,000 for a complete release of the claim. This amount consisted of (i) $300,000 for Foxboro's attorneys' fees incurred in defending this action and (ii) $950,000 in indemnity coverage, including $300,000 in complete exhaustion of the $100,000 underlying property damage limits in each of the Liberty Mutual primary policies issued for the periods January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75 and $650,000 allocated to subsequent Liberty Mutual policies for damages incurred by Foxboro. Foxboro is now looking to Centennial to bear the remaining damages, as well as future costs that Foxboro will continue to incur in this matter. Please contact me regarding Centennial Insurance Company's position on this claim.

Thank you for your continued cooperation

Very truly yours,

Robert J. Gilbert

cc:    Anthony R. Franciose, Esq.

**EXHIBIT 4**

Westwood Executive Center
Suite 2100
200 Lowder Brook Drive
Westwood, Massachusetts 02090
Telephone: (617) 326-7100



LIBERTY
MUTUAL.



MAR 26 1991    March 20, 1991

## Legal Dept.

Anthony Franciose, Esquire
The Foxboro Company
33 Comercial Street
Foxboro, MA  02035

RE: MA (WHEELER ROAD) VS THE FOXBORO COMPANY FILE NO: P101-

Dear Mr. Franciose:

I am writing in follow-up to our previous conversations in regards to this matter. We are presently investigating this site and within this letter have included an information request to aid us in that area.

POTENTIAL COVERAGE CONSIDERATIONS:

We presently lack sufficient information to comment specifically on how your policies may relate to the particular coverage issues present in environmental claims of this nature.

The questions that this type of case typically generates with respect to insurance coverage are:

1.  Whether all of the relief sought, which may include injunctive orders and recovery of governmental agency response costs incurred under statutory authority, qualifies as "damages because of bodily injury or property damage."

2.  When the property damage for which damages are sought occured.

3.  Whether any such property damage was neither "expected nor intended."

4.  Whether any such property damage arose from the release or escape of of pollutants which was both "sudden and accidental."

PRELIMINARY INFORMATION REQUESTED:

In order for us to continue our evaluation of this matter we are requesting that you provide us with answers to the following questions:

INV00171

Liberty Mutual Insurance Group / Boston
Equal Opportunity Employer

1. A history of Foxboro's ownership of the site including the date of purchase and the date of sale of the property.

2. A history of operations at the site during your ownership - include:

   a. A history of plant operations, including manufacturing methods, and the type of product (s) produced.

   b. A description of the waste (s) effluent by its physical & chemical properties.

   c. The amount of effluent discharge daily, and over what time period. Include any changes in the nature, quality and quantity of discharge due to variations in or cycling of plant operations.

3. A history of regulatory involvement at the site during your ownership. Include any reports or notices received from any federal or state agencies regarding the discharge or release of any pollutants from operations and dates and results of testing that has been done.

We will be in further contact with you once we have received and reviewed your responses to the information requested in this letter. We will review the information as well as our records of your policies and will advise you in more detail of our coverage position once this has been completed. In the interim, please keep us fully informed of any further developements and should you have any further questions, please contact me.

The defense of this matter, as previously discussed, has been referred to Lou Massery and Roy Giarrusso of The Law Firm of Cooley, Manion, Moore & Jones.

Liberty Mutual completely and fully reserves all of our rights under any insurance policy issued by Liberty Mutual. In the event that we determine that coverage does not exist for this claim we will advise you of our position in writing and cease to pay for defense costs from the date of such written notice forward. Once you have had the opportunity to review this letter, please sign where indicated below and return it to my attention.

Sincerely,

Arthur P. Gavrilles
Environmental Claims Specialist

ACKNOWLEDGED FOR _____ BY _____
                                                    (Signature)

                                               _____
                                               (Title)

AG: dw

INV00172



Suite 200
18 Sentry Park West
P.O. Box 1128
Blue Bell, Pennsylvania 19422-0989
Telephone: (215) 641-0400

**LIBERTY MUTUAL.**

December 3, 1991

Mr. Anthony Franciose, Esq.
The Foxboro Company
33 Commercial Street
Foxboro, MA 02035

RE:  MA  (WHEELER ROAD)  v.  THE  FOXBORO  COMPANY
P331-130031-01

Dear Mr. Franciose:

This letter is further to our letter of March 20, 1991.  We have completed our investigation into this matter and the following letter will outline our coverage position.

SITE HISTORY:

The Wheeler Road Site (Site) is a 9.5 acre property located at 160 Wheeler Road  in Burlington, Massachusetts that was formally owned by The Foxboro Company.  Foxboro used the site as a manufacturing plant for temperature and pressure instruments.  The site had a manufacturing plant facility and a leaching basin.

In August, 1954, the site was purchased by Trans-Sonics, Inc. The site was subsequently sold to Foxboro-Transonics Inc. in December, 1974.  Foxboro-Transonic Inc. operated at the site until 1978 when they were merged into The Foxboro Company. In July, 1978, Blanton C. Wiggins purchased the property from The Foxboro Company and in 1979 leased the site to Fiske Medical Science (manufacturer of medical instruments) and US Windpower Inc (manufacturer of mechanical wind generators). On June 11, 1982 the site was acquired by One Wheeler Road Associates.  One Wheeler Road Associates continued to lease the site to US Windpower from 1982 through 1989 as sole tenant.  In 1989 the site was converted to office space.

The manufacturing process used by Foxboro Company during their operation of the plant consisted of mechanical assembly, testing and soldering of wiring electrical contacts.  Foxboro used detergents and wash water to clean components.  Additionally, Foxboro used alcohol and trichlorethylene as cleaning agents.  Foxboro drummed all

hazardous materials and waste and sent the drums off site for disposal and recycling procedures.

In September 1984, samples re collected from the leaching basin by Haley & Aldrich. These samples were found to contain various halogined hydrocarbon compounds, including, industrial solvents, cleaning and degreasing agents. Some of the hazardous substances found were Trichlorethylene and other chemicals. A memo dated October 11, 1984 written by Richard Lombard to Board of Health was the first report to identify contamination on the site. The MADEP issued a notice of responsibility to the Gutierrez Company, the sole general partner of One Wheeler Road Associates, in November, 1985.

Norwood Engineering was retained by the Gutierrez Company to perform a comprehensive site inspection. Phase III of their investigation was based on the MADEP scope. Contaminants were detected in offsite wells in 1988 that can be related back to the site.

NATURE OF CLAIMS:

A civil action was filed by One Wheeler Road Associates and the Gutierrez Company against Foxboro in the U.S.D.C., District of Massachusetts, docket Number 90-12873k, which was served on Foxboro November 29, 1990. The complaint alleges in part, that Foxboro and the Predecessor Corporations released PCE and TCE from interior sinks at the plant which discharged through a roof drainage network into an on-site leaching system, which was later determined to be the source of contamination.

The complaint includes Count I, Federal Superfund Statute; Count II, Massachusetts Superfund Statute; Count III, Restitution; Count IV, Negligence (related to contaminating the site); Count V, Strict Liability (abnormally dangerous activity); and Count VI, Declaratory Judgement. The plaintiff seeks judgement on Counts I through V; damages; Declaratory Judgement determining the parties' rights and responsibilities concerning the contamination; and attorney fees, legal costs and other relief the court finds proper. After receiving notice of the suit, under a reservation of rights, Liberty Mutual referred the matter to the law firm of Cooley, Manion, Moore & Jones to to file an answer on behalf of Foxboro.

COVERAGE:

Liberty Mutual provided Comprehensive General Liability (CGL) Insurance to The Foxboro Company. The applicable policy for this claim is policy number LG1-112-020738-028 effective

INV00174

January 1, 1984 to January 1, 1985 with a Property Damage Liability limit of $1,000,000 per occurrence and a $1,000,000 aggregate.

Part I of the CGL Policy States:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A.  bodily injury or
Coverage B.  property damage

to which this policy applies, caused by an occurrence..

Under Part VI, Definitions,

"occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

"property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period....

Under Part I, Exclusions, This Policy Does not Apply:

(k)  to property damage to

(1)  property owned or occupied by or rented to the insured,
(2)  property used by the insured, or
(3)  property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control...

(l)  to property damage to premises alienated by the named insured arising out of such premises or any part thereof;

Under the Broad Form Comprehensive General Liability Endorsement Number 4, Part VI, Broad Form Property Damage Liability Coverage (Including Completed Operations), States:

The insurance for property damage liability applies, subject to the following additional provisions:

(A)  Exclusions (k) and (o) are replaced by the following:

(1)  to property owned or occupied by or rented

INV00175

to the insured....

Endorsement No. 32, POLLUTION EXCLUSION, replaces exclusion (f), and states:

> to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply to bodily injury or property damage included within the product hazard or the completed operations hazard if the discharge, dispersal, release or escape originates away from premises owned by, rented or loaned to a named insured.;

not SeA

## UMBRELLA EXCESS LIABILITY POLICY (UEL):

The Liberty Mutual UEL policy in effect when contamination was confirmed on October 11, 1984, was policy number LE1-112-020738-194 effective January 1, 1984 to January 1, 1985, with a combined single limit of liability of $10,000,000 per occurrence and a $10,000,000 property damage liability aggregate limit.

Part I of the UEL Policy States:

> The company will pay on behalf of the insured all sums in excess of the retained limit which the insured shall become legally obligated to pay, or with the  consent of the company, agrees to pay, as damages, direct or consequential, because of:
>
> ...(b)      property damage...

with respect to which this policy applies and caused by an occurrence.

Under Part V, Definitions:

> "occurrence" means injurious exposure to conditions, which results in personal injury, property damage or advertising injury or damage neither expected nor intended from the standpoint of the insured.
>
> "property damage" means (1) physical injury to or destruction of tangible property which occurs during the policy period....

INV00176

Under Part I, This Policy Does not Apply:

> (d) to (1) property damage to property of any kind
> owned...by the insured or by any named insured....
>
> (e) with respect to premises alienated by the named
> insured....

**Under Part I, Exclusions, Endorsement No. 11 amends
Exclusion (G) to read:**

> (g) to bodily injury or property damage arising out
> of the discharge, dispersal, release or escape of
> smoke, vapors, soot, fumes, acids, alkalis, toxic
> chemicals liquids or gases, waste materials or
> other irritants, contaminants or pollutants into
> or upon land, the atmosphere or any water course
> or body of water; but this exclusion does not
> apply to bodily injury or property damage included
> within the product hazard or the complete
> operations hazard if the discharge, dispersal,
> release or escape originates away from premises
> owned by, rented or loaned to a named insured.

## POLLUTION LIABILITY POLICY (LW):

Liberty Mutual has provided Pollution Liability Coverage to
The Foxboro Company from 1982 to January 1, 1991. The
applicable LW policy is policy number LW1-611-004218-090,
effective January 1, 1990 to January 1, 1991 with a
retroactive date of June 29, 1982. The Property Damage
limits of liability are $1,000,000 each occurrence and
$3,000,000 in aggregate.

Part I, Pollution Liability Coverage of the Pollution
Liability Policy states:

> The company will pay on behalf of the insured all sums
> which the insured shall become legally obligated to pay
> as compensatory damages because of bodily injury or
> property damage to which this insurance applies,
> provided that:
>
> (1) such bodily injury or property damage is caused
> by a pollution incident which commences subsequent
> to the retroactive date shown in the declarations
> of this policy; and
>
> (2) the claim for such damages is first made against
> the insured during the policy period and reported
> to the company during the policy period or within
> fifteen days after its termination.

A claim shall be deemed to have been made only when suit is brought or writt  notice of such claim is received by the insured.

All claims for damages because of bodily injury or property damage sustained by any one person or organization as a result of any one pollution incident shall be deemed to have been made at the time the first of those claims is made.

Part VI, Definitions of the Pollution Liability Policy, states:

"environmental damage" means the injurious presence in or upon land, the atmosphere, or any watercourse or body of water of solid, liquid, gaseous, or thermal contaminants, irritants, or pollutants;

"property damage" means (1) physical injury to, destruction of, or contamination of tangible property....

"pollution incident" means emission, discharge, release, or escape of

(1) any solid, liquid, gaseous or thermal contaminants, irritants, or pollutants directly from the insured site...

into or upon land, the atmosphere, or any watercourse or body of water, provided that such emission, discharge, release, or escape results in environmental damage.


Under Part I, Exclusions, This Policy does not apply:

(a)  to bodily injury, property damage, or environmental damage which is expected or intended from the standpoint of the insured.

(e)  to property damage or environmental damage to

(2) property owned or occupied by or rented to the insured, or

(3) property used by the insured, or

(4) property in the care, custody, or control of the insured or as to which the insured is for any purpose exercising physical control;

INV00178

(f)  to property damage  or environmental damage to
     premises alienated by the named insured arising
     out of such premise  or any part thereof.

(i)  to ... property damage, or environmental damage .
     arising out of a pollution incident emanating from
     an insured site, or part thereof used by the named
     insured for the storage, disposal, processing or
     treatment of waste materials, if such site or part
     thereof was:

     (1)  sealed off, closed, abandoned, or alienated
          prior to the retroactive date shown in the
          declarations of this policy....

**APPLICATION OF THE CGL, UEL, and LW POLICIES:**

There is no coverage under the CGL or UEL policies.
Actionable contamination was not observed until October 11,
1984, when samples taken confirmed contamination. This
contamination was discovered after your company had sold the
property. There has been no "occurrence" or "property damage"
as defined, which took place within Liberty Mutual's policy
period when Foxboro Company owned the Wheeler Road property.

It is our position that governmental response cost recovery
claims, such as the above, are equitable in nature, seeking
merely restitution under statutory authority for costs
incurred in responding to a threat to the public health,
welfare and the environment.  They are not claims for legal
damages because of property damage as covered under the
policy.

Furthermore, even if this matter were to qualify as a claim
for damages because of property damage, it is our position
that endorsement 32 which replaced exclusion (f) of the CGL
policy and endorsement 11 which replaced exclusion (g) of the
UEL policy, apply. The pollution exclusion is a complete bar
to both coverage and to the obligation to defend in this
matter.  Additionally, exclusions (k) of the CGL policy, as
replaced by endorsement 4, Part VI, A, (1), and (d) of the
UEL policy exclude coverage for property owned or occupied by
or rented to the insured. Exclusions (l) of the CGL and (e)
of the UEL eliminate coverage for property damage to premises
alienated by the named insured.

There is no coverage under the the LW policy. Foxboro Company
sold the Wheeler Road property prior to the retroactive date
of June 29, 1982. Exclusions (f) and (i),(1), preclude
coverage. Furthermore, exclusion (e) bars coverage to
property damage and environmental damage to property owned or
occupied by the insured.

INV00179

Additionally, there is no coverage for any of the counts included within the complaint, under any of these policies.

Accordingly, Liberty Mutual w...l not provide coverage in this matter and pursuant to our reservation of rights, as stated in our letter of March 20, 1991, we are withdrawing from the defense of this case. In order to allow Foxboro the time to make alternative defense arrangements, our withdrawal from defense will become effective thirty days from the date of this letter. We would have no objection should Foxboro want to continue to be defended by Cooley, et al. Under separate correspondence, we are notifying them that we have denied coverage and are withdrawing from defense.

While we have tried to identify all of the coverage considerations that we feel are related to this claim, we do hereby reserve all rights under any policies issued by Liberty Mutual to Foxboro and this letter should in no way be construed as a waiver of any of the terms, conditions, or exclusions included within the policies.

We regret that we cannot advise your more favorably with respect to this matter. We trust you understand our position.

Sincerely,

Thomas V. O'Kane

Thomas V. O'Kane
Environmental Claims Specialist

INV00180

Foxboro 1 LMFOX       2868

Claim Review: Foxboro Company, July 28, 1994



RE:    MA (Wheeler Road) -- Foxboro Company
       File No: P033-147358-01

BACKGROUND:

The Wheeler Road site is a 9.5 acre property located in Burlington, MA formerly owned by Foxboro Company.  The current owner is One Wheeler Road Associates.

The manufacturing process used by Foxboro Company during its operation of the plant (manufacturer of temperature and pressure instruments) included the use of detergents and wash water to clean components as well as alcohol and trichlorethylene as cleaning agents.  Foxboro Company drummed all hazardous materials and waste for shipment off site to disposal and recycling centers.  Besides the manufacturing plant facility, this site also contained a leaching basin.  In September, 1984, samples were collected from the leaching basin by Haley & Aldrich which analyses confirmed presence of various haloginated hydrocarbon compounds, including, industrial solvents, cleaning and degreasing agents such as trichlorethylene and other chemicals.

The MADEP issued a notice of responsibility to the Gutierrez Company (sole general partner of One Wheeler Road Associates) in November, 1985. Norwood Engineering was retained by the Gutierrez Company to perform a site inspection.

COMPLAINT:

A civil Complaint was brought by One Wheeler Road Associates and the Gutierrez Company against Foxboro Company in the United States District Court and served on the Foxboro Company November 29, 1990.  The complaint alleges that Foxboro Company, and its predecessor corporations, released PCE and TCE from interior sinks at the plant which discharged through a roof drainage network into the on-site leaching system which was later determined to be the source of contamination.

COVERAGE:

On December 3, 1991, Liberty Mutual issued its declination of coverage citing non-application of policy number LG1-112-020738-028, effective

INV00202

Foxboro 1 LMFOX          2840

RE: MA (Wheeler Road) -- Foxboro Company
    File No: P033-147358-01
    DWH File Review: July 19, 1994

## BACKGROUND:

The Wheeler Road site is a 9.5 acre property located in Burlington, MA formerly owned by Foxboro Company. The current owner is One Wheeler Road Associates.

The manufacturing process used by Foxboro Company during its operation of the plant (manufacturer of temperature and pressure instruments) included the use of detergents and wash water to clean components as well as alcohol and trichlorethylene as cleaning agents. Foxboro Company drummed all hazardous materials and waste for shipment off site to disposal and recycling centers. Besides the manufacturing plant facility, this site also contained a leaching basin. In September, 1984, samples were collected from the leaching basin by Haley & Aldrich which analyses confirmed presence of various haloginated hydrocarbon compounds, including, industrial solvents, cleaning and degreasing agents such as trichlorethylene and other chemicals.

The MADEP issued a notice of responsibility to the Gutierrez Company (sole general partner of One Wheeler Road Associates) in November, 1985. Norwood Engineering was retained by the Gutierrez Company to perform a site inspection.

## COMPLAINT:

A civil Complaint was brought by One Wheeler Road Associates and the Gutierrez Company against Foxboro Company in the United States District Court and served on the Foxboro Company November 29, 1990. The complaint alleges that Foxboro Company, and its predecessor corporations, released PCE and TCE from interior sinks at the plant which discharged through a roof drainage network into the on-site leaching system which was later determined to be the source of contamination.

## COVERAGE:

On December 3, 1991, Liberty Mutual issued its declination of coverage citing non-application of policy number LG1-112-020738-028, effective 1/1/84 to 1/1/85. Limits of insurance under this policy is $1,000,000 per occurrence for property damage liability and $1,000,000 aggregate.

INV00203

Liberty Mutual also issued Umbrella Excess Liability (UEL) insurance under policy number LE1-112-020738-194, effective 1/1/84 to 1/1/85. Limits of insurance under this policy is $10,000,000 per occurrence and $10,000,000 property damage liability aggregate limit. Our letter of December 3, 1991 disclaimed coverage under the UEL policy as well.

## DAMAGES:

According to August 1, 1991 status report from Foxboro Company's counsel, Roy Giarrusso, plaintiffs allege they have incurred no less than $350,000 in response costs so far to determine the nature and extent of contamination at the site. The site has been listed as a priority disposal site under the Massachusetts Contingency Plan and subject to direct regulatory review and oversight by the state. Assessment of remedial response actions according to the plaintiff are ongoing in accordance with provisions of the NCP.

## STATUS:

On November 13, 1985 One Wheeler Road Associates was served a notice of responsibility which required that Phase I, II and III studies be performed and that an Interim Remedial Action of rerouting the drainage system and removing the leaching basin be performed. One Wheeler Road Associates performed the work required by the agency. In March, 1987, a Phase I Site Assessment was submitted to MADEP by Haley & Aldrich. On October 8, 1987 a Phase II scope of work was submitted and in September, 1988, a Phase III environmental study was submitted. In October, 1989, a Health and Safety Measures Work Plan (Phase IV) was submitted to MADEP on behalf of the Gutierrez Company.

As of August, 1991 litigation was in discovery stage. Mr. Thomas Mudgett, an employee of Foxboro Company who once worked at the Wheeler Road facility, was deposed. He acknowledged that alcohol, trichloroethylene, freon and methylene chloride were used to clean the products, which Foxboro Company manufactured, and certain equipment. He testified, however, that nothing was disposed on or at the site and that all of the used hazardous materials were disposed off-site through the use of a contract disposal firm. He stated that sinks were not used in the disposal of waste materials.

INV00204

<u>PLAN:</u>

Review of file finds a request by the REU for a HOL legal opinion in light of their having received a rebuttal from the ph's atty on March 13, 1993. It is unclear to me whether a request for HOL opinion was ever sent.

Have dictated a HOL opinion request and will send with file and policies to HOL.

David W. Hudson

INV00205

**EXHIBIT 5**



| CHECK DIGIT | OFFICE | PRO-DUCER | PL-TERM | CO. | POLICY TYPE | TRAN-SAC-TION | INSTALL-MENT | FINANCE | SPECIAL AGT. | REINS. CO. | SUB-PROD. | FOREIGN CURRENCY | LINE | TRAN-SAC-TION | STATE | TERR. | TAX TOWN | TAX COUNTY | PROCESS CODE | REN'L | SUBLINE | CLASS | PREMIUM |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | 32 | C | C | N |  |  | N | 1 |  |  |  |  | 471 | 30 |  |  |  |  | 190 |  |  | 9850- |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 9850- |  |
|  |  |  |  |  | 5 | 71 NP | 73 BK | 75 DB | 77 CD | 79 RR |  |  |  |  |  |  |  |  |  |  |  | 9850- |  |
|  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  | 9850- |  |

REINS.
Kls
MAR 16 1972

**REINS. R 2301** AUTHORIZED BY DATE 1/1/72

GROSS LINE ____ % PML ____

RETENTION ____ %

TREATY # 200 530

PROCESSED   TREATY # ____ %

MAR 28 1972

**AL INSURANCE COMPANY**
**CIAL UMBRELLA DAILY REPORT**

**UNDERGROUND STORAGE**

...ER 462 00 76 30

Trans-Sonics, Inc.
P. O. Box 328
Lexington, Massachusetts 02173

INDIVIDUAL
PARTNERSHIP
CORPORATION
JOINT VENTURE

(NUMBER & STREET, TOWN, COUNTY & STATE)

2. Policy Period: 12.01 A.M. standard time, at the address shown above. From: **1/1/72** To: **1/1/75**
   Agent or Broker: Truman Hayes & Company
   Office Address: 30 Federal Street
   Town and State: Boston, Massachusetts

CENTRAL FILES
MAR 13 '72

3. Limit of Liability: The limit of the company's liability shall be as stated herein, subject to all the terms of this policy having reference thereto.
   (a) Policy Limit $ 2,000,000   Per Occurrence
   (b) Aggregate Applicable $ 2,000,000   Where Applicable
   (c) Retained Limit $ 10,000   Per Occurrence

4. Premium: Three year term prepaid $ 1,500.00
   Three year term installment basis: on inception date $ 500.00   on each anniversary $ 500.00
   Minimum retained premium $ 150.00

5. Form numbers of endorsements attached to policy at inception: G1690A; Q5303

## SCHEDULE A OF UNDERLYING INSURANCE

| TYPE OF POLICY | CARRIER, POLICY NUMBER and POLICY PERIOD | APPLICABLE LIMITS |
|---|---|---|
| (a) Comprehensive General Liability | Liberty Mutual Insurance Company<br>LGl-112-067402-061<br>1/1/72 to 1/1/73 | **Personal Injury Liability**<br>$ 100 ,000 each person<br>$ 300 ,000 each **occurrence**<br>$ 300 ,000 aggregate products<br>**Property Damage Liability**<br>$ 50 ,000 each **occurrence**<br>$ 50 ,000 aggregate operations, protective, products and contractual, if applicable. |
| (b) Comprehensive Automobile Liability<br>Owned, Non-Owned and Hired Vehicles | Lumbermens Insurance<br>2M0443483<br>1/1/72 to 1/1/73 | **Bodily Injury Liability**<br>$ 100 ,000 each person<br>$ 300 ,000 each **accident**<br>**Property Damage Liability**<br>$ 50 ,000 each **accident** |
| (c) Employers' Liability | Liberty Mutual Insurance Company<br>WGl-112-067402-011<br>1/1/72 to 1/1/73 | $ 100 ,000 each accident |

CEN00316

bjn EWL 3/9/72



CEN00317

| OFFICE ② | C/P/C 1 | CARD TYPE 2 | LINE ③ | TRANS-ACTION 2 | STATE ③ | TERR. ③ | TAX TOWN 4 | TAX COUNTY 2 | FINAL REPORT ① | PROCESS CODE 2 | COMM. RATE ③ | COMM. RATE ③ | CLASS OR COVERAGE IDENTIFICATION 55 56 57 58 59 60 | EXPOSURES ⑥ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | C | 02 | 471 | | | | | | | | | | 9 6 4 0 - 1 | |



Effective **4/1/72**                           , this endorsement forms a part of Policy No.   **462 00 76 30**

*(At the time stated in the policy)*

issued to **Trans-Sonics, Inc.**

by **Centennial**                    Insurance Company.                    **ENDORSEMENT #2**

*(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)*

**The Aggregate limit under the underlying property damage policy**

**is increased from 50,000 to 100,000.**

CENTRAL FILES
v .w
MAR 30 '72

**Truman Hayes**
**bjn RPH 3/28/72**

All other terms and conditions of this insurance remain unchanged.

*Harold S. Eckmann*
President

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
*Authorized Representative*

G1690A (12/71)

CEN00318

| OFFICE (2) | P/C 1 | CARD TYPE 2 | LINE (3) | TRANS-ACTION 2 | STATE 2 | TERR. (3) | .TAX TOWN 4 | TAX COUNTY 2. | FINAL REPORT (1) | PROCESS CODE 2 | | | CLASS OR RENEWAL | | | | EXPOSURES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | C | 02 | 471 | | | | f | | | | | | | | | | |




*Effective* **6/16/72** , this endorsement forms a part of Policy No. **462 00 76 30**

*(At the time stated in the policy)*

*issued to* **Trans-Sonics, Inc.**

*by* **Centennial** Insurance Company.

*(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)*

CORRECTED ENDORSEMENT #3

In consideration of the additional premium of $1,909.00 payable

as shown below, it is understood and agreed that the policy

limit is increased to $5,000,000.

Additional Premium Payable:

| | |
|---|---|
| $409.00 | 6/16/72 |
| $750.00 | 1/1/73 |
| $750.00 | 1/1/74 |

RECEIVED NOV 27 2000 SPECIALTY CLAIMS

CENTRAL FILES

AUG 07 '72

All other terms and conditions of this insurance remain unchanged.

**Truman Hayes & Co.** bjn RPH 8/3/72

*Harold A. Eckmann*
President

— — — — — — — — — — — — — — — —
*Authorized Representative*

G1690A    G1690A

CEN00319

| OFFICE | P/C | CARD TYPE | LINE | TRANS-AC-TION | STATE | TERR. | TAX TOWN | TAX COUNTY | FINAL REPORT | PROCESS CODE | COMM. RATE | COMM. RATE | CLASS OR COVERAGE IDENTIFICATION 55 56 57 58 59 60 | EXPOSURES |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 11 | C | 02 | 471 | | | | | | | | | | 9 6 4 0 - 1 | |



**Effective** **6/16/72** , this endorsement forms a part of Policy No. **462 00 76 30**

(At the time stated in the policy)

issued to **Trans-Sonics, Inc.**

by **Centennial** Insurance Company.

(The information provided for above is required to be completed only when this endorsement is issued for attachment to the policy subsequent to its effective date.)

*CORRECTED ENDORSEMENT #3*

In consideration of the additional premium of $636.00 payable as shown below, it is hereby understood and agreed that the policy limit is increased to $5,000,000.

**Additional Premium Payable:**

| | |
|---|---|
| $136.00 | 6/16/72 |
| $250.00 | 1/1/73 |
| $250.00 | 1/1/74 |

CENTRAL FILES
JUL 17 '72

Truman Hayes
bjn RPH 7/14/72

All other terms and conditions of this insurance remain unchanged.

_____
President

- - - - - - - - - - - - - - - - - - - - - -
*Authorized Representative*

G1690A (12/71)

CEN00321

**EXHIBIT 6**

TRANS-SONICS, INC.

SCHEDULE OF INSURANCE

DECEMBER 31, 1973

| Type and Description | Company | Policy No. | Limits of Coverage | | Period | Basis |
|---|---|---|---|---|---|---|
| **Transportation** | | | | | | |
| Goods and merchandise held in Trust, or Commission, Consignment, Outside Processors, Packers, Trade Shows | Centennial (A) | 235-110-657-3 | 2,000<br>40,000<br>7,000<br>4,000 | Outside Processors<br>Special Crating<br>One Exhibition<br>Transcale<br>Transportation &<br>Demonstration | 4-1-74<br>-<br>4-3-75 | Yr. |
| **Real and Personal** | Arkwright-Boston | 670195 | 2,843,000<br>2,870,000<br>25,000<br>42,000<br>200,000 | Property Damage<br>Bus. Interruption<br>Property Damage<br>Away from Premises<br>Rent (Being Canc. 5/6/74)<br>Valuable Papers | 1-1-73<br>-<br>1-1-76 | Dep.<br>Prem.<br>3 Yrs. |
| Premises on Wheeler Rd. Burlington, Mass. | | | | | | |
| **Difference in Condition** | Arkwright-Boston | S-770,044 | 1,000,000 | At any location except not more than 400,000 by earthquake in any 12 consecutive months | 1-1-73<br>-<br>1-1-76 | 3 Yrs. |
| All risks of direct physical loss or damage to insured property | | | | | | |
| **Comprehensive Gen. Liability** | Liberty Mutual | LGI 512-067-012-36 | 1,000,000<br>1,000,000 | Bodily Injury<br>Property Damage<br>each occurance<br>and aggregate | 1-1-73<br>-<br>1-1-74 | Adj.<br>Prem.<br>1 Yr. |
| To pay on behalf of the insured all sums which the insured shall become legally obligated to pay | | | | | | |
| **Umbrella Excess** | Centennial (A) | 462-00 76 30 | 5,000,000 | | 1-1-72<br>-<br>1-1-75 | Per Yr. |
| Covers insured for ultimate loss in excess of retained limits under Comprehensive General, Comprehensive Automobile Workmens Compensation | | | | | | |

(A) = Truman Hayes

**EXHIBIT 7**

# GILBERT & RENTON LLC
23 Main Street
Andover, Massachusetts 01810

Robert J. Gilbert, Esq.
Jeffrey B. Renton, Esq.
Edward J. Denn, Esq.

Telephone: (978) 475-7580
Facsimile: (978) 475-1881

May 1, 2001

<u>Via Certified Mail -- Return Receipt Requested</u>

Ms. Nancy Crosta Landale
Atlantic Mutual Insurance Company
Centennial Insurance Company
Administrative Center
Three Giralda Farms
Madison, NJ 07940-1004

  Re: Insured: Trans-Sonics, Inc.
    Claim No.: 95-806021

Dear Ms. Landale:

  I am writing in response to your letters of December 28, 2000 and April 13, 2001, concerning the claim for coverage by The Foxboro Company ("Foxboro"), as successor to Trans-Sonics, Inc., under Centennial Insurance Company Policy No. 42-00 76 30.  Your first question on page one requests the identity of those insurers from whom Centennial purchased general liability insurance prior to January 1, 1972.  We have investigated this matter exhaustively, but have not been able to identify any primary insurers prior to January 1, 1972.

  Your second question on page one requests information concerning the Liberty Mutual policies issued to Trans-Sonics between 1974 and 1982.  With respect to the period beginning January 1, 1974, Liberty Mutual provided coverage to Trans-Sonics pursuant to policy no. LGI 112-020738-024.  We have not been able to locate a copy of that policy, but have secondary evidence of the policy pursuant to the schedule of underlying insurance in the Centennial umbrella policy.

  With respect to the periods beginning January 1, 1975-76 through January 1, 1982-January 1, 1983, Foxboro received coverage under the following Liberty Mutual policies:

| Policy Number | Policy Period | Type of Policy | Limits |
|---|---|---|---|
| LGI-112-020738-025 | 1/1/75 - 1/1/76 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-193 | 1/1/73 - 1/1/76 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-026 | 1/1/76 - 1/1/77 | Primary/CGL | $500,090 occ/agg |
| LEI-112-020738-196 | 1/1/76 - 1/1/77 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-027 | 1/1/77 - 1/1/78 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-197 | 1/1/77 - 1/1/78 | Umb/Excess | $10 million occ/agg |

INV00099

# GILBERT & RENTON LLC

Ms. Nancy Crosta Landale
May 1, 2001
Page 2

| | | | |
|---|---|---|---|
| LGI-112-020738-028 | 1/1/78 - 1/1/79 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-198 | 1/1/78 - 1/1/79 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-029 | 1/1/79 - 1/1/80 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-199 | 1/1/79 - 1/1/80 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-020 | 1/1/80 - 1/1/81 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-190 | 1/1/80 - 1/1/81 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-021 | 1/1/81 - 1/1/82 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-191 | 1/1/81 - 1/1/82 | Umb/Excess | $10 million occ/agg |
| LGI-112-020738-022 | 1/1/82 - 1/1/83 | Primary/CGL | $500,000 occ/agg |
| LEI-112-020738-193 | 1/1/83 - 1/1/84 | Umb/Excess | $10 million occ/agg |

Please note that each of the subject policies was subject to a pollution exclusion that provided coverage only for sudden and accidental releases of contaminants or pollutants.

Beginning on June 29, 1982, The Foxboro Company purchased claims-made pollution coverage from Liberty Mutual. On that same date (and continuing in all subsequent years of coverage), Liberty Mutual endorsed a so-called "absolute" pollution exclusion onto the above-referenced primary and umbrella/excess policies that it issued to Foxboro. Liberty Mutual denied all coverage for the Wheeler Road claim pursuant to the post-June 29, 1982 claims-made pollution liability policies on the basis of an exclusion that barred coverage for claims arising at owned sites that had been disposed of by Foxboro prior to June 29, 1982. (Foxboro sold the Wheeler Road facility in 1978.)

Your third question on page one requests an explanation for Foxboro's decision not to purchase "occurrence" coverage after 1982. Please see Foxboro's response to the preceding question, which I trust will provide the information you are seeking.

Your next series of questions, set forth on page two of your letter, concerns details of the Foxboro/Liberty Mutual settlement. To the extent I can do so without breaching the settlement agreement with Liberty Mutual, I will attempt to provide further information.

— Question No. 1 on page two of your letter concerns payment of defense costs. Liberty Mutual disputed any obligation to cover either defense or cleanup costs, and pursuant to the settlement it is clear that by paying only $300,000 toward defense costs, Liberty Mutual did not pay all of Foxboro's defense costs.

— Question No. 2 on page two of your letter concerns the $300,000 paid by Liberty Mutual to exhaust the January 1, 1972-73, January 1, 1973-74 and January 1, 1974-75 policies. After an exhaustive search, the only information we were able to locate indicated that Liberty Mutual provided coverage to Trans-Sonics in each of these three years in the annual amount of $100,000 per occurrence/aggregate. Because the actual policies have never been located, it was unclear whether a pollution exclusion was contained in these policies.

INV00100

## GILBERT & RENTON LLC

Ms. Nancy Crosta Landale
May 1, 2001
Page 3

Please note that Foxboro did not acquire Trans-Sonics until December 19, 1974, and therefore the 1974-75 policy issued by Liberty Mutual to Foxboro (which would have provided coverage to Trans-Sonics for only 12 days) was not considered to be of material importance in the claim against Liberty Mutual.[1]

You are correct that Foxboro believes the relevant "underlying limit of liability" below the Centennial policy to be only $100,000 for the period from April 1, 1972 through January 1, 1975. However, between January 1, 1972 and April 1, 1972, the underlying limit of liability was only $50,000. These amount are stated in the Centennial umbrella policy, and we are unaware of any endorsement to the Centennial policy (or any return premium having been issued to Trans-Sonics) that would have resulted in the Centennial policy attaching at a different or higher underlying limit of liability.

– The third question on page 2 of your letter asks how the $650,000 allocable by Liberty Mutual relates to the actual limits of liability in the policies between 1975 and 1982 (partial period). We are not privy to Liberty Mutual's internal allocation, but we assume that the settlement amount was been allocated on a pro rata basis (i.e., approximately $100,000 per policy period) to each of those policies, including the half-year policy in effect in 1982 before the absolute pollution exclusion was endorsed onto the policy on June 29, 1982.

– Your final question inquires (i) whether the Liberty Mutual policies contain an aggregate limit of liability and (ii) whether Liberty Mutual has been placed on notice of the Equity Office Properties claim. In response to the first question, the answer is that the policies do contain an aggregate limit of liability, as set forth above on pp. 1-2 of this letter. Liberty Mutual disputed Foxboro's ability to "stack" policy limits, and this issue was compromised by the settlement. With respect to the Equity Office Properties claim, please note that Liberty Mutual received a site release in connection with the compromise settlement of the Wheeler Road claim and believes that the site release applies to the Equity Office Properties claim. Accordingly, Liberty Mutual is not a source of collectible insurance for the Equity Office Properties claim.

---

[1]     Interestingly, the schedule of insurance for the Centennial umbrella policy indicates that in the 1972-73 primary policy issued by Liberty Mutual to Trans-Sonics, the limit of liability for property damage liability was only $50,000 until April 1, 1972. In effect, the lower limit of liability ($50,000) for the first 91 days of 1972 under the policy issued by Liberty Mutual to Trans-Sonics was essentially offset by the higher limit of liability ($500,000) provided by Liberty Mutual to Foxboro for the last 12 days of 1974.

# GILBERT & RENTON LLC

Ms. Nancy Crosta Landale
May 1, 2001
Page 4

Finally, I want to express Foxboro's disagreement with your statement that "the Centennial umbrella policy is excess to all "collectible" insurance and requires that all collectible policies – not just those in effect from 1972 to 1975 – be exhausted before its coverage is even triggered." Without waiving any of its rights, Foxboro has two preliminary observations concerning the "other insurance" issue. First, it is clear under Massachusetts law that Foxboro has the right to allocate the entirety of the Wheeler Road loss to the 1972-75 policy period, pursuant to the Appeals Court's adoption of the Keene "spike" approach to the allocation of long-term environmental damage to a single policy period. See Rubenstein v. Royal Ins. Co. of America, 44 Mass. App. Ct. 842, 694 N.E.2d 381, 388 (1998) (allowing policyholder to assign entire loss to Royal's 1969-72 policy period), citing Keene Corp. v. Insurance Co. of N. America, 667 F.2d 1034, 1047-50 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007 (1982). Thus, as between the policyholder (Foxboro/Trans-Sonics) and the insurer (Centennial), Foxboro may seek recovery in the 1972-75 policy period from the primary carrier (Liberty Mutual) and then pursue excess/umbrella coverage during this same policy period.

Foxboro's second observation is that there is no evidence that any such "other insurance" – whether primary or excess – in fact exists. Centennial's umbrella policy is the only identified policy whose coverage is not subject to a pollution exclusion. To the contrary, a limited and/or absolute pollution exclusion is contained in each of the Liberty Mutual policies issued to Foxboro after its acquisition of Trans-Sonics on December 19, 1974, and therefore there is no post-12/19/74 insurance "covering a loss that is also covered [under the Centennial policy]." Further, the policies issued by Liberty Mutual to Trans-Sonics prior to December 19, 1974 have been exhausted in settlement of this claim. Accordingly, even assuming that a Massachusetts court both (i) would allow Centennial to apply the "other insurance" clause to policies that were issued in other policy periods (which has never been permitted in Massachusetts and has been rejected in many other jurisdictions) and (ii) would allow Centennial to raise the "other insurance" clause as a defense to coverage against its policyholder, rather than in a subsequent contribution action against other insurers (an approach that was emphatically rejected by the Rubenstein court), there is simply no "other insurance" that Centennial can identify.

I trust that this answers your questions. Foxboro looks forward to hearing from Centennial and to an early, amicable resolution of this claim.

Very truly yours,

Robert J. Gilbert

cc:    Anthony R. Franciose, Esq.

INV00102

**EXHIBIT 8**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

INVENSYS SYSTEMS, INC.,                     \*
      Plaintiff,                               \*
                            \*
      v.                                       \*     CIVIL ACTION NO: 05-11589 WGY
                            \*

CENTENNIAL INSURANCE COMPANY, \*
      Defendant.                               \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S RESPONSE TO DEFENDANT'S
## FIRST SET OF INTERROGATORIES

Pursuant to Fed. R. Civ. P. 33 and applicable local rules, Plaintiff Invensys Systems, Inc.

hereby objects and responds to Defendant's First Set of Interrogatories (the "Interrogatories").

## GENERAL OBJECTIONS

1.      Plaintiff objects to the Interrogatories to the extent that they seek to impose

obligations on them other than those set forth in the Federal Rules of Civil Procedure.

2.      Plaintiff objects to the Interrogatories to the extent they seek information or

materials protected from discovery by the attorney-client privilege, the common interest

privilege or protection, the work product protection, the spousal immunity, the joint defense

doctrine and/or any other privilege, protection, immunity or exemption.  Plaintiff will provide no

information that is subject to any such privilege, protection, immunity or exemption.

3.      Plaintiff objects to the Interrogatories to the extent they are over broad, unduly

burdensome, or seek information or materials not described with reasonable particularity or not

relevant to the claim or defense of any party.

4.      Plaintiff objects to the Interrogatories as overly broad and unduly burdensome to

the extent they seek information or materials outside its possession, or in the possession of the

Defendant or its counsel any person not a party to this lawsuit, or in the public domain.

5.    Plaintiff has not yet completed its trial preparation, including discovery. Thus, Plaintiff reserves the right to amend, modify or supplement its objections and responses.

6.    Plaintiff objects to discovery requests seeking information or documents created or pertaining to events occurring outside the time periods relevant to this case and has not attempted to provide any such information.

These General Objections are incorporated into each of the Specific Responses below and are neither waived nor in any way limited by the Specific Responses.

## SPECIFIC RESPONSES

### Interrogatory No. 1

Identify all damages, costs, response costs, fees or expenses relating to the Wheeler Road Lawsuit; the Final Judgment; and/or any other amount claimed by Invensys from Centennial in this action and State the Basis for Invensys' claim that Centennial is liable for each such item of damages, costs, response costs, fees or expenses.

### Objections to Interrogatory No. 1

Plaintiff objects to this Interrogatory to the extent it requires disclosure of the work product, including mental impressions, of Plaintiff's attorney.

Without waiving any objection, Plaintiff responds as follows.

### Response to Interrogatory No. 1

Invensys has incurred the following cost/damages in Wheeler Road Lawsuit:

| | |
|---|---|
| Net Attorneys Fees for Defending Action through 10/8/96 (payment of judgment): | $ 375,908.28 |
| Satisfaction of Judgment (4/19/96 Judgment plus post-judgment interest and costs through 10/8/96 date of payment); | $1,187,202.90 |

| | |
|---|---|
| Response costs (including engineers and consultants, costs incurred under 2/4/00 Settlement Agreement) | $  506,286.34 |
| Future remedial costs per Settlement Agreement | $  712,560.00 |
| Interest (through March 2006 - will be updated at trial) | $  529,293.00 |
| Total Past and (Estimated) Future Ultimate Net Loss: | $ 3,311,250.52 |
| Less Amount Received from Primary Insurer | ($ 1,250,000.00) |
| **TOTAL AMOUNT OF CLAIM** | **$ 2,061,250.52** |

The total response costs set forth above includes costs incurred by Invensys for groundwater remediation, including costs incurred both before and after the "Settlement Agreement and Release" dated February 4, 2000, as follows:

| | |
|---|---|
| Remediation costs prior to settlement | $235,123.81 |
| Settlement Payment (February 4, 2000) | $102,762.59 |
| Subsequent remediation payments per agreement | $168,399.94 |
| 3/1/99 - 3/15/00 ($41,822.88) | |
| 4/1/00 - 10/14/00 ($14,131.86) | |
| 11/1/00 - 5/31/01 ($20,952.02) | |
| 6/1/01 - 5/31/02 ($20,050.55) | |
| 6/1/02 - 2/28/03 ($25,515.72) | |
| 3/1/03 - 4/30/04 ($15,567.74) | |
| 5/1/04 - 8/31/05 ($19,578.79) | |
| 9/1/05 - 3/31/06 ($10,780.38) | |
| **Total Remediation Costs (through 8/31/05)** | **$506,286.34** |

In addition, Invensys continues to pay ongoing engineering, operational and other remedial costs, which are estimated at $29,690 per year (not adjusted for inflation) through 2030, for additional costs of $712,560.

These amounts are recoverable pursuant to the definition of "ultimate net loss" and, depending upon the basis upon which Centennial is deemed to have a coverage obligation, upon policy provisions defining the scope of Centennial's obligation to pay defense costs.

**Interrogatory No. 2**

Identify all liability insurance policies issued to Invensys (including The Foxboro Company or Trans-Sonics Inc.) whether or not at issue in the current action, allegedly providing coverage to Invensys (including The Foxboro Company or Trans-Sonics, Inc.) from 1954 to 1991, including the following information:

a)    Identity of the issuing company;

b)    Policy number(s);

c)    Date(s) during which the policy(ies) were in effect;

d)    Named Insured;

e)    Whether or not Invensys possesses a true and accurate copy of each such policy;

f)    If Invensys does not possess a copy of each policy, identify all available facts and documents relating to the limits of liability, terms, condition, endorsements and exclusions contained in each such policy;

g)    The limits of liability of each such policy (including any "per accident" or "per occurrence" limits) and, if applicable, the amount of underlying insurance.

**Objections to Interrogatory No. 2**

Invensys objects to this interrogatory to the extent it requires information or documents relating to "pre-acquisition coverage," i.e., policies issued to The Foxboro Company/Invensys Systems, Inc. prior to the date in 1974 that it acquired Trans-Sonics, Inc. Invensys further objects to this interrogatory to the extent it requires information or documents relating to "non-underlying coverage," i.e., policies issued to The Foxboro Company/Invensys Systems, Inc. or Trans-Sonics, Inc. in periods other than the time period of January 1, 1972 - January 1, 1975 in which Defendant provided first-layer excess/umbrella coverage to Trans-Sonics. Plaintiff further

objects to this Interrogatory to the extent it requires disclosure of the work product, including mental impressions, of Plaintiff's attorney.

Without waiving any objection, Plaintiff responds as follows:

**Response to Interrogatory No. 2**

Pursuant to Rule 33(b), Fed. R. Civ. P., the burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Defendant as it is for Plaintiff, and the answer to this interrogatory may be derived from a review of the copies of policies and secondary evidence of coverage that has previously been produced to Defendant and/or made available to Defendant. These copies of policies and secondary evidence will be made available for further inspection at a time and place mutually convenient to counsel for Plaintiff and Defendant.

**Interrogatory No. 3**

Please identify all liability insurance policies, whether or not at issue in this action, which Invensys contends have exhausted their limits or which are otherwise unavailable to respond to the Final Judgment or any of the other costs, damages, response costs, fees or expenses claimed by Invensys in this action and State the Basis for Invensys' contention with respect to why each such policy has been exhausted or is otherwise unavailable.

**Objections to Interrogatory No. 3**

Invensys objects to this interrogatory to the extent it requires information or documents relating to "pre-acquisition coverage," i.e., policies issued to The Foxboro Company/Invensys Systems, Inc. prior to the date in 1974 that it acquired Trans-Sonics, Inc. Invensys further objects to this interrogatory to the extent it requires information or documents relating to "non-underlying coverage," i.e., policies issued to The Foxboro Company/Invensys Systems, Inc. or Trans-Sonics, Inc. in periods other than the time period of January 1, 1972 - January 1, 1975 in

which Defendant provided first-layer excess/umbrella coverage to Trans-Sonics. Plaintiff further

objects to this Interrogatory to the extent it requires disclosure of the work product, including

mental impressions, of Plaintiff's attorney. Plaintiff further objects to this Interrogatory to the

extent it requires disclosure of information or documents that cannot be disclosed pursuant to a

confidentiality requirement in the Settlement Agreement between Liberty Mutual and Plaintiff.

Without waiving any objection, Plaintiff responds as follows:

**Response to Interrogatory No. 3**

Pursuant to Rule 33(b), Fed. R. Civ. P., the burden of deriving or ascertaining the answer

to this interrogatory is substantially the same for Defendant as it is for Plaintiff, and the answer

to this interrogatory may be derived from a review of the copies of policies and secondary

evidence of coverage that has previously been produced to Defendant and/or made available to

Defendant. These copies of policies and secondary evidence will be made available for further

inspection at a time and place mutually convenient to counsel for Plaintiff and Defendant.

Answering further, Plaintiff states that there has been complete exhaustion of the

property damage policy limits of the primary comprehensive general liability policies issued by

Liberty Mutual to Trans-Sonics for periods January 1, 1972-73, January 1, 1973-74, and January

1, 1974-75. Plaintiff further states that there has been complete exhaustion of the available

property damage limits of the primary comprehensive general liability policies issued by Liberty

Mutual to The Foxboro Company (now known as Invensys Systems, Inc.) for the periods

January 1, 1975 - June 29, 1982. The basis for Invensys's contention that these policies have

been exhausted in whole or in part is that in the year 2000, Liberty Mutual paid a settlement of

$1,250,000 that had the effect of exhausting the available property damage limits of liability of

the aforementioned primary policies issued to Trans-Sonics and to Foxboro/Invensys. (Plaintiff

cannot presently produce the applicable Settlement Agreement as it is covered by a confidentiality agreement.)

## Interrogatory No. 4

Please identify all settlements or other amounts received by Invensys from any insurer for any costs, damages, response costs, fees, expenses or other sums relating to the Wheeler Road Lawsuit and/or the Final Judgment, including:

a) the amount(s) received;

b) the source of each such amount;

c) the date(s) on which each such amount was received;

d) all agreements pertaining to each such settlement amount; and

e) how the amounts were allocated or apportioned with respect to the various items of Invensys' claimed damages and State the Basis for any such allocation or apportionment.

## Objections to Interrogatory No. 4

Invensys objects to this interrogatory to the extent it requires information or documents relating to "pre-acquisition coverage," i.e., policies issued to The Foxboro Company/Invensys Systems, Inc. prior to the date in 1974 that it acquired Trans-Sonics, Inc. Invensys further objects to this interrogatory to the extent it requires information or documents relating to "non-underlying coverage," i.e., policies issued to The Foxboro Company/Invensys Systems, Inc. or Trans-Sonics, Inc. in periods other than the time period of January 1, 1972 - January 1, 1975 in which Defendant provided first-layer excess/umbrella coverage to Trans-Sonics. Plaintiff further objects to this Interrogatory to the extent it requires disclosure of the work product, including mental impressions, of Plaintiff's attorney. Plaintiff further objects to this Interrogatory to the

extent it requires disclosure of information or documents that cannot be disclosed pursuant to a confidentiality requirement in the Settlement Agreement between Liberty Mutual and Plaintiff.

Without waiving any objection, Plaintiff responds as follows:

**Response to Interrogatory No. 4**

In March 2000, Plaintiff and Liberty Mutual settled a coverage lawsuit over the scope of the primary insurance coverage, with Liberty Mutual paying a total of $1,250,000 for a complete release of any insurance claims relating to the defense costs, cleanup costs, judgment, and settlement costs that are now the subject of this action. This settlement amount from Liberty Mutual consisted of (i) $300,000 for Foxboro/Invensys's attorneys' fees incurred in defending the Wheeler Road Lawsuit and (ii) $950,000 in indemnity coverage. Foxboro/Invensys and Liberty Mutual agreed that the first $300,000 of the indemnity payment would be applied to exhaust the $100,000 per policy limits of the three Trans-Sonics policies (January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75), which could not be shown to contain a pollution exclusion and therefore provided the clearest source of coverage. The remaining $650,000 was allocated to subsequent Liberty Mutual policies (all containing pollution exclusions) issued to The Foxboro Company after the December 1974 merger.

The net effect of the settlement with Liberty Mutual was the complete exhaustion of all property damage limits of liability in all primary policies sitting directly below the Centennial policy, and the exhaustion of available property damage limits in various policies issued subsequent to the expiration of Trans-Sonics' policies.

**Interrogatory No. 5**

Identify the date on which notice of the Wheeler Road Lawsuit and the Final Judgment were provided to Centennial; the manner by which notice thereof was given to Centennial; and the reasons why notice was not given to Centennial prior to that date.

**Objections to Interrogatory No. 5**

Plaintiff objects to this Interrogatory to the extent it requires disclosure of the work product, including mental impressions, of Plaintiff's attorney.

**Response to Interrogatory No. 5**

On June 24, 1999, Invensys's counsel wrote to Centennial to apprise them of the pendency of the coverage lawsuit with Liberty Mutual and requesting Centennial to search for evidence of coverage issued to Trans-Sonics. Numerous conversations thereafter ensued between John Yandrasitz (an attorney at Centennial) and Invensys's attorneys, including Kathryn E. Perrotta. Thus, as of July 1999, Centennial had received both written and oral notification of the coverage dispute with Liberty Mutual and the underlying Wheeler Road Lawsuit.

On June 9, 2000 -- shortly after receiving the settlement check from Liberty Mutual -- Invensys's attorneys tendered a formal claim for coverage to Centennial. The tender was made at this time, and not earlier, because it was only after the payment by Liberty Mutual that the excess coverage in the Centennial had been triggered by exhaustion of the limits of the underlying primary policies in the 1972, 1973 and 1974 policy years.

Numerous letters were exchanged between the parties, as Invensys responded to Centennial's requests for information. Ultimately, on July 12, 2001, Centennial denied coverage.

**Interrogatory No. 6**

Identify the employees, officers or directors of Invensys who were responsible for handling, supervising or managing the Wheeler Road Lawsuit and state whether each such person is still an employee, officer or director of Invensys.

**Response to Interrogatory No. 6**

Anthony R. Franciose, Esq., who was and continues to be an in-house attorney for The Foxboro Company (now known as Invensys Systems, Inc.) was the employee responsible for handling, supervising or managing the Wheeler Road Lawsuit.

**Interrogatory No. 7**

Identify the employees, officers or directors of Invensys who are or were responsible for handling, managing or supervising any requests or demands for insurance coverage relating to the Wheeler Road Lawsuit and/or the Final Judgment and state whether each such person is still an employee, officer or director of Invensys.

**Response to Interrogatory No. 7**

Bruce E. Wilson, who was the risk manager for The Foxboro Company (now known as Invensys Systems, Inc.) and Anthony R. Franciose, Esq., who was and continues to be an in-house attorney for The Foxboro Company (now known as Invensys Systems, Inc.) were the employees responsible for handling, supervising or managing insurance matters relating to the Wheeler Road Lawsuit. Mr. Wilson is no longer employed by Plaintiff.

**Interrogatory No. 8**

Identify all settlement agreements entered into by Invensys and the plaintiffs in the Wheeler Road Lawsuit and for each such agreement:

a)      identify the date on which it was entered into by Invensys;

b)    state the terms of the agreement;

c)    identify the person(s) who made the decision to enter into the agreement on behalf of Invensys;

d)    State the Basis for Invensys' decision to enter into the settlement agreement; and

e)    Identify the date on which notice of the agreement was provided to Centennial.

## Objections to Interrogatory No. 8

Plaintiff further objects to this Interrogatory to the extent it requires disclosure of the work product, including mental impressions, of Plaintiff's attorney.

## Response to Interrogatory No. 8

Pursuant to Rule 33(b), Fed. R. Civ. P., the burden of deriving or ascertaining the answer to this interrogatory is substantially the same for Defendant as it is for Plaintiff, and the answer to this interrogatory may be derived from a review of the copy of the settlement agreement that has previously been produced to Defendant and/or made available to Defendant.  A copy of the settlement agreement will be made available for further inspection at a time and place mutually convenient to counsel for Plaintiff and Defendant.

Answering further, Plaintiff states that Invensys decided to enter into the settlement agreement with the plaintiff in the Wheeler Road Lawsuit following the entry of final judgment, based on its assessment of the costs, likely outcome and risks of an appeal (including the possibility that the First Circuit might reverse Judge Stearns' ruling absolving Foxboro/Invensys of any liability for soil contamination. The settlement agreement with the underlying plaintiff was provided to Defendant pursuant to the notices previously identified in response to Interrogatory No. 5.

Signed under pains and penalties of perjury this 5th day of September, 2006.

Plaintiff Invensys Systems, Inc.
By: Jay S. Ehle
Its: Vice President

As to objections only:

Robert J. Gilbert BBO#565466
GILBERT & RENTON LLC
23 Main Street
Andover, MA 01810
(978) 475-7580
(978) 475-1881

Dated: September 5, 2006

## Certificate of Service

I, Robert J. Gilbert, hereby certify that, on this 5th day of September, 2006, I caused the original of the foregoing document to be served by telecopy and First Class Mail upon counsel of record for Defendant Centennial Insurance Company.

Robert J. Gilbert

**EXHIBIT 9**

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                                    SUPERIOR COURT DEPARTMENT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
THE FOXBORO COMPANY,                    \*
       Plaintiff,                         \*
                                \*        CIVIL ACTION NO. 97-6184
     v.                                        \*
                                 \*
LIBERTY MUTUAL INSURANCE            \*
COMPANY,                                            \*
       Defendant.                         \*
                                 \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### PLAINTIFF'S MOTION FOR PRETRIAL RULINGS THAT
### (1) LIBERTY MUTUAL BREACHED THE DUTY TO DEFEND AND
### (2) LIBERTY MUTUAL HAS THE BURDEN OF PROOF ON INDEMNITY ISSUES

       Pursuant to the Court's bench order on May 10, 1999 authorizing this motion to be filed,

Plaintiff The Foxboro Company respectfully moves for the following pretrial rulings:

1.     As a matter of law, Defendant Liberty Mutual Insurance Company breached its
duty to defend by unilaterally abandoning its defense of Foxboro in an underlying
environmental lawsuit, One Wheeler Road Associates, et al. v. The Foxboro
Company, No. 90-12873k (D. Mass. 1990) (the "Wheeler Road Lawsuit").

2.     By breaching the duty to defend, Liberty Mutual is bound by all of Judge Stearns'
rulings in the Wheeler Road Lawsuit that relate to the duty to indemnify.

3.     In addition, Liberty Mutual now has the burdens of proof *and* of going forward
regarding *all* indemnity issues, including (i) whether coverage has been triggered,
(ii) whether any exclusions bar coverage, (iii) whether the "sudden and accidental"
exception to the pollution exclusion applies, and (iv) whether any allocation can be
made between covered or non-covered claims, events or damages.

### CONCISE STATEMENT OF UNDISPUTED FACTS

### Facts Regarding Insurance Coverage Issued to Foxboro by Liberty Mutual

i.     Liberty Mutual provided primary comprehensive general liability insurance

coverage ("primary" or "CGL" insurance) and first-layer umbrella excess liability insurance

INV01677

coverage ("umbrella" insurance) to Foxboro over an extended period that includes January 1, 1974 through January 1, 1988. See Defendant's Answer, ¶ 6; Wilson Aff., ¶ 3; Binder of Policies, Tab Nos. 5-31.

2.    The 1974-1988 policies contain cumulative limits of liability for property damage in excess of $124 million per occurrence and in the aggregate. See Wilson Aff., ¶ 3; Binder of Policies, Tab Nos. 5-31.

3.    The primary policies contain the following basic coverage language:

> The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of
>
> Coverage A. **bodily injury** or
> Coverage B. **property damage**
>
> to which this policy applies, caused by an **occurrence**, and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage** even if any of the allegations of the suit are groundless, false or fraudulent ....
>
> \* \* \*
>
> **"property damage"** means injury to or destruction of tangible property[.]
>
> **"occurrence"** means an accident, including injurious exposure to conditions, which results, during the policy period, in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

See Policy Binder, Tab 1 (emphasis in original).

4.    The umbrella policies, while using different language and structure, contain the same basic coverage requirements as the primary policies. See Policy Binder, Tabs 2-4. The differences in wording are immaterial to this motion.

5.    Liberty Mutual's primary policies from 1974 through 1982 (as well as the 1974-1984 and 1986 umbrella policies) also contain an "owned property" exclusion and/or an exclusion

2

that allows coverage for "sudden and accidental" releases of pollution. The limited pollution exclusion reads as follows:

> "This insurance does not apply: . . . (f) to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*"

See Policy Binder at Tab 1, at Part I, Exclusion (f) (bold in original; italics added.) See also Policy Binder at Tabs 3 and 4, at Part I, Exclusion (g).

## Facts Regarding the Wheeler Road Lawsuit

6.    On November 29, 1990, Foxboro was named as the sole defendant in a federal environmental lawsuit involving Foxboro's former manufacturing facility on Wheeler Road in Burlington, Massachusetts. See One Wheeler Road Associates, et al. v. The Foxboro Company, No. 90-12873k (D. Mass. 1990) (the "Wheeler Road Lawsuit"). See Exh. A.

7.    The Complaint in the Wheeler Road lawsuit contained the following allegations against Foxboro:

(a)    From 1954 through 1978, Foxboro and its predecessor-in-interest (Trans-Sonics, Inc.) owned a 9.5-acre parcel of land at 160 Wheeler Road, Burlington, MA. Complaint, ¶ 6 (Exh. A).

(b)    Foxboro allegedly released hazardous substances, including the solvents trichloroethylene ("TCE") and tetrachloroethylene ("PCE"), into the environment. Id., ¶¶ 7-8.

3

INV01679

(c)    Without foreclosing other possible pathways by which solvents allegedly

contaminated the environment, the Complaint speculated "on information and belief" that

the solvents were released from interior sinks at the Wheeler Road site. Id., ¶ 8.

(d)    In 1982 (four years after Foxboro sold and left the site), One Wheeler

Road Associates purchased the Wheeler Road site. Id., ¶ 9.

(e)    In 1984, the Town of Burlington discovered TCE and PCE contamination

at the site and suggested that Foxboro might be responsible. Id., ¶¶ 10-11.

(f)    The Complaint alleged Foxboro's liability on various statutory and

common law theories (including negligence and strict liability) and seeking damages for,

inter alia, "damage to the value of the site and the cost of their investigative and remedial

measures." Id., ¶¶ 16-43, Prayer for Relief.

(g)    The Complaint gave no details regarding the dates when the contamination

allegedly occurred, or whether the release of solvents had been intentional as opposed to

"sudden and accidental," or whether the contamination had migrated off-site. See Exh. A.

8.    During deposition discovery, numerous witnesses provided uncontradicted

testimony that Foxboro and Trans-Sonics employees did *not* pour solvents into sinks.[1]

### Facts Regarding Liberty Mutual's Initial Decision to Defend
### the Wheeler Road Lawsuit Under a Reservation of Rights

9.    Liberty Mutual received timely notice of the Wheeler Road claim. Wilson Aff., ¶ 4.

---

[1]    See, e.g., Nicholson Depo., Exh. G at 50 (Q: Are you aware of whether any quantities of
trichloroethylene . . . were ever poured down the sinks at the Wheeler Road facility? A: No. No.");
Westcott Depo., Exh. H at 14 ("I asked him if we had ever put solvents down the sinks, and he
confirmed my impression that that was an absolute no-no. That was not done."), 68 ("[I]t was our
policy not to put solvents down sinks; that is, not into the leaching bed, the septic system, the sewage
system"); Manion Depo., Exh. I at 62 ("the corporate policy was that no organic solvents could be
placed in a sink;" no knowledge of any instance when solvents were poured in sinks).

4

10.     Upon receiving notice from Foxboro, Liberty Mutual promptly appointed defense counsel for Foxboro. Wilson Aff., ¶ 4; Exh. C.

11.     A few weeks later, Liberty Mutual confirmed in writing its agreement to provide a defense under a reservation of rights, and stated that it would be conducting a claims investigation. Exh. D at 2.

12.     In the course of the coverage investigation, one of Liberty Mutual's Special Claims Examiners, David Bogan, sent a memo dated July 23, 1991 to Thomas V. O'Kane, the Liberty Mutual claims representative conducting the investigation. Exh. K. The memorandum concluded with the following sentence: "As suit is involved, and defense costs may be mounting, let's stay on top of this one and complete our investigation as soon as possible." Id.

13.     As part of its claims investigation, Mr. O'Kane of Liberty Mutual sent a request for information to the defense counsel appointed by Liberty Mutual to defend Foxboro. The letter bore the date of July 22, 1991. Exh. E.

14.     By letter dated August 1, 1991, Roy P. Giarrusso (one of the lawyers appointed by Liberty Mutual to defend Foxboro) responded to Mr. O'Kane's July 22, 1991 request for information. Exh. F. Mr. Giarrusso's letter included, inter alia, the following statements:

(i)     With respect to Mr. O'Kane's request for any information regarding "when any offsite contamination if any, was confirmed," Exh. E, Mr. Giarrusso stated, "Also enclosed are . . . certain documents extracted from environmental contractor reports, indicating that off-site contamination has been confirmed." Exh. F at 4-5.

(ii)     Regarding the manner in which solvents may have been released into the environment, Mr. Giarrusso stated, "Foxboro did use . . . trichlorethylene [TCE] as cleaning agents in its manufacturing process. However, Foxboro did not dispose of the solvents, cleaners, degreasing agents, or any other hazardous materials used at the plant at or on the Site. Foxboro used a [sic] off-site recycler/disposer to remove and dispose of such materials. . . . .[¶] Moreover, Mr.

5

Thomas Mudgett, an employee of Foxboro who once worked at the Wheeler Road facility, . . .testified that nothing was disposed on or at the Site, ... that all of the used hazardous materials were disposed off-site through the use of a contract disposal firm [,...and] that sinks were not used to dispose of the waste materials." Id. at 2.

15.    This August 1, 1991 letter from Mr. Giarrusso was the last factual information that Liberty Mutual received from any source before completing its initial claims investigation.

16.    On August 8, 1991 -- seven days after the date of Mr. Giarrusso's response to his request for information -- Mr. O'Kane alerted his supervisor (David Bogan) that he had completed the draft CPL ("Coverage Position Letter") requested in Mr. Bogan's July 23, 1991 memo. Exh. J.

### Liberty Mutual's Unilateral Decision to Deny Coverage and to Withdraw Its Defense of the Wheeler Road Lawsuit

17.    On December 3, 1991, Liberty Mutual notified Foxboro that it was denying coverage and that it would no longer defend Foxboro in the Wheeler Road Lawsuit. Exh. L.

18.    Using a so-called "discovery" trigger, Liberty Mutual's December 3, 1991 analyzed coverage only with respect to the 1984 primary ("CGL") and umbrella ("UEL") policies (as well as a Pollution Liability Policy not at issue in this motion). Exh. L at 7.  Liberty Mutual chose 1984 because that was the year when the Town of Burlington discovered the solvents contamination. Id.

19.    Liberty Mutual did not analyze coverage under policies issued in any year other than 1984 (see Exh. L), even though the Complaint alleged Foxboro's involvement at the site since 1956 (Exh. A) and even though defense counsel had informed Liberty Mutual that Foxboro conducted manufacturing operations "at the Site from 1954 through 1978." Exh. F at 2.

6

20.    In its December 3, 1991 Coverage Position Letter ("CPL"), Liberty Mutual denied

coverage based on four coverage defenses under the 1984 primary and umbrella policies:

(a)    First, Liberty Mutual asserted that since the "contamination was discovered [in 1984] after [Foxboro] had sold the property," there was no "occurrence" during a period in which Foxboro owned the site and thus no coverage. Exh. L at 7.

(b)    Second, Liberty Mutual asserted that "governmental response cost recovery claims" are not covered and that the Complaint raised no "claims for legal damages because of property damage." Id.

(c)    Third, Liberty Mutual asserted that "[t]he pollution exclusion is a complete bar to both coverage and to the obligation to defend in this matter." Id.

d)    Fourth, Liberty Mutual asserted that the so-called "owned property" and "alienated premises" exclusions barred coverage of contamination involving Foxboro's former manufacturing facility. Id.

21.    In its December 3, 1991 Coverage Position Letter, Liberty Mutual made no

mention of the deposition testimony in which Thomas Mudgett stated that solvents had never

been poured in sinks.

22.    In its December 3, 1991 Coverage Position Letter, Liberty Mutual did not address

the possibility of "sudden and accidental" spills of solvents into sinks or floor drains connected to

the site's drainage system. Exh. L.

23.    In its December 3, 1991 Coverage Position Letter, Liberty Mutual did not mention

the documentation it had earlier received from Foxboro's defense counsel that had established the

existence of off-site property damage. Exh. L.

24.    Thirty (30) days after sending its December 3, 1991 letter, Liberty Mutual

withdrew its defense. Exh. L.

7

INV01683

25.    Over the next three years, Foxboro repeatedly asked Liberty Mutual to reconsider its coverage position. See Exh. N.

26.    In its December 3, 1991 CPL letter, Liberty Mutual asserted that both the 1984 primary policy and the 1984 umbrella policy contained so-called "absolute" pollution exclusions. Exh. L at 7. Soon thereafter, Liberty Mutual recanted its position, and acknowledged that the 1984 umbrella policy provides coverage for property damage resulting from "sudden and accidental" releases of contaminants. Exh. M at 2. However, after admitting its error, Liberty Mutual continued to deny coverage under the 1984 umbrella policy, and still failed to provide any detailed explanation for why there was no possibility of "sudden and accidental" releases of solvents at the Wheeler Road site. Id.

27.    A Liberty Mutual Claim Review memorandum dated July 28, 1994, made reference to testimony in the Wheeler Road Litigation "that sinks were not used in the disposal of waste materials," Exh. N at 4. However, Liberty Mutual never reconsidered its position that the pollution exclusion eliminated any possibility of coverage of the Wheeler Road Lawsuit.

28.    As part of its effort to convince Liberty Mutual to resume the defense, Foxboro's representatives called Liberty Mutual's attention to the SJC's decision in Trustees of Tufts University v. Commercial Union Ins. Co., 415 Mass. 844, 616 N.E.2d 68 (1993). Wilson Aff., ¶ 6; Exh. N.

29.    Liberty Mutual's claims representatives, David W. Hudson, acknowledged in a memorandum created on June 2, 1994 Liberty Mutual's computerized ACES system that he had been advised by Foxboro's counsel "of recent case law in Mass (about 18 mos ago) called 'Tufts University' whcih [sic] addresses this successor coverage issue." Exh. Q.

8

INV01684

30.    Even after being advised of the <u>Trustees of Tufts</u> decision, Liberty Mutual never analyzed coverage under policies issued in years other than 1984 (the year when the Town of Burlington discovered the solvents contamination).

31.    On July 29, 1994, David W. Hudson of Liberty Mutual sent a letter to Bruce Wilson (Foxboro's Risk Manager) to confirm that Liberty Mutual was "currently reviewing our coverage position in terms of the issues you or your counsel raised in letters responsive to our coverage position letter." Exh. N at 1.

32.    Despite Mr. Hudson's assurances in the July 29, 1994 letter, at no time after December 3, 1991 did Liberty Mutual change its position on the duty to defend or resume its defense of the Wheeler Road Lawsuit.

### Facts Concerning Judge Stearns' Ruling in the Underling Wheeler Road Lawsuit

33.    Following a bench trial in the Wheeler Road Lawsuit, Judge Stearns found that Foxboro was the only site occupant to use TCE, Exh. B, Fact No. 6.

34.    Judge Stearns found that Foxboro placed drums in a central storeroom to collect spent solvents, and employees were admonished not to pour chemical wastes down the sinks. <u>Id</u>.

35.    Judge Stearns' findings of fact established that not only sinks but also floor drains connected to the site's drainage system. <u>Id</u>.

36.    Judge Stearns' decision cited no evidence that Foxboro poured TCE into floor or sink drains or otherwise intentionally released solvents to the drainage system or the environment. Exh. B.

37.    Judge Stearns found TCE-contaminated groundwater along the "west line" of the site's drainage system, resulting from a drainage pipe hole created by a "sharp protuberances in

9

the bedrock," as well as beneath another large (18" x 10") hole in the drainage pipe. Exh. B, Fact

No. 18  Judge Stearns also found contamination along the "north line" of the drainage system,

especially in the vicinity of fallen mortar caused the pipe joints to fail. Id., Fact No. 17.

38.    While Judge Stearns found substantial contamination along the underground

drainage system (to which the facility's floor and sink drains were connected), Exh. B, Fact No.

20; Conclusion No. 1, he did *not* state how solvents entered the drainage system. Exh. B.

39.    Judge Stearns' decision did *not* rule out the possibility of sudden and accidental

spills of solvents into sinks or floor drains. Exh. B.

40.    Judge Stearns imposed *res ipsa loquitur* liability, finding Foxboro liable for

groundwater contamination (a) because Foxboro was the only party definitely to use TCE at the

site and (b) because a drainage system was present on the site:

> "1. Foxboro, the owner and operator of the Wheeler Road facility from
> 1954 to 1978, is responsible for the releases of TCE contaminating the
> groundwater in the northeastern area of the site. I base this conclusion on among
> other facts: (1) Foxboro stored hazardous materials at the site, including TCE; (2)
> Foxboro was the only occupant of the site to use TCE in its operations; (3) the
> monitoring wells downgradient of the leaching basin and the north and west drain
> lines, as well as samples taken from the surface of the bedrock, show high
> groundwater concentrations of TCE; (4) Foxboro had no formal policies
> regulating or monitoring employee use and disposal of hazardous materials; and
> (5) Foxboro has failed to show by a preponderance of the evidence that some third
> party was solely responsible for the release of TCE.
>
> "2. The installation during Foxboro's occupancy of a leaching basin
> connected to the internal sinks and floor drains of the plant provided the agency
> for disseminating TCE into the groundwater." Exh. B, Conclusions of Fact and
> Law Nos. 1 and 2.

10

INV01686

### Fact Concerning Foxboro's Damages

41.    **Underlying Judgment:** Judge Stearns held Foxboro liable for all costs for

groundwater cleanup (but not soil cleanup), and ordered Foxboro to pay the underlying plaintiffs'

attorney's fees. Exh. O.  On October 8, 1996, Foxboro satisfied the judgment, including interest

and costs, by paying $1,187,202.90 to plaintiffs. See Exh. O.  This amount does not include post-

judgment cleanup costs that, under Judge Stearns' ruling, Foxboro is liable to pay until the

groundwater cleanup is completed.

42.    **Underlying Defense Costs:** Foxboro also has incurred *net* defense costs to date

of at least $594,590.75, including unreimbursed attorney's fees and costs of at least $390,445.01

and expert consulting fees of at least $204,145.74. McIntyre Aff., Exh. 4; Exh. P.  This amount

does not include sums paid by Liberty Mutual before it withdrew from the defense of Foxboro,

nor does it include future defense costs incurred in connection with disputes over the allocation of

costs between soil cleanup (for which Foxboro is not liable) and groundwater cleanup.


### STATEMENT OF LEGAL ELEMENTS

### Legal Elements Concerning the Duty to Defend

Following well-established principles concerning the duty to defend, numerous courts in

Massachusetts have required insurers to defend their policyholders against environmental

pollution claims, even under policies containing so-called "owned property exclusions" and/or

"pollution exclusions."[2]  These principles may be stated briefly.

---

[2]    See, e.g., Trustees of Tufts, supra, 415 Mass. at 847-48; Hazen Paper Co. v. United States Fidelity & Guar. Co., 407 Mass. 689, 693, 555 N.E.2d 576 (1990) (duty to defend pollution claims; remanding for trial on indemnity issues); Polaroid, supra, 414 Mass. at 750, 610 N.E.2d at 914 (lower court

11

INV01687

First, the duty to defend is based on a simple comparison of the underlying complaint to the insurance policy, to determine if the allegations *potentially* trigger coverage:

> "It is settled in this jurisdiction, and generally elsewhere, that the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense."

Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. 316, 318, 458 N.E.2d 338 (1983).

"'In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. *There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage.*'" Id., 17 Mass.App.Ct. at 319 (cites omitted; emphasis added).

Second, the duty to defend is measured at the outset of the underlying action, based on the allegations of the underlying complaint. Id., 17 Mass.App.Ct. at 323. The possibility of coverage can arise from the allegations of the third-party complaint *or* from extrinsic information made known or reasonably available to the insurer. See Desrosiers v. Royal Ins. Co., 393 Mass. 37, 40, 468 N.E.2d 625 (1984) ("the obligation of the insurer is based not only on the facts alleged in the complaint[] but also on the facts that are known or readily knowable by the insurer"); Trustees of Tufts, supra, 415 Mass. at 852, 616 N.E.2d at 74 (determining duty to defend based on "[t]he facts alleged in the complaint and those facts known by the insurers") (citing to Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 10-11, 545 N.E.2d 1156 (1989)).

---

finding of duty to defend underlying environmental suits); Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 407 Mass. 675, 685-86, 555 N.E.2d 568 (1990); Arrow Automotive Indus., Inc. v. Liberty Mutual Ins. Co., 1998 Mass. Super. LEXIS 374 at *22 (Jan. 29, 1998) (Exh. S).

12

INV01688

However, the converse is **not** true: The insurer cannot avoid its defense obligation by citing extraneous facts that might cause the underlying claim to fall outside the policy's coverage:

> "As to whether even solid information reaching the insurer from the insured, and indicating that claimed losses were in fact uninsured, could itself relieve the insurer of its duty to defend, the Lee case says: 'This language [requiring the insurer to defend even a baseless claim] means that the insurer will defend the suit, if the injured party states a claim, which, qua claim, is for an injury 'covered' by the policy; it is *the claim* which determines the insurer's duty to defend; and it is irrelevant that the insurer may get information from the insured, or anyone else, which indicates, or even demonstrates, that the injury is not in fact "covered.""

Sterilite, 17 Mass.App.Ct. at 324 n.17 (citations omitted; emphasis added).

Third, the insurer cannot avoid a defense based on the possible application of an exclusion, where the complaint is worded broadly enough to create the potential that the exclusion will not apply. Sterilite, 17 Mass.App.Ct. at 320 ("The allegations of [the third-party] complaint seem to us ... ample enough to harbor a [non-excluded] 'breakdown' situation, and they surely do not expressly bar it.").  Another court recently invoked this rule -- i.e., that an insurer must defend a suit that neither implicates nor rules out an exclusion -- to require Liberty Mutual to defend a pollution case that (like this case) encompassed a range of possible scenarios for how releases may have occurred:

> "Thus, the duty to defend depends not on the actual facts of the event giving rise to the claimed liability, but on the full range of possible facts that could fall within the cope of the third-party's complaint.  Where a complaint is so general as to encompass a wide range of possible scenarios, the 'possibility that the liability falls within the insurance coverage' is enough to trigger the duty to defend. Sterilite, 17 Mass. App. Ct. at 319, 458 N.E.2d 338."

Arrow Automotive Industries, Inc. v. Liberty Mutual Ins. Co., 1998 Mass. Super. LEXIS 374 at *22 (January 29, 1998) (Exh. S).

INV01689

Finally, once the potential for coverage exists or can be inferred from the face of the third-party complaint, the insurer must defend until "it demonstrates with conclusive effect on the third party that as a matter of fact - as distinguished from the appearances of the complaint and policy - the third party cannot establish a claim within the insurance." Sterilite, 17 Mass. App. Ct. at 323. Until the insurer can make such a showing, it must continue its defense of the policyholder. Id., 17 Mass.App.Ct. at 323 n.15 (such "clarification may not come until the third-party action is fully tried, and in that case the duty to defend continues to the end"). See also Lumbermens, 407 Mass. at 685-86 (duty to defend continues "until there is an unalterable determination as to the nature of the underlying claim"). "What is not permitted is that an insurer shall escape its duty to defend the insured against a liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact: the insurer then stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof." See, e.g., Sterilite, 17 Mass. App. Ct. at 324 and n.17.[3]

**Legal Elements Establishing that the Burden of Proof
on Indemnity Issues Has Been Shifted to Liberty Mutual**

In support of an order that Liberty Mutual has the burdens of proof and of going forward on indemnity issues (and that in doing so, it is bound by Judge Stearns' rulings), the SJC has ruled that "an insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within the policy's coverage." Polaroid, 414 Mass. at 764. See also Liquor Liab. Joint Underwriting Ass'n of Mass. v. Hermitage Ins. Co., 419 Mass. 316, 323, 644 N.E.2d 964,

---

[3]     The SJC and the Appeals Court have adopted Sterilite's elucidation of the duty to defend, Continental Cas. Co. v. Gilbane Building Co., 391 Mass. 143, 146-47, 461 N.E.2d 209 (1984), and have applied it to environmental cases. See, e.g., Trustees of Tufts, 415 Mass. at 847-48; Rubenstein v. Royal Ins. Co., 44 Mass. App. 842, 847-48, 694 N.E.2d 381 (1997), aff'd, 429 Mass. 355 (1999).

'4

INV01690

969 (1995) (non-defending insurer has burden of allocating damages between covered and non-covered claims); Swift v. Fitchburg Mut. Ins. Co., 45 Mass. App. Ct. 617, 625, 700 N.E.2d 288, 293 (1998) ("The [SJC] was clear that 'an insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within its policy's coverage.'"); Palermo v. Fireman's Fund Ins. Co., 42 Mass. App. Ct. 283, 290, 676 N.E.2d 1158, 1163 (1997).

The SJC is also clear that in meeting this burden of proof, "[i]f an underlying case went to judgment, the [non-defending] insurer would be bound by the result of the trial, as to all material matters decided in that action that bear on the coverage issue." Polaroid, 414 Mass. at 763 n.20.

In further support, Foxboro has submitted a Memorandum of Points and Authorities, as well as a Binder of Insurance Policies and an appendix of supporting affidavits and exhibits.

THE FOXBORO COMPANY,
By its attorneys,

Robert J. Gilbert, Esq. (BBO No. 565466)
Kathryn E. Perrotta, Esq. (BBO No. 557308)
GILBERT & RENTON, P.C.
23 Main Street
Andover, MA 01810
Telephone: (978) 475-7580
Telecopy: (978) 475-1881

Dated: May 19, 1999

## CERTIFICATE OF SERVICE

I, Robert J. Gilbert, attorney for Plaintiff The Foxboro Company, hereby certify that on May 19, 1998, I served the foregoing document upon Carol A. Kelly, Esq., Martin, Magnuson, McCarthy & Kenney, 101 Merrimac Street, Boston, MA 02114-4716, by hand delivery.

Robert J. Gilbert

15

INV01691

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS.                          SUPERIOR COURT DEPARTMENT

* * * * * * * * * * * * * * * * * * * * * * * *
THE FOXBORO COMPANY,              *
        Plaintiff,              *
                             *     CIVIL ACTION NO. 97-6184
    v.              *
                             *
LIBERTY MUTUAL INSURANCE          *
COMPANY,                          *
        Defendant.              *
                             *
* * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRETRIAL RULINGS THAT (1) LIBERTY MUTUAL BREACHED THE DUTY TO DEFEND AND (2) LIBERTY MUTUAL HAS THE BURDEN OF PROOF ON INDEMNITY ISSUES

      This motion involves two issues of central importance to the trial in this case.  Both issues arise out of Liberty Mutual Insurance Company's unilateral decision to abandon the defense of an underlying environmental lawsuit, <u>One Wheeler Road Associates, et al.</u> v. <u>The Foxboro Company</u>, No. 90-12873k (D. Mass. 1990) (the "Wheeler Road Lawsuit"), alleging property damage at and near The Foxboro Company's former facility on Wheeler Road in Burlington, Massachusetts.

      *First*, Foxboro requests the Court to rule, as a matter of law, that *Liberty Mutual breached its duty to defend* by unilaterally withdrawing its defense of the Wheeler Road Lawsuit. See, e.g., <u>Trustees of Tufts University</u> v. <u>Commercial Union Ins. Co.</u>, 415 Mass. 844, 616 N.E.2d 68 (1993) (insurer must defend suit alleging pollution at policyholder's former facility).

      *Second*, Foxboro requests an order that, at the trial *on the duty to indemnify, Liberty Mutual shall have the burden of proof and the burden of going forward,* and in discharging these burdens Liberty Mutual shall be bound by the findings in the underlying case. See <u>Polaroid Corp.</u> v. <u>Travelers Indem. Co.</u>, 414 Mass. 747, 764 and n.22, 610 N.E.2d 912 (1993) ("an insurer

that wrongfully declines to defend a claim will have the burden of proving that the claim was not within the policy's coverage").

## UNDISPUTED FACTS

A.    **The Policies Issued by Liberty Mutual to The Foxboro Company**

Liberty Mutual provided primary and umbrella liability insurance to Foxboro, with cumulative limits in excess of $124 million, over an extended period that includes January 1, 1974 through January 1, 1988. <u>See</u> Defendant's Answer, ¶ 6. (Foxboro has filed a binder of relevant policy excerpts). Like the policies that have been held by other Massachusetts courts to create a duty to defend environmental suits,[1] the primary policies contain the following basic language:

> The company will pay on behalf of the **insured** all sums which the **insured** shall become legally obligated to pay as damages because of
>
> Coverage A. **bodily injury** or
> Coverage B. **property damage**
>
> to which this policy applies, caused by an **occurrence**, and the company shall have the right and duty to defend any suit against the **insured** seeking damages on account of such **bodily injury** or **property damage** even if any of the allegations of the suit are groundless, false or fraudulent ....
>
> \*   \*   \*
>
> "**property damage**" means injury to or destruction of tangible property[.]
>
> "**occurrence**" means an accident, including injurious exposure to conditions, which results, during the policy period, in **bodily injury** or **property damage** neither expected nor intended from the standpoint of the **insured**;

---

[1]    See, e.g., Trustees of Tufts, supra, 415 Mass. at 847-48; Hazen Paper Co. v. United States Fidelity & Guar. Co., 407 Mass. 689, 693, 555 N.E.2d 576 (1990) (duty to defend pollution claims; remanding for trial on indemnity issues); Polaroid, supra, 414 Mass. at 750, 610 N.E.2d at 914 (lower court finding of duty to defend underlying environmental suits); Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc., 407 Mass. 675, 685-86, 555 N.E.2d 568 (1990); Arrow Automotive Indus., Inc. v. Liberty Mutual Ins. Co., 1998 Mass. Super. LEXIS 374 at *22 (Jan. 29, 1998) (Exh. S).

2

INV01693

See Policy Binder, Tab 1 (emphasis in original).[2] Like the policies that created a duty to defend in Trustees of Tufts, Polaroid, Lumbermens, Hazen Paper, Arrow and many other Massachusetts cases, Liberty Mutual's primary policies from 1974 through 1982 (as well as the 1974-1984 and 1986 umbrella policies) also contain an "owned property" exclusion and an exclusion that allows coverage for "sudden and accidental" releases of pollution.[3]

## B.    Liberty Mutual's Initial Agreement to Defend the Wheeler Road Lawsuit

This case arises from Liberty Mutual's deliberate, unilateral decision to withdraw from the defense of a federal environmental lawsuit involving Foxboro's former manufacturing facility on Wheeler Road in Burlington, Massachusetts. See One Wheeler Road Associates, et al. v. The Foxboro Company, No. 90-12873k (D. Mass. 1990) (the "Wheeler Road Lawsuit").

**The Wheeler Road Complaint:** From 1954 through 1978, Foxboro and its predecessor-in-interest (Trans-Sonics, Inc.) owned a 9.5-acre parcel of land at 160 Wheeler Road, Burlington, MA. Complaint, ¶ 6 (Exh. A). Foxboro allegedly released hazardous substances, including the solvents trichloroethylene ("TCE") and tetrachloroethylene ("PCE"), into the environment. Id., ¶¶ 7-8. Without foreclosing other possible pathways, the Complaint speculated "on information and belief" that the solvents were released from interior sinks at the Wheeler Road site. Id., ¶ 8.

---

[2]    The umbrella policies, while using different language and structure, contain the same basic coverage requirements. See Policy Binder, Tabs 2-4. The differences in wording are immaterial to this motion.

[3]    The limited pollution exclusion reads as follows:

"This insurance does not apply: . . . (f) to **bodily injury** or **property damage** arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.*" See Policy Binder at Tab 1 (Part I, Exclusion (f)). (Bold in original; italics added.)

3

INV01694

In 1982 (four years after Foxboro sold and left the site), One Wheeler Road Associates purchased the Wheeler Road site. Id., ¶ 9. In 1984, the Town of Burlington discovered TCE and PCE contamination at the site and suggested that Foxboro might be responsible. Id., ¶¶ 10-11.

Six years later, One Wheeler Road Associates and its general partner, The Gutierrez Company, filed the Wheeler Road Lawsuit in federal court, alleging Foxboro's liability on various statutory and common law theories and seeking damages for, inter alia, "damage to the value of the site and the cost of their investigative and remedial measures." Id., ¶¶ 16-43, Prayer for Relief. A model of notice pleading, the Complaint gave no details regarding the dates when the contamination allegedly occurred, or whether the release of solvents had been intentional as opposed to "sudden and accidental," or whether the contamination had migrated off-site.[4]

**Liberty Mutual's Initial Agreement to Defend the Wheeler Road Lawsuit:** Upon receiving notice from Foxboro, and in obvious recognition of the breadth of the Wheeler Road Lawsuit, Liberty Mutual promptly appointed defense counsel for Foxboro (Exh. C) and, a few weeks later, confirmed in writing its agreement to provide a defense under a reservation of rights. Exh. D at 2. While defending Foxboro, Liberty Mutual also conducted a coverage investigation

---

[4]     The uncontradicted testimony in the underlying case confirmed that Foxboro and Trans-Sonics employees did *not* pour solvents into sinks, thus destroying the underlying plaintiffs' speculative theory - alleged "on information and belief" - that solvents might have been released "from interior sinks at the Plant." See, e.g., Nicholson Depo., Exh. G at 50 (Q: Are you aware of whether any quantities of trichloroethylene . . . were ever poured down the sinks at the Wheeler Road facility? A: No. No."); Westcott Depo., Exh. H at 14 ("I asked him if we had ever put solvents down the sinks, and he confirmed my impression that that was an absolute no-no. That was not done."), 68 ("[I]t was our policy not to put solvents down sinks; that is, not into the leaching bed, the septic system, the sewage system"); Manion Depo., Exh. I at 62 ("the corporate policy was that no organic solvents could be placed in a sink;" no knowledge of any instance when solvents were poured in sinks).

Further, Judge Stearns' findings of fact established that not only sinks but also floor drains connected to the drainage system, see Exh. B, Fact No. 6, thus raising the possibility of sudden and accidental spills into floor drains (not to mention sudden and accidental spills from counter tops into sink drains).

4

INV01695

that culminated in a July 22, 1991 request for information (Exh. E) and an August 1, 1991

response (Exh. F) that debunked Liberty Mutual's two primary coverage defenses:

(i)    The "owned property" and "alienated premises" exclusions were debunked by
documentation sent to Liberty Mutual by defense counsel "indicating
contamination has been confirmed." Exh. F at 4-5. See Rubenstein v. Royal Ins.
Co., 44 Mass. App. Ct. 842, 843-55, 694 N.E.2d 381, 388-90 (1997), aff'd, 429
Mass. 355 (1999) (owned property and alienated premises exclusions inapplicable
if there is actual or threatened off-site damage), citing Hakim v. Massachusetts
Insurers' Insolv. Fund, 424 Mass. 275, 279-80, 675 N.E.2d 1161 (1997).

(ii)   Similarly, the "pollution exclusion" defense was debunked when defense counsel
informed Liberty Mutual of the uncontradicted testimony that "nothing was
disposed on or at the Site, ... that all of the used hazardous materials were
disposed off-site through the use of a contract disposal firm [,...and] that sinks
were not used to dispose of the waste materials." Id. at 2.

This August 1, 1991 letter was the last factual information that Liberty Mutual received from any

source before completing its initial claims investigation on December 3, 1991.

## C.    Liberty Mutual's Unilateral Decision to Withdraw the Defense

On December 3, 1991, Liberty Mutual made a decision that has become the gravamen of

this motion and this case. Under management pressure to act quickly because "defense costs may

be mounting," see Exh. K, Liberty Mutual notified Foxboro on that date that it was denying

coverage and that it would no longer defend Foxboro in the Wheeler Road Lawsuit. Exh. L.

Analyzing only the 1984 primary ("CGL") and umbrella ("UEL") policies (as well as a Pollution

Liability Policy not at issue in this motion), Liberty Mutual asserted four coverage defenses:

-    First, Liberty Mutual asserted that since the "contamination was discovered [in
1984] after [Foxboro] had sold the property," there was no "occurrence" during a
period in which Foxboro owned the site and thus no coverage. Exh. L at 7.[5]

---

[5]    Liberty Mutual cited no policy language or case law to support this defense. Unsurprisingly, in 1993,
the SJC rejected the "discovery" trigger and also required insurers to defend suits alleging pollution
discovered after the insured had sold the site. See Trustees of Tufts, 415 Mass. at 848-49 ("The policy

5

**D.**    <u>Judge Stearns' Ruling in the Underling Wheeler Road Lawsuit</u>

After a bench trial, Judge Stearns found that Foxboro was the only site occupant to use TCE, Exh. B, Fact No. 6. He further found that Foxboro placed drums in a central storeroom to collect spent solvents, and employees were admonished not to pour chemical wastes down the sinks. <u>Id</u>. Like the proverbial dog that didn't bark, the decision cited no evidence (because there was none) that Foxboro poured TCE into floor or sink drains or otherwise intentionally released solvents to the environment. Thus, even after a full trial, there was not a shred of evidence to eliminate the possibility of sudden and accidental releases into the site's drainage system.

Moreover, Judge Stearns's decision included a number of specific findings that directly establish "sudden and accidental" releases of solvents into the environment. For example, along the "west line" of the site's drainage system, Judge Stearns found, <u>inter alia</u>, that groundwater had been contaminated with TCE as a result of a drainage pipe hole created by a "sharp protuberances in the bedrock," as well as beneath another large (18" x 10") hole in the drainage pipe. Exh. B, Fact No. 18 Judge Stearns also found contamination along the "north line" of the drainage system, especially in the vicinity of fallen mortar caused the pipe joints to fail. <u>Id.</u>, Fact No. 17.

The bottom line is that while Judge Stearns found substantial contamination along the underground drainage system (to which the facility's floor and sink drains were connected), Exh. B, Fact No. 20; Conclusion No. 1, he did *not* state how solvents entered the drainage system -- and thus did *not* rule out the possibility of sudden and accidental spills of solvents into sinks or floor drains. Instead, Judge Stearns imposed *res ipsa loquitur* liability, finding Foxboro liable for groundwater contamination (a) because Foxboro was the only party definitely to use TCE at the site and (b) because a drainage system was present on the site. Certainly, he did *not* impose

7

INV01698

liability based on any finding that Foxboro had deliberately poured or otherwise allowed TCE into the drainage system.[8]  Indeed, there was no evidence that could have supported such a finding, and to this day Liberty Mutual has not identified a scintilla of evidence to support such a finding.

### E.    Foxboro's Damages

Due to (i) Liberty Mutual's failure to defend Foxboro, and (ii) Judge Stearns' ruling that Foxboro is liable for groundwater cleanup, Foxboro has incurred the following damages:

-    **Underlying Judgment:** Foxboro was held liable for all costs for groundwater cleanup (but not soil cleanup), and was ordered to pay the underlying plaintiffs' attorney's fees.  On October 8, 1996, Foxboro satisfied the judgment, including interest and costs, by paying $1,187,202.90 to plaintiffs. See Exh. O.

-    **Underlying Defense Costs:** Foxboro also has incurred *net* defense costs to date of at least $594,590.75, including unreimbursed attorney's fees and costs of at least $390,445.01 and expert consulting fees of at least $204,145.74.[9] See Exh. P.

-    **Prejudgment Interest on Underlying Judgment and Defense Costs:** To date, the statutory prejudgment interest totals more than $510,000, including interest on the paid judgment (more than $275,000) and interest on unreimbursed defense costs (more than $235,000).

---

[8]     Specifically, Judge Stearns' Conclusions of Fact and Law included the following:

"1. Foxboro, the owner and operator of the Wheeler Road facility from 1954 to 1978, is responsible for the releases of TCE contaminating the groundwater in the northeastern area of the site. I base this conclusion on among other facts: (1) Foxboro stored hazardous materials at the site, including TCE; (2) Foxboro was the only occupant of the site to use TCE in its operations; (3) the monitoring wells downgradient of the leaching basin and the north and west drain lines, as well as samples taken from the surface of the bedrock, show high groundwater concentrations of TCE; (4) Foxboro had no formal policies regulating or monitoring employee use and disposal of hazardous materials; and (5) Foxboro has failed to show by a preponderance of the evidence that some third party was solely responsible for the release of TCE.

"2. The installation during Foxboro's occupancy of a leaching basin connected to the internal sinks and floor drains of the plant provided the agency for disseminating TCE into the groundwater." Exh. B, Conclusions of Fact and Law Nos. 1 and 2.

[9]     This net figure does not include $58,420.77 in defense costs paid by Liberty Mutual before it withdrew from the defense of Foxboro in December 1991.

8

INV01699

- **Future Cleanup Costs:** Finally, Judge Stearns ordered Foxboro to pay post-judgment groundwater cleanup costs. As will be shown at trial, Foxboro has incurred $102,762.59 in post-judgment cleanup costs to date, and expects to spend another $800,000.

Thus, Foxboro's total out-of-pocket loss to date (including prejudgment interest) is $2,237,602.19. Further, statutory interest is accruing at the rate of at least $17,759.03 per month (i.e., 1% per month on the $1,775,903 sum of the underlying judgment and unpaid defense costs).

## LEGAL ARGUMENT

## I.    AS A MATTER OF LAW, LIBERTY MUTUAL BREACHED ITS DUTY TO DEFEND THE FOXBORO COMPANY

### A.    Judgment on the Duty to Defend Is Appropriate As a Matter of Law

#### 1.    Legal Standard for the Duty to Defend

In Massachusetts, the duty to defend is based on a simple comparison of the underlying complaint to the insurance policy, to determine if the allegations *potentially* trigger coverage:

> "It is settled in this jurisdiction, and generally elsewhere, that the question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are 'reasonably susceptible' of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense."

Sterilite Corp. v. Continental Casualty Co., 17 Mass.App.Ct. 316, 318, 458 N.E.2d 338 (1983).

"'In order for the duty of defense to arise, the underlying complaint need only show, through general allegations, a possibility that the liability claim falls within the insurance coverage. *There is no requirement that the facts alleged in the complaint specifically and unequivocally make out a claim within the coverage.*'" Id., 17 Mass.App.Ct. at 319 (cites omitted; emphasis added).

9

INV01700

The duty to defend is measured at the outset of the underlying action, based on the allegations of the underlying complaint. Id., 17 Mass.App.Ct. at 323. The possibility of coverage can arise from the allegations of the third-party complaint *or* from extrinsic information made known or reasonably available to the insurer. See Desrosiers v. Royal Ins. Co., 393 Mass. 37, 40, 468 N.E.2d 625 (1984) ("the obligation of the insurer is based not only on the facts alleged in the complaint[] but also on the facts that are known or readily knowable by the insurer"); Trustees of Tufts, supra, 415 Mass. at 852, 616 N.E.2d at 74 (determining duty to defend based on "[t]he facts alleged in the complaint and those facts known by the insurers") (citing to Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 10-11, 545 N.E.2d 1156 (1989)).

However, the converse is **not** true: The insurer cannot avoid its defense obligation by citing extraneous facts that might cause the underlying claim to fall outside the policy's coverage:

> "As to whether even solid information reaching the insurer from the insured, and indicating that claimed losses were in fact uninsured, could itself relieve the insurer of its duty to defend, the Lee case says: 'This language [requiring the insurer to defend even a baseless claim] means that the insurer will defend the suit, if the injured party states a claim, which, qua claim, is for an injury 'covered' by the policy; it is *the claim* which determines the insurer's duty to defend; and it is irrelevant that the insurer may get information from the insured, or anyone else, which indicates, or even demonstrates, that the injury is not in fact "covered.""'

Sterilite, 17 Mass.App.Ct. at 324 n.17 (citations omitted; emphasis added).[10] Neither can the

---

[10]  Judge Fabricant made this point forcefully in a recent environmental case establishing Liberty Mutual's duty to defend an underlying environmental action:

> "Even if the complaint does not appear to fall within the policy, the insurer may have a duty to defend if additional facts, known or available to it, indicate that the claim is covered. [Citing Boston Symphony Orchestra and HDH Corp., supra.] The converse, however, is not the case; where a complaint on its face is susceptible of a reading that brings the claim within the policy, the insurer cannot rely on facts outside the complaint to justify a unilateral refusal to defend. [Citing Sterilite, supra.]"

Nashua Corp. v. Liberty Mutual Ins. Co., 1997 Mass. Super. LEXIS 541, *10-11 (2/18/97) (Exh. R).

10

INV01701

insurer avoid a defense based on the possible application of an exclusion, where the complaint is worded broadly enough to create the potential that the exclusion will not apply. Sterilite, 17 Mass.App.Ct. at 320 ("The allegations of [the third-party] complaint seem to us ... ample enough to harbor a [non-excluded] 'breakdown' situation, and they surely do not expressly bar it."). Another court recently invoked this rule -- i.e., that an insurer must defend a suit that neither implicates nor rules out an exclusion -- to require Liberty Mutual to defend a pollution case that (like this case) encompassed a range of possible scenarios for how releases may have occurred:

> "Thus, the duty to defend depends not on the actual facts of the event giving rise to the claimed liability, but on the full range of possible facts that could fall within the cope of the third-party's complaint. Where a complaint is so general as to encompass a wide range of possible scenarios, the 'possibility that the liability falls within the insurance coverage' is enough to trigger the duty to defend. Sterilite, 17 Mass. App. Ct. at 319, 458 N.E.2d 338."

Arrow Automotive Industries, Inc. v. Liberty Mutual Ins. Co., 1998 Mass. Super. LEXIS 374 at *22 (January 29, 1998) (Exh. S).

Finally, once the potential for coverage exists or can be inferred from the face of the third-party complaint, the insurer must defend until "it demonstrates with conclusive effect on the third party that as a matter of fact - as distinguished from the appearances of the complaint and policy - the third party cannot establish a claim within the insurance." Sterilite, 17 Mass. App. Ct. at 323. Until the insurer can make such a showing, it must continue its defense of the policyholder. Id., 17 Mass.App.Ct. at 323 n.15 (such "clarification may not come until the third-party action is fully tried, and in that case the duty to defend continues to the end"). See also Lumbermens, 407 Mass. at 685-86 (duty to defend continues "until there is an unalterable determination as to the nature of the underlying claim"). "What is not permitted is that an insurer shall escape its duty to defend

11

the insured against a liability arising on the face of the complaint and policy, by dint of its own assertion that there is no coverage in fact: the insurer then stands in breach of its duty even if the third party fails in the end to support any such claim of liability by adequate proof." See, e.g., Sterilite, 17 Mass. App. Ct. at 324 and n.17.[11]

### 2. The Complaint's Allegations, and Other Information Known or Available to the Insurer, Established Liberty Mutual's Duty to Defend

Like the allegations in cases such as Arrow, the "notice pleading" of the Wheeler Road Complaint was worded in general, extremely broad terms. Emblematic of its breadth, the Complaint alleged generally that "in operating the Plant, Foxboro . . . released hazardous substances and materials at the Site, including PCE and TCE." Exh. A at ¶ 8. While speculating "on information and belief" that solvents were released into sink drains, see id., the Complaint did not rule out the possibility of sudden and accidental counter-top spills into the sinks, or of other sudden and accidental events such as, e.g., spills into floor drains or (as was alleged and proven at trial) sudden and accidental breaks in the drainage lines. Exh. B, Fact Nos. 17, 18.

Indeed, by August 1, 1991 - four months before withdrawing from the defense - Liberty Mutual had learned in its claims investigation that plaintiffs' "sink" theory had no basis in fact:

> "Mr. Thomas Mudgett, an employee of Foxboro who once worked at the Wheeler Road facility, was deposed. Mr. Mudgett testified that alcohol, trichloroethylene, freon and methylene chloride were used to clean the products which Foxboro manufactured and certain equipment. Mudgett testified that nothing was disposed on or at the Site and that all of the used hazardous materials were disposed off-site through the use of a contract disposal firm. Mudgett further testified that sinks were not used to dispose of the waste materials."

---

[11]  Both the SJC and the Appeals Court not only have embraced Sterilite's broad formulation of the duty to defend, see Continental Cas. Co. v. Gilbane Building Co., 391 Mass. 143, 146-47, 461 N.E.2d 209 (1984), but also have applied it repeatedly in the environmental context. See, e.g., Trustees of Tufts, 415 Mass. at 847-48; Rubenstein, supra, 44 Mass. App. Ct. at 847-48.

INV01703

<u>See</u> Exh. F at 2. By that same date, Liberty Mutual also possessed documents proving the existence of off-site contamination and thus rebutting the "owned property" and "alienated premises" exclusions. <u>Id.</u> at 4-5 ("off-site contamination has been confirmed").

Thus, as of December 3, 1991 (<u>i.e.</u>, the date when Liberty Mutual denied coverage and withdrew from defending Foxboro), it was clear that "the full range of possible facts that could fall within the scope of the [underlying] complaint . . . encompass[ed] a wide range of possible scenarios," and thus "the 'possibility that the liability falls within the insurance coverage' [was] enough to trigger the duty to defend." <u>Sterilite</u>, 17 Mass. App. Ct. at 319, 458 N.E.2d 338.[12]

Subsequent events served only to further emphasize the existence of a duty to defend. On the legal front, the SJC rejected Liberty Mutual's argument (<u>see</u> Exh. L at 7) that coverage applied only if the pollution was discovered during a policy period when the insured owned the property. <u>See</u> <u>Trustees of Tufts University</u>, 415 Mass. at 848-49, 853-54. Even though Liberty Mutual was clearly aware of <u>Trustees of Tufts</u>, <u>see</u> Exh. Q, it still refused to defend the suit.

Meanwhile, on-going litigation in the Wheeler Road Lawsuit clearly demonstrated that the underlying plaintiffs had no evidence to support their speculation of disposal of solvents into sinks. <u>See</u> <u>supra</u> n. 4. Moreover, the plaintiffs also established the existence of floor drains, <u>see</u> Exh. B at Fact 6, thus providing another pathway for sudden and accidental spills to enter the drainage system and contaminate the Site's soil and groundwater.

---

[12]  The fact that Liberty Mutual itself read the Wheeler Road Complaint broadly enough to accept the defense from the outset -- and that it continued defending for a full year -- is a significant concession as to the Complaint's breadth, especially given Liberty Mutual's established practice of denying a defense *ab initio* in environmental cases where (in its unilateral opinion) the complaint rules out any possibility of coverage. <u>See, e.g.</u>, Liberty Mutual Ins. Co. v. <u>SCA Services, Inc.</u>, 412 Mass. 330, 588 N.E.2d 1346 (1992) (refusing to defend complaint alleging intentional contamination of soil); <u>Arrow</u>, <u>supra</u>, 1998 Mass. Super. LEXIS 374 at *24 ("Liberty declined without bringing any action to establish the absence of a duty."); <u>Nashua Corp.</u>, <u>supra</u>, 1997 Mass. Super. LEXIS 541, *12 (same).

INV01704

Inexorably, this cumulation of allegations and information permits only one conclusion: The Wheeler Road Complaint allowed for the possibility of sudden and accidental releases causing off-site property damage during one or more of the Liberty Mutual policy periods after 1974 (i.e., after Foxboro acquired the site). Liberty Mutual ignored these bedrock principles when it unilaterally abandoned its defense of the Wheeler Road Lawsuit. Having acted at its peril, Liberty Mutual must now face the consequences of its decision.

## II.    BECAUSE IT BREACHED THE DUTY TO DEFEND, LIBERTY MUTUAL NOW HAS THE BURDEN OF PROOF ON ALL "DUTY TO INDEMNIFY" ISSUES

### A.    In Addition to Being Liable for Foxboro's Defense Costs, Liberty Mutual Also Has the Burden of Proof on All Indemnity Issues

It goes without saying that Liberty Mutual, by breaching its duty to defend, is liable for Foxboro's unpaid defense costs in the Wheeler Road Lawsuit (which to date total $588,670.46, exclusive of interest). See Polaroid, 414 Mass. at 762, 610 N.E.2d at 921.[13]

Moreover, the SJC has imposed a severe evidentiary sanction upon non-defending insurers, by holding that *the burden of proof on all indemnity issues now shifts to Liberty Mutual:*

> "We, therefore, agree with the Court of Appeals of New York that an insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within its policy's coverage."

Polaroid, supra, 414 Mass. at 764, 610 N.E.2d at 922. See also, e.g., Swift v. Fitchburg Mut. Ins. Co., 45 Mass. App. Ct. 617, 625, 700 N.E.2d 288, 293 (1998) ("The [SJC] was clear that 'an

---

[13]    Liberty Mutual also must also pay Foxboro's attorney's fees in this coverage action. See Rubenstein v. Royal Ins. Co. of America, 429 Mass. 355, 708 N.E.2d 639, 643 (1999) ("Because the [insureds] established that the defendant violated its duty to defend them in the damages action, they are entitled to an award of the reasonable attorney's fees and expenses incurred in the declaratory relief action.").

14

insurer that wrongfully declines to defend a claim will have the burden of proving that the claim was not within its policy's coverage.'"). In discharging its burden of proof. Liberty Mutual is bound by Judge Stearns' findings in the Wheeler Road Lawsuit. See, e.g., Polaroid, 414 Mass. at 763 n.20, 610 N.E.2d at 921 n.20 ("If an underlying case went to judgment, the insurer would be bound by the result of the trial, as to all material matters decided in that action that bear on the coverage issue.").

Decisions by the SJC and the Appeals Court make it clear that the burden-shifting extends not only to whether the claim falls within the policy's basic coverage position (a burden that otherwise would fall upon the policyholder), but also applies to other issues involving the duty to indemnify, including two issues that are particularly salient in this case. *First*, with respect to the limited pollution exclusion, the SJC in Polaroid invoked the burden-shifting principle to require the insurer to prove the non-applicability of the "sudden and accidental" exception to pollution exclusion. See Polaroid, supra, 414 Mass. at 764 n.22, 610 N.E.2d at 922 n.22.[14] This ruling is likely to be outcome-determinative in this case, given the complete absence of any evidence (let alone any finding by Judge Stearns) that Foxboro ever poured solvents into the Site's drainage system or otherwise intentionally released solvents into the environment.

*Second*, both the SJC and the Appeals Court have held that in cases that may involve a combination of covered and non-covered claims or events, the non-defending insurer will "have

---

[14]    In Polaroid, the SJC reserved deciding whether, in the absence of a breach of the duty to defend, the insurer or policyholder would bear the burden of proving the "sudden and accidental" exception to the pollution exclusion. Polaroid, 414 Mass. at 753 n.7, 764 n.22. In 1997, the SJC held that, where the insurer defended, the policyholder would have the burden of proving the applicability of the "sudden and accidental" exception . See Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 231, 676 N.E.2d 801, 805 (1997). In this ruling, the SJC expressly reiterated that in Polaroid, "we did place the burden of proof [regarding the "sudden and accidental" exception] on the insurer in those cases where the insurer is in breach of its duty to defend the insured." Highlands, 424 Mass. at 230, n.6.

INV01706

the burden of allocating the judgment in the [underlying] lawsuit between the covered claim and the noncovered claim." See Liquor Liab. Joint Underwriting Ass'n of Mass. v. Hermitage Ins. Co., 419 Mass. 316, 323, 644 N.E.2d 964, 969 (1995) (rejecting non-defending insurer's *pro rata* allocation as arbitrary and speculative). See also Palermo v. Fireman's Fund Ins. Co., 42 Mass. App. Ct. 283, 290, 676 N.E.2d 1158, 1163 (1997). Thus, if any dispute arises at trial about the allocation of Foxboro's damages between covered or uncovered events, claims or policy periods, Liberty Mutual will bear the burden of proof on these "allocation" issues as well.

**B.      Liberty Mutual's Arguments Against Burden-Shifting Are Meritless**

In another pending case, Liberty Mutual has tried to resist burden-shifting by raising a number of arguments (none of which have been accepted). These arguments are meritless.

Liberty Mutual first may argue that burden-shifting does not apply unless the insured can demonstrate "actual prejudice" from the insurer's failure to defend. However, this argument is flatly refuted by the Polaroid decision. In Polaroid, the SJC considered whether to impose upon a non-defending insurer the sanction of "automatic indemnity" (i.e., prohibiting the insurer from raising any coverage defenses). The SJC held that "automatic indemnity" would be imposed only if the policyholder could show *actual prejudice*, i.e., that it settled the case because it "lack[ed] financial resources sufficient to maintain a proper defense." Id., 414 Mass. at 764, 610 N.E.2d at 922. Conversely, in cases where the policyholder cannot show prejudice (and thus is not entitled to "automatic indemnity"), the SJC held that "an insurer that wrongfully declines to defend will have the burden of proving that the claim was not within the its policy's coverage." Id.[15]

---

[15]    The SJC made it clear that even where there is no proof that the lack of a defense forced the insured to settle rather than litigate, there exists an element of *presumed* prejudice since "delay in determining an insurer's defense obligation could make it more difficult for an insured to prove that the underlying

16

INV01707

Thus, of the many consequences flowing from the insurer's breach of the duty to defend, only the sanction of "automatic indemnity" is preconditioned upon any showing of prejudice to the policyholder. See Swift, 700 N.E.2d at 293-94 (distinguishing "actual indemnity" sanction from "burden-shifting" sanction, and applying burden-shifting without any showing of actual prejudice). It is therefore not surprising that not a single Massachusetts court has adopted Liberty Mutual's argument that "actual prejudice" is as a precondition to Polaroid burden-shifting.

Alternatively, Liberty Mutual may attempt to argue that burden-shifting is inappropriate unless Foxboro demonstrates that Liberty Mutual failed to act in "good faith" in its withdrawal from defense of the Wheeler Road Lawsuit. Liberty Mutual would further argue that it (supposedly) did act in good faith because (supposedly) it properly stopped defending once its investigation into the broad allegations of the Complaint eliminated any possibility of coverage. This argument is meritless, for three reasons. First, Polaroid itself contains no such "bad faith" precondition to burden-shifting, and the Appeals Court has made it clear that the burden of proof will be shifted without regard to the insurer's "good faith" (or lack thereof) in declining to defend:

> "An insurer who unjustifiably refuses or fails to defend its insured, *even in good faith*, assumes the consequential risks of that breach of its insurance contract. Those risks not only include liability for the amount of the judgment reflecting claims covered by the policy, but also extend to bearing the burden of proof with respect to apportionment of a judgment between claims that were covered by the policy and claims that were not covered."

---

claim that it settled fell within policy coverage." Polaroid, 414 Mass. at 764, 610 N.E.2d at 922. This element of presumed prejudice has been seized upon in subsequent burden-shifting cases. See, e.g., Palermo, 42 Mass. App. Ct. at 290, 676 N.E.2d at 1162 ("Such a result [burden-shifting] is eminently fair, since Fireman's could (and should) have participated fully in the defense of the action. . . under a reservation of rights; and 'had it participated, and explained to the trial judge . . . the need for a verdict which would require the jury separately to state their findings as to liability and damages between the [covered and non-covered] claims, it is likely that the judge would have employed other special questions to accomplish that result.'"), quoting Liquor Liab. Joint Underwriting Ass'n of Mass., supra, 419 Mass. at 323, 644 N.E.2d at 968-69.

17

INV01708

Palermo, 42 Mass. App. Ct. at 290, 676 N.E.2d at 1163 (emphasis added).[16]

Second, the theory that a "proper investigation" is a defense to anything (except, possibly, Chapter 93A liability) is utterly inconsistent with fundamental principles of the duty to defend in this state. Sterilite prohibits withdrawing a defense based on a unilateral assertion of no coverage, see Nashua Corp., supra at *10-11 (Exh. S); and an insurer acts at its extreme peril unless it first proves "with conclusive effect on the third party that as a matter of fact - as distinguished from the appearances of the complaint and policy - that the third party cannot establish a claim within the insurance." Sterilite, 17 Mass. App. Ct. at 323. Here, the very fact that Liberty Mutual needed to investigate facts outside the Complaint before denying a defense is, per se, conclusive evidence that the Complaint was "so general as to encompass a wide range of possible scenarios, [and therefore] the 'possibility that the liability falls within the insurance coverage' is enough to trigger the duty to defend." Arrow, supra at *22, citing Sterilite, 17 Mass. App. Ct. at 319.[17]

Finally, the very notion that Liberty Mutual conducted a good-faith investigation is, in a word, absurd. Far from eliminating any possibility of coverage, Liberty Mutual's "investigation" confirmed the duty to defend by establishing both (i) that off-site contamination had occurred (thus ruling out the owned property and alienated premises exclusions, see supra at 4-5) and (ii) that intentional disposal of solvents had not occurred (thus ruling out the pollution exclusion).

---

[16] Of course, a "good faith" argument is somewhat beside the point, since it is clear that Liberty Mutual acted in utter disregard of the facts and the law in declining to defend, and that by unilaterally withdrawing from the defense, it failed to follow the course prescribed in Sterilite and other decisions of first filing -- and prevailing in -- a declaratory relief action. The salient point is that the burden of proof shifts, regardless of any Chapter 93A liability that Liberty Mutual also may face.

[17] See also General Host Corp. v. Liberty Mutual Ins. Co., 1992 U.S. Dit. LEXIS 2628, *9 (D. Mass. March 3, 1992) (rejecting Liberty Mutual's unilateral decision to stop defending, because "[a] subsequent withdrawal ... requires something more than the insurer's bare assertion of no coverage").

18

INV01709

Indeed, Liberty Mutual's own claims file establishes that its decision to stop defending resulted

not from a good-faith or principled evaluation of the claim, but instead from pressure that Liberty

Mutual placed on its claims handler to "complete our investigation as soon as possible" because

"defense costs may be mounting." Exh. K.  This is hardly the stuff of "good faith."

In sum, Liberty Mutual wrongly decided to stop defending Foxboro, even as the law and

facts clearly showed that it had a duty to defend. It must now face the consequences of its choice.

## III.    CONCLUSION AND REQUESTED FORM OF ORDER

Foxboro has submitted (as Exh. T) a proposed form of order with three elements:

- **First,** as a matter of law, Liberty Mutual breached its duty to defend the Wheeler Road Lawsuit and must pay Foxboro's reasonable defense costs.

- **Second,** Liberty Mutual is bound by all material findings in the Wheeler Road Lawsuit bearing on the duty to indemnify in this case.

- **Third,** Liberty Mutual now has the burden of proof and the burden of going forward on all issues bearing on the duty to indemnify, including whether the coverage of the policy was triggered, whether any exclusions bar coverage, whether the "sudden and accidental" exception to the pollution exclusion applies, and allocation (if any) between covered or non-covered claims, events or damages.

As set forth above, this order will streamline and organize the presentation of proof in this action.

Plaintiff The Foxboro Company accordingly urges the Court to issue its proposed pretrial order.

THE FOXBORO COMPANY,
By its attorneys,

Robert J. Gilbert, Esq. (BBO No. 565466)
Kathryn E. Perrotta, Esq.  (BBO No. 557308)
GILBERT & RENTON, P.C.
23 Main Street
Andover, MA 01810
Telephone: (978) 475-7580
Telecopy: (978) 475-1881

Dated: May 19, 1999

19

INV01710

**EXHIBIT 10**

# SETTLEMENT AGREEMENT AND RELEASE

This Settlement Agreement and Release (the "Agreement") is entered into by and between One Wheeler Road Associates, a Massachusetts Limited Partnership with a principal place of business at Burlington Office Park, One Wall Street, Burlington, Massachusetts (hereinafter referred to as "Wheeler Road Associates"), the Gutierrez Company, a Delaware Corporation and general partner of Wheeler Road Associates, with a principal place of business at Burlington Office Park, One Wall Street, Burlington, Massachusetts (hereinafter referred to as "Gutierrez"), and The Foxboro Company with a principal place of business at 33 Commercial Street, Foxboro, Massachusetts (hereinafter referred to as "Foxboro").   The foregoing shall be collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, the real property and improvements located at 200 Wheeler Road, Burlington, Massachusetts (the "Wheeler Road Property") were owned and occupied by Foxboro or its predecessor corporation from 1954 to 1978;

WHEREAS, in 1978 Foxboro sold the Wheeler Road Property to Blanton Wiggin and moved its operation to a new facility;

WHEREAS, in 1982 Wheeler Road Associates purchased the Wheeler Road Property from Mr. Wiggin;

WHEREAS, One Wheeler Road Associates and Gutierrez Co. (collectively the "Plaintiffs") were the Plaintiffs and Foxboro was the defendant in the litigation captioned <u>One Wheeler Road Associates and The Gutierrez Company v. The Foxboro Company,</u> United States

District Court for the District of Massachusetts Civil Action No. 90-128763-RGS (the "Wheeler Road Action");

WHEREAS, the Plaintiffs in the Wheeler Road Action brought suit under the Comprehensive Environmental Response and Liability Act ("CERCLA") 42 U.S.C. §9601, et seq. and M.G.L. c. 21E to recover response and remediation costs incurred to address the environmental contamination located at One Wheeler Road, Burlington, Massachusetts ( the "Wheeler Road Property");

WHEREAS, the Massachusetts Department of Environmental Protection has assigned Release Tracking Number 3-0267 to this Site;

WHEREAS, Final Judgment was entered in the Wheeler Road Action on or about April 19, 1996, a copy of which Final Judgment is appended hereto at Exhibit A;

WHEREAS, Foxboro has satisfied, in full, the monetary amount of the Final Judgment entered in the Wheeler Road Action;

WHEREAS, the Final Judgment entered in the Wheeler Road Action included certain declarations and findings as to the parties' respective responsibilities for the reasonable and necessary response costs as have been and will be incurred after October 1993 in connection with the remediation of the groundwater and soils at the Wheeler Road Property;

WHEREAS, from October 1993 through February 1999 Plaintiffs have incurred response costs in the amount of $150,439.05 at the Wheeler Road Property, which response costs are more fully detailed in Exhibit B appended hereto;

WHEREAS, Windham Environmental Corporation has submitted a not-to-exceed proposal to design and construct a soil and groundwater remedial system at the Wheeler Road

2

INV01616

Property (the "Windham Proposal"), a copy of which proposal is appended hereto at Exhibit C; and

WHEREAS, the Parties believe it is in their mutual interest to reach a resolution with respect to Plaintiffs' claims concerning the response costs which they have incurred since October 1993 and will incur in the future with respect to remediation at the Site.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants contained herein, and intending to be legally bound, the Parties agree as follows:

1. **<u>Definitions</u>**

As used herein, the following definitions apply for purposes of this Agreement:

1.1 "**<u>Wheeler Road Associates</u>**" shall mean One Wheeler Road Associates and its respective predecessors, parents, subsidiaries, affiliates, divisions, officers, directors, employees, attorneys, decedents, dependents, heirs, executors, administrators, assigns and successors.

1.2 "**<u>Gutierrez</u>**" shall mean The Gutierrez Company, and its agents, officers, directors, employees, attorneys, representatives, predecessors, successors, subsidiaries, parents, divisions, affiliates, and assigns.

1.3 "**<u>Foxboro</u>**" shall mean The Foxboro Company and its agents, officer, directors, employees, attorneys, representatives, predecessor, successors, subsidiaries, parents, divisions, affiliates, and assigns.

1.4 "**<u>Person</u>**" shall mean any individual, corporation, partnership, association, trust, government, government agency, or other entity or organization.

2. **<u>Cooperative Remediation</u>**

The Parties hereby agree to engage in a joint, cooperative, good faith effort, to manage and direct, in accordance with the Final Judgment entered in the Wheeler Road Action and the provisions set forth in Paragraphs 3, 5, 6, 7, 8 and 9 below, all necessary, reasonable and appropriate response, assessment, containment, removal, and remedial activities ("Response

3

INV01617

Actions") at the Site in a manner consistent with the provisions of M.G.L. c. 21E and the Massachusetts Contingency Plan ("MCP"), and all other applicable statutes and regulations to achieve an appropriate Response Action Outcome ("RAO") at this Site which may include an Activity and Use Limitation ("AUL") consistent with the current and continued use of the Property as a commercial property. Subject to the provisions of Paragraphs 5, 6, 7, 8 and 9 below, to the extent that M.G.L. c. 21E or the MCP is amended in the future, the parties agree to consider the application of any other Class A RAO or equivalent statement of completion for the Site by virtue of such amendment. (An RAO as currently defined under M.G.L. c. 21E and the MCP or an equivalent statement of completion which would become applicable to the site under an amendment of M.G.L. c. 21E or the MCP shall hereinafter be referred to as an "RAO Statement"). The Parties agree that they shall, to the extent required by the MCP or other applicable law, regulation or order, obtain regulatory approval of, and implement, a remedies for site soils and site groundwater that are the most cost effective remedies consistent with the requirements of the Department of Environmental Protection (" DEP") and which are consistent with the continued use of the Property as a commercial property. The Parties have jointly prepared and Wheeler Road Associates has or will submit to the DEP the Phase 4 Report for the Site. Wheeler Road Associates shall, when appropriate, also prepare and submit to the DEP an RAO Statement and any other document which the MCP requires. The Parties hereby agree and acknowledge that, upon submittal to the DEP of the RAO Statement for site groundwater and expiration of the maximum period of time afforded by the then applicable version of the MCP to conduct an audit of the RAO Statement for Site groundwater, Foxboro's obligations with respect to the Site under this Agreement and the Final Judgment entered in the Wheeler Road Action

4

shall be fully satisfied; provided, however, that nothing set forth herein shall be deemed to have changed, altered, or otherwise modified, any of the legal or factual findings contained in the Final Judgment.

### 3.    Payments by Foxboro of Settlement Amount

Foxboro hereby agrees to pay the amount of $102,762.59 ("Settlement Amount") to Plaintiffs, as full and complete consideration for the response costs which Plaintiffs have been incurred at the Wheeler Road Property from October 1993 through February 1999. These costs are more fully described in Exhibit B. As more fully set forth in paragraph 4 below, in exchange for Foxboro's payment of the Settlement Amount, Plaintiffs will release and forever discharge Foxboro for any and all claims associated with these past costs.

### 4.    Release

In consideration of Foxboro's payment of the Settlement Amount, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, and expressly subject to the conditions set forth in Paragraphs 5, 6, 7, 8 and 9 below, Wheeler Road Associates and Gutierrez hereby release Foxboro from, and covenant and agree that they will not assert or bring any claim, demand, lawsuit or cause of action (whether by way of original claim, cross claim, third-party claim or fourth-party claim) ("Claim(s)") against The Foxboro Company which arises out of, or relates in any way to, the payment of such reasonable and necessary response costs as have been and will be incurred after October 1993 in the remediation of the groundwater at the Site. The Parties hereby agree and acknowledge that nothing set forth herein shall be deemed to extinguish, release or otherwise affect the Parties' rights to seek recovery from each other, by contribution or otherwise, as to claims that are asserted by persons not a party to this Agreement

5

INV01619

claiming harm of any sort arising from release(s) of oil or hazardous material at or from the Site. This Release shall immediately take effect upon Plaintiffs receipt of the Settlement Amount. The Parties agree that the Release, and its force and effect, shall survive this Agreement.

## 5.    Allocation of Remedial System Capital Costs

The Parties hereby agree and acknowledge that the capital costs incurred to construct the remedial system (as more fully described in Exhibit C hereto) will be allocated as follows:

| | |
|---|---|
| Foxboro: | 56% |
| Wheeler Road Associates and Gutierrez: | 44% |

The Parties further agree that Foxboro will pay 15% of the System Start-up and debugging costs as they relate to the delivery of the groundwater component of the remedial system or 50% of the costs incurred on the first day of system delivery. The Parties further agree that the total costs to construct the remedial system shall not exceed the total of $68,607 set forth in the Windham Proposal and $12,988.50 incurred for installation of underground utilities and drainage to the systems, which costs were not included in the Windham Proposal and which are set out more fully in the invoices attached hereto as Exhibit D. The Parties acknowledge and agree that, if the total costs to construct the remedial system exceeds $81,595.50, Foxboro shall be under no obligation to contribute to the payment of these excess costs.

## 6.    Operation of Remedial System

The Parties hereby agree and acknowledge that they will share on an equal basis the costs of the first month's labor and monitoring costs of operating the Site's remedial system and keeping the system in compliance with the applicable regulations including, but not limited to,

6

influent and effluent monitoring and reporting the results of the monitoring.  The Parties further agree and acknowledge that for all subsequent months that the Site's remedial system is operational, Foxboro will contribute $600/month towards these costs.  Wheeler Road Associates and Gutierrez will be responsible for all other costs incurred to perform these activities.  Once the Soil Vapor Extraction ("SVE") component of the remedial system is shut down, Foxboro will pay 100% of these costs.  Foxboro understands that repairs to or modification of the groundwater component of the remedial system will be incurred as needed and that these costs have not been included in the $600 per month cost which is discussed above.  In the event costs are incurred as result of such repairs or modifications, the parties agree that the costs will be allocated according to whether they were incurred for soil remediation, which will be the Plaintiffs' responsibility, or groundwater remediation, which will be Foxboro's responsibility.  For those repairs or modification costs that cannot be so allocated, Foxboro will be responsible for 50% of such costs until the SVE component of the remedial system is shut down, after which time Foxboro shall be responsible for 100% of such costs.

7.  **Operation and Maintenance of Site Remedial System**

    The Parties hereby agree and acknowledge that the operation and maintenance costs of the Site's Remedial System will be allocated and paid as follows:

    A) Power:

        1)  While SVE component of the remedial system is operating:

| | |
|---|---|
| Foxboro: | 30% |
| Wheeler Road Associates and Gutierrez: | 70% |

INV01621

2) After SVE component of the remedial system is shutdown:

        Foxboro:                  100%

B) Parts:  actual costs as incurred

C) Telephone:

1) While SVE component of the remedial system is operating:

        Foxboro:                 50%

        Wheeler Road Associates    50%
        and Gutierrez:

2) After SVE component of the remedial system is shutdown:

        Foxboro:                  100%

D) Deposit Control:  Foxboro 100%

E) Waste Disposal: Allocated as identified and incurred.

8. **Groundwater Monitoring and MCP Compliance**

A) The Parties agree to share equally the cost of preparing and submitting the

MCP Phase IV and all other reports for the Site, with the exception of those

reports contemplated under paragraph 8(B) below.  Foxboro shall be afforded

the opportunity to review and propose edits to all such reports which contain a

narrative or otherwise transmit information other than site data prior to their

submission to the DEP, including those reports contemplated under paragraph

8(B) below.  The Parties agree that reports which only transmit Site data shall

be submitted to Foxboro ten (10) days prior to their submission to the DEP.

8

INV01622

The Parties further agree that Foxboro will be provided with copies of all reports or other written communication submitted to the DEP.

B) The Parties agree that Foxboro will be 100% responsible for the costs of performing ground-water monitoring for 10 on-Site wells on a tri-annual basis. Foxboro will also be responsible for the costs of the preparation and submission of the appropriate reports to DEP concerning this ground-water monitoring work. The Parties also agree that the number of wells to be sampled may decrease if appropriate after the influence of pumping has stabilized and VOC concentrations reach an appropriate level.

C) The Parties agree that Foxboro will have the right to monitor the groundwater sampling activities at the Site. In addition, the Parties may agree, at any time, to replace the then current Licensed Site Professional ("LSP") with a mutually agreed upon replacement ("Replacement LSP"). Until such time as the Parties are able mutually to agree upon a Replacement LSP, Wheeler Road Associates and Gutierrez shall have the right to maintain the then current LSP in his position or to designate an acting LSP for the Site.

9.   **Billing and Dispute Procedure**

On a quarterly basis, the Plaintiffs shall submit an invoice to Foxboro pursuant to the notice procedures set forth in paragraph 21 below. The invoice will set forth in detail (a) the period for which the invoice is being submitted, (b) the total response costs incurred by Wheeler Road Associates and the Gutierrez during the period, (c) by category of response costs, Foxboro's percentage share of those costs, and (d) the total amount to be paid by Foxboro for the period.

9

Foxboro shall pay its total share of the invoice within 60 days of receipt of the invoice. Should any Party to this Agreement object to the payment of any cost or invoice associated with the activities described in Paragraphs 3, 5, 6, 7 or 8 above, the Parties hereby agree that said objection shall be resolved as follows: The Party objecting to the payment of said invoices shall, within twenty (20) days of its receipt of such invoice, notify the other Parties, in writing, of its objection to payment of the invoice(s) and the basis for said objection. The Parties shall attempt to negotiate and resolve, in good faith, this objection within thirty (30) days of the receipt of the notice of objection described above. Any portion of the subject cost or invoice which is not subject to this objection procedure shall be paid within 60 days of receipt.

10.    **No Admissions**

This Settlement Agreement and Release shall not be construed as an admission of liability by any party to this agreement.

11.    **Application of Agreement Only to the Parties**

This Agreement is intended to confer rights and benefits only on the Parties hereto and the Parties specifically disavow any intention to create rights in third parties under or in relation to this Agreement.

12.    **Entire Agreement/Amendment to Agreement**

This Agreement represents the entire understanding between the Parties and, without limitation, the Parties expressly agree that any previous communications, correspondence, memoranda of agreement or agreements are excluded from this Agreement and are not to be employed to construe this Agreement. Any other provisions of this Agreement to the contrary

10

INV01624

notwithstanding, this Agreement can only be modified by a writing signed by the Parties, and this provision cannot be orally waived.

### 13.    Divisibility

If any provision of this Agreement, or any portion of any provision of this Agreement, is declared null and void, such provision or such portion of a provision shall be considered separate and apart from the remainder of this Agreement which shall remain in full force and effect.

### 14.    Construction of Agreement

This Agreement is the product of informed negotiations between the parties and their respective representatives, including counsel, and it shall not be construed either in favor of or against any Party by virtue of any rules of contract construction intended to be applicable to insurance policies, nor shall any Party be deemed to be the drafter hereof.

### 15.    No Assignment of Rights

One Wheeler Road Associates and Gutierrez represent and warrant that they are the sole owners and holders of the claims released herein, and that they have not sold, transferred, conveyed, or assigned the same, or any interest therein or portion thereof, to any third party or entity.

### 16.    Confidentiality and Disclosure

All matters relating to the existence, terms and negotiations of this Agreement shall be confidential and Parties, and their respective agents, employees, attorneys, servants, insurers, officers or directors shall not disclose such information to any other person (except insurers, reinsurers, auditors and government regulators) without prior written consent of the other parties to this Agreement or unless such disclosure is required by operation of law or by court order.

11

INV01625

The Parties shall resist all other disclosure of the terms of this Agreement unless the other Parties to this Agreement consent to such disclosure.

## 17.    Representations and Warranties

To the extent applicable, each Party represents and warrants:

17.1    That it is fully authorized to enter into this Agreement;

17.2    That, in the case of Gutierrez and Foxboro, it is a corporation, and, in the case of Wheeler Road Associates, it is a limited partnership, each duly organized and validly existing in good standing under the laws of one of the states of the United States of America;

17.3    That it has taken all necessary corporate and internal legal actions to duly approve the making and performance of this Agreement and that no further corporate or other internal approval is necessary;

17.4    That the making and performance of this Agreement will not violate any provision of law or of its articles of incorporation, charter or by-laws;

17.5    That, in making this Agreement has obtained the advice of legal counsel of his, her or its choosing;

17.6    That has read this entire Agreement and knows the contents hereof, that the terms hereof are contractual and not merely recitals, and that he, she or it has signed this Agreement of his, her or its own free act;

## 18.    Authority to Sign

Each person signing this Agreement hereby represents and warrants that he/she is a duly authorized representative of the Party for which the signature is provided, and that such person signing is specifically authorized to sign this Agreement, and that said signature will bind said Party.

## 19.    Execution

This Agreement may be executed in multiple counterparts.

INV01626

20.  **Costs**

Except as otherwise expressed in this Agreement, each Party agrees to bear all attorneys' fees, costs, and expenses arising from the actions of his, her or its own counsel in connection with this Agreement, and all matters and documents referred to herein, and for all related matters.

21.  **Notices**

Unless another individual is designated, in writing, for receipt of notices hereunder, notices to the respective Parties shall be sent, via first class mail, to the following individuals:

ONE WHEELER ROAD ASSOCIATES and
THE GUTIERREZ COMPANY:

          John A. Cataldo
          Trustee of One Wheeler Road
          Associates
          c/o The Gutierrez Company
          One Wall Street
          Burlington, MA 01803

        With a copy to:

          James W. Prendergast, Esq.
          Hale and Dorr LLP
          60 State Street
          Boston, MA 02109

THE FOXBORO COMPANY:

          Anthony R. Franciose, Esq.
          The Foxboro Company
          33 Commercial Street
          Foxboro, MA 02035

        With a copy to:

          William D. Gillis, Jr., Esq.
          Massery & Gillis, LLP
          101 Merrimac Street
          Boston, MA  02114

22.  **Contribution Protection**

A.    Nothing in this Agreement shall be construed to create any rights in, or grant any cause of action to, any person not a party to this Agreement. Each of the Settling Parties expressly reserves any and all rights (including, but not limited to, any right to contribution or

13

indemnity), defenses, claims, demands, and causes of action which each Settling Party may have against any person who is not a party to this Agreement with respect to any matter, transaction, or occurrence relating in any way to the Site.

B.    For response costs associated with remediation of the Site only, as specifically contemplated by this Agreement, the Settling Parties agree that this Agreement is meant to extinguish their liability for indemnity or contribution to each other pursuant to M.G.L. c. 21E, or any other statute or at common law.  The Parties hereby agree and acknowledge that nothing set forth herein shall be deemed to extinguish, release or otherwise effect the Parties' rights to seek recovery from each other, by contribution or otherwise, as to claims that are asserted by persons not a party to this Agreement claiming harm of any sort arising from release(s) of oil or hazardous material at or from the Site.

23.    **Effective Date**

This Agreement shall become effective on the date of its execution by all Parties hereto.

24.    **Attorney Fees**

The Parties expressly agree that this is a good faith resolution of disputed claims pursuant to the dispute resolution provisions of M.G.L. c. 21E, §4A, and that, to the best of their knowledge and belief, each Party has participated in the negotiations giving rise to this Agreement in good faith.  With respect to the matters resolved by this Agreement only, the Parties waive any rights they might otherwise have to seek an award of litigation costs and/or attorneys' fees against the other pursuant to M.G.L. c. 21E, §4A(d)(2) and (f)(1) except for litigation costs and attorneys' fees incurred in enforcement of this Agreement against a

1.

INV01628

defaulting party.  The provisions of this paragraph shall survive the termination of this

Agreement

## 25.    Termination of Agreement

Except as otherwise stated in this Agreement, the provisions of Paragraph Nos. 2, 5, 6, 7,

8 and 9 of this Agreement shall terminate upon submission to the DEP of an appropriate RAO

Statement with respect to the Site and the satisfaction by the Settling Parties of their financial

obligations as set forth in this Agreement.


IN WITNESS WHEREOF, this Agreement has been executed by:

ONE WHEELER ROAD ASSOCIATES

By: _____

Date: _____


THE GUTIERREZ COMPANY

By: _____

Date: _____

THE FOXBORO COMPANY

By: _____

Date: _____

defaulting party. The provisions of this paragraph shall survive the termination of this

Agreement

## 25.    Termination of Agreement

Except as otherwise stated in this Agreement, the provisions of Paragraph Nos. 2, 5, 6, 7,

8 and 9 of this Agreement shall terminate upon submission to the DEP of an appropriate RAO

Statement with respect to the Site and the satisfaction by the Settling Parties of their financial

obligations as set forth in this Agreement.


IN WITNESS WHEREOF, this Agreement has been executed by:

ONE WHEELER ROAD ASSOCIATES

By: _____

Date: _____


THE GUTIERREZ COMPANY

By: _____

Date: _____

THE FOXBORO COMPANY

By: _____

Date: _____

INV01630

defaulting party. The provisions of this paragraph shall survive the termination of this Agreement

## 25.    **Termination of Agreement**

Except as otherwise stated in this Agreement, the provisions of Paragraph Nos. 2, 5, 6, 7, 8 and 9 of this Agreement shall terminate upon submission to the DEP of an appropriate RAO Statement with respect to the Site and the satisfaction by the Settling Parties of their financial obligations as set forth in this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed by:

ONE WHEELER ROAD ASSOCIATES

By: _____

Date: _____

THE GUTIERREZ COMPANY

By: _____

Date: _____

THE FOXBORO COMPANY

By: _____

Date: _____

INV01631

# EXHIBIT A

INV01632

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NUMBER 9012873-RGS

ONE WHEELER ROAD ASSOCIATES AND
THE GUTIERREZ COMPANY

v.

THE FOXBORO COMPANY

FINAL JUDGMENT

APRIL 19, 1996

STEARNS, D.J.

This action came on for trial before the court, the Honorable Richard G. Stearns, District Judge, presiding, and the issues having been duly heard and tried, and orders and memoranda of decision having been issued on February 7, 1994, December 13, 1995, and April 3, 1996, it is hereby

ORDERED, ADJUDGED, AND DECLARED THAT

1.   Under Counts I and II of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, the plaintiffs, One Wheeler Road Associates and The Gutierrez Company, recover from the defendant, The Foxboro Company, the sum of $335,515.00 in environmental response costs, with interest thereon in the sum of $217,082.79 calculated at the rate of 12% per annum from November 28, 1990 to the date of this Final Judgment, as provided by law;

INV01633

2.  Under Count II of the Complaint, the plaintiffs recover nothing of the defendant to the extent said Count is based upon a claim of property damage pursuant to M.G.L. c. 21E, § 5(a)(iii), which claim was dismissed by Order of the Court (Young, J.), dated February 7, 1994;

3.  Under Counts III, IV, and V of the Complaint, having been dismissed by Order of the Court (Young, J.), dated February 7, 1994, the plaintiffs recover nothing of the defendant;

4.  Under Count VI of the Complaint, pursuant to the Order of the Court (Stearns, J.), dated December 13, 1995, as a substantial controversy between the parties of sufficient immediacy exists under 28 U.S.C. § 2201, a declaratory judgment based upon 42 U.S.C. § 9601, et seq. and M.G.L. c. 21E is hereby entered, over which this Court shall retain jurisdiction, holding the defendant liable to the plaintiffs for such reasonable and necessary response costs as have been and will be incurred after October 1993 in the remediation of the groundwater percolating in the soil to the north of the original plant located at the site owned by One Wheeler Road Associates in Burlington, Massachusetts; and

5.  Under to M.G.L. c. 21E, § 15, pursuant to the Order of the Court (Stearns, J.), dated April 3, 1996, the plaintiffs recover from the defendant $504,249.00 in attorneys' fees and costs and $87,677.00 in experts' fees and costs.

Dated at Boston, Massachusetts, this 24 day of April, 1996.

Deputy Clerk of Court

Post-Judgment interest to date
at the rate of 5.46%.    2

INV01634

# EXHIBIT B

INV01635

## REMEDIATION COSTS
## AND PROPOSED ALLOCATION
### (10/93-2/99)

| | | | | | | |
|---|---|---|---|---|---|---|
| 1. | Windham (1/96-7/98)[2] | System Redesign/Planning | $5,646.50 | 70% | $3,952.55 | 30% | $1,693.95 |
| 2. | Task No. 1 | Groundwater Monitoring | 34,884.13 | 100% | 34,884.13 | 0% | 0.00 |
| 3. | Task No. 2 | Groundwater Monitoring Data Analysis and Documentation | 19,393.71 | 100% | 19,393.71 | 0% | 0.00 |
| 4. | Task No. 3 | Initial Tier Classification Review | 290.00 | 50% | 145.00 | 50% | 145.00 |
| 5. | Task No. 4 | Phase III Submittal | 1,480.00 | 80% | 1,184.00 | 20% | 296.00 |

[1]  Attachment A

[2]  Attachment B

INV01636

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6. | Task No. 5 | Supplementary Phase II Submittal - Groundwater | 1,252.00 | 100% | 1,252.00 | 0% | 0.00 |
| 7. | Task No. 6 | Supplemental Risk Characterization - Groundwater | 837.00 | 100% | 837.00 | 0% | 0.00 |
| 8. | Task No. 7 | Downgradient Property Issues | 1,616.25 | 100% | 1,616.25 | 0% | 0.00 |
| 9. | Task No. 8 | Board of Health Issues | 2,520.00 | 0% | 0.00 | 100% | 2,520.00 |
| 10. | Task No. 9 | Review of Windham Treatment and Tier Classification | 3,042.50 | 50% | 1,521.25 | 50% | 1,521.25 |
| 11. | Task No. 10 | Permit Modification | 4,478.75 | 50% | 2,239.37 | 50% | 2,239.38 |
| 12. | Task No. 11 | Drainage Issues | 2,607.50 | 0% | 0.00 | 100% | 2,607.50 |
| 13. | Task No. 12 | Lender Documentation | 6,310.00 | 0% | 0.00 | 100% | 6,310.00 |

-2-

INV01637

| | | | % | | % | |
|---|---|---|---|---|---|---|
| 14. | Invoice No. 4050 (NCA) | Drainage and Board of Health issues | $1,582.50 | 0% | .00 | 100% | 1,582.50 |
| 15. | Invoice No. 4065 (NCA) | Groundwater Monitoring | $1,358.75 | 100% | 1,358.75 | 0% | .00 |
| | | Litigation | $340.00 | 0% | .00 | 100% | 340.00 |
| 16. | Invoice No. 4084 (NCA) | For environmental services ($2,402.90) | $1,002.90 - Groundwater monitoring | 100% | 1,002.90 | 0% | .00 |
| | | | $1,400 - Phase I studies and litigation issues | 0% | .00 | 100% | 1,400.00 |
| 17. | Invoice No. 4121 (NCA) | Environmental services in conjunction with ongoing studies ($1,148.75) | $700 - Treatment system | 56% | 392.00 | 44% | 308.00 |
| | | | $448.75 - Phase I studies and litigation issues | 0% | .00 | 100% | 448.75 |
| 18. | Invoice No. 4144 (NCA) | Ongoing review of Phase I | $170 - Groundwater monitoring | 100% | 170 | 0% | .00 |
| | | | $247.50 - Phase I | 0% | .00 | 100% | 247.50 |
| | | Litigation issues | $212.50 | 0% | .00 | 100% | 212.50 |

-3-

INV01638

| # | Invoice | Description | Amount | % | Amount | % | Amount |
|---|---|---|---|---|---|---|---|
| 19. | Invoice No. 4165 (NCA) | Review of data and information pertaining to proposed treatment system | $527.50 - Treatment system | 56% | $295.40 | 44% | 232.10 |
| | | | $ 127.50 - Phase I | 0% | .00 | 100% | 127.50 |
| | | Litigation issues | $0 | 0% | .00 | 100% | .00 |
| 20. | Invoice No. 4203 (NCA) | Review of treatment system | $860.00 | 56% | 481.60 | 44% | 378.40 |
| 21. | Invoice No. 4219 (NCA) | Review of treatment system data | $895.00 | 56% | 501.20 | 44% | 393.80 |
| 22. | Invoice No. 4237 (NCA) | Review of data and information pertaining to the treatment system | $1,690.00 | 56% | 946.40 | 44% | 743.60 |
| 23. | Invoice No. 4252 (NCA) | Services performed in conjunction with the update of groundwater quality | $949.10 | 100% | 949.10 | 0% | .00 |

-4-

INV01639

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 24. | Invoice No. 4278 (NCA) | Review of treatment system | $977.50 | 56% | 547.40 | 44% | 430.10 |
| 25. | Invoice No. 4293 (NCA) | Review of data and information pertinent to treatment system | $1,325.00 | 56% | 742.00 | 44% | 583.00 |
| | | Review of treatment system | $501.25 | 56% | 280.70 | 44% | 220.55 |
| | | Review of downgradient property status submittal | $0 | 100% | .00 | 0% | .00 |
| 26. | 4/10/97 Comm. Of Mass. | Major Permit Modification | $1,200 | 50% | 600.00 | 50% | 600.00 |
| 27. | 11/12/98 Comm. Of Mass. | Tier 1A Annual Compliance Assurance Fee | $4,774.96 | 50% | 2,387.48 | 50% | 2,387.48 |
| 28. | 9/1/98 Windham | Treatment System Design | $2,762.50 | 56% | 1,547.00 | 44% | 1,215.50 |
| 29. | 11/13/98 Windham (Invoice No. 10262) | Treatment System Design | $1,527.50 | 56% | 855.40 | 44% | 672.10 |

-5-

| | | | | | | |
|---|---|---|---|---|---|---|
| 30. | 11/25/98 Windham | Treatment System Design | $6,000.00 | 56% | 3,360.00 | 44% | 2,640.00 |
| 31. | 1/6/99 Windham (Invoice No. 10275) | Treatment System construction | $34,500.00 | 56% | 19,320.00 | 44% | 15,180.00 |

-6-

WINDHAM ENVIRONMENTAL CORPORATION
ITEMS PAID BY ONE WHEELER ROAD
1/1/96-7/7/98

| | DATE PAID | CHECK NUMBER | AMOUNT |
|---|---|---|---|
| 1 WINDHAM ENVIRONMENTAL CORPORATION | 05/16/97 | 1519 | $520.00 |
| 2 " " " | 05/16/97 | 1519 | 2,665.00 |
| 3 " " " | 07/08/97 | 1580 | 199.00 |
| 4 " " " | 07/28/97 | 1606 | 585.00 |
| 5 " " " | 12/03/97 | 1760 | 877.50 |
| 6 " " " | 03/09/98 | 1897 | 800.00 |

TOTAL

$5,646.50
===========

INV01642

| ID | | | | | | | Amt A | Amt B | Amt C | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2338 | 4.5 | 2.75 | | | | 3.75 | 490.88 | 948.38 | 1820.88 | — |
| 2354 | 5.0 | 5.0 | | | | 2.5 | 453.75 | 408.75 | | — |
| 2371 | 4.0 | 7.0 | | | | | 408.75 | | | — |
| 2481 | 10.75 | 7.0 | | | | 6.25 | 1136.25 | | | — |
| 2495 | | | | | | 0.5 | | | | — |
| 2711 | 8.0 | 0.75 | | | | 2.25 | 561.00 | 641.00 | 1777.25 | — |
| 2721 | 12.0 | 8.0 | 1.0 | | | 2.25 | 561.00 | 1119.75 | 2997.25 | — |
| 2808 | 7.0 | 18.0 | 2.0 | | | 2.25 | 1232.00 | 1877.50 | | — |
| 2827 | 1.5 | 1.5 | 0.5 | | | 5.0 | 561.00 | 2803.75 | | — |
| 2912 | 2.0 | 1.5 | 5.5 | 0.5 | | 0.5 | 462.00 | 1546.80 | 1546.80 | — |
| 2925 | 2.0 | 5.5 | 3.5 | | | 6.25 | 528.00 | 977.50 | 1965.50 | — |
| 2997 | 2.0 | 7.5 | 3.0 | | | 1.5 | 1408.00 | 2639.25 | 2639.24 | — |
| 3005 | | 3.0 | | | | 1.5 | 528.00 | 960.50 | 1965.50 | — |
| 3103 | 1.0 | 5.0 | 1.0 | | 1.0 | 0.5 | 1232.00 | 1284.50 | 2262.00 | — |
| 3218 | 2.5 | 6.0 | 5.0 | | 3.0 | 2.0 | 562.40 | 1546.80 | 1546.80 | — |
| 3233 | 4.0 | 2.5 | 7.0 | 4.0 | | 0.5 | 462.00 | 1587.00 | 2065.75 | — |
| 3337 | 3.0 | 1.0 | | 7.0 | | 2.25 | 1587.00 | | | — |
| 3432 | 3.0 | 5.5 | 5.5 | | 6.75 | 1.25 | 478.75 | 2065.75 | | — |
| 3456 | | 3.0 | 1.5 | 0.75 | 1.25 | 1.0 | 586.25 | 2639.24 | | — |
| 3477 | 4.5 | 3.0 | 3.0 | | 1.25 | 0.75 | 550.75 | 586.25 | 2020.75 | — |
| 3506 | 2.0 | 1.5 | | | | 0.25 | 571.25 | | | — |
| 3526 | 5.5 | 1.5 | 7.5 | | | 1.5 | 312.50 | | | — |
| 3561 | 5.0 | 7.5 | | | | 1.5 | | | | — |
| 3578 | 5.0 | 2.5 | 5.0 | 0.25 | 2.5 | 2.5 | 990.00 | 1652.50 | 3956.25 | — |
| 3681 | 6.0 | 5.5 | 5.0 | 0.5 | 0.75 | 3.0 | 990.00 | 1250.00 | | — |
| 3718 | 10.5 | 14.0 | | 1.0 | 2.25 | 1.25 | 2218.15 | 1826.25 | | — |
| 3801 | 10.0 | 3.5 | 1.0 | | 0.75 | 1.25 | 990.00 | 1503.75 | 4044.40 | — |
| 3833 | 4.0 | 2.0 | 2.0 | 8.0 | 1.5 | 2.5 | 924.00 | 1546.50 | 3030.25 | — |
| 4023 | 3.0 | | | | 0.5 | 5.25 | 118.80 | 582.55 | 582.55 | — |

INV01643

Attachment B

| INV | | | | | | | | | | | | Total | Count |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2677 | 4.5 | | | | | | | | | | | 712.50 | 2 |
| 2685 | 10.0 | | 7.0 | | | | | | | | | 605.00 | 2 |
| 2745 | 1.0 | | 35.0 | 2.0 | 0.5 | 0.5 | | | | | | 3503.75 | 2 |
| 2769 | 2.0 | | 2.0 | | | | | | | | | 205.00 | 2 |
| 2794 | 8.5 | 2.0 | 8.50 | 1.5 | 0.5 | | | | | 1.5 | | 290.00 | 3 |
| 2838 | 2.0 | | | | | | | 1.0 | | 1.5 | | 1480.00 | 4 |
| 2859 | 6.5 | | | | | | | | | | | 552.50 | 2 |
| 2871 | 3.0 | | | | | | | | | | | 255.00 | 2 |
| 2954 | 1.5 | 1.0 | | | | | | | | | | 292.50 | 2 |
| 2939 | 5.5 | | | | | | | | | | | 555.00 | 7 |
| 3041 | 3.5 | 1.0 | 2.5 | | 0.5 | | 1.75 | | | 2.5 | 3.0 | 716.25 | 2 |
| 3185 | 12.0 | | 3.5 | | | | | | 3.0 | 3.0 | | 1265.00 | 2 |
| 3204 | 7.0 | 2.0 | 6.5 | | | | | | 1.0 | 1.0 | | 1171.25 | 2 |
| 3254 | 5.0 | | 5.0 | | | | | 0.5 | 0.75 | 0.75 | | 768.75 | 7 |
| 3277 | 5.0 | | 10.0 | | | | | 10.50 | 1.25 | 1.25 | | 1252.50 | 5 |
| 3601 | 8.0 | | 0.5 | | | | | | 8.00 | | | 735.00 | 8 |
| 3543 | 5.0 | | 15.0 | 2.0 | | | 1.0 | | 3.75 | | | 2520.00 | 8 |
| 3415 | 4.0 | | 2.0 | 1.0 | | | | | | | | 626.25 | 2 |
| 3397 | 5.0 | | 3.0 | | 0.5 | 0.5 | | | 3.0 | | | 485.00 | 2 |
| 3384 | 6.5 | 2.0 | 8.50 | | | | | 8.50 | 6.50 | | | 837.50 | 2/6 |
| 3623 | 18.0 | | 22.50 | | 0.5 | | | | 3.0 | | | 3042.50 | 9 |
| 3652 | 10.0 | 6.0 | 38.25 | | 1.0 | 2.75 | | 8.50 | 10.25 | 2.5 | 50.00 | 4478.75 | 10 |
| 3755 | 1.5 | | 6.5 | | 1.0 | | | | 0.75 | | | 486.25 | 2 |
| 3759 | | 3.0 | 3.0 | | | | | | 3.0 | | | 180.00 | 2 |
| 3776 | | | 0.5 | | 0.25 | 0.25 | | 1.5 | 1.0 | 1.0 | | 365.00 | 2 |
| 3875 | 8.0 | | 1.5 | 2.75 | | | | | 1.0 | 1.0 | | 787.50 | 2 |
| 3890 | 11.5 | 3.0 | 1.0 | | | | | | | 0.5 | | 1277.50 | 2 |
| 3911 | 12.0 | 4.0 | 8.0 | | | | | 6.75 | 4.5 | 4.5 | | 2607.50 | 11 |
| 39? | 3.0 | | 3.5 | 4.5 | 0.5 | | | 0.5 | 2.25 | | 1620.08 | 2501.33 | 2 |

INV01644

| INV. | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3938 | 5.5 | | | 8.25 | | | | | | 3.0 | 44.88 | 1112.38 | 2 |
| 3951 | 2.0 | | 4.5 | | | | | | 0.5 | | 457.50 | 2 |
| 3962 | 5.0 | | | | | | | | | | 425.00 | 2 |
| 3804 | 5.5 | | 5.00 | | | | | 5.75 | | 968.75 | 2 |
| 3817 | 4.5 | | 33.5 | 1.0 | | | | 8.75 | 170.00 | 2918.75 | 12 |
| 3994 | 5.5 | | 9.0 | 3.5 | 3.0 | 3.0 | 12.0 | 1872.50 | 12 |
| 3998 | 5.0 | | 10.75 | 1.5 | 1.0 | 3.0 | 2.5 | 5.25 | 1518.75 | 12 |

INV01645

# EXHIBIT C

INV01646

** TOTAL PAGE.00

# Former US Windpower Site - Final Cost Estimate

| item | supplies/comment | unit cost | quantity | cost | eng hours | build hrs | tech hrs | total hours | total |
|---|---|---|---|---|---|---|---|---|---|
| **Capital Cost** | | | | | | | | | |
| **major equipment** | | | | | | | | | |
| trailer/building | FSI | $5,000.00 | 1 | $5,000.00 | 5 | 0 | 0 | 5 | $7,226.00 |
| duplex bag filter | westport | $4,000.00 | 1 | $4,000.00 | 5 | 1 | 1 | 13 | $5,205.00 |
| lp adsorption beds | grundfos | $1,000.00 | 2 | $2,000.00 | 2 | 1 | 1 | 6 | $3,600.00 |
| recovery pump | renolds | $1,200.00 | 1 | $1,200.00 | 2 | 1 | 1 | 4 | $1,740.00 |
| pretreatment system | spencer or CF | $1,000.00 | 1 | $1,000.00 | 2 | 1 | 1 | 4 | $1,416.00 |
| extraction blower | | $3,000.00 | 1 | $3,000.00 | 6 | 4 | 4 | 13 | $4,865.00 |
| vp adsorption beds | westport | $2,000.00 | 1 | $2,000.00 | 16 | 10 | 10 | 35 | $3,825.00 |
| moisture separator | gast | $1,000.00 | 1 | $1,000.00 | 2 | 2 | 2 | 2 | $1,700.00 |
| | | | | | 38 | 26 | 26 | 88 | $33,235.00 |
| **I & c** | | | | | | | | | |
| enclosure | grayber | $2,000.00 | 1 | $2,000.00 | 4 | 4 | 4 | 12 | $3,400.00 |
| panel | grayber | $200.00 | 1 | $200.00 | 6 | 4 | 4 | 16 | $1,140.00 |
| starters | grayber | $100.00 | 4 | $400.00 | 2 | | | 8 | $960.00 |
| plc | graybar | $2,000.00 | 1 | $2,000.00 | 50 | 8 | 8 | 60 | $6,820.00 |
| relays | grayber | $50.00 | 4 | $200.00 | 2 | 2 | 2 | 6 | $680.00 |
| level switches | dwyer | $100.00 | 2 | $200.00 | 2 | 2 | 2 | 6 | $680.00 |
| dp sensors | dwyer | $200.00 | 2 | $400.00 | 2 | 2 | 2 | 6 | $680.00 |
| pressure sensors | dwyer | $200.00 | 2 | $400.00 | 2 | 2 | 2 | 6 | $580.00 |
| temp sensors | omega | $200.00 | 1 | $200.00 | 2 | 2 | 2 | 6 | $1,420.00 |
| flowmeter | signet/signal | $800.00 | 1 | $800.00 | 2 | 2 | 2 | 6 | $1,140.00 |
| transducer | chuk | $500.00 | 1 | $500.00 | 2 | 2 | 2 | 6 | $580.00 |
| orifice plate | crane | $200.00 | 1 | $200.00 | 2 | 2 | 2 | 6 | $590.00 |
| modem | cpi | $200.00 | 1 | $200.00 | 2 | 2 | 2 | 6 | $440.00 |
| buttons | graybar | $100.00 | 2 | $200.00 | 2 | 2 | 2 | 6 | $580.00 |
| switches | grayber | $50.00 | 4 | $200.00 | 2 | 2 | 2 | 6 | $720.00 |
| lights | grayber | $50.00 | 6 | $300.00 | 2 | 2 | 2 | 8 | |
| | | | | | 88 | 44 | 36 | 168 | $20,940.00 |
| **pipe & valves** | | | | | | | | | |
| pipe | webb | $0.50 | 200 | $100.00 | 20 | 20 | 20 | 80 | $3,140.00 |
| pipe | webb | $0.30 | 100 | $70.00 | 6 | 5 | 6 | 16 | $792.00 |
| fittings | webb | $16.00 | 20 | $300.00 | 10 | 10 | 10 | 30 | $1,920.00 |
| valves | webb | $40.00 | 20 | $800.00 | 10 | 10 | 10 | 30 | $2,820.00 |
| | | | | | 46 | 45 | 45 | 135 | $8,472.00 |
| **electrical** | | | | | | | | | |
| conductor | graybar | $0.20 | 500 | $100.00 | 10 | 10 | 10 | 30 | $1,640.00 |
| conduit | graybar | $0.50 | 200 | $100.00 | 10 | 10 | 10 | 30 | $1,640.00 |
| distribution box | graybar | $100.00 | 2 | $200.00 | 4 | 4 | 4 | 12 | $1,680.00 |
| | | | | | 24 | 24 | 24 | 72 | $4,180.00 |
| **start-up & debug** | | | 4000 | $400.00 | 32 | 32 | 32 | 96 | $4,800.00 |
| | | | | | 195 | 136 | 130 | 463 | $68,697.00 |
| **Monthly Operating Cost** | | | | | | | | | |
| electrical power | per kilowatt-hour | $0.10 | 4000 | $400.00 | 8 | | 32 | 72 | $450.00 |
| parts | 01% of capital cost | $68.61 | 1 | $68.61 | | | | 0 | $382.33 |
| labor | | | | $0.00 | | | | 0 | $3,240.00 |
| phone service | per month estimated | $50.00 | 1 | $50.00 | | | | 0 | $60.00 |
| deposit control chemical | per month estimated | $60.00 | 1 | $60.00 | | | | 0 | $60.00 |
| regen service | per month estimated | $1,000.00 | 1 | $1,000.00 | | | | 0 | $150.00 |
| waste disposal | per month estimated | $200.00 | 1 | $200.00 | | | | 0 | $240.00 |
| | | | | | | | | | $4,282.33 |

INV01647

# EXHIBIT D

INV01648

1999  NCA    FROM NCA 6085865653

# WEC

Windham Environmental Corporation

JUL 1 5 1999

Invoice #:    WRA-3-1
Date:         May 26, 1999
Submitted To: P. Augustin Rios
              The Gutierrez Company
              One Wall Street
              Burlington, MA 01803
Note:         Underground and electrical not w/in scope of contract

### Time Accounting

| Date | Task | Hours | Staff | Hourly Rate | Charges |
|------|------|-------|-------|-------------|---------|
| 03/10/99 | coordinate underground piping work, set-up, schedule, install main hose | 7.00 | Project Manager | $50.00 | $350.00 |
| 03/13/99 | Install subgrade piping from manway #2 to shed | 13.50 | Project Manager | $50.00 | $675.00 |
| 03/18/99 | subgrade piping install, coordinate communications | 10.00 | Project Manager | $50.00 | $500.00 |
| 04/08/99 | subgrade piping installation and electrical coord. | 12.00 | Project Manager | $50.00 | $600.00 |
| 04/12/99 | underground piping/equipment operation | 10.00 | Project Manager | $50.00 | $500.00 |
| | Professional Sevices Total: | 52.50 | | | $2,625.00 |
| | Credit for client pump | | | | ($1,200.00) |
| | Total Due | | | | $1,425.00 |

INV01649

**DAY**

T    AL CONTRACTORS

NORMAN E. DAY, INC.
116 PERIMETER ROAD
UNIT E
NASHUA, NH 03063

**Invoice**

Invoice Number:
6427

Invoice Date:
3/31/99

Page:
1

03-880-4601
03-882-7647

GUTIERREZ COMPANY
PROPERTY MANAGEMENT
WALL STREET
_INGTON, MA   01803

omer ID: GUTPROPMANG

| stomer PO | Payment Terms | Sales Rep ID | Due Date |
|---|---|---|---|
| PLACE | Net 30 Days | KNIGHT | 4/30/99 |

| Description | Amount |
|---|---|
| NE AT 200 WHEELER ROAD IN BURLINGTON, MA. | |
| FOR ENVIRONMENTAL SHED AS FOLLOWS: | |
| EXISTING WIRING AND EQUIPMENT AS NEEDED, AND CLEAN OUT OF | |
| ' 'NDERGROUND CONDUITS. | |
| , J ONE EXISTING UNDERGROUND CONDUIT FROM WELL #2 TO WELL | |
| . WAS BROKEN. | |
| E JUNCTION BOXES IN THE BUILDING, WELL #1, AND WELL #2 AS | |
| | |
| ONE 460 VOLT 30 AMP  3 PHASE CIRCUIT FROM THE BUILDING | |
| NEW ENVIRONMENTAL SHED WITH ONE TRANSFORMER AT 15 KVA, | |
| 120 - 208 VOLT, 3 PHASE, TO SUPPLY POWER FOR EXISTING | |
| N THE SHED. | |
| ONE 3 PAIR TELEPHONE CABLE FROM THE BUILDING TO THE | |
| PANEL LOCATED IN THE ENVIRONMENTAL SHED. | |
| WIRING FROM THE ENVIRONMENTAL SHED AS FOLLOWS: | |
| AMP., 3 PHASE CIRCUIT TO WELL #4 FOR THE PUMP. | |
| NAL CABLE FOR THE TRANSDUCER TO WELL #4. | |
| E INCH CONDUITS TO WELL #2, FOR WIRING AS DESCRIBED, AND | |
| RE. | |
| 2/24/99 THRU 3/19/99 | 5,487.50 |
| | 4,600.00 |
| | 46.00 |

RECEIVED
APR - 2 1999
MAY 1 7 1999
THE GUTIERREZ COMPANIES

|  |  |
|---|---|
| Subtotal | 10,133.50 |
| Sales Tax | 230.00 |
| Total Invoice Amount | 10,363.50 |
| Check No: | Payment Received | 0.00 |
| **TOTAL** | 10,363.50 |

INV01650

**<u>EXHIBIT 11</u>**

 **AtlanticMutual Companies**

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Certified Mail, Return Receipt Requested*

July 12, 2000

Robert J. Gilbert, Esq.
Gilbert & Renton, PC
23 Main Street
Andover, Massachusetts 01810

*Re*:    **Insured:**          **Trans-Sonics, Inc.**
         **Claim No.:**        **95-806021**
         **Policy No.:**       **462 007 630, effective January 1, 1972 - January 1, 1975**
         **Site:**             **160 Wheeler Road, Burlington, Massachusetts**

Dear Mr. Gilbert:

Centennial Insurance Company (herein "Centennial") hereby acknowledges receipt of your notice of claim involving the above-referenced matter. Based on the limited information submitted with the claim, I am unable to render a decision as to Centennial's defense and/or indemnity obligations to your client at this time.

Centennial will proceed with an investigation of this matter pursuant to a complete reservation of any and all rights available to it under all policies at issue, including all policy terms, conditions, definitions, exclusions and endorsements contained therein. This reservation includes the right to deny or limit such obligation as may be alleged, and as events may warrant.

At the outset, please be advised that given the nature of this claim and the limited information presented in connection with it, there are a number of coverage defenses or issues which may apply, including:

- Coverage is provided only for a claim arising out of an "occurrence" as defined by the policy. To the extent that the pollution or contamination was either expected or intended, there would be no coverage. If there was no occurrence during the applicable policy period, there is no coverage;

- There is no coverage if the underlying claim does not involve a claim for "damages" within the meaning of our policy. If this claim does not involve "property damage" within the meaning of the policy, there is no coverage;

2
**Mr. R. Gilbert**
**July 12, 2000**

- Environmental cleanup claims may not be considered claims for legal damages, but rather claims for equitable or injunctive relief which would not be covered. Also, environmental cleanup claims may not be considered claims for property damage, but rather claims for economic loss or a business risk which are not covered;

- There is no coverage if the insured knew or should have know of any "property damage" prior to the inception of the policies, in that coverage cannot be provided for a nonfortuitous event or set of circumstances;

- The applicable pollution exclusion in the policy may bar any coverage for the claim;

- There may be no coverage for "property damage" to property owned, occupied by or rented to the insured, property used by the insured, or property in the care, custody or control of the insured or as to which the insured has for any purpose exercised physical control;

- There may be no coverage for "property damage" to premises alienated by the insured;

- We provide coverage only to the named insured or insureds as set forth or defined in the policy;

- To the extent that your client has paid any amounts or incurred any obligations without obtaining our prior consent, such amounts or liabilities incurred constitute voluntary payments made by you and are not chargeable to us;

- The insured's obligations are subject to the "Other Insurance" and Underlying Insurance" conditions contained in the policy;

- To the extent that any claims made against an insured include fines, penalties or punitive damages, they would not be claims for legal damages on account of bodily injury or property damage, and would not be covered. Claims for such damages may also be in violation of public policy and not covered;

- Environmental cleanup claims generally do not come within a products liability or completed operations hazard.

- To the extent that the insured was aware of the pollution or claim of pollution at or before the time it applied to us for coverage and failed to disclose that information, coverage would be void or voidable as a result of a material misrepresentation(s) under the policy;

3
Mr. R. Gilbert
July 12, 2000

- In most cases, it is a condition of coverage that timely and adequate notice be given of any loss or claim which may involve a policy. In the event that timely notice was not given, there would be no coverage;

- There may be no coverage if the insured failed to comply with conditions specified in the policies. Coverage provided by the policies, if applicable, is in all events subject to and limited by the exclusions of the policies.

The above-referenced coverage issues are not meant to be exhaustive. Centennial reserves the right to supplement the above with additional grounds for denial of coverage should additional information warrant same.

Finally, please direct your attention to the following list of questions. Please completely answer each question and its subparts. If a particular question or subpart is inapplicable, please respond accordingly but also indicate why the question/subpart does not apply:

1.  Please identify any and all Centennial policy(ies) under which your client seeks coverage.

2.  Please identify other companies which issued insurance to your client which have or may provide coverage for the claim submitted to Centennial, including each such insurer's policy numbers, types and levels of coverage, coverage dates, policy limits and agent. Please include, without limitation, general liability, property, auto liability and pollution liability policies.

3.  Please advise of any and all steps taken by you or your client to preserve insurance records and ensure that all carriers potentially providing coverage received timely notice of this claim.

4.  Please identify all other carriers placed on notice of this claim, including those carriers placed on notice of this claim prior to the entry of judgment against your client in/about April 1996. Please provide copies of your client's notices to Arkwright-Boston and Liberty Mutual. Please also provide a copy of your client's settlement agreement with Liberty Mutual.

5.  Please identify other companies which issued insurance policies in which your client was named as an insured or additional insured which apply or potentially may apply to this claim, including each such insurer's policy numbers, types and levels of coverage, coverage dates, policy limits and agent. Please include, without limitation, general liability, property, auto liability and pollution liability policies.

4
**Mr. R. Gilbert**
**July 12, 2000**

6.      Please state whether any of the insurance companies identified in response to the above questions have advised that:

      a) they will or will not contribute to your client's legal defense and satisfaction of judgment relative to this matter;

      b) their policies cover or do not cover your client's claim;

      c) they have exhausted their limits through the payment of settlements, judgments or defense costs; and/or

      d) they will make payments or disbursements on your client's behalf (including payment of legal defense costs) under a reservation of rights to recoup or recover the payments or disbursements from you.

If any of your responses to the above sections are in the affirmative, please explain in full.

7.      State the nature and duration of your client's association with the site. Please also detail the nature of your client's relationship with the insured and the transaction(s) causing Foxboro to become an alleged successor-in-interest to Trans-Sonics, Inc.

8.      Describe the nature of all activities conducted at the site and the insured's as well as your client's involvement in same. Provide the dates your client owned/occupied/conducted operations at the site and describe the nature of your client's operations on site.

9.      Identify the nature and quality of the alleged contaminants associated with the site.

10.     Advise of the method of chemical and waste disposal practices at the site during your client's and its predecessor's operations.

11.     Identify all Potentially Responsible Parties (PRPs) and/or any other entity which may have contributed to contamination at the site.

12.     State whether a claim was made or action commenced (including, but not limited to, the imposition of any fine) against the insured and/or your client by any public or governmental agency, department, council or other regulatory agency arising from or relating to pollution/contamination at the site. If any such claim or action was made, please explain and provide all documentation relative to same.

**<u>EXHIBIT 12</u>**


**AtlanticMutual Companies**

Atlantic Mutual Insurance Company
Centennial Insurance Company

Administrative Center
Three Giralda Farms
Madison, New Jersey 07940-1004

973 408-6000
http://www.atlanticmutual.com

*Via Telefax and Certified Mail, Return Receipt Requested*

July 12, 2001

Robert J. Gilbert, Esquire
Gilbert & Renton, LLC
23 Main Street
Andover, MA 01810

Re:    **Insured:**        **Trans-Sonics, Inc.**
       **Claim No.:**      **95-806021**
       **Policy No.:**     **462 007 630, effective January 1, 1972 – January 1, 1975**
       **Site:**           **160 Wheeler Road, Burlington, Massachusetts**

Dear Mr. Gilbert:

Thank you for your letter of May 1, 2001 responding to my letters of December 28, 2000 and April 13, 2001. We appreciate your recent supply of the information requested in our earlier letters and, at your request, have again analyzed your client's request for coverage under policy 462 007 630. As expressed more fully herein, Centennial Insurance Company (herein "Centennial") is denying coverage.

From the information provided, I understand that Foxboro, the alleged successor to the insured, alleges $3.66 million in damages stemming from its adjudged pollution liability at a site previously owned by it and Trans-Sonics between August 1954 and December 1978. In your initial June 9, 2000 letter, you advised that Foxboro had resolved the primary coverage issues, with Liberty Mutual paying $1.25 million in exchange for a release of the claim. You also advised that, at a bench trial concerning the underlying pollution claim in April 1996, Foxboro was found liable for groundwater contamination but exonerated for soil contamination; that it was ordered to pay a judgment of $1,144,523.79; and that the parties agreed to waive their respective rights of appeal so long as Foxboro paid the outstanding judgment plus accrued costs and post-judgment interest and achieve the necessary remediation of groundwater. Centennial has no record of ever being placed on notice of the claim underlying this action.

Foxboro claims to have been unable to identify the insurer or insurers providing liability insurance coverage to Trans-Sonics, Inc. prior to January 1, 1972. It remains unclear which insurer or insurers might be responsible for damage attributable to that portion of the *One Wheeler Road* suit alleging that contamination had occurred on or from this property throughout the period of time from 1954 to 1978, when it manufactured electronic instruments and conducted other manufacturing operations at the site.

INV00104

As for the period after 1972, you previously indicated that both Trans-Sonics and Foxboro were insured under various liability insurance policies issued by Liberty Mutual. You further indicated that your client released Liberty Mutual from all obligations under those policies in return for partial reimbursement of the defense costs incurred with respect to the *One Wheeler Road* litigation and an indemnity payment of $950,000.

In addition to the four primary liability insurance policies issued to Trans-Sonics and Foxboro between 1972 and 1974 discussed in our earlier exchange of letters, your letter of May 1, 2001 identifies eight Comprehensive General Liability policies issued by Liberty Mutual between January 1, 1975 and January 1, 1983, each of which is stated to contain coverage in the amount of $500,000 each occurrence and in the aggregate. It appears from these materials, coupled with your earlier letter, that the total "occurrence" limits provided under the Liberty Mutual coverage in effect while this pollution is alleged to have occurred is $4.6 million.

The above-referenced policy provides, in pertinent part:

> [Centennial Insurance Company . . . [a]grees with the insured, named in the declarations made part hereof, in consideration of premium and in reliance upon statements in the application and declarations and subject to the limits of liability, exclusions and other terms of this policy:

> **I. Coverage.** To indemnify the insured for the ultimate net loss in excess of the retained limit hereinafter defined, which the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law, or assumed by the insured under contract on account of
>    (a) Personal Injury Liability,
>    (b) Property Damage Liability, or
>    (c) Advertising Liability
> to which this insurance applies, caused by an occurrence anywhere in the world.

> **II. Defense – Settlement.** With respect to any occurrence not covered by the underlying policy(ies) listed in Schedule A hereof or any other underlying insurance collectible by the insured, but covered by the terms and conditions of this insurance except for the amount of retained limit specified in Item (b) of Insuring Agreement IV, the company shall:

> (a) defend any suit brought against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; . . .

> This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

INV00105



The policy contains the following definitions:

> **(6) Occurrence** - The term "occurrence" wherever used herein shall mean an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected not intended from the standpoint of the insured. . . .

> **(9) Property Damage Liability** - The term "Property Damage Liability" shall mean liability for damages because of injury to or destruction of tangible property.

> **(10) Ultimate Net Loss** - The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after taking proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred. This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

The policy also contains the following conditions:

> **J. Other Insurance.** If other collectible insurance with any other insurer is available to the insured, covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and contribute with, such other insurance. If collectible insurance under any other policy(ies) of the company is available to the insured, covering a loss also covered hereunder (other than underlying insurance of which the insurance hereunder is in excess), the company's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies).

> **K. Underlying Insurance.** If underlying insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this insurance applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

As you can see, a condition to coverage under the Centennial umbrella policy is the exhaustion of all other policies with applicable insurance coverage for a loss. Accordingly, Centennial cannot agree that your client's acceptance of $950,000 was a proper "exhaustion" of nearly $5 million in insurance coverage and satisfies this condition of the Centennial policy.

Further, we note from your letter that Liberty Mutual itself provided umbrella liability insurance to Foxboro during the period January 1, 1973 through January 1, 1984 with annual limits of $10 million each occurrence and in the aggregate. Again, we do not agree that any right exists to claim insurance coverage under the Centennial policy insofar

INV00106