UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INVENSYS SYSTEMS, INC., <br> Plaintiff, <br><br> v. <br><br> CENTENNIAL INSURANCE COMPANY, <br> Defendant. | CIV. NO: 1:05-CV-11589-WGY |

**DEFENDANT CENTENNIAL INSURANCE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1, Defendant Centennial Insurance Company ("Centennial") submits this memorandum of law in support of its Motion for Summary Judgment on all counts and claims of the Complaint. There are no disputed issues of fact and Centennial is entitled to judgment as a matter of law based upon the policyholder's clear breach of the terms of the excess liability policy issued by Centennial to Trans-Sonics, Inc. ("Trans-Sonics").[1]

**<u>INTRODUCTION</u>**

No clearer case of a breach of the fundamental requirement that the insurer be provided with timely notice of a claim could be imagined. Trans-Sonics first gave notice to Centennial of its claim for coverage more than nine *years* after the underlying lawsuit was filed; *four years* after a Final Judgment was entered; and only after it had signed a settlement agreement

---

[1] For ease of reference, Centennial will collectively refer to Plaintiff Invensys Sytems, Inc. and its predecessors as "Trans-Sonics" since Trans-Sonics is identified as the Named Insured on the subject Centennial policy.

1021342v2

committing it to the payment of ongoing costs over a period that may extend for decades. By the time that notice was given to Centennial, Trans-Sonics had released its primary insurer, Liberty Mutual Insurance Company ("Liberty Mutual"), for its liability relating to the claim for only a small fraction of the available limits. Trans-Sonics' attempt to foist responsibility for this claim onto Centennial should be rejected. If the Court does not grant summary judgment under the egregious facts of late notice presented here, it will have effectively written the notice requirement out of the policy.[2]

## STATEMENT OF UNDISPUTED FACTS

### I.    THE *WHEELER ROAD LAWSUIT* AND NOTICE TO CENTENNIAL

Trans-Sonics operated a manufacturing facility in Burlington, Massachusetts (the "Site") from 1954 to 1974, at which time its assets were sold to The Foxboro Company ("Foxboro"). [Defendant Centennial Insurance Company's Statement of Undisputed Facts, ¶¶ 1, 2 and Ex. 1 thereto (hereafter, "St., ¶ __; Ex. ___"]. Foxboro continued to operate the facility until 1978, at which time it was sold to One Wheeler Road Associates. [*Id.*]

Trans-Sonics manufactured electronic instruments and systems at the site, using certain hazardous chemicals, including perchlorethylene (PCE) and/or trichloroethylene (TCE). [St., ¶ 3]. In 1984, environmental contamination was discovered on the property. [St., ¶ 4]. The Massachusetts Department of Environmental Quality Engineering (the "DEQE," now the "DEP") issued a Notice of Responsibility to Trans-Sonics and others in 1985. [St., ¶ 5].

In 1990, the current owner of the property sued Foxboro, seeking recovery for the costs of cleaning up the site under CERCLA and various other statutes. [*See One Wheeler Road*

---

[2] Centennial has moved for summary judgment only on the grounds of late notice and breach of the voluntary payments condition. Centennial has asserted numerous other reasons why there is no coverage for this claim under the Centennial policy.

1021342v2

*Associates and the Gutierrez Company v. The Foxboro Company*, United States District Court (D. Mass.), C.A. No. 90-23873-K (the "*Wheeler Road Lawsuit*") St., ¶ 8, Ex. 2]. The first notice to Centennial of the *Wheeler Road Lawsuit* was not provided until **more than nine (9) years later** in June 2000. [St., ¶ 11; Ex. 3]. By that time, the *Wheeler Road Lawsuit* had proceeded through discovery and trial. [St., ¶ 12; Ex. 1,2]. Final Judgment was entered against Trans-Sonics in 1996 for $1,144,523.79, including a declaration that Trans-Sonics was responsible for certain ongoing costs of remediation at the Site. [St., ¶¶ 12-14] The Final Judgment was paid by Trans-Sonics in October 1996, again with absolutely no notice to Centennial or suggestion that Centennial had any liability for the Final Judgment. [St., ¶ 15; Ex. 3].

Trans-Sonics notified its primary insurer, Liberty Mutual Insurance Company ("Liberty Mutual") of the *Wheeler Road Lawsuit* and requested that Liberty Mutual provide a defense. [St., ¶ 16; Ex. 4]. Liberty Mutual issued primary coverage to Trans-Sonics (including Foxboro) for at least the period from 1972 to 1982. [St., ¶ 17; Exs. 6,7]. The collective limits of liability available to Trans-Sonics for this period were $4.8 million. In addition, the Liberty Mutual policies required Liberty Mutual to defend suits that were potentially within the scope of coverage and to pay Trans-Sonics' defense costs in addition to the limits of liability. [St., ¶ 19, Ex. 9]. Trans-Sonics purchased separate pollution liability coverage from Liberty Mutual on a "claims made" basis commencing in 1982 and continuing until 1991. [*Id.*]. The coverage that Trans-Sonics bought for the specific purpose of insuring against liability for pollution had limits of $1 million. [St., ¶ 21; Ex. 7].

After initially contesting coverage, Liberty Mutual agreed to defend Trans-Sonics for some period of time. Liberty Mutual later withdrew that defense and Trans-Sonics commenced a declaratory judgment action against it to establish its duty to defend and indemnify Trans-Sonics

1021342v2

for the *Wheeler Road Lawsuit*. [St., Ex. 9]. Trans-Sonics obtained a ruling from the Massachusetts Superior Court declaring that Liberty Mutual was obligated to defend. Nevertheless, Trans-Sonics thereafter entered into a settlement with Liberty Mutual under which Liberty Mutual agreed to only pay Trans-Sonics the sum of $1,250,000, an amount far less than Trans-Sonics' known damages. [St., ¶ 25-27; Ex. 8]. While Trans-Sonics has refused to produce a copy of the settlement agreement with Liberty Mutual, the settlement agreement apparently allocated $300,000 of the settlement to defense costs and $950,000 to indemnity. [*Id.*]. The agreement purported to extinguish Liberty Mutual's obligations under all policies in effect during the period from 1972 to 1982. Again, Centennial was not advised of the settlement with Liberty Mutual until after it was completed.

Moreover, while the suit against Liberty Mutual was pending, Trans-Sonics entered into a settlement agreement with the plaintiffs in the *Wheeler Road Lawsuit* in February, 2000. [St., ¶ 29; Ex. 10]. The settlement agreement resolved how ongoing costs of remediation at the Trans-Sonics Site would be allocated. [*Id.*] No notice of this settlement agreement was provided to Centennial until several months after it had been executed. [St., Ex. 3].

On June 9, 2000, Trans-Sonics forwarded, for the first time, a copy of the Complaint and Final Judgment in the *Wheeler Road Lawsuit* to Centennial. [*Id.*] This notice was some ***sixteen years*** after the contamination was discovered; ***fifteen years*** after a Notice of Responsibility was issued to Trans-Sonics; ***nine years*** after the *Wheeler Road Lawsuit* was commenced; ***four years*** after the Final Judgment was entered; nearly ***four years*** after the Final Judgment was paid; and only after Trans-Sonics had entered into settlement agreements with the plaintiffs in the *Wheeler Road Lawsuit* and the primary insurer, Liberty Mutual. In essence, Trans-Sonics demanded that Centennial agree to pay the difference between the amount of the settlement with Liberty Mutual

4

1021342v2

and its claimed past and future costs arising out of the *Wheeler Road Lawsuit*. [*Id.*] Centennial issued an initial reservation of rights on July 12, 2000 and, after an exchange of further information and documents, denied coverage for the claim on July 12, 2001. [St., ¶ 35, 36; Exs. 11, 12]. Trans-Sonics waited another four years to commence this suit.

## II.  THE RELEVANT INSURANCE POLICIES

### A.  <u>Centennial</u>

Centennial issued a single excess liability policy to Trans-Sonics for the period from January 1, 1972 to January 1, 1975. [St., ¶ 38-45; Ex. 5]. The Centennial excess policy provides limits of liability in the amount of $5 million per occurrence excess of the underlying Liberty Mutual policy in effect for this period, which had annual limits of $100,000.[3] [*Id.*] The Centennial policy provides coverage for property damage resulting from an "occurrence." The term "occurrence" is defined as follows:

> The term "Occurrence" wherever used herein shall mean an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.

[St., ¶ 40; Ex. 5]. Moreover, the definition of "property damage" specifies that the property damage must "occur during the policy period." [*Id.*]

The insuring agreement of the Centennial policy states that it only provides coverage for "ultimate net loss," which is defined in the policy as:

> **(10) Ultimate Net Loss** – The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after taking proper deduction for all recoveries and

---

[3] As originally written, the underlying limits were $50,000 and the limits of the excess policy were $2 million. These limits (including a revised limit of the Liberty Mutual policy) were reflected in an endorsement. [St., ¶ 39; Ex. 5].

salvages collectible, *but excludes* all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred. *This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance*.

[St., ¶ 42, Ex. 5 (emphasis added)].

The Centennial policy requires "*immediate*" notice of a claim or suit and prohibits Trans-Sonics from entering into settlement agreements or making other voluntary payments without Centennial's knowledge or consent. The policy states:

**Insured's Duties in the Event of Occurrence, Claim or Suit.**

(a)   In the event of an occurrence, which appears reasonably likely to involve such insurance as is afforded by this policy, written notice containing particulars sufficient to identify the insured and also reasonably attainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

*(b)   If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.*

(c)   The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of personal injury or property damage or advertising offense with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. *The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense. . .* ;

[St., ¶ 45, Ex. 5 (emphases added)].

1021342v2

### B.    Liberty Mutual

According to Trans-Sonics, the Liberty Mutual primary policies that serve as the underlying insurance to the Centennial policy have never been located. [St., ¶¶ 46-55; Exs. 7-9]. Nevertheless, Trans-Sonics has represented that Liberty Mutual never disputed the fact that these policies did exist and contained standard CGL language imposing a duty to defend and to pay defense costs in addition to limits. [*Id.*]. Moreover, Liberty Mutual apparently conceded that it could offer no proof that any of the underlying policies contained a pollution exclusion or that the limits of liability were other than the $100,000 per occurrence referred to in the Centennial policy. [*Id.*]

In addition to these policies, it is not disputed that Liberty Mutual issued a $500,000 CGL policy to Foxboro that was in effect when Foxboro purchased the assets of Trans-Sonics in 1974. [*Id.*]. Moreover, Foxboro continued to operate the Trans-Sonics Site through at least 1978 and had policies in effect with Liberty Mutual with annual limits of $500,000 per occurrence. [*Id.*]. Similar policies were purchased by Foxboro from Liberty Mutual for each of the years though 1982. [*Id.*] Accordingly, the total primary limits available to Trans-Sonics from Liberty Mutual were $4.8 million in addition to Liberty Mutual's obligation to pay defense costs.[4] [*Id.*]. Foxboro also purchased separate pollution liability policies from Liberty Mutual commencing in 1982 and continuing through 1991. [*Id.*]. The Liberty Mutual pollution liability policies had an annual limit of liability for property damage in the amount of $1 million. [*Id.*]

---

[4] Foxboro also apparently purchased umbrella excess policies from Liberty Mutual during this period which had annual limits of $10 million. [*Id.*].

## ARGUMENT

I. **SUMMARY JUDGMENT SHOULD BE GRANTED WHEN THERE IS NO GENUINE ISSUE OF MATERIAL FACT AND THE DEFENDANT IS ENTITLED TO JUDGMENT IN ITS FAVOR AS A MATTER OF LAW**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 36 (1st Cir. 1995), *cert. denied*, 516 U.S. 1113, 116 S. Ct. 914 (1996), *Libertad v. Welch*, 53 F.3d 428, 433 (1st Cir. 1995). Summary judgment is appropriate where, after drawing all reasonable inferences in favor of the nonmoving party, there is no doubt as to whether there is a genuine issue of material fact. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir. 1987). "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials in the pleadings, but must set forth specific facts showing there is a genuine issue for trial." *Barbour*, 63 F.3d at 37, *quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also* Fed.R.Civ.P. 56(e); *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Rogers*, 902 F.2d at 143, *quoting Anderson*, 477 U.S. at 249-50 (citations omitted).

1021342v2

## II. TRANS-SONICS BREACHED THE POLICY CONDITIONS REQUIRING TIMELY NOTICE AND PROHIBITING VOLUNTARY PAYMENTS

### A. Trans-Sonics Failed to Timely Notify Centennial of the *Wheeler Road Lawsuit*.

The Centennial policy requires that Trans-Sonics give the insurer notice of an occurrence "as soon as practicable" and that the insured give "immediate" written notice in the event of a claim or suit. Also, the insured was directed not to voluntarily enter into settlements or assume liability. Trans-Sonics' failure to notify Centennial of its claim until years after a Final Judgment was entered and it had executed a binding settlement agreement clearly violated these provisions and the Court should rule that Trans-Sonics is not entitled to coverage as a matter of law.

Under Massachusetts law, an insurer is entitled to disclaim coverage due to an insured's failure to comply with the requirements of timely notice or similar conditions to coverage if its ability to investigate, defend or otherwise respond to the claim is prejudiced by the insured's late notice. *See* Mass. Gen. L. c. 175 § 112; *Liberty Mutual Ins. Co. v. The Black & Decker Corp.*, No. 96-10804-DPW, 2003 U.S. Dist. LEXIS 25397 at *85 (D. Mass Dec. 5, 2003); *Darcy v. The Hartford Ins. Co.*, 407 Mass. 481, 485, 554 N.E.2d 28, 31 (1990); *Johnson Controls, Inc. v. Bowes*, 381 Mass. 278, 282, 409 N.E.2d 185, 187-88 (1980). "The length of delay, of course, in notice will always be a relevant factor to be considered in determining whether actual prejudice has been shown by an insurer, and the longer the delay, the more likely that prejudice exists." *Darcy v. The Hartford Ins. Co.*, 407 Mass. 481, 486, 554 N.E.2d 28, 31 (1990). The length of delay in giving notice to the insurer is highly persuasive evidence of prejudice, especially after a final judgment has been entered or a settlement has been reached because it puts the insurer in a "substantially less favorable position than it would have been in had timely notice been provided." *Darcy*, 407 Mass. at 486, 554 N.E.2d at 31.

The Massachusetts Supreme Judicial Court has expressly held that where a judgment has already been entered against the insured, thus thwarting any ability on the part of the insurer to investigate, respond or have any input at all with respect to the claim, prejudice will be presumed as a matter of law. *Lusalon, Inc. v. Hartford Accident and Indem. Co.*, 400 Mass. 767, 511 N.E.2d 595 (1987). Under *Lusalon,* no further showing of specific prejudice is required; the insurer is not required to prove the negative of what might have happened if the policyholder had complied with the terms of the policy.

Courts in other jurisdictions have equally recognized this fundamental principle since to do otherwise would vitiate a central condition of the policy. *Prince George's County v. Local Gov't Ins. Trust*, 388 Md. 162, 189, 879 A.2d 81, 97-98 (Md. 2005) (finding prejudice as a matter of law when the insured notified the insurer after a judgment because the insured presented the insurer with a *fait accompli*). See e.g., *Las Vegas Star Taxi, Inc. v. St. Paul Fire & Marine Ins. Co.*, 102 Nev. 11, 14, 714 P.2d 562, 564 (Nev. 1986) (finding prejudice as a matter of law where the plaintiff notified insurer of the case ten days before the trial date and settled the case on its own one day into trial). In *Las Vegas*, the court noted that the insured wanted the insurer to pay the settlement unless the insurance company proved that the settlement was excessive. *Id*. The court said that "[n]o insurance company can fairly be called upon under such circumstances to come in and prove that the insured's settlement compromise was excessive or that the insurance company would not under all of the contingencies of the injured party's claim have had to pay the settlement sum or more." *Id*. The court rejected the contention that the insured should be allowed to obligate itself for a settlement and then require their insurer to pay if the insurer cannot prove that the settlement was too high. "Such a position emasculates the letter and spirit of the insurance contract." *Id.; Herman Bros., Inc. v. Great West Cas. Co.*, 255

1021342v2

Neb. 88, 99, 582 N.W.2d 328, 335 (Neb. 1998) (finding that insurer received notice four years after the facts began to develop, three years after the insured employer closed a site, and 18 months after the insured received an amended charge and the complaint, and after insured entered a tentative settlement agreement, and that based upon the above the insurer was not given an opportunity to protect its interests, therefore being prejudiced as a matter of law); *Hooper v. Zurich Am. Ins. Co.*, 552 N.W.2d 31, 36 (Minn. Ct. App. 1996) ("The dispositive factor is not how much time elapses prior to the tender of defense; it is what happens during that time." The Court found prejudice existed because the insurer had no opportunity to control the litigation, seek a declaratory judgment on coverage, or attempt to settle before an adverse judgment).

In *Lusalon*, a masonry contractor sued a general contractor for its unreimbursed work on a construction project. The general contractor counterclaimed, alleging that Lusalon caused damage to numerous door frames by removing the mortar "in a poor and unworkmanlike manner." At trial, the master concluded that the finish paint failed because of Lusalon's "unworkmanlike . . . use of dilute muriatic acid." He found that Lusalon owed the general contractor $2,854.75, plus interest, the difference between the cost of repair borne by the general contractor and the remainder due to Lusalon under the contract. At that point, Lusalon retained a new set of lawyers who for the first time gave notice of the pending claims to Lusalon's CGL insurer, Hartford. Hartford declined to provide a defense, both on the basis of certain policy exclusions as well as the insured's untimely notice. The Massachusetts Supreme Judicial Court agreed, declaring that "any duty that Hartford might otherwise have had to defend against the general contractor's counterclaim was forfeited by Lusalon's failure to notify Hartford and to forward the counterclaim until after the case had been tried to the master and adverse findings had been entered by him. This delay was prejudicial as matter of law." 400 Mass. at 769, 511

N.E.2d at 596 (internal citations omitted). *Lusalon* controls the issues in this case and requires that judgment be entered for Centennial.

The rule set forth in *Lusalon* is in keeping with the view of courts across the country that have held that a final judgment or a settlement constitutes prejudice as a matter of law to the insurer. *See, e.g., Earle v. State Farm Fire & Cas. Co.*, 935 F. Supp. 1076, 1082 (N.D. Cal. 1996) (post-trial notice); *Las Vegas Star Taxi, Inc. v. St. Paul Fire & Marine Ins. Co.*, 102 Nev. 11, 14, 714 P.2d 562, 564 (Nev. 1986) (post-settlement notice); *Herman Bros., Inc. v. Great West Cas. Co.*, 255 Neb. 88, 99, 582 N.W.2d 328, 335 (Neb. 1998) (post-settlement notice); *Prince George's County v. Local Gov't Ins. Trust*, 388 Md. 162, 193, 879 A.2d 81, 100 (Md. 2005) (post-judgment notice); *Hooper v. Zurich Am. Ins. Co.*, 552 N.W.2d 31, 37 (Minn. Ct. App. 1996) (post-judgment notice); *Metal Bank of Amer., Inc. v. Ins. Co. of North Am.*, 360 Pa. Super 350, 361, 520 A.2d 493, 499 (Pa. Super. 1987) (post-judgment notice). Notifying an insurer of a claim after it has already been litigated to judgment or negotiated to settlement deprives the insurer of an opportunity to play a meaningful role throughout the process and presents the insurer with "a virtual *fait accompli*." *Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 440 (2d Cir. 1995).

The fact that Centennial is an excess carrier is of no consequence as the purpose of the notice-prejudice is to **protect the insurer's interests**, including both the obligation to defend and, as here, the duty to pay judgments on behalf of the insured (the duty to indemnify). *Employers' Liab. Assurance Corp., Ltd. v. Hoechst Celanese Corp.*, 43 Mass. App. Ct 465, 475, 684 N.E.2d 600, 607 (1997). The United States Court of Appeals for the Fifth Circuit recently recognized, excess insurers have equal need for timely notice of cases pending against them so that they can evaluate the claims and make decisions with respect to whether to participate in settlement. In

*Motiva Enterprises v. St. Paul Fire & Marine Ins. Co.,* 445 F.3d 381, 386 (5th Cir. 2006), the court held that an excess carrier was not required to prove prejudice in a case where the insured entered into a settlement without its knowledge or consent. "Where, as here, the insurer is not consulted about the settlement, the settlement is not tendered to it and the insurer has no opportunity to participate in or consent to the ultimate settlement decision, we conclude that the insurer is prejudiced as a matter of law." 445 F.3d at 386.

While a few courts have held that excess carriers are not as likely as primary carriers to suffer harm from late notice because they are one layer removed from the investigation and handling of claims and they have no duty to defend, the excess insurer has the same interest (or more) as a primary insurer as regards its claimed indemnity duties. Further, in this case, the Centennial policy contains the same notice requirements as are typically found in primary policies. *See Employers' Liability Assurance*, 43 Mass. App. Ct. at 471-474, 684 N.E.2d at 605-606 (explaining that primary policies instruct the insured to give notice to the carrier "promptly," "immediately," "as soon as practicable (or the like) after the happening of an occurrence (internal quotations omitted)). Unlike the excess notice provisions at issue in *Employers' Liability Assurance*, which only required notice when the insured believed that its liabilities might exceed the available primary coverage, the Centennial policy required notice of an occurrence "as soon as practical" and notice of a claim or suit "immediately." Because the notice provision at issue in this case mirrors that of a primary policy, Trans-Sonics did not have any discretion as to the timing of the notice to Centennial.

Moreover, "the principle underlying the notice provision, that is, to enable the insurer reasonable and timely opportunity to investigate the underlying claim, applies to both primary and excess policies under these circumstances." *See Fireman's Fund Ins. Co. v. Valley Manuf.*

1021342v2

*Products Co., Inc.*, 765 F. Supp. 1121, 1123 (D. Mass. 1991) (occurrence was reasonably likely to involve the excess insurers). The court in *Fireman's Fund* goes on to say,

> [a]n excess insurer's liability is dependent upon the primary insurer's fulfilling its obligations of investigation, pursuit of settlement opportunities, and, if necessary, defense of the lawsuit at trial…the very same factors which prejudicially impact the primary insurer impact, to an even greater extent, the excess insurer, whose potential liability is much greater than that of the primary insurer.

*Id.*, n2. The District Court's comments in *Fireman's Fund* are particularly apt here. The Centennial policy had a relatively low attachment point. Trans-Sonics is seeking to have Centennial indemnify it for the Final Judgment and related settlement in an amount which it claims could ultimately exceed $2 million. [St., Ex. 8]. This is far more than Liberty Mutual paid as the primary insurer that issued policies to Trans-Sonics and its successors over a period of at least twenty years.

Even if, as an excess insurer, Centennial was not going to participate in the investigation and litigation of the underlying claim, Trans-Sonics' still should have recognized and adhered to the notice provisions in the policy. *See Avco Corp. v. Aetna Casualty & Surety Co.*, 679 A.2d 323, 330 (R.I. 1996). "[A] corporation like [Trans-Sonics] is presumed to have more sophistication in managing its affairs than the average consumer," who is the one intended to be protected by the rule requiring the insurer to show it was prejudiced by the insured's failure to give notice. *Id.* Thus, "where the insured is presumed to have more business acumen than the average consumer," the notice-prejudice rule is undercut. *Id.*

No clearer case of late notice prejudicing Centennial's rights can be imagined. Centennial was not put on notice of any claim for coverage relating to the alleged contamination or the *Wheeler Road Lawsuit* until sixteen years after the contamination was discovered and fifteen years after Trans-Sonics was named as a potentially responsible party by the DEQE; nine

years after the suit was filed; four years after entry of the Final Judgment; nearly four years after Trans-Sonics paid the Final Judgment; and only after Trans-Sonics had entered into a settlement that obligated it to pay additional amounts. The express terms of the policy require Trans-Sonics to give immediate notice of ***all suits***, not just those where Trans-Sonics has information that the suit is likely to impact the Centennial excess policy.[5] Trans-Sonics failed to do so. By the time that Centennial received notice of this matter it was too late for it to do anything to protect its interests: the case was over. Under the holding in *Lusalon* and comparable authorities from other jurisdictions, the Court must find that Trans-Sonics' notice was late and that Centennial was prejudiced as a matter of law.

### B. Trans-Sonics is Not Entitled to Coverage Based Upon its Breach of the Voluntary Payments Condition.

Massachusetts law prohibits a policyholder such as Trans-Sonics from entering into a settlement agreement or making voluntary payments without the knowledge or consent of the insurer. *Augat, Inc. v. Liberty Mutual Ins. Co.*, 410 Mass. 117, 123, 571 N.E.2d 357, 361 (1991) (no coverage where policyholder entered into consent decree to resolve environmental claim and there was nothing left for the insurer to do other than "write the check"). Under the holding of *Augat*, the insurer is not required to demonstrate any form of prejudice resulting from the voluntary payment made by the policyholder in order to avoid coverage. *Id.* Instead, prejudice will be presumed because the purpose underlying the voluntary payment provision – to give the insurer an opportunity to protect its interests – is frustrated. *Id.*; *see also Eastern Products Corp. v. Continental Casualty Co.*, 58 Mass. App. Ct. 16, 24-25, 787 N.E.2d 1089, 1096 (2003) (presuming prejudice where, prior to giving notice to its insurer, the insured entered into an

---

[5] Of course, to the extent that Trans-Sonics may now assert that it only has to exhaust $100,000 of underlying coverage, it must clearly have known early in the litigation of the *Wheeler Road Lawsuit* (if not before the suit was filed) that if it was found to be liable to the plaintiffs the cost of remediation would exceed that amount.

agreement to clean up a contaminated site at its own expense); *Atlas Tack Corp. v. Liberty Mutual Ins. Co.*, 48 Mass. App. Ct. 378, 384, 721 N.E.2d 8, 12 (1999) (holding that prejudice should be presumed because the insured assumed the obligation to pay without notifying the insurer). *Compare, Sarnafil, Inc. v. Peerless Ins. Co.*, 418 Mass. 295, 305, 636 N.E.2d 247, 253 (1994) (indicating that, under the specific facts of the case, insurer would have to show it had incurred actual prejudice); *Employer's Liab. Assurance Corp. v. Hoescht Celanese Corp.*, 43 Mass. App. Ct. 465, 480-481, 684 N.E.2d 600, 610 (Mass. App. Ct. 1997) (suggesting that the issue of prejudice remains to be proven by the insurer before it will be discharged of responsibility under the insurance contract).

In this case, as in many others, the insured's failure to notify the insurer of an occurrence or claim goes hand in hand with the insured's voluntary payment in violation of the insurance contract. *See, e.g., Liberty Mutual Ins. Co. v. The Black & Decker Corp.*, No. 96-10804-DPW, 2003 U.S. Dist. LEXIS 25397 *1, 109-110 (D. Mass. Dec. 5, 2003) (holding that "[t]he insurer's evidence of prejudice is strongest in cases where the voluntary payments are made before the insurer is notified of the dispute, and therefore both the notice and the voluntary payment provisions are implicated"). Trans-Sonics apparently claims that the payment of the Final Judgment and subsequent settlement was not "voluntary." Here, however, the Final Judgment did not specify the exact amount that would ultimately be owed and left it up to the parties to negotiate a resolution. Trans-Sonics did so without the knowledge, involvement of consent of the party whom it now seeks to have pay for the settlement. The purpose underlying notice and consent-to-settlement provisions is directly implicated here because Centennial was not given any opportunity to protect its interests at any point during the sixteen years that elapsed between the alleged "occurrence" and notice to Centennial. Trans-Sonics' failure to notify Centennial of

the *Wheeler Road Lawsuit* deprived Centennial of any opportunity to participate in the discovery, litigation and subsequent settlement. Had Centennial been notified of the *Wheeler Road Lawsuit* prior to the entry of Final Judgment, the trial may have had a different result. There may have been opportunities to settle with the Plaintiffs in the *Wheeler Road Lawsuit* on more favorable terms earlier in the case. Further, Centennial was not notified of the settlement agreement with Liberty Mutual until after a binding agreement had been reached, and Centennial was thereby deprived of any opportunity to participate in the settlement negotiations, including the amount and allocation of any settlement. Centennial, like the insurers in *Augat* and *Atlas Tack*, was notified too late and is left (according to Trans-Sonics) with nothing to do but issue a check. Trans-Sonics' claim for these costs is barred as a matter of law under the holding of *Augat*.

## CONCLUSION

The record establishes that Trans-Sonics violated both the notice and voluntary payment provisions of its insurance policy with Centennial. Trans-Sonics allowed the case to proceed to Final Judgment but did not bother to advise Centennial of this fact until more than four years later. Even then, Trans-Sonics only provided notice to Centennial *after* it had entered into a final settlement agreement with the plaintiffs in the *Wheeler Road Lawsuit* and compromised the insurance available from Liberty Mutual that would have covered the entirety of the claimed loss. For the reasons set forth above, Centennial is entitled to judgment as a matter of law.

1021342v2

CENTENNIAL INSURANCE COMPANY,

By its attorneys,

/s/ John T. Harding

---

John T. Harding BBO #221270
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7558
(617) 342-4888 (facsimile)

Dated: September 22, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document has been electronically filed, and served upon all counsel of record in compliance with the Fed.R.Civ.P. this 22nd day of September, 2006.

/s/ John T. Harding

---

John T. Harding

1021342v2