UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INVENSYS SYSTEMS, INC., )<br>      Plaintiff, )<br> )<br>v. )<br> )<br>CENTENNIAL INSURANCE COMPANY, )<br>      Defendant. )<br>_____ ) | Civ. No. 1:05-CV-11589-WGY<br><br><br>**REQUEST FOR HEARING** |

**MEMORANDUM IN SUPPORT OF PLAINTIFF INVENSYS SYSTEMS, INC.'S
<u>MOTION OF FOR SUMMARY JUDGMENT</u>**

      This is an environmental insurance case, arising under an excess policy that does not contain any form of pollution exclusion. Pursuant to a settlement payment of $1,250,000, the underlying insurer has already paid the entire policy limits of the primary policies directly underlying the excess policy. Coverage is not seriously disputed by Defendant Centennial Insurance Company.

      Instead, Centennial relies on three principal defenses:

      **Late Notice:** Centennial asserts that Invensys violated the terms of the excess policy by providing late notice of the claim. This defense should be rejected as a matter of law, because Centennial has failed to meet its burden of proving actual and substantial prejudice. Specifically, Centennial has not identified a single thing that would have turned out differently, let alone more favorably to Centennial, if it had received earlier notice. To the contrary, by not being involved in the earlier coverage dispute with Liberty Mutual, Centennial received a huge windfall as a result of Liberty Mutual's agreement to pay $650,000 under policies that (unlike Centennial's policy) contained pollution exclusions.

1

**Voluntary Payments:** Centennial next asserts that Invensys violated the cooperation clause of the excess policy by making so-called "voluntary" payments to resolve the underlying environmental lawsuit. This defense also should be rejected as a matter of law, for two reasons. First, the "voluntary" payments were hardly voluntary. The payments satisfied a final judgment entered by Judge Stearns after a bench trial in the underlying case. Invensys's property had been levied, and post-judgment interest was accruing. Second, Centennial cannot meet its burden of proving actual and substantial prejudice. Indeed, as with the late notice defense, Centennial has failed to establish a single thing that would have turned out differently -- and more favorably to Centennial -- if it had received advance notice of Invensys's satisfaction of the judgment.

**Allocation:** Finally, Centennial argues that Invensys has failed to exhaust underlying limits. This argument is without any factual or legal merit. It is without factual merit, because there is no dispute that the underlying primary insurer, Liberty Mutual, has paid out the entire policy limits of the three primary policies that constituted the "underlying" insurance below Centennial's excess policy. And the argument is without legal merit, because it disregards established Massachusetts law that allows policyholders to allocate continuous losses on a joint and several basis to any policy period that provides coverage. See Rubenstein v. Royal Ins. Co. of America, Rubenstein v. Royal Ins. Co., 44 Mass. App. Ct. 842, 852, 694 N.E.2d 381, 388 (1998), aff'd on other grounds, 429 Mass. 355 (1999). See also Massachusetts Elec. Co. v. Commercial Union Ins. Co., 20 Mass. L. Rep. 193, 2005 Mass. Super. LEXIS 548, *5-6 (Oct. 25, 2005) (joint and several liability to excess policies with "total sum" language).

For these reasons, Invensys requests summary judgment with respect to Counts II and IV of its Complaint, pertaining to the duty to indemnity past and future damages and cleanup costs.

**FACTUAL BACKGROUND**

**Corporate History:** Plaintiff Invensys Systems, Inc. is the corporate successor to a company known as Trans-Sonics, Inc. In December 1974, Trans-Sonics was acquired by, and merged into, The Foxboro Company (now known as Invensys Systems, Inc.). Fact No. 3.

**The Trans-Sonic Site and the <u>One Wheeler Road Associates</u> Lawsuit:** From 1954 through 1978, Invensys and its predecessor-in-interest, Trans-Sonics ("Invensys") owned a 9.7-acre parcel at 200 Wheeler Road, Burlington, MA. In 1978, Foxboro sold and left the Wheeler Road site. In 1982, One Wheeler Road Associates purchased the site. In 1984, the Town of Burlington discovered TCE and PCE contamination at the site. Fact No. 4.

Six years later, One Wheeler Road Associates and its general partner, The Gutierrez Company, filed the <u>One Wheeler Road</u> lawsuit in federal court, alleging Invensys's liability on various statutory and common law theories and seeking damages for, <u>inter</u> <u>alia</u>, "damage to the value of the site and the cost of their investigative and remedial measures." <u>See</u> Fact No. 30; Exh. No. 37. The gravamen of the complaint -- as well as the evidence at trial -- was that solvent contamination escaped from breaches in the facility's drainage system, as well as from the leaching basin that was used until the facility connected with the town sewer system in 1974. Exh. 37. However, Judge Stearns made clear that Invensys did not deliberately contaminate the environment; at most, its actions were negligent. Fact Nos. 17-21; Exh. 1 at 3, 11.[1] This finding is consistent with uncontradicted testimony confirming that Invensys and Trans-Sonics

---

[1] Judge Stearns held that "Foxboro's role is mitigated in some degree by the fact that it polluted the site during an era in which the latent environmental threat of toxic substances was not as well understood as it is today, and when such substances were subject to far less regulation. Options open to U.S. Windpower in the 1970's, like recycling and scavenging, were not as readily available to Foxboro in the 1950's. Weighing against Foxboro, on the other hand, is the decision to install a wastewater disposal system, the design of which, even by the more casual standards of the time, should have been recognized as irresponsible." Exh. 1 at 11.

employees did *not* intentionally dispose of contaminants into the environment.[2] See also Sarapas Aff., Exh. 33 at ¶ 4-6.

After a bench trial, Judge Stearns held that Invensys was responsible for both groundwater contamination and soil contamination at the site.  However, Judge Stearns only imposed liability for groundwater remediation, accepting Invensys's argument for shifting 100% of soil contamination costs to the plaintiffs. Fact Nos. 32-34.  The Court assessed damages of $1,144,523.79 against Invensys for the groundwater contamination and related pro rata expenses, and also entered a declaration holding Invensys liable for on-going groundwater remediation and monitoring, but not for soil remediation.  Fact Nos. 36-38.

Both sides having partly prevailed and partly lost at trial, the parties agreed to waive their respective rights of appeal provided the terms of the judgment were fulfilled.  This required Invensys/Foxboro to pay the outstanding judgment (plus accrued costs and post-judgment interest) to One Wheeler Road Associates. In addition, the post-judgment resolution required the parties to work together to remediate soil and groundwater, with the parties respective obligations formally set forth in a February 2000 settlement agreement that implemented the Court's declaration of rights. Fact Nos. 41-42; Exh. 26.

Thus, as set forth in Fact Nos. 36-44, the total loss incurred to date by Invensys (not including interest, expected future remediation costs, or attorney's fees and costs), through

---

[2]   See, e.g., Nicholson Depo., Exh. 8 at 50 ("**Q:** Are you aware of whether any quantities of trichloroethylene . . . were ever poured down the sinks at the Wheeler Road facility? **A:** No. No."); Westcott Depo., Exh. 9 at 14 ("I asked him if we had ever put solvents down the sinks, and he confirmed my impression that that was an absolute no-no.  That was not done."), 68 ("[I]t was our policy not to put solvents down sinks; that is, not into the leaching bed, the septic system, the sewage system"); Manion Depo., Exh. 10 at 62 ("the corporate policy was that no organic solvents could be placed in a sink;" no knowledge of any instance when solvents were poured in sinks).

March 31, 2006, is as follows:

| | |
|---|---:|
| Net Attorneys Fees for Defending Action through 10/8/96 (payment of judgment): | $ 375,908.28 |
| Satisfaction of Judgment (4/19/96 Judgment plus post-judgment interest and costs through 10/8/96 date of payment); | $1,187,202.90 |
| Response costs (including engineers and consultants, costs incurred under 2/4/00 agreement) | $ 506,286.34 |
| TOTAL AMOUNT OF LOSS (TO DATE) | $ 2,069,397.52 |

## FACTS CONCERNING THE INSURANCE COVERAGE IN THIS CASE

**The Excess Policy At Issue in this Case:** Defendant Centennial Insurance Company issued Policy No. 42-00 76 30, a three-year commercial umbrella policy, to Trans-Sonics for the period January 1, 1972-1975. See Exh. No. 3, 4. The property damage limits of liability were initially $2,000,000 per year excess of $100,000. On June 16, 1972, these limits increased to $5,000,000. This policy did not contain any form of pollution exclusion. Fact No. 54. ***It is important to this case to understand that this policy was issued directly to Trans-Sonics before the merger with Foxboro/Invensys.***

The Centennial Policy provided two kinds of coverage. The first kind -- known as "excess" insurance -- would become operative when a suit against the insured involved a claim covered by both the Centennial Policy and the underlying primary policy. In such a case, the Centennial Policy would provide coverage in excess of the limits of the underlying primary policy (which in each of the three years was provided by Liberty Mutual in the amount of $100,000 per occurrence/aggregate per year). This "excess" coverage did not require Centennial to defend, but instead obligated Centennial to pay "ultimate net loss" incurred by the insured

(including defense costs and judgments). This obligation to pay ultimate net loss would kick in once the primary insurer had paid the full total of the underlying limits of liability. ***Because this claim was also covered by the underlying Liberty Mutual policy, excess insurance -- and only excess insurance -- is involved in this case.*** Fact Nos. 44, 46.[3]

**Underlying Primary Coverage:** Prior to bringing this lawsuit, Invensys successfully pursued primary insurance coverage from Liberty Mutual Insurance Company. To understand this excess insurance claim against Centennial, it is first necessary to understand that Liberty Mutual provided two different categories of primary insurance to Invensys.

The first category of primary insurance involves a series of three one-year policies that Liberty Mutual issued directly to Trans-Sonics during the period s January 1,1972-73, January 1, 1973-74, and January 1, 1974-75, u.e., before the December 1974 merger between Trans-Sonics and Foxboro/Invensys. These policies have never been located, but their terms and conditions were established by secondary evidence, including an insurance schedule prepared in connection with the 1974 merger, see Exh. 5, as well as "schedules of underlying insurance" contained in the Centennial policy. See Exh. 3. In each of the three years, the policies provided property damage limits of $100,000 per occurrence/aggregate. In addition, because the policies of insurance could not be located, Liberty Mutual had no direct evidence that the policies contained a pollution exclusion (especially the first policy, which was issued in 1972 before the introduction of the 1973 ISO standard form policy containing a limited pollution exclusion). ***Thus, the first category of primary policies -- covering the 1972-75 time period, and issued***

---

[3] The second type of insurance provided by the Centennial policy is known as "umbrella" insurance. "Umbrella" insurance becomes operative when a claim is covered by the terms of the excess/umbrella policy but is not covered by the terms of the underlying primary policy. In such case, the umbrella insurer would be obligated to defend the insured from the outset, subject only to the policyholder's payment of a $25,000 deductible. This case

*directly to Trans--Sonics before the merger with Invensys -- contained no pollution exclusion.* Fact Nos. 56-58.

No other coverage issued to Trans-Sonics, other than the 1972- 75 primary policies from Liberty Mutual and the 1972-75 Centennial excess policy, has ever been located. Fact No. 59.

The second category of primary coverage involves policies issued by Liberty Mutual to Invensys (then known as The Foxboro Company) after the December 1974 merger with Trans-Sonics. Although the cumulative policy limits were substantial, these policies all contained pollution exclusions. Fact Nos. 62, 63. Liberty Mutual strenuously argued that the pollution exclusion would have barred coverage under these policies. However, Invensys argued (i) that due to Liberty Mutual's breach of the duty to defend, the burden of proof on the applicability of the pollution exclusion would shift to Liberty Mutual, and (ii) that Liberty Mutual lacked any evidence to prove that the pollution releases were sudden and accidental.

**Settlement of the Primary Insurance Claim:** In March 2000, Foxboro and Liberty Mutual settled a coverage lawsuit over the scope of the primary insurance coverage, with Liberty Mutual paying a total of $1,250,000 for a complete release of the claim. This amount consisted of (i) $300,000 for Foxboro's attorneys' fees incurred in defending this action and (ii) $950,000 in indemnity coverage. The parties stipulated that the first $300,000 of the indemnity payment would be applied to exhaust the $100,000 per policy limits of the three Trans-Sonics policies (January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75), which could not be shown to contain a pollution exclusion and therefore provided the clearest source of coverage. The remaining $650,000 was allocated to subsequent Liberty Mutual policies (all containing

---

does *not* involve umbrella coverage.

7

pollution exclusions) issued to Invensys after the December 1974 merger. The net effect of the settlement with Liberty Mutual was the complete exhaustion of all primary limits of liability directly below the Centennial policy. See Fact Nos. 69-71.

**Notice to Centennial:** For purposes of this summary judgment motion only, Invensys will concede that Centennial first received notice of the underlying lawsuit on June 9, 2000.[4]

On June 9, 2000 -- shortly after receiving the settlement check from Liberty Mutual -- Invensys's attorneys tendered a formal claim for coverage to Centennial. See Exh. 14. The tender was made at this time, and not earlier, because it was only after the payment by Liberty Mutual that the excess coverage in the Centennial had been triggered by exhaustion of the limits of the underlying primary policies in the 1972, 1973 and 1974 policy years.

Numerous letters were exchanged between the parties, as Invensys responded to Centennial's requests for information. Ultimately, on July 12, 2001, Centennial denied coverage. See Exh. 16. Centennial asserted only one specific ground for denying coverage: the supposed failure of Invensys to exhaust underlying primary limits of coverage.

## STANDARD FOR SUMMARY JUDGMENT

The standard for summary judgment is familiar to the Court.

However, one aspect of the summary judgment standard deserves special emphasis. Two of the key issues in this case -- the "late notice" defense and the "voluntary payments" defense -- are ones in which defendant Centennial Insurance Company has the burden of proving actual and substantial prejudice. Thus, summary judgment on these two issues is governed by the Supreme

---

[4] At trial, Invensys would establish that Centennial had notice by no later than July 1999. See Fact Nos. 72, 73; Exh. Nos. 7, 8, 10, 12. However, because there is no evidence of any prejudice, the dispute over the exact date of notice is immaterial to the resolution of this case.

Court's decision in Celotex, which "mandates the entry of summary judgment" against a party who fails to adduce "sufficient evidence" of an essential element of its claim or defense. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). See also Paterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Elec. Co., 840 F.2d 985, 992 (1st Cir. 1988) ("Under conventional Rule 56 jurisprudence, it was Palco's obligation in opposing the defendant's motions to demonstrate the existence of a *genuine* factual dispute on an issue (like waiver) on which it would bear the devoir of persuasion at trial.").

Where (as here) Centennial bears the burden of persuasion at trial on an essential element of its "late notice" and "voluntary payment" defenses, Invensys can prevail on summary judgment -- even without adducing any evidence of its own -- by pointing out Centennial's lack of "sufficient evidence" to meet its burden of proof. See Celotex at 325. Once Invensys has done so, the burden shifts to Centennial (the party with the burden of persuasion) to adduce "sufficient evidence"" to raise a genuine issue of material fact. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

**LEGAL ANALYSIS**

This case presents a straightforward claim for excess coverage of damages incurred in connection with an environmental property damage claim. Many of the issues typically presented by environmental insurance claims are not present in this lawsuit. For example:

(a) There is no dispute that the limits of liability of the primary policies *directly underlying the Centennial excess policy* have been totally exhausted by payment of a portion of the judgment at issue in this case. See Fact Nos. 69, 70; Franciose Aff., Exh. 34 at ¶ 35. Indeed, Centennial has received a windfall insofar as a substantial additional portion of the claim ($650,000) was paid by the primary insurer as a compromise of a dispute whether coverage was available under later primary policies (i.e., primary policies that were issued after the expiration of the Centennial policy and therefore did not underlie the Centennial policy) that

    contained pollution exclusions. See Fact No. 70; Waymon Aff., Exh. 36 at ¶ 13(d).

(b) There is no dispute that this case involves actual damages awarded by a court.

(c) There is no dispute that the damages in this case resulted from actual injury to third-party property, i.e., damage to groundwater, including off-site groundwater. See Fact Nos. 31, 36; see also, e.g., Rubenstein, 44 Mass. App. Ct. at 848, 694 N.E.2d at 385.

(d) The Centennial policy does not contain any form of pollution exclusion. See Fact No. 54; Exh. 3.

(e) There is no evidence that Invensys "expected or intended" that disposal of solvents into its waste drainage system would result in environmental harm. To the contrary, the undisputed evidence at trial, as well Judge Stearns' findings, expressly found that Invensys did not have any intent or expectation of causing environmental contamination. See Fact Nos. 17-21; Employee testimony (Exh. 28, 29, 30); Sarapas Aff., Exh. 33 at ¶¶ 4-6.

This does not mean that Centennial is conceding coverage in this case. However, the principal defenses that Centennial has relied upon to date are without merit, as discussed below.

## I. THE "LATE NOTICE" DEFENSE IS WITHOUT MERIT

Centennial first contends that Invensys's delayed notice is a defense to coverage. Massachusetts law is clear that even in cases of "extreme" delay, the insurer is required to prove that it was actually prejudiced by the delay. See Mass. Gen. L. c. 175, § 112; Darcy v. Hartford Ins. Co., 407 Mass. 481, 484-85, 554 N.E.2d 28, 31-32 (1990). "The insurer always bears the burden of proving that it was actually prejudiced by the delay, even where the delay was 'extreme.'" Liberty Mut. Ins. Co. v. Black & Decker Corp., 2003 U.S. Dist. LEXIS 25397, *85-86 (D. Mass. 2003), citing Darcy, 407 Mass. at 484-85, 486-87. "The length of delay is one 'relevant factor to be considered' in assessing prejudice, but the insurer must show actual harm to its interests, such as loss of critical evidence or testimony from material witnesses, or other

evidence that demonstrates insurer is in a 'substantially less favorable position than it would have been in had timely notice been provided.' Darcy, 407 Mass. at 486.  However, general assertions concerning the detrimental impact of delay on trial preparation, such as speculation that memories of witnesses would be less fresh, or that statutes of limitations might have run, are insufficient. Id. at 487 n.5." Liberty Mutual v. Black & Decker Corp., id. at *86.

Here, Centennial has not provided any evidence of "prejudice."  Unlike in Darcy, in which the insurer established that late notice resulted in actual and substantial prejudice because it was no longer able to gather facts necessary to its coverage determination, Centennial has never once asserted that its investigation was hindered in any way by late notice.  The claims correspondence between Invensys and Centennial establishes (1) that all of Centennial's material inquiries were answered, see Exh. Nos. 7-22, and (2) that Centennial had all the information that it felt it needed when it issued its formal coverage position. See Exh. 23.  Notably, Centennial never once asserted that it had been prejudiced (let alone *actually* and *substantially* prejudiced) by late notice.  Instead, it denied coverage based on the alleged lack of exhaustion of the underlying primary limits. Id.

Rather than citing specific facts that point to actual, substantial prejudice, Centennial does exactly what the Black & Decker opinion says is insufficient: Centennial makes a variety of "general assertions" without tying them to specific outcomes that would have changed if earlier notice had been provided.  Invensys respectfully requests the Court to peruse Centennial's response to Interrogatory No. 10 (Exh. 31 at 17-20), requesting the specific facts upon which Centennial claimed to be prejudiced.  There is literally not one single fact cited in these answers that indicates even an iota of prejudice.  Instead, Centennial makes "general assertions" but

omits any evidence to suggest that earlier notice would have materially, and favorably, impacted Centennial's position.

In fact, Centennial was *not* prejudiced by late notice. Invensys was well defended by experienced, reputable defense counsel that was selected by the primary insurer, Liberty Mutual. See Fact No. 66-67; Exh. 34 at ¶ 27, 28. Despite the fact that Invensys plainly contributed to soil contamination, defense counsel (and their expert, Dames & Moore) were able to persuade Judge Stearns to shift 100% of liability for soil contamination to the underlying plaintiffs. Subsequent coverage litigation against Liberty Mutual resulted in $650,000 in damages being paid by the primary insurer under policies that not only were not "underlying" the excess policy but also that contained pollution exclusions. See Waymon Aff., Exh. 36 at ¶¶ 8, 9, 13.

In this sense, then, it is clear that Centennial's position was actually *improved* by the late notice. Because Invensys did not discover the Centennial policy until several years into the coverage litigation against Liberty Mutual, it was impractical to add Centennial as a defendant. As a result, when Liberty Mutual finally settled, $650,000 -- ***more than half of the total amount of its $1,250,000 payment*** -- was paid out under policies containing pollution exclusions. It is highly likely that Liberty Mutual would never have agreed to make such a substantial payment under policies with pollution exclusions if Centennial's policy (which had $5 million limits and no pollution exclusion) had been on the table during the litigation and settlement discussions. Thus, it is fair to say that Centennial actually benefited -- "to the tune of $650,000" -- by not receiving earlier notice and by not being involved in the original coverage lawsuit. See Waymon Aff., Exh. 36 at ¶ 13(d), 13(l).

Finally, the different grounds upon which Centennial alleges that it was prejudiced have

12

been thoroughly rebutted by the expert affidavit of Gene Waymon. See Exh. 36 at ¶¶ 8-13. As set forth in Mr. Waymon's affidavit, Centennial speculates that it would have done things that no normal excess insurer ever does in an environmental coverage dispute.  For example, Centennial proposes that perhaps it would have stepped into defend (it doesn't actually say that it would; it just says that maybe it would have).  However, as set forth in Mr. Waymon's affidavit, Exh. 36 at ¶ 5-7.  it is essentially unheard of for an excess insurer (as distinct from an umbrella insurer) to step in and defend an environmental claim where the underlying primary insurer has refused to do so.  Indeed, Centennial itself admits as much, not only in its denial letter where it stated that the alleged failure to exhaust primary limits meant that it had no coverage obligation (see Exh. 23), but also in its response to Interrogatory No. 14, where it simply refuses to answer whether it Centennial has ever exercised its right to associate in the defense of an environmental claim where the primary insurer has refused to defend. See Resp. to Interrogatory 14, Exh. 31 at 24-25.

The bottom line is that Centennial fails to meet its burden of proving actual, substantial prejudice as  a result of late notice.  Invensys is entitled to summary judgment on this issue.

## II.     THE VOLUNTARY PAYMENTS DEFENSE IS WITHOUT MERIT

Centennial next contends that coverage is barred under the "voluntary payments" clause of the policy, due to the alleged failure of Invensys to provide notice of the underlying One Wheeler Road Associates lawsuit prior to entering into a settlement agreement on February 4, 2000. See Centennial Response to Interrogatory Nos. 11 and 12, Exh. 15 hereto.  Centennial apparently relies on the SJC decision in Augat, Inc. v. Liberty Mutual Ins. Co., 410 Mass. 117, 571 N.E.2d 357 (1991), which held that a primary insurer may escape coverage without any

13

showing of prejudice where an insured -- prior to giving notice of an underlying claim to its insurer -- enters into a voluntary settlement that fixes the insured's liability to a third party.

The Voluntary Payments defense lacks any factual or legal merit.

### A.    There Has Not Been Any Voluntary Payment

As a matter of undisputed fact, there has not been any "voluntary payment" by Invensys. Just the opposite: Invensys never made any payment, and never entered into any agreement with the underlying plaintiffs, until *after* it had gone through a lengthy trial, been adjudged liable, incurred the entry of a final judgment imposing liability of $1,144,523.79 (with post-judgment interest accruing daily), and seen its property levied upon. See Fact No. 41. The same is true with respect to payments made under the February 2000 settlement agreement, pursuant to which Invensys and the underlying plaintiffs allocated responsibility for post-trial remediation costs in strict accordance with Judge Stearns' declaration of rights. See Fact No. 42.  It is unreasonable -- and at odds with reality -- for Centennial to describe any of these payments as "voluntary." See, e.g., Waymon Aff., Exh. 36 at ¶ 14-15.

It is also at odds with the terms of the Centennial policy, which expressly provides coverage for "damages by reason of the liability imposed upon the insured by law." See Exh. 4 at 1 (Insuring Agreement I).  There is no dispute that, upon entry of the final judgment by Judge Stearns, every amount of damages that Invensys has paid has been "imposed upon the insured by law." Centennial would have the Court expand the policy to include a requirement that requires the insured to exhaust all appeals before the insurer's indemnity obligation applies.  However, there is no such requirement in the policy, and it is unreasonable and improper for Centennial to claim such a requirement. See also Waymon Aff., Exh. 36 at ¶ 15.

Centennial's argument also is contrary to Mass. Gen. L. c. 175, §§ 112 and 113, which provide that the legal liability the insurer under a liability policy becomes fixed as of the date of entry of a final judgment against the policyholder. Thereafter, any payment or settlement based on this final judgment is deemed to be compulsory, not voluntary. In this case, the February 4, 2000 Settlement Agreement constituted an implementation of the Judge Stearns' Final judgment dated April 19, 1996, insofar as it allocated liability for past and future groundwater to Invensys/Foxboro and allocated liability for past and future soil remediation to One Wheeler Road Associates. Thus, the predicate "voluntary payment" does not exist.[5]

### B. Centennial Cannot Meet Its Burden of Proving "Actual and Substantial" Prejudice Resulting from the Alleged "Voluntary Payment"

Even if there had been a so-called "voluntary payment," Centennial still would not be able to rely on this defense. Cases subsequent to Augat have made it clear that there is ***not*** a "rule" of *per se* prejudice upon violation of the voluntary payments provision, but instead that insurers will still be required to carry their burden of proof that they have been substantially prejudiced by the breach of the voluntary payments clause:

> [T]he excess insurers appear from the start to be misreading Augat itself when they suggest that, in the face of a violation by an insured of the express prohibition of voluntary payments in a primary policy, the insurer is forthwith discharged of responsibility without having to demonstrate prejudice. In Augat the particular facts established prejudice without more. Thus the court said, "We conclude that no showing of prejudice is required *in this case*" (emphasis supplied).

Employer's Liability Assurance Corp., Ltd. v. Hoechst Celanese Corp., 43 Mass. App. Ct. 465, 684 N.E.2d 600 (1997). Numerous post-Augat cases, both state and federal, have repeatedly

---

[5] It also should be noted that in order to establish a "voluntary payment" defense, the insurer must demonstrate that it was not notified of the underlying claim prior to the date of the supposed voluntary payment. In this case, Invensys provided a combination of oral and written notice of the underlying claim in June and July 1999, some eight months prior to the February 4, 2000, settlement agreement. However, because Centennial disputes the

15

required insurers to make a showing of actual and substantial prejudice before invoking the "voluntary payments" defense. See, e.g., Sarnafil, Inc. v. Peerless Ins. Co., 418 Mass. 295, 305, 636 N.E.2d 247, 253 (1994); Liberty Mutual Ins. Co. v. Black & Decker Corp., 2003 U.S. Dist. LEXIS 25397, *106-07 (D. Mass. December 5, 2003) (Augat and other cases "do not stand for the simplistic proposition that a voluntary payment implies prejudice as a matter of law.").

      Centennial has provided no evidence nor made any argument that it incurred substantial prejudice from the alleged "voluntary payment," nor could it reasonably make that argument. It does not assert that it would have taken steps to "protect its interests" by, say, defending Invensys in the underlying suit. Nor does it explain why it took no investigative action even after learning in June 1999 of the existence of the underlying suit. This case is on all fours with New England Extrusion, Inc. v. American Alliance Ins. Co., 874 F. Supp. 467, 471 (D. Mass. 1995), in which Judge Ponsor required the insurer "to show material prejudice to its position in order to be relieved of liability under the insurance contract as a result of plaintiff's breach of the policy's notice and voluntary settlement provisions" and then found that it could not do so where (as here) "the insured notified the insurer of the claim before settling but the insurer did not respond at all until the claim had already settled." Black & Decker, supra, 2003 U.S. Dist LEXIS 25397 at *110, discussing New England Extrusion.

      Invensys respectfully asks the Court to read the discovery response provided by Centennial with respect to the issue of prejudice resulting from the alleged voluntary payment. See Response to Interrogatory No. 13, Exh. 31 at 22-24. Centennial cannot identify a single fact to demonstrate that it was prejudiced by the alleged voluntary payment. The conclusory

---

actual date when it received actual notice of the claim, Invensys does not rely upon this ground in this motion.

interrogatory answer fails, as a matter of law, to meet Centennial's burden of proof on this issue.[6] See also Waymon Aff., Exh. 36 at ¶ 14, 15.

### III. THERE IS NO MERIT TO CENTENNIAL'S ALLOCATION ARGUMENT

Invensys's position is very clear in this case: Because Liberty Mutual has completely exhausted all limits of property damage liability in the three primary policies that are identified in the Centennial policy as "Underlying Insurance," Centennial is required by the terms of its own policy to "drop down" and act as underlying insurance. See Centennial Policy, Exh. 3 (Schedule of Underlying Insurance); Exh. 4 (Insuring Agreement IV [3d para.], and Condition K). In addition, under established Massachusetts law, Centennial is *jointly and severally liable* to pay 100% of the remaining past and future damages that Invensys incurred in the One Wheeler Road lawsuit.

This position is based on the above-cited sections of the policy, as well as clear Massachusetts law providing that each insurer whose policy period is triggered by a long-term loss is *jointly and severally liable* for the entire loss, up to the full amount of its policy limits. This rule is directly compelled by the holding of the Massachusetts Appeals Court in Rubenstein v. Royal Ins. Co. of America, 44 Mass. App. Ct. 842, 852, 694 N.E.2d 381, 388 (1998) (adopting rule that "each policy provides indemnity for the insured's entire liability, and each insurer is jointly and severally liable for the entire claim"), aff'd on other grounds, 429 Mass. 355 (1999).

---

6   Centennial certainly cannot meet its burden by making the assertion that "additional information responsive to this Interrogatory is contained in the documents that Centennial has produced to Trans-Sonics in this action and in the documents that Trans-Sonics has produced to Centennial." See Response to Interrogatory No. 13, Exh. 31 at 22-24. As an initial matter, the information being sought in this interrogatory -- particularly the request for "all facts" to support the claim of prejudice -- is not the type of information that is fairly susceptible to production of business records under Rule 33(d). But even if this was an appropriate use of Rule 33(d), the answer fails to meet the requirements of the rule because it fails to identify the documents containing the responsive information. Instead, it directs Invensys literally to every document in this case.

As the Court in Rubenstein made quite clear:

> [W]hen multiple policies are triggered to cover the same loss, each policy provides indemnity for the insured's entire liability, and each insurer is jointly and severally liable for the entire claim. … [¶] … [T]he judge did not err in failing to allocate liability among the insurers.

Id. Rubenstein's rule of joint and several liability has been consistently followed by the state and federal courts of Massachusetts:

> This ruling has been followed by lower Massachusetts courts. See Commercial Union Ins. v. Gillette Co., 17 Mass. L. Rep. 726, 2004 WL 142717 (Mass. Sup. Ct. 2004). As I previously noted, see Boston Gas Co. v. Century Indem. Co., 2005 U.S. Dist. LEXIS 1220, No. 02-12062, 2005 WL 212621, at *2 (D. Mass. Jan 31, 2005), federal courts predicting state law rely upon state appellate decisions "unless . . . convinced by other persuasive data that the highest court of the law would decide otherwise." Comm'r v. Bosch's Estate, 387 U.S. 456, 465, 87 S. Ct. 1776, 18 L. Ed. 2d 886 (1967). Rubenstein and its progeny thus compel me to adopt the "all sums," joint-and-several allocation method, in the absence of compelling information indicating that the SJC would choose another allocation method. See Liberty Mut. Ins. Co. v. Black & Decker Corp., 383 F. Supp. 2d 200, 215 (D. Mass. 2004) (adopting "all sums" allocation method based on Massachusetts appellate decisions).

Boston Gas Co. v. Century Indem. Co., 2006 U.S. Dist. LEXIS 41133, *5-6 (D. Mass. June 21, 2006) (Zobel, J.) (applying joint and several liability to excess insurers).[7]

Notwithstanding this clear policy language and equally case law, Centennial has taken a position that it is ***not*** jointly and severally liable, and that liability instead should be allocated on a time-on-the-risk basis:

> Centennial states that in the event that the Court were to find that Invensys is entitled to coverage under the Policy issued by Centennial to Trans-Sonics for any portion of its claims relating to the *Wheeler Road Lawsuit* (a matter which Centennial denies), then any such costs associated with the claim should be allocated on a pro rata by time on the risk basis to all policies that were issued to

---

[7]   It is irrelevant to the "joint and several" analysis that Centennial is an excess insurer. The Centennial policy expressly provides that "this policy … in the event of exhaustion, shall continue in force as underlying insurance." See Exh. 4 (Insuring Agreement IV, [3d ¶]; see also id., Condition K (same). See also, e.g., Boston Gas, supra; Massachusetts Elec. Co., supra, 20 Mass. L. Rep. 193, 2005 Mass. Super. LEXIS 548, *5-6 (Oct. 25, 2005) (applying joint and several liability to excess policies using "total sum" language rather than "all sums" language).

> Invensys (or any of its predecessors) from the first date on which property damage or the operations at the Wheeler Road site occurred through the date on which the *Wheeler Road Lawsuit* was filed. To the extent that Invensys (or its predecessors) did not purchase insurance, cannot locate copies of any insurance policies that were or may have been in effect or settled with any of its insurers for a sum that is less than the available limits in each year, then Invensys is required to bear the costs allocated to each such period.

See Response to Interrogatory No. 18, Exh. 31 at 27-28.

Invensys respectfully suggests that Centennial's position is utterly at odds with the law in Massachusetts. Moreover, its position is unsupported by any language in the Centennial policy that would indicate an intent on the part of the insurer to cover only a *pro rata* portion of the liability. (Indeed, *pro rata* allocation in CERCLA cases is particularly inappropriate, because responsible parties -- including Invensys in this case -- often find themselves liable for property damage that continues to occur for many years after they have left the site.) If Centennial had intended to be liable only for *pro rata* liability, then its policy should have said so.

Centennial has also suggested that the "other insurance" clause requires apportionment to primary policies in other policy years before the Centennial policy may be accessed. However, such an argument completely misses the point of Rubenstein and its progeny, all of which make clear that "joint and several" liability is *not* a harsh result for insurers, precisely because of the possibility that an insurer held jointly and severally liable may obtain contributing payments from other carriers through "other insurance" clauses or equitable contribution. See, e.g., Rubenstein, 44 Mass. App. Ct. at 852, 694 N.E.2d at 388; Massachusetts Elec. Co., supra, 20 Mass. L. Rep. 193, 2005 Mass. Super. LEXIS 548, *5-6 (applying joint and several liability to excess policies notwithstanding "other insurance" clauses in policies).

For these reasons, Invensys requests an order that Centennial is jointly and severally

liable for all damages and cleanup costs not covered by the Liberty Mutual settlement.

## CONCLUSION

Invensys respectfully requests summary judgment on Counts II and IV of its complaint, an order awarding damages of $743,489.24 for breach of the duty to indemnify (<u>see</u> Fact No. 84), and an order directing payment of future remediation costs, attorney's fees, costs, and interests.

|  |  |
|---|---|
|  | Respectfully submitted,<br>PLAINTIFF INVENSYS SYSTEMS, INC.,<br>By its attorneys, |
|  | _____/s Robert J. Gilbert/_____<br>Robert J. Gilbert, Esq. (BBO # 565466)<br>GILBERT & RENTON LLC<br>344 North Main Street<br>Andover MA 01810<br>Tel (978) 475-7580 |
| Dated: September 22, 2006 | Fax (978) 475-1881 |

## **CERTIFICATE OF SERVICE**

I, Robert J. Gilbert, hereby certify that on September 22, 2006, a true and correct copy of the foregoing document was served electronically upon John T. Harding, Esq., counsel of record for Defendant Centennial Insurance Company.

_____/s Robert J. Gilbert/_____
Robert J. Gilbert