## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| INVENSYS SYSTEMS, INC.,<br>Plaintiff,<br><br>v.<br><br>CENTENNIAL INSURANCE COMPANY,<br>Defendant. | ) ) ) ) ) ) ) ) ) | CIV. NO: 1:05-CV-11589-WGY |

### DEFENDANT CENTENNIAL INSURANCE COMPANY'S
### RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN
### SUPPORT OF ITS MOTION OF FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendant Centennial Insurance Company ("Centennial") respectfully submits the following Response to Plaintiff Invensys Systems, Inc.'s ("Invensys") Separate Statement of Undisputed Material Facts.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

#### Facts Concerning Underlying Claim

1.     Plaintiff Invensys Systems, Inc. has filed this action to recover insurance proceeds under an excess/umbrella insurance policy issued by Defendant Centennial Insurance Company. See Complaint.

**RESPONSE:   Admitted, except that Centennial denies that Plaintiff is entitled to any coverage under the Centennial policy.**

2.     This insurance claim involves liability imposed upon Invensys pursuant to Findings of Fact and Rulings of Law issued on December 13, 1995, by Judge Stearns following a

1

bench trial conducted in <u>One Wheeler Road Associates, Inc. v. The Foxboro Company</u>, Civ. No. 90-12873-K (D. Mass.). <u>See</u> Exh. 1.

**RESPONSE: Admitted.**

3.     Plaintiff Invensys Systems, Inc. is the corporate successor to a company known as Trans-Sonics, Inc. In December 1974, Trans-Sonics was acquired by The Foxboro Company (now known as Invensys Systems, Inc.) and merged into an entity called Foxboro/Trans-Sonics, Inc. In 1978, Foxboro/Trans-Sonics, Inc. was merged into The Foxboro Company. In 2001, The Foxboro Company changed its name to Invensys Systems, Inc. <u>See</u> Exh. 1 at 1 and n.2; Exh. 2.[1]

**RESPONSE: Admitted.**

4.     The site in question consists of approximately 9.7 acres of semi-wooded land located at 200 Wheeler Road in Burlington, Massachusetts. The property was owned and occupied by The Foxboro Company (Foxboro) or its predecessor corporations (principally Trans-Sonics, Inc.) from August 16, 1954, to December 20, 1978. <u>See</u> Exh. 1 at 1 n.2.

**RESPONSE: Admitted.**

5.     In 1978, Invensys sold the Wheeler Road site and ceased all operations at the site. In 1982, One Wheeler Road Associates purchased the Wheeler Road site. <u>See</u> Exh. 1 at 2.

**RESPONSE: Admitted.**

6.     In 1956, Invensys built a 28,000 square foot factory on the then undeveloped site. Invensys was a manufacturer of precision electronics. Its main customer was the U.S. military. In 1958, the plant was enlarged by a 12,000 square foot addition.

**RESPONSE: Admitted.**

---

[1] Hereafter, references to "Invensys" are intended to refer to Invensys, The Foxboro Company, Foxboro/Trans-Sonics, Inc., and Trans-Sonics; provided that where more specificity is required, references to "Trans-Sonics" will refer to Trans-Sonics, Inc. with respect to events occurring prior to the 1974 merger.

7.    In 1978, Invensys sold the property to Blanton Wiggin and moved its operations to a facility on Blanchard Road in Burlington. See Exh. 1 at 2.

**RESPONSE: Admitted.**

8.    In June of 1982, One Wheeler Road Associates, a Massachusetts limited partnership, purchased 200 Wheeler Road from Wiggin. The Gutierrez Company, a Delaware corporation with its principal place of business in Massachusetts, is the general partner of One Wheeler Road Associates. See Exh. 1 at 2.

**RESPONSE: Admitted.**

9.    Two commercial tenants replaced Invensys at 200 Wheeler Road. From June of 1979 to December of 1988. U.S. Windpower, Inc., designed, built and tested windmill generators at the site. Fiske Med-Science, Inc., a medical equipment supplier owned by Wiggin, had offices at the site between 1978 and 1982. Upon purchasing the property, One Wheeler Road Associates assumed U.S. Windpower's lease. (Fiske Med-Science ceased doing business at or about the time of the sale). In 1989-1990, One Wheeler Road Associates and Gutierrez demolished the old Invensys plant and replaced it with a six-story commercial office building. See Exh. 1 at 2.

**RESPONSE: Admitted.**

10.    Invensys engaged in intensive manufacturing activity on the site. By 1959 Invensys employed over 230 workers. See Exh. 1 at 2.

**RESPONSE: Admitted.**

11.    Invensys used commercial solvents to clean and degrease electronic components, and for that purpose purchased substantial quantities of TCE, methylene chloride, cutting oils, and freon, typically in 55 gallon drums and 5 gallon cans. See Exh. 1 at 2.

**RESPONSE: Admitted.**

3

12.    Invensys was the only occupant of the site to use commercially formulated TCE and acetone in its operations, and the only occupant to use appreciable quantities of freon. See Exh. 1 at 3.

**RESPONSE: Admitted.**

13.    One Wheeler Road Associates did not engage in manufacturing activities at the site or otherwise make use of hazardous materials. There is no evidence that Fiske Med-Science used hazardous materials in its operations. See Exh. 1 at 3.

**RESPONSE: Admitted.**

14.    U.S. Windpower used a solvent called D-SOL 128, which contained PCE and methylene chloride, two of the site contaminants. It also contains petroleum distillate. U.S. Windpower did not use TCE in its operations, the significant and highly toxic groundwater contaminant. See Exh. 1 at 3.

**RESPONSE: Admitted.**

15.    In 1984, the Town of Burlington Board of Health discovered trichloroethylene (TCE), methylene choloride, freon, 1,1,1, trichloroethylene (TCA), tetrachloroethylene ("PCE"), and traces of petroleum distillates in a leaching basin at the site. See Exh. 1 at 2.

**RESPONSE: Admitted.**

16.    Subsequent investigation by U.S. Windpower and its contractor, Eastern Pipe, found two on-site waste disposal systems, a sanitary sewer leading to a septic leaching field, and a gravitational storm drain feeding the leaching basin. Three internal sinks and the floor drains in the main building, and three roof drains on the east side of the addition, were connected to the storm drain. See Exh. 1 at 2.

**RESPONSE: Admitted.**

4

17.    When the plant was initially constructed, there were no practical means of connecting either system to the Burlington town sewer. The sanitary system was connected to the town sewer in 1974. See Exh. 1 at 2.

RESPONSE: Admitted.

18.    In constructing the system of floor and sink drains, Invensys' primary concern was the possible impact waste solvents might have on the integrity of the plant's septic system. The routing of the internal sinks and floor drains to the leaching basin appears to have been undertaken to avert any such damage. See Exh. 1 at 3.

RESPONSE: Admitted.

19.    Judge Stearns found that although employees were verbally admonished against using the sinks to dispose of chemical wastes, Invensys had little appreciation of the environmental risk. See Exh. 1 at 3.

RESPONSE: Admitted.

20.    Uncontradicted testimony in the One Wheeler Road Associates lawsuit confirmed that Foxboro and Trans-Sonics employees did not pour solvents into sinks. See Sarapas Affidavit, Exh. 33 at ¶ 4, 5.[2]

RESPONSE: Admitted.

21.    Conditions on the site were inconsistent with continuous or repeated disposal of solvents into the environment. See Sarapas Affidavit, Exh. 33 at ¶ 6.

---

[2] See also, e.g., Nicholson Depo., Exh. 28 at 50 ("Q: Are you aware of whether any quantities of trichloroethylene . . . were ever poured down the sinks at the Wheeler Road facility? A: No. No."); Westcott Depo., Exh. 29 at 14 ("I asked him if we had ever put solvents down the sinks, and he confirmed my impression that that was an absolute no-no. That was not done."), 68 ("[I]t was our policy not to put solvents down sinks; that is, not into the leaching bed, the septic system, the sewage system"); Manion Depo., Exh. 30 at 62 ("the corporate policy was that no organic solvents could be placed in a sink;" no knowledge of any instance when solvents were poured in sinks).

**RESPONSE: Denied. Mr. Sarapas was never properly disclosed nor designated as an expert witness pursuant to Fed.R.Civ.P. 26 and the Scheduling Order entered by the Court. Centennial has filed a Motion to Strike the Affidavit of Mr. Sarapas because it violates the Court's Scheduling Order and the Federal Rules of Civil Procedure and is also irrelevant to any issue in this case. Should the Court grant Centennial's Motion to Strike, Invensys would be precluded from relying on Mr. Sarapas' testimony, and "evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." _Noviello v. City of Boston_, 398 F.3d 76 (1st Cir. 2005) (_quoting Vazquez v. Lopez-Rosario_, 134 F.3d 28, 33 (1st Cir. 1998)).**

22.    In December of 1984, One Wheeler Road Associates and Gutierrez retained Haley & Aldrich, an environmental consulting firm, to investigate contamination in the area of the leaching basin and to recommend a course of remediation. Haley & Aldrich's samples confirmed the presence of the hazardous substances earlier identified. See Exh. 1 at 4.

**RESPONSE: Admitted.**

23.    On April 23, 1985, Haley & Aldrich recommended that removal of the leaching basin "be discussed with the Burlington Board of Health (BOH) and (DEQE) prior to undertaking any work." See Exh. 1 at 4.

**RESPONSE: Admitted.**

24.    A copy of the Haley & Aldrich report was forwarded to the Burlington BOH and the Massachusetts Department of Environmental Protection (then the DEQE). In November of 1985, DEQE issued a "Notice of Responsibility" ordering "immediate remedial actions" at the site, including the rerouting of the drainage system and the removal of any liquid residues from the leaching basin. The Notice of Responsibility named Tilestone Estates (the nominee trust that

6

held title during Trans-Sonics' period of ownership), Foxboro Trans-Sonics, Blanton Wiggin, Fiske Med-Science, One Wheeler Road Associates, and U.S. Windpower as potentially responsible parties. See Exh. 1 at 4.

**RESPONSE: Admitted.**

25.    Sometime thereafter One Wheeler Road Associates and Gutierrez authorized Haley & Aldrich to begin work. Thereafter, and continuing for a period of several years, Haley & Aldrich and numerous contractors working at Haley & Aldrich's direction conducted substantial site investigation and remediation activities, including soil and groundwater cleanup. See Exh. 1 at 4-7.

**RESPONSE: Admitted.**

26.    All investigative and remedial work through the date of trial and all projected future remediation measures have been consistent with the requirements of the Massachusetts Contingency Plan and the National Contingency Plan and have been carried out with all necessary DEP approvals, and were reasonable in amount and necessary to restore the environmental integrity of the property. See Exh. 1 at 10.

**RESPONSE: Admitted.**

27.    The site investigation discovered various forms of latent damage to the piping for the drainage system, including broken and loose mortar and partially mortared pipes, three locations where sharp protuberances in the bedrock caused ruptures in the piping, and a hole with weathered edges that was sufficiently large to allow a large rock to fall through. Exh. 1 at 5-6.

**RESPONSE: Admitted.**

28.    The site investigation determined that soil and groundwater contamination was located, *inter alia*, near the former leaching basin, below the areas where the underground piping

1029037v1

had been compromised (see supra, Fact 27), near a drainage invert, and near a waste manhole. See Exh. 1 at 5-6.

**RESPONSE: Admitted.**

29.    The remediation at the site includes future expected groundwater treatment and monitoring. See Exh. 1 at 6-7, 11, 12-13.

**RESPONSE:  Admitted, except that Centennial denies that the amount of any future work that will be required at the Site has been determined.  In the alternative, any such amount been determined pursuant to a voluntary settlement that was entered into by Trans-Sonics without Centennial's knowledge or consent and in violation of the terms of the Centennial policy.**

30.    In 1990, One Wheeler Road Associates and its general partner, The Gutierrez Company, filed suit against Invensys in federal court pursuant to the Comprehensive Environmental Response and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and Mass. Gen. L. c. 21E, to recover response and remediation costs, including "damage to the value of the site and the cost of their investigative and remedial measures." See Complaint in One Wheeler Road Associates, Inc. v. The Foxboro Company, Civ. No. 90-12873-K (D. Mass.), Exh. 37 at ¶¶16 - 43 and Prayer for Relief; see also Exh. 1 at 1.

**RESPONSE: Admitted.**

31.    Following a bench trial, Judge Stearns ruled that Invensys, the owner and operator of the Wheeler Road facility from 1954 to 1978, was responsible for the releases of TCE contaminating the groundwater in the northeastern area of the site. See Exh. 1 at 9 (Finding No. 1) ("I base this conclusion on among other facts: (1) Foxboro stored hazardous materials at the site, including TCE; (2) Foxboro was the only occupant of the site to use TCE in its operations;

8

(3) the monitoring wells downgradient of the leaching basin and the north and west drain lines, as well as samples taken from the surface of the bedrock, show high groundwater concentrations of TCE; (4) Foxboro had no formal policies regulating or monitoring employee use and disposal of hazardous materials; and (5) Foxboro has failed to show by a preponderance of the evidence that some third party was solely responsible for the release of TCE.").

**RESPONSE: Admitted.**

32.    Judge Stearns found that Invensys bore some responsibility for soil contamination. See Exh. 1 at 9. Judge Stearns also found that U.S. Windpower (whose liability was born by One Wheeler Road Associates and Gutierrez by dint of their ownership of the property when U.S. Windpower was a tenant) bore primary responsibility for soil contamination. See Exh. 1 at 9.

**RESPONSE: Admitted.**

33.    Judge Stearns also found, based on expert testimony adduced by Invensys, that soil remediation efforts had little impact on groundwater quality and therefore were not properly chargeable to Invensys. See Exh. 1 at 10.

**RESPONSE: Admitted.**

34.    Judge Stearns found that Invensys had established at trial, by a preponderance of the evidence, that the damage to soil was divisible from the damage to groundwater. See Exh. 1 at 10.

**RESPONSE: Admitted.**

35.    Judge Stearns assigned responsibility for 100% of soil remediation costs ($231,563.96) to One Wheeler Road and Gutierrez Associates (by dint of their legal liability for contamination caused by their tenant, U.S. Windpower).

9

**RESPONSE: Admitted.**

36.    Judge Stearns allocated 100% of groundwater remediation past costs ($187,672.00) and 100% of costs associated with the leaching basin and drainage system ($86,826.00), as well as 100% of future costs for these items, to Invensys. See Exh. 1 at 12.

**RESPONSE: Admitted.**

37.    Judge Stearns allocated 54.25% of Phase I and Phase II response costs ($60,916) to Invensys. See Exh. 1 at 12.

**RESPONSE: Admitted.**

38.    In total, Judge Stearns imposed damages of $335,515 upon Invensys, together with liability for reasonable attorney's fees and costs and expert witness fees. See Exh. 1 at 13.

**RESPONSE: Admitted.**

39.    On April 19, 1996, Judge Stearns issued final judgment imposing $335,515 in damages, $217,082.79 in interest, $504,249.00 in attorney's fees and costs, and $87,677.00 in experts' fees and costs -- for a total judgment of $1,144,523.79. See Exh. 2.

**RESPONSE: Admitted.**

40.    Both Invensys and One Wheeler Road/Gutierrez appealed Judge Stearns' ruling.

**RESPONSE: Admitted.**

41.    Both Invensys and One Wheeler Road Associates having partly prevailed and partly lost at trial, the parties to the One Wheeler Road lawsuit agreed in October 1996 to waive their respective rights of appeal and to abide by the terms of the judgment as entered by Judge Stearns. On October 8, 1996, Invensys satisfied the judgment by paying the judgment amount plus accrued interest, for a total payment of $1,187,202.90. See Franciose Affidavit, Exh. 34 at ¶13; Exh. 25.

**RESPONSE: Admitted.**

42.    In addition, the post-judgment resolution required the parties to work together to remediate soil and groundwater, with the parties' respective obligations formally set forth in a February 2000 agreement implementing the Court's declaration of rights. See Exh. 26 (Settlement Agreement and Release). Pursuant to the February 4, 2000 agreement, Invensys has paid a total of $506,286.34 to date, broken down as follows:

| | |
|---|---|
| Remediation costs (10/93 - 2/99) | $235,123.81 |
| Remediation costs through 2/00 | $102,762.59 |
| Additional remediation payments | $168,399.94 |
| 3/1/99 - 3/15/00 ($41,822.88) | |
| 4/1/00 - 10/14/00 ($14,131.86) | |
| 11/1/00 - 5/31/01 ($20,952.02) | |
| 6/1/01 - 5/31/02 ($20,050.55) | |
| 6/1/02 - 2/28/03 ($25,515.72) | |
| 3/1/03 - 4/30/04 ($15,567.74) | |
| 5/1/04 - 8/31/05 ($19,578.79) | |
| 9/1/05 - 3/31/06 ($10,780.38) | |
| **Total Remediation Costs (through 8/31/05)** | **$506,286.34** |

See Exh. 26 (agreement); Exh. 35 (record of post-settlement remediation costs paid through March 31, 2006); Franciose Affidavit, Exh. 34 at ¶15. (Remediation costs are billed by One Wheeler Road Associates to Invensys every 6 to 12 months. The most recent bill was sent in April 2006 and accounted for costs through March 31, 2006.)

**RESPONSE: Denied, except that Centennial admits that Trans-Sonics entered into the Settlement Agreement and that Trans-Sonics has paid the costs set forth above pursuant to the terms of the Settlement Agreement, all in violation of the terms of the Centennial policy. Further, Trans-Sonics has been reimbursed for certain of these costs pursuant to its settlement with Liberty Mutual.**

11

43.    In connection with the underlying One Wheeler Road lawsuit, Invensys incurred the defense costs through the date of the October 8, 1996 payment of the judgment of $375,908.28. See Franciose Affidavit, Exh. 34 at ¶16.

**RESPONSE:   Denied.   Trans-Sonics was reimbursed by Liberty Mutual for $300,000 of these costs.  Further, these costs are not covered under the Centennial policy.**

44.    Thus, the total loss incurred to date by Invensys (not including interest, expected future remediation costs, or attorney's fees and costs), through March 31, 2006, is as follows:

| | |
|---|---|
| Net Attorneys Fees for Defending Action through 10/8/96 (payment of judgment): | $ 375,908.28 |
| Satisfaction of Judgment (4/19/96 Judgment plus post-judgment interest and costs through 10/8/96 date of payment); | $1,187,202.90 |
| Response costs (including engineers and consultants, costs incurred under 2/4/00 agreement) | $ 506,286.34 |
| **TOTAL AMOUNT OF LOSS (TO DATE)** | **$ 2,069,397.52** |

**RESPONSE:   Denied.   Trans-Sonics was reimbursed by Liberty Mutual for $1,250,000 of these costs.  Further, these costs are not covered under the Centennial policy.**

## FACTS CONCERNING PRIMARY AND EXCESS INSURANCE COVERAGE

### The Excess Policy Issued by Defendant Centennial Insurance Company

45.    Defendant Centennial Insurance Company issued Policy No. 42-00 76 30, a three-year commercial umbrella policy, to Trans-Sonics for the period January 1, 1972-1975. See Exh. 3. This policy was issued directly to Trans-Sonics before the December 1974 merger with Invensys.

**RESPONSE: Admitted.**

46.    The property damage limits of liability in the Centennial Policy were initially $2,000,000 per occurrence/aggregate per year, excess of primary limits of $100,000 per

12

occurrence/aggregate per year. On June 16, 1972, these limits increased to $5,000,000 per occurrence/aggregate per year, excess of primary limits of $100,000 per occurrence/aggregate per year. Id.

**RESPONSE:  Admitted, except that Centennial denies that the limits of liability are stated on a "per year" basis.  Centennial denies that more than a single limit of liability would apply to Trans-Sonics' claim in the event that the Court was to determine that Trans-Sonics is entitled to coverage.**

47.     The Centennial Policy provides two kinds of coverage. The first kind -- known as "excess" insurance -- becomes operative when a suit against the insured involved a claim covered by both the Centennial Policy and the underlying primary policy. In such a case, the Centennial Policy provides coverage in excess of the limits of the underlying primary policy (which in each of the three years was provided by Liberty Mutual in the amount of $100,000 per occurrence/aggregate per year). This "excess" coverage does not require Centennial to defend, but instead obligates Centennial to pay "ultimate net loss" incurred by the insured (including defense costs and judgments). This obligation to pay ultimate net loss kicks in once the primary insurer had paid the full total of the underlying limits of liability. See Policy, Exh. 4 at 1 (Section IV(a)), at 3 (definition of "ultimate net loss").

**RESPONSE:  Denied to the extent that Trans-Sonics purports to characterize the terms of the coverage provided by the Centennial policy.  Centennial admits that the policy speaks for itself as to its terms and conditions.  Centennial's only obligation was to provide coverage in accordance with the terms, conditions and exclusions in the policy, including without limitation the requirement that Trans-Sonics provide immediate notice of any suit for which it sought coverage.**

13

48.    The second type of insurance provided by the Centennial policy is known as "umbrella" insurance. "Umbrella" insurance becomes operative when a claim is covered by the terms of the excess/umbrella policy but is *not* covered by the terms of the underlying primary policy. In such case, Centennial is obligated to pay claims that are in excess of a "retained limit" of $25,000. In addition, the "umbrella" coverage obligates Centennial to defend Invensys from the beginning of the claim. See Policy, Exh. 4 at 1 (Section II.a.).

**RESPONSE:  Denied to the extent that Trans-Sonics purports to characterize the terms of the coverage provided by the Centennial policy.  Centennial admits that the policy speaks for itself as to its terms and conditions.  Centennial's only obligation was to provide coverage in accordance with the terms, conditions and exclusions in the policy, including without limitation the requirement that Trans-Sonics provide immediate notice of any suit for which it sought coverage.**

49.    Because this claim was covered by the primary insurance issued by Liberty Mutual, this claim involves the *excess* coverage provided under the Centennial policy, not the umbrella coverage. Id.

**RESPONSE:  Denied to the extent that Trans-Sonics purports to characterize the terms of the coverage provided by the Centennial policy.  Centennial admits that the policy speaks for itself as to its terms and conditions.  Centennial's only obligation was to provide coverage in accordance with the terms, conditions and exclusions in the policy, including without limitation the requirement that Trans-Sonics provide immediate notice of any suit for which it sought coverage.  Centennial further admits that Trans-Sonics asserted that the claim was covered under the terms of the underlying Liberty Mutual policy.**

14

50.    The "excess" portion of the Centennial policy requires Centennial "to indemnify the insured for the ultimate net loss in excess of the retained limit hereinafter defined, which the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law ... on account of ... (b) Property Damage Liability ... to which this policy applies, caused by an occurrence anywhere in the world." See Policy, Exh. 4 at 1 (Section I).

**RESPONSE:  Denied to the extent that Trans-Sonics purports to characterize the terms of the coverage provided by the Centennial policy.  Centennial admits that the policy speaks for itself as to its terms and conditions.  Centennial's only obligation was to provide coverage in accordance with the terms, conditions and exclusions in the policy, including without limitation the requirement that Trans-Sonics provide immediate notice of any suit for which it sought coverage.  Centennial further admits that Trans-Sonics asserted that the claim was covered under the terms of the underlying Liberty Mutual policy.**

51.    The policy defines "ultimate net loss" as follows:

> The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication nor compromise with the written consent of the company, after making proper deduction for all recoveries and salvages collectible, but excludes all loss expenses and legal expenses (including attorney's fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred. This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

See Exh. 4 at 3.

**RESPONSE:  Admitted.**

52.    The Centennial policy defines "occurrence" to mean an "accident, including continuous or repeated exposure to conditions, which results, in ... property damage ... neither expected nor intended from the standpoint of the insured." See Exh. 4 at 3.

15

**RESPONSE: Admitted.**

53.    The Centennial policy defines "Property Damage Liability" to include "liability for damages because of (1) physical injury to or destruction of tangible property which occurs during the policy period." See Exh. 4 at 3.

**RESPONSE: Admitted.**

54.    There is no pollution exclusion in the Centennial policy. The policy jacket for the Centennial policy does not include any form of pollution exclusion, see id., and the numbered endorsements to the policy likewise did not include any pollution exclusion. See id. Centennial does not contend that the Policy contains any form of pollution exclusion. See Exh. 31 at 15 (answer to Interrogatory No. 6).

**RESPONSE: Admitted.**

55.    Invensys was unaware of the existence of the Centennial policy until 1999, when it discovered a schedule of insurance prepared in connection with the Trans-Sonics merger in 1974. See Exh. 5; see also Franciose Affidavit, Exh. 34 at ¶29.

**RESPONSE: Denied. The existence of the Centennial policy was known to Trans-Sonics at the time it was issued and was reflected in the Schedule of Insurance prepared in connection with the acquisition of Trans-Sonics in 1974. All of this information was available to Invensys as the successor-in-interest to Trans-Sonics and Foxboro at the time the *Wheeler Road Lawsuit* was commenced. There is no basis for Trans-Sonics to claim that it was "unaware" of the Schedule of Insurance reflecting the existence of the Centennial policy since that Schedule of Insurance was in its continuous possession at all times from 1974.**

**The Underlying Liberty Mutual Primary Coverage**

56.     Liberty Mutual provided two different categories of primary insurance to Invensys. The first category of primary insurance involves a series of three one-year policies that Liberty Mutual issued directly to Trans-Sonics during the periods January 1,1972-73, January 1, 1973-74, and January 1, 1974-75, i.e., before the December 1974 merger between Trans-Sonics and Foxboro/Invensys. See Centennial Policy, Exh. 3 (schedule of underlying insurance shows that Liberty Mutual issued primary coverage to Trans-Sonics). This coverage shall be known as the "Trans-Sonics Primary Coverage."

**RESPONSE: Admitted.**

57.     Other than a schedule of insurance prepared in connection with the Trans-Sonics merger, see Exh. 4, the Schedule of Underlying Insurance in the primary policy is the only evidence that was ever located to establish the Trans-Sonics Primary Coverage issued by Liberty Mutual. See Franciose Affidavit, Exh. 34 at ¶ 29-34.

**RESPONSE: Denied.**

58.     In each of the three years that the Trans-Sonics Primary Coverage was in effect, Liberty Mutual provided property damage limits of $100,000 per occurrence/aggregate. See Centennial Policy, Exh. 3 (Schedule of Underlying Insurance).

**RESPONSE: Admitted.**

59.     Because the actual Liberty Mutual policies that were issued to Trans-Sonics could not be located, Liberty Mutual had no direct evidence that the policies contained a pollution exclusion (especially the first policy, which was issued in 1972 before the introduction of the 1973 ISO standard form policy containing a limited pollution exclusion). See Franciose

Affidavit, Exh. 35 at ¶ 33, 35. ***Thus, the first category of Liberty Mutual primary policies —***
***covering the 1972-75 time period — contained no form of pollution exclusion.***

**RESPONSE: Admitted.**

60.    No  other  coverage  issued  to  Trans-Sonics,  other  than  the  1972-75  primary
policies from Liberty Mutual and the 1972-75 excess policy from Centennial, has ever been
located. See Franciose Affidavit, Exh. 35 at ¶ 31.

**RESPONSE: Denied, including insofar as Trans-Sonics may be entitled to coverage**
**under additional policies issued to The Foxboro Company.**

61.    Invensys was unaware of the existence of the Liberty Mutual primary coverage
that was provided to Trans-Sonics until 1999, when it discovered a schedule of insurance
prepared in connection with the Trans-Sonics merger in 1974. See Exh. 5; see also Franciose
Affidavit, Exh. 35 at ¶ 29, 30.

**RESPONSE: Denied.  See Centennial Response to paragraph 55.**

62.    By  coincidence,  Liberty  Mutual  also  provided  primary  liability  insurance  to
Invensys at all times from the date of the merger in December 1974 through the date of the One
Wheeler Road lawsuit in 1990. See Franciose Affidavit, Exh. 35 at ¶ 19-21.

**RESPONSE: Denied, except that Centennial admits that Liberty Mutual issued the**
**identified policies to Invensys/Foxboro.**

63.    All primary policies issued by Liberty Mutual to Invensys, from the date of the
merger through 1990, contained either limited or absolute pollution exclusions. See, e.g., 1974
primary policy (Exh. 38). Liberty Mutual also issued a claims-made Pollution Legal Liability
policy that was in effect during the period when the Wheeler Road claim was received, but
coverage  was  excluded  because  the  policy  contained  a  "retroactive  date"  that  prohibited

coverage for releases commencing prior to June 1982. See 1990-91 policy (Exh. 39). During the claims process and subsequently during coverage litigation between Invensys and Liberty Mutual, Liberty Mutual strenuously argued that these pollution exclusion would have barred coverage for the Wheeler Road loss. See Franciose Affidavit, Exh. 35 at ¶ 19-21.

**RESPONSE: Denied, except that Centennial admits that the post-1974 Liberty Mutual policies contained a pollution exclusion; that Liberty Mutual took the position that there was no coverage for the *Wheeler Road Lawsuit* under these policies; that Liberty Mutual took the position that there was no coverage under the Pollution Legal Liability policies; and that Trans-Sonics contested Liberty Mutual's positions.**

### Settlement of the Primary Insurance Claim Against Liberty Mutual

64.    Promptly after being sued by One Wheeler Road Associates and Gutierrez in 1990, Invensys tendered defense of this case to Liberty Mutual. The tender was made pursuant to the Liberty Mutual policies that had been issued to Invensys. See Exh. 6; see also Franciose Affidavit, Exh. 35 at ¶ 23.

**RESPONSE: Admitted.**

65.    In 1990, Invensys did not tender defense to Liberty Mutual under the primary policies issued by Liberty Mutual to Trans-Sonics, because Invensys was unaware of the existence of those policies. See Franciose Affidavit, Exh. 35 at ¶ 22.

**RESPONSE: Denied, except that Centennial admits that Trans-Sonics did not specifically tender the defense of the *Wheeler Road Lawsuit* under the policies that were issued to Trans-Sonics for the 1972-1974 time period. See Centennial's Response to paragraph 55.**

66.    Liberty Mutual initially agreed to defend Invensys in the One Wheeler Road lawsuit, pursuant to a reservation of rights. Liberty Mutual appointed an experienced defense

19

attorney, Louis Massery of Cooley, Manion, to undertake the defense. <u>See</u> Exh. 6; <u>see also</u> Franciose Affidavit, Exh. 35 at ¶ 25.

**RESPONSE: Admitted.**

67.    Liberty Mutual subsequently denied coverage and withdrew from the defense of Invensys in the One Wheeler Road lawsuit. However, Invensys continued to utilize the services of Mr. Massery and his firm, the defense counsel originally appointed by Liberty Mutual. <u>See</u> Exh. 6; <u>see also</u> Franciose Affidavit, Exh. 35 at ¶ 26. (In addition, Invensys retained an experienced environmental consultant, Leonard Sarapas of the firm of Dames & Moore, to provide expert consulting services in defense of the One Wheeler Road lawsuit.) <u>See</u> Franciose Affidavit, Exh. 35 at ¶ 27.

**RESPONSE: Admitted.**

68.    After the One Wheeler Road lawsuit resulted in a substantial judgment against Invensys, Invensys filed a coverage lawsuit against Liberty Mutual pursuant to the policies issued to Invensys. In the course of the coverage lawsuit, Invensys discovered that Liberty Mutual also had issued primary coverage -- probably without any form of pollution exclusion -- to Trans-Sonics prior to the 1974 merger. Invensys then notified Liberty Mutual that it was also seeking coverage pursuant to the policies issued to Trans-Sonics. <u>See</u> Franciose Affidavit, Exh. 34 at ¶ 33.

**RESPONSE: Denied.    See Centennial's Response to paragraph 55.  Centennial further states that its original notices to Liberty Mutual were broad enough to have encompassed the policies issued to Trans-Sonics.**

69.    Following several years of litigation activity, Invensys and Liberty Mutual ultimately agreed in March 2000 to settle the coverage lawsuit. Pursuant to a confidential

settlement agreement, Liberty Mutual received a complete release from liability at the Wheeler Road site, in exchange for a payment to Invensys of $1,250,000, allocated as follows: (i) $300,000 for Invensys' attorneys' fees incurred in defending the One Wheeler Road lawsuit, and (ii) $950,000 to indemnity Invensys for a portion of the damages that it had paid and would become obligated to pay. See Franciose Affidavit, Exh. 34 at ¶ 34.

**RESPONSE:   Admitted, except that Centennial denies that it is bound by any purported "allocation" of the settlement proceeds by Invensys and Liberty Mutual.**

70.     The settlement agreement between Liberty Mutual and Invensys further provided that the first $300,000 of the indemnity payment would be applied to exhaust the $100,000 per policy limits of the three policies that Liberty Mutual had issued to Trans-Sonics (January 1, 1972 - 73, January 1, 1973-74 and January 1, 1974-75), which could not be shown to contain a pollution exclusion and therefore provided the clearest source of coverage. The remaining $650,000 was allocated to subsequent Liberty Mutual policies (all containing pollution exclusions) issued to Invensys after the December 1974 merger. See Franciose Affidavit, Exh. 34 at ¶ 35.

**RESPONSE: Denied.  Insofar as Trans-Sonics has refused to produce a copy of the Settlement Agreement with Liberty Mutual, there is no basis for the Court to consider these alleged "facts" regarding the Liberty Mutual Settlement and Mr. Francoise's affidavit should be stricken.  Centennial further denies that it is bound by any purported "allocation" of the settlement proceeds by Invensys and Liberty Mutual.**

71.     The net effect of the settlement with Liberty Mutual was the complete exhaustion of all primary limits for property damage liability in the periods directly below the Centennial policy.

**RESPONSE: Denied, including insofar as the issue of "exhaustion" is a matter of law for the Court to determine.**

### Notice to Centennial:

72.    On June 24, 1999, Invensys' counsel wrote to Centennial, requesting Centennial to search for evidence of coverage issued to Trans-Sonics. See Exh. 7.

**RESPONSE: Admitted.**

73.    Numerous conversations thereafter ensued between John Yandrasitz (an attorney at Centennial) and Invensys' attorneys. See Exh. 8 (on July 16, 1999, Centennial attorney acknowledges numerous conversations); Exh. 10 (on June 9, 2000, Invensys attorney references numerous conversations over preceding year concerning One Wheeler Road Associates case and coverage dispute with Liberty Mutual); Exh. 12 (on July 12, 2000, Centennial attorney responds to June 9, 2000 letter and does not dispute that numerous conversations took place over preceding year). Thus, as of July 1999, Centennial had received both written and oral notification of the coverage dispute with Liberty Mutual and the underlying One Wheeler Road Associates lawsuit.

**RESPONSE: Denied. There is no evidence as to the substance of any of the oral conversations between Invensys' attorney, Centennial's attorney, or Centennial. Denied to the extent that Centennial received both written and oral notification of the coverage dispute with Liberty Mutual and the underlying One Wheeler Road Associates lawsuit as of July 1999. The July 16, 1999 letter cited in paragraph 73 does not reference or mention Liberty Mutual or the *Wheeler Road Lawsuit*. It merely references a letter dated June 24, 1999 from Kathryn E. Perotta of Gilbert & Renton, P.C. (which merely states that there is a matter involving The Foxboro Company pending in Middlesex Superior Court, Cambridge, MA and requesting information relating to Centennial's relationship with**

22

Trans-Sonics) and subsequent conversations. **None of these alleged conversations related to the presentation of a claim to Centennial and do not constitute notice of a claim under the Centennial policy.**

74.    On June 9, 2000 -- shortly after receiving the settlement check from Liberty Mutual -- Invensys' attorneys tendered a formal claim for coverage to Centennial. The tender was made at this time, because it was only after the payment by Liberty Mutual that the excess coverage in the Centennial had been triggered by exhaustion of the limits of the underlying primary policies in the 1972, 1973 and 1974 policy years. See Exh. 10.

**RESPONSE:    Denied, except admitted to the extent that Invensys' attorneys tendered a claim for coverage to Centennial in a letter dated June 9, 2000.    Centennial denies that this notice complied with the terms of the Centennial policy.**

75.    Numerous letters were exchanged between the parties, as Invensys responded to Centennial's requests for information. See Exh. 11-22.

**RESPONSE: Admitted.**

76.    On July 12, 2001, Centennial denied coverage. See Exh. 23.

**RESPONSE: Admitted.**

77.    At no time during the claims process (including its claim denial letter dated July 12, 2001) did Centennial assert that it had been prejudiced by any alleged late notice or any alleged voluntary payment. See Exh. 23; see also, generally, Exh. Nos. 7-22.

**RESPONSE: Denied.  The reservation of rights letter from Centennial to Invensys' attorneys dated October 24, 2000 (Ex. 15 to Pl.'s Stmt. of Facts) states timely and adequate notice of any loss of claim involving a policy would likely be a condition of coverage and that there would be no coverage if the insured failed to comply with conditions specified in**

the policies. Similarly, Centennial's initial response to the notice from Invensys dated July 12, 2000 [Ex. 12 to Pl.'s Stmt. of Facts.] raises the issue of late notice. Further, the denial of coverage letter dated July 12, 2001 (Ex. 23 to Pl.'s Stmt. of Facts), incorporates by reference the July 12, 2000 and October 24, 2000 reservation of rights letters.

78.    At no time during the claims process (including its claim denial letter dated July 12, 2001) did Centennial identify any specific facts setting forth ways in which it believed it had been prejudiced by any alleged late notice or any alleged voluntary payment. See id.

RESPONSE: Denied. See response to paragraph 77.

79.    At no time during discovery (including its responses to Interrogatory Nos. 9, 10, 11, 12 and 13) did Centennial identify any specific facts setting forth ways in which it believed it had been prejudiced by any alleged late notice or any alleged voluntary payment. See Exh. 31 at 16-24 (responses to Interrogatory Nos. 9, 10, 11, 12 and 13).

RESPONSE: Denied. Centennial's responses to Interrogatory Nos. 9-13 specifically set forth the ways in which Centennial was prejudiced by the late notice, including insofar as Trans-Sonics litigated the *Wheeler Road Lawsuit* to Final Judgment without notice to Centennial.

80.    Centennial has refused to state whether there are any instances in which, as an *excess* insurer, it has associated in the defense of an environmental pollution claim after the underlying primary insurer denied coverage and refused to defend. See Exh. 31 at 24 (response to Interrogatory No. 14.

RESPONSE: Denied on the grounds that Centennial's handling of any other claim is irrelevant to the issue of late notice in this case. Under the Centennial policy, Centennial had no obligation to defend the *Wheeler Road Lawsuit*. In addition, Centennial's actions as

24

an excess insurer in other contexts are irrelevant to the issues before the Court. Centennial was deprived of the opportunity to associate itself in the defense of the *Wheeler Road Lawsuit* or the litigation with Liberty Mutual because Invensys failed to provide timely notice of a claim or suit as required by the terms of the Centennial policy. Admitted to the extent that Centennial has not stated whether it has associated in the defense of an environmental pollution claim after the underlying primary insurer denied coverage as such information is neither relevant to this action nor reasonably calculated to lead to the discovery of admissible evidence and is outside the scope of proper discovery. Any information as to how Centennial responded to other claims at other times involving different facts is entirely irrelevant to any issue of coverage in this case.

## DAMAGES SOUGHT ON SUMMARY JUDGMENT

81.    Insofar as coverage is sought under the "excess" portion of the Centennial policy (as opposed to the "umbrella" portion), Invensys does not seek damages relating to the duty to defend. See Fact Nos. 47-50, supra.

**RESPONSE: Admitted.**

82.    Of the $1,250,000 payment made by Liberty Mutual, $300,000 was allocated to the duty to defend. See Fact No. 69. $950,000 was allocated to indemnity. See id.

**RESPONSE: Admitted, except that Centennial denies that it is bound by any such "allocation" between Invensys and Liberty Mutual.**

83.    The total indemnity obligation incurred to date by Invensys is $1,693,489.24. See Fact No. 44.

**RESPONSE: Denied. See Centennial's prior responses.**

84.    Accordingly, after giving credit for the portion of the Liberty Mutual settlement that was allocated to indemnity, the remaining indemnity obligation being sought by Invensys

pursuant to this motion is $743,489.24. This amount does not include future remediation costs (after March 31, 2006), interest, attorney's fees or costs.

**RESPONSE: Admitted to the extent that these amounts are claimed by Invensys. Centennial denies that it has any obligation to pay any of these costs under the terms of the Centennial policy.**

**CENTENNIAL INSURANCE COMPANY,**
By its attorneys,

*/s/ John T. Harding*

John T. Harding BBO #221270
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7558
Dated:  November 1, 2006          (617) 342-4888 (facsimile)

<u>Certificate of Service</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 1, 2006.

*/s/ John T. Harding*

John T. Harding, Jr. BBO #221270

1029037v1