# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

INVENSYS SYSTEMS, INC.,
Plaintiff,

v.

CENTENNIAL INSURANCE COMPANY,
Defendant.

)
)
)
)
)
)
)
)
)

CIV. NO: 1:05-CV-11589-WGY

## DEFENDANT CENTENNIAL INSURANCE COMPANY'S MOTION TO STRIKE EXPERT REPORTS OF GENE WAYMON AND LEONARD C. SARAPAS AND SUPPORTING MEMORANDUM OF LAW

Pursuant to Fed.R.Civ.P. 26 and 56(e) and Local District Court Rules 26.4 and 56.1, Defendant Centennial Insurance Company ("Centennial") moves that the Court strike the expert reports and affidavits of Gene Waymon ("Waymon") [Ex. A hereto] and Leonard C. Sarapas ("Sarapas") [Ex. B hereto] (collectively the "Expert Reports") from the record in this case. Plaintiff Invensys Systems, Inc. ("Invensys") did not disclose these purported "experts" and the Expert Reports in accordance with the Court's Scheduling Order and the applicable rules. Invensys did not seek leave of Court to disclose these experts late and, accordingly, no such permission was ever granted by the Court. Moreover, the "opinions" that Waymon and Sarapas seek to offer are entirely irrelevant to any issue in the case. The inclusion of the Expert Reports in its Motion for Summary Judgment is an impermissible attempt by Invensys to introduce

previously undisclosed expert testimony. The Court should strike the Expert Reports from the record.[1]

## INTRODUCTION

There is no dispute that Invensys' disclosure of its purported Expert Reports failed to comply with the Court's Scheduling Order. The deadline for completion of expert discovery was August 11, 2006.[2] Invensys did not serve any expert reports at that time or move for leave to disclose experts late. The expert opinion of Waymon was first disclosed to Centennial in an affidavit attached to Invensys' Motion for Summary Judgment, filed with the Court on September 22, 2006, six weeks after the close of expert discovery, and clearly less than 90 days before the scheduled trial date of November 6, 2006, as required by Fed.R.Civ.P. 26.

Waymon's purported opinion is offered by Invensys on the issues of late notice and voluntary payments. In particular, Waymon opines that the handling of environmental claims under an excess/umbrella policy is passive, reactive, and much less active and rigorous than the handling of environmental claims by a primary insurer and that it is "essentially unheard of" for an excess insurer such as Centennial to step in and defend an environmental claim where the underlying primary insurer has refused to do so. [Waymon Report, ¶7]. Waymon also opines that Centennial has not identified any actual or substantial prejudice that it has suffered as a

---

[1]Invensys and Centennial each filed a Motion for Summary Judgment on September 22, 2006. [PACER Nos. 16 and 19]. The Court, *sua sponte*, suggested that the Motions for Summary Judgment be considered as a "case stated" and the parties agreed to this procedure in lieu of a bench or jury trial. [Docket Entry 10/4/2006]. The Court has scheduled a hearing on the issues raised by the Motions for Summary Judgment for November 13, 2006. [Docket Entry 10/4/2006].

[2] The Scheduling Order specifies that all expert discovery (including depositions) be completed by August 11, 2006. Necessarily, any expert reports would have needed to be disclosed sufficiently in advance of this deadline to permit the scheduling of depositions.

result of the late notice or voluntary payments. [Waymon Report, ¶¶11-14]. The expert opinion of Waymon must be stricken because it was not disclosed or produced in accordance with the Court's deadline for Rule 26(a)(2) disclosures. As a result, Invensys has offered previously undisclosed expert opinion which must be deemed to be improper and inadmissible. Moreover, the speculative statements of Waymon are entirely irrelevant to any issue in the case and there is no foundation for these "opinions" to be considered.

Similarly, Invensys first disclosed Sarapas' Expert Report on September 22, 2006, six weeks after the close of expert discovery and clearly less than 90 days before the scheduled trial date, as required by Fed.R.Civ.P. 26. Sarapas' opinion is offered by Invensys on the issue of contamination and supports the Findings of Fact and Conclusions of Law entered by Judge Stearns in the *Wheeler Road Lawsuit*. Specifically, Sarapas opines that: (1) there is no evidence of intent to discharge TCE into the plant's interior drains or onto the ground; (2) there is no evidence of intent to contaminate at all; (3) there was no continuous or repeated discharge of solvents into the drainage systems; and (4) sufficient evidence existed to sustain Judge Stearns' ruling that Invensys is liable for groundwater contamination. [Sarapas Report, §III]. The operative facts have been adjudicated in the *Wheeler Road Lawsuit* and Centennial has never suggested that it intends to "relitigate" the underlying case in the context of this insurance coverage action. In addition to being untimely, these "opinions" are irrelevant to the issues of late notice, voluntary payments, allocation, or any other matter in this case and should be disregarded by the Court in ruling upon this case.

## THE EXPERT DISCLOSURE DEADLINE

The Scheduling Order established a deadline for completion of expert discovery of August 11, 2006.[3] The Scheduling Order was subsequently amended to extend the deadline for dispositive motions by one week,[4] but the expert discovery deadline remained set for August 11, 2006. No leave to designate experts beyond the expert discovery deadline was granted, and in fact, none was ever sought by Invensys. Further, the parties jointly requested that the Scheduling Order be amended, including an extension of the expert discovery deadline,[5] but the motion was denied approximately six weeks before Invensys disclosed its Expert Reports.[6] Therefore, the deadline for completion of expert discovery remained August 11, 2006.

## ARGUMENT

**I.    INVENSYS DID NOT COMPLY WITH THE COURT'S SCHEDULING ORDER.**

Invensys ignored the Court's Scheduling Order and the applicable rules governing expert disclosure. The Expert Reports of Waymon and Sarapas were not provided until 6:00 pm on Friday, September 22, 2006, when Invensys filed its Motion for Summary Judgment.[7] At this

---

[3] See Docket Entry 10/17/2005 - Electronic ORDER entered re 6 JOINT STATEMENT re scheduling conference. SO ORDERED AS THE CASE MANAGEMENT SCHEDULING ORDER. Expert Discovery due by 8/11/2006. Dispositive Motions due by 9/16/2006.

[4] See Docket Entry 9/11/2006 - Electronic ORDER entered granting 13 Motion for Extension of Time Dispositive Motions due by Friday 9/22/2006. The case remains on the Running Trial List for November 6, 2006.

[5] See Docket Entry #12 - Joint MOTION to Amend Scheduling Order.

[6] See Docket Entry 8/1/2006 - Electronic ORDER entered re 12 Joint Motion to Amend Scheduling Order is DENIED. "This Case is on the November Running Trial List."

[7] Counsel for Centennial received a "corrected" copy of the Expert Report on September 26, 2006 under cover of a letter dated September 25, 2006. Sarapas' Curriculum Vitae, which the Expert Report stated was attached, was not forwarded to counsel for Centennial until September 27, 2006. Centennial does not agree that the "reports" provided by Invensys comply with the expert report requirements of Fed.R.Civ.P. 26. However, the Court does not need to consider the adequacy of the reports in light of the fact that they were served many weeks after the Court's deadline and without obtaining leave of Court or designate expert witnesses late.

late date, neither of the reports should be considered, as doing so would undermine the Court's authority in enforcing the Scheduling Order.[8] Invensys has offered these reports in support of its Motion for Summary Judgment on the issues of late notice, voluntary payments and allocation. Because the reports are inadmissible, they should not be considered in any decision on this case, nor should they serve as the basis for any opposition to Centennial's Motion for Summary Judgment. As the First Circuit Court of Appeals has noted:

> The nonmovant bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value; as a rule, "evidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998).

*Noviello v. City of Boston*, 398 F.3d 76 (1st Cir. 2005). The Federal Rules of Civil Procedure similarly provide:

> A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such information is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed.R.Civ.P. 37(c). Since Invensys cannot offer any justification for the belated disclosure of experts, and because considering the error is not harmless, the late expert testimony must be excluded. *Wilson v. Bradlees*, 250 F.3d 10 (1st Cir. 2001). *See also Heidtman v. County of El Paso*, 171 F.3d 1038, 1040 (5th Cir. 1999); *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 741-742 (7th Cir. 1998).

---

[8] The fact that the expert disclosures are in the form of Affidavits in Support of Invensys' Motion for Summary Judgment is of no moment. Otherwise, a party could evade the requirements of a Scheduling Order and Rule 26 simply by calling an expert report an "Affidavit."

In determining whether the expert testimony should be excluded, the Court should be guided by the consideration of four factors: (1) the explanation, if any, for the party's failure to identify the witness; (2) the importance of the witness's testimony; (3) the prejudice to the opposing party of allowing the witness to testify; and (4) the possibility of curing such prejudice by granting a continuance. *See Samos Imex Corp. v. Nextel Communs., Inc.*, 194 F.3d 301, 305 (1st Cir. 1999); *Hamburger v. State Farm*, 361 F.3d 875, 883 (5th Cir. 2004); *Geiserman v. MacDonald*, 893 F.2d 787 (5th Cir. 1990); *Bradley v. United States*, 866 F.2d 120, 124-26 (5th Cir. 1989); *Murphy v. Magnolia Elec. Power Ass'n*, 639 F.2d 232, 234-35 (5th Cir. 1981); *Central Maine Power Co. v. Foster Wheeler Corp.*, 115 F.R.D. 295, 297 (D. Me. 1987); 8 C. Wright & A. Miller, Federal Practice and Procedure, §2050 at 327 (1970). *See also Musser v. Gentiva*, 356 F.3d 751, 757 (7th Cir. 2004); *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir. 1998); *Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001).

In the present case, the failure to disclose the Expert Reports of either Waymon or Sarapas prior to Invensys' filing of its Motion for Summary Judgment cannot be justified. Indeed, Invensys had not offered any reason for its late disclosures of experts. Serving reports at this time prevents Centennial from taking the depositions of these experts since Centennial has no right to do so under the Scheduling Order. There is no opportunity for Centennial to retain its own experts and submit rebuttal expert reports. In short, the entire purpose for requiring the timely disclosure of experts would be frustrated if the Court were to consider these reports in ruling on the case. Invensys' failure to make a timely disclosure of the Expert Reports cannot be described as harmless, particularly when the time for discovery has elapsed. *See Seifert v. United States*, 2005 U.S. Dist. LEXIS 33088 *1, 4, n.4 (E.D. Cal. 2005).

Invensys' late disclosure of the Expert Reports subverts the purposes underlying the Federal Rules of Civil Procedure. Full disclosure during the discovery stage "make[s] a trial less of a game of blindman's bluff and more of a fair contest with the basic issues and facts disclosed to the fullest practical extent." *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 682 (1958). The disclosure rules avoid trial by ambush and conserve litigation resources. *Thibeault v. Square D Co.*, 960 F.2d 239, 244 (1st Cir. 1992). Moreover, the rules are designed to prevent one party from obtaining a tactical advantage by failing to fully disclose an expert's opinions during the discovery process, thereby depriving the adversary of an adequate opportunity to challenge the expert, solicit alternative expert opinions, or conduct expert discovery. *Poulis-Minott v. Smith*, 388 F.3d 354, 358 (1st Cir. 2004) (holding that a party gains an unfair tactical advantage by failing to make a complete expert disclosure in a timely fashion). Another purpose of the disclosure rules is to "ensure that deposition testimony can proceed with parties already armed with the expert's report, so as to evaluate the opinions to be offered." *Beller v. United States*, 221 F.R.D. 696, 700 (D.N.M. 2003). Similarly, the rules provide the opposing party with the "opportunity to prepare for examination of experts via depositions in advance of trial." *Id.* (*quoting Aircraft Gear Corp. v. Kaeman Aerospace Corp.*, 1995 U.S. Dist. LEXIS 13962 at *1 (N.D. Ill. 1995). These concerns are particularly applicable here since the parties and the Court have determined that the matter will be decided as a "case stated" and Centennial will therefore not have any opportunity to cross-examine the experts designated by Invensys at trial.

Centennial has basically been ambushed by the Expert Reports long after the deadline for expert discovery expired. Invensys' failure to comply with the Federal Rules and the Court's Scheduling Order deprived Centennial of any opportunity to depose these experts, retain its own experts to counter and challenge the opinions, and conduct expert discovery in light of the

reports. The Federal Rules and the Court's Scheduling Order protect the litigants and do not "give license to sandbag one's opponent with claims and issues" that should have been included earlier. *Beller*, 221 F.R.D. at 701.

## II.    THE EXPERT REPORTS ARE IRRELEVANT

The Expert Reports are not relevant to the issues of late notice, voluntary payments, allocation, or any other issue in this case. Federal Rule of Evidence 702 requires that an expert witness be "sufficiently qualified to assist the trier of fact, and that his or her expert testimony must be relevant...and rest on a reliable basis. *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002). The Supreme Court has imposed a "gate keeping" function upon judges requiring them to "ensure that three basic requirements are met before admitting expert testimony: (1) the expert is qualified to testify by knowledge, skill, experience, training, or education; (2) the testimony concerns scientific, technical, or other specialized knowledge; and (3) the testimony is such that it will assist the trier of fact in understanding or determining a fact in issue." *Correa v. Cruisers*, 298 F.3d 13, 24 (1st Cir. 2002) (*citing Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)); *see also Diaz*, 300 F.3d at 73.

The *Daubert* test serves a screening function and allows for a preliminary evaluation of expert testimony for reliability and relevance. *Daubert*, 509 U.S. at 592-93. The "ultimate purpose" of the *Daubert* inquiry is to determine if the expert testimony will aid the finder of fact in resolving a disputed issue. *Hochen v. Bobst Group, Inc.*, 290 F.3d 446, 452 (1st Cir. 2002). "To be admissible, expert testimony must be relevant not only in the sense that all evidence must be relevant, *see* Fed.R.Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi-Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998). This ensures that an "expert's testimony both rests on a reliable foundation and is relevant to the

8

task at hand." *Daubert*, 509 U.S. at 597. Moreover, "[e]xpert testimony on a subject that is well within the bounds of a jury's [or Court's] ordinary experience generally has little probative value." *United States v. Casas*, 356 F.3d 104, 120 (1st Cir. 2004) (*quoting United States v. Montas*, 41 F.3d 775, 784 (1st Cir. 1994)).

Neither Waymon's nor Sarapas' "opinions" comment on subjects appropriate for expert testimony. Interpreting the contractual requirements of the Centennial policy is a matter of law for the Court. Whether Trans-Sonics' prolonged delay in providing notice to Centennial of its claim for the *Wheeler Road Lawsuit* amounts to late notice and whether Trans-Sonics' settlements are voluntary payments present questions of law that can be resolved without expert testimony. Since the actual facts of late notice are not contested, the issue of whether coverage is barred is solely one for the Court. Determining whether notice was late or whether Trans-Sonics' payments were voluntary does not require the specialized or technical knowledge of a purported expert. The Expert Reports do not aid the inquiry in any respect. The Court is perfectly equipped to decide this matter on its own, particularly insofar as Waymon simply purports to offer "generic" statements that are not specifically tied to the facts of this claim. The Expert Reports do not assist the trier of fact to understand the evidence or to determine any fact in issue. Therefore, the Expert Reports are irrelevant. Moreover, there is no foundation for Waymon to offer speculative opinions on what "might" have happened if Trans-Sonics had provided timely notice to Centennial when the *Wheeler Road Lawsuit* was filed. The key point is that Centennial was utterly deprived of any opportunity to analyze the case and make its own decisions as to how it should respond. Having been deprived of this opportunity, the Court should not consider speculation by a purported expert hired to re-invent the past.

9

It is not for witnesses, expert or not, to instruct the trier of fact as to applicable principles of law. *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997). Purely legal questions that relate to the law to be applied are exclusively within the domain of the judge. *Id.* "Expert testimony that consists of legal conclusions cannot properly assist the trier of fact." *Id.* at 100 (quoting *Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207, 1212 (D.C. Cir. 1997)). "Accordingly, expert testimony on such purely legal issues is rarely admissible." *Id.* at 99. Because Waymon and Sarapas have offered purely conclusory and irrelevant opinions on legal issues, the Expert Reports should be stricken from the record.

CENTENNIAL INSURANCE COMPANY,
By its attorneys,

/s/ John T. Harding

John T. Harding BBO #221270
**MORRISON MAHONEY LLP**
250 Summer Street
Boston, MA 02210
(617) 439-7558
Dated:  November 1, 2006     (617) 342-4888 (facsimile)

## Certificate of Service

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 1, 2006.

/s/ John T. Harding

John T. Harding, Jr. BBO #221270

1023744v1

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

INVENSYS SYSTEMS, INC.,        )
　　　　　Plaintiff,              )
                              )
　　v.                          )
                              )    Civ. No. 1:05-CV-11589-WGY
CENTENNIAL INSURANCE  COMPANY,  )
　　　　　Defendant.              )
                              )

## AFFIDAVIT OF GENE WAYMON IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Gene Waymon, hereby testify and affirm as follows:

1)    I am of the age of majority and I make this affidavit freely, voluntarily and based on my own firsthand personal knowledge. I have been retained by Plaintiff Invensys Systems, Inc. to provide expert consulting services with respect to claims-handling issues. The testimony that I am providing pursuant to this affidavit is based upon (1) my experience, training and knowledge obtained in the course of my 25-plus year career as a liability claims investigator, claims handler and claims manager, including more than 15 years handling environmental claims in Massachusetts; (2) my review of the discovery responses submitted on Monday, September 18, 2006 by Defendant Centennial Insurance Company; and (3) my review of additional materials that were provided to me, including the following:

-    The Complaint and Answer in this case.
-    Claims correspondence between Invensys's attorneys and Centennial Insurance Company.
-    The Centennial excess policy at issue in this case.
-    A letter dated March 13, 2006 from Invensys's attorney to Centennial's attorney, setting forth the damages and defense costs incurred by Invensys in the underlying lawsuit, the settlement paid by Liberty Mutual, and the net amount being sought by Invensys in this lawsuit against Centennial.

1

- The decision by Judge Stearns in the underlying environmental lawsuit (One Wheeler Road Associates v. The Foxboro Company), and the underlying Complaint.

- Claims correspondence involving the Liberty Mutual primary coverage issued to Invensys, consisting of letters dated December 4, 1990, March 20, 1991, and December 3, 1991.

2)    As noted, I have been involved in the handling of liability claims for more than 25 years, and the handling of environmental liability claims for more than 15 years. This experience includes the handling of both primary and excess/umbrella claims.

3)    In addition, throughout my career I have worked closely with claims representatives from dozens of other insurance companies. The nature of the claims that I have specialized in -- long-tail environmental and toxic tort claims -- means that most claims implicate policies that stretch over many years, sometimes over many decades. It is not unusual for a single claim to trigger primary and umbrella/excess policies issued by ten or more different insurance companies. Through the experience of working together with claims representatives from other companies, as well as my frequent participation in industry seminars, I have become knowledgeable about industry practices with respect to the investigation and handling of environmental claims under primary and excess/umbrella policies.

4)    There is a substantial difference between the handling of primary claims and the handling of excess/umbrella claims.

5)    When a primary insurer is placed on notice of an environmental claim, substantial attention must be paid to issues such as (a) whether to provide the policyholder with a defense of the underlying claim, (b) what sorts of information to request the policyholder to provide directly in support of the insurer's claims investigation, (c) what sorts of information to attempt to secure

2

through requests to sources other than the policyholder, (d) whether to retain outside investigators to conduct additional investigations that go beyond the requests for information being made by in-house claims personnel, (e) detailed analysis of the costs and risks of litigation and the likely outcome in pretrial motion practice as well as trial and on appeal, and (f) constant interaction with defense counsel and, where possible, with the policyholder.

6)    By contrast, the handling of an excess liability claim is much less intensive. In theory, excess insurers are concerned with many of the same issues that are listed in the preceding paragraph as being of concern to primary insurers. In practice, however, excess insurers devote far fewer resources and take many fewer steps than primary insurers in handling environmental claims, for numerous reasons.

- First, where there is underlying primary insurance in place, excess insurers typically do not have a duty to provide a defense. Even in situations where the primary insurer has asserted coverage defenses and is refusing to provide a current defense, it has been the uniform practice across the insurance industry for excess/umbrella insurers to refuse to step in to provide a defense to an environmental claim. Absent the complete exhaustion of underlying insurance (or the rare situation where the primary policy has an absolute pollution exclusion but the excess/umbrella policy clearly does not exclude pollution claims), I cannot recall a single instance in which an excess insurer has voluntarily "dropped down" to defend an environmental claim that the primary insurer has refused to defend.

- Second, there is generally not a strong financial incentive for the excess insurer to conduct a searching claims investigation. Except for the larger and more complicated sites, experience in the environmental field has established that it is relatively unusual for environmental claims to penetrate into the excess layer. Even when the excess layer is reached, the costs typically involve *indemnity* (i.e., cleanup costs), rather than *defense*. Experience in the environmental field has established that the defense costs are often substantially greater than the ultimate cost of remediation. And even where defense costs reach into the excess layer, they typically are subsumed under the definition of "ultimate net loss" and have the effect of eroding policy limits, thus capping the excess insurer's liability. Finally, it is very common for excess insurers to reinsure the policies (and for the reinsurers in turn to retrocede (re-reinsure) their assumed risks). Although the existence of reinsurance in theory should not diminish

the extent to which an excess insurer investigates and handles a claim, in practice it is the unfortunate (but not surprising) case that excess insurers who have reinsured a substantial amount of their risk simply do not devote as much time or expense to claims-handling. In sum, even when a large claim potentially could reach into the excess layer, the excess insurer's ultimate exposure is often a small fraction of the nominal limit of liability stated in the policy -- and the excess insurer's incentive to expend any significant time or resources on claims investigation and handling is quite small.

- Third, excess insurers have learned that they can "piggyback" on the claims-handling effort of primary insurers. All insurers typically are interested in knowing as much as possible about a claim; but it is expensive to gain this knowledge. Since primary insurers have an immediate claim that clearly has reached their layer of coverage, they have a financial incentive to conduct a thorough claim, to collect relevant information, and to appoint capable defense counsel to protect their policyholders' interests (as well as to limit the potential size of the claim). Excess insurers are aware of all this, and they understand that it makes economic sense simply to make paper requests to their policyholders and to rely on the primary insurers to do thorough investigations and to ensure that the policyholders are adequately represented.

7)    The bottom line is that the handling of environmental claims under a primary policy is an active, searching exercise; whereas the handling of environmental claims under an excess/umbrella policy is passive, reactive, and much less active and rigorous.

8)    I have reviewed the early claims correspondence between Liberty Mutual and Invensys. From that review, it is clear that Liberty Mutual ensured that Invensys was being defeated by capable, experienced defense counsel. Indeed, the Cooley, Manion firm -- which Liberty Mutual retained, and which Invensys continued to utilize after Liberty Mutual withdrew from the defense -- had a well-deserved reputation as one of the outstanding litigation defense firms in Boston.

9)    I also have scrutinized Judge Stearns's decision in this case. It is clear from that decision that Invensys was very well represented at trial, and that both the attorneys and the environmental expert retained by Invensys (Leonard Sarapas, from the well-regarded

4

environmental consulting firm, Dames & Moore) earned a substantial "win" by persuading Judge Stearns to relieve Invensys of any liability for past or future soil contamination costs even though (as Judge Stearns found) Invensys had contributed to the soil contamination.

10)    I have scrutinized Centennial's responses to discovery in this case, particularly its responses to Interrogatory Nos. 9, 10, 11, 12 and 13, in which Centennial asserts that it suffered prejudice as a result of (a) late notice from Invensys and (b) voluntary payments supposedly made by Invensys. For purposes of opining whether Centennial in fact has suffered any prejudice, I have been asked to assume that Invensys did not provide notice to Centennial until June 2000 (i.e., after Invensys had paid the final judgment in the One Wheeler Road lawsuit and after it had entered into a settlement agreement with the plaintiffs regarding allocation of post-trial and future remediation costs).[1]

11)    My initial opinion is that in its response to Interrogatory Nos. 9 - 13, Centennial has not identified any "actual" or "substantial" prejudice that it suffered as a result of the alleged late notice or the alleged voluntary payments. Instead, the discovery responses simply identify a series of steps that Centennial *might* have taken, but it does not point to any facts or evidence to suggest any reasonable likelihood that the amount of damages or costs incurred by Invensys would have been any different, or that the amount being sought from Centennial would have been any lower. Centennial is simply speculating that things might have turned out differently, but they don't say why or how or what would have happened differently or more favorably if they

---

[1]    I should add that in my opinion, upon receipt of the June 24, 1999 correspondence from Invensys's counsel informing Centennial of pending coverage litigation against the underlying insurer, any responsible excess insurer would have requested detailed information about the nature of the claim. In my view, if in fact Centennial is correct in its assertion that it was never informed orally of the nature of the coverage dispute and the extent of the underlying claim, then it was irresponsible -- and an example of very passive claims

SEP 23,2006 04:26P  Case 1:05-cv-11589-WGY    Document 23    Filed 09/25/2006    Page 7 of 14    page 7

had received earlier notice.

12)    It is also my opinion that Centennial did not suffer any actual or substantial prejudice as a result of the alleged late notice or the alleged voluntary payments. With respect to the alleged late notice, it is clear from the claims correspondence between Centennial and Invensys's counsel that Centennial received answers to the material requests for information that it made. It is also significant that in all of its claims correspondence, including the July 12, 2001 letter in which it denies coverage, Centennial did not cite late notice as a reason for denying the claim, nor did it ever cite any specific type of prejudice that actually suffered as a result of the alleged late notice. At bottom, it is clear to me that Centennial received complete answers to its claims inquiries; that after conducting their inquiry, Centennial's claims personnel had no problem with the manner in which the underlying lawsuit had been defended and ultimately resolved; and that Centennial in no way felt that its position had been worsened by the timing of the notice. And based on my review of all of the materials, I agree: There is no reason to believe that timely notice to Centennial would have changed a single thing about the outcome of this case.

13)    With particular reference to the specific examples of prejudice identified by Centennial in its discovery responses, I have the following opinions:

a.    Centennial was deprived of an opportunity to make a timely investigation of the facts relating to the *Wheeler Road Lawsuit*

**Opinion:**    Centennial's claims correspondence makes it clear that it received all of the information that it felt was necessary in order to render a claims determination. Centennial fails to identify any information that it needed but was unable to obtain, let alone how it was prejudiced.

administration -- for Centennial to have turned a willful blind eye by not requesting more information about the nature of the claim.

6

SEP 23, 2006 04:26P

b.    Centennial was deprived of its contractual right to associate in the defense of the *Wheeler Road Lawsuit*

**Opinion:**    This is an absurd contention, for several reasons. First, I am not aware of a single instance in all my years handling excess environmental insurance claims in which an excess insurer has associated in a claim. Second, it would make no sense in this case for Centennial to do so, not only because capable defense counsel had already been appointed by the primary insurer but also because Centennial was not an "umbrella" insurer with a duty to defend but, instead, was an "excess" insurer with no duty to defend. Simply put, no reasonable excess insurer would pay to associate in the defense of a claim for which counsel was already in place and for which it had no independent obligation to defend. Finally, Centennial does not state any facts to indicate that anything would have changed or turned out more favorably if it had associated in the defense. In other words, it cites no "actual" or "substantial" prejudice.

c.    Centennial was deprived of an opportunity to explore the issue of whether the *Wheeler Road Lawsuit* could be settled or otherwise resolved without trial

**Opinion:**    Centennial fails to cite any facts to indicate that a settlement was possible on terms that could have been even close to as favorable as the partially successful outcome that Invensys achieved at trial. Moreover, I am not aware of a single instance in all my years handling excess environmental insurance claims in which an excess insurer has stepped in to try to settle an environmental claim in which the underlying primary insurer has denied coverage and is not attempting to settle the claim. This contention simply does not represent the reality of how excess insurers behave.

d.    Centennial was prejudiced because Trans-Sonics was aware during the course of the *Wheeler Road Lawsuit* that the damages being sought by the plaintiff could be in the range of several million dollars and that its primary insurer, Liberty Mutual Insurance Company, had denied coverage for the claim

**Opinion:**    Centennial does not cite any facts or evidence to suggest that things would have turned out differently if it had been informed earlier of this claim. What, exactly, would it have done differently? And how, exactly, would this have changed the outcome. As noted, the case was very well-defended. Moreover, it is noteworthy that Centennial received quite a windfall -- $650,000, to be exact -- by not being involved in the case earlier. Based on my experience in excess claims-handling, if Centennial had been notified (and sued) along with Liberty Mutual, then Centennial would have been

7

called upon to contribute a much larger portion of the costs incurred by Invensys. The reason is that under the applicable allocation rules in Massachusetts, as well as the strict enforcement given to pollution exclusions in Massachusetts, the focus of the settlement between Invensys and its insurers would have been only on those policies providing coverage without any pollution exclusion. This would mean that Liberty Mutual would have been very unlikely to contributed $650,000 under policies with pollution exclusions; instead, both Invensys and Liberty Mutual would have insisted that this amount be "spiked upward" into the ample policy limits of the Centennial policy.

Thus, it is my firm opinion that Centennial actually benefited, to the tune of $650,000, by not being brought into the case until after Liberty Mutual had already settled.

e.    Centennial had no opportunity to participate in the decision to take the *Wheeler Road Lawsuit* to trial, including after Liberty Mutual had withdrawn from the defense of the case

**Opinion:**    This is an absurd contention, for the same reasons given with respect to Centennial's claim that it was denied an opportunity to associate in the defense. (Those reasons are incorporated into this opinion.)

f.    Centennial was prejudiced because a Final Judgment was entered against Trans-Sonics several years before notice of the *Wheeler Road Lawsuit* was provided to Centennial

**Opinion:**    For the same reasons expressed with respect to "d" above, I do not believe that Centennial was prejudiced by the delay. To the contrary, it received a windfall of $650,000 by not being involved until after Liberty Mutual had paid this amount out under policies which (unlike the Centennial policy) had pollution exclusions.

g.    Centennial was deprived of any opportunity to participate in the decision not to appeal the Final Judgment in the *Wheeler Road Lawsuit*

**Opinion:**    Centennial cites no facts or evidence to suggest that the decision not to appeal was a mistake, or that Centennial was hurt by the decision. To the contrary, as a claims-handler I believe that the decision not to appeal was correct, given the difficulty of overturning detailed fact findings and rulings made pursuant to a bench trial. Indeed, an appeal probably would have simply resulted in much higher costs to Centennial, because interest would have continued to accrue and because Invensys easily could have been ordered to pay for some

8

or all of the soil contamination (which Judge Stearns found Invensys to have partially caused).

Moreover, Centennial's claim is disingenuous, given its consistent position that it had no obligation to participate in this claim because everything should have been handled by the primary insurer. Based on my long experience, no excess insurer would have stepped in to oppose the decision not to appeal, particularly where the primary insurer itself was not participating.

h.    Trans-Sonics entered into a binding settlement of the *Wheeler Road Lawsuit* without providing notice of the existence of the suit or the Final Judgment to Centennial

**Opinion:**    I address this further below, in my discussion of the voluntary payments defense (which I incorporate by reference). Briefly, Centennial fails to cite any *prejudice*, that is, how anything would have been different if it had received earlier notice. In addition, this assertion overlooks the fact that Invensys was already subject to a ***binding final judgment, and its property had been levied***, at the time the settlement was entered into. There was nothing voluntary about Invensys's actions, nor was there any way in which Centennial was prejudiced by the settlement agreement, which did no more than effectuate the binding declaration of rights entered by Judge Stearns.

i.    Trans-Sonics incurred substantial costs pursuant to the terms of the settlement that it entered into with the plaintiffs in the *Wheeler Road Lawsuit* without providing notice of the existence of the suit, the Final Judgment or the settlement to Centennial

**Opinion:**    My opinion is the same with respect to item "h" above (which I incorporate by reference).

j.    Trans-Sonics did not notify Centennial of the fact that its primary insurer, Liberty Mutual Insurance Company, had denied coverage for the claim

**Opinion:**    Even if Centennial had known that Liberty Mutual was not defending, there is no evidence that anything would have happened differently. I say this for the same reasons given with respect to Centennial's claim that it was denied an opportunity to associate in the defense. (Those reasons are incorporated into this opinion.) Simply put, I am not aware of any excess insurer that would have stepped into this environmental claim and provided a defense that the primary insurer was refusing to provide. That's just not a realistic statement of how excess carriers, in 1991 or now, respond to such situations. Moreover, it is noteworthy that Centennial refuses to say whether it has ever actually done so.

9

k.   Trans-Sonics did not notify Centennial that it was involved in litigation with Liberty Mutual relating to coverage for the *Wheeler Road Lawsuit* until the coverage litigation was on the eve of trial, when it was too late for Centennial to seek to intervene in the coverage action in order to protect its rights against Trans-Sonics and Liberty Mutual

Opinion:   Again, Centennial does not identify how it was prejudiced by the supposed inability to intervene. In fact, for reasons previously discussed, by not participating in the case against Liberty Mutual, Centennial actually received a windfall of $650,000 because of the contribution that Liberty Mutual made under policies containing a pollution exclusion.
It is also my opinion that this assertion of prejudice indicates that Centennial turned a willful blind eye to the insurance claim. Whereas it is now claiming all manner of prejudice resulting from late notice, it is clear from my review of the claims correspondence that Centennial behaved very passively even after being alerted on the "eve of trial" (July 1999) that a coverage action was about to be tried against the underlying insurer. In fact, the settlement with Liberty Mutual did not occur until March 2000, which provided Centennial with ample opportunity to get involved. The fact that Centennial behaved so passively during these several months indicates not only that it was not prejudiced by its supposed inability to intervene, but also that it is unlikely that it would have taken any of the other steps that it now claims that it was deprived from taking.

l.   Liberty Mutual issued primary and umbrella insurance policies to Trans-Sonics and/or Invensys that had limits that were more than sufficient to cover all of Trans-Sonics' liabilities (past and future) relating to the *Wheeler Road Lawsuit*. Centennial was prejudiced because Trans-Sonics entered into a settlement agreement with Liberty Mutual that compromised Trans-Sonics' claim against Liberty Mutual for substantially less than the amount of coverage that Liberty Mutual had provided to Trans-Sonics

Opinion:   As I have expressed at length already, the settlement with Liberty Mutual did not prejudice Centennial, but instead provided a substantial windfall of $650,000. Given the strict enforcement that Massachusetts courts give to pollution exclusions, it is my opinion as somebody who has participated in the litigation and settlement of many Massachusetts environmental insurance claims that Centennial (which has no pollution exclusion in its policy) is extremely fortunate that Liberty Mutual agreed to pay any money at all under the policies having pollution exclusions.
In any event, Centennial is simply speculating that the settlement with Liberty Mutual would have been more favorable if Centennial had been on notice

10

earlier. But Centennial provides absolutely no facts or evidence to support this assertion.

In sum, it is my firm opinion based on years of settling multi-insurer disputes with policyholders, that if Centennial's $5 million excess policy -- with no pollution exclusion -- had been involved in the Liberty Mutual case, then Liberty Mutual would have paid less, not more.

14)    With respect to the alleged "voluntary payment," I disagree with Centennial's assertion that it has been prejudiced. First, it is absurd, from a claims perspective, to construe any of Invensys's actions as "voluntary." In this case, the insured was vigorously defended at trial by capable attorneys and a capable expert. The case went to trial, written findings were made, and a final judgment was entered. A levy was made on Invensys's property. I do not know of a single reputable claims person who, under these circumstances, would construe the policyholder's payment of the judgment amount, with interest, as being even remotely "voluntary" as that term is used in the insurance industry. Similarly, it is clear from a simple comparison of Judge Stearns' opinion and final judgment to the February 2000 settlement agreement, that Invensys did not "voluntarily" agree to do anything in that settlement agreement. Instead, Invensys was subject to a court order requiring it to take responsibility for specifically identified remediation costs. Again, I do not know a single reputable claims manager who would regard the February 2000 settlement agreement as remotely "voluntary."

15)    It is also my opinion that it would be unreasonable to take the position that Invensys acted voluntarily by paying a judgment rather than exhausting all possible appeals. Appeals are expensive and risky, especially where (as here) Invensys's property had been levied, interest costs were accruing. Invensys would be responsible for plaintiffs' attorney's fees on appeal, and Invensys faced a risk of being ordered by the appellate court to assume some or all

11

responsibility for soil cleanup. Moreover, the Centennial policy does not contain any requirement that the indemnity obligation is conditioned on the exhaustion of all appeals. Rather, the policy promises to pay ultimate net loss that "the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law." See Centennial Policy, Insuring Agreement I. Judge Stearns' order makes it clear that the judgment had "been imposed upon the insured by law," and no reputable claims handler would construe the payment of this judgment as "voluntary."

## EXPERIENCE AND QUALIFICATIONS

16)    I am currently employed as Regional Vice President of Enviro-Tox Loss Services, Inc., an company that assists corporate clients in managing claims and litigation involving environmental, toxic, asbestos and other complex long-tail liabilities. I have been involved in the handling of such claims since 1981, when I joined Aetna Life & Casualty as a claims representative. My responsibilities at Aetna increased steadily during the thirteen years that I spent at the company, including substantial responsibility for adjusting, handling, managing and overseeing environmental and other long-tail claims, under both primary and excess policies. At the time Aetna sold its casualty business to Travelers in 1994, I was serving as a Casualty Claim Manager. In 1994, I began working for Commercial Union as an Environmental Claim Consultant, again with responsibility for substantial responsibility for adjusting, handling, managing and overseeing environmental and other long-tail claims, under both primary and excess policies. I continued at Commercial Union and its successor companies through several mergers and name changes, until joining Enviro-Tox Loss Services in 2006. My experience over the last 25 years has included the management of scores of complex coverage litigation cases,

12

excess policies. I continued at Commercial Union and its successor companies through several mergers and name changes, until joining Enviro-Tox Loss Services in 2006. My experience over the last 25 years has included the management of scores of complex coverage litigation cases, requiring knowledge and application of strategies and concepts involving drop-down procedures; coverage triggers; coverage allocation among different insurers, policies and time periods; policy terms, conditions and exclusions; and the practical application of the law governing these policy provisions in determining actions to take in the handling of primary and excess insurance claims. In at least 20 instances, I have served as the "lead carrier" in complex, multi-insurer long-tail claims, requiring me to manage the cases on a day-to-day basis and work with other participating insurers in the investigation and resolution of coverage claims.

17)     I have not testified as an expert witness in trial or at deposition in the last four years.

18)     I have not authored any publications in the last ten years.

19)     I am being compensated for the time spent on this expert engagement at the rate of $120 per hour.

I, Gene Waymon, testify under the pains and penalties of perjury that the foregoing is true and correct to the best of my knowledge, this 22 day of September, 2006.

_Gene Waymon_ (signature)
Gene Waymon

17

**EXHIBIT B**

Case 1:05-cv-11589-WGY   Document 26-3   Filed 11/01/2006   Page 2 of 8
09/19/2006 20:59 FAX 5086472337                                                   ☑002/004
Case 1:05-cv-11589-WGY   Document 23   Filed 09/25/2006   Page 2 of 8

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INVENSYS SYSTEMS, INC.,<br>    Plaintiff, | )<br>)<br>) |
|    v. | )<br>)   Civ. No. 1:05-CV-11589-WGY<br>) |
| CENTENNIAL INSURANCE COMPANY,<br>    Defendant. | )<br>)<br>) |

### AFFIDAVIT OF LEONARD SARAPAS IN SUPPORT OF
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Leonard Sarapas, hereby testify and affirm as follows:

1.      I am of the age of majority and I make this affidavit freely, voluntarily and based on my own firsthand personal knowledge. I am licensed as a Professional Engineer and a Professional Hydrologist. Since June 2003, I have been the Corporate Director, Environment, Health & Safety for Boston Scientific Corporation. In May 1999, I became the Director of Environmental Affairs for Cabot Corporation. Prior to that time, I operated an environmental consulting firm, Balsam Environmental Consultants, Inc., which in 1994 was acquired by and became part of the international consulting firm, Dames & Moore. I remained at Dames & Moore until assuming my current position at Cabot Corporation.

2.      In the course of my 30-year career, I have provided investigative and consulting services in connection with hundreds of sites having soil and/or groundwater contamination, including dozens of sites with groundwater contaminated by solvents such as trichloroethylene (TCE) and tetrachloroethylene (PCE). These solvents-contaminated sites have included sites having significant plumes of contaminated groundwater resulting from relatively small releases of TCE or PCE, e.g., releases on the order of five (5) to fifty-five (55) gallons of solvents.

3.      In 1993, I was retained to provide expert consulting services for Defendant Invensys Systems, Inc. (then known as The Foxboro Company) in connection with its defense of a lawsuit alleging that releases of TCE and PCE had resulted in soil and groundwater contamination at and in the vicinity of Invnesys's former Wheeler Road facility in Burlington, Massachusetts, including substantial off-site groundwater contamination. See One Wheeler Road Associates, et al. v. The Foxboro Company, No. 90-12873k (D. Mass. 1990) (the "Wheeler Road Lawsuit"). Over the next six years, I worked closely with Invensys and its attorneys, providing consulting services and advice in connection with the investigation and remediation of the Wheeler Road site. Accordingly, I have extensive personal knowledge of the conditions on the site.

1

EXHIBIT 33

4.      I participated actively in Invensys's defense during the federal trial in the Wheeler Road Lawsuit.  Following that trial, Judge Stearns found that "[t]he installation during Foxboro's occupancy of a leaching basin connected to the internal sinks and floor drains of the plant provided the agency for disseminating TCE into the groundwater." See One Wheeler Road Associates v. The Foxboro Company, 1995 U.S. Dist. LEXIS 20219, *33 (D. Mass. December 13, 1995), Conclusions of Fact and Law No. 2.  However, Judge Stearns's opinion did not contain any finding concerning *how* TCE was released into either the "internal sinks" or "floor drains" that connected to the plant's drainage system.  This absence of any finding concerning *how* solvents were released into the drainage system was consistent with the evidence at trial, since during the trial the underlying plaintiffs did not produce evidence that TCE had ever been intentionally poured by any Foxboro employee into the plant's interior drains.  Similarly, at trial the underlying plaintiffs did not produce evidence that any solvents had ever been poured onto the ground.

5.      There was also no evidence introduced at trial that Foxboro intentionally contaminated the soil or groundwater at the site.  This was reflected in Jude Stearns' factual finding that "[a]lthough employees were verbally admonished against using the sinks to dispose of chemical wastes, Foxboro had little appreciation of the environmental risk." See Opinion, 1995 U.S. Dist. LEXIS 20219, *8. See also id., *41-42 ("Foxboro's role is mitigated in some degree by the fact that it polluted the site during an era in which the latent environmental threat of toxic substances was not as well understood as it is today, and when such substances were subject to far less regulation. ... Weighing against Foxboro, on the other hand, is the decision to install a wastewater disposal system, the design of which, even by the more casual standards of the time, should have been recognized as irresponsible.").

6.      The soil conditions at and in the vicinity of the plant's leaching basin strongly suggest that the TCE contamination did not result from continuous or repeated discharges of TCE solvents into the plant's drainage system.   I base this conclusion on two important factors:

a.      While TCE-contaminated *soil* was found in the area of the leaching basin, the amount of such TCE soil contamination was relatively small and concentrated, which is inconsistent with repeated or continuous discharges over a long period of time.  Foxboro conducted operations at the Wheeler Road facility for more than 20 years.  If Foxboro had regularly disposed of solvents into the plant's drains, then the amount of *soil* contamination in the area of the leaching basin and site piping would have been far greater and more widespread.

b.      A relatively small release of TCE (on the order of five (5) to fifty-five (55) gallons) can result in a very substantial plume of groundwater contamination like that seen at the Wheeler Road site.

7.      In the course of the Wheeler Road Lawsuit, the underlying plaintiffs attempted to

2

Case 1:05-cv-11589-WGY     Document 26-3     Filed 11/01/2006     Page 4 of 8
09/19/2006 21:00 FAX  5086472337                                                          ☑004/004
Case 1:05-cv-11589-WGY     Document 23     Filed 09/25/2006     Page 4 of 8

hold Foxboro liable for contamination resulting from two different sudden and accidental breaks in the underground piping. Judge Stearns found that soil under these breaks was contaminated by PCE, and that groundwater under these breaks was contaminated by TCE. Judge Stearns held Foxboro liable for the TCE-contaminated groundwater beneath the pipe breaks.

I, Leonard C. Sarapas, testify under the pains and penalties of perjury that the foregoing is true and correct to the best of my knowledge, this _19_ day of September, 2006.

Leonard C. Sarapas

3

Leonard C. Sarapas, P.E., P.H.
19 Croy Path
Hampstead, N.H.  03841
Tel: (603) 329-6113


Robert J. Gilbert, Esq.
Gilbert & Renton LLC
344 North Main Street
Andover, MA 01810

           Re:    *Invensys Systems, Inc. v. Centennial Insurance Company*,
                  C. A. No. 05-11589-WGY (D. Mass.)

Dear Mr. Gilbert:

       This document shall set forth my opinions regarding the above-referenced case.  My opinions are based upon my firsthand personal knowledge of (1) the environmental conditions at the facility formerly owned and operated by Invensys Systems, Inc. ("Invensys") and located at Wheeler Road, Burlington, Massachusetts (the "Site"), and (2) the proceedings in the underlying case known as One Wheeler Road Associates, et al. v. The Foxboro Company, C. A. No. 90-12873k (D. Mass. 1990) (the "Underlying Lawsuit").

      **I.**      **Statement of Qualifications; Personal Experience, Background and Professional Designations.**

       I am licensed as a Professional Engineer in thirteen (13) states, including all of the states in the Northeast United States.  I am fully qualified as a Professional Hydrologist.  I have over 25 years of experience and expertise as a manager in applied environmental fields, including scientific and technical matters, regulatory compliance, and project oversight.  Over the course of my 30-year career, I have provided investigative and consulting services in connection with hundreds of sites having soil and/or groundwater contamination, including dozens of sites contaminated by solvents such as trichloroethylene (TCE) and tetrachloroethylene (PCE).

       Since June 2003, I have been the Corporate Director, Environment, Health & Safety, Boston Scientific Corporation.  In May 1999, I became the Director of Environmental Affairs for Cabot Corporation.  Prior to that time, I operated an environmental consulting firm, Balsam Environmental Consultants, Inc., which in 1994 was acquired by and became part of the international consulting firm Dames & Moore.  I remained at Dames & Moore until moving over to Cabot in 1999.

       For a more complete description of my professional experiences I have attached hereto a copy of my *curriculum vitae*.

Robert J. Gilbert, Esq.
September 22, 2006
Page 2

**II. Extensive Knowledge About the Site and the Underlying Lawsuit.**

I have extensive personal knowledge of the environmental conditions at the Site. In 1993, I was retained to provide expert consulting services for Defendant Invensys Systems, Inc. (then known as The Foxboro Company) in connection with its defense in the Underlying Lawsuit. The plaintiff in the Underlying Lawsuit, One Wheeler Road Associates ("One Wheeler Road"), had acquiring the Site in 1982. (In 1978, Invensys had sold the Site to a third party.) One Wheeler Road commenced the Underlying Lawsuit to compel Invensys to take complete responsibility for the assessment and cleanup of TCE- and PCE-contaminated soils and groundwater at and in the vicinity of the Site, including substantial off-site migration of contaminated groundwater.

For the next six (6) years, I worked closely with Invensys and its attorneys, providing consulting services and advice in connection with the investigation and remediation of the Site. Among other things, I reviewed numerous environmental studies and reports prepared by the environmental consultants retained by One Wheeler Road, Nangle Consulting Associates, Inc. ("Nangle"), including, without limitation, Nangle's extensive project overview and project summary documents dated March 23 and 26, 1993, as well as the numerous appendices, data compilations, studies, reports, and submissions attached to and referenced in those documents. I also conducted a complete file review at the Massachusetts Department of Environmental Protection (the "MADEP").

I also have extensive personal knowledge of the proceedings in the Underlying Lawsuit. I participated actively in Invensys's defense throughout the case, including, without limitation, in preparing for trial, testifying at trial, and assisting during post-trial proceedings.

**III. Opinions.**

A) <u>No Evidence of Intent to Discharge into Interior Drains or Onto Ground.</u> Following the trial in the Underlying Lawsuit, Judge Stearns found that "[t]he installation during Foxboro's occupancy of [the Site] a leaching basin connected to the internal sinks and floor drains of the plant provided the agency for disseminating TCE into the groundwater." <u>One Wheeler Road Associates</u> v. <u>The Foxboro Company</u>, 1995 U.S. Dist. LEXIS 20219, *33 (D. Mass., Dec. 13, 1995). However, Judge Stearns did not make any findings concerning how TCE was released into either the "internal sinks" or "floor drains" that connected to the plant's drainage system. In my opinion, the absence of any findings concerning how solvents were released into the drainage system was consistent with the evidence at trial. Notably, One Wheeler Road did not produce any evidence that TCE had ever been intentionally poured by any Invensys (Foxboro) employee into the plant's interior drains, or onto the ground.

Robert J. Gilbert, Esq.
September 22, 2006
Page 3

       B)     __No Evidence of Intent to Contaminate at All__.  In my opinion, there was no evidence introduced at trial that Invensys (Foxboro) intentionally contaminated any soil or groundwater at the Site.  This was reflected in Judge Stearns' finding that "[a]lthough employees were verbally admonished against using the sinks to dispose of chemical wastes, Foxboro had little appreciation of the environmental risk." __Opinion__, 1995 U.S. Dist. LEXIS 20219, *8, __See__ __also__ __id.__ at **41-42 ("Foxboro's role is mitigated in some degree by the fact that it polluted the site during an era in which the latent environmental threat of toxic substances was not as well understood as it is today, and when such substances were subject to far less regulation . . . . Weighing against Foxboro, on the other hand, is the decision to install a wastewater disposal system, the design of which, even by the more casual standards of the time, should have been recognized as irresponsible.").

       C)     __No Continuous or Repeated Discharge of Solvents Into Drainage System__. In my opinion, the soil conditions at and in the vicinity of the plant's leaching basin strongly suggest that the TCE contamination did not result from continuous or repeated discharges of TCE solvents into the plant's drainage system.  This opinion is supported by two important factors.  First, a relatively small release of TCE (on the order of five (5) to fifty-five (55) gallons) can result in a very substantial plume of groundwater contamination like that at the Site.  Second, while TCE-contaminated soil was found in the area of the leaching basin, the amount of such TCE soil contamination was relatively small and concentrated, which is inconsistent with repeated or continuous discharges over a long period of time.  Because Foxboro conducted operations at the Facility for more than 20 years, and regular disposal of solvents into the plant's drains would have resulted in far greater, and more widespread, soil contamination in the area of the leaching basin and site piping, it is my opinion that such releases did not occur.

       D)     __Sufficient Evidence Existed to Sustain Judge Stearns Holding Invensys__ __Liable for TCE-Contaminated Groundwater Beneath Pipe Breaks__.  Foxboro Was Not Liable for PCE Soil Contamination.  In the Underlying Lawsuit, One Wheeler Road sought to impose liability upon Invensys (Foxboro) for contamination resulting from two different sudden and accidental breaks in the underground piping.  Judge Stearns found that soil under these breaks was contaminated by PCE, and that groundwater was contaminated by TCE.  Judge Stearns thus held Invensys (Foxboro) liable for the TCE-contaminated groundwater, but not for the PCE-contaminated soils.

    **IV.**    **Exhibits to Be Relied Upon by Expert Witness.**

       I expect to rely upon the trial reports and documents produced and used in the Underlying Litigations.  This includes any reports prepared by me or my firm, Dames & Moore, by Nangle or the other consultants retained by One Wheeler Road, and/or from the files of the MADEP.  All of these exhibits have been produced or made available to counsel for both parties in this case.

Robert J. Gilbert, Esq.
September 22, 2006
Page 4

**V.    Compensation.**

I am not being compensated for my expert opinions and testimony in connection with summary judgment proceedings. If this case should proceed beyond summary judgment, I would need to negotiate an appropriate rate of compensation for any expert services or testimony that I might provide in connection with the trial.

**VI.    Other Expert Trial or Deposition Testimony in the Past Four Years; Publications in the Past Ten Years.**

I have not testified as an expert at deposition or trial in the past four years. I have not published any works in the past ten years.

\*  \*  \*

Very truly yours,

Leonard C. Sarapas