## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| INVENSYS SYSTEMS, INC.,<br>Plaintiff,<br><br>v.<br><br>CENTENNIAL INSURANCE COMPANY,<br>Defendant. | CIV. NO: 1:05-CV-11589-WGY |

### DEFENDANT CENTENNIAL INSURANCE COMPANY'S
### MEMORANDUM OF LAW IN OPPOSITION TO
### PLAINTIFF INVENSYS SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1, Defendant Centennial Insurance Company ("Centennial") submits this Memorandum of Law in opposition to the Motion for Summary Judgment filed by Plaintiff Invensys Systems, Inc. as the successor-in-interest to Trans-Sonics, Inc. ("Trans-Sonics")[1] on Counts II and IV of the Complaint. Trans-Sonics seeks a ruling in its favor on Centennial's alleged breach of its duty to indemnify past cleanup costs, and declaratory relief requiring Centennial to indemnify remediation costs that may be incurred in the future. Trans-Sonics seeks an award of damages for costs incurred through March 31, 2006 in the amount of $743,489.24.[2]

Trans-Sonics is not entitled to judgment as a matter of law and judgment should instead be entered for Centennial. The uncontested facts establish that Trans-Sonics breached the terms of the excess liability policy issued by Centennial, which defeats any claim for coverage. No clearer case of

---

[1] Centennial will collectively refer to Plaintiff Invensys Sytems, Inc. and its predecessors as "Trans-Sonics" since Trans-Sonics is identified as the Named Insured on the Centennial policy.

[2] Centennial's position is that Trans-Sonics is not entitled to coverage for any aspect of this claim. However, in the event that the Court were to rule otherwise, Centennial respectfully suggests that the Court separately consider the issue of damages. In particular, there are issues relating to specific costs claimed by Trans-Sonics; how the amounts received by Trans-Sonics from Liberty Mutual are to be applied; and the extent to which an award of interest is appropriate. Centennial suggests that such issues be determined (if necessary) after supplemental briefing.

a breach of the fundamental requirement that the insurer be provided with timely notice of a claim could be imagined. Trans-Sonics first gave notice to Centennial of its claim more than *nine years* after the underlying lawsuit was filed; *four years* after a Final Judgment was entered and satisfied; and only after it had signed a settlement agreement committing it to the payment of ongoing costs over a period that may extend for decades. By the time that notice was given to Centennial, Trans-Sonics had released its primary insurer, Liberty Mutual Insurance Company ("Liberty Mutual"), from its liability relating to the claim for only a small fraction of the available limits. Trans-Sonics' attempt to foist responsibility for this claim onto Centennial should be rejected. If the Court grants judgment in favor of Trans-Sonics under the egregious facts of late notice presented here, it will have effectively written the notice and voluntary payments requirements out of the policy.[3]

### STATEMENT OF UNDISPUTED FACTS

The undisputed facts relating to this claim are set forth in Centennial's Motion for Summary Judgment and Statement of Undisputed Facts filed on September 22, 2006 [PACER Nos. 19-21], which Centennial incorporates by reference. Centennial notes below certain facts that are particularly relevant to Centennial's opposition to Trans-Sonics' Motion for Summary Judgment.

A.   **The Centennial Excess Policy[4]**

Centennial issued a single excess liability policy to Trans-Sonics for the period from January 1, 1972 to January 1, 1975. [St., ¶¶38-45; Ex. 5].[5] The Centennial excess policy provides limits of liability in the amount of $5 million per occurrence excess of the underlying Liberty Mutual policy that

---

[3] Pursuant to the procedure suggested by the Court and agreed to by the parties, this matter will be submitted and decided as a "case stated." To the extent that the Court determines that there are any factual disputes or matters which may require the development of additional facts, Centennial respectfully suggests that the Court schedule a limited evidentiary hearing.
[4] A more legible copy of the Centennial policy is attached as Exhibit A hereto.
[5] All references [St., ¶___] are to Centennial's Statement of Undisputed Facts dated September 22, 2006.

1023757v1

was in effect for this period, which had annual limits of $100,000. [*Id.*][6] The Centennial policy provides coverage for property damage resulting from an "occurrence." The term "occurrence" is defined as follows:

> The term "Occurrence" wherever used herein shall mean an accident, including continuous or repeated exposure to conditions, which results, in personal injury, property damage or advertising liability neither expected nor intended from the standpoint of the insured.

[St., ¶40; Ex. 5]. The definition of "property damage" specifies that the property damage must "occur during the policy period." [*Id.*] The insuring agreement of the Centennial policy further states that it only provides coverage for "ultimate net loss," which is defined in the policy as follows:

> **(10) Ultimate Net Loss** – The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after taking proper deduction for all recoveries and salvages collectible, ***but excludes*** all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred. ***This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.***

[St., ¶42, Ex. 5 (emphasis added)].

The Centennial policy requires "*immediate*" notice of a claim or suit and prohibits Trans-Sonics from entering into settlement agreements or making other voluntary payments without Centennial's knowledge or consent. The policy states:

> **Insured's Duties in the Event of Occurrence, Claim or Suit.**
>
> (a)    In the event of an occurrence, which appears reasonably likely to involve such insurance as is afforded by this policy, written notice containing particulars sufficient to identify the insured and also reasonably attainable information with respect to the time, place and

---

[6] As originally written, the underlying limits were $50,000 and the limits of the Centennial policy were $2 million. These limits (including a revised limit of the Liberty Mutual policy) were reflected in an endorsement. [St., ¶39; Ex. 5].

circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

> **(b)     If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.**

> (c)     The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of personal injury or property damage or advertising offense with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. *The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense. . . .*

[St., ¶45; Ex. 5 (emphases added)].

## B.     The Liberty Mutual Policies

According to Trans-Sonics, the Liberty Mutual primary policies that serve as the underlying insurance to the Centennial policy have never been located. [St., ¶¶46-55; Exs. 7-9]. Trans-Sonics has represented that Liberty Mutual never disputed the fact that these policies were issued and contained standard CGL language imposing a duty to defend and to pay defense costs in addition to limits. [*Id.*] Liberty Mutual conceded that it could offer no proof that any of the underlying policies contained a pollution exclusion or that the limits of liability were other than the $100,000 per occurrence referred to in the Centennial policy. [*Id.*]

In addition to these policies, it is not disputed that Liberty Mutual issued a CGL policy to Foxboro with limits of $500,000 that was in effect when Foxboro purchased the assets of Trans-Sonics in 1974. [*Id.*] Foxboro continued to operate the Trans-Sonics Site through at least 1978 and had policies in effect with Liberty Mutual with annual limits of $500,000 per occurrence. [*Id.*] Similar policies were purchased by Foxboro from Liberty Mutual for each of the years through 1991. [*Id.*; Exhibit B]. Accordingly, the total primary limits available to Trans-Sonics from Liberty Mutual at the

4

time the *Wheeler Road Lawsuit* was filed were *at least $4.8 million* in addition to Liberty Mutual's obligation to pay defense costs. [*Id.*][7] Foxboro purchased separate pollution liability policies on a "claims made" basis from Liberty Mutual commencing in 1982 and continuing through 1991. [*Id.*] The Liberty Mutual pollution liability policies had an annual limit of liability for property damage of $1 million. [*Id.*].[8]

Thus, assuming that all of the Liberty Mutual "occurrence" policies were triggered by the *Wheeler Road Lawsuit* under the rule set forth in *Trustees of Tufts Univ. v. Commercial Union Insurance Co.*, 415 Mass. 844, 616 N.E. 2d 68 (1993) *and* that one year of the "claims made" pollution liability policies applied, Trans-Sonics had at least $5.8 million in coverage available from Liberty Mutual in addition to Liberty Mutual's obligation to pay defense costs outside of limits. Nevertheless, Trans-Sonics elected to release Liberty Mutual from all of its contractual obligations for a total payment of only $1,250,000 [St., ¶25]. Trans-Sonics settled with Liberty Mutual before any notice of the claim was given to Centennial. [St., ¶¶25-28]. Although it is undisputed that the environmental contamination took place over a long period of time, and that Trans-Sonics took the position in prior coverage litigation that all of the Liberty Mutual policies were triggered, Trans-Sonics now contends that all of the costs associated with this long-term contamination should be shoe-horned into the single period of the Centennial excess policy.

---

[7] Foxboro purchased umbrella excess policies from Liberty Mutual during this period which had annual limits of $10 million per occurrence. [*Id.*]

[8] A Schedule of the Liberty Mutual policies as produced by Trans-Sonics in this case is attached as Exhibit B.

1023757v1

**ARGUMENT**

### I.    TRANS-SONICS IS IMPROPERLY ATTEMPTING TO SHIFT THE BURDENS OF PROOF AND PERSUASION TO CENTENNIAL

Trans-Sonics argues that Centennial bears the burden of persuasion on the late notice and voluntary payments defenses, and that Trans-Sonics can prevail by merely "pointing out Centennial's lack of 'sufficient evidence' to meet its burden of proof." As the party moving for judgment, it is actually Trans-Sonics that bears the burden of proving that there is no genuine disputed issue of material fact and that it is entitled to judgment as a matter of law. "To succeed [on a motion for summary judgment], the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Only after the moving party has properly supported its motion for summary judgment does the burden shift to the nonmoving party. *Barbour v. Dynamics Research Corp.*, 63 F.3d 32, 37 (1st Cir. 1995), *cert. denied*, 516 U.S. 1113 (1996); *see* Fed.R.Civ.P. 56(e); *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Rogers*, 902 F.2d at 143, *quoting Anderson*, 477 U.S. at 249-50 (citations omitted). As the nonmoving party, Centennial also benefits from any reasonable inferences in its favor that may be drawn from the evidence. *Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804 (1st Cir. 1987).

### II.    TRANS-SONICS IS NOT ENTITLED TO JUDGMENT ON THE ISSUE OF LATE NOTICE

#### A.    Trans-Sonics' Notice Was Late and Unexcused

The Centennial policy requires that Trans-Sonics give the insurer notice of an occurrence "as soon as practicable" and that the policyholder give "immediate" written notice in the event of a claim or suit. Trans-Sonics failed to timely notify Centennial of the *Wheeler Road Lawsuit*. By Trans-

6

Sonics' own admission, notice of the claim was given several years after the claim arose and the *Wheeler Road Lawsuit* was filed and litigated to judgment. Trans-Sonics' failure to notify Centennial of its claim until years after a Final Judgment was entered and it had executed a binding settlement agreement clearly violated the provisions of the policy. Any suggestion by Trans-Sonics that it was "unaware" of the Centennial policy is untenable. The existence of the Centennial policy was readily known at the time the *Wheeler Road Lawsuit* was filed as it is referenced in a Schedule of Insurance included in the closing documents for the acquisition of the assets of Trans-Sonics by Foxboro in December 1974 [Ex. 5 to Plaintiff's St.]. The fact that Trans-Sonics apparently did not bother to look for this easily locatable Schedule of Insurance that was sitting in its files does not provide an "excuse" for what was clearly untimely notice.

## B.    Centennial Has Established Prejudice From Trans-Sonics' Late Notice

Trans-Sonics argues that Centennial must prove "actual and substantial" prejudice caused by the delay in receiving notice. Trans-Sonics nowhere articulates precisely what type of prejudice an insurer in Centennial's shoes much establish or how it could ever satisfy its burden. In effect, Trans-Sonics asks this Court to adopt a rule under which an excess insurer could never establish prejudice. Trans-Sonics ignores the fact that the Massachusetts Supreme Judicial Court (the "SJC") has expressly held that where a judgment has already been entered against the insured, thus thwarting any ability on the part of the insurer to investigate, respond or have any input at all with respect to the claim, prejudice will be established as a matter of law. *Lusalon, Inc. v. Hartford Accident and Indem. Co.*, 400 Mass. 767, 511 N.E.2d 595 (1987).

Under *Lusalon*, no further showing of specific prejudice is required; the insurer is not required to prove the negative of what might have happened if the policyholder had complied with the terms of the policy. This holding squarely contradicts Trans-Sonics' claim that Centennial must tie its so-called "general assertions" to specific outcomes that would have changed if earlier notice had been provided,

7

and clearly supports Centennial's position that being called upon years after the fact to pay a judgment in a lawsuit for which it was never provided notice satisfies its burden of proof.[9]

The rule set forth in *Lusalon* is in keeping with the view decisions of courts across the country that have held that a final judgment or settlement constitutes prejudice to the insurer as a matter of law. *See, e.g., Earle v. State Farm Fire & Cas. Co.*, 935 F. Supp. 1076, 1082 (N.D. Cal. 1996) (post-trial notice); *Las Vegas Star Taxi, Inc. v. St. Paul Fire & Marine Ins. Co.*, 102 Nev. 11, 14, 714 P.2d 562, 564 (Nev. 1986) (post-settlement notice); *Herman Bros., Inc. v. Great West Cas. Co.*, 255 Neb. 88, 99, 582 N.W.2d 328, 335 (Neb. 1998) (post-settlement notice); *Prince George's County v. Local Gov't Ins. Trust*, 388 Md. 162, 193, 879 A.2d 81, 100 (Md. 2005) (post-judgment notice); *Hooper v. Zurich Am. Ins. Co.*, 552 N.W.2d 31, 37 (Minn. Ct. App. 1996) (post-judgment notice); *Metal Bank of Amer., Inc. v. Ins. Co. of North Am.*, 360 Pa. Super. 350, 361, 520 A.2d 493, 499 (Pa. Super. 1987) (post-judgment notice). Notifying an insurer of a claim after it has already been litigated to judgment or negotiated to settlement deprives the insurer of any opportunity to play a meaningful role in the litigation process and presents the insurer with "a virtual *fait accompli*." *Am. Ins. Co. v. Fairchild Indus., Inc.*, 56 F.3d 435, 440 (2nd Cir. 1995).

While Trans-Sonics repeatedly invokes the general principles set forth in *Darcy v. The Hartford Ins. Co.*, 407 Mass. 481, 485, 554 N.E. 2d 28 (1990), Trans-Sonics never explains how these principles should be meaningfully applied to the facts here. Under Massachusetts law, an insurer is entitled to disclaim coverage due to an insured's failure to comply with the requirements of timely notice or similar conditions to coverage if its ability to investigate, defend or otherwise respond to the claim is prejudiced. *See* Mass. Gen. L. c. 175 §112; *Liberty Mutual Ins. Co. v. The Black & Decker Corp.*, No. 96-10804-DPW, 2003 U.S. Dist. LEXIS 25397, *85 (D. Mass. Dec. 5, 2003); *Darcy*, 407

---

[9] The *Lusalon* case is discussed in further detail in Centennial's 9/22/06 Memorandum of Law at pp. 11-12.

1023757v1

Mass. at 485, 554 N.E.2d at 31; *Johnson Controls, Inc. v. Bowes*, 381 Mass. 278, 282, 409 N.E.2d 185, 187-88 (1980). "The length of delay, of course, in notice will always be a relevant factor to be considered in determining whether actual prejudice has been shown by an insurer, and the longer the delay, the more likely that prejudice exists." *Darcy*, 407 Mass. at 486, 554 N.E.2d at 31. The length of delay in giving notice to the insurer is highly persuasive evidence of prejudice, especially after a final judgment has been entered or a settlement has been reached, because it puts the insurer in a "substantially less favorable position than it would have been in had timely notice been provided." *Darcy*, 407 Mass. at 486, 554 N.E.2d at 31.

Trans-Sonics suggests that Centennial was not prejudiced because it is an excess insurer and excess insurers do not "typically" become actively involved in the handling of a suit. [Trans-Sonics Br. at 13].[10]   Trans-Sonics offers no foundation for its "conclusion" or any evidence to show that Centennial would not have become involved in the claim if presented with timely notice. In any event, the fact that Centennial is an excess insurer is of no legal consequence as the purpose of the notice-prejudice rule is to ***protect the insurer's interests***, both as respects the obligation to defend and, as here, the duty to pay judgments on behalf of the insured (the duty to indemnify). *Employers' Liab. Assurance Corp., Ltd. v. Hoechst Celanese Corp.*, 43 Mass. App. Ct. 465, 475, 684 N.E.2d 600, 607 (1997); *Motiva Enterprises v. St. Paul Fire & Marine Ins. Co.*, 445 F.3d 381, 386 (5th Cir. 2006) (excess carrier was not required to prove prejudice in a case where the insured entered into a settlement without its knowledge or consent).

While a few courts have noted that excess insurers are not as likely as primary insurers to suffer harm from late notice because they are one layer removed from the investigation and handling of

---

[10] To the extent that Trans-Sonics purports to rely for its position upon the untimely expert affidavit and report of Gene Waymon, these statements should be disregarded for the reasons set forth in Centennial's Motion to Strike Expert Reports of Gene Waymon and Leonard C. Sarapas filed herewith.

1023757v1

claims and usually have no duty to defend, an excess insurer still has the same interest (or more) as a

primary insurer as regards its claimed indemnity obligation. Further, in this case, the Centennial policy

contains the same notice requirements that are typically found in primary policies. *See Hoechst-*

*Celanese*, 43 Mass. App. Ct. at 471-474, 684 N.E.2d at 605-606 (explaining that "primary policies

instruct the insured to give notice to the carrier 'promptly,' 'immediately,' 'as soon as practicable' (or

the like) after the happening of an occurrence"). Unlike the excess notice provisions at issue in

*Hoechst-Celanese*, which only required notice when the insured developed a belief that its liabilities

might exceed the available primary coverage, the Centennial policy required notice of a claim or suit

"immediately." Because the notice provision at issue in this case mirrors that of a primary policy,

Trans-Sonics did not have any discretion to delay notifying Centennial of the suit.

Moreover, "the principle underlying the notice provision, that is, to enable the insurer a

reasonable and timely opportunity to investigate the underlying claim, applies to both primary and

excess policies under these circumstances." *See Fireman's Fund Ins. Co. v. Valley Manuf. Products*

*Co., Inc.*, 765 F. Supp. 1121, 1123 (D. Mass. 1991) (occurrence was reasonably likely to involve the

excess insurers). As Judge Keeton noted in *Fireman's Fund*:

> [a]n excess insurer's liability is dependent upon the primary insurer's
> fulfilling its obligations of investigation, pursuit of settlement
> opportunities, and, if necessary, defense of the lawsuit at trial...the very
> same factors which prejudicially impact the primary insurer impact, to an
> even greater extent, the excess insurer, whose potential liability is much
> greater than that of the primary insurer.

*Id.* at n2. Judge Keeton's comments in *Fireman's Fund* are particularly apt here. The Centennial

policy had a relatively low attachment point. Trans-Sonics is seeking to have Centennial indemnify it

for the Final Judgment and related settlement in an amount which it claims could ultimately exceed $2

million. [St., Ex. 8]. This is far more than Liberty Mutual paid as the primary insurer that issued

policies to Trans-Sonics and its successors over a period of at least twenty years.

10

Trans-Sonics ignores the fact that it was involved in a battle with Liberty Mutual over coverage for the *Wheeler Road Lawsuit*. During the course of the underlying case, Liberty Mutual pulled the plug on the defense. [St., ¶24]. The Centennial policy contains a limited defense obligation which could have arguably come into play after Liberty Mutual denied coverage and refused to defend its policyholder. [St., ¶43]. It certainly would have been important for Centennial to know that Liberty Mutual had abandoned Trans-Sonics with respect to the defense of the *Wheeler Road Lawsuit* so that Centennial could make an informed decision about what course of action to take. Instead of notifying Centennial of this development, Trans-Sonics assumed control of its own defenses, subsequently commenced coverage litigation against Liberty Mutual, and kept Centennial entirely in the dark.

Trans-Sonics boldly argues that Centennial's position was actually ***improved*** by the late notice and by not being involved in the *Wheeler Road Lawsuit*. However, even if, as an excess insurer, Centennial elected not to participate in the investigation and defense of the underlying claim, Trans-Sonics still should have complied with the notice provisions in the policy. *See Avco Corp. v. Aetna Cas. & Sur. Co.*, 679 A.2d 323, 330 (R.I. 1996). Obviously, it could not have been known at the time it was commenced how the *Wheeler Road Lawsuit* would turn out. Centennial was entitled to evaluate the case for itself and determine how to best protect its interests. Any claimed "benefit" has been invented by Trans-Sonics only with the advantage of after-the-fact hindsight. Trans-Sonics has not disclosed whether there were opportunities to settle the suit for less than what was ultimately paid. Trans-Sonics ignores the fact that as a result of its unilateral decision to litigate the case, it wound up having to pay attorneys' fees and interest that were more than the actual damages awarded by the District Court [Plaintiff's St., ¶39]. Moreover, any asserted "benefit" to Centennial is irrelevant to the fact that Trans-Sonics failed to notify Centennial of the suit in accordance with the express terms of the policy.

1023757v1

No clearer case of late notice prejudicing Centennial's rights can be imagined. Centennial was not put on notice of any claim for coverage relating to the alleged contamination or the *Wheeler Road Lawsuit* until sixteen years after the contamination was discovered and fifteen years after Trans-Sonics was named as a potentially responsible party by the DEQE; nine years after the suit was filed; four years after entry of the Final Judgment; nearly four years after Trans-Sonics paid the Final Judgment; and only after Trans-Sonics had entered into a settlement that obligated it to pay additional amounts and released Liberty Mutual from its contractual obligations. The express terms of the policy required Trans-Sonics to give immediate notice of ***all suits***, not just those where Trans-Sonics had information that the suit was likely to impact the Centennial excess policy. Trans-Sonics failed to do so. By the time that Centennial received notice of this matter it was too late for it to do anything to protect its interests: the case was over. Under the holding of *Lusalon* and comparable authorities from other jurisdictions, the Court must find that Trans-Sonics' notice was late and that Centennial was prejudiced as a matter of law.

### III.    TRANS-SONICS IS NOT ENTITLED TO JUDGMENT ON THE ISSUE OF VOLUNTARY PAYMENTS

The express terms of the Centennial policy and Massachusetts law prohibit a policyholder from entering into a settlement agreement or making voluntary payments without the knowledge or consent of the insurer. *Augat, Inc. v. Liberty Mutual Ins. Co.*, 410 Mass. 117, 123, 571 N.E.2d 357, 361 (1991) (no coverage where policyholder entered into consent decree to resolve environmental claim and there was nothing left for the insurer to do other than "write the check"). Under the holding of *Augat*, the insurer is not required to demonstrate prejudice resulting from the voluntary payment made by the policyholder in order to avoid coverage. *Id.* Instead, prejudice will be presumed because the purpose underlying the voluntary payment provision – to give the insurer an opportunity to protect its interests – is inherently frustrated. *Id.; Eastern Products Corp. v. Continental Cas. Co.*, 58 Mass. App. Ct. 16,

24-25, 787 N.E.2d 1089, 1096 (2003) (presuming prejudice where, prior to giving notice to its insurer, the insured entered into an agreement to clean up a contaminated site at its own expense); *Atlas Tack Corp. v. Liberty Mutual Ins. Co.*, 48 Mass. App. Ct. 378, 384, 721 N.E.2d 8, 12 (1999) (prejudice should be presumed because the insured assumed the obligation to pay without notifying the insurer). *See, e.g., Liberty Mutual Ins. Co. v. The Black & Decker Corp.*, No. 96-10804-DPW, 2003 U.S. Dist. LEXIS 25397 at *109-110 (D. Mass. Dec. 5, 2003) ("[t]he insurer's evidence of prejudice is strongest in cases where the voluntary payments are made before the insurer is notified of the dispute, and therefore both the notice and the voluntary payment provisions are implicated").

Under the Centennial policy, the insured was directed not to voluntarily enter into settlements or assume liability unless it agreed to be responsible for those payments on its own.  Trans-Sonics apparently claims that the payment of the Final Judgment and subsequent settlement of the *Wheeler Road Lawsuit* were not "voluntary."  However, the Final Judgment did not specify the exact amount that would ultimately be owed and left it up to the parties to negotiate a resolution.  Trans-Sonics entered into this agreement without the knowledge, involvement of consent of the party whom it now seeks to have pay for the settlement. The purpose underlying notice and consent-to-settlement provisions is directly implicated here because Centennial was not given any opportunity to protect its interests at any point in the process.  Centennial, like the insurers in *Augat* and *Atlas Tack*, was notified too late and is left (according to Trans-Sonics) with nothing to do but issue a check.  Trans-Sonics' claim for these costs is barred as a matter of law under the holding of *Augat*.

### IV.   TRANS-SONICS IS NOT ENTITLED TO JUDGMENT ON THE ISSUES OF ALLOCATION AND EXHAUSTION

### A.   <u>Trans-Sonics' Costs Should Be Allocated Over The Entire Period Of Injury</u>

For the reasons set forth above, the Court should rule as a matter of law that Trans-Sonics is not entitled to coverage under the Centennial policy for any costs associated with the *Wheeler Road*

1023757v1

*Lawsuit*. However, even if Trans-Sonics was able to establish coverage, the costs should be allocated on a *pro rata* basis over the entire period of the alleged injury. It was never disputed in the underlying case that the environmental damage occurred over a long period of time—at least during the period from 1954 to 1978 when the facility was in operation. *One Wheeler Road Assoc. v. The Foxboro Co.*, No. 90-12879-RGS, 1995 U.S. Dist. LEXIS 20219 *1, 33 (D. Mass. Dec. 13, 1995). It is equally uncontested that Trans-Sonics obtained coverage from Liberty Mutual each year during the period from 1972 to 1991 [St., ¶17; Exhibit B]. Trans-Sonics also obtained specific coverage from Liberty Mutual to respond to its environmental liabilities. [St., ¶21][11].

Judge Stearns did not make any specific findings of fact with respect to the amount of property damage that took place in any particular year of operations at the site. [St., Ex. 1]. In cases such as this where it is not possible for the policyholder to prove the specific amount of damage that took place during a particular period of time, the SJC has suggested that all policies during the period of injury are triggered. *Trustees of Tufts Univ. v. Commercial Union Ins. Co*, 415 Mass. 844, 616 N.E.2d 68 (1993). The logical corollary of relieving the policyholder of its burden to establish the specific amount of property damage that took place in a particular policy period is that the costs associated with the "occurrence" should be allocated over the entire period of injury, not compressed into an arbitrary policy period selected by the insured. This principle of allocation directly flows from the language of the Centennial policy, which specifies that the policy only responds for "property damage" that takes place "during the policy period." [St., ¶41].

Any number of courts have held that where property damage occurs in more than one year, the costs incurred by the policyholder must be allocated on a *pro rata* basis over the entire period of

---

[11] To the extent that Trans-Sonics did not purchase insurance before or after this period or cannot locate the policies, the *pro rata* shares for these periods must be borne by Trans-Sonics. The absence of insurance cannot expand Centennial's obligations.

14

injury. *See e.g., Consolidated Edison Co. of New York, Inc. v. Certain Underwriters of Lloyds, London,* 98 N.Y.2d 208, 221-225, 774 N.E.2d 687, 693-696 (2002); *Olin Corp. v. Insurance Company of North America,* 221 F.3d 307, 321-327 (2d Cir. 2000); *Sybron Transition Corp. v. Security Ins. Co. of Hartford,* 258 F.3d 595, 597-602 (7th Cir. 2001) (New York law); *Northern States Power Co. v. Fidelity & Cas. Co.,* 523 N.W.2d 657, 662 (Minn. 1994); *Security Ins. Co. of Hartford v. Lumbermens' Mutual Cas. Co.,* 826 A.2d 107, 115-122 (Conn. 2003); *Atchison Topeka & Santa Fe RR Co. v. Stonewall Ins. Co.,* 71 P.3d 1097, 1132-1134 (Kan. 2003); *Public Service Co. v. Wallis & Cos.,* 986 P.2d 924, 939 (Colo. 1999); *Domtar, Inc. v. Niagara Fire Ins. Co.,* 563 N.W.2d 724, 732-33 (Minn. 1997); *Carter-Wallace, Inc. v. Admiral Ins. Co.,* 154 N.J. 312, 327-28, 712 A.2d 1116, 1124 (N.J. 1998); *Owens-Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 475, 650 A.2d 974, 993-94 (N.J. 1994); *Mayor of Baltimore v. Utica Mut. Ins. Co.,* 802 A.2d 1070, 1076, 1100-1104 (Md. App. 2002), *appeal dismissed,* 821 A.2d 369 (Md. 2003); *Arco Industries Corp. v. American Motorists Ins. Co.,* 594 N.W.2d 61, 68-69 (Mich. App. 1998). This rule is consistent with the fundamental terms of the excess policy that was issued by Centennial to Trans-Sonics. Centennial agreed to pay *only* for those damages that took place during its policy period, *not* for damages that occurred outside its policy period. [St. ¶41]. The Court should apply this rule of law to Trans-Sonics' claim.

The SJC has never ruled upon the issue of allocation. In its argument against a *pro rata* allocation of liability, Invensys relies upon a single case and its progeny, namely, *Rubenstein v. Royal Ins. Co. of America,* 44 Mass. App. Ct. 842, 694 N.E.2d 381 (1998), *aff'd on other grounds,* 429 Mass. 355 (1999). However, the courts that cite *Rubenstein* on the allocation issue and begrudgingly impose joint and several liability imply that it might be better replaced by *pro rata* allocation. *See e.g., Boston Gas Co. v. Century Indemnity Co.,* No. 02-12062-RMZ, 2006 U.S. Dist. LEXIS 41133 *1, 5-6 (D. Mass. June 21, 2006) (declining to grant certification on the issue of allocation because it was not outcome determinative even though the allocation method remained an open question); *Liberty Mutual*

*Ins. Co. v. Black & Decker Corp.*, 383 F. Supp. 2d 200, 215 (D. Mass. 2004) (noting that the SJC's denial of further appellate review of the allocation issue in *Rubenstein* in no way suggests approval of the decision below).  Moreover, the court in *Liberty Mutual* flatly stated that it "might well reject the 'all sums' theory [of joint and several liability]." *Id.*  The court went on to note that "[t]he idea of joint and several liability derives from tort, not contract, and is somewhat awkward in the contract context." *Id.*  *Rubenstein* simply cannot be squared with the better-reasoned cases holding that *pro rata* allocation of damages which take place during more than one policy period is appropriate.

The time on the risk approach to allocation and its implications for Trans-Sonics' claim against Centennial are illustrated by the New York Court of Appeals' decision in *Consolidated Edison.*  Con Ed sought coverage for the cost of cleaning up a manufactured gas plant that a corporate predecessor owned and operated in Tarrytown, New York between 1873 and 1933.  The site was later sold to another company.  Contamination was discovered on the property in 1995 pursuant to an investigation conducted at the request of the NYDEC, which demanded that Con Ed clean up the property.  Con Ed subsequently brought suit against insurers that had issued policies to it between 1936 and 1986, seeking coverage for costs that it incurred for the cleanup.  98 N.Y. 2d at 215-216, 774 N.E. 2d at 688-89.

The trial court ruled that any coverage that might otherwise apply to the claim should be pro rated on a "time on the risk" basis throughout the period of alleged injury, with each affected year from 1936 to 1986 being allocated an equal share of the costs.  The New York Court of Appeals affirmed the trial court's ruling, rejecting the argument made by Con Ed that it should be permitted to collect its total liability (so-called "all sums") under *any* policy that was in effect during the 50 years that property damage occurred.  Con Ed further contended that the designated policy would then be required to seek contribution from other insurers who provided coverage during the relevant period, a "joint and several" approach analogous to tort law.    This argument was rejected.  The Court of

16

Appeals held:

> Joint and several allocation in the present factual setting is inconsistent with the unambiguous language of the policies before us. Con Edison concedes that it is impossible to determine the extent of the property damage that is the result of an occurrence in a particular policy period. Indeed, its theory of the case was that while the plant was in operation—long before any of the policies were issued—there were leaks, spills and drips that eventually migrated to the groundwater. Con Edison planned to establish that the dispersion of the pollutants was a gradual, continuous process, thus creating an inference that there was an accident or occurrence during each and every policy period, though there is no evidence of an accident during any particular policy period.
>
> Con Edison wants to combine this uncertainty-based approach, which implicates many successive policies, with an entitlement to choose a particular policy for indemnity. Yet collecting all the indemnity from a particular policy presupposes ability to pin an accident to a particular policy period. Although more than one policy may be implicated by a gradual harm, joint and several allocation is not consistent with the language of the policies providing indemnification for "all sums" of liability that resulted from an accident or occurrence "during the policy period."
>
> Pro rata allocation under these facts, while not explicitly mandated by the policies, is consistent with the language of the policies. *Most fundamentally, the policies provide indemnification for liability incurred as a result of an accident or occurrence during the policy period, not outside that period.* Con Edison's singular focus on "all sums" would read this important qualification out of the policies. Proration of liability among the insurers acknowledges the fact that there is uncertainty as to what actually transpired during any particular policy period.

98 N.Y.2d at 224, 774 N.E.2d at 694-695 (emphasis added). *Accord Olin Corp. v. INA,* 221 F.3d 307, 321-327 (2nd Cir. 2000) (*pro rata* allocation of clean-up costs); *Sybron Transition Corp. v. Security Ins. Co. of Hartford,* 258 F.3d 595, 597-602 (7th Cir. 2001) (settlement of asbestos bodily injury claims allocated on a *pro rata* basis). *See Northern States Power Co. v. Fidelity & Cas. Co.,* 523 N.W. 2d 657, 662 (Minn. 1994) ("essence of the actual injury trigger theory is that each insurer is held liable for only those damages which occurred during its policy period; no insurer is held liable for damages outside its policy period. Where the policy periods do not overlap, therefore, the insurers are

17

consecutively, not concurrently liable").

In addition to being the logical corollary of the definition of "property damage" contained in the Centennial policy, *pro rata* allocation makes sense in the context of this case. Trans-Sonics never contended here or in the *Wheeler Road Lawsuit* that it is possible to precisely quantify the amount of "property damage" that took place at the site during any particular period of time. The District Court did not make any findings that some specific "accident" took place during the period when the Centennial policy was in effect. Trans-Sonics seeks to avoid its burden of proving specific "property damage" during the period of the Centennial policy by contending that the "property damage" at the site was continuous during every period from at least 1954 through 1978. There is no reason why Centennial should have to pay for "property damage" that took place outside of its policy period (assuming that there is coverage at all). Centennial can only be liable (at most) for its *pro rata* share of Trans-Sonics' costs. There is absolutely no reason to permit Trans-Sonics to load all of its costs into a narrow window of time and its argument for "all sums" liability should be rejected.

### B.  Trans-Sonics Failed to Properly Exhaust All Available Coverage

Separate and distinct from the issue of allocation, the Centennial policy contains an "other insurance" clause that operates to bar Trans-Sonics' claim. [St., ¶44; Ex. A hereto].[12] The clause requires Trans-Sonics to exhaust all "collectible" insurance that applies to the claim. The clause does not limit its operation to only the primary insurance that serves as the underlying insurance to the Centennial policy. In fact, Trans-Sonics had "collectible" insurance with Liberty Mutual applicable to the years in which the "property damage" took place of at least $5.8 million. [Ex. B hereto]. Trans-

---

[12] The policy states: "J.  Other Insurance. *If other collectible insurance with any other insurer is available to the insured*, covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. . . " (emphasis added).

Sonics chose to compromise its claim against Liberty Mutual for an amount that Trans-Sonics knew would not be sufficient to cover its known liabilities for remediation at the site.

By settling with Liberty Mutual for less than the full policy limits for all triggered years, Trans-Sonics absolved Liberty Mutual of amounts that it would otherwise owe and now seeks to impose such amounts on Centennial, contrary to the terms of the Centennial policy. *See A.W. Chesterton Co. v. Mass. Insurers Insolvency Fund*, 445 Mass. 502, 524-25, 838 N.E.2d 1237, 1254 (2005). The SJC explained in *A.W. Chesterton* that a company that settles with an insurer for less than the policy limits should bear the financial responsibility of settling too conservatively. *Id.* at 525. Although the *A.W. Chesterton* case involved the statutorily-created fund charged with paying covered claims against insolvent insurers, the analysis equally applies here. An insured who agrees to settle should bear the risk that the settlement amount is insufficient to cover its costs, especially where, as here, the insured was keenly aware that it was settling for an amount that was inadequate. Centennial should not be forced to assume this financial burden. Trans-Sonics' failure to exhaust all other "collectible" insurance bars its claim.

## CONCLUSION

The record establishes that Trans-Sonics violated both the notice and the voluntary payment provisions of the Centennial policy. Trans-Sonics allowed the underlying case to proceed to Final Judgment but did not bother to advise Centennial of this fact until more than four years later. Even then, Trans-Sonics only provided notice to Centennial *after* judgment had been entered and paid; *after* it had entered into a final settlement agreement with the plaintiffs in the *Wheeler Road Lawsuit*; and *after* it had compromised the insurance available from Liberty Mutual that would have covered the entirety of the claimed loss. Even if Centennial were to owe some amount, it should only be required to pay its *pro rata* share of damages for the limited period of time that its policy was in effect. Trans-Sonics' claim against Centennial is barred because Trans-Sonics failed to exhaust all other

19

"collectible" insurance as required by the Centennial policy.  For the reasons set forth above Trans-Sonics is not entitled to judgment as a matter of law and judgment should be entered for Centennial . [13]

> CENTENNIAL INSURANCE COMPANY,
>
> By its attorneys,
>
> /s/ John T. Harding
>
> —————————————————
> John T. Harding BBO #221270
> **MORRISON MAHONEY LLP**
> 250 Summer Street
> Boston, MA 02210
> (617) 439-7558
> (617) 342-4888 (facsimile)

Dated: November 1, 2006

### CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 1, 2006.

> /s/ John T. Harding
>
> —————————————————
> John T. Harding

---

[13] In the event that the Court were to find coverage, Centennial respectfully suggests that the Court set a briefing schedule for issues relating to Trans-Sonics' claimed damages, as well as the application of principles of exhaustion and allocation to the specific facts of the claim.  Of course, in the event that the Court determines that Trans-Sonics is not entitled to coverage, that would end the matter.

1023757v1

**EXHIBIT A**

# CENTENNIAL INSURANCE COMPANY

### 45 WALL STREET, NEW YORK, NEW YORK 10005

(A stock insurance company, herein called the company)

## Insuring Agreements

Agrees with the insured, named in the declarations made a part hereof, in consideration of the payment of the premium and in reliance upon the statements in the application and declarations and subject to the limits of liability, exclusions and other terms of this policy.

**I. Coverage.** To indemnify the insured for the ultimate net loss in excess of the retained limit hereinafter defined, which the insured shall become legally obligated to pay as damages by reason of the liability imposed upon the insured by law, or assumed by the insured under contract on account of:

(a) Personal Injury Liability,
(b) Property Damage Liability, or
(c) Advertising Liability

to which this policy applies, caused by an occurrence.

**II. Defense — Settlement.** With respect to any occurrence not covered by the underlying policy(ies) listed in Schedule A hereof or any other underlying insurance coverable by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item (b) of Insuring Agreement IV, the company shall:

(a) defend any suit brought against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent, but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;

(b) pay all premiums on bonds to release attachments for an amount not in excess of the applicable limit of liability of this policy, all premiums on appeal bonds required in any such defended suit, but without obligation to apply for or furnish any such bonds;

(c) pay all expenses incurred by the company, all costs taxed against the insured in any such suit and all interest accruing after entry of judgment until the company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the company's liability thereon;

(d) pay all reasonable expenses incurred by the insured at the company's request, including actual loss of wages or salary (but not loss of other income) not to exceed $50 per day because of his attendance at hearings or trials at such request;

and these amounts so incurred, except settlements of claims and suits are payable by the company in addition to the applicable limit of liability of this policy.

In jurisdictions where the company may be prevented by law or otherwise from carrying out this agreement, the company shall pay any expense incurred with its written consent in accordance with this agreement.

The insured shall promptly reimburse the company for any amount of ultimate net loss paid on behalf of the insured within the retained limit specified in Item (b) of Insuring Agreement IV.

This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

**III.** Definition of "Named Insured" and "Insured". "Named Insured" includes any subsidiary company (including subsidiaries thereof) of the named

Insured and any other company coming under the named insured's control of which it assumes active management.

The unqualified word "Insured", wherever used, includes the named insured and also:

(a) any person, organization, trustee or estate to whom or to which the named insured is obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or on behalf of the named insured or to facilities of or used by the named insured; but

(b) except with respect to the ownership, maintenance or use, including loading or unloading, of automobiles while away from premises owned by, rented to or controlled by the named insured or the ways immediately adjoining; (i) any executive officer, other employee, director or stockholder thereof while acting within the scope of his duties as such; (2) any organization or proprietor with respect to real estate management for the named insured;

(c) any person while using an automobile owned by or loaned to the named insured or hired (except in behalf of any named insured and any person or organization legally responsible for the use thereof, provided the actual use of the automobile is by the named insured or with the named insured's permission, and any executive officer, director or stockholder of the named insured with respect to the use of an automobile not owned by the named insured in the business of the named insured. The insurance afforded with respect to any person or organization other than the named insured does not apply:

(i) to any person or organization, or to any agent or employee thereof, operating an automobile sales agency, repair shop, service station, storage garage or public parking place, with respect to any occurrence arising out of the operation thereof;

(d) with respect to any automobile hired by or loaned to the named insured, to the owner or a lessee thereof other than the named insured, or to any agent or employee of such owner or lessee, except as provided in paragraph (a) or (d) of this Insuring Agreement;

(e) any additional interest, other than the named insured or the insured described in paragraphs (a), (b) or (c) of this Insuring Agreement, included in the underlying policy(ies) listed in Schedule A, but only to the extent that insurance is provided to such additional insured thereunder;

If the named insured is designated in the declarations as a partnership or joint venture, the partnership or joint venture so designated and any partner or member thereof but only with respect to his liability as such; however, this policy does not apply to the conduct of any partnership or joint venture of which the insured is a partner or member and which is not designated in this policy as a named insured.

If the named insured is designated in the declarations as an individual, the person so designated but only with respect to the conduct of a business of which he is the sole proprietor.

Page 1

**IV. Retained Limit — Limit of Liability.** With respect to Coverage I (a), I (b) or I (c), or any combination thereof, the company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:

(a) the total of the applicable limit(s) of the underlying policy(ies) listed in Schedule A hereof, and the applicable limit(s) of any other underlying insurance collectible by the insured, but in no event less than the amount stated in Insuring Agreement IV (b), or

(b) the amount stated in Item 3(c) of the declarations as the Retained Limit as the result of any one occurrence not covered by the said policy or policies of insurance; and then up to an amount not exceeding the amount stated in Item 3(a) of the declarations.

There is no limit to the number of occurrences during the policy period for which claims may be made, except that the liability of the company arising out of either the products hazard or the completed operations hazard or both combined on account of all occurrences during each policy year shall not exceed the amount stated in Item 3(b) of the declarations.

In the event of the reduction or exhaustion of the aggregate limit(s) of liability of the underlying policy(ies) listed in Schedule A by reason of losses paid thereunder, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limit(s), or (2) in the event of exhaustion, shall continue in force as underlying insurance.

**V. Policy Period — Territory.** This policy applies only to occurrences happening anywhere during the policy period.

*Exclusions*

7

This insurance shall not apply:

(a) to any obligation for which the insured or any company as its insurer may be held liable under any Workmen's Compensation, Unemployment Compensation, Disability Benefits or similar law, provided, however, that this exclusion does not apply to liability of others assumed by the named insured under contract or agreement;

(b) to property damage to (1) property owned by the insured, or (2) the insured's products arising out of such products or any part of such products, or (3) work performed by or on behalf of the insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith, or (4) premises alienated by the named insured arising out of such premises or any part thereof, or (5) property rented to, occupied or used by or in the care, custody or control of the insured to the extent the insured is under contract to provide insurance thereon;

(c) under Coverage I (c) to liability for (1) failure of performance of contract, (2) infringement of registered trade mark, service mark or trade name by use thereof as the registered trade mark, service mark or trade name of goods or services sold, offered for sale or advertised, but this shall not relate to titles or slogans (3) incorrect description of any article or commodity, or (4) mistake in advertised price;

(d) under Coverages I (a) and I (b), except with respect to operations performed by independent contractors, to the ownership, maintenance, operation, use, loading or unloading of watercraft if the personal injury or property damage occurs away from premises owned by, rented to or controlled by the named insured;

(e) under Coverages I (a) and I (b), except with respect to operations performed by independent contractors, to the ownership, maintenance, operation, use, loading or unloading of aircraft;

(f) to personal injury or property damage resulting from the failure of the insured's products or work completed by or for the insured to perform the function or serve the purpose intended by the insured, if such failure is due to a mistake or deficiency in any design, formula, plan, specifications, advertising material or printed instructions prepared or developed by any insured; but this exclusion does not apply to bodily injury or property damage resulting from the active malfunctioning of such products or work;

(g) to damages claimed for the withdrawal, inspection, repair, replacement or loss of the use of the insured's products or work completed by or for the insured or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein;

(h) I. under any Liability Coverage to injury, sickness, disease, death or destruction

(a) with respect to which an insured under the policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

(b) resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II. under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if

(a) the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

(b) the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

(c) the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

III. as used in this exclusion:
"hazardous properties" include radioactive, toxic or explosive properties;
"nuclear material" means source material, special nuclear material or byproduct material;
"source material", "special nuclear material", and "byproduct material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof;
"spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor;
"waste" means any waste material (1) containing byproduct material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof;
"nuclear facility" means
(a) any nuclear reactor,

**COMMERCIAL UMBRELLA POLICY**

**PROVISIONS PART ONE**

8

Insert Declarations page (Part Two) here so that top edge butts against fold of Contract, and permits policy number to appear through window. ATTACH ENDORSEMENTS, IF ANY, TO TOP BACK OF DECLARATIONS.

(b) any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste.

(c) any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235.

(d) any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operation;
"nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.
With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

Page 3

A. Definitions.

(1) Advertising Liability — The term "Advertising Liability" wherever used herein shall mean liability for damages because of:
(a) libel, slander or defamation;
(b) infringement of copyright or of title or of slogan;
(c) piracy or unfair competition or idea misappropriation under an implied contract;
(d) invasion of rights of privacy;
committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the named insured's advertising activities.

(2) Aircraft — The term "Aircraft" wherever used herein shall mean any heavier than air or lighter than air aircraft designed to transport persons or property.

(3) Automobile — The term "automobile" wherever used herein shall mean a land motor vehicle, trailer or semi-trailer.

(4) Completed Operations Hazard — The term "Completed Operations Hazard" includes personal injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
(a) when all operations to be performed by or on behalf of the named insured under the contract have been completed, or
(b) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or
(c) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as part of the same project.
Operations which may require further service or maintenance work, or correction, repair or replacement because of any defect or deficiency, but which are otherwise complete shall be deemed completed.
The completed operations hazard does not include bodily injury or property damage arising out of:
(a) operations in connection with the transportation of property, unless the bodily injury or property damage arises out of a condition in or on a vehicle created by the loading or unloading thereof,
(b) the existence of tools, uninstalled equipment or abandoned or unused materials.

(5) Damages — The term "Damages" includes damages for death and for care and loss of services resulting from personal injury and damages for loss of use of services resulting from property damage.

(6) Insured's Products — The term "Insured's Products" shall mean goods or products manufactured, sold, handled or distributed by the insured or by others trading under his name, including any container thereof (other than a vehicle) but "Insured's products" shall not include a vending machine or any property other than such a container, rented to or located for use of others but not sold.

(7) Occurrence — The term "Occurrence" wherever used herein shall mean an accident, including injurious exposure to conditions, which results, during the policy period, in personal injury or property damage neither expected nor intended from the standpoint of the insured.

(8) Personal Injury Liability — The term "Personal Injury Liability" shall mean:
(a) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury; (b) false arrest, detention or imprisonment, malicious prosecution or humiliation; (c) the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of rights of privacy, except when: (1) the publication of this part (c) arises out of the insured's advertising activities; (2) wrongful entry or eviction, or other invasion of the right of private occupancy; committed or for the purpose of protecting persons or property.

(9) Products Hazard — The term "Products Hazard" includes personal injury and property damage arising out of the insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury or property damage occurs away from premises owned by or rented to the named insured and after physical possession of such products has been relinquished to others.

(10) Property Damage Liability — The term "Property Damage Liability" shall mean liability for damages because of injury to or destruction of tangible property.

(11) Ultimate Net Loss — The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in the settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after making proper deduction for all recoveries and salvages collectible, but excludes all expenses and costs (including attorneys' fees, court costs and interest on any judgment or award) and office expenses of the insured, or the company and all salaries of employees and office expenses of the insured, the company and any underwriting member thereof so incurred. This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance.

B. Premium. Unless stated elsewhere in the company, the premium for this policy is the premium stated in Item 4 of the Declarations except as provided in Condition F.

C. Inspection and Audit. The company shall be permitted but not obligated to inspect the named insured's property and operations at any time. Neither the company's right to make inspections nor the making thereof nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the named insured or others, to determine or warrant that such property or operations are safe.
The company may examine and audit the named insured's books and records at any time during the policy period and extensions thereof and within three years after the final termination of this policy, as far as they relate to the subject matter of this insurance.

D. Severability of Interests. The term "insured" is used severally and not collectively except with respect to (a) the property owned by any named insured and (b) insuring Agreement IV (Related Limit — Limit of Liability) and (c) Condition I (Other Insurance). The inclusion in this policy of more than one insured shall not operate to increase the company's limit of liability for all insureds arising out of any one occurrence beyond the limits set forth in Insuring Agreement IV.

E. Insured's Duties in the Event of Occurrence, Claim or Suit.
(a) In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.
(b) If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.
(c) The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of personal injury or property damage or advertising offense with respect to which insurance is afforded under this policy, and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense; however, in the event that the amount of ultimate net loss becomes certain either through final court judgment or agreement among the insured, the claimant and the company, then, the

insured may pay the amount of ultimate net loss to the claimant to effect settlement and, upon submission of due proof thereof, the company shall indemnify the insured for that part of such payment which is in excess of the retained limit, or, the company will, upon request of the insured, make such payment to the claimant on behalf of the insured.

F. Assistance and Cooperation. Except as provided in Insuring Agreement II (Defense, Settlement) or Insuring Agreement IV (Retained Limit — Limit of Liability) with respect to the exhaustion of the aggregate limit(s) of the underlying policy(ies) listed in Schedule A, or in Condition K (Underlying Insurance), the company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured; but the company shall have the right and opportunity to associate with the insured in the defense and control of any claim or proceeding reasonably likely to involve the company. In such event the insured and the company shall cooperate fully.

G. Appeals. In the event the insured or the insured's underlying insurer elects not to appeal a judgment in excess of the retained limit, the company may elect to do so at its own expense, and shall be liable for the taxable costs, disbursements and interest incidental thereto, but in no event shall the liability of the company for ultimate net loss exceed the amount set forth in Insuring Agreement IV (Retained Limit — Limit of Liability) for any one occurrence plus the taxable costs, disbursements and interest incidental to such appeal.

H. Action Against the Company. No action shall lie against the company with respect to any one occurrence unless, as a condition precedent thereto, the insured shall have fully complied with all the terms of this policy, nor until the amount of the insured's obligation to pay an amount of ultimate net loss in excess of the retained limit shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company. The insured shall make a definite claim for any loss in which the company may be liable within a reasonable time after such final determination. If any subsequent payments are made by the insured on account of the same occurrence, the insured shall make additional claims from time to time and these claims shall be payable within thirty (30) days after proof in conformity with this policy. Any person or organization or the legal representative thereof who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing contained in this policy shall give any person or organization any right to join the company as a co-defendant in any action against the insured to determine the insured's liability.

I. Bankruptcy or Insolvency. Bankruptcy or insolvency of the insured shall not relieve the company of any of its obligations hereunder.

J. Other Insurance. If other collectible insurance with any other insurer is available to the insured, covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. If collectible insurance under any other policy(ies) of the company is available to the insured, covering a loss also covered hereunder (other than underlying insurance of which the insurance afforded by this policy is in excess), the company's total liability shall in no event exceed the greater or greatest limit of liability applicable to such loss under this or any other such policy(ies).

K. Underlying Insurance. If underlying insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

L. Subrogation. The company shall be subrogated to the extent of any payment hereunder to all the insured's rights of recovery therefor, and the insured shall do nothing after loss to prejudice such rights and shall do everything necessary to secure such rights. Any amount so recovered shall be apportioned as follows:

Any interest (including the insured's) having paid an amount in excess of the retained limit plus the limit of liability hereunder shall be reimbursed first to the extent of actual payment. The company shall be reimbursed next to the extent of its actual payment hereunder. If any balance then remains unpaid, it shall be applied to reimburse the insured or any underlying insurer, as their interests may appear. The expenses of all such recovery proceedings shall be apportioned in the ratio of respective recoveries. If there is no recovery in proceedings conducted solely by the company, it shall bear the expenses thereof.

M. Changes. Notice to or knowledge of any agent or other person shall not effect a waiver or change any part of this policy nor estop the company from asserting any right under it, nor shall the terms of this policy be waived or changed except by endorsement hereon, signed by a duly authorized representative of the company.

N. Assignment. Assignment of interest under this policy shall not bind the company until its consent is endorsed hereon.

O. Maintenance of Underlying Insurance. It is a condition of this insurance that the underlying policy(ies) listed in Schedule A, or renewals or replacements thereof not more restricted, shall be maintained in force as collectible insurance during the currency of this policy, except for any reduction of the aggregate limit(s) contained therein solely by reason of losses in respect of occurrences happening during the policy period. In the event of failure by the insured so to maintain such policy(ies) or to meet all conditions subsequent to loss under such policy(ies), the insurance afforded by this policy shall apply in the same manner it would have applied had such policy(ies) been so maintained in force.

Upon notice that any aggregate limit of liability under any policy of underlying insurance has been exhausted, the named insured shall immediately make all reasonable efforts to reinstate such limit. The named insured shall give the company written notice as soon as practicable of any change in the scope of coverage or in the amount or limits of insurance under any underlying insurance, and of the termination of any coverage or exhaustion of aggregate limits of any underlying insurer's liability.

P. Cancellation. This policy may be cancelled by the named insured by surrender thereof to the company or any of its authorized agents, or by mailing to the company written notice stating when thereafter such cancellation shall be effective. This policy may be cancelled by the company by mailing to the named insured at the address shown in this policy written notice stating when, not less than thirty (30) days thereafter, such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the policy period. Delivery of such written notice either by the named insured or by the company shall be equivalent to mailing. If the named insured cancels, earned premium shall be computed in accordance with the customary short rate table and procedure. If the company cancels, earned premium shall be computed pro rata.

Premium adjustment may be made at the time cancellation is effected or as soon as practicable thereafter.

If this policy insures more than one named insured, cancellation may be effected by the first of such named insureds for the account of all insureds; and notice of cancellation by the company to such first named insured shall be notice to all insureds. Payment of any unearned premium to such first named insured shall be for the account of all interests therein.

IN WITNESS WHEREOF the Centennial Insurance Company has caused this policy to be signed by its president and secretary at New York, N. Y., but this policy shall not be valid unless completed by the attachment hereto of a declarations page designated as Commercial Umbrella Policy — Part Two and countersigned on the aforesaid declarations page by a duly authorized representative of the company.

Secretary

President

Printed in U.S.A.

**EXHIBIT B**

| POLICY TYPE | POLICY NO. | EFFECTIVE DATES | POLICY LIMITS |
|---|---|---|---|
| CGL | 112-020738-020 | 1/1/70-1/1/71 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-190 | 1/1/70-1/1/73 | $10 million occ/agg<br>Retention: $25,000 |
| CGL | 112-020738-021 | 1/1/71-1/1/72 | $500,000 occ/agg |
| CGL | 112-020738-023 | 1/1/73-1/1/74 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-193 | 1/1/73-1/1/74 | $10 million occ/agg<br>Retention: $25,000 |
| CGL | 112-020738-024 | 1/1/74-1/1/75 | $500,000 occ/agg |
| CGL | 112-020738-025 | 1/1/75-1/1/76 | $500,000 occ/agg |
| CGL | 112-020738-026 | 1/1/76-1/1/77 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-196 | 1/1/76-1/1/77 | $10 million occ/agg<br>Retention: $25,000 |
| CGL | 112-020738-027 | 1/1/77-1/1/78 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-197 | 1/1/77-1/1/78 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |
| CGL | 112-020738-028 | 1/1/78-1/1/79 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-198 | 1/1/78-1/1/79 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |
| CGL | 112-020738-029 | 1/1/79-1/1/80 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-199 | 1/1/79-1/1/80 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |
| CGL | 112-020738-020 | 1/1/80-1/1/81 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-190 | 1/1/80-1/1/81 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |

| CGL | 112-020738-021 | 1/1/81-1/1/82 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-191 | 1/1/81-1/1/82 | $10 million occ/agg<br>Retention: $25,000 |
| CGL | 112-020738-022 | 1/1/82-1/1/83 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-192 | 1/1/82-1/1/83 | $10 million occ/agg<br>Retention: $25,000 |
| CGL | 112-020738-023 | 1/1/83-1/1/84 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-193 | 1/1/83-1/1/84 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |
| CGL | 112-020738-024 | 1/1/84-1/1/85 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-194 | 1/1/84-1/1/85 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |
| CGL | 112-020738-025 | 1/1/85-1/1/86 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-195 | 1/1/85-1/1/86 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |
| CGL | 112-020738-026 | 1/1/86-1/1/87 | $500,000 occ/agg |
| Umbrella/Excess | 112-020738-196 | 1/1/86-1/1/87 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |
| CGL | 112-020738-027 | 1/1/87-1/1/88 | $1 million occ<br>$2 million agg |
| Umbrella/Excess | 112-020738-197 | 1/1/87-1/1/88 | $10 million occ/agg<br>Retention: $25,000 domestic<br>$250,000 foreign-based |
| CGL | 611-004218-048 | 1/1/88-1/1/89 | $2 million occ/agg |
| Umbrella/Excess | 611-004218-088 | 1/1/88-1/1/89 | $9 million occ/agg<br>Retention: $250,000 |
| CGL | 611-004218-049 | 1/1/89-1/1/90 | $2 million occ/agg |

| Umbrella/Excess | 611-004218-089 | 1/1/89-1/1/90 | $9 million occ/agg<br>Retention: $250,000 |
|---|---|---|---|
| CGL | 611-004218-040 | 1/1/90-1/1/91 | $2 million occ/agg |
| Umbrella Excess | 611-004218-080 | 1/1/90-1/1/91 | $9 million occ/agg<br>Retention: $25,000; amended to $2 million occ/agg-foreign based |
| Casualty Insurance | Binder # 374781 | 6/29/82-8/27/82 | $1 million occ/agg |
| Pollution Liability | 112-020738-413 | 6/29/83-6/29/84 | $5 million occ/agg, retro to 6/29/82 |
| Pollution Liability | 112-020738-414 | 6/29/84-6/29/85 | $5 million occ/agg through 11/5/84, retro to 6/29/82<br>$6 million occ as of 11/6/84<br>$10 million agg as of 11/6/84 |
| Pollution Liability | 112-020738-415 | 6/29/85-6/29/86 | $6 million occ<br>$9 million agg, retro to 6/29/82 |
| Pollution Liability | 112-020738-416 | 6/29/86-6/29/87 | $6 million occ<br>$9 million agg |
| Pollution Liability | 112-020738-417 | 6/29/87-6/29/88 | $6 million occ<br>$9 million agg, retro to 6/29/82 |
| Pollution Liability | 611-004218-098 | 6/29/88-6/29/89 | $1 million occ<br>$3 million agg, retro to 6/29/82 |
| Pollution Liability | 611-004218-099 | 6/29/89-1/1/90 | $1 million occ<br>$3 million agg, retro to 6/29/82 |
| Pollution Liability | 611-004218-090 | 1/1/90-1/1/91 | $1 million occ<br>$3 million agg |