UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
INVENSYS SYSTEMS, INC.,                        )
          Plaintiff,                        )
                     )
         v.                        )        Civ. No. 1:05-CV-11589-WGY
                     )
CENTENNIAL  INSURANCE  COMPANY,     )
          Defendant.                        )
_____)        **REQUEST FOR HEARING**

**PLAINTIFF INVENSYS SYSTEMS, INC.'S CONCISE STATEMENT OF DISPUTED
MATERIAL FACTS, SU BMITTED IN OPPOSITION TO DEFENDANT
CENTENNIAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiff Invensys Systems, Inc. respectfully submits this

Concise Statement of Disputed Material Facts in Opposition to Defendant Centennial Insurance

Company's Motion for Summary Judgment.

**Note Concerning References to the Record:** When Plaintiff is citing to exhibits that

Defendant has submitted, it will refer to "Def. Exh. __."  When referring to exhibits submitted

by Plaintiff, it will identify them as "Pl. Exh. __."  For brevity and economy, Plaintiff will not

resubmit Pl. Exh. 1 - 39, which exhibits have been attached to Plaintiff's own Motion for

Summary Judgment filed September 22, 2006.

**PLAINTIFF'S RESPONSE TO CENTENNIAL STATEMENT OF FACTS, AND
PLAINTIFF'S CONCISE STATEMENT OF MATERIAL DISPUTED FACTS**

**CENTENNIAL FACT NO. 1**

1.      Plaintiff Invensys Systems, Inc., successor-in-interest to Trans-Sonics, Inc. ("Trans-

Sonics") operated a manufacturing facility in Burlington, Massachusetts (the "Site") from

approximately 1954 to 1974, at which time the assets of Trans-Sonics were sold to The Foxboro

Company ("Foxboro").  [Ex. 1].

1

**NOT DISPUTED**

**CENTENNIAL FACT NO. 2**

2.      Foxboro continued to operate the facility until 1978, at which time it was sold.  [Ex. 1].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 3**

3.      The facility manufactured electronic instruments and systems and used hazardous materials including PCE and TCE in the process.  [Ex. 1].

> **DISPUTED IN PART:** Judge Stearns ruled that Invensys at most used trace amounts of PCE; that a company called U.S. Windpower was the principal user of PCE at the Wheeler Road site; and that Invensys is not legally responsible for soil contamination resulting from U.S. Windpower's use of PCE at the Wheeler Road site. <u>See</u> Pl. Exh. 1 at 3, 9 ("U.S. Windpower is responsible for the concentrations of PCE in the soil …. I base this conclusion on the fact that only U.S. Windpower used significant quantities of PCE ….").

**CENTENNIAL FACT NO. 4**

4.      Environmental contamination that allegedly originated from Trans-Sonics' operations was discovered at the Site no later than 1984.  [Ex. 1].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 5**

5.      The Massachusetts Department of Environmental Quality Engineering (the "DEQE," now the "DEP") issued Notices of Responsibility to Trans-Sonics in 1985.  [Ex. 1].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 6**

6.      Trans-Sonics and others named were named as potentially responsible parties liable for the contamination at the Site by the DEQE.  [Ex. 1].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 7**

7.      No notice of the alleged contamination or the fact that the DEQE had issued a Notice of Responsibility to Trans-Sonics was provided to Centennial. [Ex. 1].

**DISPUTED:** Invensys provided notice to Centennial as early as June 1999, and certainly no later than June 2000. On June 24, 1999, Invensys's counsel wrote to Centennial, requesting Centennial to search for evidence of coverage issued to Trans-Sonics. See Pl. Exh. 7.  Numerous conversations thereafter ensued between John Yandrasitz (an attorney

at Centennial) and Invensys's attorneys. <u>See</u> Pl. Exh. 8 (on July 16, 1999, Centennial

attorney acknowledges numerous conversations); Pl. Exh. 10 (on June 9, 2000, Invensys

attorney references numerous conversations over preceding year concerning <u>One</u>

<u>Wheeler Road Associates</u> case and coverage dispute with Liberty Mutual); Exh. 12 (on

July 12, 2000, Centennial attorney responds to June 9, 2000 letter and does not dispute

that numerous conversations took place over preceding year).  Thus, as of July 1999,

Centennial had received both written and oral notification of the coverage dispute with

Liberty Mutual and the underlying <u>One Wheeler Road Associates</u> matters.

**CENTENNIAL FACT NO. 8**

8.      In 1990, the current owner of the Trans-Sonics Site brought an action in this Court

seeking to recover costs associated with remediating the Site.  [Exs. 1, 2].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 9**

9.      The complaint sought damages under various federal statutes and for other causes of

action.  [Exs. 1, 2].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 10**

10.    The case was styled as *One Wheeler Road Associates and The Gutierrez Company v. The Foxboro Company*, C.A. No. 90-12873-K, United States District Court (D. Mass.) (the "*Wheeler Road Lawsuit*").  [Ex. 2].

**NOT DISPUTED**


**CENTENNIAL FACT NO. 11**

11.    The first notice to Centennial of the *Wheeler Road Lawsuit* was not provided until ***more than nine (9) years later*** in June 2000.  [Ex. 3].

**DISPUTED:** Invensys provided notice to Centennial as early as June 1999, and certainly no later than June 2000. On June 24, 1999, Invensys's counsel wrote to Centennial, requesting Centennial to search for evidence of coverage issued to Trans-Sonics. See Pl. Exh. 7.  Numerous conversations thereafter ensued between John Yandrasitz (an attorney at Centennial) and Invensys's attorneys. See Pl. Exh. 8 (on July 16, 1999, Centennial attorney acknowledges numerous conversations); Pl. Exh. 10 (on June 9, 2000, Invensys attorney references numerous conversations over preceding year concerning One Wheeler Road Associates case and coverage dispute with Liberty Mutual); Exh. 12 (on July 12, 2000, Centennial attorney responds to June 9, 2000 letter and does not dispute that numerous conversations took place over preceding year).  Thus, as of July 1999, Centennial had received both written and oral notification of the coverage dispute with Liberty Mutual and the underlying One Wheeler Road Associates matters.

12.     By that time, the *Wheeler Road Lawsuit* had proceeded through discovery and trial,
resulting in the entry of Findings of Fact, Rulings of Law and a Final Judgment in 1996, some ***four
years*** before notice of the claim to Centennial [Exs. 1, 2].

**NOT DISPUTED, except that Invensys reiterates (as set forth in the preceding response
to Fact No. 11, that notice was provided as early as June 1999.**

**CENTENNIAL FACT NO. 13**

13.     Trans-Sonics was found to be liable for having caused groundwater contamination at
the Site, but was not held responsible for soil contamination.  [Exs. 1, 2].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 14**

14.     The Final Judgment against Trans-Sonics was in the amount of $1,144,523.79 and
also included a declaration that Trans-Sonics would be responsible for certain ongoing remediation
at the Site.  [Exs. 1, 2].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 15**

15.     The Final Judgment was paid by Trans-Sonics in October 1996, again with absolutely
no notice to Centennial or suggestion that Centennial had any liability for the Final Judgment.  [Ex.
3].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 16**

16.    Trans-Sonics notified its primary insurer, Liberty Mutual Insurance Company ("Liberty Mutual") of the *Wheeler Road Lawsuit* and requested that Liberty Mutual provide a defense.  [Ex. 4].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 17**

17.    Liberty Mutual issued primary coverage to Trans-Sonics (including Foxboro) for at least the period from 1972 to 1982.  [Exs. 6, 7, 8].

> **DISPUTED.** As phrased, this asserted fact fails to distinguish between (1) primary policies that Liberty Mutual issued to Trans-Sonics, Inc. prior to its acquisition by The Foxboro Company (now known as Invensys) in December 1974 (which policies contained no pollution exclusion) and (2) primary policies issued to The Foxboro Company following the effective date of the acquisition of Trans-Sonics (all of which policies contained some form of limited or absolute pollution exclusion). See Invensys Fact Nos. 56-63; Pl. Exh. 3, 4, 31, 34 (Franciose Aff., ¶¶ 19-21, 29-35), 38, 39.

**CENTENNIAL FACT NO. 18**

18.    The collective limits of liability available to Trans-Sonics for this period were at least $4.8 million. [Exs. 6, 7, 8].

**DISPUTED.** The use of the term "available" is misleading. Liberty Mutual vigorously disputed that coverage was available under any policies issued to Invensys after 1974. <u>See</u> Pl. Exh. 6 (December 3, 1991 letter at 7).

19.      The Liberty Mutual policies required Liberty Mutual to defend suits that were potentially within the scope of coverage and to pay Trans-Sonics' defense costs ***in addition to*** the limits of liability. [Exs. 6, 7, 9].

**NOT DISPUTED**

**CENTENNIAL FACT NO. 20**

20.      The total amount claimed by Invensys is $2,061,250.52. [Ex. 8].

**DISPUTED:** In this action, Invensys seeks an award of unreimbursed indemnity costs incurred in the underlying Wheeler Road lawsuit; but Invensys does ***not*** seek unreimbursed defense costs incurred in the Wheeler Road lawsuit. The total amount of past indemnity costs sought by Invensys is $743,489.24. <u>See</u> Pl. Fact Nos. 41-44, 81-84. <u>See</u> <u>also</u> Pl. Exh. No. 25, 26, 34 (Franciose Aff., ¶¶ 13-16), 35.

In addition, Invensys seeks an award of pre-judgment interest at the Massachusetts pre-judgment rate of 12%, accruing from the date of tender of this claim to Centennial, costs (June 9, 2000, per Pl. Exh. 10) or, for costs incurred after the date of tender, the date when those costs became payable by Invensys. For purposes of calculating such interest, Invensys seeks the following:

<u>Interest to be calculated from June 9, 2000 (date of tender to Centennial)</u>
1.    Satisfaction of Judgment on 10/8/96 - $1,187,202.90 (Pl. Exh. 25 and 34, ¶ 13)
2.    Remediation costs through 2/99, paid pursuant to February 2000 agreement - $235,123.81 (Pl. Exh. 26, 34, ¶ 15)
3.    Remediation costs through 2/00, also paid pursuant to February 2000 agreement - $102,762.59 (<u>Id.</u>)

<u>Interest to be calculated from post-tender date on remedial items payable by Invensys</u>
1.    Payment for additional remedial items through March 15, 2000 - $41,822.88 (interest to run from April 14, 2000)
2.    Payment for additional remedial items through October 14, 2000 - $14,131.86 (interest to run from November 13, 2000)
3.    Payment for additional remedial items through May 31, 2001 - $20,952.02 (interest to run from June 30, 2001)
4.    Payment for additional remedial items through May 31, 2002 - $20,050.55 (interest to run from June 30, 2002)
5.    Payment for additional remedial items through February 28, 2003 - $25,515.72 (interest to run from March 30, 2003)
6.    Payment for additional remedial items through April 30, 2004 - $15,567.74 (interest to run from May 30, 2004)
7.    Payment for additional remedial items through August 31, 2005 - $19,578.79 (interest to run from September 30, 2005)
8.    Payment for additional remedial items through March 31, 2006 - $14,131.86 (interest to run from April 30, 2006)

<u>See</u> Exh. 34, Franciose Aff. at ¶ 15.  Finally, Invensys seeks an order requiring payment of future remedial costs payable under the February 2000 agreement between Invensys and One Wheeler Road Associates, as well as  an award of attorney's fees and costs incurred in this action and post-judgment interest at the legal rate.

## CENTENNIAL FACT NO. 21

21.    Trans-Sonics purchased separate pollution liability coverage from Liberty Mutual on a "claims made" basis commencing in 1982 and continuing until 1991.  [Ex. 7].

**UNDISPUTED**

22.     The coverage that Trans-Sonics bought for the specific purpose of insuring against liability for pollution had property damage limits of $1 million each year.  [Exs. 4, 7].

**NOT DISPUTED, FOR PURPOSES OF THIS ACTION**

23.     After initially contesting coverage, Liberty Mutual agreed to defend Trans-Sonics (or to reimburse its defense costs) relating to the *Wheeler Road Lawsuit* for some period of time.  [Exs. 4, 7, 9].

> **DISPUTED.** In December 1990, Liberty Mutual initially agreed to defend Invensys in the Wheeler Road Lawsuit, subject to a reservation of rights.  On December 3, 1991, Liberty Mutual denied coverage and withdrew its defense of Invensys in the Wheeler Road Lawsuit. <u>See</u> Pl. Exh. 6.

**CENTENNIAL FACT NO. 24**

24.     According to Trans-Sonics, Liberty Mutual subsequently terminated the defense and Trans-Sonics commenced a declaratory judgment action against Liberty Mutual to establish its duty to defend and indemnify Trans-Sonics for the *Wheeler Road Lawsuit*.  [Ex. 4, 7, 9].

**UNDISPUTED**

**CENTENNIAL FACT NO. 25**

25.     After obtaining favorable rulings on Liberty Mutual's defense obligations, Trans-Sonics entered into a settlement with Liberty Mutual under which Liberty Mutual agreed to pay Trans-Sonics the sum of $1,250,000, which was far less than Trans-Sonics' known damages. [Ex. 8].

**UNDISPUTED, except that Invensys objects to the argumentative term "far less."**

26.     While Trans-Sonics has refused to produce a copy of the settlement agreement with Liberty Mutual, the settlement agreement apparently allocated $300,000 of the settlement to defense costs and $950,000 to indemnity.  [Ex. 8].

> **UNDISPUTED, except that Invensys notes that it is Liberty Mutual, not Invensys, that has refused to permit the release of the Confidential Settlement Agreement between Invensys and Liberty Mutual.  See Pl. Exh. 16, 17 and 18.  However, Invensys has provided the essential terms of the Settlement Agreement to Centennial.  Finally, to the extent Centennial doubts the veracity of these representations, Centennial has foregone any opportunity to conduct discovery of Liberty Mutual to confirm the information provided by Invensys and its counsel.  See Pl. Exh. 10, 14, 21.**

## CENTENNIAL FACT NO. 27

27.     The agreement purported to extinguish Liberty Mutual's obligations under all policies in effect during the period from 1972 to 1982.  [Ex. 8].

> **DISPUTED. The Settlement Agreement between Liberty Mutual and Invensys only releases property damage claims arising at the Wheeler Road site.  To the extent policy limits remain under any Liberty Mutual policies, the Settlement Agreement does not purport to extinguish Liberty Mutual obligations not involving property damage arising from the Wheeler Road site.  Centennial fails to provide any evidence to the contrary.**

**CENTENNIAL FACT NO. 28**

28.    Centennial was not advised of the settlement with Liberty Mutual until after it was completed.

**UNDISPUTED.**

**CENTENNIAL FACT NO. 29**

29.    While the suit against Liberty Mutual was pending, Trans-Sonics entered into a settlement agreement with the plaintiffs in the *Wheeler Road Lawsuit* in February, 2000.  [Ex. 10].

**UNDISPUTED.**

**CENTENNIAL FACT NO. 30**

30.    The settlement agreement resolved how ongoing costs of remediation at the Trans-Sonics Site would be allocated.  [Ex. 10].

**DISPUTED IN PART.** The February 2000 settlement agreement incorporated Judge Stearns' findings of fact and rulings and law dated December 13, 1995, as well as his Final Judgment dated April 19, 1996, concerning how ongoing costs of remediation would be allocated. See Pl. Exh. 1, 2, 25, 34 (Franciose Aff. at ¶ 13).

**CENTENNIAL FACT NO. 31**

31.    No notice of this settlement agreement was provided to Centennial until several months after it had been executed.  [Ex. 3].

**UNDISPUTED**

**B.    Notice to Centennial**

32.    Trans-Sonics provided notice of the *Wheeler Road Lawsuit* to Centennial on or about June 9, 2000, when Trans-Sonics forwarded, for the first time, a copy of the Complaint and Final Judgment for the *Wheeler Road Lawsuit*.  [Ex. 3].

> **DISPUTED:** Invensys provided notice to Centennial as early as June 1999, and certainly no later than June 2000. On June 24, 1999, Invensys's counsel wrote to Centennial, requesting Centennial to search for evidence of coverage issued to Trans-Sonics. See Pl. Exh. 7.  Numerous conversations thereafter ensued between John Yandrasitz (an attorney at Centennial) and Invensys's attorneys. See Pl. Exh. 8 (on July 16, 1999, Centennial attorney acknowledges numerous conversations); Pl. Exh. 10 (on June 9, 2000, Invensys attorney references numerous conversations over preceding year concerning One Wheeler Road Associates case and coverage dispute with Liberty Mutual); Exh. 12 (on July 12, 2000, Centennial attorney responds to June 9, 2000 letter and does not dispute that numerous conversations took place over preceding year).  Thus, as of July 1999, Centennial had received both written and oral notification of the coverage dispute with Liberty Mutual and the underlying One Wheeler Road Associates matters.

**CENTENNIAL FACT NO. 33**

33.    This notice was some ***sixteen years*** after the contamination was discovered; ***fifteen years*** after a Notice of Responsibility was issued to Trans-Sonics; ***nine years*** after the *Wheeler Road Lawsuit* was commenced; ***four years*** after the Final Judgment was entered; nearly ***four years*** after

the Final Judgment was paid; and only after Trans-Sonics had entered into settlement agreements

with the plaintiffs in the *Wheeler Road Lawsuit* and the primary insurer, Liberty Mutual.

**DISPUTED:** Invensys provided notice to Centennial as early as June 1999, and certainly

no later than June 2000. On June 24, 1999, Invensys's counsel wrote to Centennial,

requesting Centennial to search for evidence of coverage issued to Trans-Sonics. See Pl.

Exh. 7.  Numerous conversations thereafter ensued between John Yandrasitz (an attorney

at Centennial) and Invensys's attorneys. See Pl. Exh. 8 (on July 16, 1999, Centennial

attorney acknowledges numerous conversations); Pl. Exh. 10 (on June 9, 2000, Invensys

attorney references numerous conversations over preceding year concerning One

Wheeler Road Associates case and coverage dispute with Liberty Mutual); Exh. 12 (on

July 12, 2000, Centennial attorney responds to June 9, 2000 letter and does not dispute

that numerous conversations took place over preceding year).  Thus, as of July 1999,

Centennial had received both written and oral notification of the coverage dispute with

Liberty Mutual and the underlying One Wheeler Road Associates matters.

**CENTENNIAL FACT NO. 34**

34.    Trans-Sonics demanded that Centennial agree to pay the difference between the

amount of the settlement with Liberty Mutual and its claimed past and future costs arising out of the

*Wheeler Road Lawsuit*. [Exs. 3, 8].

**UNDISPUTED**

**CENTENNIAL FACT NO. 35**

35.    Centennial issued a reservation of rights with respect to Trans-Sonics' claim on July 12, 2000.  [Ex. 11].

**UNDISPUTED**

**CENTENNIAL FACT NO. 36**

36.    After further investigating Trans-Sonics' claim, Centennial denied coverage on July 12, 2001 [Ex. 12].

**UNDISPUTED**

**CENTENNIAL FACT NO. 37**

37.    Trans-Sonics waited nearly another four years to commence this suit.

**UNDISPUTED**

**CENTENNIAL FACT NO. 38**

**C.    The Centennial Policy**

38.    Centennial issued a single excess liability policy to Trans-Sonics that was in effect during the period from January 1, 1972 to January 1, 1975.  [Ex. 5].

**UNDISPUTED, provided that Invensys notes that the policy provided both excess coverage and umbrella coverage.**

15

**CENTENNIAL FACT NO. 39**

39.     The Centennial excess policy states that it provides limits of liability in the amount of

$5 million per occurrence excess of the underlying Liberty Mutual policy, which had limits of

$100,000.[1]  [Ex. 5].

**UNDISPUTED.  (BOTH MAIN TEXT AND FOOTNOTE.)**

40.     The Centennial policy provides coverage for property damage resulting from an

"occurrence."  The term "occurrence" is defined as follows:

> The term "Occurrence" wherever used herein shall mean an accident,
> including continuous or repeated exposure to conditions, which
> results, in personal injury, property damage or advertising liability
> neither expected nor intended from the standpoint of the insured.

[Ex. 5].

**UNDISPUTED.**

**CENTENNIAL FACT NO. 41**

41.     The definition of "property damage" specifies that the property damage must "occur

during the policy period."  [Ex. 5].

**DISPUTED.**   The policy does not define "property damage" *per se*.  Rather, it defines

"Property Damage Liability," stating in relevant part that such liability includes "liability for

damages because of 1. physical injury to or destruction of tangible property which occurs

during the policy period...." <u>See</u> Pl. Exh. 4 at 3.

---

1 As originally written, the underlying limits were $50,000 and the limits of the excess policy
were $2 million.  These limits (including a revised limit of the Liberty Mutual policy) were

42.    The insuring agreement of the Centennial policy states that it only provides coverage for "ultimate net loss," which is defined in the policy as:

> **(10) Ultimate Net Loss** – The term "Ultimate Net Loss" shall mean the sum actually paid or payable in cash in settlement or satisfaction of losses for which the insured is liable either by adjudication or compromise with the written consent of the company, after taking proper deduction for all recoveries and salvages collectible, ***but excludes*** all loss expenses and legal expenses (including attorneys' fees, court costs and interest on any judgment or award) and all salaries of employees and office expenses of the insured, the company or any underlying insurer so incurred. ***This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance***.

[Ex. 5 (emphases added)].

> **UNDISPUTED,** except that Invensys notes that the word the insuring agreement does not use the word "only."   Thus, the policy may have other aspects of coverage other than responsibility to pay "ultimate net loss" (for example, the obligation, in the event of exhaustion of underlying insurance while a claim is on-going, Centennial may be obligated "to assume charge of the settlement or defense of any claim or proceeding resulting from the same proceeding ...."). See Pl. Exh. 4 at 4 (Condition K).

**CENTENNIAL FACT NO. 43**

43.    The Centennial policy also provides certain coverage for defense costs, but only in the limited circumstances where no such coverage is provided by the underlying policy and there is no coverage for defense costs owed by a primary insurer:

> **Defense-Settlement**. With respect to any occurrence not covered by the underlying policy(is) listed in Schedule A hereof or any other

reflected in an endorsement.  [Ex. 5]

underlying insurance collectible by the insured, but covered by the terms and conditions of this insurance except for the amount of retained limit specified in Item (b) of Insuring Agreement IV, the company shall:

(a) defend any suit brought against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient; . . .

***This insurance shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance***.

[Ex. 5 (emphasis added)].

**UNDISPUTED IN PART.** Invensys notes that should further claims or suits arise from the same occurrences at the Wheeler Road Site, then Centennial would have an obligation to assume charge of the defense, by reason of Condition K, which provides that "[i]f underlying insurance is exhausted by any occurrence, [Centennial] shall be obligated "to assume charge of the settlement or defense of any claim or proceeding resulting from the same proceeding …." See Pl. Exh. 4 at 4 (Condition K).

## CENTENNIAL FACT NO. 44

44.    The Centennial policy further provides that it operates as excess insurance to all other "collectible" insurance:

J. Other Insurance. ***If other collectible insurance with any other insurer is available to the insured***, covering a loss also covered hereunder (except insurance purchased to apply in excess of the sum of the retained limit and the limit of liability hereunder), the insurance hereunder shall be in excess of, and not contribute with, such other insurance. . . .

[Ex. 5 (emphasis added)].

**UNDISPUTED, although not material.**

18

**CENTENNIAL FACT NO. 45**

45.    Further, the policy requires immediate notice of a claim or suit and prohibits Trans-

Sonics from entering into settlement agreements or making other voluntary payments without

Centennial's knowledge or consent:

> **Insured's Duties in the Event of Occurrence, Claim or Suit.**
>
> (a)    In the event of an occurrence, which appears reasonably likely to involve such insurance as is afforded by this policy, written notice containing particulars sufficient to identify the insured and also reasonably attainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.
>
> *(b)    If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons or other process received by him or his representative.*
>
> (c)    The insured shall cooperate with the company and, upon the company's request, assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the insured because of personal injury or property damage or advertising offense with respect to which insurance is afforded under this policy; and the insured shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses. *The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense. . .;*

[Ex. 5 (emphasis added)].

**DISPUTED IN PART, UNDISPUTED IN PART.**  Invensys agrees that

that the policy contains the quoted language.  Invensys disputes the

paraphrase that is supplied in the introductory sentence of Fact No. 45 as

stating these conditions in absolute terms, when the legal effect provided

under Massachusetts law is that neither condition is enforceable unless the insurer proves actual and substantial prejudice.

Further, Centennial omits material language from Subparagraph (c) of Condition E of the policy. Specifically, Centennial omits language stating that an insured may settle a case when "the amount of ultimate net loss becomes certain … through trial court judgment."

**CENTENNIAL FACT NO. 46**

**D.    The Liberty Mutual Policies**

46.    The Liberty Mutual policies that serve as the immediate underlying insurance to the Centennial policy have never been located.  [Exs. 7-9].

**UNDISPUTED.**

**CENTENNIAL FACT NO. 47**

47.    Trans-Sonics has represented that Liberty Mutual did not contest in the declaratory judgment action filed by Trans-Sonics that the policies were issued; were standard CGL policies with a duty to defend; and that defense costs were to be paid in addition to limits.  [Exs. 7-9].

**UNDISPUTED.**

**CENTENNIAL FACT NO. 48**

48.    Moreover, Liberty Mutual apparently conceded that it could offer no proof that any of the underlying policies contained a pollution exclusion or that the limits of liability were other than the $100,000 per occurrence referred to in the Centennial policy.  [Exs. 7-9].

**UNDISPUTED**


**CENTENNIAL FACT NO. 49**

49.    In addition to these policies, it is not disputed that Liberty Mutual issued a policy to Foxboro that was in effect when Foxboro purchased the assets of Trans-Sonics in 1974.  [Exs. 7-9].

**UNDISPUTED, except that Centennial omits the material fact that the 1974 policy that had been issued to The Foxboro Company (as distinct from the separate policy issued to Trans-Sonics) contained a limited pollution exclusion. See Pl. Exh. 38, Exclusion f.**


**CENTENNIAL FACT NO. 50**

50.    This policy provided limits of liability of $500,000 per occurrence.  [Exs. 7-9].

**UNDISPUTED.**


**CENTENNIAL FACT NO. 51**

51.    Foxboro continued to operate the Trans-Sonics Site through at least 1978 and had policies in effect with Liberty Mutual with annual limits of $500,000 per occurrence.  [Exs. 7-9].

**UNDISPUTED, except that Centennial omits the material fact that the 1974 - 1978 Liberty Mutual policies that had been issued to The Foxboro Company contained limited pollution exclusions. See Pl. Exh. 38, Excl. f; Pl. Exh. 34, Franciose Aff. ¶20.**

21

**CENTENNIAL FACT NO. 52**

52.    Similar policies were purchased by Foxboro from Liberty Mutual for each of the years though 1982.  [Exs. 7-9].

> **UNDISPUTED, except that Centennial omits the material fact that the Liberty Mutual policies that had been issued to The Foxboro Company for the period through June 29, 1982 all contained limited pollution exclusions.** <u>See</u> **Pl. Exh. 38, Excl. f; Pl. Exh. 34, Franciose Aff. ¶20.**

**CENTENNIAL FACT NO. 53**

53.    Accordingly, the total primary limits available to Trans-Sonics from Liberty Mutual were at least $4.8 million in addition to Liberty Mutual's obligation to pay defense costs.2  [Ex. 7].

> **DISPUTED.**  Because of the existence of pollution exclusions in the Liberty Mutual policies issued to Invensys between late 1974 and June 1982, Liberty Mutual disputed that these limits of liability were "available" to Invensys. <u>See</u> Pl. Exh. 6 (December 3, 1991 letter at 7).

**CENTENNIAL FACT NO. 54**

54.    Foxboro purchased separate pollution liability policies from Liberty Mutual commencing in 1982 and continuing through 1991.  [Ex. 7].

> **UNDISPUTED.**

---

2 Foxboro also apparently purchased umbrella excess policies from Liberty Mutual during this period which had annual limits of $10 million.  (**UNDISPUTED.**)

55.     The Liberty Mutual pollution liability policies had a limit of liability for property damage in the amount of $1 million.  [Ex. 7].

**UNDISPUTED FOR PURPOSES OF THIS LAWSUIT,** except to note the additional fact that policies were claims-made policies that contained a retroactive date prohibiting claims involving releases occurring, or property disposed of by the insured, prior to June 29, 1982. See Pl. Exh. 6, December 3, 1991 letter at 5, 7.

Respectfully submitted,
PLAINTIFF INVENSYS SYSTEMS, INC.,
By its attorneys,

_____/s Robert J. Gilbert/_____
Robert J. Gilbert, Esq. (BBO # 565466)
GILBERT & RENTON LLC
344 North Main Street
Andover MA 01810
Tel (978) 475-7580
Dated: November 1, 2006                    Fax (978) 475-1881

## CERTIFICATE OF SERVICE

I, Robert J. Gilbert, hereby certify that on November 1, 2006, a true and correct copy of the foregoing document was served electronically upon John T. Harding, Esq., counsel of record for Defendant Centennial Insurance Company.

_____/s Robert J. Gilbert/_____
Robert J. Gilbert